Timothy P. Fox (CA Bar 157750)
*tfox@creeclaw.org*
Elizabeth Jordan*
*ejordan@creeclaw.org*
CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER
1245 E. Colfax Avenue, Suite 400
Denver, CO 80218
Tel:  (303) 757-7901
Fax: (303) 872-9072

Lisa Graybill*
*lisa.graybill@splcenter.org*
Jared Davidson*
*jared.davidson@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
201 St. Charles Avenue, Suite 2000
New Orleans, Louisiana 70170
Tel:  (504) 486-8982
Fax: (504) 486-8947

Stuart Seaborn (CA Bar 198590)
*sseaborn@dralegal.org*
Melissa Riess (CA Bar 295959)
*mriess@dralegal.org*
DISABILITY RIGHTS ADVOCATES
2001 Center Street, 4th Floor
Berkeley, California 94704
Tel:  (510) 665-8644
Fax: (510) 665-8511

Attorneys for Plaintiffs (continued on next page)

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### EASTERN DIVISION – RIVERSIDE

| | |
|---|---|
| FAOUR ABDALLAH FRAIHAT, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*,<br><br>Defendants. | Case No.: 19-cv-01546-JGB(SHKx)<br><br>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: March 24, 2020 |

William F. Alderman (CA Bar 47381)
*walderman@orrick.com*
Jake Routhier (CA Bar 324452)
*jrouthier@orrick.com*
ORRICK, HERRINGTON &
SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
Tel: (415) 773-5700
Fax: (415) 773-5759

Michael W. Johnson**
*mjohnson1@willkie.com*
Dania Bardavid**
*dbardavid@willkie.com*
Jessica Blanton**
*jblanton@willkie.com*
Joseph Bretschneider**
*jbretschneider@willkie.com*
WILLKIE FARR &
GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Tel: (212) 728-8000
Fax: (212) 728-8111

Maia Fleischman*
*maia.fleischman@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
2 South Biscayne Boulevard
Suite 3750
Miami, FL 33131
Tel: (786) 347-2056
Fax: (786) 237-2949

Christina Brandt-Young*
*cbrandt-young@dralegal.org*
DISABILITY RIGHTS
ADVOCATES
655 Third Avenue, 14th Floor
New York, NY 10017
Tel: (212) 644-8644
Fax: (212) 644-8636

Mark Mermelstein (CA Bar 208005)
*mmermelstein@orrick.com*
ORRICK, HERRINGTON &
SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA 90017
Tel: (213) 629-2020
Fax: (213) 612-2499

Leigh Coutoumanos**
*lcoutoumanos@willkie.com*
WILLKIE FARR &
GALLAGHER LLP
1875 K Street NW, Suite 100
Washington, DC 20006
Tel: (202) 303-1000
Fax: (202) 303-2000

Shalini Goel Agarwal
(CA Bar 254540)
*shalini.agarwal@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
106 East College Avenue
Suite 1010
Tallahassee, FL 32301
Tel: (850) 521-3024
Fax: (850) 521-3001

Maria del Pilar Gonzalez Morales
(CA Bar 308550)
*pgonzalez@creeclaw.org*
CIVIL RIGHTS EDUCATION
AND ENFORCEMENT CENTER
1825 N. Vermont Avenue, #27916
Los Angeles, CA 90027
Tel: (805) 813-8896
Fax: (303) 872-9072

Attorneys for Plaintiffs (continued from previous page)
*Admitted Pro Hac Vice
**Pro Hac Vice Application Forthcoming

## **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES**.............................................................. iii

I.      INTRODUCTION ................................................................. 1

II.     FACTS ................................................................................. 4

        A.      COVID-19 Poses an Extraordinary Risk to People in Detention Centers With Risk Factors. .................................. 4

        B.      COVID-19 Has Already Begun Infecting People in Detention Centers. ................................................................. 5

        C.      People With Risk Factors Are at Significantly Increased Risk of Significant Harm, Complications or Death If They Are Infected. .......................................................... 6

        D.      ICE's Responses to COVID-19 and Its Inadequate Healthcare System Will Not Protect People With Risk Factors. .................................................................................. 7

III.    ARGUMENT........................................................................ 8

        A.      Plaintiffs are likely to succeed on their two Fifth Amendment claims. ............................................................ 9

                1.      ICE's COVID-19 Policies and Practices Demonstrate Objective Deliberate Indifference to People with Risk Factors. ........................................ 9

                2.      Defendants' COVID-19 Response Subjects Plaintiffs and Similarly Situated People with Risk Factors to Punitive Conditions in Violation of the Fifth Amendment. ..............................................15

        B.      Plaintiffs Are Likely to Prevail on Their Section 504 Claims............................................................................17

                1.      Defendants' Failure to Protect Persons with Chronic Health Conditions from COVID-19 Denies them Meaningful Access to Defendants' Programs and Activities .............................................17

        C.      Plaintiffs Satisfy the Remaining Preliminary Injunction Factors ...........................................................22

                1.      The Subclass Will Suffer Irreparable Harm Absent Immediate Relief. .............................................22

                2.      The Balance of Hardships Tips Decidedly in Plaintiffs' Favor .......................................................24

3.    A Preliminary Injunction is in the Public Interest.................24

IV.   CONCLUSION ...........................................................................25

# TABLE OF AUTHORITIES

*A.H.R. v. Wash. State Health Care Auth.,*
   No. C15-5701JLR, 2016 WL 98513 (W.D. Wash. Jan. 7, 2016)......................23

*Anderson v. United States*
   612 F.2d 1112 (9th Cir. 1979).........................................................................8

*Armstrong v. Brown,*
   732 F.3d 955 (9th Cir. 2013)........................................................................18

*Arroyo v. U.S. Dep't of Homeland Sec.,*
   Case No. SACV 19-815 JGB, 2019 WL 2912848 (C.D. Cal. June 20, 2019).....8

*Black v. Wiggington,*
   1:12–CV–03365, 2015 WL 468618 (N.D. Ga. Feb, 4, 2015) ..........................21

*Brantley v. Maxwell-Jolly,*
   656 F. Supp. 2d 1161 (N.D. Cal. 2009)..........................................................23

*Brown v. Plata,*
   563 U.S. 493 (2011)..........................................................................9, 12, 14

*D.R. v. Antelope Valley Union High Sch. Dist.,*
   746 F. Supp. 2d 1132 (C.D. Cal. 2010)..........................................................23

*Dawson v. Asher,*
   No. C20-0409-JLR-MAT, 2020 WL 1304557 (W.D. Wash. Mar. 19, 2020) ...15

*Enyart v. Nat'l Conference of Bar Examiners, Inc.,*
   630 F.3d 1153 (9th Cir. 2011)......................................................................25

*Gordon v. County of Orange,*
   888 F.3d 1118 (9th Cir. 2018)........................................................................9

*Harris v. Bd. of Supervisors, L.A. Cnty.,*
   366 F.3d 754 (9th Cir. 2004).........................................................................24

*Helling v. McKinney,*
   509 U.S. 25 (1993).................................................................................13, 15

*Hernandez v. County of Monterey,*
   110 F. Supp. 3d 929 (N.D. Cal. 2015).......................................................19, 23

*Hernandez v. County of Monterey,*
   305 F.R.D. 132 (N.D. Cal. 2015) ........................................................9

*Hernandez v. Sessions,*
   872 F.3d 976 (9th Cir. 2017) ...........................................................8

*Hutto v. Finney,*
   437 U.S. 678 (1978) ........................................................................14

*J.P. v. Sessions,*
   Case No. LA CV18-06081 JAK (SKx), 2019 WL 6723686 (C.D. Cal.
   Nov. 5, 2019) ..................................................................................8

*Jones v. Blanas,*
   393 F.3d 918 (9th Cir. 2004) .............................................9, 15, 16

*Jones v. Texas Dep't of Criminal Justice,*
   880 F.3d 756 (5th Cir. 2018) ..........................................................23

*King v. County of Los Angeles,*
   885 F.3d 548 (9th Cir. 2018) ..........................................................15

*M.R. v. Dreyfus,*
   663 F.3d 1100 (9th Cir. 2011), *amended on other grounds by and*
   *reh'd denied*, 697 F.3d 706 (9th Cir. 2012) ..................................23

*McClendon v. City of Albuquerque,*
   Case No. 95 CV 24 JAP/KBM, 2016 WL 9818311, at *14 (D.N.M.
   Nov. 9, 2016) ..................................................................................21

*Melendres v. Arpaio,*
   695 F.3d 990 (9th Cir. 2012) ..........................................................22

*Olmstead v. L.C. ex rel Zimring,*
   527 U.S. 581 (1999) ...............................................................20, 21

*Parsons v. Ryan,*
   754 F.3d 657 (9th Cir. 2014) ..........................................................13

*Pierce v. District of Columbia,*
   128 F. Supp. 3d 250 (D.D.C. 2015) ...............................................18

*Reaves v. Dep't of Corrs.,*
   195 F. Supp. 3d 383 (D. Mass. 2016) ............................................21

*Saravia v. Sessions,*
    280 F. Supp. 3d 1168 (N.D. Cal. 2017) ............................................................8

*Torres v. U.S. Dep't of Homeland Sec.,*
    411 F. Supp. 3d 1036 (C.D. Cal. 2019) ..........................................................17

*Updike v. Multnomah County,*
    870 F.3d 939 (9th Cir. 2017) ...........................................................................18

*Winter v. Natural Resources Def. Council, Inc.,*
    555 U.S. 7 (2008) .............................................................................................24

*Winters v. Ark. Dept. of Health & Human Servs.,*
    491 F.3d 933 (8th Cir. 2007) ...........................................................................21

*Xochihua-Jaimes v. William P. Barr,*
    Case No. 18-71460 (9th Cir. March 23, 2020) ...........................................2, 15

**Statutes**

29 U.S.C. § 705(20)(B) .........................................................................................18

29 U.S.C. § 794 (a) ...............................................................................................17

42 U.S.C. § 12102 .................................................................................................18

**Other Authorities**

6 C.F.R. § 15.30(d) ...............................................................................................20

28 C.F.R. § 35.130(d) .....................................................................................20, 21

# I.   INTRODUCTION

The COVID-19 pandemic is a public health crisis unprecedented in modern history that has resulted in the infection of hundreds of thousands of people and the deaths of tens of thousands in just a few months. Without immediate and drastic public health measures, it could result in the death of as many as 2.2 million people in the United States alone.

Tens of thousands of people are currently subject to civil immigration detention in the United States. Immigration and Customs Enforcement ("ICE") imprisons them in close quarters in facilities with long track records of egregiously inadequate healthcare documented by the Department of Homeland Security's ("DHS") own Office of Inspector General ("OIG") and multiple other organizations, which ICE has failed to remediate. ICE knows of the acute and imminent threat COVID-19 poses to detained populations; two infectious disease experts retained by DHS itself recently advised that COVID-19 poses an "imminent risk to the health and safety of immigrant detainees, as well as to the public at large, that is a direct consequence of detaining populations in congregate settings."[1] Detained people with certain risk factors—including people who are older, pregnant, or who have underlying medical conditions (enumerated below and hereinafter referred to as "Risk Factors")—are at a heightened risk of serious illness, life-altering complications, and death from COVID-19.

Yet, ICE's response to the COVID-19 is alarmingly inadequate—particularly now that there is now at least one documented positive case of a person in ICE detention. Although ICE has issued some skeletal "guidance" on COVID-19, that guidance is dangerously deficient in numerous respects from any reasonable medical and public health perspective. For example, as detailed below,

---

[1] Letter from Dr. Scott Allen and Dr. Josiah Rich to Congressman Bennie Thompson et al. (Mar. 19, 2020) (the "Allen/Rich letter") (attached as Exhibit E to Seaborn Decl.).

ICE's policies and practices do not contemplate identifying persons with Risk Factors, much less taking the significant steps necessary to reduce the risk of contagion, illness, complications, and death in its already broken medical care system. ICE's approach is contrary to the recommendations of its own experts and is inconsistent with appropriate standards of care during this pandemic. In fact in recognition of "the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers," the Ninth Circuit recently issued a published order requiring the release of a detained immigrant. *See Xochihua-Jaimes v. William P. Barr*, Case No. 18-71460 (9th Cir. March 23, 2020) (attached as Exhibit G to Declaration of Stuart Seaborn in Support of Plaintiffs' Motion for Class Certification and Emergency Motion for Preliminary Injunction ("Seaborn Decl.")).

As detailed below, Plaintiffs are highly likely to succeed on the merits of their claims that ICE's inadequate response to COVID-19 (1) violates the Due Process Clause by constituting objectively deliberate indifference to a substantial risk of harm and imposing punitive conditions, and (2) violates Section 504 of the Rehabilitation Act by failing to affirmatively identify and accommodate the needs of disabled people with Risk Factors and by subjecting them to unnecessarily restrictive placements. Moreover, Plaintiffs can show that, absent such emergency relief, the substantial—and lethal—risk of COVID-19 infection constitutes an irreparable harm as Plaintiffs' and other peoples' very lives hang in the balance. Given that ICE has access to multiple alternatives to detention and no legal interest in punishing people with Risk Factors by subjecting them to a risk of COVID-19 infection, the balance of equities tip sharply in favor of Plaintiffs. Finally, minimizing COVID-19 transmission in a carceral setting is inarguably in the public interest, as the risk of infection also includes staff and community members.

Accordingly, ICE must take immediate and significant measures to protect people with Risk Factors, or, if those measures cannot be immediately implemented, release those people absent a showing of dangerousness. DHS's own experts have urged ICE to release people with Risk Factors,[2] as have 3000 medical professionals.[3] This is in accord with a growing number of jails across the country that are releasing medically vulnerable people.

On behalf of two subclasses of people with Risk Factors in ICE custody, Plaintiffs seek a preliminary injunction requiring ICE to immediately (i) identify all people in ICE custody with one or more Risk Factors; (ii) conduct a comprehensive, evidence-based assessment of medically necessary precautions that should be implemented to ensure the health and safety of such persons during the COVID-19 pandemic, including assurance that all such persons have timely access to competent, sufficient, and appropriately qualified staffing, medical care, screening, social distancing measures, sanitation methods, education, equipment, hospitals, and all other medically necessary protective measures; (iii) promptly (within 48 hours) effectuate the release of individuals with one or more Risk Factors if such medically necessary safeguards cannot be immediately (within 24 hours) provided to ensure health and safety, and absent an individualized finding of dangerousness to community; and (iv) modify its existing COVID-19 protocols to remediate all Protocol Deficiencies.[4] Plaintiffs also seek the immediate appointment of a Special Master to oversee this process.

_____

[2] Allen/Rich letter.

[3] Letter from Dr. Nathaniel Kratz et al., to Matthew T. Albence, Acting Dir., U.S. Immigr. and Customs Enf't (Mar. 2020) ("Medical Professionals Letter") (attached as exhibit []).

[4] The Protocol Deficiencies are identified in paragraph 14 of the Declaration of Homer Venters in Support of Motion for Preliminary Injunction and Class

## II.   FACTS

### A.   COVID-19 Poses an Extraordinary Risk to People in Detention Centers With Risk Factors.

COVID-19, a disease caused by the novel coronavirus, has reached pandemic status. Almost 400,000 people worldwide have been diagnosed with COVID-19, and over 18,000 people have died as a result.[5] In the United States, over 46,000 people have been diagnosed with COVID-19, of whom almost 600 have died.[6] The transmission of COVID-19 is expected to grow exponentially. Decl. of Carlos Franco-Paredes in Supp. of Mot. for Prelim. Inj. and Class Certification ("Franco-Paredes Decl.") ¶ 1.

People are able to transmit the disease even before they exhibit any symptoms, and for weeks after those symptoms have resolved. Decl. of Jaimie Meyer is Supp. of Mot. for Prelim. Inj. and Class Certification ("Meyer Decl.") ¶ 20. In China, the average infected person passed the virus on to 2-3 other people, and transmission occurred at a distance of 3-6 feet. *Id.*

Because humans have never been exposed to this virus, they have not developed any immunities or protective responses, and thus everyone is at risk of infection. *Id.* Further, there is no vaccine currently available, and there is unlikely to be a vaccine for at least a year. *Id.* The only prevention strategies are social distancing, and containment practices such as intensive handwashing, decontamination, and aggressive cleaning of surfaces. *Id.* ¶ 23.

---

Certification. Those deficiencies may change as the ICE Protocols are modified.

[5] Ciara Linnane, *Coronavirus update: 407,405 cases, 18,227 deaths, Italy shows glimmer of hope and NYC remains U.S. epicenter*, MARKETWATCH (Mar. 24, 2020), https://www.marketwatch.com/story/coronavirus-update-392870-cases-globally-17159-deaths-italy-shows-glimmer-of-hope-and-nyc-remains-us-epicenter-2020-03-24.

[6] *Coronavirus COVID-19 Global Cases by the Ctr. for Sys. Sci. and Eng'g (CSSE) at John Hopkins Univ.*, JOHN HOPKINS UNIV. & MED. (Mar. 24, 2020), https://coronavirus.jhu.edu/map.html

---

### B.     COVID-19 Has Already Begun Infecting People in Detention Centers.

There is now at least one person in ICE detention who has tested positive for COVID-19.[7] This comes as no surprise: ICE employees have already tested positive,[8] and it is clear that guards and other detention facility staff will continue to spread the virus throughout ICE's detention system. Allen/Rich letter at 3; Venters Decl. ¶ 8. According to an expert in infectious diseases in congregate settings, "ICE will not be able to stop the entry of COVID-19 into ICE facilities, and the reality is that the infection is likely inside multiple facilities already." Decl. of Homer Venters in Supp. of Mot. for Prelim. Inj. and Class Certification ("Venters Decl.") ¶ 7. DHS's own infectious disease experts share this view. On March 19, 2020, Dr. Scott Allen and Dr. Josiah Rich—both medical experts for DHS's Office of Civil Rights and Civil Liberties who are experts in the field of detention health, infectious disease, and public health—wrote a letter (attached as Exhibit E to the Seaborn Decl.) to members of Congress. In that letter, these experts warned of the "imminent risk to the health and safety of immigrant detainees" posed by COVID-19. Allen/Rich letter at 3.

Once COVID-19 is in a facility, "ICE will be unable to stop the spread of the virus throughout the facility." Venters Decl. ¶ 8; *see generally* Meyer Decl. ¶¶ 7-19. There are numerous reasons for this, including: social distancing, essential to slowing the spread of COVID-19, is an "oxymoron in congregant settings" (Allen/Rich letter at 4); the virus will spread as people are transferred among

---

[7] Hamed Aleaziz, *An Ice Detainee Has Become the First to Test Positive for the Coronavirus*, BUZZFEED NEWS (Mar. 24, 2020, 3:36 P.M. EST), https://www.buzzfeednews.com/article/hamedaleaziz/immigrant-ice-detention-facility-coronavirus-test; Ken Klippenstein, *Exlcusive: ICE Detainees Are Being Quarantined* (Mar. 24, 2020, 2:48 P.M. EST), https://www.thenation.com/article/society/corona-covid-immigration-detention/.

[8] Emily Kassie, *First ICE Emp. Tests Positive for Coronavirus*, THE MARSHALL PROJECT (Mar. 19, 8:15 PM), https://www.themarshallproject.org/2020/03/19/first-ice-employee-tests-positive-for-coronavirus

---

detention centers, people move within detention centers, and staff bring the virus in from the community (Allen/Rich letter at 3; Venters Decl. ¶ 8); and many detention centers are in remote areas with limited access to hospitals and qualified staff (Allen/Rich letter at 4).

### C.   People With Risk Factors Are at Significantly Increased Risk of Significant Harm, Complications or Death If They Are Infected.

Certain characteristics put people at higher risk of death or serious illness from COVID-19. These characteristics ("Risk Factors") include: people who are age 55 or older; people who are pregnant; and people who have underlying chronic conditions.[9] Each of the named Plaintiffs have such Risk Factors making them highly vulnerable, such as being 55 or older and having conditions such as diabetes, asthma, and hypertension.[10] Preliminary data show that 15 percent of people in high-risk categories who have contracted COVID-19 have died. Franco-Paredes Decl. at 4. In addition, people with Risk Factors are at significantly increased risk of serious harm from COVID-19. For example, people with Risk Factors can suffer severely damaged lung tissue requiring extensive periods of rehabilitation and, in some cases, permanent loss of respiratory capacity, heart

---

[9] These include:  cardiovascular disease (congestive heart failure, history of myocardial infarction, history of cardiac surgery); high blood pressure; chronic respiratory disease (asthma, chronic obstructive pulmonary disease including chronic bronchitis or emphysema, or other pulmonary diseases); diabetes; cancer; liver disease; kidney disease; autoimmune diseases (psoriasis, rheumatoid arthritis, systemic lupus erythematosus); severe psychiatric illness; history of transplantation or HIV/AIDS.

[10] Venters Decl. ¶ 21; Decl. of Alex Hernandez in Supp. of Mot. for Prelim. Inj. and Class Certification ("Hernandez Decl.") ¶ 2; Decl. of Faour Fraihat in Supp. of Mot. for Prelim. Inj. and Class Certification ("Fraihat Decl.") ¶ 3-5; Decl. of Jimmy Sudney in Supp. of Mot. for Prelim. Inj. and Class Certification ("Sudney Decl.") ¶ 3-7; Decl. of Martin Munoz in Supp. of Mot. for Prelim. Inj. and Class Certification (Munoz Decl.) ¶ 2; Declaration of Aristoteles Sanchez Martinez in Supp. of Mot. for Prelim. Inj. and Class Certification ("Sanchez Martinez Decl.") ¶ 2-4.

damage, or damage to other organs. Franco-Paredes Decl. at 4-5. Most people with Risk Factors who develop even mild symptoms require close monitoring, and if they develop moderate or severe symptoms, they require advanced support. Meyer Decl. ¶ 22. This level of supportive care requires highly specialized equipment in limited supply, and a team of care providers, including 1:1 or 1:2 nurse-to-patient ratios, respiratory therapists, and intensive care physicians. This level of support can quickly exceed local health care resources. Franco-Paredes Decl. at ¶¶ 6-7.

### D.    ICE's Responses to COVID-19 and Its Inadequate Healthcare System Will Not Protect People With Risk Factors.

ICE issued an "Interim Reference Sheet on 2019-Novel Coronavirus (COVID-19)" and has established a webpage entitled "ICE Guidance on COVID-19," which are attached as Exhibit H and I to the Seaborn Decl. These documents (collectively the "ICE Protocols") will not protect people with Risk Factors. As detailed in Dr. Venters's declaration, the ICE Protocols do not: identify the Risk Factors; include any procedures during intake or otherwise to identify people with those Risk Factors; or describe any steps to provide increased protections for people with Risk Factors. Venters Decl. ¶¶ 14, 20-21. The protocols also do not address: imminent shortages of medical supplies and staffing or education of detained people and staff about the virus, amongst other critical issues as outlined in Dr. Venters' report.[11]

Further, as detailed in the attached declarations, there is substantial evidence that ICE's COVID-19 protocols are not being followed in detention centers throughout the country, and that ICE is otherwise failing to provide an adequate response, which exacerbates the risk of harm to the subclass.[12]

---

[11] *See generally* Venters Decl.

[12] *See generally* Decl. of Andrea Saenz ("Saenz Decl."); Decl. of Laura G. Rivera in Supp. of Mot. for Prelim. Inj. and Class Certification ("Rivera Decl."); Decl. of Anne Rios in Supp. of Motion for Prelim. Inj. and Class Certification ("Rios Decl."); Decl. of Elissa Steglich in Supp. of Mot. for Prelim. Inj. and Class

Finally, the COVID-19 pandemic will place an enormous burden on an already broken system and therefore make it functionally impossible to provide adequate care. As detailed below, ICE's healthcare system already failed to provide adequate care prior to the pandemic. COVID-19 will make these conditions much worse—and virtually impossible to respond consistent with governing standards of care.

## III.  ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Arroyo v. U.S. Dep't of Homeland Sec.*, Case No. SACV 19-815 JGB (SHKx), 2019 WL 2912848, at *6 (C.D. Cal. June 20, 2019) (citation omitted). Plaintiffs meet each of these requirements.[13]

---

Certification ("Steglich Decl."); Decl. of Keren Swick in Supp. of Mot. for Prelim. Inj. and Class Certification ("Zwick Decl."); Decl. of Linda Corchado in Supp. of Mot. for Prelim. Inj. and Class Certification ("Corchado Decl.");Hernandez Decl.; Fraihat Decl.; Sudney Decl.; Munoz Decl.; Decl. of Mikhail Solomonov in Supp. of Mot. for Prelim. Inj. and Class Certification ("Solomonov Decl."); Decl. of Francis L. Conlin in Supp. of Mot. for Prelim. Inj. and Class Certification ("Conlin Decl.").

[13] Mandatory injunctions are appropriate when extreme or very serious damage will result if the mandatory injunction is not granted. *Anderson v. United States* 612 F.2d 1112 (9th Cir. 1979); *see also J.P. v. Sessions*, Case No. LA CV18-06081 JAK (SKx), 2019 WL 6723686 (C.D. Cal. Nov. 5, 2019) (holding that severe trauma due to family separation constitutes extreme or very serious damage justifying a mandatory injunction); *Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017) (holding that unlawful detention constitutes extreme or very serious damage); *Saravia v. Sessions*, 280 F. Supp. 3d 1168 (N.D. Cal. 2017) (holding that detention of minors without due process results in extreme or very serious damage).

---

**A.**   **Plaintiffs are likely to succeed on their two Fifth Amendment claims.**

1.   ICE's COVID-19 Policies and Practices Demonstrate Objective Deliberate Indifference to People with Risk Factors.

People in immigration detention establish a due process violation warranting injunctive relief by showing that Defendants' policies and practices concerning medical care—in their totality—constitute objective deliberate indifference to a substantial risk of suffering serious harm. *Gordon v. County of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018).[14] In systemic cases, such as here, deliberate indifference is shown by, *inter alia*, evidence of "systematic or gross deficiencies in staffing, facilities, equipment, or procedures." *Hernandez v. County of Monterey*, 305 F.R.D. 132, 152-53, 155 n. 138 (N.D. Cal. 2015). Importantly, the key question in systemic cases focuses not on individual circumstances but rather on whether systemic deficiencies "taken as whole" subject people to a "substantial risk of serious harm." *See Brown v. Plata*, 563 U.S. 493, 505 n.3 (2011).

Here, the evidence establishes not only that COVID-19 poses a substantial risk of serious harm to the subclass but also that Defendants' response to that imminent risk—viewed in its totality and in relation to Defendants' already inadequate healthcare system—constitutes objective deliberate indifference.

First, there is no serious dispute that people with Risk Factors in detention face a substantial risk of serious harm from the COVID-19 pandemic. Numerous experts—including medical experts retained by DHS—have concluded that COVID-19 poses a substantial risk of harm to all people in detention given the

---

[14] The plaintiff in *Gordon* was in pretrial criminal detention, whereas Plaintiffs and the putative subclass members in this case are in civil detention. People in civil detention are entitled to greater constitutional protections than people in pretrial criminal detention. *Jones v. Blanas*, 393 F.3d 918, 934 (9th Cir. 2004). Thus, Plaintiffs and the class may be entitled to even more protection than the *Gordon* standard. Because Plaintiffs easily meet the *Gordon* standard, they do not propose a less stringent one for purposes of this motion.

nature of both detention and the disease itself.[15] That substantial risk is exponentially magnified for Plaintiffs and other people with Risk Factors whose healthcare conditions and/or age place them at heightened risk of illness, serious complications, and even death.[16]

Second, the evidence overwhelmingly shows that—on a systematic scale—Defendants have been objectively deliberately indifferent to the medical needs of the people with Risk Factors during the COVID-19 pandemic. That evidence shows that Defendants have failed to promulgate and implement medically necessary protocols and practices to protect medically vulnerable people. As detailed in the attached report of Dr. Homer Venters, a nationally recognized expert on correctional healthcare, ICE's response to COVID-19 contains serious defects, including: failures to screen medically vulnerable people and implement corresponding precautions; inadequate screening mechanisms; inadequate infection control procedures; inadequate guidance to clinicians on when to test and hospitalize; failure to account for infection surge and corresponding impact on pre-existing inadequacies of facility, equipment, and staffing capabilities; failures to consider the medical necessity of release; amongst other defects.[17]

Further, ICE's response to COVID-19 contradicts important provisions in the recently-issued guidelines from the Center for Disease Control ("CDC") addressing COVID-19 in correctional and detention facilities.[18] For example, contrary to the CDC Guidelines, the ICE Protocols: (1) do not discuss staffing shortages that will result from the pandemic, or provide guidance to detention

---

[15] Allen/Rich Letter; Medical Professionals Letter.

[16] Venters Decl. at ¶¶ 21-22 .

[17] *See generally* Venters Decl.

[18] *Interim Guidance on Mgmt. of Coronavirus Disease 2019 (COVID-19) in Corr. and Det. Facilities*, CDC (March 23, 2020) https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

---

center staff on how to address staffing shortages as the level of medical encounters increase, and as increased staffing becomes necessary to provide infection control measures while transporting patients; (2) fail to include basic infection control measures, including use of masks for anyone with a cough; and (3) do not require social distancing to prevent the spread of infection, including maintaining 6 feet of separation between people, a measure that is impossible to achieve in the limited space available in detention centers. *See generally* Venters Decl. ¶¶ 11-12, 14.

The evidence further establishes that these serious defects are far from anomalous, but rather systemic in nature. Indeed, the attached declarations paint an alarming picture of ICE's inadequate responses to COVID-19 across the entire country, including failures to: test for COVID-19,[19] provide basic and necessary sanitation supplies such as hand sanitizer,[20] check symptoms, provide necessary education about COVID-19 to detained people and staff,[21] provide people with protective gear (e.g., masks),[22] increase medical staffing,[23] respond to sick calls,[24] and assess medically vulnerable detained people and increase precautionary measures.[25] As a direct consequence, medically vulnerable people feel like they are "sitting ducks"[26] and are "scared for [their] life."[27]

---

[19] Solomonov Decl. at ¶ 7; Munoz Decl. ¶ 5.

[20] Hernandez Decl. ¶ 4; Sudney Decl. ¶ 11; Solomonov Decl. ¶7.

[21] *See, e.g.,* Steglich Decl. at ¶ 6; Zwick Decl. at ¶¶ 9-14; Rivera Declaration at ¶ 12; Corchado Decl. at ¶ 16; Hernandez Decl. ¶ 3; Fraihat Decl. ¶ 6; Sudney Decl. ¶ 8; Munoz Decl. ¶3

[22] Rios Decl. at ¶ 23; Fraihat Decl. ¶ 9; Sudney Decl. ¶ 11; Munoz Decl. ¶ 7; Solomonov Decl. ¶ 7.

[23] Zwick Decl. at ¶ 16; Hernandez Decl. ¶ 4; Fraihat Decl. ¶ 9; Sudney Decl. ¶ 11; Munoz Decl. ¶ 7.

[24] *See* Saenz Decl. at ¶ 8; Munoz Decl. ¶¶ 8-9.

[25] Hernandez Decl. ¶ 8; Fraihat Decl. ¶ 10; Sudney Decl. ¶ 12; Munoz Decl. ¶ 11; Solomonov Decl. at ¶ 10.

[26] Rios Decl. at ¶ 13.

[27] Hernandez Decl. at ¶ 8; Munoz Decl. at ¶ 11; Fraihat Decl. at ¶ 10.

---

Importantly, the COVID-19 pandemic—and ICE's unreasonable response to it—will significantly strain ICE's already broken medical care system. Long before the COVID-19 outbreak, numerous reports (including by DHS itself) have identified serious and substantial flaws in ICE's medical care system. For example, a 2017 OIG report that assessed care at certain ICE facilities identified "long waits for the provision of medical care[.]"[28] Other reports echo these alarming findings about substandard medical care in ICE facilities.[29] These pre-existing and well-known inadequacies to ICE's medical care system[30]—when viewed in their totality and in relation to ICE's COVID-19 response—further evince objective deliberate indifference to the critical healthcare needs of people with Risk Factors. *See, e.g., Brown*, 563 U.S. at 505 n.3; Pl.'s Compl. at 12-13 (collecting cases).

ICE's inadequate COVID-19 response will be further exacerbated by its pre-existing, systemic, and long-entrenched failures to conduct meaningful oversight. Indeed, numerous reports—including those by DHS itself—have concluded that

---

[28] Off. of Inspector Gen., Off. of Homeland Sec., *OIG-18-32: Concerns About ICE Detainee Treatment and Care at Detention Facilities*, at 7 (Dec. 11, 2017), https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf.

[29] *See, e.g.,* U.S. Gov't Accountability Off. *GAO-16-23: Additional Actions Needed to Strengthen Mgmt. and Oversight of Detainee Med. Care* (Feb. 2016), https://www.gao.gov/assets/680/675484.pdf; Human Rts. Watch, Am. Civil Liberties Union, Nat'l Immigr. Just. Ctr. & Det. Watch Network, *Code Red: The Fatal Consequences of Dangerously Substandard Med. Care in Immigr. Det,* at 15, 19, 25, 46 (June 2018), https://www.hrw.org/sites/default/files/report_pdf/us0618_immigration_web2.pdf; Human Rts. First, *Prisons and Punishment: Immigr. Det. inCal.*, at 10-13 (Jan. 2019), https://www.humanrightsfirst.org/sites/default/files/Prisons_and_Punishment.pdf; J. David McSwane, *ICE Has Repeatedly Failed to Contain Contagious Diseases, Our Analysis Shows. It's a Danger to the Pub.*, PROPUBLICA (Mar. 20, 2020), available at https://www.propublica.org/article/ice-has-repeatedly-failed-to-contain-contagious-diseases-our-analysis-shows-its-a-danger-to-the-public (analysis of DDRs demonstrates that ICE facilities have "long histories of mishandling infectious diseases that can rapidly spread outside their walls.").

[30] Venters Dec. ¶ 8.

---

ICE fails to effectively oversee the detention facilities holding people in its custody.[31] These ongoing oversight failures almost certainly guarantee that ICE will at best be unable—or, at worst, unwilling—to meaningfully oversee medical care during the COVID-19 pandemic in the over 100 detention facilities across the country. For these reasons, a Special Master is necessary to ensure that necessary protocols implemented to protect people with Risk Factors.

ICE's deliberate indifference to the serious medical needs of people with Risk Factors during the COVID-19 pandemic is itself a cognizable constitutional injury making injunctive relief appropriate. *See, e.g., Helling v. McKinney*, 509 U.S. 25, 33 (1993) (holding that it "would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them"); *Parsons v. Ryan*, 754 F.3d 657, 680 (9th Cir. 2014) (exposure to a substantial risk of serious harm is, "in its own right, a constitutional injury"). To abate this risk of harm, ICE must immediately identify all people with Risk Factors and implement medically necessary precautions to ensure that they are protected from COVID-19. Absent immediate implementation of such precautionary measures, release is the only medically appropriate way to protect people with Risk Factors.[32] Such measures are consistent with the recommendations of DHS's own experts who have urged ICE

---

[31] *See, e.g.,* Off. of Inspector Gen., U.S. Dep't of Homeland Sec., *OIG-19-18: ICE Does Not Fully Use Contracting Tools to Hold Det. Facility Contractors Accountable for Failing to Meet Performance Standards*, at 5 (Jan. 29, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf; Off. of Inspector Gen., U.S. Dep't of Homeland Sec., *OIG-18-55: Immigr. and Customs Enf't Did Not Follow Fed. Procurement Guidelines When Contracting for Det. Servs.*, at 19 (Feb. 21, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-02/OIG-18-53-Feb18.pdf.
[32] *See* Venters Decl. ¶ 23.

---

to release detainees with Risk Factors,[33] as well as the recommendations of 3000 medical professionals.[34]

Both ICE and this Court are empowered to release medically vulnerable people during the COVID-19 pandemic. First, ICE has long maintained discretion to release medically vulnerable people from detention so that they may simultaneously adjudicate their removal cases while ensuring that they can seek necessary medical care outside detention.[35] There has been no intervening change of law that prohibits ICE from releasing people.[36]

Second, and crucially, this Court maintains inherent and broad authority to cure constitutional injuries irrespective of ICE's decision to exercise its powers to release. *See, e.g.*, *Brown v. Plata*, 563 U.S. at 503 ("[w]ithout a reduction in overcrowding, there will be no efficacious remedy for the unconstitutional care of the sick and mentally ill in California's prisons."); *Hutto v. Finney*, 437 U.S. 678, 687-88 (1978) (finding "a 30-day limitation on sentences to punitive isolation" an appropriate remedy to unconstitutional prison conditions). Indeed, the Ninth Circuit recently issued a published order requiring the release of a detained immigrant, holding that "in light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers, the court *sua sponte* orders that Petitioner be immediately released from detention and that removal of Petitioner be stayed pending final

---

[33] Allen/Rich Letter.

[34] Medical Professionals Letter.

[35] *See*, e.g., Decl. of Andrew Lorenzen-Strait in Supp. of Mot. for Prelim. Inj. and Class Certification ("Lorenzen-Strait Decl."); Decl. of Maureen Sweeney ("Sweeny Decl.").

[36] *Id.*

disposition by this court."[37] *See Xochihua-Jaimes v. William P. Barr*, Case No. 18-71460 (9th Cir. March 23, 2020).

> 2.  Defendants' COVID-19 Response Subjects Plaintiffs and Similarly Situated People with Risk Factors to Punitive Conditions in Violation of the Fifth Amendment.

Defendants' policies and practices concerning the custody and care of people with Risk Factors during the COVID-19 pandemic are more restrictive and—in many cases—more dangerous than conditions in criminal detention and therefore constitute punishment in violation of the Fifth Amendment.

People in civil detention are entitled to "more considerate treatment" than individuals detained pursuant to criminal process and may not be subjected to punitive conditions. *See Jones*, 393 F.3d at 931 (citing *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982)). A rebuttable presumption of punitiveness arises in two circumstances: (1) "where the individual is detained under conditions identical to, similar to, or more restrictive than those under which pretrial criminal detainees are held," *id*. at 934, or (2) where those conditions "are employed to achieve objectives that could be accomplished in so many alternative and less harsh methods," *id*. at 932.  If Plaintiffs establish even one of these presumptions, "the burden shifts to the defendant to show (1) legitimate, non-punitive interests justifying the conditions of [the detained person's] confinement and (2) that the restrictions imposed . . . [are] not excessive in relation to these interests." *King v. County of Los Angeles*, 885 F.3d 548, 557 (9th Cir. 2018) (internal quotation marks omitted).

---

[37] The district court's recent and non-binding decision in *Dawson v. Asher*, No. C20-0409-JLR-MAT, 2020 WL 1304557 (W.D. Wash. Mar. 19, 2020), has no bearing on the issues presented here. First, Plaintiffs in *Dawson* provided no evidence—much less the substantial evidence marshalled here—evincing the deficiencies in ICE's policies and other responses to COVID-19. *Second*, the court's ruling in *Dawson* suggesting that a detained person cannot seek injunctive relief until after someone is infected in the facility is contrary to binding Supreme Court precedent making clear that detained people need not await actual harm to seek an injunction to abate that harm. *See Helling*, 509 U.S. at 33 .

---

Here, the Plaintiffs with Risk Factors establish both presumptions of punitive conditions. First, by systemically failing to implement protocols to assess the propriety of continued detention for people with Risk Factors during the COVID-19 pandemic, ICE subjects Plaintiffs and the subclass to conditions that are "more restrictive than those under which pretrial criminal detainees are held." *See Jones*, 393 F.3d at 934. Indeed, throughout the country, sheriffs and other entities with jail oversight have taken steps to both assess and abate the significant risks to medically vulnerable people during the COVID-19 outbreak.[38] In sharp contrast, ICE has systemically failed to administer such protective measures to screen people with Risk Factors in order to assess the risks of their continued detention and/or to identify additional precautionary measures that should be implemented to protect them in light of their medical vulnerability.[39] As a result,

---

[38] *See, e.g.,* BBC NEWS, *US Jails Begin Releasing Prisoners to Stem COVID-19 Infections* (Mar. 19, 2020), https://www.bbc.com/news/world-us-canada-51947802; Salvador Hernandez, *Los Angeles is Releasing Inmates Early and Arresting Fewer People Over Fears of the Coronavirus in Jails*, BUZZFEED NEWS (Mar. 16, 2020, 4:39 PM), https://www.buzzfeednews.com/article/salvadorhernandez/los-angeles-coronavirus-inmates-early-release; Julia Marsh and Ben Feuerherd, NYC to release 40 coronavirus-prone inmates from Rikers as early as today, NEW YORK POST (Mar. 19, 2020) https://nypost.com/2020/03/19/nyc-to-release-40-coronavirus-prone-inmates-from-rikers-as-early-as-today/; Ryan Autullo, Travis County Judges Releasing Inmates to Limit Coronavirus Spread, STATESMAN (Mar. 16, 2020, 6:12 PM), https://www.statesman.com/news/20200316/travis-county-judges-releasing-inmates-to-limit-coronavirus-spread?fbclid=IwAR3VKawwn3bwSLSO9jXBxXNRuaWd1DRLsCBFc-ZkPN1INWW8xnzLPvZYNO4; CBS News 8, *San Diego & Sheriff to Release Inmates to Reduce Vulnerable Jail Population*, (Mar. 21, 2020, 11:33 AM), https://www.cbs8.com/article/news/health/coronavirus/san-diego-da-sheriff-to-release-inmates-to-reduce-vulnerable-jail-population/509-75730ca5-445a-4811-9024-6aeb1d9c2777; Letter from Mike McGrath, Chief Just., Sup. Ct. of Mont., to Mont. Dist. Ct. Judges (Mar. 20, 2020), https://courts.mt.gov/Portals/189/virus/Ltr%20to%20COLJ%20Judges%20re%20COVID-19%2003242020.pdf?ver=2020-03-20-115517-333; https://www.pghcitypaper.com/pittsburgh/allegheny-county-jail-plans-to-release-some-medically-vulnerable-inmates-but-advocacy-groups-say-its-not-enough/Content?oid=16978582; https://www.nbcchicago.com/news/local/cook-county-jail-releases-detainees-highly-vulnerable-to-coronavirus/2238813/

[39] *See generally* Venters Decl.; *see also* note 9 *supra*.

---

1 people with Risk Factors in ICE custody face even worse—and more dangerous—

2 conditions than they would in many jails during the COVID-19 pandemic.

3         Second, Plaintiffs and the putative subclass also satisfy *Jones*'s alternative

4 test for establishing unconstitutionally punitive conditions, because the

5 "restrictions [imposed on them during the COVID-19 outbreak] are 'employed to

6 achieve objectives that could be accomplished in so many alternative and less

7 harsh methods.'" *See Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036,

8 1065 (C.D. Cal. 2019) (quoting *Jones*, 393 F.3d at 932). As detailed above, ICE

9 has discretion to release medically vulnerable people during the COVID-19

10 pandemic.[40] Moreover, Defendants also fail to implement medically necessary

11 precautionary measures—short of release—to protect people with Risk Factors

12 from the lethal harms of COVID-19. Such measures include: providing necessary

13 education about COVID-19; ensuring conditions of confinement do not promote

14 the spread of the virus; increasing medical staff; and conducting adequate

15 screening procedures; amongst other protective measures.[41] Yet, as reflected in the

16 attached declarations, Defendants' policies and practices fail to provide such less

17 harsh and dangerous measures and thereby subject the subclass to unnecessarily

18 punitive conditions.

19         **B.       Plaintiffs Are Likely to Prevail on Their Section 504 Claims.**

20                 1.       Defendants' Failure to Protect Persons with Chronic Health
                          Conditions from COVID-19 Denies them Meaningful Access to
21                        Defendants' Programs and Activities

22         Section 504 of the Rehabilitation Act prohibits Executive Agencies such as

23 ICE and DHS from denying persons with disabilities the benefits of their programs

24 and activities solely on the basis of disability.  *See* 29 U.S.C. § 794 (a). Persons

25 _____

26 [40] *See*, e.g., Lorenzen-Strait Decl.; Sweeney Decl.; Decl. of Laura Rivera at ¶¶ 14-16.

27 [41] Venters Decl. ¶ 20.

28

1    with the chronic health conditions that place them at risk of severe illness or death

2    if exposed to COVID 19[42] are persons with disabilities under Section 504.[43]

3           In the context of detention facilities, Section 504 requires covered entities to

4    take affirmative steps—including identifying, tracking and accommodating

5    disability-related needs—to ensure that people with disabilities have meaningful

6    access to the benefits of their programs and activities. *See Armstrong v. Brown*,

7    732 F.3d 955, 958-62 (9th Cir. 2013) (affirming order requiring DOC to ensure

8    county facilities affirmatively track and accommodate the needs of people in

9    detention with disabilities, including within 24 hours of intake)*;see also Updike v.*

10   *Multnomah County*, 870 F.3d 939, 949 (9th Cir. 2017) (citing *Duvall v. County of*

11   *Kitsap*, 260 F.3d 1124, 1136 (9th Cir. 2001)); *Pierce v. District of Columbia*, 128

12   F. Supp. 3d 250, 266-69 (D.D.C. 2015).

13          Due to the unique nature of detention, in which facility staff control nearly

14   all aspects of detained individuals' daily lives, "most everything provided" to

15   detained individuals is a covered program or activity, including "sleeping, eating,

16   showering, toileting, communicating with those outside the jail by mail and

17   telephone, exercising, entertainment, safety and security, the jail's administrative,

18   disciplinary, and classification proceedings, medical, mental health and dental

19   services, the library, educational, vocational, substance abuse and anger

20

---

21   [42] These chronic health conditions include cardiovascular disease, including
     congestive heart failure, history of myocardial infarction, and history of cardiac
22   surgery; high blood pressure; chronic respiratory disease, including asthma,
     chronic obstructive pulmonary disease including chronic bronchitis or emphysema,
23   or other pulmonary diseases; diabetes; cancer; liver disease; kidney disease;
     autoimmune diseases, including psoriasis, rheumatoid arthritis, and systemic lupus
24   erythematosus; severe psychiatric illness; history of transplantation; and
     HIV/AIDS; Meyer Decl. ¶ 13, Franco-Paredes Decl. at. ¶¶ 1-2; Venters Decl. at ¶
25   13n.4-5)

26   [43] *See* 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102, defining disability as "a
     physical or mental impairment that substantially limits one or more major life
27   activities of [an] individual." The listed conditions limit individuals by
     substantially limiting their ability to breathe, circulate their blood, and fight off
28   infection, among other limitations.

---

*Fraihat, et al. v. ICE, et al.*, Case No. 19-cv-01546-JGB(SHKx)                    **18**
Pls.' Mot. for a Prelim. Inj.

1  management classes and discharge services." *Hernandez v. County of Monterey*,

2  110 F. Supp. 3d 929, 935–36 (N.D. Cal. 2015) (internal citations omitted).

3       Defendants have failed to affirmatively identify detained persons whose

4  chronic health conditions place them at risk of severe illness or death if exposed to

5  COVID-19, conduct evaluations to determine appropriate precautions to protect

6  such persons from contracting the virus, and implement those precautions. The

7  failure to identify and implement such needed precautions (which are the

8  equivalent of disability-based reasonable modifications to a covered entity's

9  programs and services) leaves persons with chronic health conditions at significant

10  risk of severe illness.  The threat of death and severe illness will undoubtedly result

11  in isolation and severe limitations on daily life and access to activities—including

12  access to nearly all of the activities the district court in *Hernandez* found to be

13  covered and thus subject to the meaningful access requirements.

14       In sum, Defendants' failure to identify and implement appropriate

15  precautions for detained persons with chronic health conditions in light of their

16  Risk Factors will deny those persons meaningful access to Defendants' programs

17  and activities, among other harms, in violation of Section 504. Plaintiffs are likely

18  to prevail on the merits of their Section 504 claim as a result.  *See Hernandez v.*

19  *County of Monterey*, 110 F. Supp. 3d 929 (N.D. Cal. 2015) (court found that

20  plaintiffs likely to succeed on the merits and a preliminary injunction was

21  appropriate in part to control the spread of a tuberculosis, a communicable disease,

22  within a jail facility).

23       **(b)**  **Defendants' Failure to Identify and Implement Necessary**

24            **Precautions for Persons with Chronic Health Conditions**

25            **Subjects Them to Unnecessarily Restrictive Placements in**
          **Violation of Section 504**

26  As noted above, living in a congregate setting creates an elevated risk of

27  contracting the virus. But the disability subclass members also have chronic health

28

conditions that create an even more elevated risk of contracting the virus, which will likely lead to medical isolation or segregation.[44] Because of this, Defendants have a duty under *Olmstead v. L.C. ex rel Zimring,* 527 U.S. 581 (1999) to assess whether this setting is truly appropriate to the subclass members' needs, and if not, take steps to provide them with an alternate placement with less restrictive consequences.

The regulations promulgated pursuant to the ADA (parallel to the Rehabilitation Act) provide that "[a] public entity shall administer services, programs, and activities in the most integrated setting *appropriate to the needs* of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (emphasis added). The Supreme Court held in *Olmstead v. L.C. ex rel Zimring,* that "[u]njustified [institutional] isolation . . . is properly regarded as discrimination based on disability." 527 U.S. 581, 597, 600 (1999). DHS and ICE recognize that they must comply with *Olmstead*. DHS's regulations provide that "[t]he Department shall administer programs and activities in the most integrated setting *appropriate to the needs* of qualified individuals with a disability." 6 C.F.R. § 15.30(d) (emphasis added); *see also ICE National Detention Standards for Non-Dedicated Facilities* at 137 (2019) (Standard 4.7 provides that Facilities are required by the Rehabilitation Act to have an equal opportunity to participate in the facility's programs, services, and activities "in the least restrictive and most integrated setting possible").[45]

The federal agency's duty under *Olmstead* consists of two parts. First, the agency must assess the placement needs of qualified individuals. *Olmstead* makes clear that jurisdictions must provide non-institutional placement "when the State's

---

[44] Venters Decl. ¶¶ 16-17.

[45] https://www.ice.gov/doclib/detention-standards/2019/nds2019.pdf; ICE, *Performance-Based National Detention Standards 2011*, Standard 4.8 at 344 (rev. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf (same).

---

treatment professionals determine that such placement is appropriate." *Olmstead*, 527 U.S. at 607. Second, the agency must ensure that placement is actually made in the most integrated setting appropriate to those needs.

A covered entity violates *Olmstead* when it fails to make an assessment of what setting is most "appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). In 2003, the Department of Justice made findings that Laguna Honda Hospital in San Francisco had violated *Olmstead* by failing to "conduct[] meaningful assessments of most residents to determine whether the nursing home is the most integrated setting to meet their needs."[46]

Courts have held that the *Olmstead* duty of assessment and appropriate placement also applies to people with disabilities in jail environments. *See, e.g., See Winters v. Ark. Dept. of Health & Human Servs.*, 491 F.3d 933, 936-37 (8th Cir. 2007); *Reaves v. Dep't of Corrs.*, 195 F. Supp. 3d 383, 422-23, 427 (D. Mass. 2016); *Black v. Wiggington*, 1:12–CV–03365, 2015 WL 468618 (N.D. Ga. Feb, 4, 2015). This duty of appropriate placement extends to release from jail into the community in appropriate prisoners' situations. *See McClendon v. City of Albuquerque*, Case No. 95 CV 24 JAP/KBM, 2016 WL 9818311, at *14 (D.N.M. Nov. 9, 2016) (holding that the *Olmstead* mandate applied to a jail where overcrowding violated the Eighth Amendment, and that the defendants could develop a community diversion program for prisoners with mental health and developmental disabilities in order to discharge their duties under *Olmstead*).

---

[46] U.S. Department of Justice Department of Civil Rights, *Investigation of Laguna Honda Hospital and Rehabilitation Center* at 9 (Apr. 1, 2003), https://www.ada.gov/olmstead/documents/laguna_findings2.pdf. Later, the Department of Justice also found that the State of California had also failed in its duty to make similar assessments under the Social Security Act. U.S. Department of Justice Department of Civil Rights, *Laguna Honda Hospital and Rehabilitation Center, San Francisco, California* (Aug. 3, 2004), https://www.ada.gov/olmstead/documents/laguna_findings3.pdf.

The same duty to assess the needs of people with disabilities applies here. Because members of the subclass have disabilities and are at heightened risk of isolation during the COVID-19 pandemic as result of those disabilities, Defendants have an affirmative duty under *Olmstead* to assess what setting is appropriate to their needs and to ensure that unnecessary isolation does not take place.  As those assessments have not yet occurred, and no alteration has taken place, the subclass's *Olmstead* claim has a high likelihood of success on the merits.

### C.   Plaintiffs Satisfy the Remaining Preliminary Injunction Factors

Plaintiffs satisfy the other factors for issuance of a preliminary injunction.

### 1.   The Subclass Will Suffer Irreparable Harm Absent Immediate Relief.

Plaintiffs will suffer irreparable harm absent an injunction. COVID-19 is associated with significant morbidity and mortality in individuals with certain disabilities and chronic medical conditions. Franco-Paredes Decl. at 2, 3-4; Meyer Decl. ¶ 21. The risk posed by COVID-19 is significantly higher in the detention context than in the community, "in terms of risk of transmission, exposure, and harm to individuals who become infected." Meyer Decl. ¶¶ 7, 13. The mortality rate amongst populations with the relevant Risk Factors is significantly higher. Franco-Paredes Decl. at 4, 6; Meyer Decl. ¶¶ 14-16. Further, there is evidence that people with disabilities that fall within the high-risk categories are significantly more likely to develop complications. Franco-Paredes Decl. at 5-6.

 In addition, "[i]t is well-established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Irreparable harm is also established where a preliminary injunction is necessary to preserve the health of someone in a detention setting. *See, e.g., Jones v. Texas Dep't of Criminal Justice*, 880 F.3d 756, 759 (5th Cir. 2018). Here, detained people

with Risk Factors are at significant risk of serious illness, life-altering complications, and death and will thus suffer irreparable harm absent an injunction.

As noted above, the disability subclass members are also subject to a greater likelihood of contracting the virus; complications and/or death from the virus; and higher morbidity, mortality, and poor health outcomes due to their underlying medical and disability conditions when medical and other care in the facility is taxed by conditions relating to the virus. Meyer Dec. ¶¶ 28, 30, 32; Franco-Paredes Dec. at 6. If any of these risks materializes, subclass members could be subjected to isolation in the extreme,[47] denying them meaningful access to the Defendants' detention programs as result. Such exclusion of people with disabilities from programs or services provided by a covered entity has been found to constitute irreparable injury. *See Hernandez,* 110 F. Supp. 3d at 956-57 (irreparable harm found where jail facility failed to provide persons with disabilities access to its programs and activities); *D.R. v. Antelope Valley Union High Sch. Dist.*, 746 F. Supp. 2d 1132, 1145–46 (C.D. Cal. 2010) (student suffered irreparable harm by missing minutes of education classes per day because of structural barriers).

Further, the Ninth Circuit recognizes that a risk of a more restrictive placement "inflicts cognizable irreparable injury for purposes of a preliminary injunction." *See, e.g., M.R. v. Dreyfus*, 663 F.3d 1100, 1111 (9th Cir. 2011), *amended on other grounds by and reh'd denied*, 697 F.3d 706 (9th Cir. 2012); *A.H.R. v. Wash. State Health Care Auth.*, No. C15-5701JLR, 2016 WL 98513, at *15 (W.D. Wash. Jan. 7, 2016) (collecting cases); *Brantley v. Maxwell-Jolly*, 656 F. Supp. 2d 1161, 1176-77 (N.D. Cal. 2009) (same).

---

[47] For example, detention facilities sometimes isolate medically sensitive people in solitary confinement, although this is both ineffective as to the virus and dangerous to mental health.  [Meyer Dec. ¶ 10; Venters Dec. ¶¶ 10, 16-17.]

2.    <u>The Balance of Hardships Tips Decidedly in Plaintiffs' Favor</u>

The balance of equities favors Plaintiffs. Courts "'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter v. Natural Resources Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (*quoting Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)). The Ninth Circuit has held that the interest in protecting individuals from physical harm outweighs monetary costs to government entities. *See Harris v. Bd. of Supervisors, L.A. Cnty.*, 366 F.3d 754, 766 (9th Cir. 2004).

Plaintiffs' interests in preventing exposure to a deadly virus and obtaining adequate health care if exposed or infected is essentially an interest in survival and the preservation of their lives. Further, people with disabilities that place them at heightened risk of infection will continue to be denied meaningful access to programs provided by Defendants if they are sickened or killed by COVID-19.

In sharp contrast to Plaintiffs' hardships, Defendants will merely be required to devise a plan to review people with Risk Factors and release those they cannot adequately care for in light of the spread of COVID-19. Other, safer options are available. These other placements may include placement in the community, which is indisputably among the options legally available to ICE and which has proven successful in the past in ensuring that subject individuals appear in court. Moreover, requiring Defendants to review individual risk factors and release those who they may not adequately protect may result in reducing future costs. Franco-Paredes Decl. at 1 ("the attack rate inside these centers may take exponential proportions consuming significant medical care and financial resources").

3.    <u>A Preliminary Injunction is in the Public Interest</u>

Protecting public health by minimizing risk of transmission of COVID-19 is inarguably in the public interest. Immediately implementing measures to protect the health of people with Risk Factors, and releasing those for which such

measures cannot be implemented and who do not pose a danger to the public, protects the health of those people, staff, and the public at large by mitigating or eliminating a situation in which detained people become infected by COVID-19 and must rely on hospitals and medical equipment.  Meyer Decl. ¶ 8. Further, a preliminary injunction enjoining Defendants' violations of the Rehabilitation Act and *Olmstead* would serve the public's interest in enforcement of federal disability law and "in elimination of discrimination on the basis of disability." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1167 (9th Cir. 2011).

## IV.    CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court grant the requested preliminary injunction to abate the imminent harm of COVID-19.


Respectfully Submitted,


/s/ Timothy P. Fox
Timothy P. Fox
Elizabeth Jordan
Maria del Pilar Gonzalez Morales
CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER

/s/ Stuart Seaborn
Stuart Seaborn
Christina Brandt-Young
Melissa Riess
DISABILITY RIGHTS
ADVOCATES

/s/ William F. Alderman
William F. Alderman
Mark Mermelstein
Jake Routhier
ORRICK, HERRINGTON &
SUTCLIFFE LLP


Attorneys for Plaintiffs

/s/ Michael W. Johnson
Michael W. Johnson
Dania Bardavid
Leigh Coutoumanos
Jessica Blanton
Joseph Bretschneider
WILLKIE FARR &
GALLAGHER LLP

/s/ Lisa Graybill
Lisa Graybill
Shalini Goel Agarwal
Jared Davidson
Maia Fleischman
SOUTHERN POVERTY LAW
CENTER