Timothy P. Fox (CA Bar 157750)
*tfox@creeclaw.org*
Elizabeth Jordan*
*ejordan@creeclaw.org*
CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER
1245 E. Colfax Avenue, Suite 400
Denver, CO 80218
Tel:  (303) 757-7901
Fax: (303) 872-9072

Lisa Graybill*
*lisa.graybill@splcenter.org*
Jared Davidson*
*jared.davidson@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
201 St. Charles Avenue, Suite 2000
New Orleans, Louisiana 70170
Tel:  (504) 486-8982
Fax: (504) 486-8947

Stuart Seaborn (CA Bar 198590)
*sseaborn@dralegal.org*
Melissa Riess (CA Bar 295959)
*mriess@dralegal.org*
DISABILITY RIGHTS ADVOCATES
2001 Center Street, 4th Floor
Berkeley, California 94704
Tel:  (510) 665-8644
Fax: (510) 665-8511

Attorneys for Plaintiffs (continued on next page)

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION – RIVERSIDE

| | |
|---|---|
| FAOUR ABDALLAH FRAIHAT, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*,<br><br>Defendants. | Case No.: 19-cv-01546-JGB(SHKx)<br><br>**Declaration of Laura G. Rivera in Support of Motion for Preliminary Injunction and Class Certification**<br><br>Date: March 24, 2020 |

William F. Alderman (CA Bar 47381)
*walderman@orrick.com*
Jake Routhier (CA Bar 324452)
*jrouthier@orrick.com*
ORRICK, HERRINGTON &
SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105
Tel:  (415) 773-5700
Fax: (415) 773-5759

Michael W. Johnson**
*mjohnson1@willkie.com*
Dania Bardavid**
*dbardavid@willkie.com*
Jessica Blanton**
*jblanton@willkie.com*
Joseph Bretschneider**
*jbretschneider@willkie.com*
WILLKIE FARR &
GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Tel:  (212) 728-8000
Fax: (212) 728-8111

Maia Fleischman*
*maia.fleischman@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
2 South Biscayne Boulevard
Suite 3750
Miami, FL 33131
Tel:  (786) 347-2056
Fax: (786) 237-2949

Christina Brandt-Young*
*cbrandt-young@dralegal.org*
DISABILITY RIGHTS
ADVOCATES
655 Third Avenue, 14th Floor
New York, NY 10017
Tel:  (212) 644-8644
Fax: (212) 644-8636

Mark Mermelstein (CA Bar 208005)
*mmermelstein@orrick.com*
ORRICK, HERRINGTON &
SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA 90017
Tel:  (213) 629-2020
Fax: (213) 612-2499

Leigh Coutoumanos**
*lcoutoumanos@willkie.com*
WILLKIE FARR &
GALLAGHER LLP
1875 K Street NW, Suite 100
Washington, DC 20006
Tel:  (202) 303-1000
Fax: (202) 303-2000

Shalini Goel Agarwal
(CA Bar 254540)
*shalini.agarwal@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
106 East College Avenue
Suite 1010
Tallahassee, FL 32301
Tel:  (850) 521-3024
Fax: (850) 521-3001

Maria del Pilar Gonzalez Morales
(CA Bar 308550)
*pgonzalez@creeclaw.org*
CIVIL RIGHTS EDUCATION
AND ENFORCEMENT CENTER
1825 N. Vermont Avenue, #27916
Los Angeles, CA 90027
Tel:  (805) 813-8896
Fax: (303) 872-9072

Attorneys for Plaintiffs (continued from previous page)
*Admitted Pro Hac Vice
**Pro Hac Vice Application Forthcoming

## DECLARATION OF LAURA G. RIVERA, ESQ.

I, Laura G. Rivera, Esq., make this declaration on my personal knowledge and if called to testify, I could and would do so competently as follows:

1.       I serve as the Director of the Southeast Immigrant Freedom Initiative of the Southern Poverty Law Center ("SIFI"). SIFI provides *pro bono* representation to detained immigrants in proceedings before the Executive Office for Immigration Review and U.S. Immigration and Customs and Enforcement ("ICE"). SIFI prioritizes representing detained individuals in seeking their release from ICE custody.

2.       SIFI represents individuals confined inside the following detention centers in Louisiana and Georgia: the LaSalle Detention Center ("LaSalle") in Jena, Louisiana; the Pine Prairie ICE Processing Center ("Pine Prairie") in Pine Prairie, Louisiana; the Irwin County Detention Center ("Irwin") in Ocilla, Georgia; the Folkston ICE Processing Center ("Folkston") in Folkston, Georgia; and the Stewart Detention Center ("Stewart") in Lumpkin, Georgia.

3.       Since SIFI's founding in 2017, SIFI has represented hundreds of individuals confined inside these five detention centers, primarily on custody matters. SIFI currently has clients inside all five of these detention centers.  To date, our primary mode of contact with confined individuals is through a free and confidential hotline through which confined individuals may reach us. The hotline has typically been staffed by two full-time SIFI staff who operate the hotline Monday through Thursday of each week during business hours. Since March 16, 2020, in light of the COVID-19 pandemic, SPLC has closed its offices, and three SPLC employees have rotated staffing the hotline on Mondays and Thursdays only.

4.       Since the outbreak of the novel coronavirus, several SIFI staff have visited individuals inside four of the detention centers and spoken by phone to individuals at all five detention centers. What SIFI staff have personally witnessed and learned in conversation with detained individuals reveals a grossly deficient response by government officials and private contractors to stem the spread of the virus inside these detention centers.

5.       Since the COVID-19 outbreak was declared a pandemic, SIFI and partner orgs have submitted two letters to ICE and facility administrators requesting information about their response plans for this pandemic; yet to date, SIFI has received no response.

### Pine Prairie Detention Center, Pine Prairie, LA

6.       Perhaps the most alarming information SIFI has documented relates to Pine Prairie, a detention center operated by private prison contractor GEO Group. On March 16, 2020—well after public health authorities had declared the novel coronavirus a global pandemic—a SIFI staff

1

member conducted in-person visitation with five individuals inside Pine Prairie. As a condition to visitation, she was required to submit to a temperature check and to sign paperwork stating that she had not traveled out of the country and that she did not have physical symptoms. She was permitted to wear her own mask and gloves into the visitation area. None of the GEO Group staff or detained people wore masks or gloves.

7.      Visitation at Pine Prairie is contact visitation only. The SIFI staff member was seated at a table about six feet from those she visited. The five individuals she visited independently gave her a consistent message: none had received any information about the coronavirus. They also mentioned lacking access to hand soap. When she asked them whether the GEO Group staff had changed any protocols in response to the pandemic, they said their conditions have not changed in any noticeable way. The five individuals had engaged in a hunger strike and had been subjected to solitary confinement. Three of them independently told her that while segregated inside one- or two-person cells, they were not given water to drink for almost a week, and they were forced to drink water from the toilet.

8.      On March 18, 2020, the same staff member conducted legal visitation by video teleconference with a man inside Pine Prairie. The man was wearing a mask and gloves. He told her that he and roughly sixty others inside his housing unit, Charlie Alpha, were under quarantine. Guards had told those in Charlie Alpha that someone inside that unit was suspected of having COVID-19. The suspected COVID-19 carrier had been removed from the Charlie Alpha unit. Everyone else remained inside Charlie Alpha. He told her that detained people inside Charlie Alpha were responsible for cleaning their own unit. They had access to some chemicals to clean with. However, they had no access to hand soap or hand sanitizer, only the soap given to them for showers. The GEO Group guards had not taken any measures to space people out inside the unit.

9.      The next day, on March 19, 2020, a different person inside Pine Prairie contacted SIFI to seek legal assistance. The caller said he had received some information about the coronavirus through the use of a tablet device. He said those in his unit were receiving hygiene supplies every two days. He reported that two people with symptoms of coughing, fever, or shortness of breath had been removed from his unit.

10.     The following day, March 20, 2020, a SIFI staff member conducted in-person visitation at Pine Prairie with five individuals from the quarantined Charlie Alpha unit. Upon entering the detention center, she signed a form stating that she was not symptomatic and had not been exposed to COVID-19 or traveled to high risk areas. Her temperature was not checked. Some staff wore masks; others did not. As before, she sat at a six-foot table in the visitation area. Because the table is located in a common area, the visits were not private or confidential. The five men from the quarantine unit wore masks but no gloves. As they waited in the common area, they sat alongside other detained people awaiting visitation who did not have masks or gloves. They told her that they were only given masks when they left the dorm, not while they were inside of it. They also told her that detained individuals are still cleaning the dorms, and they are given neither masks nor gloves. Guards and ICE agents sometimes wear masks and gloves when they enter Charlie

Alpha and sometimes do not. Several of them also reported to her that ICE continues to bring new people into confinement at Pine Prairie. It is putting those new people into the Charlie Alpha unit, a known high-risk unit.

**LaSalle Detention Center, Jena, LA**

11.     On March 19, 2020, SIFI staff also received a call from a person confined inside LaSalle, another detention center operated by private prison contractor GEO Group. The caller complained of having a fever, chest pain, difficulty breathing while trying to sleep, and of coughing blood. He reported having been tested for the flu and having returned a negative result; however, to his knowledge, he had not been tested for coronavirus. The only treatment he reported receiving inside LaSalle was ibuprofen, syrup, and salt, which had not helped. He reported sharing a unit, HD, with others who had symptoms of coughing, fever, or shortness of breath. None had been removed from the unit. New people were being brought into the unit. GEO Group staff were not routinely using gloves. He reported that a different housing unit, OD, had been quarantined earlier for two to three weeks. His understanding was that some individuals inside that unit had been infected with the common flu.

12.     Two other callers confined inside LaSalle, both women, reported suffering from health problems. Both said that neither ICE nor GEO Group guards had told them anything about the coronavirus. One caller reported having asthma, thyroid problems, and liver problems; the other reported having high blood pressure.

13.     On March 20, 2020, the New Orleans ICE Field Office denied release on parole to two SIFI clients with medical complications who are confined inside LaSalle. The clients, asylum seekers, have both engaged in a hunger strike for more than 120 days. Their frustration with the delay and process of their asylum cases led them to engage in a hunger strike. Despite evidence from a leading medical expert in detainee health, Dr. Allen Keller, that they are medically vulnerable, and strong evidence that the individuals pose no risk to public safety and no flight risk, ICE denied their parole requests a second time. The clients told a SIFI attorney that they would likely be force fed with nasogastric tubes yesterday or today. Given the available data on the high rates of transmission of the novel coronavirus and the most likely method of transmission through the mucosa, force feeding medically fragile individuals inside likely contaminated detention center medical wings may compound their risk of infection.

14.     ICE enjoys broad discretion to release people in its custody at various stages of their removal proceedings through mechanisms that include humanitarian parole, release on recognizance, conditional release on bond, and release on an order of supervision. Federal law provides for release on humanitarian parole for people in ICE custody who have serious medical conditions for whom continued detention would not be appropriate. 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5. Yet the New Orleans ICE Field Office rarely grants release to individuals in its custody; and the responses from the Atlanta ICE Field Office to recent requests for release remains

spotty for SIFI clients, as many applications are denied or languish without agency action for months on end.

15.     For example, a SIFI client with serious medical conditions has been awaiting a decision on his humanitarian parole request for about seven months, all the while suffering from inadequate medical treatment. The parole request, submitted in August 2019 (while the man was confined inside Folkston), included medical evidence of diabetes or pre-diabetes, hypertension, high cholesterol, a possible bone infection, and weight gain of some 40 pounds in detention. That month, an ICE official told his SIFI attorney that the parole request remained under review, reassuring her that the facility had appropriate medical resources to manage his medical condition. In early 2020, he was transferred to Stewart and placed in solitary confinement in the medical unit, where he spent ten days with the lights on 24 hours a day and with air-conditioning on full blast. In February 2020, SIFI staff contacted ICE about his case, and was told the August 2019 parole request was still pending; ICE agents then resubmitted the parole request to the region's ICE field office headquarters in Atlanta. Concerned about the potential impact that contracting COVID-19 could have on this client, the SIFI attorney pressed ICE on this man's case on March 17 and 18, 2020, only to be told that the parole request was still pending.

16.     Another disturbing trend in ICE parole adjudication relates to a rash of denials of parole to asylum seekers who have passed their initial fear interview, based on differing interpretations of current law among individual ICE adjudicators. The denials have concerned individuals who—due to the third-country transit ban—have received positive *reasonable fear* but not *credible fear* findings. Despite no binding law articulating such restrictions, some ICE adjudicators have interpreted the law to forbid grants of parole to such individuals. With thousands of asylum seekers subject to the third-country transit ban, such an arbitrary restriction could foreclose parole to untold people in ICE custody with special medical vulnerabilities.

**Irwin Detention Center, Ocilla, GA**

17.     In Georgia, reports from people confined inside Irwin reveal a lack of access to information about the coronavirus and a growing threat of contagion. A kitchen worker who contacted SIFI staff yesterday reported that there were confirmed cases of COVID-19 inside the facility and that it was under quarantine. In terms of precautions, the only one he reported was that he and other kitchen workers have been instructed to replace plastic ware with paper plates. The man, who suffers from diabetes and high blood pressure, expressed concern that he would be at higher risk of contracting the virus and experiencing respiratory complications. He requested SIFI's assistance in obtaining release from custody to avert becoming infected.

18.     A caller from Irwin on March 19, 2020 reported that he suffered from high blood pressure and that he had stopped receiving medication for it. Neither ICE nor guards had given him any information about coronavirus. At least one person inside his housing unit was coughing, and the cough was worsening, but that person had not as yet been removed from his housing unit.

**Folkston ICE Processing Center, Folkston, GA**

19.     Requirements for in-person legal visitation inside Folkston, another detention center operated by GEO Group, seem to mirror those at Pine Prairie. A SIFI attorney who visited individuals inside both wings of the detention center on March 16, 2020 was required to undergo a temperature check and to sign a form affirming several things: that she had not been experiencing symptoms, traveled outside the United States, traveled to China or any other affected area, or had contact with anyone who has traveled outside of the United States within fourteen days. She was told that persons who answered yes to any of these questions, or had a fever greater than 100.4 degrees Fahrenheit, would not be allowed to conduct legal visitation unless the warden approved it. She was permitted to bring her own gloves and disinfectant wipes into the visitation area.

20.     That day, the SIFI attorney observed an ICE officer walk into the facility from the parking lot and deliver a box with a thermometer to the front entry staff. The ICE officer said he had driven to different drugstores to find thermometers because they were sold out. The SIFI attorney took this to mean that ICE headquarters had not supplied the facility with sufficient thermometers to meet the facility's needs.

21.     Two individuals confined inside Folkston contacted SIFI to seek legal services on March 19, 2020. One of the callers reported that neither ICE nor guards had given him any information about the coronavirus, and that he lacked access to soap and hand sanitizer. He reported that there was at least one person inside of his housing unit who had symptoms like coughing, fever, or shortness of breath; this person had not been removed from the caller's housing unit as of the time of his call. He reported delays in receiving medical attention, including waits of five to six days to see medical staff after initiating a request. The other caller reported feeling sick due to the lack of ventilation inside the detention center. He reported being aware of the coronavirus outbreak, and expressed fear of contracting the virus because he thought the detention center most likely would not provide proper medical treatment.

**Stewart Detention Center, Lumpkin, GA**

22.     At Stewart, a detention center operated by private prison company CoreCivic, no reports of suspected COVID-19 infections have directly reached SIFI staff. A SIFI attorney who has visited the facility in the past week reported that people entering Stewart were not required to submit to temperature checks or pass any screening. Some but not all CoreCivic staff wore gloves; no staff wore masks. The SIFI attorney saw no change in the volume of staff traffic in and out of the facility. When she asked a CoreCivic staff member whether staff considered vulnerable could stay home, the CoreCivic staff member responded that she knew nothing about that. For legal visitation, which is non-contact, CoreCivic staff wiped down both sides of the visitation room before the visits began, but not between visits; the SIFI attorney once saw CoreCivic staff give wipes to a client to take into his side of the visitation room. The SIFI attorney was allowed to bring her own gloves, disinfectant wipes, and hand sanitizer.

23.     Seven people confined inside Stewart called SIFI to seek services on March 19, 2020. Only one reported feeling ill. That caller reported feeling numbness in his left arm and pressure on his chest. None reported instances of cellmates exhibiting symptoms like coughing, fever, or shortness of breath. Most reported having received at least some information about the coronavirus from ICE or guards. A couple reported seeking signs about coronavirus posted inside the facility; two also reported having been told to wash their hands often. All reported having access to soap.

24.     Just under two years ago, in February 2008, I conducted a stakeholder tour of Stewart, and observed concerning practices in their intake unit. Thinking these practices were relevant to Stewart's ability to minimize transmissions during this outbreak, I returned to my notes, which state: "One holding cell in use near entrance to intake; cell was overcrowded. Seems like bad protocol to handle potential infectious disease by crowding sick people into one small cell."

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on March 22, 2020 in Decatur, Georgia.

_____

Laura G. Rivera, Esq.