Timothy P. Fox (CA Bar 157750)
*tfox@creeclaw.org*
Elizabeth Jordan*
*ejordan@creeclaw.org*
CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER
1245 E. Colfax Avenue, Suite 400
Denver, CO 80218
Tel:  (303) 757-7901
Fax: (303) 872-9072

Lisa Graybill*
*lisa.graybill@splcenter.org*
Jared Davidson*
*jared.davidson@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
201 St. Charles Avenue, Suite 2000
New Orleans, Louisiana 70170
Tel:  (504) 486-8982
Fax: (504) 486-8947

Stuart Seaborn (CA Bar 198590)
*sseaborn@dralegal.org*
Melissa Riess (CA Bar 295959)
*mriess@dralegal.org*
DISABILITY RIGHTS ADVOCATES
2001 Center Street, 4th Floor
Berkeley, California 94704
Tel:  (510) 665-8644
Fax: (510) 665-8511

Attorneys for Plaintiffs (continued on next page)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION – RIVERSIDE**

| | |
|---|---|
| FAOUR ABDALLAH FRAIHAT, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*,<br><br>Defendants. | Case No.: 19-cv-01546-JGB(SHKx)<br><br>**Declaration of Jaimie Meyer in Support of Motion for Preliminary Injunction and Class Certification**<br><br>Date: March 24, 2020 |

William F. Alderman (CA Bar 47381)
*walderman@orrick.com*
Jake Routhier (CA Bar 324452)
*jrouthier@orrick.com*
ORRICK, HERRINGTON &
SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
Tel: (415) 773-5700
Fax: (415) 773-5759

Michael W. Johnson**
*mjohnson1@willkie.com*
Dania Bardavid**
*dbardavid@willkie.com*
Jessica Blanton**
*jblanton@willkie.com*
Joseph Bretschneider**
*jbretschneider@willkie.com*
WILLKIE FARR &
GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Tel: (212) 728-8000
Fax: (212) 728-8111

Maia Fleischman*
*maia.fleischman@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
2 South Biscayne Boulevard
Suite 3750
Miami, FL 33131
Tel: (786) 347-2056
Fax: (786) 237-2949

Christina Brandt-Young*
*cbrandt-young@dralegal.org*
DISABILITY RIGHTS
ADVOCATES
655 Third Avenue, 14th Floor
New York, NY 10017
Tel: (212) 644-8644
Fax: (212) 644-8636

Mark Mermelstein (CA Bar 208005)
*mmermelstein@orrick.com*
ORRICK, HERRINGTON &
SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA 90017
Tel: (213) 629-2020
Fax: (213) 612-2499

Leigh Coutoumanos**
*lcoutoumanos@willkie.com*
WILLKIE FARR &
GALLAGHER LLP
1875 K Street NW, Suite 100
Washington, DC 20006
Tel: (202) 303-1000
Fax: (202) 303-2000

Shalini Goel Agarwal
(CA Bar 254540)
*shalini.agarwal@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
106 East College Avenue
Suite 1010
Tallahassee, FL 32301
Tel: (850) 521-3024
Fax: (850) 521-3001

Maria del Pilar Gonzalez Morales
(CA Bar 308550)
*pgonzalez@creeclaw.org*
CIVIL RIGHTS EDUCATION
AND ENFORCEMENT CENTER
1825 N. Vermont Avenue, #27916
Los Angeles, CA 90027
Tel: (805) 813-8896
Fax: (303) 872-9072

Attorneys for Plaintiffs (continued from previous page)
*Admitted Pro Hac Vice
**Pro Hac Vice Application Forthcoming

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

## I. BACKGROUND AND QUALIFICATIONS

1. I am Dr. Jaimie Meyer, an Assistant Professor of Medicine at Yale School of Medicine and Assistant Clinical Professor of Nursing at Yale School of Nursing in New Haven, Connecticut. I am board certified in Internal Medicine, Infectious Diseases and Addiction Medicine. I completed my residency in Internal Medicine at NY Presbyterian Hospital at Columbia, New York, in 2008. I completed a fellowship in clinical Infectious Diseases at Yale School of Medicine in 2011 and a fellowship in Interdisciplinary HIV Prevention at the Center for Interdisciplinary Research on AIDS in 2012. I hold a Master of Science in Biostatistics and Epidemiology from Yale School of Public Health.

2. I have worked for over a decade on infectious diseases in the context of jails and prisons. From 2008-2016, I served as the Infectious Disease physician for York Correctional Institution in Niantic, Connecticut, which is the only state jail and prison for women in Connecticut. In that capacity, I was responsible for the management of HIV, Hepatitis C, tuberculosis, and other infectious diseases in the facility. Since then, I have maintained a dedicated HIV clinic in the community for patients returning home from prison and jail. For over a decade, I have been continuously funded by the NIH, industry, and foundations for clinical research on HIV prevention and treatment for people involved in the criminal justice system, including those incarcerated in closed settings (jails and prisons) and in the community under supervision (probation and parole). I have served as an expert consultant on infectious diseases and women's health in jails and prisons for the UN Office on Drugs and Crimes, the Federal Bureau of Prisons, and others. I also served as an expert health witness for the US Commission on Civil Rights Special Briefing on Women in Prison.

3. I have written and published extensively on the topics of infectious diseases among people involved in the criminal justice system including book chapters and articles in leading peer-reviewed journals (including Lancet HIV, JAMA Internal Medicine, American Journal of Public Health, International Journal of Drug Policy) on issues of prevention, diagnosis, and management of HIV, Hepatitis C, and other infectious diseases among people involved in the criminal justice system.

4. My C.V. includes a full list of my honors, experience, and publications, and it is attached as Exhibit A.

5. To date, I am not being paid for my work in this case, although I am being paid $1,000 for my time spent on a case filed in federal court in New York involving similar issues. In making the following statements, I am not commenting on the particular issues posed by this case. Rather, I am making general statements about the realities of persons in jails and prisons.

6. I have not testified as an expert at trial or by deposition in the past four years.

## II. HEIGHTENED RISK OF EPIDEMICS IN JAILS AND PRISONS

7. The risk posed by infectious diseases in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected. There are several reasons this is the case, as delineated further below.

8. Globally, outbreaks of contagious diseases are all too common in closed detention settings and are more common than in the community at large. Prisons and jails are not isolated from communities. Staff, visitors, contractors, and vendors pass between communities and facilities and can bring infectious diseases into facilities. Moreover, rapid turnover of jail and prison populations means that people often cycle between facilities and communities. People often need to be transported to and from facilities to attend court and move between facilities. Prison health is public health.

9. <u>Reduced prevention opportunities:</u> Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. When people must share dining halls, bathrooms, showers, and other common areas, the opportunities for transmission are greater. When infectious diseases are transmitted from person to person by droplets, the best initial strategy is to practice social distancing. When jailed or imprisoned, people have much less of an opportunity to protect themselves by social distancing than they would in the community. Spaces within jails and prisons are often also poorly ventilated, which promotes highly efficient spread of diseases through droplets. Placing someone in such a setting therefore dramatically reduces their ability to protect themselves from being exposed to and acquiring infectious diseases.

10. <u>Disciplinary segregation or solitary confinement is not an effective disease containment strategy.</u>  Beyond the known detrimental mental health effects of solitary confinement, isolation of people who are ill in solitary confinement results in decreased medical attention and increased risk of death.  Isolation of people who are ill using solitary confinement also is an ineffective way to prevent transmission of the virus through droplets to others because, except in specialized negative pressure rooms (rarely in medical units if available at all), air continues to flow outward from rooms to the rest of the facility.  Risk of exposure is thus increased to other people in prison and staff.

11. <u>Reduced prevention opportunities:</u> During an infectious disease outbreak, people can protect themselves by washing hands.  Jails and prisons do not provide adequate opportunities to exercise necessary hygiene measures, such as frequent handwashing or use of alcohol-based sanitizers when handwashing is unavailable.  Jails and prisons are often under-resourced and ill-equipped with sufficient hand soap and alcohol-based sanitizers for people detained in and working in these settings.  High-touch surfaces (doorknobs, light switches, etc.) should also be cleaned and disinfected regularly with bleach to prevent virus spread, but this is often not done in jails and prisons because of a lack of cleaning supplies and lack of people available to perform necessary cleaning procedures.

12. <u>Reduced prevention opportunities:</u> During an infectious disease outbreak, a containment strategy requires people who are ill with symptoms to be isolated and that caregivers have access to personal protective equipment, including gloves, masks, gowns, and eye shields.  Jails and prisons are often under-resourced and ill-equipped to provide sufficient personal protective equipment for people who are incarcerated and caregiving staff, increasing the risk for everyone in the facility of a widespread outbreak.

13. <u>Increased susceptibility:</u> People incarcerated in jails and prisons are more susceptible to acquiring and experiencing complications from infectious diseases than the population in the community.[1]  This is because people in jails and prisons are more likely than people in the community to have chronic underlying health conditions, including diabetes, heart disease,

---

[1] *Active case finding for communicable diseases in prisons*, 391 The Lancet 2186 (2018), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(18)31251-0/fulltext.

3

chronic lung disease, chronic liver disease, and lower immune systems from HIV.

14. <u>Jails and prisons are often poorly equipped to diagnose and manage infectious disease outbreaks</u>.  Some jails and prisons lack onsite medical facilities or 24-hour medical care.  The medical facilities at jails and prisons are almost never sufficiently equipped to handle large outbreaks of infectious diseases. To prevent transmission of droplet-borne infectious diseases, people who are infected and ill need to be isolated in specialized airborne negative pressure rooms.  Most jails and prisons have few negative pressure rooms if any, and these may be already in use by people with other conditions (including tuberculosis or influenza).  Resources will become exhausted rapidly and any beds available will soon be at capacity. This makes both containing the illness and caring for those who have become infected much more difficult.

15. <u>Jails and prisons lack access to vital community resources to diagnose and manage infectious diseases.</u> Jails and prisons do not have access to community health resources that can be crucial in identifying and managing widespread outbreaks of infectious diseases.  This includes access to testing equipment, laboratories, and medications.

16. <u>Jails and prisons often need to rely on outside facilities (hospitals, emergency departments) to provide intensive medical care</u> given that the level of care they can provide in the facility itself is typically relatively limited. During an epidemic, this will not be possible, as those outside facilities will likely be at or over capacity themselves.

17. <u>Health safety:</u> As an outbreak spreads through jails, prisons, and communities, medical personnel become sick and do not show up to work. Absenteeism means that facilities can become dangerously understaffed with healthcare providers. This increases a number of risks and can dramatically reduce the level of care provided.  As health systems inside facilities are taxed, people with chronic underlying physical and mental health conditions and serious medical needs may not be able to receive the care they need for these conditions.  As supply chains become disrupted during a global pandemic, the availability of medicines and food may be limited.

18. <u>Safety and security:</u> As an outbreak spreads through jails, prisons, and communities, correctional officers and other security personnel become sick

and do not show up to work. Absenteeism poses substantial safety and security risk to both the people inside the facilities and the public.

19. These risks have all been borne out during past epidemics of influenza in jails and prisons. For example, in 2012, the CDC reported an outbreak of influenza in 2 facilities in Maine, resulting in two inmate deaths.[2] Subsequent CDC investigation of 995 inmates and 235 staff members across the 2 facilities discovered insufficient supplies of influenza vaccine and antiviral drugs for treatment of people who were ill and prophylaxis for people who were exposed. During the H1N1-strain flu outbreak in 2009 (known as the "swine flu"), jails and prisons experienced a disproportionately high number of cases.[3] Even facilities on "quarantine" continued to accept new intakes, rendering the quarantine incomplete. These scenarios occurred in the "best case" of influenza, a viral infection for which there was an effective and available vaccine and antiviral medications, unlike COVID-19, for which there is currently neither.

## III. PROFILE OF COVID-19 AS AN INFECTIOUS DISEASE[4]

20. The novel coronavirus, officially known as SARS-CoV-2, causes a disease known as COVID-19. The virus is thought to pass from person to person primarily through respiratory droplets (by coughing or sneezing) but may also survive on inanimate surfaces. People seem to be most able to transmit the virus to others when they are sickest but it is possible that people can transmit the virus before they start to show symptoms or for weeks after their symptoms resolve. In China, where COVID-19 originated, the average infected person passed the virus on to 2-3 other people; transmission occurred at a distance of 3-6 feet. Not only is the virus very efficient at being transmitted through droplets, everyone is at risk of infection because

---

[2] *Influenza Outbreaks at Two Correctional Facilities — Maine, March 2011*, Centers for Disease Control and Prevention (2012), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6113a3.htm.
[3] David M. Reutter, *Swine Flu Widespread in Prisons and Jails, but Deaths are Few*, Prison Legal News (Feb. 15, 2010), https://www.prisonlegalnews.org/news/2010/feb/15/swine-flu-widespread-in-prisons-and-jails-but-deaths-are-few/.
[4] This whole section draws from Brooks J. Global Epidemiology and Prevention of COVID19, COVID-19 Symposium, Conference on Retroviruses and Opportunistic Infections (CROI), virtual (March 10, 2020); *Coronavirus (COVID-19)*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/index.html; Brent Gibson, *COVID-19 (Coronavirus): What You Need to Know in Corrections*, National Commission on Correctional Health Care (February 28, 2020), https://www.ncchc.org/blog/covid-19-coronavirus-what-you-need-to-know-in-corrections.

our immune systems have never been exposed to or developed protective responses against this virus. A vaccine is currently in development but will likely not be able for another year to the general public. Antiviral medications are currently in testing but not yet FDA-approved, so only available for compassionate use from the manufacturer. People in prison and jail will likely have even less access to these novel health strategies as they become available.

21. Most people (80%) who become infected with COVID-19 will develop a mild upper respiratory infection but emerging data from China suggests serious illness occurs in up to 16% of cases, including death.[5] Serious illness and death is most common among people with underlying chronic health conditions, like heart disease, lung disease, liver disease, and diabetes, and older age.[6] Death in COVID-19 infection is usually due to pneumonia and sepsis. The emergence of COVID-19 during influenza season means that people are also at risk from serious illness and death due to influenza, especially when they have not received the influenza vaccine or the pneumonia vaccine.

22. The care of people who are infected with COVID-19 depends on how seriously they are ill.[7] People with mild symptoms may not require hospitalization but may continue to be closely monitored at home. People with moderate symptoms may require hospitalization for supportive care, including intravenous fluids and supplemental oxygen. People with severe symptoms may require ventilation and intravenous antibiotics. Public health officials anticipate that hospital settings will likely be overwhelmed and beyond capacity to provide this type of intensive care as COVID-19 becomes more widespread in communities.

23. COVID-19 prevention strategies include containment and mitigation. Containment requires intensive hand washing practices, decontamination and aggressive cleaning of surfaces, and identifying and isolating people

---

[5] *Coronavirus Disease 2019 (COVID-19): Situation Summary*, Centers for Disease Control and Prevention (March 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/summary.html.

[6] *Clinical course and risk factors for mortality of adult inpatients with COVID-19 in Wuhan, China: a retrospective cohort study.* The Lancet (published online March 11, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext

[7] *Coronavirus Disease 2019 (COVID-19): Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease*, Centers for Disease Control and Prevention (March 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.

who are ill or who have had contact with people who are ill, including the use of personal protective equipment. Jails and prisons are totally under-resourced to meet the demand for any of these strategies. As infectious diseases spread in the community, public health demands mitigation strategies, which involves social distancing and closing other communal spaces (schools, workplaces, etc.) to protect those most vulnerable to disease. Jails and prisons are unable to adequately provide social distancing or meet mitigation recommendations as described above.

24. The time to act is now. Data from other settings demonstrate what happens when jails and prisons are unprepared for COVID-19. News outlets reported that Iran temporarily released 70,000 prisoners when COVID-19 started to sweep its facilities.[8] To date, few state or federal prison systems have adequate (or any) pandemic preparedness plans in place.[9] Systems are just beginning to screen and isolate people on entry and perhaps place visitor restrictions, but this is wholly inadequate when staff and vendors can still come to work sick and potentially transmit the virus to others.

I declare under penalty of perjury that the foregoing is true and correct.

March 22, 2020   _____
New Haven, Connecticut                Dr. Jaimie Meyer

---

[8] *Iran temporarily releases 70,000 prisoners as coronavirus cases surge*, Reuters (March 9, 2020), https://www.reuters.com/article/us-health-coronavirus-iran/iran-temporarily-releases-70000-prisoners-as-coronavirus-cases-surge-idUSKBN20W1E5.

[9] Luke Barr & Christina Carrega, *State prisons prepare for coronavirus but federal prisons not providing significant guidance, sources say*, ABC News (March 11, 2020), https://abcnews.go.com/US/state-prisons-prepare-coronavirus-federal-prisons-providing-significant/story?id=69433690.

7