Timothy P. Fox (CA Bar 157750)
*tfox@creeclaw.org*
Elizabeth Jordan*
*ejordan@creeclaw.org*
CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER
1245 E. Colfax Avenue, Suite 400
Denver, CO 80218
Tel:  (303) 757-7901
Fax: (303) 872-9072

Lisa Graybill*
*lisa.graybill@splcenter.org*
Jared Davidson*
*jared.davidson@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
201 St. Charles Avenue, Suite 2000
New Orleans, Louisiana 70170
Tel:  (504) 486-8982
Fax: (504) 486-8947

Stuart Seaborn (CA Bar 198590)
*sseaborn@dralegal.org*
Melissa Riess (CA Bar 295959)
*mriess@dralegal.org*
DISABILITY RIGHTS ADVOCATES
2001 Center Street, 4th Floor
Berkeley, California 94704
Tel:  (510) 665-8644
Fax: (510) 665-8511

Attorneys for Plaintiffs (continued on next page)

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION – RIVERSIDE

| | |
|---|---|
| FAOUR ABDALLAH FRAIHAT, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*,<br><br>Defendants. | Case No.: 19-cv-01546-JGB(SHKx)<br><br>**Declaration of Elizabeth Jordan in Support of Plaintiffs' Reply Brief in Support of Emergency Motion for Preliminary Injunction**<br><br>Date: April 13, 2020<br>Time: 9:00 a.m.<br>Hon. Jesus G. Bernal |

William F. Alderman (CA Bar 47381)
*walderman@orrick.com*
Jake Routhier (CA Bar 324452)
*jrouthier@orrick.com*
ORRICK, HERRINGTON &
SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105
Tel:  (415) 773-5700
Fax: (415) 773-5759

Michael W. Johnson**
*mjohnson1@willkie.com*
Dania Bardavid**
*dbardavid@willkie.com*
Jessica Blanton**
*jblanton@willkie.com*
Joseph Bretschneider**
*jbretschneider@willkie.com*
WILLKIE FARR &
GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Tel:  (212) 728-8000
Fax: (212) 728-8111

Maia Fleischman*
*maia.fleischman@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
2 South Biscayne Boulevard
Suite 3750
Miami, FL 33131
Tel:  (786) 347-2056
Fax: (786) 237-2949

Christina Brandt-Young*
*cbrandt-young@dralegal.org*
DISABILITY RIGHTS
ADVOCATES
655 Third Avenue, 14th Floor
New York, NY 10017
Tel:  (212) 644-8644
Fax: (212) 644-8636

Mark Mermelstein (CA Bar 208005)
*mmermelstein@orrick.com*
ORRICK, HERRINGTON &
SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA 90017
Tel:  (213) 629-2020
Fax: (213) 612-2499

Leigh Coutoumanos**
*lcoutoumanos@willkie.com*
WILLKIE FARR &
GALLAGHER LLP
1875 K Street NW, Suite 100
Washington, DC 20006
Tel:  (202) 303-1000
Fax: (202) 303-2000

Shalini Goel Agarwal
(CA Bar 254540)
*shalini.agarwal@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
106 East College Avenue
Suite 1010
Tallahassee, FL 32301
Tel:  (850) 521-3024
Fax: (850) 521-3001

Maria del Pilar Gonzalez Morales
(CA Bar 308550)
*pgonzalez@creeclaw.org*
CIVIL RIGHTS EDUCATION
AND ENFORCEMENT CENTER
1825 N. Vermont Avenue, #27916
Los Angeles, CA 90027
Tel:  (805) 813-8896
Fax: (303) 872-9072

Attorneys for Plaintiffs (continued from previous page)
*Admitted Pro Hac Vice
**Pro Hac Vice Application Forthcoming

I, Elizabeth Jordan, declare as follows:

1. I am an attorney duly licensed to practice law in the States of Louisiana and New York and am appearing *Pro Hac Vice* in this case. I am counsel of record for Plaintiffs in the above-captioned case. This declaration is based upon my personal knowledge. If called to testify, I would testify competently to the facts described in this declaration.

2. I submit this declaration in support of Plaintiffs' Reply Brief in Support of Emergency Motion for Preliminary Injunction.

**EXHIBITS IN SUPPORT OF PLAINTIFFS' REPLY BRIEF IN SUPPORT OF EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**

1. Attached as **Exhibit A** is a true and correct copy of Department of Homeland Security Office of the Inspector General, U.S. Immigration and Customs Enforcement's Alternatives to Detention (Revised) (Feb. 4, 2015), available at https://www.oig.dhs.gov/assets/Mgmt/2015/OIG_15-22_Feb15.pdf (last visited Apr. 8, 2020).

2. Attached as **Exhibit B** is a true and correct copy of National Immigrant Justice Center, ICE Released Its Most Comprehensive Immigration Data Yet. It's Alarming. (Mar. 13, 2018), available at https://immigrantjustice.org/staff/blog/ice-released-its-most-comprehensive-immigration-detention-data-yet (last visited Apr. 8, 2020).

3. Attached as **Exhibit C** is a true and correct copy of American Immigration Council, Fact Sheet, Immigrants and Families Appear in Court (July 30, 2019), available at https://www.americanimmigrationcouncil.org/research/immigrants-and-families-appear-court (last visited Apr. 8, 2020).

4. Attached as **Exhibit D** is a true and correct copy of Memorandum from Attorney Gen. William Barr to Director of Bureau of Prisons, (April 3, 2020) available at https://www.justice.gov/file/1266661/download (last

visited Apr. 8, 2020).

5. Attached as **Exhibit E** is a true and correct copy of U.S. Immigration and Customs Enforcement Fiscal Year 2019 Enforcement and Removal Operations Report, available at https://www.ice.gov/sites/default/files/documents/Document/2019/eroReportFY2019.pdf (last visited Apr. 8, 2020).

6. Attached as **Exhibit F** is a true and correct copy of U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations Bond Management Handbook, (Aug. 19, 2014) available at https://www.aila.org/File/Related/16051730f.pdf (last visited Apr. 8, 2020).

7. Attached as **Exhibit G** is a true and correct copy of Peter B. Berg, Assistant Dir., Field Operations, Updated Guidance: COVID-19 Detained Docket Review-Effective Immediately (Apr. 4, 2020).

8. Attached as **Appendix 1** is a table of court decisions addressing the COVID-19 pandemic and request for release of people detained in immigration detention centers across the country.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 9, 2020 in Denver, Colorado.

Elizabeth Jordan

# EXHIBIT A

OFFICE OF INSPECTOR GENERAL

# U.S. Immigration and Customs Enforcement's Alternatives to Detention (Revised)


Homeland Security

**February 4, 2015**

**OIG-15-22**

# HIGHLIGHTS

## *U.S. Immigration and Customs Enforcement's Alternatives To Detention*

**February 4, 2015**

**Why We Did This**

ICE's Intensive Supervision Appearance Program offers alternatives to detention. We reviewed whether: (1) the rate at which individuals in the Intensive Supervision Appearance Program have absconded or committed criminal acts has been reduced since 2009; (2) ICE can improve the effectiveness of its alternatives to detention program, either by revising or expanding its Intensive Supervision Appearance Program contract, or through other cost-effective means; and (3) ICE's Risk Classification Assessment is effective.

**What We Recommend**

We made five recommendations to improve ICE's management of the Intensive Supervision Appearance Program and the Risk Classification Assessment.

**For Further Information:**
Contact our Office of Public Affairs at (202) 254-4100, or email us at DHS-OIG.OfficePublicAffairs@oig.dhs.gov

# What We Found

According to U.S. Immigration and Customs Enforcement (ICE), the Intensive Supervision Appearance Program is effective because, using its performance metrics, few program participants abscond. However, ICE has changed how it uses the program and no longer supervises some participants throughout their immigration proceedings. As a result, ICE cannot definitively determine whether the Intensive Supervision Appearance Program has reduced the rate at which aliens, who were once in the program but who are no longer participating, have absconded or been arrested for criminal acts. ICE should adjust its performance metrics to reflect changes in its criteria for program participation.

ICE instructed field offices to consider redetaining noncompliant Intensive Supervision Appearance Program participants, but most field offices do not have sufficient funding for detention bed space to accommodate all noncompliant participants. ICE could improve the effectiveness of the program by allocating some Intensive Supervision Appearance Program contract funds to redetain noncompliant participants.

ICE developed a Risk Classification Assessment to assist its release and custody classification decisions. However, the tool is time consuming, resource intensive, and not effective in determining which aliens to release or under what conditions.

# Agency Response

ICE concurred with all five recommendations.



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

February 4, 2015

MEMORANDUM FOR: The Honorable Sarah R. Saldaña
Director
U.S. Immigration and Customs Enforcement

FROM: John Roth
Inspector General

SUBJECT: *U.S. Immigration and Customs Enforcement's Alternatives to Detention*

Attached for your information is our revised final report, *U.S. Immigration and Customs Enforcement's Alternatives to Detention (OIG-15-22)*. We incorporated the formal comments from the U.S. Immigration and Customs Enforcement (ICE) in the final report.

The report contains five recommendations aimed at improving ICE's management of its alien release decisions and terms of release. Your office initially concurred with Recommendation 1, 2, 3, and 4, and did not concur with Recommendation 5.

Based on information provided in your initial response, we clarified Recommendation 5 and provided ICE with an opportunity to modify its response. ICE modified its response and now concurs with the Recommendation 5. We consider Recommendations 1, 2, 3, 4, and 5 resolved and open.

As prescribed by the *Department of Homeland Security Directive 077-01, Follow-Up and Resolutions for Office of Inspector General Report Recommendations,* within 90 days of the date of this memorandum, please provide our office with a written response that includes your (1) corrective action plan and (2) target completion date for each recommendation. Also, please include responsible parties and any other supporting documentation necessary to inform us about the current status of the recommendation.

Consistent with our responsibility under the *Inspector General Act,* we will provide copies of our report to appropriate congressional committees

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

with oversight and appropriation responsibility over the Department of Homeland Security. We will post the report on our website.

Please call me with any questions, or your staff may contact Anne Richards, Assistant Inspector General for Inspections, at (202) 254-4100.

## Errata page for OIG-15-22

### *U.S. Immigration and Customs Enforcement's Alternatives to Detention*

**Change made to Recommendation 5, page 13, (see below):**
We revised the recommendation for clarity:

**OIG Draft Language:**

**Recommendation 5.** We recommend that ICE Executive Associate Director for the Office of Enforcement and Removal Operations: Revise the Risk Classification Assessment special vulnerabilities module to ensure that ICE conducts medical evaluations in accordance with the ICE Performance Based National Detention Standard on medical care.

**OIG Final Report Language:**

**Recommendation 5.** We recommend that ICE Executive Associate Director for the Office of Enforcement and Removal Operations: Revise the Risk Classification Assessment special vulnerabilities module to ensure that when ICE conducts the Risk Classification Assessment at a detention facility, medical staff or trained ERO officers ask detainees relevant medical questions in a setting that provides privacy.

OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

# Table of Contents

Results of Inspection.................................................................................2

Background .............................................................................................3

Intensive Supervision Appearance Program Performance Metrics
Need Revision ................................................................................6

Risk Classification Assessment is Ineffective to Determine Release
Decisions.................................................................................... 11

# Appendixes

Appendix A:  Transmittal to Action Official ................................. 16
Appendix B:  Scope and Methodology ......................................... 18
Appendix C:  ICE Comments to the Draft Report......................... 19
Appendix D:  Risk Classification Assessment Checklist............... 22
Appendix E:  ISAP II Termination Rates ...................................... 23
Appendix F:  Risk Classification Assessment Overrides .............. 25
Appendix G:  Medical Screening and Special Vulnerabilities
                        Checklists................................................................ 26
Appendix H:  Major Contributors to This Report ......................... 31
Appendix I:   Report Distribution................................................ 32

# Abbreviations

ATD            Alternatives to Detention
DHS            Department of Homeland Security
ENFORCE   Enforcement Case Tracking System
ERO            Enforcement and Removal Operations
FY              fiscal year
GPS            Global Positioning System
ICE             U.S. Immigration and Customs Enforcement
INA             Immigration and Nationality Act
ISAP           Intensive Supervision Appearance Program
OIG            Office of Inspector General
RCA            Risk Classification Assessment



OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

# Results of Inspection

The *Immigration and Nationality Act*, as amended, grants U.S. Immigration and Customs Enforcement (ICE) administrative authority to detain aliens during the process of removing them from the United States. ICE's Intensive Supervision Appearance Program offers alternatives to detention. Under the program, ICE supervises aliens it has released from detention, and monitors them electronically. As a condition of release, ICE requires aliens to appear in immigration court for removal proceedings and comply with removal orders from the United States.

We reviewed whether: (1) the rate at which individuals in the Intensive Supervision Appearance Program have absconded or committed criminal acts has been reduced since 2009; (2) ICE can improve the effectiveness of its alternatives to detention program, either by revising or expanding its Intensive Supervision Appearance Program contract, or through other cost-effective means; and (3) ICE's Risk Classification Assessment is effective.

According to ICE, the Intensive Supervision Appearance Program is effective because, using its performance metrics, few program participants abscond. However, ICE has changed how it uses the program and no longer supervises some participants throughout their immigration proceedings. As a result, ICE cannot definitively determine whether the Intensive Supervision Appearance Program has reduced the rate at which aliens, who were once in the program but who are no longer participating, have absconded or been arrested for criminal acts. ICE should adjust its performance metrics to reflect changes in its criteria for program participation.

ICE instructed field offices to consider redetaining noncompliant Intensive Supervision Appearance Program participants, but most field offices do not have sufficient funding for detention bed space to accommodate all noncompliant participants. ICE could improve the effectiveness of the program by allocating some Intensive Supervision Appearance Program contract funds to redetain noncompliant participants.

ICE developed a Risk Classification Assessment to assist its release and custody classification decisions. However, the tool is time consuming, resource intensive, and not effective in determining which aliens to release or under what conditions.

We made five recommendations to improve ICE's management of the Intensive Supervision Appearance Program and the Risk Classification Assessment.



# Background

The *Immigration and Nationality Act*, as amended (INA), grants ICE administrative authority to detain aliens during the process of removing them from the United States. ICE's Office of Enforcement and Removal Operations (ERO) manages and oversees Federal immigration detention. ERO detains aliens to ensure they appear in court for immigration hearings and comply with removal orders that immigration courts may issue.

ERO tracks more than 1.8 million aliens in immigration removal proceedings, but ICE's budget only funds 34,000 detention beds. Because ERO cannot detain all aliens who are waiting to appear in immigration courts or waiting for removal, it prioritizes detention bed space for: (1) aliens it is required to detain under the INA; (2) those who pose a risk to public safety if released; and (3) those at risk of absconding. However, ERO may not detain all aliens who fall in these three categories. For example, ERO cannot indefinitely detain most aliens who have a final removal order, but are not removable from the United States.[1] ERO may also not be able to detain all aliens who are at risk of absconding.

In 2003, to provide additional options for supervised release, Congress appropriated funds to pilot a 5-year Intensive Supervision Appearance Program (ISAP). Called ISAP I, the program operated in ten cities; it ran from 2004 to 2009. In June 2008, Congress appropriated approximately $62 million to fund the first year of a program called ISAP II, which was designed to expand the original program nationwide. For fiscal year (FY) 2014, Congress appropriated approximately $90 million for the program; ERO plans to renew the program contract for ISAP III in November 2014. Our report focuses on ISAP II.

ERO uses ISAP II in conjunction with the less restrictive release conditions associated with payment of a bond, or having to report periodically to an ERO field office. Under ISAP II, ERO, through a contractor, provides a supervised alternative to detention using technology and case management. The intent of this supervised release is to increase compliance with release conditions, appearances in immigration court for removal hearings, and final removal orders that immigration courts may issue.

---

[1] Certain countries refuse to issue travel documents to their nationals who are under final removal orders or countries delay the removal process. Since 2001, the U.S. Supreme Court has determined that ICE generally should not detain aliens with a final removal order for longer than 6 months if there is no significant likelihood of removal in the reasonably foreseeable future. Even if there is no significant likelihood of removal within the reasonably foreseeable future, however, DHS regulations permit the continued detention of certain classes of removable aliens on account of special circumstances, such as national security or public safety reasons. *See* 8 C.F.R. § 241.14(f). Decisions include *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001) and *Clark v. Martinez*, 543 U.S. 371, 386 (2005).



ISAP II currently has two supervision options, Technology-Only and Full-Service. As of February 2014, there were 10,833 active Technology-Only program participants and 11,368 active Full-Service participants. ERO's contractor provides electronic monitoring services for both programs, either through use of an ankle bracelet that enables Global Positioning System (GPS) monitoring or voice recognition software for telephonic reporting. Contractor charges for supervision vary by type of monitoring. The full cost of Technology-Only supervision is difficult to estimate because ERO does not track the cost of using its personnel to manage cases, but the contractor charges $0.17 a day per participant for telephonic monitoring and $4.41 for GPS monitoring. For Full-Service supervision, the contractor provides case management, as well as electronic monitoring, and charges an average of $8.37 a day per participant.

Contractor-provided case management includes:

- encouraging participants to comply with immigration proceedings, obtain travel documents, and plan for return to their country of origin;
- providing information on transportation, medical care, religious services, legal resources, and other community resources;
- scheduling unannounced visits to the participant's work and/or living address;
- scheduling participant visits to the contractor's office; and
- reporting any instances of program noncompliance to ERO, such as tampering with or removing a GPS ankle bracelet or missing a visit.

When ISAP II expanded to a nationwide program in 2009, ERO identified three high priority categories of aliens to enroll:

(1) aliens with final removal orders who are not removable from the United States and cannot be legally held in custody more than 6 months, but who are a danger to the community;

(2) aliens in removal proceedings, not issued final removal orders, who are at high risk of absconding; and

(3) aliens with final removal orders, previously released under supervision, who violate the terms of supervision by committing crimes or otherwise fail to comply with release conditions.

**Risk Classification Assessment**

ICE implemented the Risk Classification Assessment (RCA) in January 2013, in response to a 2009 immigration detention review.[2] The RCA is a module in ICE's Enforcement Case Tracking System (ENFORCE), which ERO uses to

---

[2] Dr. Dora Schriro, *Immigration Detention Overview and Recommendations*, ICE, October 6, 2009.



track detention, removal, and release operations. When ERO first detains an alien, ERO uses the RCA to generate standardized recommendations for:

    (1) detention or release;
    (2) custody classification level for detained aliens;
    (3) immigration bond amount, if applicable; and
    (4) community supervision level (including ISAP II) for released aliens.

ICE expects ERO officers to complete the RCA at intake or within 5 days of detention, unless detention is mandatory. Appendix D shows the RCA information ERO collects for each alien.



OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

# Intensive Supervision Appearance Program Performance Metrics Need Revision

According to ERO, ISAP II is effective because, using its performance metrics, few program participants abscond. However, ERO has not adjusted its performance metrics to account for changes in the criteria for ISAP II participation. In 2011, ERO began removing some participants from the program and reducing GPS monitoring for others when their immigration proceedings were delayed. As a result, ERO cannot definitively determine whether ISAP II has reduced the rate at which aliens, who were once in the program but who are no longer participating, have absconded or been arrested for criminal acts. In addition, some program participants willfully violate the terms of ISAP II supervision, but ERO currently does not have sufficient resources to redetain these aliens.

**Intensive Supervision Appearance Program**

When ERO expanded ISAP II nationwide in 2009, it developed performance metrics to verify the effectiveness of the program. At that time, ERO was enrolling aliens in the program who were at high risk of committing criminal acts, absconding, or violating the terms of their release, such as reporting requirements. ERO intended for these aliens to continue participating in ISAP II and remain under supervision until their immigration cases were completed, either because they were removed from the United States or granted an immigration benefit, such as asylum. Thus, to determine whether ISAP II would reduce the rate of those who absconded or were arrested for criminal acts, ERO only measured the rate for those participating in the program.

For contract years 2010 through 2012, ERO reported that the rates at which ISAP II participants absconded and were arrested for criminal acts declined each year. Figure 1 and appendix E show these numbers as percentages of the total number of aliens whose ISAP II participation ended during the contract year.

**Figure 1: Number of ISAP II Participants Who Absconded or Were Arrested**

| Contract Year [November to November] | 2010 | 2011 | 2012 |
|---|---|---|---|
| Total number of participants whose participation in ISAP II ended during the contract year | 8,591 | 12,268 | 17,524 |
| Number of participants who absconded | 927 (10.79%) | 982 (8.00%) | 851 (4.86%) |
| Number of participants arrested by other law enforcement agency | 576 (6.70%) | 729 (5.94%) | 705 (4.02%) |

*Source*: ISAP II annual reports from contract years 2010 through 2012.



OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

In 2011, ERO changed the criteria for participation in ISAP II for aliens whose immigration proceedings were delayed, when ERO had no control over the delays. Specifically, ERO changed participation criteria for:

- <u>Non-removable aliens</u>: ERO headquarters instructed field offices to terminate ISAP II participation for aliens in the program who could not be removed from the United States and not enroll additional nonremovable aliens in the program. For example, ERO terminated the participation of Cuban criminals who could not be repatriated because Cuba would not accept them. According to ERO, it could release most of these aliens from detention using an immigration bond or another monitoring method, such as having them report to an ERO field office.

- <u>Aliens at risk of absconding</u>: ERO headquarters instructed field offices to limit GPS monitoring for aliens who did not yet have a removal order, but were waiting to appear in immigration court, and were generally compliant with the terms of ISAP II supervision. According to ERO, because some immigration cases can take years to complete, it was not always feasible to continue GPS monitoring for aliens waiting to appear in immigration court. ERO also reasoned that those who had been complying with program terms and had a set court date would be less likely to abscond months before the court date. ERO headquarters recommended using another monitoring method during this period, such as having participants report telephonically.

As a result of these changes in criteria, as shown in figure 2, and in more detail in appendix E, ERO terminated the participation of more than half of its compliant ISAP II participants before their immigration cases were completed through removal from the United States or granting of an immigration benefit.

**Figure 2: Reasons for ISAP II Participation Termination**



*Source*: ISAP II annual reports from contract years 2010 through 2012.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Although ERO reasoned these changes in participation would increase ISAP II's effectiveness, the office did not define effectiveness. Nor did ERO update its performance metrics to account for former ISAP II program participants who had absconded or were arrested for criminal acts after their participation ended. Although ERO ended participation in ISAP II for many aliens before their immigration cases were completed, the office continued to measure whether aliens absconded or were arrested for criminal acts only while actually participating in ISAP II.

As a result, ERO cannot accurately determine whether transitory participation in ISAP II reduces the rate at which aliens, who were once in the program, later abscond or are arrested for criminal acts. To better evaluate the program's effectiveness, ERO should develop and implement performance metrics to determine whether transitory participation in ISAP II contributes over time to reducing the rate at which aliens abscond or are arrested for criminal acts.

**Program Violators**

ERO does not have sufficient resources to redetain participants who willfully violate ISAP II's terms of supervision, such as those who tamper with GPS monitors or miss appointments. Beginning in 2012, ERO instructed field offices to consider redetaining noncompliant participants, but most field offices do not have sufficient funding for the number of beds needed to accommodate program violators.[3] ERO officers said that dedicating funding for approximately 150 to 200 detention beds nationally, to redetain program violators as necessary, would discourage willful noncompliance. Currently, ERO uses most ISAP II contract funds for electronic monitoring and supervision. ERO could improve ISAP II's effectiveness by allocating some ISAP II contract funds to redetaining noncompliant participants.

**Recommendation 1.** We recommend that ICE Executive Associate Director for the Office of Enforcement and Removal Operations: Develop and implement performance metrics to evaluate Intensive Supervision Appearance Program effectiveness.

**Recommendation 2.** We recommend that the Principal Deputy Assistant Secretary: Assess and report on the feasibility of using funds from the Alternatives to Detention (ATD) program to provide detention beds for noncompliant Intensive Supervision Appearance Program participants.

---

[3] *Alternatives to Detention (ATD) Program Guidance,* Executive Associate Director for Enforcement and Removal Operations, August 10, 2012; *De-escalation of Alternatives to Detention Full Service Participants,* Associate Director, Custody Management, January 31, 2013.



OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

**Management Comments and OIG Analysis**

We evaluated ICE's written response and have made changes to the report where we deemed appropriate. A summary of ICE's written response to the report recommendations and our analysis of the response follows each recommendation. A copy of ICE's response, in its entirety, is appendix C. ICE concurred with all report recommendations. We appreciate ICE's comments and contributions.

**Management Response**: ICE officials concurred with Recommendation 1. In its response ICE said the program has established metrics to evaluate effectiveness and programmatic success of the Alternatives to Detention program. However, ICE has found it difficult to develop a methodology that can measure appropriately the latent effects of Alternatives to Detention participation on aliens' future compliance with their reporting and court appearance requirements. ICE will continue to assess existing data and data collection methods with a view to identify more specifically the challenges that need resolution before such a methodology can be implemented. After the initial evaluation, ICE will work to develop one or more performance metrics to gauge such latent effects. ICE requests that this recommendation be considered resolved and open pending the results of this initial evaluation, which ICE estimates completing by July 1, 2015.

**OIG Analysis**: We consider ICE's proposed actions responsive to the intent of Recommendation 1, which is resolved and open. Rather than focusing solely on the latent effects of program participation, ICE officials may want to consider performance metrics that recognize milestones participants achieve while enrolled in the program. These milestones could include obtaining travel documents and planning for departure. This recommendation will remain open pending our receipt of ICE's developed and implemented performance metrics to evauate ISAP effectiveness.

**Management Response**: ICE officials concurred with Recommendation 2. ICE responded that it believes there is sufficient detention capacity to accommodate noncompliant ATD participants should the program's increased monitoring and/or reporting requirements prove insufficient to correct noncompliant behavior. ICE will continue to exercise its prosecutorial discretion appropriately when deciding whom to detain, and align ATD resources appropriately with ICE's enforcement priorities. Should future need for additional bed space funds arise, ICE will reprogram, as it has in the past, funds from other programs, including ATD. ICE requests that this recommendation be considered resolved and closed.

**OIG Analysis**: We consider ICE's actions partially responsive to the intent of Recommendation 2, which is resolved and open. ICE officials stated there is sufficient detention capacity to accommodate noncompliant ATD participants,



but many field office directors said they need existing detention bed space for higher risk cases. ICE has the option of reprogramming funds, but this process is cumbersome. We will close this recommendation when ICE officials obtain a legal opinion on whether reserving a portion of existing ATD funding to redetain noncompliant participants is feasible. ICE may, as a matter of policy, continue to fund redetention of noncompliant participants through other means, or not fund redetention at all.



OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

# Risk Classification Assessment is Ineffective to Determine Release Decisions

ICE developed the RCA to assist its release and custody classification decisions. However, the tool is time consuming, resource intensive, and not effective in determining which aliens to release or under what conditions. In addition, RCA questions on special vulnerabilities conflict with ICE's Performance Based National Detention Standards.

## Processing Time and Resources

As shown in appendix D, ERO field officers ask each alien as many as 178 RCA questions during intake processing. This requirement adds 15 to 30 minutes to each alien interview. The RCA also requires at least two ERO levels of review. As a result, completing the RCA can add several hours to alien intake processing. To avoid holding aliens overnight at intake processing, ICE headquarters authorizes its field offices with high intake volume the option of postponing the RCA for up to 5 days.[4] However, postponing the RCA requires field officers to conduct two risk assessments, (1) an informal assessment at intake and (2) the formal RCA later.

The RCA adds unnecessary processing time because it does not allow ERO officers the ability to triage an alien's intake; officers must ask each alien every RCA question.[5] For example, officers must ask aliens who are:

- a risk to public safety all questions related to terms of release;
- too ill to detain all questions related to terms of custody; and
- redetained because ERO has scheduled their removal all questions related to terms of custody and terms of release.

## Alien Release Decisions

The RCA does not enhance the quality of ERO field office release decisions. For example, the system is not capable of making recommendations on complex cases and refers such cases to an ERO supervisor.[6] As shown in appendix F, of the 228,095 RCA decisions made between July 30, 2012, and December 31, 2013, the RCA made no recommendation for 41,971, or 18.4 percent of cases. When the system does make a recommendation, ERO officers routinely override the recommendation. Of the 228,095 RCA recommendations

---

[4] RCA guidance states that all aliens must have an RCA completed as early in the process as possible, unless they are subject to mandatory detention and will be removed within 5 days, in which case the RCA is not necessary.

[5] ERO officers do not ask male aliens whether they are pregnant or nursing.

[6] The system refers high risk aliens with serious medical issues to ERO supervisors. RCA also refers aliens with both minor criminal convictions and weak community ties to ERO supervisors.



OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

between July 30, 2012, and December 31, 2013, ERO officers overrode 49,861, or 21.9 percent of the RCA recommendations.

RCA recommendations are of limited value to ERO officers in determining which aliens to place on ISAP II. For example, the system generally recommends bond for higher risk releases and supervision without a bond for lower risk releases. In practice, ERO field offices are encouraged to ensure compliance among higher risk releases with a combination of a bond and ISAP II GPS monitoring. RCA recommendations also do not take into account ISAP II's available funding for new participants or the program's Full-Service and Technology-Only geographic locations.

**RCA Predictive Capabilities**

ICE did not design the RCA to improve its predictive capabilities over time. For example, ICE headquarters does not evaluate the rate at which:

- aliens kept in detention were later granted relief;
- aliens determined not to be vulnerable were later determined to require specialized care;
- ICE lowered bond amounts for aliens unable to pay bond;
- immigration judges offered bonds to aliens ICE had determined not to release; or
- aliens recommended for release who abscond.

**RCA Special Vulnerabilities Assessment**

RCA questions on special vulnerabilities conflict with ICE's Performance Based National Detention Standards medical screening guidance.[7] According to the Standards, all detainees must undergo an intake medical screening within 12 hours of entry into a detention facility.[8] Appendix G shows the Standards medical screening questionnaire and the RCA special vulnerability questions. The Standards require that a medical professional or trained detention officer conduct the screening and provide privacy to the detainee. In contrast, an ERO officer may not have the necessary medical training and cannot offer privacy when asking the RCA special vulnerabilities questions.

---

[7] ICE, *Performance Based National Detention Standards 2011*, as modified by February 2013 errata, 4.3 Medical Care, page 288. http://www.ice.gov/doclib/detention-standards/2011/medical_care.pdf.

[8] *Performance Based National Detention Standards 2011*, pages 288–289. http://www.ice.gov/doclib/detention-standards/2011/medical_care.pdf.



As shown in appendix G, most of the 31 RCA special vulnerabilities questions have a medical component.[9] ICE can protect vulnerable populations better by ensuring medical staff or ERO officers trained in the Standards conduct the detainee intake medical screenings.

**Recommendation 3.** We recommend that ICE Executive Associate Director for the Office of Enforcement and Removal Operations: Revise the Risk Classification Assessment tool to eliminate nonmaterial questions when statutory requirements, humanitarian considerations, or bed space limitations determine custody and release decisions.

**Recommendation 4.** We recommend that ICE Executive Associate Director for the Office of Enforcement and Removal Operations: Establish and implement performance measures to evaluate and improve the accuracy, efficiency, and effectiveness of the Risk Classification Assessment.

**Recommendation 5.** We recommend that ICE Executive Associate Director for the Office of Enforcement and Removal Operations: Revise the Risk Classification Assessment special vulnerabilities module to ensure that when ICE conducts the Risk Classification Assessment at a detention facility, medical staff or trained ERO officers ask detainees relevant medical questions in a setting that provides privacy.

**Management Response**: ICE officials concurred with Recommendation 3. ICE responded it reviews RCA deployment success on an ongoing basis and has already made changes to the RCA to allow for more efficient processing. ICE continues to pursue enhancements and efficiencies. For example, in August 2013, ICE streamlined the RCA by generating an automatic detain decision in expedited removal cases, allowing field offices to skip the submission/approval steps otherwise required. ICE said it initiated a formal process to review whether greater efficiencies could be achieved by eliminating nonmaterial questions, without lessening the RCA's usefulness. The process will require input from ERO field offices and relevant ICE headquarters programs, analysis of performance measures and other data, and an assessment of the costs and benefits of any possible changes. However, ICE officials disagree with the examples of nonmaterial questions cited in the our report, and cannot commit to making specific changes before ICE completes its assessment. ICE requests that this recommendation be considered resolved and open pending completion of its review of the RCA, which ICE estimates completing by July 31, 2015.

---

[9] The RCA special vulnerabilities questions include serious physical illness, serious mental illness, disability, age, pregnancy, and risk based on sexual orientation or gender identity, all of which the Standards' medical screening covers. The RCA special vulnerabilities questions also include whether an alien is a victim of persecution or torture, sexual abuse or violent crime, or human trafficking. While these cases may require medical attention, the RCA does not instruct ERO officers to refer the case to medical staff.



**OIG Analysis**: We consider ICE's proposed actions responsive to the intent of Recommendation 3, which is resolved and open.

**Management Response**: ICE officials concurred with Recommendation 4. ICE responded that it will continue to use performance measures to improve RCA accuracy, efficiency, and effectiveness. Since initial deployment, ICE has measured RCA accuracy, efficiency, and effectiveness by using a variety of performance measures. These include field office completion rates, recommendation rates by type, decision rates by type, and system override rates.

ICE also conducted rigorous analyses of RCA recommendations and field office decisions, cross referencing every crime category and flight risk factor. ICE used this data to assess the likely impact of a large number of possible changes. Based on this ongoing analysis, as well as input from field offices, ICE said it made significant RCA process changes in August 2013 and January 2014, such as for scoring and decision logic. These changes have reduced override rates from 21.9 percent to 7.6 percent for all decisions from January to August 2014, and have resulted in RCA recommendations that are more closely aligned with ICE's enforcement priorities. ICE notes the importance that some overrides are not only expected, but even desirable. Supervisors must maintain the ability to exercise discretion and the RCA requires written justifications in cases where recommendations are overridden.

Further, the principal goals of the RCA are to promote consistency and transparency in detention-related decision making and to better align field office decisions with ICE policies and priorities. ICE said it disagrees with the hypothetical performance measures listed in our report, as the RCA was not intended to predict factors such as the likely future rulings of immigration judges or a detainee's ability to pay bond. ICE deployed the most recent set of scoring changes in January 2014. Further review of performance measures and consideration of additional changes are ongoing. ICE requests that this recommendation be considered resolved and closed.

**OIG Analysis**: We consider ICE's proposed actions partially responsive to the intent of Recommendation 4, which is resolved and open. ICE should provide us documentation on the program analysis it described. Based on ICE's description, the metrics developed focus on whether field officers are completing the RCA and whether the RCA's recommendations match the decisions officers would already make. The RCA offers ICE an opportunity to use its limited resources more effectively. ICE officials may want to consider performance metrics to evaluate how the RCA can provide field officers better information or allow officers to work more efficiently.

**Management Response**: ICE did not concur with Recommendation 5 in its original response. ICE officials responded that in some circumstances, ICE



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

asks the RCA Special Vulnerability questions in field office facilities. ICE said that field office facilities are not governed by ICE detention standards. Based on ICE's original response, we clarified Recommendation 5 to apply only when ICE conducts the Risk Classification Assessment at a detention facility. We provided ICE with an opportunity to modify its original response. ICE modified its response and now concurs with Recommendation 5. ICE will ensure that controls are in place to ensure that RCA Special Vulnerability assessments performed at detention facilities are conducted in a setting that provides privacy to the alien being assessed, and in accordance with applicable detention standards. ICE said modifications to the RCA would not be necessary to implement this recommendation.

**OIG Analysis**: We consider ICE's proposed actions responsive to the intent of Recommendation 5, which is resolved and open. ICE should provide us documentation on the controls it implements to ensure that RCA Special Vulnerability assessments performed at detention facilities are conducted in accordance with applicable detention standards.



OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

# Appendix A

# Transmittal to Action Official



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

February 4, 2015

MEMORANDUM FOR:   The Honorable Sarah R. Saldaña
Director
U.S. Immigration and Customs Enforcement

FROM:   John Roth
Inspector General

SUBJECT:   *U.S. Immigration and Customs Enforcement's Alternatives to Detention*

Attached for your information is our revised final report, *U.S. Immigration and Customs Enforcement's Alternatives to Detention (OIG-15-22)*. We incorporated the formal comments from the U.S. Immigration and Customs Enforcement (ICE) in the final report.

The report contains five recommendations aimed at improving ICE's management of its alien release decisions and terms of release. Your office initially concurred with Recommendation 1, 2, 3, and 4, and did not concur with Recommendation 5.

Based on information provided in your initial response, we clarified Recommendation 5 and provided ICE with an opportunity to modify its response. ICE modified its response and now concurs with the Recommendation 5. We consider Recommendations 1, 2, 3, 4, and 5 resolved and open.

As prescribed by the *Department of Homeland Security Directive 077-01, Follow-Up and Resolutions for Office of Inspector General Report Recommendations*, within 90 days of the date of this memorandum, please provide our office with a written response that includes your (1) corrective action plan and (2) target completion date for each recommendation. Also, please include responsible parties and any other supporting documentation necessary to inform us about the current status of the recommendation.

Consistent with our responsibility under the *Inspector General Act*, we will provide copies of our report to appropriate congressional committees



OFFICE OF INSPECTOR GENERAL
Department of Homeland Security



with oversight and appropriation responsibility over the Department of Homeland Security. We will post the report on our website.

Please call me with any questions, or your staff may contact Anne Richards, Assistant Inspector General for Inspections, at (202) 254-4100.

2



# Appendix B

# Scope and Methodology

The Department of Homeland Security (DHS) Office of Inspector General (OIG) was established by the *Homeland Security Act of 2002* (Public Law 107-296) by amendment to the *Inspector General Act of 1978*. This is one of a series of audit, inspection, and special reports prepared as part of our oversight responsibilities to promote economy, efficiency, and effectiveness within the Department.

We reviewed ICE's alternatives to detention. Our objectives were to determine whether:

(1) the rate at which individuals in the ISAP II program have committed criminal acts or absconded has been reduced since 2009;

(2) ICE can improve the effectiveness of its alternatives to detention program, either by revising or expanding its ISAP II contract, or through other cost-effective means; and

(3) ICE's release risk assessment tool is effective.

We conducted field work for this report from April 2013 to April 2014. We conducted more than 100 interviews with ICE officials, ICE contractors, nongovernmental organizations, and officials from the Department of Justice Executive Office for Immigration Review, and the Probation and Pretrial Service Office, Administrative Office of the United States Courts. These included in-person and telephone interviews with ERO field office directors, deputies, and assistants from 18 of the 24 ERO field offices. We interviewed ERO headquarters staff, including detailed field officials to headquarters. We also interviewed ICE officials from the Law Enforcement and Statistical Analysis Unit. We conducted eight field site visits to interview ERO supervisory and nonsupervisory officers. We obtained direct access to the ENFORCE database and conducted an independent review of alien records in the ISAP II program, and aliens for whom ERO had conducted risk classification assessments.

We conducted this review under the authority of the *Inspector General Act of 1978*, as amended, and according to the Quality Standards for Inspections and Evaluation issued by the Council of the Inspectors General on Integrity and Efficiency.



OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

# Appendix C

# ICE Comments to the Draft Report



*Office of Management and Administration*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

**U.S. Immigration
and Customs
Enforcement**

January 28, 2015

MEMORANDUM FOR:     Anne L. Richards
                    Assistant Inspector General for Inspections
                    Office of Inspector General

FROM:               Radha C. Sekar
                    Executive Associate Director
                    Management and Administration

SUBJECT:            Management Response for OIG Draft Report, "ICE's Alternative
                    to Detention" dated October 7, 2014 (OIG Project No. 13-065-
                    ISP-ICE)

Thank you for the opportunity to review and comment on the subject draft report. U.S.
Immigration and Customs Enforcement (ICE) appreciates the Office of Inspector General's
(OIG) work in planning and conducting its review and issuing this report.

ICE concurs with all five recommendations in the draft report. Of these, ICE is requesting
closure of three recommendations. OIG's recommendations and ICE's responses are as follows:

**Recommendation 1**: We recommend that ICE's Executive Associate Director for the Office of
Enforcement and Removal Operations: Develop and implement performance metrics to evaluate
Intensive Supervision Appearance Program effectiveness.

**Response:** Concur. While the ICE program has established metrics to evaluate effectiveness
and programmatic success of the Alternatives to Detention (ATD) program, it has found it
difficult to develop a methodology that can appropriately measure the latent effects of ATD
participation on aliens' future compliance with their reporting and court appearance
requirements. ICE will continue to assess existing data and data collection methods with a view
to more specifically identifying the challenges that need to be overcome before such a
methodology can be put into place. After the initial evaluation, ICE will work to develop one or
more performance metrics to gauge such latent effects.

ICE requests that OIG classify this recommendation as resolved and open pending the results of
this initial evaluation.

Estimated Completion Date (ECD): July 1, 2015

www.ice.gov



OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

Management Response for OIG Draft Report, "ICE's Alternative to Detention" dated October 7, 2014 (OIG Project No. 13-065-ISP-ICE)

**Recommendation 2:** We recommend that the ICE [Acting Director] assess and report on the feasibility of using funds from the Alternative to Detention program to provide detention beds for noncompliant Intensive Supervision Appearance Program (ISAP) participants.

**Response:** Concur. ICE believes there is sufficient detention capacity to accommodate non-compliant ATD participants should the program's increased monitoring and/or reporting requirements, including the use of GPS, prove insufficient to correct non-compliant behavior. ICE will continue to appropriately exercise its prosecutorial discretion when deciding who to detain, and appropriately align ATD resources with the agency's enforcement priorities. If the need for additional funds for bed space arises in the future, ICE will, as it has in the past, reprogram funds from other programs (including ATD).

ICE requests that this recommendation be considered resolved and closed.

**Recommendation 3:** We recommend that ICE's Executive Associate Director for the Office of Enforcement and Removal Operations: Revise the Risk Classification Assessment tool to eliminate nonmaterial questions when statutory requirements, humanitarian considerations, or bed space limitations determine custody and release decisions.

**Response:** Concur. ICE has reviewed the success of the Risk Classification Assessment's (RCA) deployment on an ongoing basis, has already made changes to the RCA to allow for more efficient processing, and continues to pursue enhancements and efficiencies. For example, in August of 2013 ICE streamlined the RCA by generating an automatic detain decision in Expedited Removal cases, allowing Field Offices to skip the submission/approval steps otherwise required. ICE has initiated a formal process to review specifically whether greater efficiencies could be achieved by eliminating non-material questions, without lessening the RCA's usefulness. The process will require input from Enforcement and Removal Operations (ERO) Field Offices and relevant ICE headquarters programs, analysis of performance measures and other data, and an assessment of the costs and benefits of any possible changes. However, ICE disagrees with the examples of non-material questions cited in the OIG report, and cannot commit to making specific changes before it has completed its assessment.

ICE requests that this recommendation be considered resolved and open pending completion of its review of the RCA.

Estimated Completion Date (ECD): July 31, 2015

**Recommendation 4:** We recommend that ICE's Executive Associate Director for the Office of Enforcement and Removal Operations: Establish and implement performance measures to evaluate and improve the accuracy, efficiency, and effectiveness of the Risk Classification Assessment.

**Response:** Concur. ICE will continue to use performance measures to improve the accuracy, efficiency, and effectiveness of the RCA. Ever since the RCA's initial deployment, ICE has measured the accuracy, efficiency, and effectiveness of the RCA through the use of a variety of performance measures, including Field Office completion rates, recommendation rates by type,

2



OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

Management Response for OIG Draft Report, "ICE's Alternative to Detention" dated October 7, 2014 (OIG Project No. 13-065-ISP-ICE)

decision rates by type, and system override rates. ICE has also conducted rigorous analyses of RCA recommendations and field office decisions cross referencing every crime category and flight risk factor, and used this data to assess the likely impact of a large number of possible changes. Based on this ongoing analysis as well as input from Field Offices, ICE made significant changes in August 2013 and January 2014 to the RCA process, scoring and decision logic. These changes have reduced override rates from 21.9% to 7.6% (for all decisions from January – August 2014), and has resulted in RCA recommendations that are more closely aligned with ICE enforcement priorities. It is important to note that some number of overrides is not only expected but even desirable; supervisors must maintain the ability to exercise discretion, and the RCA requires written justifications in cases where recommendations are overridden. Further, the principal goals of the RCA are to promote consistency and transparency in detention-related decision-making, and to better align Field Office decisions with ICE policies and priorities; ICE disagrees with the hypothetical performance measures listed in the OIG report, as the RCA was not intended to predict factors such as the likely future rulings of immigration judges or an individual's ability to pay bond. The most recent set of scoring changes were deployed by ICE in January 2014. Further review of performance measures and consideration of additional changes are ongoing.

ICE requests that this recommendation be considered resolved and closed.

**Recommendation 5:** Revise the Risk Classification Assessment special vulnerabilities module to ensure that when ICE conducts the Risk Classification Assessment at a detention facility, medical staff or trained ERO officers ask detainees relevant medical questions in a setting that provides privacy.

**Response:** Concur. ICE will ensure that controls are in place to ensure that RCA Special Vulnerability assessments performed at detention facilities are conducted in a setting that provides privacy to the alien being assessed, in accordance with applicable detention standards. Modifications to the RCA would not be necessary to implement this recommendation.

ICE requests that this recommendation be considered resolved and closed.

Again, thank you for the opportunity to review and comment on this draft report. Technical and sensitivity comments have been sent under separate cover. We look forward to working with you in the future.

Should you have any questions, please contact Michael Moy, Senior Portfolio Manager, at (202) 732-6263 or by e-mail at Michael.C.Moy@ice.dhs.gov.

3



## Appendix D

# Risk Classification Assessment Checklist

| ENFORCE Database Tab | Examples of Data Recorded | Data Fields |
|---|---|---|
| Person Details | • Biographical Information<br>• Tracking Information (photos, fingerprints, alien number, and social security number) | 26 |
| Encounter Details | • Apprehension Information<br>• Physical Description | 45 |
| Supporting Information | • Relatives<br>• Attorney/Representative | 13 |
| Summary | • Supervisory Approval | 11 |
| Special Vulnerabilities[10] | • Physical and Mental Illness<br>• Victim of Persecution/Abuse | 31 |
| Mandatory Detention | • Subject to Mandatory Detention in INA<br>• Final Removal Order | 5 |
| Risk to Public Safety | • Most Severe Conviction<br>• Disciplinary Infractions | 20 |
| Risk of Flight | • Immigration Violation History<br>• Community Ties | 27 |
| **Total Data Fields** | | **178** |

*Source*: ENFORCE.

---

[10] A complete list of Special Vulnerabilities questions is included in appendix G.



OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## Appendix E

## ISAP II Termination Rates (Full-Service/Technology-Only)

| Contract Year [November to November] | 2010 | | | 2011 | | | 2012 | | |
|---|---|---|---|---|---|---|---|---|---|
| Full-Service (FS) Technology-Only (TO) | FS | TO | Total | FS | TO | Total | FS | TO | Total |
| Total Served | 19,996 | 5,782 | 25,778 | 24,047 | 11,333 | 35,380 | 24,359 | 16,093 | 40,452 |
| Active in Program (at end of contract year) | 13,429 | 3,758 | 17,187 | 13,862 | 9,250 | 23,112 | 12,611 | 10,317 | 22,928 |
| Terminated from Program (at end of contract year) | 6,567 | 2,024 | 8,591 | 10,185 | 2,083 | 12,268 | 11,748 | 5,776 | 17,524 |
| **Reasons for Termination** | | | | | | | | | |
| Departure Verified (Final Order of Removal) | 999 | 122 | 1,121 | 1,126 | 203 | 1,329 | 923 | 220 | 1,143 |
| Relief/Benefit Granted | 601 | 100 | 701 | 603 | 168 | 771 | 401 | 433 | 834 |
| Departure Verified (Voluntary Departure) | 526 | 22 | 548 | 963 | 61 | 1,024 | 1,087 | 133 | 1,220 |
| Departed the United States while in proceedings | 142 | 1 | 143 | 121 | 5 | 126 | 95 | 9 | 104 |
| **Total Favorable Outcomes** | **2,268** | **245** | **2,513** | **2,813** | **437** | **3,250** | **2,506** | **795** | **3,301** |
| No Longer Required to Participate (As determined by ERO) | 2,534 | 1,110 | 3,644 | 5,429 | 1,033 | 6,462 | 7,488 | 3,904 | 11,392 |
| Arrested by ICE for Removal | 83 | 65 | 148 | 99 | 63 | 162 | 97 | 95 | 192 |
| Pending Departure Verification | 183 | 31 | 214 | 147 | 31 | 178 | 160 | 92 | 252 |
| Arrested by Other Law Enforcement Agency | 515 | 61 | 576 | 640 | 89 | 729 | 546 | 159 | 705 |
| Other (No longer required to report: medical or deceased) | 120 | 84 | 204 | 133 | 27 | 160 | 161 | 39 | 200 |
| **Total Neutral Outcomes** | **3,435** | **1,351** | **4,786** | **6,448** | **1,243** | **7,691** | **8,452** | **4,289** | **12,741** |
| Pre-Removal Order Program Absconder | 432 | 59 | 491 | 395 | 40 | 435 | 271 | 59 | 330 |
| Post-Removal Order Program Absconder | 325 | 111 | 436 | 405 | 142 | 547 | 348 | 173 | 521 |
| Pre-Removal Order Program Violator | 61 | 45 | 106 | 107 | 56 | 163 | 156 | 205 | 361 |
| Post-Removal Order Program Violator | 46 | 213 | 259 | 17 | 165 | 182 | 15 | 255 | 270 |
| **Total Unfavorable Outcomes** | **864** | **428** | **1,292** | **924** | **403** | **1,327** | **790** | **692** | **1,482** |

*Source*: ISAP II annual reports for contract years 2010 through 2012.



OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

# ISAP II Termination Rates – Percentages

| Contract Year [November to November] | 2010 | | 2011 | | 2012 | |
|---|---|---|---|---|---|---|
| Full-Service (FS) Technology-Only (TO) | Total | | Total | | Total | |
| Total Served | 25,778 | | 35,380 | | 40,452 | |
| Active in Program (at end of contract year) | 17,187 | | 23,112 | | 22,928 | |
| Terminated from Program (at end of contract year) | 8,591 | | 12,268 | | 17,524 | |
| **Reasons for Termination** | | | | | | |
| Full-Service (FS) Technology-Only (TO) | Total | Percent | Total | Percent | Total | Percent |
| Departure Verified (Final Order of Removal) | 1,121 | 13.05% | 1,329 | 10.83% | 1,143 | 6.52% |
| Relief/Benefit Granted | 701 | 8.16% | 771 | 6.28% | 834 | 4.76% |
| Departure Verified (Voluntary Departure) | 548 | 6.38% | 1,024 | 8.35% | 1,220 | 6.96% |
| Departed the United States while in proceedings | 143 | 1.66% | 126 | 1.03% | 104 | 0.59% |
| **Total Favorable Outcomes** | **2,513** | **29.25%** | **3,250** | **26.49%** | **3,301** | **18.83%** |
| No Longer Required to Participate (As determined by ERO) | 3,644 | 42.42% | 6,462 | 52.67% | 11,392 | 65.01% |
| Arrested by ICE for Removal | 148 | 1.72% | 162 | 1.32% | 192 | 1.10% |
| Pending Departure Verification | 214 | 2.49% | 178 | 1.45% | 252 | 1.44% |
| Arrested by Other Law Enforcement Agency | 576 | 6.70% | 729 | 5.94% | 705 | 4.02% |
| Other (No longer required to report: medical or deceased) | 204 | 2.37% | 160 | 1.30% | 200 | 1.14% |
| **Total Neutral Outcomes** | **4,786** | **55.70%** | **7,691** | **62.68%** | **12,741** | **72.71%** |
| Pre-Removal Order Program Absconder | 491 | 5.72% | 435 | 3.55% | 330 | 1.88% |
| Post-Removal Order Program Absconder | 436 | 5.08% | 547 | 4.46% | 521 | 2.97% |
| Pre-Removal Order Program Violator | 106 | 1.23% | 163 | 1.33% | 361 | 2.06% |
| Post-Removal Order Program Violator | 259 | 3.01% | 182 | 1.48% | 270 | 1.54% |
| **Total Unfavorable Outcomes** | **1,292** | **15.04%** | **1,327** | **10.82%** | **1,482** | **8.45%** |

*Source*: ISAP II annual reports for contract year 2010 through 2012.



OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## Appendix F

# Risk Classification Assessment Overrides

| RCA No Recommendation | Final Decisions | | | |
|---|---|---|---|---|
| | Detain in the Custody of this Service | Detain, Eligible for Bond | Release on Community Supervision | Total |
| Detain in the Custody of this Service | 117,291 | 226 | 2,157 | **119,674** |
| Detain, Eligible for Bond | 42,957 | 17,933 | 4,002 | **64,892** |
| Release on Community Supervision | 252 | 267 | 1,039 | **1,558** |
| Officer to Determine - Detain or Release on Community Supervision | 17,573 | 12,010 | 12,388 | **41,971** |
| **Totals** | **178,073** | **30,436** | **19,586** | **228,095** |
| 228,095 Total Decisions and 41,971 with No Recommendation = 18.4 % with No RCA Recommendation[11] | | | | |

| RCA Overrides | Final Decisions | | | |
|---|---|---|---|---|
| | Detain in the Custody of this Service | Detain, Eligible for Bond | Release on Community Supervision | Total |
| Detain in the Custody of this Service | 117,291 | 226 | 2,157 | **119,674** |
| Detain, Eligible for Bond | 42,957 | 17,933 | 4,002 | **64,892** |
| Release on Community Supervision | 252 | 267 | 1,039 | **1,558** |
| Officer to Determine - Detain or Release on Community Supervision | 17,573 | 12,010 | 12,388 | **41,971** |
| **Totals** | **178,073** | **30,436** | **19,586** | **228,095** |
| 228,095 Total Decisions and 49,861 with ERO Overrides = 21.9 % with ERO Overrides[12] | | | | |

*Source*: ICE RCA Cumulative Report, December 2013.

---

[11] Between January 2014 and August 2014, the no recommendation rate was 15.7 percent.

[12] Between January 2014 and August 2014, the override rate was 7.6 percent. ICE officials said they reduced the override rate by adjusting the RCA's scoring and decision logic.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

# Appendix G

# Medical Screening and Special Vulnerabilities Checklists

| Reset Form | Email Form | Print Form |
|---|---|---|

## ICE Health Service Corps
### Intake Screening

Patient was identified by (check 2 sources): ☐ Arm Band  ☐ Picture  ☐ Verbally  ☐ Other: _____

If detainee was transferred from another facility, did a medical transfer summary accompany the detainee? ☐ No  ☐ Yes  ☐ N/A

Time of arrival in camp: _____   Time of initial screening: _____

**S:**

1. What language do you speak? ☐ English  ☐ Spanish  ☐ Other: _____   Name or INT # _____

**Medical Screening**

2. How do feel today? (Explain in his/ her own words)

3. Are you currently having any pain? ☐ Yes  ☐ No   If yes, complete pain assessment below:

   3a. Character of pain:   3b. Location:   3c. Duration:   3d. Intensity: (0-10 pain scale)   3e. What relives pain or makes it worse?

4. Do you have any significant medical problems? ☐ Yes  ☐ No
   If yes, explain:

5. Do you take any medication on a regular basis, including over the counter and herbal? ☐ Yes  ☐ No
   If yes, list medications:

6. Do you have any allergies to include allergies to medication or food? ☐ Yes  ☐ No
   If yes, list medications:

7. Are you now or have you ever been treated by a doctor for a medical condition to include hospitalizations? ☐ Yes  ☐ No
   If yes, explain:

8. Have you ever had a persistent cough for more than three weeks, coughed up blood, had a persistent fever, night sweats, or unexplained weight loss? ☐ Yes  ☐ No   If yes, explain:

9. Are you pregnant? ☐ Yes  ☐ No  ☐ N/A (male)   If yes, date of last menstrual period: _____

10. Have you had any recent acute changes with your vision? ☐ Yes  ☐ No
    If yes, explain:

**Oral Screening**

11. Are you having any significant dental problems? ☐ Yes  ☐ No
    If yes, explain:

**Mental Health Screening**

12. Have you ever tried to kill yourself? ☐ Yes  ☐ No
    If yes, When did the attempt occur? _____   Method: ☐ Gun  ☐ Hanging  ☐ Cutting skin  ☐ Pills  ☐ Other
    **If attempt was within the last 90 days, make referral immediately and ensure safety.**

13. Are you currently thinking about killing or harming yourself? ☐ Yes  ☐ No
    **If Yes, make referral immediately and ensure safety.**

| Last Name: | First Name: |
|---|---|
| A#: | Country of Origin: |
| Date of Camp Arrival (DCA): | DOB: |
| Medical Clinic: | Sex: |

IHSC Form 795-A          03/2011          Page 1 of 3



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

# ICE Health Service Corps
## Intake Screening (Continued)

14. Do you have a history of assaulting or attacking others or have you ever been locked up for fighting while in jail/prison?  ☐ Yes  ☐ No
Have you ever been in jail or prison?  ☐ Yes  ☐ No   If yes, when? _____
Do you know of someone in this facility whom you wish to attack?  ☐ Yes  ☐ No   If yes, who is this person? _____
**If Yes, make referral immediately and ensure safety.**

15. Do you now or have you ever heard voices that other people don't hear; seen things or people that others don't see; or felt others were trying to harm you for no logical or apparent reason?  ☐ Yes  ☐ No   If yes, explain: _____

16. Have you ever been diagnosed with a mental illness or have you ever been hospitalized for psychiatric reasons?  ☐ Yes  ☐ No
If yes, explain: _____

17. Is there a history of mental illness in your family?  ☐ Yes  ☐ No
If yes, What illness? _____

18. Have you been a victim of physical or sexual abuse?  ☐ Yes  ☐ No
If yes, explain: _____

19. Do you feel that you are currently in danger of being physically or sexually assaulted?  ☐ Yes  ☐ No
If yes, explain: _____

20. Have you ever sexually assaulted anyone?  ☐ Yes  ☐ No
If yes, explain: _____

**Learning/Cultural/Religious Assessment**

21. Is there anything important to know about your religious or cultural beliefs that are of concern to you while in detention?  ☐ Yes  ☐ No
If yes, explain: _____

22. Have you ever had difficulties learning or understanding written information?  ☐ Yes  ☐ No
If yes, explain: _____

**Substance Use/Abuse Screening**

23. Have you ever been **treated** for drug or alcohol problems or suffered **withdrawal** symptoms from drug use?  ☐ Yes  ☐ No
If yes, explain: _____

24. Do you now or have you ever used tobacco products, drank alcohol or used drugs? (If yes, give details below)  ☐ Yes  ☐ No
If yes, explain: _____

| Substance Use/Route of Use | Date of Last Use | Amount/Quantity Last Used |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**O:**

☐ Patient appears to have **normal** physical/emotional characteristics **and no barrirers to communication.**
☐ Patient appears **oriented** to person, place and time.   ☐ Patient appears **NOT to be oriented** to:   ☐ Person  ☐ Place  ☐ Time

| Last Name: | First Name: |
|---|---|
| A#: | Country of Origin: |
| Date of Camp Arrival (DCA): | DOB: |
| Medical Clinic: | Sex: |

IHSC Form 795-A          03/2011          Page 2 of 3



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## ICE Health Service Corps
### Intake Screening (Continued)

**O: (Continued)**

Explain any abnormalities the patient appears to have: _____

If you observe any of the following, check the appropriate box:

☐ Skin Broken out in bumps/ rash    ☐ Malnourished appearance    ☐ Shaking/ tremors    ☐ Agitation    ☐ None Observed

☐ Inability to focus or concentrate    ☐ Developmental disabilities    ☐ Excessive sweating    ☐ Cuts or bruises

☐ Patient wears glasses or contacts    ☐ Bizarre or crazy behavior    ☐ Physical disabilities    ☐ Needle Tracks

Comments:

**Vital Signs**

| T | P | resp. | BP | hgt. | wt |
|---|---|---|---|---|---|

HGC Results:  ☐ Positive   ☐ Negative   ☐ N/A (male)

**A:**

Initial Medical Screening:   ☐ Normal   ☐ Abnormal

**P:**

Disposition:   ☐ General Population    ☐ General population with referral for medical/mental health care

☐ Isolation until medically evaluated    ☐ Referral for immediate medical/mental health or dental care

Education:   ☐ Tuberculosis and CXR explained to patient and process completed with appropriate shielding

☐ Physical exam scheduled for patient

☐ Access to medical/dental/mental health care, grievance process explained to patient

☐ Patient given the Dealing with Stress and Medical Orientation and Health Information Brochure in the patient's language

☐ Patient verbalized understanding of any teaching or instruction

☐ Patient was asked if he or she had any additional questions, and any questions were addressed

Care/ Interventions/ Follow-up:   ☐ See SF 600 for detailed assessment and plan.    ☐ Physical exam scheduled for patient.

☐ The following care/treatment was given during this intake screening:

_____ Provider's Signature    _____ Date    _____ Time    _____ Stamp/Printed Name

| Last Name: | First Name: |
|---|---|
| A#: | Country of Origin: |
| Date of Camp Arrival (DCA): | DOB: |
| Medical Clinic: | Sex: |

IHSC Form 795-A          03/2011          Page 3 of 3



OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

**RCA: Special Vulnerabilities**

| ENFORCE TABS<br>Data Fields |
|---|
| Does a Special Vulnerability exist? Inquire, observe, and review all documentation. If based on your assessment, the vulnerability exists, select the appropriate boxes below. |
| **Serious Physical Illness (Yes/No)** |
| Assess whether the individual has been diagnosed or claims to have a serious physical illness such as: diabetes, seizures, HIV AIDS, heart problems, cancer, epilepsy, or other serious illness. |
| Ask:  • Has the individual been hospitalized in the past six months?<br>• Is the individual taking prescription medication?<br>• Does the individual require daily medical care?<br>• Is the individual terminally ill? |
| Review sources of information including: medical records or prescription medications, information on I-794 or I-795 or other medical intake screening documents. |
| **Serious Mental Illness (Yes/No)** |
| Assess through questioning, observation and documentation whether the individual has or claims to have a serious mental illness. |
| Ask:  • Has the individual been hospitalized or treated for mental illness?<br>• Is the individual taking medication for mental illness? |
| Observe:  • Did the individual appear to be disoriented?<br>• Does the individual appear to be aware of his/her surroundings?<br>• Is the individual unable to focus on instructions?<br>• Is the individual hearing voices?<br>• Is the individual expressing irrational or violent thoughts towards themselves or others? |
| **Disabled (Yes/No)** |
| Assess whether the individual has a serious physical or mental disability. |
| Ask:  • Does the individual require assistance with the activities of daily living, such as bathing, eating, toileting, and dressing? |
| Observe:  • Does the individual use a wheelchair, cane, crutches, walker or have a prosthesis?<br>• Is the individual blind, deaf, mute, an amputee, or have other disabilities? |
| **Elderly (Yes/No)** |
| Assess whether the individual has physical indicators of infirmity or fragility caused by old age. Although elderly status is often defined as being 65 years or older, the key issue is whether the individual is infirm due to old age (some under 65 may meet that definition and some 65 or older may not). |
| **Pregnant (Yes/No)** |
| Ask female individuals if they are currently pregnant or have reason to believe they are pregnant. |
| **Nursing (Yes/No)** |
| Ask female individuals if they are currently nursing an infant/toddler. |

*Source*: ENFORCE.



### OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## RCA: Special Vulnerabilities

| ENFORCE TABS Data Fields |
|---|
| Does a Special Vulnerability exist? Inquire, observe, and review all documentation. If based on your assessment, the vulnerability exists, select the appropriate boxes below. |

| Primary Caretaking Responsibility (Yes/No) | |
|---|---|
| Ask the individual if he/she is the primary person responsible for the care of a child, elderly person or an individual who otherwise is unable to care for him or herself. If the response is positive, inquire about the circumstances regarding that dependent, such as: relationship, age, nature of infirmity, and who is currently caring for that dependent. | |

| Risk Based on Sexual Orientation/Gender Identity (Yes/No) | |
|---|---|
| Ask the individual if he/she fears any harm in detention based on his/her sexual orientation or gender identity. | |

| Victim of Persecution/Torture (Yes/No) | |
|---|---|
| In making your assessment, consider country of origin, documentation of claim, and evidence of trauma. Note: If the individual answers positively, provide the detainee with the number for UNHCR: 1-888-272-1913. | |
| Ask: | • Were you persecuted in your home country, or have you been tortured? |
| Note: | • If the individual answers positively, provide the detainee with the number for UNHCR: 1-888-272-1913. |

| Victim of Sexual Abuse or Violent Crime (Yes/No) | |
|---|---|
| Review any evidence substantiating the claim. Note: If the individual answers positively, provide the detainee with number for the federally funded National Domestic Violence Hotline: 1-800-799-7233 which can also assess eligibility for U visas. | |
| Ask: | • Have you been the victim of sexual abuse or violent crime? |
| Note: | • If the individual answers positively, provide the detainee with number for the federally funded National Domestic Violence Hotline: 1-800-799-7233 which can also assess eligibility for U visas |

| Victim of Human Trafficking (Yes/No) | |
|---|---|
| Verbatim what is in the Ask: and Note: fields | |
| Ask: | • Since entering the United States, has someone intimidated, deceived, obligated or forced you into prostitution or labor against your will? |
| Note: | • If the individual answers positively, contact the local ICE HSI duty agent and provide biographic and location details to the ICE HSI duty officer for further investigation. |

| Other (Yes/No) | |
|---|---|
| If you believe individual would be vulnerable in detention for a reason not listed here, check this box and provide further details below. | |

*Source*: ENFORCE.



## Appendix H

## Major Contributors to This Report

Marcia Moxey Hodges, Chief Inspector
Lorraine Eide, Lead Inspector
Jennifer Kim, Inspector
Morgan Ferguson, Inspector



# Appendix I

# Report Distribution

### Department of Homeland Security

Secretary
Deputy Secretary
Chief of Staff
Deputy Chief of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Assistant Secretary for Office of Policy
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
Director, U.S. Immigration and Customs Enforcement
Chief Privacy Officer
ICE Audit Liaison

### U.S. Department of Justice

GAO/OIG Liaison

### Office of Management and Budget

Chief, Homeland Security Branch
DHS OIG Budget Examiner

### Congress

Congressional Oversight and Appropriations Committees

## ADDITIONAL INFORMATION AND COPIES

To view this and any of our other reports, please visit our website at: www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov. Follow us on Twitter at: @dhsoig.



## OIG HOTLINE

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click on the red "Hotline" tab. If you cannot access our website, call our hotline at (800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

> Department of Homeland Security
> Office of Inspector General, Mail Stop 0305
> Attention: Hotline
> 245 Murray Drive, SW
> Washington, DC  20528-0305

# EXHIBIT B

En Español (/espanol/sobre-el-centro-nacional-de-justicia-para-inmigrantes)

Login (/user/login?destination=/for-attorneys)

(/)

# ICE Released Its Most Comprehensive Immigration Detention Data Yet. It's Alarming.

## March 13, 2018

Home (/) / NIJC Commentary (/staff/blog) /
ICE released its most comprehensive immigration detention data yet. It's alarming.

**AUTHOR:** Tara Tidwell Cullen

## Here Is What We've Learned From It, And A Link For You To Study The Data Yourself.

The Department of Homeland Security (DHS) is notoriously obscure about the systems it uses to detain immigrants in the United States. Without a court order, it is rare that DHS's Immigration and Customs Enforcement (ICE) divulges any details about where its jails and prisons are located, who or how many people are held there, or any details about how they are managed — including how much taxpayers spend to keep them open, and who gets that money.

NIJC's Transparency Project (/transparency) has detailed this lack of accountability in numerous reports, most recently in *ICE Lies* (/ICElies), where we teamed up with the Detention Watch Network to show how DHS's patterns of irresponsible governance— including fiscal mismanagement and secrecy in its detention operations — contribute to a failure of accountability for ongoing human rights violations. Last month, the DHS Office of Inspector General released a report (https://www.oig.dhs.gov/sites/default/files/assets/2018-02/OIG-18-53-Feb18.pdf) finding that ICE violated federal procurement laws in 2014 when it signed, and in 2016 extended, a contract for more than $1 billion (https://www.washingtonpost.com/business/economy/inside-the-administrations-1-billion-deal-to-detain-central-american-asylum-seekers/2016/08/14/e47ff1960-5819-11e6-9aee-8075993d73a2_story.html?utm_term=.368c7d00258e) with private prison company Core Civic (formerly Corrections Corporation of America, or CCA) to build and operate the South Texas Family Residential Detention Center via a pass-through Inter-Governmental Service Agreement with the City of Eloy, Arizona.

This lack of transparency has become an issue in Congress's federal budget negotiations, with advocates and a growing number of senators and representatives calling for appropriators to cut ICE's funding.

In the past several months, ICE has released some facility information in response to Freedom of Information Act requests. Most recently, the Immigrant Legal Resource Center obtained an extensive and detailed list of DHS facilities in response to a FOIA request (/sites/default/files/content-type/page/documents/2018-03/2017-6-22_ILRC_FOIA_to_ICE_FINAL.pdf) it filed as part of its research on sanctuary cities (https://www.ilrc.org/sites/default/files/resources/rise_of_sanctuary-lg-20180201.pdf). This list contains a relative trove of information about how immigration detention is currently operating in the United States.

**View and download the Excel data file via Scribd** (/ice-detention-facilities-november-2017)

**About the data:** The set of 10 lists includes data on types of contracts, demographics, medical care providers, and inspections history for more than 1,000 federal facilities that detain immigrants, including county jails, Bureau of Prisons facilities, Office of Refugee Resettlement centers, hospitals, and hotels (more on those down

ICE released its most comprehensive immigration detention data yet | National Immigrant Justice Center

NATIONAL
IMMIGRANT
JUSTICE CENTER
A HEARTLAND ALLIANCE PROGRAM

()

below. Customs and Border Patrol facilities are not included in the data. DHS compiled the data between
November 4 and 6, 2017 — about one month into fiscal year (FY) 2018.

**Here are 7 highlights of what NIJC found in our review of this new data:**

## 1. The Number Of People Locked Up By ICE Reached A Record High (Again)

In November 2017, ICE reported that its total average daily population for FY 2018 was 39,322 people. This
marks the second year in a row the U.S. government hit an unprecedented high in how many immigrants it
incarcerates.

## 2. ICE Is Detaining Kids, Sometimes For Months

ICE currently has nine facilities available to detain juveniles, with approximately six of those limited to under
72 hours. These are neither family detention centers nor Office of Refugee Resettlement children's shelters;
instead, ICE contracts with juvenile jails to hold children under 18 separate from adults, including their family
members. The facilities used to jail children for longer than 72 hours are the Northern Oregon Juvenile
Detention facility in The Dalles, Oregon; the Abraxas Academy Detention Center in Morgantown, Pennsylvania;
and the Cowlitz County Juvenile facility in Longview, Washington. While the average detention population for
these facilities is only one to three children, the average length of stay for a juvenile detained in one of the
three facilities ranges from 100 to 240 days. This means that in recent years ICE has detained dozens of
children in juvenile jails for many months on end, in remote locations far from family and any accessible legal
representation.

## 3. ICE Categorizes The Vast Majority Of People Locked Up As Posing No Danger To The Community

ICE reports that an average of 71 percent of people detained on a given day were subject to "mandatory
detention" in the first month of FY 2018 (the only period for which this data was provided). An average of 51
percent of the daily population that month were marked as "non-criminal," and 51 percent also were classified
as posing "no threat." Twenty-three percent were classified as the lowest "Level 1" threat, which typically
includes people with low-level and nonviolent criminal convictions. Only 15 percent were classified at the
highest threat level.

## 4. Private Prison Companies Dominate The Detention System

On an average day in November 2017, most
people in ICE custody were in prisons operated by
private companies.
About 71 percent of the average daily population
that month were held in privately operated jails.
An average of more than 15,000 people daily were
held in 33 jails where local governments signed
contracts with the federal government (known as
Inter-Governmental Service Agreements or U.S.
Marshal Service Intergovernmental Agreements)
and then subcontracted facility operations to
private, for-profit companies.



(https://immigrantjustice.org/sites/default/files/jail-
operators_for-web.jpg)

## 5. ICE Contracts With Hotels, And Has Detained Thousands Of People At One In San Diego

The facility lists include 12 hotels, some listed as active since 2009. Most of the hotels have never had an
average daily population of more than three people — except the Quality Suites San Diego Otay Mesa
(https://www.choicehotels.com/california/san-diego/quality-inn-hotels/ca506). ICE has booked thousands of
people into this hotel since fiscal year 2016, including children. Most of them were individuals transferred

NATIONAL
IMMIGRANT
JUSTICE CENTER
A HEARTLAND ALLIANCE PROGRAM

from another facility, but some were being booked into ICE custody for the first time. The maximum population listed for the first month of fiscal year 2018 was 120 people, and the average daily population at the end of fiscal year 2017 was 22 people. All of these individuals were listed as "non-criminal" with "no ICE threat level."
(7)

## 6. Figuring Out Which Detention Standards Govern A Jail Is Still A Murky Business

Only 65 percent of ICE's adult detention centers are contractually bound by one of the agency's three sets of detention standards - known as the 2000 National Detention Standards (NDS), 2008 Performance-Based National Detention Standards (PBNDS), and 2011 PBNDS. About 14 percent of detained immigrants — an average of 5,000 people a day — are held in facilities contracted under other standards including American Correctional Association accreditation guidelines, the Department of Justice's 2000 Federal Performance-Based Detention Standards (FPBDS) for federal prisons, and standards created by Immigration and Naturalization Service (INS), the agency that predated ICE. Some contracts only bind jail operators to the vaguely worded "minimum service standards," "local standards," or to "COR Detention Standards" which refer to the Contracting Officer Representative and pertain to enforcement of the technical aspects of a facility's contract rather than conditions inside the jail. According to ICE, however, regardless of the standards listed in the contract, all of its facilities are inspected under one of the three sets of ICE standards. In 2014, the Government Accountability Office reported that, to avoid opening full detention contracts to negotiation



(https://immigrantjustice.org/sites/default/files/contracted-standards-by-facility-for-web2.jpg)



(https://immigrantjustice.org/sites/default/files/last-inspection-standards-byfacility_for-web.jpg)

(https://www.documentcloud.org/documents/2168965-government-accountability-office-october-2014.html#document/p35/a227798), ICE sometimes obtains a facility's agreement to be inspected according to a newer set of standards without explicitly incorporating the new standards into the contract. This practice has created a web of varying guidelines, making it difficult to untangle what standards actually govern a facility's performance. According to the new data, which lists both the contracted standards and the standards applied at the last inspection, only 63 percent of immigrants are held in detention centers that were last inspected under the PBNDS 2011, the most robust set of guidelines. Twenty-four percent of immigrants are in jails inspected under the least stringent 2000 NDS, and 13 percent are in jails inspected under the PBNDS 2008. Twenty-two percent of immigration jails are smaller detention centers which were permitted to conduct their own inspections, known as Organizational Review Self-Assessments (ORSAs).*

## 7. No Matter What Happens To Immigrants In Their Care, Jails Keep Passing Inspections

Every "authorized" ICE facility has passed every inspection since 2012, even those where multiple people have died, some later reported to be as a result of (/fatalneglect) of medical neglect (https://www.hrw.org/news/2016/07/07/us-deaths-immigration-detention). This pattern continues one which



We noted in our 2015 analysis (/livesinperil) of these reports, which revealed that only one of 150 facilities was given a deficient rating on an annual inspection after 2009, when Congress passed an appropriations law stating the federal government must discontinue contracts with immigration detention facilities that fail two consecutive inspections. As in 2015, the new data suggests that facilities have an opportunity to have their final rating adjusted after an inspector finds it deficient. The ICE inspections involve two rounds of review before a final rating is assigned: the inspector makes a "recommended" rating, which then is reviewed by ICE and assigned a final rating. In the November 2017 list, four facilities are reported to have had a recommended rating in their last inspection of "deficient," "at-risk," or

(https://immigrantjustice.org/sites/default/files/last-inspection-standards-byadp_for-web.jpg)

"does not meet standards." As of November, the final rating for all of these jails had been pending for more than 100 days — by far the longest-pending inspections of more than 200 detention centers listed. The new list also reveals that in November 2017, ICE detained an average of 98 people per day at nine jails listed as "not inspected."

The new data set also includes a list of 13 facilities classified as "use prohibited," most of which are noted as having failed two consecutive inspections in 2008 and 2009, just before the appropriations law took effect. According to ICE's list, some of these jails still occasionally hold a small number of individuals.

**View and download the Excel data file via Scribd** (/ice-detention-facilities-november-2017)

*If you have questions, or spot an error in our analysis, contact NIJC via the press room (/press-room-contact-us).*

*Tara Tidwell Cullen is NIJC's director of communications.*


**\*Correction:** An earlier version of this post stated that 22 percent of immigrants were held in jails permitted to conduct their own unregulated "self-assessment" for their last inspections. It has been updated to reflect that 22 percent of immigration jails were permitted to conduct these types of inspections.


**TAGS**

DETENTION & ENFORCEMENT (/TAXONOMY/TERM/124)　　DEFUND HATE (/TAXONOMY/TERM/163)
NIJC TRANSPARENCY PROJECT (/TAXONOMY/TERM/150)

- 🏠 224 S. Michigan Ave., Suite 600, Chicago, IL 60604

f (https://www.facebook.com/immigrantjustice/?fref=ts)　🐦 (https://twitter.com/nijc)
(https://www.instagram.com/immigrantjustice/)
(https://www.youtube.com/user/ImmigrantJustice)
(https://www.linkedin.com/company/national-immigrant-justice-center)

© 2011-2016 National Immigrant Justice Center | Website by Wire Media (http://www.wiremedia.net) | Admin Login (/user)

# EXHIBIT C



# Immigrants and Families Appear in Court:
# Setting the Record Straight

Immigrants placed into removal proceedings and told to appear in immigration court face a unique penalty for missing court. Unlike criminal court, where a missed court appearance usually results in a judge issuing a warrant for the defendant's arrest, an immigrant who misses even a single court hearing is generally ordered deported "*in absentia*" (Latin for "in absence").[1]

This fact sheet presents studies and analyses on immigrants' "appearance rate" in court (the rate at which immigrants appear for court hearings). The fact sheet further contrasts appearance rate with "in absentia rate," a separate and distinct measurement used by the government, which the government and the media often confuse for appearance rate.

## Do Immigrants Appear in Court?

Comprehensive analyses of the government's own data show that in the vast majority of situations, immigrants placed into removal proceedings appear for all of their court hearings.

Even a person who misses a hearing by accident can be ordered removed "in absentia." A judge may only overturn this "in absentia removal order" if the government failed to notify the immigrant of the hearing, or if the immigrant shows that "exceptional circumstances" led to the failure to appear.[2] Establishing "exceptional circumstances" can be difficult. Courts have refused to overturn removal orders in many circumstances in which the person did not deliberately miss court, where the reasons for missing court were as diverse as a car breaking down, late arrival coupled with long security lines, unusually bad traffic, or a mistaken belief that a hearing was scheduled for the afternoon and not the morning.[3]

Possibly due to the severe consequences of failure to appear, immigrants are highly likely to appear in court. Analysis of data from the Executive Office for Immigration Review (EOIR), which oversees the immigration courts, shows that in the vast majority of cases, only 14-23 percent of immigrants scheduled to appear in immigration court missed a hearing and were ordered removed in absentia (Figure 1).

Setting the Record Straight: Immigrants Appear in Court | American Immigration Council | July 2019

Figure 1. What Percent of Immigrants Not Held in Government Custody Appeared for Court?

| Group and Time Period Covered by Study or Dataset | Appearance Rate in Immigration Court | Appearance Rate if Immigrant Represented by Attorney |
|---|---|---|
| All immigrants placed in removal proceedings from Fiscal Year (FY) 2008 to June 2019[4] | 83 percent | 97 percent |
| Families released from ICE family detention centers, FY 2001 to 2016[5] | 86 percent | 97 percent (with asylum application filed) |
| Non-family individuals released from ICE detention, FY 2001 to 2016[6] | 81 percent | 96 percent (with asylum application filed) |
| Families placed on expedited Family Unit Docket, September 2018 to May 31, 2019[7] | 81 percent | 99 percent |
| Families placed on Adults with Children docket, April 2014 to May 2018[8] | 77 percent | 98 percent |
| Juveniles placed in removal proceedings, FY 2005 to June 2019[9] | 83 percent | 98 percent |

Source: Author's analysis of publicly available data and literature. See endnotes for details.

Studies also show that families are not significantly more likely to miss court than individual adults or unaccompanied children. For example, one study of EOIR data revealed that families released from family detention centers between 2001 and 2016 appeared in court 86 percent of the time, compared to 81 percent for all immigrants released from detention centers over that period.[10] Asylum-seeking families who had representation and were released from detention had even higher appearance rates.[11]

Studies also show a significant link between representation and appearance in court. Having access to an attorney means immigrants have someone who can help them navigate an unfamiliar system, including helping ensure they appear in court.[12] Once immigrants manage to obtain a lawyer, they show up for all court hearings in the overwhelming majority of cases, with appearance rates of 96 percent or higher for every group (see Figure 1).

Of course, many people miss court through no fault of their own. There are serious barriers that can contribute to someone not appearing in court, such as lack of notice; government errors in providing notice; physical, geographical and language obstacles; trauma and mental health; and lack of legal representation.[13]

For these reasons, a significant number of removal orders for failure to appear are later overturned by an immigration judge for lack of notice or "extraordinary circumstances."[14] A 2018 study of families ordered removed for missing court demonstrated that attorneys were able to overturn 44 out of 46 in absentia removal orders issued to asylum-seekers' families.[15] In one case, a family member received two pieces of mail on the same day—a letter telling the person to appear for a court proceeding with a hearing date which had already passed, and an in absentia removal order for missing that court date.[16]

## Significant Flaws Exist with the Government's Measurement of Failures to Appear

Given that studies consistently show a high appearance rate for those in removal proceedings, why does the government insist that there is an epidemic of immigrants skipping court and "disappearing" into the United States?[17] Boiled down, the most basic answer is: **the government does not measure the percent of immigrants failing to appear in court.** Instead, it uses an alternate, "completion-based" method which significantly overstates the prevalence of in absentia orders of removal for failure to appear in court.

Every year EOIR publishes data on what it calls the "in absentia rate." This rate is calculated by determining what percent of "case completions" (a decision in an immigrant's case, such as a grant of relief or an order of removal) occurred because the immigrant missed court.[18] For example, if a judge ordered one person removed for failure to appear and granted another person relief from removal, the "in absentia" rate would be 50 percent—one order of removal for missing court out of two completions.

This approach means that people who are showing up to court during their case, but have not received a final decision, are not factored into the equation. Cases often require multiple hearings over the course of years before a "completion," which means that EOIR's statistic neglects to account for the hundreds of thousands of immigrants who have appeared in court, but whose cases are not yet complete. EOIR's "in absentia rate" gives the false impression that more immigrants miss court than actually do because cases where an immigrant fails to appear at the first hearing take significantly less time to complete than a case where the immigrant appears diligently for years before a final decision.

Even though EOIR's "in absentia rate" is **not** a full measure of appearance rates, DHS has cited "in absentia" rate figures in ways that falsely imply that it is. For example, in June 2019, Acting DHS Secretary Kevin McAleenan testified in front of the Senate Judiciary Committee that 90 percent of families placed on EOIR's recently-created expedited "Family Unit Docket" failed to appear in court.[19] But McAleenan was wrong; an independent analysis of EOIR data on the Family Unit Docket showed that as of May 31, 2019, **81 percent** of families on the docket had appeared for all scheduled hearings since September 2018.[20] When families were represented, 99 percent had appeared in court for all hearings.[21]

Setting the Record Straight: Immigrants Appear in Court | American Immigration Council | July 2019

So why the difference? McAleenan appears to have confused EOIR's "in absentia rate" for the rate at which families missed court.[22] This citation of the Family Unit Docket's "in absentia rate" as if it were the appearance rate provides a cautionary example of why citation to EOIR's "in absentia rate" can be problematic. The expedited Family Unit Docket was created by EOIR in November 2018 with the intention of expediting cases of recently-arrived families.[23] Because the docket has only existed for a matter of months, and because cases in immigration court often take months or years to complete, only a small fraction of cases placed on the docket have reached an ultimate decision on the merits of a case.

## Figure 2. Perils in Citing the Family Unit Docket's "In Absentia" Rate

Families missed court in 80 percent of "completed" cases…

…but those families represent 21 percent of total cases



Source: EOIR, *Family Unit Decisions in 10 Courts* (July 19, 2019).

Data from EOIR shows that out of 64,362 cases placed on the docket in 10 cities since September 2018, over 74 percent of cases are still pending (47,408).[24] Of the cases completed as of June 2018, 3,371 were completed because a judge issued a decision on the merits of the case, while 13,583 were completed because the immigrant failed to appear in court (Figure 2).

Thus, even though 79 percent of families placed on the docket have appeared in court, the "in absentia" rate reported by EOIR would be 80 percent. This example shows how the government's methodology for reporting failures to appear can create the wrong impression about how often people appear in court.

## How Should Appearance Rates Be Calculated?

Alternate methods should be used to calculate the "in absentia rate" because EOIR's current method does not fully reflect the percent of immigrants who appear in court.

A better approach is a cohort-based methodology, which looks at the percent of people placed into removal proceedings each year who have been ordered removed for missing court. By focusing on a group of people and tracking them throughout the entire multi-year process of immigration court, a cohort-based method avoids harmful abstractions.  Unlike EOIR's completion-based methodology, looking at groups of people over time better shows what percent of immigrants appeared in court.

Using a cohort-based method reveals that in every year since 2007, fewer than 25 percent of people placed on the non-detained docket were ordered removed for missing court (Figure 3). Since 2015, over 80 percent of all immigrants placed into removal proceedings have appeared for their court proceedings and avoided an order of removal for missing court.

### Figure 3: Percent of Non-Detained Cases with a Final Order of Removal for Missing Court



Fiscal Year Case Begun

Note:  Years reflect the fiscal year case originally filed with immigration court, through May 2019.
Source: TRAC, *Details on Deportation Proceedings in Immigration Court* (last accessed July 2019). Data on file with author.

This cohort-based method shows that even with more asylum-seekers arriving at the border in the past five years, immigrants placed in removal proceedings are still highly likely to appear in court. And despite record levels of families arriving at the border in FY 2019, orders of removal for missing court remain relatively uncommon.

Given the concerns noted above, EOIR should immediately abandon the use of its completion-based "in absentia" statistics, or at the very least clarify that such statistics do not represent appearance rates. As shown in Figure 4, the cohort-base methodology provides a significantly more accurate way of measuring the rate at which immigrants appear in court.

### Figure 4. Cohort-Based Methodology Compared to EOIR's Completion-Based "In Absentia Rate"
Using cases begun in Fiscal Year 2016 as a case study



Source: Author's analysis of data on "never-detained" and "released" cases begun in FY 2016, through June 2019. TRAC, *Details on Deportation Proceedings in Immigration Court* (last accessed July 2019).

EOIR's own data demonstrates in other ways that there is no crisis of immigrants failing to appear in court. In FY 2018, 46,051 orders of removal for missing court were issued,[25] despite DHS filing a record high of 314,316 cases[26] in immigration court that year and amid a record high backlog of 794,316 cases.[27]

Good policy comes from good data. The government's reliance on "completion-based" reporting methods distorts appearance rates and gives the false impression that there is an epidemic of failures to appear in immigration court. But as long-term studies show, when you track people from start to finish, the vast majority of immigrants appear in court.

## What Could Further Improve Appearance Rates?

Given immigrants' likelihood of appearing in court, there is little evidence for the government's frequent assertion that detention is necessary to ensure appearance in court.

Instead, focus should be on ensuring that immigrants who want to appear in immigration court have the opportunity to do so. This could be achieved through initiatives like the Family Case Management Program, an innovative program which achieved a 99 percent compliance rate with immigration court appearances through the use of community support and supervision.[28] The immigration courts could also adopt simple methods to help ensure that people don't miss court. Studies have shown that sending text messages or email reminders can have a significant effect on ensuring appearance in court.[29]

Improved access to counsel is also key in further increasing immigrants' appearance rates. As Figure 1 shows, when immigrants are represented, they appear in court over 97 percent of the time. Having an attorney can help immigrants understand the complex and confusing immigration court system and navigate around common pitfalls that can lead to an order of removal for missing court. Indeed, immigrants with attorneys fair better at every stage of the court process.[30] Improving access to counsel would almost certainly have a significant effect on ensuring that every immigrant who wants their day in court has the opportunity to get one.

The government should also focus on fixing procedural errors which lead to immigrants not receiving notice of their court hearings. Even though the immigration system is faced with historic case backlogs, the government's failure to properly file notices to appear with correct address information and the court's well-documented failure to send hearing notices in a timely manner have created significant obstacles to immigrants receiving a fair day in court.[31]

These obstacles have become especially problematic in light of EOIR's expedited Family Unit Docket, where the accelerated process has created more opportunities for government error. Some families placed on the docket report that the first document they received from the immigration court was an order of removal for missing a court date about which they never received notice.[32] Given the high potential for error, EOIR should carefully review docketing practices for cases placed on the Family Unit Docket and instruct judges to hold the government to its burden of proving by "clear, unequivocal, and convincing evidence" that a family received notice of a hearing before ordering anyone removed for missing court.[33]

At present, the only way for individuals to determine whether a court date has been set is to call 1-800-898-7180 and listen to an automated message available only in English and Spanish.[34] In addition, those in removal proceedings can only change the address the court has on file by mailing a form in English to the correct

immigration court.[35] This thoroughly outdated system creates innumerable opportunities for well-meaning individuals to fall through the cracks. It is far past time for EOIR to modernize these systems and focus its resources on ensuring that no person ever misses court through government error.

## Endnotes

1. INA § 240(b)(5); 8 U.S.C. § 1229a(b)(5).

2. INA § 240(b)(5)(C); 8 U.S.C. § 1229a(b)(5)(C).

3. *See, e.g.*, *Magdaleno de Morales v. I.N.S.*, 116 F.3d 145 (5th Cir. 1997) (no exceptional circumstances where respondent's car broke down and he chose to "backtrack" home to fix the car before calling court); *Hui Lin v. Atty. Gen. of U.S.*, 127 Fed. Appx. 617 (3d Cir. 2005) (no exceptional circumstances where respondent arrived late and was further delayed by long security lines); *Sharma v. I.N.S.*, 89 F.3d 545 (9th Cir. 1996) (no exceptional circumstances where respondent arrived nearly two hours late due to traffic and difficulty finding parking); *Valencia-Fragoso v. I.N.S.*, 321 F.3d 1204 (9th Cir. 2003) (no exceptional circumstances where respondent lost hearing notice and mistakenly appeared at 1:00PM instead of 8:30AM).

4. Author's analysis of data on cases begun from FY 2008 to June 2019 reveal 313,466 final orders of removal in absentia issued out of 1,803,215 cases where at least one scheduled hearing had occurred. Transactional Records Access Clearinghouse, Details on Deportation Proceedings in Immigration Court, https://trac.syr.edu/phptools/immigration/nta/, last accessed July 2019 (collecting data on all cases by fiscal year case begun, measuring by current status, and sorting by custody status, representation, and absentia outcomes). Individuals with representation had 35,037 final orders of removal in absentia out of 1,263,211 cases where at least one scheduled hearing had occurred.

5. Ingrid Eagley, Steven Shafer, & Jana Whalley, Detaining Families: A Study of Asylum Adjudication in Family Detention (Washington, DC: American Immigration Council, August 2018), 23, fig. 7, https://www.americanimmigrationcouncil.org/research/detaining-families-a-study-of-asylum-adjudication-in-family-detention.

6. Ibid.

7. See Transactional Records Access Clearinghouse, "Most Released Families Attend Immigration Court Hearings," June 18, 2019, Table 1, https://trac.syr.edu/immigration/reports/562/ (showing percent of recently released families who attended all court hearings) .

8. Author's analysis of data on Adults with Children docket cases from April 2014 to May 2018 reveal 38,095 cases with a final order of removal in absentia out of 165,905 cases. *See* Transactional Records Access Clearinghouse, Priority Immigration Court Cases: Women with Children, last accessed July 2019, https://trac.syr.edu/phptools/immigration/mwc/ (collecting data on individuals placed on EOIR's "Adults with Children" docket, through May 2018). Individuals with representation had 2,588 final orders of removal in absentia out of 105,063 cases.

9. Author's analysis of data on cases begun from FY 2005 to June 2019 reveal 100,719 cases with a final order of removal in absentia out of 589,415 cases. See Transactional Records Access Clearinghouse, Juveniles — Immigration Court Deportation Proceedings, last accessed July 2019, https://trac.syr.edu/phptools/immigration/juvenile/ (collecting data on all juvenile cases in EOIR dockets. Data includes unaccompanied children from FY 2005 to FY 2017 and all juveniles in removal proceedings from FY 2018 to present). Individuals with representation had 6,863 final orders of removal in absentia out of 303,223 cases.

10. Eagly & Shafer, *Detaining Families*, at Fig. 7.

11. Ibid. (showing that individuals released from family detention with an asylum application had a 96% appearance rate; when these individuals had representation, their appearance rate increased to 97%).

12. See Ingrid Eagly and Steven Shafer, "A National Study of Access to Counsel in Immigration Court," *University of Pennsylvania Law Review* 164, no. 1 (December 2015), at 73-75, https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=9502&context=penn_law_review.

13. See CLINIC & Urban Justice Ctr., Denied a Day in Court: The Government's Use of In Absentia Removal Orders Against Families Seeking Asylum, 2018, 16-27, https://cliniclegal.org/sites/default/files/Denied-a-Day-in-Court.pdf.

14. Transactional Records Access Clearinghouse, "What Happens When Individuals Are Released on Bond in Immigration Court Proceedings?" September 14, 2016, https://trac.syr.edu/immigration/reports/438/ (noting that EOIR's calculation of in absentia rate only counts "initial case completions," and opining that "using the first proceeding and ignoring subsequent ones is quite inappropriate. Where, for example, the individual never received notice of the hearing, the case may be reopened and a later hearing take place. Use of the last proceeding, rather than the first, is thus a more accurate measure in this context. In fact, using the last proceeding instead of the first significantly impacts and reduces the calculated rates.").

15. CLINIC & Urban Justice Ctr., 17.

16. Ibid., 18-19.

17. See Department of Homeland Security Secretary Kirstjen Nielsen, "Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration," December 20, 2018, https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration (suggesting that asylum-seekers "often disappear before a court can determine their claim's merits").

18. EOIR also only considers "initial case completions," which excludes cases where the immigrant was ordered removed for missing court and

Case 5:19-cv-01546-JGB-SHK   Document 113-1   Filed 04/09/20   Page 60 of 182   Page ID
#:1756
Setting the Record Straight: Immigrants Appear in Court| American Immigration Council | July 2019

then successfully reopened the case. EOIR also does not consider an order administratively closing a case to be a "case completion." Both of these factors significantly affect EOIR's reported in absentia rate. See Transactional Records Access Clearinghouse, "What Happens When Individuals Are Released on Bond in Immigration Court Proceedings?" September 14, 2016, fn 7, https://trac.syr.edu/immigration/reports/438/.

19. See Jack Crowe, "DHS Secretary: 90 Percent of Recent Asylum-Seekers Skipped Their Hearings," *National Review*, June 11, 2019, https://www.nationalreview.com/news/dhs-secretary-90-percent-of-recent-asylum-seekers-skipped-their-hearings/.

20. See Transactional Records Access Clearinghouse, "Most Released Families Attend Immigration Court Hearings," June 18, 2019, Table 1, https://trac.syr.edu/immigration/reports/562/.

21. Ibid.

22. When ICE ERO Director Nathalie Asher testified in Congress in May, she described the methodology which DHS used to calculate the figure cited by McAleenan—the same measurement EOIR uses to calculate in absentia rate. This figure is the clear origin of ICE's talking point. *See* ICE ERO Acting Director Nathalie Asher, *Testimony Before the Senate Judiciary Committee* (May 8, 2019), at 2.

23. See Executive Office for Immigration Review, "Family Unit" Data for Select Courts, July 19, 2019, https://www.justice.gov/eoir/file/1187416/download (last accessed July 25, 2019).

24. Ibid.

25. Executive Office for Immigration Review, In Absentia Removal Orders, April 23, 2019, https://www.justice.gov/eoir/page/file/1060851/download.

26. Executive Office for Immigration Review, New Cases and Total Completions, April 23, 2019, https://www.justice.gov/eoir/page/file/1060841/download.

27. Executive Office for Immigration Review, Pending Cases, April 23, 2019, https://www.justice.gov/eoir/page/file/1060836/download.

28. Women's Refugee Commission, The Family Case Management Program: Why Case Management Can and Must Be Part of the US Approach to Immigration (New York, NY: 2019), https://www.womensrefugeecommission.org/rights/resources/1807-the-family-case-management-program-why-case-management-can-and-must-be-part-of-the-us-approach-to-immigration.

29. Brice Cooke, et al., *Text message reminders decreased failure to appear in court in New York City* (2018).

30. Ingrid Eagly & Steven Shafer, Access to Counsel in Immigration Court (Washington, DC: 2016), https://americanimmigrationcouncil.org/research/access-counsel-immigration-court.

31. See Kristina Cooke and Mica Rosenberg, "No 'day in court': U.S. deportation orders blindside some families," *Reuters*, July 26, 2019, https://www.reuters.com/article/us-usa-immigration-deportations/no-day-in-court-us-deportation-orders-blindside-some-families-idUSKCN1UL16J.

32. Ibid.

33. 8 U.S.C. § 1229a(b)(5)(A).

34. Executive Office for Immigration Review, Customer Service Initiatives, March 20, 2018, last accessed July 2019, https://www.justice.gov/eoir/customer-service-initiatives.

35. Executive Office for Immigration Review, Form EOIR-33 Immigration Court Listing, June 12, 2019, last accessed July 2019, https://www.justice.gov/eoir/form-eoir-33-eoir-immigration-court-listing.

# EXHIBIT D



# Office of the Attorney General
## Washington, D. C. 20530

April 3, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU OF PRISONS

FROM:         THE ATTORNEY GENERAL

SUBJECT:      <u>Increasing Use of Home Confinement at Institutions Most Affected by COVID-19</u>

The mission of BOP is to administer the lawful punishments that our justice system imposes. Executing that mission imposes on us a profound obligation to protect the health and safety of all inmates.

Last week, I directed the Bureau of Prisons to prioritize the use of home confinement as a tool for combatting the dangers that COVID-19 poses to our vulnerable inmates, while ensuring we successfully discharge our duty to protect the public. I applaud the substantial steps you have already taken on that front with respect to the vulnerable inmates who qualified for home confinement under the pre-CARES Act standards.

As you know, we are experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton. We have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions. I would like you to give priority to these institutions, and others similarly affected, as you continue to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards. In addition, the CARES Act now authorizes me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons. I hereby make that finding and direct that, as detailed below, you give priority in implementing these new standards to the most vulnerable inmates at the most affected facilities, consistent with the guidance below.

I.    **<u>IMMEDIATELY MAXIMIZE APPROPRIATE TRANSFERS TO HOME CONFINEMENT OF ALL APPROPRIATE INMATES HELD AT FCI OAKDALE, FCI DANBURY, FCI ELKTON, AND AT OTHER SIMILARLY SITUATED BOP FACILITIES WHERE COVID-19 IS MATERIALLY AFFECTING OPERATIONS</u>**

Memorandum from the Attorney General                                    Page 2
Subject: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

While BOP has taken extensive precautions to prevent COVID-19 from entering its facilities and infecting our inmates, those precautions, like any precautions, have not been perfectly successful at all institutions. I am therefore directing you to immediately review all inmates who have COVID-19 risk factors, as established by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton, and similarly situated facilities where you determine that COVID-19 is materially affecting operations. You should begin implementing this directive immediately at the facilities I have specifically identified and any other facilities facing similarly serious problems. And now that I have exercised my authority under the CARES Act, your review should include all at-risk inmates—not only those who were previously eligible for transfer.

For all inmates whom you deem suitable candidates for home confinement, you are directed to immediately process them for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility, or, in appropriate cases subject to your case-by-case discretion, in the residence to which the inmate is being transferred. It is vital that we not inadvertently contribute to the spread of COVID-19 by transferring inmates from our facilities. Your assessment of these inmates should thus be guided by the factors in my March 26 Memorandum, understanding, though, that inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations.

I also recognize that BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large numbers of inmates in the community. I therefore authorize BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as BOP determines in every such instance that doing so is appropriate and consistent with our obligation to protect public safety.

Given the speed with which this disease has spread through the general public, it is clear that time is of the essence. Please implement this Memorandum as quickly as possible and keep me closely apprised of your progress.

## II.   **PROTECTING THE PUBLIC**

While we have a solemn obligation to protect the people in BOP custody, we also have an obligation to protect the public. That means we cannot simply release prison populations en masse onto the streets. Doing so would pose profound risks to the public from released prisoners engaging in additional criminal activity, potentially including violence or heinous sex offenses.

That risk is particularly acute as we combat the current pandemic. Police forces are facing the same daunting challenges in protecting the public that we face in protecting our inmates. It is impossible to engage in social distancing, hand washing, and other recommend steps in the middle of arresting a violent criminal. It is thus no surprise that many of our police officers have fallen ill with COVID-19, with some even dying in the line of duty from the disease. This pandemic has dramatically increased the already substantial risks facing the men and women who keep us safe, at the same time that it has winnowed their ranks while officers recover from getting sick, or self-quarantine to avoid possibly spreading the disease.

Memorandum from the Attorney General                                                    Page 3
Subject: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates. Thus, while I am directing you to maximize the use of home confinement at affected institutions, it is essential that you continue making the careful, individualized determinations BOP makes in the typical case. Each inmate is unique and each requires the same individualized determinations we have always made in this context.

I believe strongly that we should do everything we can to protect the inmates in our care, but that we must do so in a careful and individualized way that remains faithful to our duty to protect the public and the law enforcement officers who protect us all.

# EXHIBIT E



ENFORCEMENT AND REMOVAL OPERATIONS

# U.S. Immigration and Customs Enforcement Fiscal Year 2019 Enforcement and Removal Operations Report



U.S. Immigration and Customs Enforcement

**Table of Contents**

Overview ................................................................................................................ 3

ICE Custody and Case Management ..................................................................... 4

   *Initial Book-Ins Resulting from CBP Apprehensions Increased* ..................... 4

   *Average Daily Population Resulting from CBP Apprehensions Increased* ............... 5

   *Currently Detained Population Shifted due to CBP Apprehensions* ..................... 6

   *Average Length of Stay in ICE Custody Declined* ..................................... 8

   *Use of Family Residential Centers Decreased* ......................................... 8

   *ICE's Non-Detained National Docket Continued to Grow* ............................. 10

   *Alternatives to Detention Expanded* ................................................. 11

ERO Administrative Arrests ................................................................................ 11

   *Administrative Arrests Declined but Focused on Criminals* ......................... 12

   *ERO Continued to Pursue Criminal Arrests and Prosecutions* ...................... 15

ICE Detainers ....................................................................................................... 16

ICE Removals ....................................................................................................... 18

   *Removals with CBP as the Arresting Agency Increased* ............................. 19

   *Removals of USBP-Identified Family Unit and Unaccompanied Alien Children Apprehensions Continued to Increase* ......................................... 20

   *Removals of Criminals Remained a Priority* ........................................ 21

Conclusion ........................................................................................................... 25

Appendix ............................................................................................................... 26

   *Appendix A: Methodology* ......................................................... 26

   *Appendix B: Removals by Country of Citizenship* ................................. 27

**Overview**

This report summarizes U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) activities during Fiscal Year (FY) 2019[1] and highlights the impact of changing migration patterns on the agency's operations.

ICE shares responsibility for administering and enforcing the nation's immigration laws with Department of Homeland Security (DHS) component agencies, including U.S. Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services. ICE ERO is responsible for the identification, arrest, and removal of aliens who present a danger to national security or a threat to public safety, or who otherwise undermine border control and the integrity of the U.S. immigration system. As a result, ICE ERO's main areas of focus are interior enforcement operations, management of the agency's detained population nationwide, and removal of aliens who have received a final order.

While ERO's targeted immigration enforcement operations focus on the interior of the country, changes in migration flows at the Southwest Border directly impact nearly every area of the agency's operations, including interior enforcement, detention capacity, transportation, removals, personnel, and overall expenditures. Despite some decrease in apprehensions toward the end of the fiscal year, CBP has continued to apprehend record numbers of migrants, particularly family units and Unaccompanied Alien Children (UAC), along the Southwest Border, and DHS and its component agencies continue to experience the ramifications of this unprecedented migration across operational areas.

According to CBP data, during FY 2019, the number of individuals apprehended or found inadmissible nationwide totaled 1,148,024, an increase of 68 percent over the previous fiscal year. The vast majority of this activity occurred along the Southwest Border, where the U.S. Border Patrol (USBP) apprehended 851,508 aliens, an increase of 115 percent over the previous year, and a higher number than any of the previous ten fiscal years. Among those apprehended were 473,682 family unit members, representing the highest number for any year on record and 342 percent higher than the previous year's record of 107,212. Overall, family unit members and UAC accounted for 64.5 percent of all individuals apprehended by the USBP at the Southwest Border during FY 2019, demonstrating both the magnitude and the changing demographics that have fueled a border security and humanitarian crisis and have compromised ICE's ability to conduct enforcement in the interior.

This sustained increase in migration has stretched resources across the U.S. government, requiring ERO to redirect its enforcement personnel and detention capacity to support border enforcement efforts as well as a significantly increased detained population. This has negatively impacted the number of ERO's interior arrests, as well as the percentage of removals stemming from such arrests, and has also changed the overall composition of ICE's detained population. Because much of ERO's limited detention capacity has been dedicated to housing aliens arrested by CBP, many of whom are subject to mandatory detention under U.S. immigration laws regardless of criminality, the increase in border apprehensions has resulted in a lower overall percentage of ICE detainees who have a criminal history (the vast majority of those arrested by

---

[1] FY 2019 indicates October 1, 2018 through September 30, 2019.

ERO in the interior have criminal convictions or pending criminal charges, while those arrested by CBP at the border often do not have any known criminal history).

In addition, the situation at the Southwest Border has also driven a significant increase in the number of non-detained cases[2] ERO manages nationwide, which surpassed 3.2 million cases in FY 2019, after steadily increasing from 2.6 million cases in FY 2018 and 2.4 million cases in FY 2017. With 5,300[3] law enforcement officers across 24 field offices, ERO does not have sufficient resources to effectively manage the sustained increase in non-detained cases.

This report presents ERO's FY 2019 year-end statistics in the following areas: 1) ICE Custody and Case Management, 2) ERO Administrative Arrests, 3) ICE Detainers, and 4) ICE Removals.

## ICE Custody and Case Management

ERO detains individuals to ensure their presence for immigration proceedings and to secure their departure from the United States once they become subject to an executable final order of removal. Detention is an important and necessary part of immigration enforcement, and in FY 2019, 85 percent of those removed by ERO had spent time in ICE detention prior to their departure from the country. Because ERO's limited detention beds account for only a small fraction of those who are amenable to removal, the agency's detention resources are primarily focused on individuals who represent a threat to public safety, for whom detention is mandatory by law, or who may be a flight risk.

In addition, ERO manages a non-detained docket of more than 3.2 million cases, which includes aliens in all stages of the immigration process across the country. During FY 2019, ICE's detained and non-detained dockets both increased significantly, which was overwhelmingly due to the historic levels of CBP apprehensions at the Southwest Border.

### Initial Book-Ins Resulting from CBP Apprehensions Increased

Typically, when an alien is apprehended by CBP, he or she is transferred to ICE custody pending removal proceedings. An initial book-in to an ICE detention facility is defined as the first time an alien enters ICE custody for a detention stay and does not include transfers between facilities. In FY 2019, ERO experienced an increase in overall book-ins resulting from CBP activity at the border. During this time period, 73 percent of all initial book-ins to ICE custody resulted from CBP apprehensions, while overall initial book-ins to ICE custody increased 29 percent compared to FY 2018 and 58 percent compared to FY 2017.

---

[2] Non-detained cases consist of active removal cases for aliens not in ICE Custody.
[3] ERO estimates that as of the end of FY 2019, there were approximately 5,300 Deportation Officers in its 24 field offices, excluding supervisory and headquarters personnel.

**Figure 1: FY 2017 – FY 2019 Initial Book-Ins by Arresting Agency**

*Average Daily Population Resulting from CBP Apprehensions Increased*

ERO's Average Daily Population (ADP) measures the number of individuals in ICE custody on an average day during the fiscal year. ERO's ADP reached 50,165 in FY 2019, an increase of 19 percent compared to FY 2018. Like ERO's initial book-ins, the increase in overall ADP was driven by the increased CBP activity at the border, with CBP apprehensions accounting for 60 percent of those in custody, and ERO administrative arrests in the interior accounting for only 40 percent.

**Figure 2: FY 2018 – FY 2019 Average Daily Population by Arresting Agency**



5

*Currently Detained Population Shifted due to CBP Apprehensions*

ERO provides a range of comprehensive services to ensure the welfare of all those in its custody, including medical, dental, and mental healthcare, access to legal and educational resources, and recreational opportunities. It utilizes a nationwide network of detention facilities, including five ICE-owned, contractor operated Service Processing Centers, eight privately owned and/or operated Contract Detention Facilities, 12 Intergovernmental Service Agreement (IGSA) facilities which are dedicated to detaining ICE detainees, and approximately 200 shared-use IGSAs. Through a robust inspections program, the agency ensures detention facilities utilized to detain ICE detainees do so in accordance with ICE national detention standards, which are typically much more rigorous than those that apply to other detained populations and conform to or exceed American Correctional Association guidance.

ICE's currently detained population represents a small fraction of the overall number of removal cases it manages nationwide, and the agency prioritizes its detention resources to focus on public safety and national security threats, flight risks, and those who are subject by law to mandatory detention. Since many recent border entrants are subject to mandatory detention under the Immigration and Nationality Act (INA), increased CBP apprehensions have caused a major shift in the composition of the detained population. At the end of FY 2019, 63 percent of the detained population was initially apprehended by CBP, an increase from 52 percent at the end of FY 2018 and 40 percent at the end of FY 2017.

This shift has forced ERO to balance its public safety mission in the interior with support for CBP operations at the Southwest Border, and ERO's corresponding adjustment of resources has come at a significant cost to other operational areas. As the detained population has grown, ERO officers have had to be redeployed across the country to assist with detained docket management. These temporary deployments and reassignments have come at a significant cost to ERO's interior enforcement and public safety efforts.

6

**Figure 3: End of FY 2019 ICE National Docket Snapshot**



**Figure 4: End of FY 2019 Currently Detained Population Snapshot by Arresting Agency**



**Figure 5: FY 2017- FY 2019 Currently Detained Population Snapshots by Arresting Agency**



*Average Length of Stay in ICE Custody Declined*

The average length of stay (ALOS) represents the average amount of time an alien was detained while in ICE custody. ICE's ALOS has been trending downward since FY 2017, which is primarily due to changes in the composition of the detained population.

In FY 2019, ICE's ALOS for its detained population was 34.3 days, which decreased from 39.4 days in FY 2018 and 43.7 days in FY 2017. The primary drivers for this decrease in ALOS were a greater percentage of CBP cases and a smaller percentage of criminal aliens as a result (CBP apprehensions typically have shorter stays in detention while criminal cases tend to have longer stays), more family unit cases (which are usually booked in and out of custody quickly due to the *Flores Settlement Agreement* (FSA)[4]), and the need to prioritize extremely limited detention resources (including through the release of aliens not subject to mandatory detention, or who do not appear to pose a public safety threat or flight risk).

**Figure 6: FY 2017 – FY 2019 Average Length of Stay in ICE Custody**



*Use of Family Residential Centers Decreased*

While CBP apprehensions at the Southwest Border have increased overall in recent years, the composition of those apprehended has also changed. DHS and its component agencies have seen a significant increase in families and UAC, predominantly from El Salvador, Guatemala, and Honduras (collectively known as the Northern Triangle countries), either being apprehended along the Southwest Border or who are determined to be inadmissible upon presenting themselves at ports of entry. While for many years the majority of those apprehended along the

---

[4] Based upon a ruling by the U.S. Court of Appeals for the Ninth Circuit that the FSA applies to all alien minors detained in DHS custody, including *accompanied* minors, *Flores v. Lynch*, 828 F.3d 898, 905 (9th Cir. 2016), such alien minors must be released or transferred to a "licensed program" "as expeditiously as possible[,]" pursuant to paragraph 12 of the FSA. In the context of expedited removal and reinstatement of removal, the U.S. District Court for the Central District of California noted that "if 20 days is as fast as Defendants, in good faith and in the exercise of due diligence, can possibly go in screening family members for reasonable or credible fear" that may fall within the standard. *Flores v. Lynch*, 212 F. Supp.3d 907, 914 (C.D. Cal. 2015).

Southwest Border were adult males from Mexico, the composition of arrivals has changed dramatically. In FY 2019, USBP apprehensions of family units at the Southwest Border increased more than 340 percent compared to FY 2018.

In FY 2019,[5] there were over 470,000 USBP apprehensions of members of family units and 37,906 initial book-ins to ICE's three Family Residential Centers[6], while ICE directly released approximately 200,000 family unit members from its custody[7] as a result of the high volume of CBP apprehensions during this time period. Due to the humanitarian crisis caused by the record number of family unit members arriving at the border, CBP was also forced to conduct direct releases of thousands of members of this population who were never turned over to ICE and are not represented in ICE's release data as a result.

Pursuant to the FSA and subsequent court interpretations, pre-final order children accompanied by their parents generally cannot be held in immigration detention for more than 20 days. As a result, few migrant families spend time in detention and most of those that do are quickly released into the interior of the United States where they may wait years for their court cases to conclude. As a result, very few members of this population have been removed from the country, even after receiving a final order of removal from a Department of Justice Executive Office for Immigration Review immigration judge (**Figure 15**).

**Figure 7: FY 2017 – FY 2019 Initial Book-Ins to ICE Family Residential Centers**



---

[5] "Southwest Border Migration 2019," https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019.

[6] ICE Family Residential Centers include Berks County Family Shelter, Karnes County Residential Center, and South Texas Family Residential Center.

[7] ICE began manually tracking the number of family unit members released from its custody on December 21, 2018. Between December 2018 and September 30, 2019, ICE released approximately 200,000 family unit members across its four Field Offices covering the Southwest Border. Most of these aliens were apprehended by the USBP, subsequently transferred to ICE custody, and released into the interior of the country shortly thereafter.

*ICE's Non-Detained National Docket Continued to Grow*

ERO manages active removal cases via the ICE National Docket. The national docket includes all aliens in removal proceedings and encompasses both the smaller detained docket and the much larger non-detained docket. Cases on the non-detained docket include aliens who are both pre- and post-final order, and who have been released on parole, bond, an order of recognizance, an order of supervision, or who are from countries where ERO is in the process of obtaining the necessary travel documents for repatriation.[8]

In FY 2019, the number of aliens on ICE's non-detained docket continued to increase, surpassing 3.2 million cases for the first time, up from 2.6 million cases at the end of FY 2018 and 2.4 million at the end of FY 2017. Like other increases in agency statistics this fiscal year, Southwest Border activity – including more than 470,000 USBP apprehensions of family units – accounted for nearly all of the growth on the non-detained docket.

As the ICE National Docket has continued to grow over the last several years, the number of fugitive aliens[9] on the non-detained docket has continued to grow as well. At the end of FY 2019, the number of fugitives stood at 595,430, an increase from 565,892 in FY 2018 and 540,836 in FY 2017. The continued growth of the fugitive backlog is a direct result of the pressures placed on the immigration system by the crisis at the Southwest Border, as well as the fact that ICE's Fugitive Operations resources have remained static for many years in the absence of additional appropriations.

**Figure 8: Non-Detained National Docket Cases at End of Fiscal Year**



---

[8] While most countries cooperate with ICE's requests to issue travel documents to their citizens who have been ordered removed by an immigration judge, a small number of countries fail to honor such requests or take a longer time to do so, which adds to removal timelines and results in aliens from these countries spending more time on the non-detained docket (and for those who are on the detained docket, more time in detention).
[9] An ICE fugitive is defined as an alien who has failed to leave the United States based upon a final order of removal, deportation or exclusion, or who has failed to report to ICE after receiving notice to do so.

10

*Alternatives to Detention Expanded*

ICE's Alternatives to Detention (ATD) program uses technology and case management to monitor aliens' court appearances and compliance with release conditions while their removal proceedings are pending on the non-detained immigration court docket. ATD is not a substitute for detention, but instead complements immigration enforcement efforts by offering increased supervision for a small subset of eligible aliens who are not currently in ICE detention.

ATD may serve as an appropriate additional layer of supervision for an alien who is released from detention pursuant to an Order of Recognizance, an Order of Supervision (for aliens already subject to final removal orders), a grant of parole, or a bond. Adults age 18 and over may be eligible for participation in ATD but must be thoroughly vetted by ERO officers, who review an alien's criminal, immigration, and supervision history, family and/or community ties, status as a caregiver or provider, and humanitarian or medical considerations when making enrollment determinations in order to determine whether a candidate is likely to comply with the terms of the program.

While ERO has expanded its use of ATD from approximately 23,000 participants in FY 2014 to 96,000 as of the end of FY 2019, this expansion has come with a number of challenges, including high levels of absconders among recently enrolled family units. In FY 2019, the absconder rate[10] for family units was 26.9 percent, more than double the 12.3 percent absconder rate for non-family unit participants, demonstrating the growing challenges such enrollments create for immigration enforcement.

Thus, while ATD can complement other immigration enforcement efforts when used appropriately on a vetted and monitored population of participants, the program was not designed to facilitate ERO's mission of removing aliens with final orders. Additionally, ERO lacks sufficient resources to keep all current participants enrolled through the pendency of their proceedings, or to locate and arrest the significant number of participants who abscond, problems which will only be exacerbated by enrolling greater numbers of participants without the addition of enforcement resources. While ERO has continued to expand the use of ATD to monitor the non-detained population in FY 2019, the program will need to be further resourced in order to appropriately monitor participants, including through the addition of officers who can locate, arrest, and remove those who fail to adhere to conditions of enrollment. Finally, while additional resources would improve the efficacy of ATD at current levels of enrollment, ERO notes that the program is not a viable solution for addressing the magnitude of cases on the non-detained docket, which surpassed 3.2 million in FY 2019.

## ERO Administrative Arrests

ERO primarily arrests aliens for civil violations of U.S. immigration law. In furtherance of this mission, it conducts enforcement actions based on intelligence-driven leads in communities

---

[10] Absconder Rate = Count of Absconders/Count of Overall Terminations. ICE calculates the percentage of absconders by looking at the overall number of aliens who concluded the ATD program in a given time period ("overall terminations"), and the number of those terminations which occurred due to a participant absconding.

11

nationwide (at-large arrests) and works with jails to identify aliens who are amenable to removal and who have been arrested by state or local authorities for criminal activity (custodial arrests).

In FY 2019, ERO's overall administrative arrests decreased by 10 percent over the last fiscal year, while administrative arrests of convicted criminals decreased by 12 percent, and at-large arrests decreased by 12 percent. As with other enforcement activity in FY 2019, this was significantly impacted by the reallocation of resources in response to the crisis at the border. These resources included approximately 350 ERO officers who were reassigned in support of Southwest Border operations. Thus, while ERO continues to conduct enforcement in the interior of the United States, in light of its limited resources and the sheer volume of aliens attempting to enter the country, the agency has had to balance its support for border security with its interior public safety mission.

*Administrative Arrests Declined but Focused on Criminals*

While ERO administrative arrests, including arrests of criminals, have declined overall since FY 2018, ICE remains committed to directing its enforcement resources to those aliens posing the greatest risk to the safety and security of the United States. As a result, the majority of aliens arrested by ERO are convicted criminals, followed by those with pending criminal charges at the time of arrest. In FY 2019, 86 percent of ERO's administrative arrests consisted of aliens with criminal convictions or pending criminal charges.[11]

ERO continues to carry out its public safety mission with limited resources, and as a result, many of the criminal aliens it arrests have extensive criminal histories with multiple convictions or pending charges. Of the 123,128 ERO administrative arrests in FY 2019 with criminal convictions or pending criminal charges, the criminal history for this group represented 489,063 total criminal convictions and pending charges as of the date of arrest, which equates to an average of four criminal arrests/convictions per alien, highlighting the recidivist nature of the aliens that ICE arrests.

---

[11] ICE defines immigration violators' criminality in the following manner: Convicted Criminal: Immigration Violators with a criminal conviction entered into ICE systems of record at the time of the enforcement action; Pending Criminal Charges: Immigration Violators with pending criminal charges entered into ICE system of record at the time of the enforcement action; Other Immigration Violators: Immigration Violators without any known criminal convictions, or pending charges entered into ICE system of record at the time of the enforcement action.

**Figure 9: FY 2017 – FY 2019 ERO Administrative Arrests by Criminality**



**Figure 10: FY 2017 – FY 2019 At-Large Administrative Arrests by Criminality**



13

**Table 1: FY 2017 – FY 2019 ERO Administrative Arrests of Other Immigration Violators[12]**

| ERO Administrative Arrest Type | FY2017 | | FY2018 | | FY2019 | |
|---|---|---|---|---|---|---|
| | Arrests | Percentage | Arrests | Percentage | Arrests | Percentage |
| **Other Immigration Violators** | **15,478** | **100%** | **20,464** | **100%** | **19,971** | **100%** |
| Notice to Appear | 7,642 | 49% | 11,570 | 57% | 11,272 | 56% |
| Fugitives | 2,350 | 15% | 2,791 | 14% | 2,560 | 13% |
| Reinstatement | 1,695 | 11% | 1,846 | 9% | 1,981 | 10% |
| Other | 3,791 | 24% | 4,257 | 21% | 4,158 | 21% |

**Table 2: FY 2019 Criminal Charges and Convictions for ERO Administrative Arrests[13, 14]**

| Criminal Charge Category | Criminal Charge | Criminal Conviction | Total Offenses |
|---|---|---|---|
| Traffic Offenses - DUI | 25,417 | 49,106 | 74,523 |
| Traffic Offenses | 28,519 | 39,717 | 68,236 |
| Dangerous Drugs | 20,277 | 47,453 | 67,730 |
| Immigration | 10,769 | 46,888 | 57,657 |
| Assault | 19,648 | 26,156 | 45,804 |
| Obstructing Judiciary, Congress, Legislature, Etc. | 10,442 | 10,287 | 20,729 |
| General Crimes | 8,114 | 9,891 | 18,005 |
| Larceny | 4,599 | 12,456 | 17,055 |
| Obstructing the Police | 5,641 | 8,776 | 14,417 |
| Fraudulent Activities | 4,145 | 7,875 | 12,020 |
| Burglary | 2,565 | 7,757 | 10,322 |
| Weapon Offenses | 3,281 | 6,997 | 10,278 |
| Public Peace | 3,605 | 5,838 | 9,443 |
| Sex Offenses (Not Involving Assault or Commercialized Sex) | 1,992 | 4,658 | 6,650 |
| Invasion of Privacy | 2,078 | 4,233 | 6,311 |
| Family Offenses | 2,296 | 3,139 | 5,435 |
| Stolen Vehicle | 1,568 | 3,686 | 5,254 |
| Sexual Assault | 1,654 | 3,407 | 5,061 |
| Robbery | 1,155 | 3,581 | 4,736 |
| Forgery | 1,549 | 2,979 | 4,528 |
| Damage Property | 1,653 | 2,245 | 3,898 |

---

[12] "Other" types of arrests of Other Immigration Violators include, but are not limited to, arrests for Expedited Removal, Visa Waiver Program Removal, Administrative Removal, and Voluntary Departure/Removal.

[13] The specific criminal charges and convictions represent the criminal history as entered in the ICE system of record based on the FBI's National Crime Information Center (NCIC) offense codes. Each alien may have multiple criminal convictions or charges at the time of their administrative arrest, and Table 2 lists categories which accounted for at least 1,000 combined charges and convictions among those who were administratively arrested by ERO in FY 2019.

[14] Notes: "Traffic Offenses" include (besides Traffic Offenses – DUI which is listed separately) Hit and Run, Transport Dangerous Material, and Traffic Offense (describe offense). "Immigration" offenses include Illegal Entry, Illegal Reentry, False Claim to U.S. Citizenship, and Alien Smuggling. "Obstructing Judiciary, Congress, Legislature, Etc.," refers to several related offenses including, but not limited to: Perjury; Contempt; Obstructing Justice; Misconduct; Parole and Probation Violations; and Failure to Appear. "General Crimes" include Conspiracy, Crimes Against Person, Licensing Violation, Money Laundering, Morals - Decency Crimes, Property Crimes, Public Order Crimes, Racketeer Influenced and Corrupt Organizations Act (RICO), and Structuring.

14

| Criminal Charge Category | Criminal Charge | Criminal Conviction | Total Offenses |
|---|---|---|---|
| Liquor | 1,991 | 1,799 | 3,790 |
| Stolen Property | 1,181 | 2,562 | 3,743 |
| Flight / Escape | 1,171 | 2,012 | 3,183 |
| Homicide | 374 | 1,549 | 1,923 |
| Kidnapping | 723 | 1,110 | 1,833 |
| Health / Safety | 481 | 1,012 | 1,493 |
| Commercialized Sexual Offenses | 605 | 743 | 1,348 |
| Threat | 534 | 658 | 1,192 |

*ERO Continued to Pursue Criminal Arrests and Prosecutions*

ICE is committed to protecting the safety and security of the homeland and adhering to the President's June 20, 2018 Executive Order 13841, *Affording Congress the Opportunity to Address Family Separation*, which directs the Executive Branch to continue to rigorously enforce immigration laws and to prosecute illegal border entrants. When compared to FY 2018, ERO notes a slight drop in overall criminal arrests, which aligns with the 10 percent decrease in administrative arrests as well as other decreases in enforcement activity during the year. However, enforcement efforts still resulted in a significant number of criminal arrests and prosecutions.

In FY 2019, ERO enforcement activities resulted in 6,739 criminal arrests (10 percent drop from FY 2018), 6,802 Indictments/Bills of Information (a seven percent drop from FY 2018), and 7,142 Convictions (a less than one percent illegal border entrants). These efforts resulted in the prosecutions of offenses which include, but are not limited to: 8 U.S.C. § 1253, Penalties Related to Removal, U.S.C § 1325, Illegal Entry into the United States; 8 U.S.C § 1326, Illegal Re-Entry of Removed Alien; 18 U.S.C. § 1361, Destruction of Government Property, 18 U.S.C § 1546, Fraud and Misuse of Visas, Permits and Other Documents; 18 U.S.C § 111, Assaulting and/or Resisting an Officer; and 18 U.S.C § 922(g)(5), Felon in Possession of a Firearm.

15

**Figure 11: FY 2017 – FY 2019 Prosecution Statistics**



## ICE Detainers

A detainer is a request from ICE to local law enforcement agencies to notify DHS as early as practicable before a removable alien is released from local custody. Detainers request that local law enforcement agencies maintain custody of the alien for a period not to exceed 48 hours beyond the time the alien would otherwise be released, to allow DHS to assume custody for removal purposes in accordance with federal law. ICE also serves a warrant of removal or warrant of arrest at the time the detainer is lodged with the receiving law enforcement agency in accordance with existing legal requirements[15] and a formal ICE policy directive issued in 2017.[16]

Detainers reduce potential risks to ERO officers and the general public by allowing arrests to be made in secure custodial settings as opposed to at-large in communities, conserve scarce government resources, and allow ERO to assume custody of criminal aliens before they have an opportunity to reoffend. In FY 2019, ERO issued 165,487 detainers; the aliens who were the subjects of these detainers had criminal histories[17] including, but not limited to, the following crimes: more than 56,000 assaults, 14,500 sex crimes, 5,000 robberies, 2,500 homicides, and 2,500 kidnappings.

---

[15] Federal law vests authority in immigration officers – rather than federal judges – to issue warrants for violations of civil immigration law provisions. *See* INA § 287, 8 U.S.C. § 1357. As a result, no judge in the United States has the authority to issue a warrant for a civil immigration violation.

[16] ICE Policy Directive No. 10074.2, *Issuance of Detainers by ICE Immigration Officers* (Mar. 24, 2017), *available at*: https://www.ice.gov/sites/default/files/documents/Document/2017/10074-2.pdf.

[17] "Criminal history" includes all criminal convictions and pending charges associated with the group of aliens who were the subjects of detainers in FY 2019. Criminal charges may be added or dropped at any point and convictions may be overturned, so this data is a snapshot in time but is representative of the serious criminal histories and corresponding public safety risk associated with this group of individuals.

16

Detainers are one of the most critical public safety tools ERO officers have at their disposal. However, in recent years, the agency has experienced an increase in the number of jurisdictions that do not cooperate with its enforcement efforts or who do not honor detainers. While ERO has limited visibility into whether a detainer has been honored unless an alien is subsequently rearrested, a number of aliens who have been released under these circumstances have gone on to commit additional crimes that could have been prevented if ERO had been able to assume custody in accordance with federal immigration laws. As a result, ICE uses its unique law enforcement authorities to help prevent such crimes from occurring, and continues to seek ways to maintain and strengthen its state and local partnerships nationwide in furtherance of its national security and public safety mission.

ICE detainers issued in FY 2019 decreased slightly (by seven percent) from those issued in FY 2018. Like other decreases in interior enforcement activity, this was impacted by the diversion of resources to the Southwest Border as well as limited detention space. However, ICE has also experienced an increase in the number of jurisdictions that do not cooperate with its enforcement efforts nationwide, and estimates that limited visibility into the actions of state and local law enforcement in non-cooperating jurisdictions has also impacted the number of detainers issued.



**Figure 12: FY 2017 – FY 2019 ICE Detainers Issued**

One of the biggest impediments to ERO's public safety efforts during FY 2019 was the lack of cooperation from an increasing number of jurisdictions nationwide. However, in keeping with its goal to build cooperative, respective relationships with law enforcement partners and guarantee public safety, ICE continued to collaborate with its law enforcement partners to help ensure – to the greatest extent possible – that removable aliens who may pose a safety threat are not released into the community. In furtherance of this mission, ERO has continued to operate its 287(g) Jail

17

Enforcement Model (JEM) Program,[18] a valuable force multiplier which enhances community safety by allowing ICE to partner with state and local law enforcement agencies to identify and remove criminal aliens and immigration law violators before they are released. At end of FY 2019, ICE had 77 signed and operational Memorandums of Agreement (MOAs) nationwide.

Additionally, ICE launched the 287(g) Warrant Service Officer (WSO) Program in May 2019 to provide an opportunity for jurisdictions that seek to cooperate with enforcement efforts but who are precluded from honoring ICE detainers as a matter of local policy or state law. While WSO officers can serve and execute administrative warrants on designated aliens in their jails under the terms of the MOA, unlike the traditional 287(g) JEM Program, WSO officers do not interview individuals regarding alienage and removability, and do not process aliens who are in the United States in violation of immigration law. By the end of FY 2019, approximately 40 jurisdictions had expressed interest, with 42 subsequently signing MOAs with ICE during the first month of FY 2020. ICE is currently pursuing additional agreements nationwide.

**ICE Removals**

An ICE removal is the compulsory and confirmed movement of an inadmissible or deportable alien out of the United States.[19] ICE removals include both aliens arrested by ERO in the interior of the country and aliens who were apprehended by CBP and turned over to ERO for removal efforts. While ICE's overall removals increased slightly from FY 2018 to FY 2019, the portion of removals resulting from CBP apprehensions increased significantly during this time period.

Detention remains a necessary tool for facilitating the repatriation of those who have received a final order of removal, and 85 percent of those removed by ICE in FY 2019 had spent time in ICE detention prior to repatriation to their home country. In FY 2019, there were 226,400 removals with detention involved, a slight increase from 209,928 such removals in FY 2018, demonstrating the continued importance of detention for the removal process.

---

[18] Section 287(g) of the INA authorizes ICE to delegate the limited authority to state and local law enforcement officers to enforce federal immigration law under a signed memorandum of agreement.

[19] ICE removals include removals and returns where aliens were turned over to ICE for removal efforts. This includes aliens who have received a final order of removal, as well as those who have been processed for Expedited Removal (ER) or Voluntary Return (VR) that are turned over to ICE for detention. Aliens processed for ER and not detained by ERO or VRs after June 1st, 2013 and not detained by ICE are primarily processed by the USBP. CBP should be contacted for those statistics.

**Figure 13: FY 2017 – FY 2019 ICE Removals**



*Removals with CBP as the Arresting Agency Increased*

During FY 2019, a much greater percentage of ICE's removals stemmed from an initial apprehension by CBP (68 percent) rather than an arrest by ICE (32 percent). In comparison, during FY 2018, removals stemming from a CBP apprehension accounted for 63 percent and removals stemming from an ICE arrest accounted for 37 percent. This is consistent with other shifts in ICE workload resulting from the crisis at the Southwest Border during FY 2019.

**Figure 14: FY 2017 – FY 2019 ICE Removals by Arresting Agency**

*Removals of USBP-Identified Family Unit and Unaccompanied Alien Children Apprehensions Continued to Increase*

Since the initial surge at the Southwest Border in FY 2014, there has been a continued increase in the arrival of both family units and UAC. In FY 2019, there were approximately 76,000 UAC and 470,000 family unit members apprehended by USBP at the Southwest Border, a 52 percent increase for UAC and a 341 percent increase for family unit members from the previous fiscal year.

While USBP routinely turns apprehended family unit members over to ERO for removal proceedings, judicial interpretations of the *FSA* and other adverse court rulings impose practical limitations on ICE's ability to detain family units through the completion of removal proceedings, making removal of members of this population extremely challenging. At the peak of CBP's apprehensions in May 2019, the USBP apprehended nearly 85,000 family units in a single month,[20] forcing both CBP and ICE to directly release members of this population into the United States.

DHS is responsible for transferring apprehended UAC to the custody to the Department of Health and Human Services (HHS) within 72 hours, absent exceptional circumstances, and the agency's primary role consists of transporting UAC from CBP to HHS custody. Like DHS, HHS is similarly limited in their ability to detain this population through the pendency of removal proceedings, so few UAC are ultimately removed.

In FY 2019, ERO conducted a number of targeted enforcement efforts in the interior of the country, including Operation Border Resolve, in order to uphold the integrity of the U.S. immigration system by locating, arresting, and removing members of the family unit and UAC populations with final orders of removal. As a result, during the fiscal year ERO removed 5,702 aliens identified as family unit members based on USBP apprehension data from the initial surge in FY 2014 through the end of FY 2019, as well as 6,351 UAC.[21] While this represents a 110 percent increase in removals of family unit members and a 14 percent increase in removals of UAC from FY 2018 to FY 2019, it remains a small fraction of overall apprehensions for these populations.

During FY 2017, FY 2018, and FY 2019 as a whole, the USBP apprehended 656,516 family unit members and 167,491 UAC, while in the same time period, ICE removed 10,739 family unit members and 15,520 UAC – a 1.6 percent and 9.2 percent removal rate, respectively.[22] These low removals of family unit members and UAC are a result of the significant challenges ICE faces when enforcing final orders issued for members of these populations. In addition to the sheer volume of arrivals and limited government resources, a growing immigration court case backlog, high numbers of absconders among family units, and judicial and legislative

---

[20] "Southwest Border Migration 2019," https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019.

[21] ICE notes that this analysis is based on cross-referencing data with another agency, and that these figures are accurate to the best of its knowledge based on currently available information.

[22] ICE removals of family unit members and UAC include all those identified as members of these populations by the USBP; some of the removals that occurred during the past three years may correspond to aliens who were apprehended prior to this time period.

constraints[23] also contribute to extremely low numbers of removals and corresponding strain across the U.S. immigration system.

**Figure 15: FY 2017 – FY 2019 ICE Removals of USBP-Identified Family Unit Apprehensions (FMUA) and USBP-Identified Unaccompanied Children Apprehensions (UAC)**



*Removals of Criminals Remained a Priority*

ICE remains committed to directing its enforcement resources to those aliens posing the greatest risk to the safety and security of the United States. Despite shifts in the composition of the detained population, including an increase in removals of "other immigration violators" resulting from CBP apprehensions, ICE removals of aliens with criminal convictions and pending criminal charges continued to increase in FY 2019.

Interior removals are those initially arrested by ICE who were subsequently removed by ERO. In FY 2019, the overwhelming majority (91 percent) had criminal convictions or pending criminal charges at the time of arrest, demonstrating ICE's continued efforts to prioritize public safety in the interior despite resource constraints.

---

[23] By creating barriers to the removal of minors and family unit members, the *FSA* and the Trafficking Victims Protection Reauthorization Act in its current form are exploited by transnational criminal organizations and human smugglers, and create legal loopholes that incentivize a high volume of illegal immigration among family units and UAC.

**Figure 16: FY 2017 – FY 2019 ICE Removals by Criminality**



**Figure 17: FY 2017 – FY 2019 ICE Interior Removals by Criminality**



ICE removals of known or suspected gang members and known or suspected terrorists (KSTs) are instrumental to ICE's national security and public safety mission. ICE identifies gang members and KSTs by checking an alien's background in federal law enforcement databases, conducting interviews with aliens, and reviewing information received from its law enforcement partners, which is flagged accordingly in ERO's system of record. In FY 2019, ICE removed 5,497 known or suspected gang members, a slight decrease from FY 2018 that aligns with other decreases in interior enforcement. However, ICE's KST removals increased from 42 to 58.



**Figure 18: FY 2017 – FY 2019 ICE Removals of Known or Suspected Gang Members**



**Figure 19: FY 2017 – FY 2019 ICE Removals of Known or Suspected Terrorists**

Examples of KSTs and suspected gang members removed by ERO in FY 2019 include the following:

- **Ali Caby, aka "Alex Caby"**, a 41-year-old Iranian national, was removed to Bulgaria on March 21, 2019. Caby ran the Bulgaria office of AW-Tronics, a Miami export company that shipped and exported various aircraft parts and equipment to Syrian Arab Airlines. Ali Caby supervised and encouraged subordinate employees of AW-Tronics in the willful exportation of the parts and equipment to SDN Syrian Air, whose activities have assisted the Syrian government's violent crackdown on its people. Syrian Air is an OFAC-designated entity for transporting weapons and ammunition to Syria in conjunction with Hizballah, a terrorist organization, and the Iranian Revolutionary Guard Corps.

  On December 19, 2017, Caby was convicted in U.S. District Court for the Southern District of Florida of conspiracy to violate the International Emergency Economic Powers Act for illegally exporting aviation parts and equipment to Syria without obtaining a license or authorization, following an investigation by ICE Homeland Security Investigations (HSI), the Federal Bureau of Investigation (FBI), the Department of Commerce, the Defense Criminal Investigative Service, CBP, and the South Florida Joint Terrorism Task Force, and sentenced to 24 months in prison, followed by two years of supervised release. On Jan. 15, 2019, an immigration judge ordered Caby removed

from the United States to Bulgaria, where Caby had legal permanent residency, or Iran as an alternative, and ERO subsequently removed him from the country.[24]

- **Carlos Alfredo Luna-Guebara**, a 26-year-old national of El Salvador, was removed to El Salvador on May 15, 2019. Luna-Guebara was a wanted fugitive in his native country for aggravated homicide, conspiracy to commit homicide, and terrorist organization membership, and Salvadoran officials indicated to ERO that he is a documented active member of the 18th Street criminal gang.

  Luna-Guebara previously entered the United States on an unknown date and at an unknown location without admission or parole by an immigration officer, and was subsequently arrested on local charges in Pennsylvania. He was ordered removed by an immigration judge on April 8, 2019, and ERO subsequently removed him from the country and turned him over to Salvadoran officials without incident.[25]

- **Yassin Muhiddin Aref**, a 38-year-old Iraqi national, was removed to Iraq on June 10, 2019. In the summer of 2003, the FBI began investigating Aref after they received information indicating he had possible ties to terrorist organizations. His name and telephone number were found in three different suspected Ansar-al-Islam camps in Iraq, and telephone records for his telephone in Albany, New York, reflected 14 calls to the Syrian office of the Islamic Movement in Kurdistan. The FBI subsequently arrested him for conspiring to conceal the proceeds of the sale of a surface-to-air-missile he believed was unlawfully imported into the United States, knowing it would be sold to foreign terrorist group Jaish-E-Mohammed.

  On March 8, 2007, Aref was convicted in U.S. District Court for the Northern District of New York and sentenced to 180 months imprisonment on seven counts relating to material support of terrorism and weapons of mass destruction, including conspiracy to use, attempt to use, or conspire to use, a weapon of mass destruction against any person within the United States, in violation of 18 USC § 2339A; and conspiracy to provide material support and resources to a Foreign Terrorist Organization, in violation of 18 USC § 2239B. He was ordered removed by an immigration judge on October 9, 2018, and ERO subsequently removed him from the country.[26]

- **Houcine Ghoul**, a 45-year-old Tunisian national, was removed to Tunisia on June 19, 2019. Ghoul previously entered the United States on a tourist visa in 2001, overstayed his visa, and subsequently obtained status as a legal permanent resident through a sham marriage to a U.S. citizen, who he later divorced.

  The investigation into Ghoul's conduct began in April 2014 when Ghoul posted a photo online that explicitly displayed support for the Islamic State of Iraq and al-Sham (ISIS), a

---

[24] "ICE removes Iranian man convicted of violating the International Emergency Economic Powers Act," https://www.ice.gov/news/releases/ice-removes-iranian-man-convicted-violating-international-emergency-economic-powers.
[25] "ICE removes Mara 18th Street Gang member to El Salvador," https://www.ice.gov/news/releases/ice-removes-mara-18th-street-gang-member-el-salvador.
[26] "ICE removes Iraqi man convicted of terrorism related charges," https://www.ice.gov/news/releases/ice-removes-iraqi-man-convicted-terrorism-related-charges.

designated foreign terrorist organization. This photo displayed an individual holding a sign with the Arabic phrase, "The victory of the Islamic State in Iraq and Syria," and then below in English, "ISIS," and "N. Carolina, USA," the state where Ghoul was then residing. The photo later appeared in an online propaganda video posted by others to display worldwide support for ISIS, along with a self-description within the account, describing Ghoul as "Extremist, terrorist, tough, brain-washed, radical, I love explosions, booby trapping, beheading the enemy, and am among the supporters of establishing the religion with the sword."

In August 2018, Ghoul was sentenced to 24 months in prison, followed by deportation, for attempted unlawful procurement of naturalization and making false statements on his tax return, following an investigation conducted by ICE HSI, the FBI and the Internal Revenue Service. ERO lodged a detainer on Ghoul, and upon his release from Bureau of Prisons custody, removed him from the country.[27]

**Conclusion**

As the agency primarily responsible for immigration enforcement efforts in the interior of the United States, ICE plays a critical role in the national security and public safety of this country by upholding America's immigration laws as set by Congress. During FY 2019, ICE operations were significantly impacted by the surge at the Southwest Border, including extremely high numbers of aliens turned over from CBP to ERO for detention and removal, many of them subject to mandatory detention, and record numbers of family units and UAC – the vast majority of whom remain on ICE's continually growing non-detained docket of more than 3.2 million cases. This high volume of migration, including unprecedented numbers of family unit and UAC arrivals, stretched both ERO resources and those of the entire U.S. government to the breaking point, and created a severe humanitarian crisis and border security crisis that continues to cripple the immigration system.

In FY 2019, record migration at the Southwest Border took up limited ICE detention resources, drove increases in the agency's ADP and decreases in its interior arrests (including arrests of criminals), and forced ICE to balance its critical public safety mission in the interior with its support for DHS efforts to secure the border. While CBP apprehensions decreased somewhat toward the end of FY 2019 from their peak during the months of May, June, and July, sustained high levels of migration over the course of several years have severely taxed ERO's ability to execute key aspects of its mission. ICE projects that until fundamental changes are made to the immigration enforcement process – including legislation that addresses current legal loopholes that incentivize high levels of illegal migration  – the crisis situation at the border will continue, and the hundreds of thousands of cases that began during FY 2019 will continue to impact the entire immigration system for many years to come.

---

[27] "Tunisian national with terrorist ties removed from US," https://www.ice.gov/news/releases/tunisian-national-terrorist-ties-removed-us.

**Appendix**

*Appendix A: Methodology*

## Data Source:

Data used to report ICE statistics are obtained through the ICE Integrated Decision Support (IIDS) system data warehouse.

## Data Run Dates:

FY2019: IIDS v.1.3.4 run date 10/06/2019; ENFORCE Integrated Database (EID) as of 10/04/2019

FY2018: IIDS v.1.34 run date 10/08/2018; ENFORCE Integrated Database (EID) as of 10/06/2018

FY2017: IIDS v.1.28 run date 10/09/2017; ENFORCE Integrated Database (EID) as of 10/07/2017

## Removals

ICE Removals include removals and returns initiated by ICE and those initiated by other agencies in which aliens were turned over to ERO for repatriation efforts. Returns include Voluntary Returns, Voluntary Departures, and Withdrawals Under Docket Control. Any voluntary return recorded on or after June 1, 2013 without an ICE intake case is not recorded as an ICE removal.

Removals data are historical and remain static. In FY 2009, ERO began to "lock" removal statistics on October 5 at the end of each fiscal year and counted only aliens whose removal or return was already confirmed. Aliens removed or returned in that fiscal year but not confirmed until after October 5 were excluded from the locked data, and thus from ICE statistics. To ensure an accurate and complete representation of all removals and returns, ICE will count removals and returns confirmed after October 5 toward the next fiscal year. The number of removals in FY 2017, excluding the "lag" from FY 2016, was 220,649. The number of removals in FY 2018, excluding the "lag" from FY 2017, was 252,405. The number of removals in FY 2019, excluding the "lag" from FY 2018, was 262,591.

26

*Appendix B: Removals by Country of Citizenship*

**Table 3: FY 2018 – FY 2019 ICE Removals by Country of Citizenship[2829]**

| Country of Citizenship | FY 2018 | FY 2019 |
|---|---|---|
| **Total** | **256,085** | **267,258** |
| AFGHANISTAN | 30 | 36 |
| ALBANIA | 98 | 80 |
| ALGERIA | 17 | 20 |
| ANDORRA | 0 | 0 |
| ANGOLA | 32 | 40 |
| ANGUILLA | 0 | 2 |
| ANTIGUA-BARBUDA | 24 | 12 |
| ARGENTINA | 121 | 130 |
| ARMENIA | 27 | 48 |
| ARUBA | 1 | 1 |
| AUSTRALIA | 39 | 40 |
| AUSTRIA | 7 | 8 |
| AZERBAIJAN | 14 | 10 |
| BAHAMAS | 101 | 109 |
| BAHRAIN | 1 | 2 |
| BANGLADESH | 147 | 159 |
| BARBADOS | 17 | 29 |
| BELARUS | 10 | 18 |
| BELGIUM | 17 | 7 |
| BELIZE | 91 | 90 |
| BENIN | 10 | 9 |
| BERMUDA | 5 | 2 |
| BHUTAN | 1 | 1 |
| BOLIVIA | 81 | 64 |
| BOSNIA-HERZEGOVINA | 47 | 36 |
| BOTSWANA | 1 | 3 |
| BRAZIL | 1,691 | 1,770 |
| BRITISH VIRGIN ISLANDS | 1 | 4 |
| BRUNEI | 0 | 0 |
| BULGARIA | 34 | 21 |
| BURKINA FASO | 35 | 20 |
| BURMA | 40 | 29 |
| BURUNDI | 14 | 5 |
| CAMBODIA | 110 | 80 |
| CAMEROON | 72 | 76 |

[28] Country of citizenship is reported as it appears in ICE's system of record at the time the data is pulled but may be updated as additional information is discovered or verified.

[29] For FY 2019, the Swaziland country of citizenship has been changed to Eswatini and Macedonia has been changed to North Macedonia to reflect these countries' name changes. Countries of citizenship for FY 2018 remain unchanged.

| Country of Citizenship | FY 2018 | FY 2019 |
|---|---|---|
| CANADA | 342 | 318 |
| CAPE VERDE | 68 | 50 |
| CAYMAN ISLANDS | 0 | 3 |
| CENTRAL AFRICAN REPUBLIC | 2 | 7 |
| CHAD | 13 | 3 |
| CHILE | 166 | 253 |
| CHINA, PEOPLES REPUBLIC OF | 726 | 637 |
| CHRISTMAS ISLAND | 0 | 0 |
| COLOMBIA | 1,162 | 1,158 |
| COMOROS | 0 | 0 |
| CONGO | 18 | 15 |
| COSTA RICA | 162 | 176 |
| CROATIA | 12 | 9 |
| CUBA | 463 | 1,179 |
| CYPRUS | 3 | 1 |
| CZECH REPUBLIC | 47 | 56 |
| CZECHOSLOVAKIA | 4 | 2 |
| DEM REP OF THE CONGO | 79 | 81 |
| DENMARK | 2 | 5 |
| DJIBOUTI | 3 | 3 |
| DOMINICA | 19 | 16 |
| DOMINICAN REPUBLIC | 1,769 | 2,186 |
| EAST TIMOR | 0 | 0 |
| ECUADOR | 1,264 | 2,253 |
| EGYPT | 85 | 57 |
| EL SALVADOR | 15,445 | 18,981 |
| EQUATORIAL GUINEA | 5 | 5 |
| ERITREA | 62 | 49 |
| ESTONIA | 13 | 9 |
| ESWATINI | 0 | 1 |
| ETHIOPIA | 36 | 32 |
| FIJI | 21 | 11 |
| FINLAND | 3 | 3 |
| FRANCE | 85 | 78 |
| FRENCH GUIANA | 0 | 2 |
| FRENCH POLYNESIA | 0 | 2 |
| GABON | 6 | 8 |
| GAMBIA | 111 | 124 |
| GEORGIA | 20 | 38 |
| GERMANY | 72 | 77 |
| GHANA | 243 | 203 |
| GREECE | 22 | 32 |
| GRENADA | 9 | 13 |
| GUADELOUPE | 1 | 1 |

28

| Country of Citizenship | FY 2018 | FY 2019 |
|---|---|---|
| GUATEMALA | 50,390 | 54,919 |
| GUINEA | 219 | 102 |
| GUINEA-BISSAU | 5 | 4 |
| GUYANA | 142 | 125 |
| HAITI | 934 | 690 |
| HONDURAS | 28,894 | 41,800 |
| HONG KONG | 15 | 7 |
| HUNGARY | 81 | 71 |
| ICELAND | 2 | 0 |
| INDIA | 611 | 1,616 |
| INDONESIA | 110 | 77 |
| IRAN | 22 | 21 |
| IRAQ | 48 | 84 |
| IRELAND | 47 | 33 |
| ISRAEL | 93 | 89 |
| ITALY | 125 | 140 |
| IVORY COAST | 82 | 39 |
| JAMAICA | 792 | 751 |
| JAPAN | 28 | 21 |
| JORDAN | 94 | 106 |
| KAZAKHSTAN | 30 | 26 |
| KENYA | 140 | 122 |
| KIRIBATI | 0 | 0 |
| KOREA | 32 | 59 |
| KOSOVO | 14 | 15 |
| KUWAIT | 11 | 21 |
| KYRGYZSTAN | 15 | 19 |
| LAOS | 8 | 5 |
| LATVIA | 17 | 15 |
| LEBANON | 51 | 48 |
| LESOTHO | 1 | 0 |
| LIBERIA | 113 | 108 |
| LIBYA | 8 | 6 |
| LIECHTENSTEIN | 0 | 0 |
| LITHUANIA | 49 | 37 |
| LUXEMBOURG | 0 | 0 |
| MACAU | 1 | 2 |
| MACEDONIA | 18 | 0 |
| MADAGASCAR | 1 | 0 |
| MALAWI | 3 | 1 |
| MALAYSIA | 11 | 9 |
| MALDIVES | 1 | 0 |
| MALI | 63 | 52 |
| MALTA | 0 | 1 |

| Country of Citizenship | FY 2018 | FY 2019 |
|---|---|---|
| MARSHALL ISLANDS | 35 | 32 |
| MARTINIQUE | 0 | 0 |
| MAURITANIA | 98 | 41 |
| MAURITIUS | 0 | 1 |
| MEXICO | 141,045 | 127,492 |
| MICRONESIA, FEDERATED STATES OF | 99 | 91 |
| MOLDOVA | 38 | 28 |
| MONACO | 0 | 0 |
| MONGOLIA | 28 | 19 |
| MONTENEGRO | 18 | 23 |
| MONTSERRAT | 1 | 1 |
| MOROCCO | 58 | 33 |
| MOZAMBIQUE | 0 | 3 |
| NAMIBIA | 2 | 0 |
| NAURU | 0 | 0 |
| NEPAL | 45 | 162 |
| NETHERLANDS | 40 | 40 |
| NETHERLANDS ANTILLES | 2 | 6 |
| NEW CALEDONIA | 0 | 0 |
| NEW ZEALAND | 24 | 22 |
| NICARAGUA | 879 | 2,240 |
| NIGER | 5 | 13 |
| NIGERIA | 369 | 286 |
| NORTH KOREA | 0 | 0 |
| NORTH MACEDONIA | 0 | 15 |
| NORWAY | 7 | 9 |
| OMAN | 0 | 0 |
| PAKISTAN | 235 | 202 |
| PALAU | 9 | 10 |
| PALESTINE | 0 | 0 |
| PANAMA | 59 | 55 |
| PAPUA NEW GUINEA | 1 | 2 |
| PARAGUAY | 6 | 7 |
| PERU | 581 | 571 |
| PHILIPPINES | 217 | 176 |
| PITCAIRN ISLANDS | 0 | 0 |
| POLAND | 123 | 135 |
| PORTUGAL | 96 | 101 |
| QATAR | 2 | 3 |
| REUNION | 0 | 0 |
| ROMANIA | 403 | 400 |
| RUSSIA | 107 | 153 |
| RWANDA | 2 | 12 |
| SAMOA | 30 | 17 |

| Country of Citizenship | FY 2018 | FY 2019 |
|---|---|---|
| SAN MARINO | 0 | 0 |
| SAO TOME AND PRINCIPE | 0 | 0 |
| SAUDI ARABIA | 135 | 79 |
| SENEGAL | 125 | 55 |
| SERBIA | 30 | 31 |
| SERBIA AND MONTENEGRO | 2 | 2 |
| SEYCHELLES | 0 | 1 |
| SIERRA LEONE | 79 | 86 |
| SINGAPORE | 6 | 3 |
| SLOVAKIA | 35 | 22 |
| SLOVENIA | 1 | 1 |
| SOLOMON ISLANDS | 0 | 0 |
| SOMALIA | 229 | 151 |
| SOUTH AFRICA | 42 | 39 |
| SOUTH KOREA | 122 | 127 |
| SOUTH SUDAN | 61 | 65 |
| SPAIN | 209 | 259 |
| SRI LANKA | 36 | 112 |
| ST. HELENA | 0 | 0 |
| ST. KITTS-NEVIS | 15 | 11 |
| ST. LUCIA | 28 | 22 |
| ST. PIERRE AND MIQUELON | 0 | 0 |
| ST. VINCENT-GRENADINES | 13 | 19 |
| STATELESS | 0 | 0 |
| SUDAN | 42 | 18 |
| SURINAME | 19 | 12 |
| SWAZILAND | 0 | 0 |
| SWEDEN | 19 | 21 |
| SWITZERLAND | 4 | 6 |
| SYRIA | 7 | 9 |
| TAIWAN | 27 | 51 |
| TAJIKISTAN | 8 | 4 |
| TANZANIA | 19 | 25 |
| THAILAND | 55 | 46 |
| TOGO | 24 | 16 |
| TONGA | 21 | 10 |
| TRINIDAD AND TOBAGO | 104 | 106 |
| TUNISIA | 16 | 20 |
| TURKEY | 85 | 113 |
| TURKMENISTAN | 2 | 4 |
| TURKS AND CAICOS ISLANDS | 4 | 3 |
| TUVALU | 0 | 0 |
| UGANDA | 13 | 22 |
| UKRAINE | 105 | 125 |

| Country of Citizenship | FY 2018 | FY 2019 |
|---|---|---|
| UNITED ARAB EMIRATES | 2 | 3 |
| UNITED KINGDOM | 209 | 198 |
| UNKNOWN | 42 | 46 |
| URUGUAY | 47 | 51 |
| UZBEKISTAN | 41 | 45 |
| VANUATU | 0 | 0 |
| VENEZUELA | 336 | 327 |
| VIETNAM | 122 | 80 |
| YEMEN | 24 | 46 |
| YUGOSLAVIA | 5 | 3 |
| ZAMBIA | 12 | 7 |
| ZIMBABWE | 19 | 16 |

# EXHIBIT F

*Office of Enforcement and Removal Operations*

U.S. Department of Homeland Security
500 12th Street, SW
Washington, D.C. 20536



U.S. Immigration
and Customs
Enforcement

**Document Number:** ERO 11301.1
**Effective Date:** 8/19/2014
**Office of Primary Responsibility: AD for Custody Management**

## Enforcement and Removal Operations

# Bond Management Handbook

(b)(6),(b)(7)(C)

Approved

Title: **Assistant Director for Custody Management**

Date signed: _8 - 19 - 2014_

FOR OFFICIAL USE ONLY
**AILA Doc. No. 16051730. (Posted 6/7/16)**
ICE 2016-ICLI-00005 26 of 488

## Table of Contents

Foreword.............................................................................................................iii

I. Introduction ...................................................................................................... 1
   A. Background ................................................................................................... 1
   B. Sensitive Personally Identifiable Information (SPII)......................................1
   C. Immigration Bond Overview ........................................................................1

II. Issuing Immigration Bonds ........................................................................... 2
   A. Legal Authority for Issuing Bonds ............................................................... 2
   B. Alien's Release from Custody on a Bond .................................................... 3
      1. Custody Determination ........................................................................... 3
         a. Form I-286 – *Notice of Custody Determination* ............................... 3
         b. Appeal of Custody Determination...................................................... 3
   C. Issuing the Immigration Bond ...................................................................... 4
      1. Bonds Secured by Cash or Cash Equivalent ("Cash Bonds").............. 5
      2. Bonds Secured by a Surety Company.................................................... 6
   D. Changing the Bond Amount ......................................................................... 6
      1. Surety Bonds ......................................................................................... 6
      2. Cash Bonds ........................................................................................... 7

III. Issuing Bond Notices................................................................................... 7
   A. Factors When Issuing Bond Notices............................................................7
   B. eBOND System............................................................................................8
   C. Cancelation Notices (Form I-391, *Notice Immigration Bond Canceled*) ............... 8
   D. Demand Notices (Form I-340, *Notice to Obligor to Deliver Alien.*) ...................... 10
   E. Breach Notices (Form I-323, *Notice-Immigration Bond Breached*)...................... 11
   F. Annotating Breach Notices to Reflect Mitigation......................................... 12
   G. Breach Rescission Notices/MTRs (Form 71-042, *Notice of Decision upon Motion
      to Reopen or Reconsider Bond Breach Declaration* ........................................... 13
   H. *Notice to Surrender for Deportation* (Form I-166)............................................. 14

IV. Processing Bond Appeals .......................................................................... 14

V. Interactions with Bond Obligors................................................................. 16
   A. Request to Change the Surrender Date ..................................................... 16
   B. Request to Surrender the Alien before a Demand is Made ....................... 16
   C. Deceased Obligors.....................................................................................17

VI. Administrative/General Matters ................................................................. 17

VII. Appendices
     Appendix 1:  Responsibilities............................................................... 19
     Appendix 2:  Substantial Performance/Substantial Violation Standard............. 21
     Appendix 3:  Field Office Bond Verification Instruction ....................................... 22

**AILA Doc. No. 16051730. (Posted 6/7/16)**
ICE 2016-ICLI-00005 27 of 488

Appendix 4: Immigration Bond........................................................................ 25
Appendix 5: Delivery Bonds........................................................................... 30
Appendix 6: Voluntary Departure Bonds ........................................................ 31
Appendix 7: Order of Supervision (OSUP) Bonds ........................................... 34
Appendix 8: Bond Worksheet ........................................................................ 35
Appendix 9: Notice to Cash Bond Obligors IRS "Backup Withholding" Rules.. 37
Appendix 10: OTCnet Scanner Processing of Cash Bond Deposits.................. 38
Appendix 11: Notice – Immigration Bond Canceled .......................................... 41
Appendix 12: Final Orders of Removal............................................................. 42
Appendix 13: Completing and Sending Demand Notices (Form I-340) ............. 43
Appendix 14: Re-sending Demand Notices Returned as Undeliverable ........... 48
Appendix 15: Timing for Issuing Form I-323: *Notice – Immigration Bond*
*Breached* ..................................................................................... 49
Appendix 16: Breached Surety Bonds – Referral to the ICE Chief Financial
Officer for Collection .................................................................... 50
Appendix 17: Notice – Immigration Bond Breached (Delivery Bond)................. 52
Appendix 18: Notice – Immigration Bond Breached (Voluntary Departure
Bond) ......................................................................................... 53
Appendix 19: Notice – Immigration Bond Breached (Order of Supervision
Bond) ......................................................................................... 54
Appendix 20: Notice of Bond Breach Reconsideration Decision ...................... 55
Appendix 21: Notice of Appeal or Motion and Instructions (Form I-290B)......... 56
Appendix 22: Record of Proceeding (ROP) for Breached Bond Appeals...........66
Appendix 23: Best Practice Regarding Use of Form I-166 ............................... 68
Appendix 24: Sample Mitigation...................................................................... 70
Appendix 25: Creating A Manual Bond When eBONDS System Is Off Line......71

**AILA Doc. No. 16051730.   (Posted 6/7/16)**
ICE 2016-ICLI-00005 28 of 488

## Foreword

This Bond Management Handbook (Handbook) provides ERO Field Office personnel with a comprehensive explanation of immigration bond policies and procedures from the time a bond is first issued until it is breached or canceled. Immigration bonds perform a critical role in efficiently administering immigration laws. Bonds allow the Federal Government to avoid the expense of detaining aliens while removal proceedings are conducted.

This Handbook takes a tiered approach to provide information about managing immigration bonds. The body of the Handbook addresses general policies while appendices provide more detailed guidance and examples of critical documents used in managing immigration bonds.

I am confident that this Handbook will help ERO personnel to more effectively manage immigration bonds and better understand the highly technical aspects of bond management.

(b)(6),(b)(7)(C)

**Assistant Director for Custody Management
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement**

AILA Doc. No. 16051730.  (Posted 6/7/16)
ICE 2016-ICLI-00005 29 of 488

# I.    Introduction

## A.    Background

This Bond Management Handbook (Handbook) provides guidance and detailed procedures for issuing immigration bonds and processing bond paperwork, including demand notices, breach notices, breach rescission notices, and cancelation notices.

The audience of this Handbook includes the ERO officers who process bonds and Financial Operations-Burlington (FinOps-Burlington). The body of the Handbook provides general guidance on immigration bonds. The appendices contain detailed procedures for handling bonds as well as samples of bond forms. Obtain forms from the inSight ICE Forms home page or EAGLE in order to make sure you are using the most recent approved version of a form.

Send any questions, comments, or concerns about immigration bonds to the Bond Management Unit (BMU) at the Headquarters (HQ) ERO Bond mailbox at (b)(7)(E) (b)(7)(E) Additional information about the immigration bond program may be found at the (b)(7)(E)

The procedures detailed in this Handbook are intended for the internal management of ICE and do not create any right or benefit, substantive or procedural, enforceable at law or in equity by a party against ICE or any agency of the Federal Government. Any failure of ICE to comply with any provisions in this document shall not be available to any person or entity as a defense, except as otherwise required by law.

## B.    Sensitive Personally Identifiable Information (SPII)

Department of Homeland Security (DHS) policy designates A-Numbers as SPII and should only be shared with those who have a need to know. SPII is any personally identifiable information about a person which, if lost, compromised, or disclosed without authorization, could result in substantial harm, embarrassment, inconvenience, or unfairness to the individual. All SPII must be handled in compliance with the (b)(7)(E) (b)(7)(E)

When sending documents via the U.S. Postal Service, UPS, or any other commercial mail carrier, do not use the A-Number as a reference number on tracking forms, return receipts, envelopes, or packages. If you need an identifying number to track a shipment or to file a return receipt, use the bond number. Using "EARM" and "BMIS," you can search by the bond number to identify the alien and his or her A-Number.

## C.    Immigration Bond Overview

The immigration bond program allows ICE to avoid detention costs for aliens who are released from custody on bond. In FY 2013, 45,179 immigration bonds were posted in

the amount of $243 million. Each bond is in effect for an average length of 25 months, which translates into hundreds of millions of dollars saved in detention costs.

Another benefit of the bond program is that, by statute, the amounts collected on breached bonds are deposited into a special fund called the Breached Bond Detention Fund (BBDF). ICE may use money deposited in the BBDF to pay for detention bed space and costs incurred in collecting amounts due on breached bonds. To reap the benefits of a well-administered bond program, ICE employees processing bonds should fully understand how bonds are issued and managed so that the bonds serve as an effective incentive for aliens to surrender into ICE custody, timely depart the United States, or comply with the terms of an order of supervision.

Three different entities within ICE – the BMU, ERO Field Offices, and FINOPS-BURLINGTON – are directly involved with immigration bond management. The BMU, part of HQ ERO Custody Management, supports field operations by providing guidance related to immigration bond management to achieve uniformity in bond processes and procedures. ERO employees in the Field Offices and sub-offices issue bonds and process bond paperwork. FINOPS-BURLINGTON employees, as part of the Office of Financial Management, oversee the financial aspects of bonds, such as refunding cash deposits on canceled bonds, issuing invoices for breached surety bonds, and issuing interest payments on breached or canceled cash bonds. Office of the Principal Legal Advisor (OPLA) attorneys support all three of these entities by providing legal advice in the performance of their functions. An explanation of the responsibilities of each office is set forth in Appendix 1.

## II.   Issuing Immigration Bonds

### A.   Legal Authority for Issuing Bonds

Immigration bonds are issued pursuant to the broad grant of authority to the Secretary of Homeland Security to "prescribe such forms of bond" to carry out the authority delegated under the Immigration and Nationality Act (INA). 8 U.S.C. § 1103(a)(3).

The primary regulatory authority addressing immigration bonds is codified at 8 C.F.R. § 103.6. While this section is titled "Surety Bonds," it encompasses both bonds secured by cash and bonds issued by surety companies. Because this regulation was issued by the former Immigration and Naturalization Service (INS), it includes bonds that are not currently issued by ICE, such as public charge bonds and maintenance of status bonds.

Pursuant to 8 C.F.R. § 103.6, Field Office Directors (FODs) are authorized to approve bonds and to take appropriate action to protect the interests of the United States with respect to such bonds. Enforcement Delegation Number 001 also enables FODs to re-delegate this authority to appropriate subordinate ICE officials. After an immigration bond has been posted to release an alien from ICE custody, a FOD at any time may revoke the bond, rearrest the alien under the original warrant, and detain the alien. 8 U.S.C. § 1226(b).

2

The regulation sets forth the broad standard used to determine whether a bond should be breached or canceled. The regulation states that a "bond is breached when there has been a substantial violation of the stipulated conditions." 8 C.F.R. § 103.6(e). Conversely, a bond obligor is released from liability (the bond is canceled) when substantial performance of all conditions imposed by the terms of a bond exists. *Id.* § 103.6(c)(3). A summary of case law explaining the "substantial performance" standard is attached as Appendix 2.

## B. Alien's Release from Custody on a Bond

Immigration bonds are primarily issued to release an alien who has been placed in removal proceedings before an immigration judge from ICE custody. The purpose of most immigration bonds is to have a mechanism in place requiring the alien to appear in response to a properly issued notice to surrender on a particular date at a particular place and time (a "demand notice"). Most immigration bonds are like criminal bail bonds. The person or company that posted the bond on behalf of the alien (the obligor) forfeits the face value of the bond if the obligor or the alien fails to comply with the terms and conditions of the bond.

### 1. Custody Determination

Before a bond is issued, a DHS official first evaluates whether the alien is eligible to be released from ICE custody. Because this Handbook focuses on bond management, you should review other ICE guidance for more detailed information about making custody determinations. From a bond management perspective, ICE employees processing bonds must know whether the alien may be released from custody on an immigration bond and the amount of the bond to be issued.

#### a. Form I-286 – Notice of Custody Determination

A DHS official issues **Form I-286** – *Notice of Custody Determination* pursuant to section 236 of the INA to notify the alien whether he or she will be detained in custody, released under an immigration bond, or released on his or her own recognizance while a removal proceeding is ongoing. This form is served on the alien, typically at the same time a Notice to Appear setting forth the reasons why the alien is subject to removal from the United States, is served on the alien.

#### b. Appeal of Custody Determination

Unless Federal law prohibits the alien's release from custody, or unless the alien is in "asylum only" proceedings or expedited removal, the alien may request a review of the custody determination by an Immigration Judge (IJ). The categories of aliens who may obtain IJ review of custody determinations may vary among the judicial circuits. An officer who has any doubts about an alien's eligibility for IJ redetermination of bond should consult an OPLA attorney in the Office of Chief Counsel (OCC attorney).

**AILA Doc. No. 16051730. (Posted 6/7/16)**
ICE 2016-ICLI-00005 32 of 488

If the alien requests IJ review of the custody determination, an IJ schedules a custody hearing and issues a custody order. The IJ may reduce the amount of the bond, keep it the same, or increase the amount of the bond. While the alien may appeal the IJ's decision to the Board of Immigration Appeals (BIA), further appeals rarely happen and typically the IJ's custody order will be the final decision setting the amount of the immigration bond. If you have any questions about whether the IJ's custody order is final, please consult with an OCC attorney.

## C.  Issuing the Immigration Bond

If a final custody determination states that the alien may be released from DHS custody after posting a bond in a certain amount, the alien's family or friends may seek to have a bond issued. By regulation, immigration bonds may be secured by cash or cash equivalent (currency, postal money orders, other money orders accepted at the discretion of the FOD, cashier's checks, or U.S. bonds/notes) or by a surety company authorized by the Department of the Treasury to post bonds on behalf of the Federal government. See field office bond verification instructions attached as Appendix 3.

Immigration bonds are posted on **Form I-352**, *Immigration Bond* (attached as Appendix 4). The bond form contains instructions as well as the bond's general terms and conditions, which explain the parties' obligations under the bond agreement and identifies events that automatically cancel the bond.

Paragraph G of the Form I-352 sets forth the different conditions that may be imposed on the bond obligor. Paragraph G. (1) applies when the bond is conditioned upon the delivery of the alien (a "delivery bond"), meaning that the bond is breached when the obligor fails to deliver the alien to ICE in response to a demand notice. More detailed information about delivery bonds is attached as Appendix 5.

Paragraph G.(2) applies when the bond is conditioned upon the alien not becoming a public charge (a "public charge" bond). ICE does not issue bonds with this condition.

Paragraph G.(3) applies when the bond is conditioned upon the voluntary departure of the alien (a "voluntary departure" bond), meaning the bond is breached when the obligor fails to provide valid proof that the alien left the United States on or before the voluntary departure date set by court order. This proof must be submitted within 30 days of the voluntary departure date. More detailed information about voluntary departure bonds is attached as Appendix 6, including an explanation of what constitutes "valid" proof of departure.

Paragraph G.(4) applies when the bond is conditioned upon the alien complying with an order of supervision (an "order of supervision" bond), meaning the bond is breached when the alien violates one or more of the terms set forth in his or her order of supervision. More detailed information about order of supervision bonds is attached as Appendix 7.

4

## 1. Bonds Secured by Cash or Cash Equivalent ("Cash Bonds")

Roughly 90% of the bonds issued by ICE are secured by cash, money orders, cashier's checks, or U.S. bonds/notes (hereinafter collectively referred to as "cash"). ICE collects from the bond obligor the face amount of the bond as security for performance of the bond's terms and conditions. If the obligor performs the bond's conditions, the bond is canceled and the cash deposit is returned to the obligor. If the obligor fails to perform the bond's conditions, the bond is breached and ICE retains the cash deposit. By statute, regardless of whether the bond is breached or canceled, the Government pays interest on the cash deposited as security for the bond to the obligor.

Within ICE, ERO is responsible for issuing the bond, collecting the cash deposit, and processing the bond paperwork associated with the bond (demand notice, breach notice, breach rescission notice, bond cancelation notice, etc.). FINOPS-BURLINGTON is responsible for handling the financial aspects of the bond (issuing refunds for bond cancelations, issuing interest payments, ensuring the funds are deposited in the correct Treasury account, etc.).

Like all immigration bonds, cash bonds are issued using **Form I-352**, *Immigration Bond*. When the bond form is used for a cash bond, Part I is signed by the obligor who pledges the cash as security for performing the terms of the bond. Other forms are used with cash bonds:

- **Form I-305**, *Receipt of Immigration Officer – United States Bonds or Notes, or Cash, Accepted as Security on Immigration Bond*. This document serves as a receipt for payment of the cash securing the bond and the original is given to the obligor once the bond has been approved. It must be sent to FINOPS-BURLINGTON by the obligor for the cash deposit to be refunded.

- **Form I-312**, *Designation of Attorney in Fact*. This form allows an individual (the "attorney in fact") to accept on the obligor's behalf the funds deposited to secure the cash bond upon cancelation of the bond.

- **Form I-395**, *Affidavit in Lieu of Lost Receipt*. If Form I-305 is lost or destroyed, the bond obligor may complete this form to seek refund of the cash deposit. Form I-395 must be notarized.

- **Form I-352A**, *Notice to Cash Bond Obligors IRS 'Backup Withholding' Rules.* This document notifies cash bond obligors that some of the interest earned on cash bond deposits may be subject to withholding based on IRS rules. This form should be provided to cash bond obligors when the cash bond is posted and also when the cancelation or breach notice is sent to the obligor. This form does not apply to surety bonds because surety bonds are not secured by cash deposits and thus no interest is earned on surety bonds.

5

**AILA Doc. No. 16051730.  (Posted 6/7/16)**
ICE 2016-ICLI-00005 34 of 488

Detailed instructions for posting cash bonds and handling the cash can be found at
(b)(7)(E)

Appendices 8, 9, and 10 contain a Bond Worksheet that may be used when an obligor seeks to post a cash bond, a copy of the "Notice to Cash Bond Obligors of IRS 'Backup Withholding' Rules," information on using OTCnet check scanning to process a cash bond deposit electronically, and back-up procedures to use when the OTCnet check scanner is not working.

## 2. Bonds Secured by a Surety Company

By statute, the Department of the Treasury is responsible for certifying surety companies as authorized to post bonds, including immigration bonds, on behalf of the United States. Treasury publishes a list of certified surety companies on the Internet at
(b)(7)(E)                                                                  The list of approved sureties is called "Department Circular 570."

Surety companies typically post bonds using an agent. An agent is a company acting on behalf of the surety company and is a "co-obligor" on the bond. As co-obligor, the agent (as well as the surety) may be liable for any amount due when the bond is breached. Because the agent is acting on behalf of the surety company, a "Power of Attorney" form must be submitted with each surety bond establishing that the surety has authorized the agent to post a bond of a certain amount on the surety's behalf.

Surety companies do not deposit cash when posting an immigration bond. Rather, they agree to pay the face amount of the bond after the bond is breached. FINOPS-BURLINGTON issues an invoice to collect the amount due on the bond from the surety company or its agent after it receives a copy of the breach notice from the Field Office.

Almost all surety companies are currently using the eBONDS system. When surety companies and their agents use eBONDS, the Field Office  receives electronically a draft of a completed, unsigned Form I-352 and a Power of Attorney form. Detailed instructions for issuing surety bonds can be found at
(b)(7)(E)

## D.  Changing the Bond Amount

On occasion the face amount of a bond already issued may need to be increased or lowered before any action is taken on the bond.

## 1. Surety Bonds

If the face amount of a surety bond needs to be changed, the Field Office cancels the original bond by issuing **Form I-391** (see section III.A below) and issues a new bond in the new amount. The new surety bond must be accompanied by a new power of attorney in the correct amount. This does not apply to surety bonds posted through eBONDS. Refer to the user manual for bonds posted through eBONDS.

6

**2. Cash Bonds**

The procedures for increasing and decreasing the amount of a cash bond can be found at (b)(7)(E)

# III.   Issuing Bond Notices

ICE informs the bond obligor about each action ICE takes pursuant to the terms and conditions of the bond by issuing a notice to the obligor. ICE personnel decide what action to take on a bond by monitoring the progress of the alien's removal proceeding, reviewing documents in the alien's A-file, and reviewing entries in agency databases, such as EARM, and BMIS. Before addressing the different types of bond notices, a few general points need to be addressed:

## A.   Factors When Issuing Bond Notices:

Processing immigration bond notices is highly technical because immigration bonds are contractual agreements. Both ICE and the bond obligors must comply with the terms and conditions set forth in the bond forms. In the past, when the obligors and ICE disagreed over the correct interpretation of the terms and conditions of the bond form, they have sought rulings from the federal courts on the meaning of those terms. Litigation in the federal courts is ongoing. Until these cases are finally resolved, uncertainty about the proper interpretation of certain terms and conditions in the bond forms will remain. This Handbook provides guidance on the best practices to use when issuing bond documents.

When issuing notices, keep in mind:

- Different versions of the bond form contain different terms and conditions. Bonds on the 1997, 1999, 2000, and 2008 bond forms are still in effect. You may even come across a bond using the 1984 bond form. Different rules may apply to different bond forms. This Handbook highlights those different rules. See Appendix 15 for specific information about the various bond forms.

- Different rules may apply to different bond obligors. Most significantly, different rules apply when Gonzales and Gonzales Immigration Bonds (G&G) is the agent for Farwest, Amwest, or American Surety companies. Different rules apply to G&G because the former INS entered into two settlement agreements known as the "Amwest Agreements" with G&G in 1995 and 1997. These settlement agreements set forth certain terms and conditions that apply only to bonds posted by G&G for certain surety companies. This Handbook highlights the different rules that apply to bonds posted by G&G.

- Check for thoroughness and accuracy after completing a form. Make sure certified mail receipts that you received are properly filed in the alien's A-file or sent to the Records Digitization Facility (RDF) to be added to a digitized A-file. Remember that in order to collect money due on a breached bond, ICE often

7

must prove that it issued notices properly and that those notices were received. We cannot establish this proof without complete records.

## B.   eBONDS System

ERO implemented the eBONDS system to streamline the processing and issuing of surety bonds. The eBONDS system allows surety companies and their agents to fill in information required on the bond form and electronically submit the bond form to Field Offices.  The eBONDS system enables Field Offices to prepare bond notices, using EARM. Upcoming software enhancements will also enable Field Offices to electronically issue demand, breach, and cancelation notices directly to surety companies and their agents. ERO also plans to periodically update the guidance provided in this Handbook to reflect upcoming enhancements to the eBONDS system.

The eBONDS system interfaces with EARM. ERO also integrated the EARM system with BMIS.  The current version of EARM (EARM 5.0) enables real-time data entry, data posting and information-sharing for processing immigration bonds.

EARM 5.0 enables ERO Bond Control Specialists to complete all related bond activities within EARM and submit that information immediately to BMIS or eBONDS as appropriate. Activities include:

- Initiating and completing  immigration bond form I-352 online for both cash and surety bonds
- Tracking the status of a bond in real time
- Storing all bond documents in the SharePoint document repository
- Canceling a bond
- Breaching a bond
- Mitigating a bond
- Creating the surety bond breach checklist
- Preparing the Motion to Re-open

Note: See Appendix 25 to manually post a bond in EARM if the eBONDS system goes off line.

## C.   Cancelation Notices (Form I-391, *Notice Immigration Bond Canceled*)

The bond's terms and conditions list several events that, when they occur before a bond is breached, automatically terminate the bond. When one of these events occurs before a bond is breached, ERO personnel issue a Cancelation Notice, Form I-391. See attached as Appendix 11.

After completing a Cancelation Notice, Form I-391, print a copy of the electronic version and place the hard copy in the alien's A-file.

The events that automatically cancel a bond when they occur prior to the breach are:

8

- Death of the alien (evidenced by a death certificate).

- DHS taking the alien back into its custody (detaining the alien for more than a few hours).

- Removal of the alien.

- Grant of permanent residence or citizenship to the alien.

- ICE's receipt of notice that the alien has been taken into custody by another federal, state or local law enforcement agency and will be detained for more than 30 days.

- Termination (but not administrative closure or stay or closure without prejudice) of removal proceedings.

- Voluntary departure of the alien as evidenced by valid proof of departure.

Issue cancelation notices when the bond obligor fulfills the bond conditions, i.e.:

- The alien is surrendered on the date in the demand notice fulfilling the condition of a delivery bond and the alien is taken into ICE custody;

- ICE receives valid proof that the alien left the United States on or before the voluntary departure date fulfilling the condition of a voluntary departure (VD) bond; or

- The alien is in compliance with all requirements set forth in an order of supervision fulfilling the conditions of an order of supervision (OSUP) bond.

In the exercise of discretion, bonds may be also canceled when:

- The alien is granted Temporary Protected Status by IJ or U.S. Citizenship and Immigration Services (USCIS).

- The alien is granted a benefit under a special category visa (ex. T, U-Visa,) by USCIS.

- The alien is granted Withholding of Removal or Deferred Enforcement Action by IJ and the possibilities of removal due to a change in country conditions are unforeseeable (consult with your Supervisory Detention and Deportation Officer (SDDO) and local OCC).

- Administratively Closed cases pursuant to an OPLA prosecutorial discretion review.

- Aliens are granted asylum by the IJ or the BIA, unless ICE reserved an appeal.

9

Upon cancelation, submit Form I-391, *Notice Immigration Bond,* to FINOPS-BURLINGTON using EARM or manual back up procedures (refer to eBONDS participants handbook). Submit Form I-391 within 60 days of the event that warranted the action. Place a copy of Form I-391 in the alien's A-File.

When cash bonds are canceled, the Field Office sends Form I-391 and Form I-352A by regular mail to the obligor. The Field Office also notifies the obligor to forward the original Form I-305 (issued when the bond was posted) to the FINOPS-BURLINGTON. The cash deposit cannot be refunded until FINOPS-BURLINGTON receives Form I-305. If the obligor loses Form I-305, the obligor submits notarized **Form I-395**, *Affidavit in Lieu of Lost Receipt.* The Obligor sends the original, notarized Form I-395 to FINOPS-BURLINGTON so that the cash deposit can be refunded.

Because surety companies do not deposit cash to secure bonds, the cancelation process for surety bonds is simpler. The Field Office need only send Form I-391 by regular mail to the company and agent, submit Form I-391, *Notice Immigration Bond,* to FINOPS-BURLINGTON using EARM or manual back up procedures (refer to eBONDS participants handbook), and place a copy of Form I-391 in the alien's A-File.

Detailed instructions for issuing a cancelation notice (**Form I-391**) can be found at
(b)(7)(E)

## D. Demand Notices (Form I-340, *Notice to Obligor to Deliver Alien*)

Demand notices are issued by using **Form I-340**, *Notice to Obligor to Deliver Alien.* Under the current version of the bond form, demand notices are issued only for delivery bonds

To properly issue a demand notice, determine:

- Whether the demand notice needs to be sent to more than one obligor;

- The last-known address of the obligor(s);

- An appropriate date to use as the surrender date;

- The proper purpose for issuing the demand notice; and

- Whether a "Questionnaire and Worksheet" (Form I-340A) needs to be sent with the demand notice

Detailed instructions on completing and sending demand notices can be found in Appendix 13.

After completing a demand notice, Form I-340, print a copy of the electronic version and place the hard copy in the alien's A-file.

Note: Do not issue demand notices for voluntary departure and order of supervision bonds because these bonds are not conditioned upon the delivery of an alien.

Demand notices on delivery bonds may be issued when ICE has a reason to call the alien into an ICE office. Reasons for issuing demand notices include:

- To remove the alien pursuant to a final order of removal;

- To interview the alien about his or her immigration status; and

- To take the alien back into custody, for example, if the alien committed a crime while released on bond.

Send Form I-340 demand notices within 30 days of the date of the final order of removal.

A "final order" of removal has a specific and highly technical meaning in immigration law. A detailed explanation of when an order of removal becomes "final" is attached as Appendix 12.

- On all final order cases, the alien must be taken into custody and processed accordingly. If you determine that the alien is eligible for release, you may release the alien on an Order of Supervision with the additional compliance tool known as an "OSUP" bond.

Send demand notices to the bond obligor(s) by certified mail, return receipt requested. File copies of the demand notices in the alien's A-file. Follow proper procedures for issuing an I-340 using (b)(7)(E) or if necessary, follow the manual backup procedures (see (b)(7)(E) participants manual). Staple the certified mail receipts (commonly known as "greenies") to the demand notice in the A-file as soon as they are received from USPS.

When certified mail to an obligor comes back as "Returned to Sender," take further action to make sure the obligor receives a copy of the demand notice. Detailed instructions on resending demand notices are attached as Appendix 14.

## E.   Breach Notices (Form I-323, *Notice – Immigration Bond Breached*)

Issue breach notices by using **Form I-323**, *Notice – Immigration Bond Breached.* Breach notices may be issued for delivery bonds, VD bonds, and OSUP bonds. For certain bonds, the breach notice must be issued within 180 days of the breach date. A chart setting forth the mandatory time frames for issuing breach notices is attached as Appendix 15.

Send breach notices to the bond obligor(s) by regular mail. Submit a copy of Form I-323 to FINOPS BURLINGTON using EARM or manual back up procedures (refer to eBONDS participants' handbook). Print a copy of the electronic version and place the hard copy in the alien's A-file.

11

The best practice is to issue breach notices within 45 days of the breach date so that prompt action may be taken by FINOPS-BURLINGTON in handling the financial aspect of the bond breach.

Before issuing a breach notice on a surety bond, ERO personnel complete the checklist titled *Breached Surety Bonds – Referral for Collection,* which is signed by the SDDO supervising bonds. This checklist is designed to make sure current procedures for surety bonds are completed and that the surety bonds are sent to the FINOPS-BURLINGTON along with the breach notice. A copy of this checklist is attached as Appendix 16.

Note: Referral for Collection Checklist signature authority cannot be delegated below the level of an SDDO or acting SDDO.

**Breach of a Delivery Bond**. A delivery bond is breached when the obligor fails to surrender the alien (or the alien fails to appear) on the date and place specified in the demand notice. The breach date is the date when the alien was supposed to but failed to appear, known as the surrender date. A sample breach notice for a breach of a delivery bond is attached as Appendix 17.

**Breach of a VD Bond.** A VD bond is breached when the obligor fails to submit valid proof to ICE that the alien left the United States on or before the voluntary departure date. The breach date for a VD bond is the 30th day after the date by which the alien was supposed to depart. A sample breach notice for a breach of a VD bond is attached as Appendix 18.

**Breach of an OSUP Bond**, An OSUP bond is breached when the alien fails to substantially comply with one or more terms contained in an order of supervision. The breach date is the date that the alien violated the order of supervision. Include a brief explanation on the breach notice how the alien violated the order of supervision. A sample breach notice for a breach of an OSUP bond is attached as Appendix 19.

Note: upon execution of the breach bond documents, the alien is considered a fugitive. Ensure the file is forwarded to the Fugitive Operation Unit for further review and action.

## F.   Annotating Breach Notices to Reflect Mitigation

Mitigation is a policy that encourages bond obligors to surrender aliens to ICE offices, even if they missed the surrender date. Mitigation means that the amount forfeited (because the bond was breached) will be reduced because the obligor surrendered the alien within 90 days of the surrender date.

Mitigation applies only to delivery bonds when the obligor surrenders the alien. It does not apply when the alien on his or her own appears at an ICE office.

12

The amount of mitigation varies depending on how close to the surrender date the obligor delivers the alien. The amount forfeited is reduced by these amounts:

- Alien delivered 30 days or fewer after the surrender date – amount forfeited is reduced by 66% ($3,400 would be due on a $10,000 bond).

- Alien delivered 31-60 days after surrender date – amount forfeited is reduced by 50% ($5,000 would be due on a $10,000 bond).

- Alien delivered 61-90 days after the surrender date – amount forfeited is reduced by 30% ($7,000 would be due on a $10,000 bond).

- 91 or more days after surrender date – no mitigation.

ERO personnel annotate the breach notice (Form I-323) with the date the alien was surrendered and the percentage of mitigation to which the obligor is entitled so that FINOPS-BURLINGTON personnel will know how to handle the financial aspect of a breach when the mitigation policy applies.

Send copies of the annotated breach notice reflecting mitigation to the bond obligor(s) by regular mail. File copies of the annotated breach notice in the alien's A-file.  Send copies by e-mail to FINOPS-BURLINGTON.

A sample Form I-323 with an annotation for mitigation is attached as Appendix 24. Field Offices should obtain stamps reflecting the annotation in the sample.

**G.  Breach Rescission Notices/MTRs** (ICE Form 71-042, Notice of Decision upon Motion to Reopen or Reconsider Bond Breach Declaration)

When ERO personnel are notified by the BMU that a bond breach is not valid or when they realize on their own that a bond breach is invalid, they should rescind the breach by issuing a *Notice of Decision upon Motion to Reopen or Reconsider Bond Breach Declaration.* This form is known as an MTR, ICE Form 71-042.

A breach rescission reverses the prior breach determination so that the bond is no longer breached. When rescinding the breach and issuing an MTR, ERO personnel consider whether the bond should stay in effect or be canceled.

- If the bond should stay in effect, ERO personnel check the box on the MTR form stating that the bond is reinstated.

- If the bond should be canceled, ERO personnel check the box on the MTR form stating that the bond is canceled.

- Only one of the boxes (bond is reinstated or bond is canceled) should be checked.

13

Send copies of MTRs to the bond obligor(s) by regular mail. Submit a copy of the MTRs to FINOPS BURLINGTON using EARM or manual back up procedures (refer to eBONDS participants handbook). File copies of the MTRs in the alien's A-file.

If the MTR is issued because an administrative error was made in issuing demand or breach notices, check the box stating that the decision was based upon an incorrect application of law or policy and insert "Notice Defect" or "Administrative Error" on the lines that follow.

A copy of the MTR form is attached as Appendix 20.

### H. *Notice to Surrender for Deportation (*Form I-166)

**Form I-166,** *Notice to Surrender for Deportation* has in the past been sent directly to aliens to notify them of a proposed removal date and to ask them to appear on a specific date and time for removal. Do not send Form I-166 to bonded aliens. Only send a demand notice to the bond obligor. Do not send a demand notice addressed to the alien. See Appendix 23 for additional discussion.

## IV. Processing Bond Appeals

By regulation, bond obligors have the right to appeal bond breach determinations. Obligors appeal bond breach determinations by filling out Form I-290B, Notice of Appeal. See Appendix 21 for a copy of Form I-290B and instructions.

The appeal is adjudicated by USCIS' Administrative Appeals Office (AAO). 8 C.F.R. § 103.3 grants the AAO jurisdiction to adjudicate breached bond appeals.

The obligor has 30 days from the date the breach notice was issued (adding three days if sent by mail) to file an appeal (submit Form I-290B). If the last date to file falls on a weekend or legal holiday, the filing period extends to the next business day.

The current fee for filing an appeal is $630. This fee may be waived if the applicant can show an inability to pay the fee. USCIS developed Form I-912, *Request for Fee Waiver,* for this purpose. Fee waiver guidance is available at the USCIS website (http://www.uscis.gov/i-290b).

- The obligor submits the bond appeal (Form I-290B and required fees) via one of the Chicago Lockbox addresses listed below:

| U.S Postal Service | USPS Express Mail/Courier |
|---|---|
| Chicago Lockbox | Chicago Lockbox |
| USCIS | USCIS |
| P.O. Box 4733 | Attn: FBAS |
| Chicago, IL 60680-4733 | 131 S. Dearborn, 3rd Floor |
| | Chicago, IL 60603-5517 |

14

- Lockbox collects the fees and forwards an appeal package to the AAO.

- AAO receives the mail and notifies BMU via email of bond appeal cases that it received.

- BMU notifies FINOPS-BURLINGTON. The breach determination is not final until AAO renders a decision on the appeal. FINOPS-BURLINGTON cannot issue an invoice on a surety bond or process payment on a cash bond until AAO issues a decision on the appeal.

- BMU notifies the appropriate Field Office of the bond appeal and requests that the Field Office review the breach determination to ensure that it is valid.

- If the breach is not valid, the Field Office issues a breach rescission (MTR, discussed in Section III.E above).

- If the Field Office determines that the breach is valid, the office prepares a Record of Proceedings (ROP) according to guidance in Appendix 22 and forwards the ROP to the AAO via e-mail with a copy to BMU (ICE-BONDS-APPEALS MAILBOX).

- The ROP is a subset of documents from the alien's A-file. These documents are relevant to the breach determination and allow the AAO to review the breach to adjudicate the appeal. ERO personnel send the ROP and the appeal documents to the AAO within two weeks of receipt of the appeal. The ROP is considered the administrative record for the appeal.

- After the ROP is sent to the AAO, AAO personnel review the appeal and the documentation to issue a decision on the appeal. AAO generally issues a decision within a few months after its receipt of the ROP. File a copy of the AAO decision in the alien's A-file and email a copy of the decision to the FINOPS-BURLINGTON at (b)(6),(b)(7)(C)

- If the AAO dismisses the appeal, FINOPS-BURLINGTON manages the financial end of the breached bond.

- If the AAO sustains the appeal, ERO personnel determine whether to issue a new set of demand notices or cancel the bond. In general, new demand notices may be issued if the alien has not yet been taken into ICE custody, left the United States, or died. If you need assistance in determining what to do after an appeal has been sustained, please contact the BMU.

15

# V.   Interactions with Bond Obligors

Bond obligors often communicate with Field Office personnel in response to notices they received from ICE. This Handbook addresses two of the most common issues that arise. Other questions should be addressed with your supervisor or the BMU.

## A.   Request to Change the Surrender Date

After receiving a demand notice, an obligor may contact the Field Office to ask for an extension of time to deliver the alien.

- It is solely within the discretion of Field Office personnel whether to extend the time that the obligor has to surrender the alien.

- It generally is advisable to grant an extension when the obligor is actively trying to locate the alien. The bond was issued to secure delivery of the alien and sometimes obligors need to obtain a reasonable extension of time to perform.

- If the Field Office agrees to set a new surrender date, Field Office personnel issue a new demand notice with the new surrender date. Note the decision to change the surrender date in the comments section or the case actions and decisions screen of EARM.

## B.   Request to Surrender the Alien before a Demand is Made

Sometimes bond obligors seek to surrender the bonded alien into ICE custody before ICE issues a demand notice. Obligors seek early surrender because they want to avoid future liability under the terms and conditions of the bond when they believe the alien has become a flight risk.

- If the obligor makes a telephonic request for early surrender, ask the obligor to submit the request in writing so a formal written response can be made. The obligor should submit a written request at least three days in advance of the date the obligor seeks to surrender the alien.

- It is solely within the discretion of the Field Office Director whether to allow the early surrender of an alien.

- In deciding whether to allow early surrender, consider the following factors:

  o Whether the bonded alien is a flight risk;

  o Whether the bonded alien committed a serious offense after the bond was posted;

  o Whether the obligor can reasonably guarantee delivery on demand given the circumstances;

16

- o  Whether the bonded alien is a threat to public safety;

- o  Whether adequate detention space is available to house the bonded alien; and

- o  Any other factors deemed relevant.

- The Field Office should issue a brief written decision on the request for early surrender with an explanation of the reasons the request was denied.

## C.  Deceased Obligors

Upon notification that a cash bond obligor is deceased, contact HQ BMU before taking any action on the bond. HQ BMU will refer to HQ OPLA for an opinion on a case-by-case basis.

# VI.  Administrative/General Matters

When processing bond paperwork, ERO personnel must consistently and timely update files and computer systems in order for others in DHS to know about the latest actions taken on a bond.

- In a timely manner, file all bond-related paperwork in the alien's A-file. Most bond documents are filed in the right-hand side of the A-file with the most current documents placed on top.

- If the alien's A-file is digitized, create a T-file. When bond breach or cancelation is final, send the file to the RDF in Williamsburg, KY. The RDF's address is: Records Digitization Facility; 965 South Highway 25W; Williamsburg, KY 40769.

- For bond documents that are not automatically sent to FINOPS-BURLINGTON electronically through the eBONDS system, be sure to email copies of bond documents to FINOPS-BURLINGTON at (b)(6),(b)(7)(C)

- When taking actions on bonds, such as sending out demand or breach notices, note the date such actions were taken in the Comments section or the case actions and decisions screen of the EARM system. It is particularly helpful to note whether the alien was delivered to the Field Office on the surrender date.

- Respond to other offices' requests for A-files as soon as possible. If you aren't currently using the file but need it back by a certain date, staple a note onto the top of the A-file asking that it be returned to your office by that date.

- When a bonded alien is granted a change of venue, document and file this information using Form I-350.

17

- Make sure that bond files are not sent prematurely to the National Record Center (NRC).

- Review all files with an open bond before retiring the file or sending it to NRC.

(b)(7)(E)

**AILA Doc. No. 16051730.  (Posted 6/7/16)**
ICE 2016-ICLI-00005 47 of 488

# VII.  Appendices

## APPENDIX 1:  Responsibilities

**ERO Field Office** (SDDO, Deportation Officer, Bond Control Specialist, Enforcement and Removal Assistant) - responsible for:

- Approving new bonds

- Properly handling cash deposited as security for bonds

- Determining whether a bond should be breached, canceled, or remain in effect

- Issuing all types of bond notices

- Documenting whether the alien appears in response to a demand notice

- Reviewing bond breach appeals

- Reviewing bond appeals and taking appropriate action depending on whether the review of the breach determination establishes that the breach is valid

- Updating Agency databases with bond-related information

- Filing all bond-related documents in the A-file or sending them to the office having custody of the A-file, NRC, or the RDF if the A-file is digitized. Note: When sending documents to NRC, the RDF, or any other USCIS office to be filed in the A-file.  Log into the USCIS intranet, and comply with USCIS procedures at: (b)(7)(E)

**FinOps-Burlington** (Bonds Branch) - responsible for:

- Accounting for cash bond deposits and refunds

- Issuing cash bond interest payments

- Issuing invoices for breached surety bonds

- Tracking debts owed by surety companies on breached bonds

- Working with OPLA to collect delinquent surety bond debt

- Updating the BMIS database to reflect current obligor information (address changes name changes, etc.)

**ERO BMU -** responsible for:

- Developing policy guidance on immigration bond issues

19

- Providing training to Field Office personnel on bond issues

- Notifying Field Office personnel of breach rescissions and bond cancelations that
  need to be prepared based on legal reviews

- Answering questions from Field Office personnel about bond issues and consulting
  with OPLA when legal issues arise

- Organizing focused bond review projects

- Updating sureties and agents about new developments, such as the eBONDS system

20

**AILA Doc. No. 16051730.  (Posted 6/7/16)**
ICE 2016-ICLI-00005 49 of 488

## APPENDIX 2: Substantial Performance/Substantial Violation Standard

ICE regulations state that when **"substantial performance"** of all conditions imposed by the bond occurs, the obligor is released from liability under the bond when the bond is canceled.

Conversely, when a **"substantial violation"** of the conditions imposed by the bond occurs, the bond is breached.

The federal courts use four factors to evaluate whether a violation of the terms of a bond is "substantial":

- The extent of the breach

- Whether the breach was intentional or accidental

- Whether the alien acted in good faith

- Whether the alien took steps to make amends or place himself or herself in compliance

Consider the obligor's conduct: did the obligor make a reasonable, good faith effort to timely surrender the alien in response to the demand notice?

The obligor is not required to deliver the alien exactly as specified in the demand. For example, if the demand notice sets the time for delivery at 9:00 a.m. on a particular day and the alien is delivered at 1:00 p.m. on that same day, no "substantial" violation of the conditions imposed by the bond would have occurred.

Reference: *Ruiz-Rivera v. Moyer,* 70 F.3d 498, 501 (7th Cir. 1995); *Bahramizadeh v. INS,* 717 F.2d 1170, 1173 (7th Cir. 1983); *Int'l Fidelity Ins. Co. v. Crosland,* 490 F. Supp. 446, 448 (S.D.N.Y. 1980).

Please contact the BMU if you have any questions about whether the substantial compliance standard has been met.

21

## APPENDIX 3:    Field Office Bond Verification Instruction

It is imperative to verify the identity of an alien in order to avoid an inadvertent release of an alien from ERO custody. The Field Office accepting the bond and the field office releasing the alien identifies the alien by name, alien registration number, FBI number, date of birth, country of citizenship, etc.

## A. Accepting Office

All ERO offices that accept bonds must service the public from 9:00 a.m. to 3:00 p.m. local time.

The following persons can post a bond:

- U.S. Citizens
- Lawful Permanent Residents
- Lawfully admitted nonimmigrants (visa holders)
- Aliens released on an OSUP
- Aliens placed in removal proceedings; deferred action, stays of removal, etc.
- Authorized surety companies and their agents
- Foreign nationals

1. When an alien who is in violation of the INA appears in order to post a bond:

    a. Place the alien in removal proceedings.

    b. Once served with the *Notice to Appear*, Form I-862, the alien may post the bond.

2. If an alien subject to a *Final Order of Removal* appears in order to post a bond, take the alien into custody and have custody status determined by the Field Office Director.

    a. If you plan to release an alien subject to a *Final Order of Removal* who appeared in order to post a bond, issue an Order of Supervision with or without an Order of Supervision Bond. Discuss the case with your supervisor.

    Note: The cash bond obligor usually completes the Bond Worksheet (see Appendix 8). The Bond Worksheet is a useful reference guide, but is not needed for eBONDS processing because the eBONDS program is self-explanatory.

22

3. After the obligor completes and submits the Bond Worksheet:

    **a.** Review Bond Worksheet for completeness.
    **b.** Verify the identity of the obligor (valid Government-issued photo identification passport, military ID, LPR card, driver's license, etc.).
    **c.** Verify the physical address of the obligor (e.g., zip code on USPS website).

4. Create a Bond Eligibility Request in eBONDS. Follow the *EARM Participant Workbook for eBONDS* instructions posted in Virtual University (VU). Log into VU and search for the *EARM Participant Workbook for eBONDS*. Send the Bond Eligibility Request to the DCO controlling the A-file for verification.

5. The individual or a corporation must pay in cash (i.e., currency, money order, certified check, or cashier's check). On all bonds over $10,000, the only accepted methods of payment are cashier's or certified checks.

6. Checks and money orders should be payable to "US Department of Homeland Security" or "Immigration and Customs Enforcement." However, if an obligor presents a check or money order that contains an abbreviation (such as ICE) or a spelling error, the Field Office may accept the check since Treasury will process it for ICE.

7. If the alien is in the custody of an accepting office, arrange for the alien's release according to established local procedures. Otherwise, forward the bond documents to the appropriate field office to release the alien.

8. Upon bond posting completion, release the alien from custody in a timely manner in a location that is safe and where public transportation is available.

## B. <u>Releasing Office</u>

1. Verify Bond Eligibility Request. Review the following information and documents. Verify that the alien is eligible to be released on a bond:

    • Alien information and bond amount;

    • Record of deportable/inadmissible alien (Form I-213)

    • Notice of Custody Determination (Form I-286)

2. If the alien appealed the custody determination, retrieve IJ bond redetermination from "PLAnet" and verify appeal status. If unable to retrieve a copy of the custody redetermination or appeal, contact OCC immediately.

3. Once the bond is posted, check with your FOD or designee regarding approval for releasing the alien.

23

**4.** Release the alien from custody in a timely manner in a safe location and where public transportation is available.

**5.** If the alien cannot be released upon posting of the bond, release the alien as soon as practicable.

**6.** Coordinate release of the alien with all appropriate parties identified, including the detention facility, the field office(s), obligor, and alien.

**7.** If the alien cannot be released within 24 hours after the bond is posted, notify HQ BMU immediately.

**C. Database Updates**

**1.** The Field Office **accepting** the bond is responsible for entering bond data in EARM.

    **a.** On the BOND screen, enter the:

- Amount deposited (BOND-AMT-POSTED)
- Type of bond
- Bond number
- Posting date
- Obligor's name and address

    **b.** Review the comments section for completeness of information related to posting of the bond (e.g., bond accepted at Docket Control Office (DCO) …; documents forwarded to DCO …, etc.).

**2.** The field office **releasing** the alien is responsible for reviewing the data entered in EARM.

    **a.** Also review the comments entered in EARM (e.g., unable to release alien because…; Field Office was notified because….).

    **b.** The DCO sets up "call up" and monitors cases every month.

**D. Quality Control**

FODs or designees have overall responsibility for bond quality assurance. However, everyone involved with bond processing is responsible for checking for completeness and accuracy of a bond before it is posted. This includes:

- SDDOs
- Detention and Deportation Officers

24

- DOs
- Immigration Enforcement Agents
- Enforcement and Removal Assistants
- Bond Control Specialists

25

# APPENDIX 4: Immigration Bond
## (Sample)

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

### IMMIGRATION BOND

OMB No. 1653-0022; Expires 06/30/2015

**INSTRUCTIONS**

(READ INSTRUCTIONS CAREFULLY)

This bond is posted as security for performance and fulfillment of the bonded alien's obligations to the government. An acceptable surety company or an entity or individual who deposits United States bonds, notes, or cash may execute the bond as surety. The surety is the obligor; the bonded alien is the principal; and DHS is the beneficiary of all bonds it authorizes. The obligor guarantees the performance of the conditions of the bond. The bond's guaranty is secured by the amount of the bond. An acceptable surety company is one that appears on the current Treasury Department Circular 570 as a company holding the requisite certificate of authority to act as a surety on Federal bonds. An agent of an acceptable surety company may execute the bond only if the agent attaches to the bond a currently valid power of attorney showing the authority of the agent to act for the surety company. Powers of Attorney do not have official form numbers. They differ from state to state and from company to company. Any agent of an acceptable surety company is a co-obligor on this bond, and he/she shall sign as a co-obligor in paragraph D. Failure of an agent to sign as co-obligor shall result in rejection of the bond. A co-obligor shall be jointly and severally liable with the surety company for any breach of this bond (i.e., the liability of a co-obligor is in addition to, not instead of, that of the obligor). DHS may refuse to accept any bond to the extent permitted by law.

Obligors and co-obligors (if any) shall state their full name and address in Paragraph A, and shall sign the bond where indicated in Paragraph D. Either the obligor or co-obligor, or both, may be corporate entities. In addition, an obligor who deposits United States bonds, notes, or cash must deposit the requisite security and execute the appropriate Power of Attorney (i.e., either Paragraph H or I). This deposit and execution may be made before two officers or employees of the Department of Homeland Security ("DHS") who have been authorized to administer oaths pursuant to 8 U.S.C. 1357, and who shall sign as witnesses in Paragraph J. A notary public may witness the obligor's signature in either Paragraph H or I by affixing his/her notarial seal where indicated and showing the date his/her commission expires. No seal is required when officers or employees of the DHS witness the transaction. When a notary public witnesses the obligor's signature, DHS witnesses must still acknowledge receipt of the security for the bond in Paragraph J.

Only the owner of record may deposit United States bonds or notes. Such bonds or notes must be negotiable and not redeemable within one year of the date of the deposit. Any charges made by the depository for accepting United States bonds or notes must be borne by the alien or the owner of the security.

**PRIVACY ACT STATEMENT**

**Authority and Purpose:** The Immigration and Nationality Act, as amended, (8 U.S.C. 1103, 1183, 1226, 1229c, and 1363) authorizes the collection of this information to provide for the posting, maintenance, cancellation, and breach of an immigration surety bond, and for associated financial management activities, including collection of unpaid monies, reimbursement of the bond principal, and the calculation, payment, and reporting of interest. The Internal Revenue Code (26 U.S.C. 6109) and Executive Order 9397 authorize the collection of the Social Security number (SSN).

**Disclosure:** Furnishing this information is voluntary; however, failure to provide it will result in the non-issuance of the immigration bond. For cash bonds, your SSN is necessary to pay interest through the U.S. Treasury Department and to comply with Internal Revenue Service requirements to report interest payments.

**Routine Uses:** This information will be used by and disclosed to DHS personnel and contractors or other agents who need the information to support the enforcement of immigration laws and the provision of immigration benefits. DHS may share this information with the U.S. Treasury Department to report interest paid to an obligor, and to facilitate payments to or collection of monies owed by an obligor. DHS may also share this information with the U.S. Justice Department and other Federal and State agencies for collection, enforcement, investigatory, or litigation purposes, or as otherwise authorized pursuant to its published Privacy Act system of records notice.

ICE Form I-352 Instructions (3/08)

Page 1 of 5

26

**Public Reporting Burden.** Under the Paperwork Reduction Act, an agency may not sponsor an information collection and a person is not required to respond to a collection of information unless it displays a currently valid OMB control number. We try to create forms and instructions that are accurate, can be easily understood, and which impose the least possible burden on you to provide us with information. Often this is difficult because some immigration laws are very complex. The estimated average time to complete and file this application is 30 minutes per application. If you have comments regarding the accuracy of this estimate, or suggestions for making this form simpler, you can write to the Department of Homeland Security, U.S. Immigration and Customs Enforcement, 500 12th Street, S.W., Room 3138, Washington DC 20536. **(Do not mail your completed application to this address.)**

GENERAL TERMS AND CONDITIONS

The express language of the bond shall take precedence over any inconsistent policies or statements. Federal law shall apply to the interpretation of the bond, and its terms shall be strictly construed.

Provided it has the concurrence of the government and it does not change the amount of the bond, an obligor may re-bond the alien at any time and at no expense to the government. Cancellation of a bond issued as a delivery bond shall occur upon any of the following, provided they occur prior to the date of a breach: DHS' taking the alien back into its custody; deportation/exclusion/removal of the bonded alien; grant of permanent residence to the bonded alien; notice of the detention of the bonded alien for 30 or more days pursuant, or prior to a conviction by local, state, or federal authorities; termination of deportation/removal proceedings (but not administrative closure or stay of such proceedings); death of the bonded alien; voluntary departure by the bonded alien as evidenced by valid proof thereof; or other circumstances as provided by statute or regulation. Cancellation for these reasons is automatic, and any subsequent appearance demand, or attempt to breach the bond, is null and void. The bond will not be canceled solely because the bonded alien is detained for less than 30 days by any local, state, or federal government agency.

DHS shall notify the obligor or co-obligor of a demand to produce the alien, the breach or cancellation of a bond, and any demand for payment of a bond. Notice sent to either the obligor or co-obligor is sufficient to trigger the duties and obligations under this bond. Any obligation or duty imposed on an obligor by this bond applies equally to all co-obligors.

DHS shall send notice of a breach of the bond to the obligor or co-obligor on Form I-323, Notice- Immigration Bond Breached, at the address of record. DHS regulations provide that upon notification of a breach the obligor has 30 days in which to file an administrative appeal or motion for reconsideration of the breach. Any obligor who contests a declaration of breach shall file an administrative appeal seeking review of the declaration of breach. A declaration of breach shall be administratively final if not timely appealed. Judicial review of any administrative declaration of bond breach is pursuant to the Administrative Procedures Act, 5 U.S.C. § 701, et seq.

Demands for amounts due under the terms of this bond will be sent to the obligor or co-obligor after a declaration of breach becomes administratively final. For bonds posted by acceptable surety companies, if the surety company or agent of the surety company does not make payment within 120 days of the demand for payment, DHS may notify the Department of the Treasury of such nonpayment. If payment is not made within 30 days of the date of the demand for payment, interest, penalty, and handling charges as provided by the Debt Collection Act, 31 U.S.C. § 3701, et seq., and the Federal Claims Collection Standards, 31 C.F.R. §§ 900-904, will accrue from the date of the first demand.

27

**AILA Doc. No. 16051730.  (Posted 6/7/16)**
ICE 2016-ICLI-00005 56 of 488

# (Sample)

DEPARTMENT OF HOMELAND SECURITY
**U.S. Immigration and Customs Enforcement**

**IMMIGRATION BOND**     OMB No. 1653-0022; Expires 08/30/2015

Power of Attorney Number _____
(Bonded Alien) File No. _____
Bond Receipt No. _____

A.
Name of Obligor: _____

Street Address of Obligor: _____

City, State and Zip Code: _____

Telephone: _____  Name of Agent/Co-Obligor (if any-Surety Bonds only): _____

Address (if different from that of Obligor): _____

Telephone: _____  Address to use for notice purposes: ___ Obligor  ___ Agent  ___ Both

If this is executed by a surety company the rate of premium is: _____% and the amount of premium is: _____

The name and address of the person who executed a written instrument with the surety company requesting it to post bond is: _____

B. Information about alien for whom bond is furnished:
Name: _____

Current Location (i.e., where detained): _____

Date and country of birth: _____ / _____  Nationality: _____

Date, port and means of arrival in the United States: _____ / _____

Alien to reside at: _____

Telephone number at alien's residence: _____

C. In consideration of the facts recited in paragraph or paragraphs herein numbered _____ and captioned
_____ (and in any rider
or riders lettered _____ and captioned _____ , the above named
obligor and the agent acting on its behalf (if any), by subscribing hereto, hereby declare that they are firmly bound unto the
United States in the sum of _____ dollars ($ _____ ) unless the guarantee
of the bond is that the alien shall not become a public charge, the obligor, and the agent acting on its behalf (if any), declare
themselves bound in such amount or successive amounts as are prescribed in paragraph (G-2) herein as liquidated damages and
not as penalty, which sum is to be paid to the United States immediately upon failure to comply with the terms set forth in any such
paragraph or rider. The obligor and agent further agree that any notice to him/her in connection with this bond may be accomplished
by mail, directed to him/her at the above address. The obligor acknowledges receipt of a copy of the executed bond and any
attached rider or riders specified above.

D. Signed and sealed this _____ day of _____
                                    (Month/Year)

_____        _____
     (Signature of Obligor)                    (Signature of Agent/Co-Obligor (if any))

E. Bond approved and accepted at _____  on _____
                                       (City and State)                (Date)

_____        _____
  (Field Office Director Printed Name)            (Field Office Director Signature)

F.
Surety Company _____  Taxpayer Identification Number _____
Agent-Bonding Company _____  Taxpayer Identification Number _____
Obligors-Cash/Treasury Bond _____  Taxpayer Identification Number _____

31 U.S.C.A. § 7701(c)(1). The head of each Federal agency require each person doing business with that agency to furnish to that
agency such person's taxpayer identifying number. It is the intent of the DHS to use such numbers for purposes of collecting and
reporting information on any delinquent accounts arising out of such person's relationship with the Government. The obligor, surety,
or agent must furnish its Taxpayer Identification Number (TIN) to DHS. Failure to furnish the TIN may result in a refusal of the bond.

ICE Form I-352 (3/08)                                                                Page 3 of 5

28

**AILA Doc. No. 16051730.  (Posted 6/7/16)**
ICE 2016-ICLI-00005 57 of 488

# (Sample)

## IMMIGRATION BOND

OMB No. 1653-0022; Expires 08/30/2015

Power of Attorney Number  _____

(Bonded Alien) File No.  _____

Bond Receipt No  _____

---

**G.**

**(1) BOND CONDITIONED UPON THE DELIVERY OF AN ALIEN.** In consideration of the granting of the application of the above alien for release from custody under a warrant of arrest issued by the Attorney General charging that he/she is unlawfully in the United States, provided there is furnished a suitable bond as authorized by Section 236 and/or Section 241 of the Immigration and Nationality Act, the obligor hereby furnishes such bond with the following conditions if: (1) the alien is released from custody and if the obligor shall cause the alien to be produced or to produce himself/herself to an immigration officer or an immigration judge of the United States, as specified in the appearance notice, upon each and every written request until exclusion/deportation/removal proceedings in his/her case are finally terminated; (2) the said alien is accepted by the DHS for detention or deportation/removal; or (3) the bond is otherwise canceled, this obligation shall terminate. If, however, the obligor fails to surrender the alien in response to a timely demand while the bond remains in effect, the full amount of the bond (see Paragraph C above) becomes due and payable. The obligor agrees that no order issued by or under the authority of the Attorney General or Secretary of Homeland Security by virtue of which issuance or execution of any order of deportation/removal is or may be deferred, shall be in any manner construed to impair or render void this obligation or any part thereof.

**(2) BOND THAT ALIEN SHALL NOT BECOME A PUBLIC CHARGE.** In consideration of the granting of the application of the above alien for permission to enter the United States, providing there is furnished a suitable bond that he/she will not become a public charge, the obligor hereby furnishes such bond with the following conditions: if the alien is admitted to the United States and accepts any form of prohibited public assistance the obligor shall pay to the United States or to any State, Territory, county, town, municipality or district thereof, which shall have provided such public assistance any or all charges or expenses arising therefrom up to the total amount of the bond. In the event that the public authority providing the assistance is not authorized to accept reimbursement, the obligor agrees that he/she will promptly pay the actual expenses to the Department of Homeland Security. If the obligor fails to pay all charges or expenses within 30 days after notice to him/her by the DHS that the alien received a form of prohibited public assistance that was considered in making a determination that the alien has become a "public charge" provided that in no event shall the liability of the obligor exceed the total amount of bond, then DHS may cease to do business with the obligor or co-obligor. Any such amounts collected by the DHS, which are not turned over to the public authority providing the assistance will be deposited in the Breached Bond Detention Fund. Not withstanding any violation of this bond and any payment made pursuant to the terms thereof, this obligation shall remain in full force and effect as to the remainder of the liability of this obligation until the departure, naturalization or death of the alien. It is further agreed that suit to enforce any of the conditions of this bond may be instituted by either United States, or any interested State, Territory, county, town, municipality, or district thereof.

**(3) BOND CONDITIONED UPON THE VOLUNTARY DEPARTURE OF AN ALIEN.** In consideration of the granting by the Attorney General of an application of the above alien to depart voluntarily from the United States, provided there is furnished a suitable bond as authorized by 8 U.S.C. 1229c the obligor hereby furnishes such bond with the following conditions if: (1) the obligor ensures that the alien departs the United States on or before the date specified in the order granting voluntary departure, and provides probative documentation of the departure within 30 days of the date specified in the order granting voluntary departure; or (2) the alien is actually accepted by the DHS for detention or deportation/removal, this obligation shall terminate. Otherwise the amount of the bond specified in Paragraph C above shall become due and payable.

**(4) ORDER OF SUPERVISION BOND.** In consideration of the granting of the release of the above alien pursuant to a post removal period order of supervision, the obligor hereby furnishes this guaranty with the condition that: if the alien fully performs all of the conditions of the order of supervision and surrenders for removal, then this obligation shall terminate; but if the alien fails to fully perform all of the conditions of the order of supervision, or the alien fails to surrender for removal, the full amount of this bond shall become due and payable by the obligor.

---

ICE Form I-352 (3/08)

Page 4 of 5

29

**AILA Doc. No. 16051730.  (Posted 6/7/16)**
ICE 2016-ICLI-00005 58 of 488

# (Sample)

## IMMIGRATION BOND

OMB No. 1653-0022; Expires 06/30/2015

(Bonded Alien) File No. _____

Bond Receipt No. _____

H. Pledge and Power of Attorney for Use When United States Bonds or Notes Are Deposited As Security

I hereby pledge the United States Bond/Notes described in the following schedule as security for the performance and fulfillment of the obligations described in paragraph C above in accordance with 6 U.S.C. 15, 31 CFR part 225, and Treasury Department Circular 154. I appoint the Attorney General of the United States as my attorney to collect, sell, assign, and transfer said United States Bond or Note. In the case of any default in performance of conditions herein, my attorney shall have the power to collect without appraisal or valuation notice, and to apply the proceeds to the satisfaction of any damages, demands, or deficiencies arising from such default. I waive my right to redeem this security.

| Title of Bond/Notes | Coupons Attached | Face Value | Interest Rate | Serial No. | Interest Dates |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

(Affix Seal Here if Required)             (Signature of Person Pledging Bonds or Notes)

I. Pledge and Power of Attorney For Use When Cash Is Deposited as Security

I hereby pledge the amount of _____ ($. _____ )

United States currency as security for the performance and fulfillment of the obligations described in paragraph C above. I appoint the Attorney General of the United States as my attorney to collect or to assign and transfer the said sum of money. I agree that, in case of default in the performance of any of the conditions herein to which I have subscribed, said attorney shall have full power to collect said sum of money or any part thereof or to assign and transfer said sum or any part thereof deemed appropriate by said attorney to the satisfaction of any damages, demands, or deficiencies arising by reason of such default. I further empower said attorney, in the event all the conditions herein to which I have subscribed have been complied with and the bond is canceled, to deliver the said sum of money plus any interest accrued thereon, to me at my risk and expense by such means as said attorney shall select

(Affix Seal Here if Required)             (Signature of Person Pledging Cash)

J. Before me, within the county/city/parish of _____ in _____

The above named individual personally appeared before us, acknowledged the execution of the foregoing power of attorney, and deposited the security described above. Witness our hands this _____ day of _____

_____        _____
(Signature)                  (Title)

_____        _____
(Signature)                  (Title)

30

**AILA Doc. No. 16051730. (Posted 6/7/16)**
ICE 2016-ICLI-00005 59 of 488

## APPENDIX 5:   Delivery Bonds

A. **Delivery bonds** are the most common type of immigration bond. They are similar to criminal bail bonds and require the obligor to surrender the alien in response to a demand notice issued by ICE. The **minimum amount** for a delivery bond is $1,500. 8 U.S.C. § 1126(a)(2)(A).

B. **Multiple demands possible** – Under the terms of Paragraph G.(1) of the bond form, an obligor will be liable for the face amount of the bond if s/he "fails to surrender the alien in response to a timely demand when the bond remains in effect," and the obligor "shall cause the alien to be produced or to produce himself/herself . . . upon each and every written request until exclusion/deportation/removal proceedings in his/her case are finally terminated."

While demand notices typically are issued after a final order of removal, ICE may, in its discretion, issue more than one demand notice on a delivery bond. For example, if ICE needed to question the alien about some aspect of his immigration status, the field office could issue a demand notice for an "interview" and later issue another demand notice for "removal" once the final order of removal had been issued.

31

## APPENDIX 6:    Voluntary Departure (VD) Bonds

**A.** VD bonds require the alien to leave the United States on or before the voluntary departure date set by the IJ or BIA.

    **1.** When an alien is granted permission to voluntarily depart the United States, the alien must pay his or her own transportation costs, thereby saving the Government the time and expense of removing the alien. 8 C.F.R. § 1240.26 sets forth the rules governing the IJ's authority to grant voluntary departure.

    **2.** Depending on whether the IJ grants voluntary departure prior to completion of removal proceedings or at the completion of removal proceedings, the VD period set by the IJ will usually range from 60 to 120 days. If the alien files an appeal with the BIA, the BIA may reinstate the voluntary departure period in its order.

    **3.** When the IJ grants the alien's request for voluntary departure, the judge also enters an "alternate order of removal." This means that if the alien fails to depart on or before the VD date, the alternate order of removal automatically goes into effect, and the alien can be removed from the United States after the VD date.

**B.** **IJ Order Requiring a VD Bond**

    **1.** VD bonds are posted after an IJ issues an order requiring the alien to post a VD bond. The minimum amount of a VD bond is $500, 8 C.F.R. § 1240.26(c)(3)(i), but on occasion IJs have incorrectly ordered a bond at a lower amount. When that happens, consult an OCC attorney.

    **2.** The alien must post the bond within five business days of the IJ's order granting VD. The Field Office Director may, in his or her discretion, keep the alien in ICE custody until the bond is posted. Additionally, the FOD may accept a bond posted more than five business days after the IJ's order if there are unusual circumstances.

    **3.** If the alien files an appeal of the IJ's order with the BIA, the alien must submit within 30 days of filing the appeal proof of having posted the required VD bond. If the alien fails to submit this proof, the BIA will not reinstate the voluntary departure period in its order. 8 C.F.R. § 1240.26(c)(3)(ii).

    **4.** If the alien does not post a VD bond and evidence of the alien's departure is received, consult 8 C.F.R. § 1240.26(c)(4). If the alien does not post bond and fails to depart, consult an attorney in the OCC before determining whether this is a final order of removal.

**C.** **Conditions Imposed by VD Bonds**

    **1.** When a VD bond is posted, paragraph C on the bond form reflects that the bond is conditioned upon the voluntary departure of the alien. Paragraph G.3 of the bond form (voluntary departure) applies.

32

2. Two conditions must be satisfied to fulfill the conditions of a VD bond: 1) The alien must leave the United States on or before the voluntary departure date set by the court; and 2) the obligor must submit valid proof that the alien did, in fact, timely leave the United States. The obligor must submit this proof within 30 days of the voluntary departure date.

3. Even if the bond obligor fails to submit valid proof of departure, VD bonds can be canceled when electronic records, such as the ATS-P, show that the alien left the United States on or before the VD date. The field office has the discretion to follow up on such cases by checking passenger manifests in TECS before concluding that the alien has departed. However, once the field office accepts the electronic evidence of departure and cancels the bond, the cancelation is final.

## D. Valid Proof of Departure

The following, when fully and properly completed, are examples valid evidence of departure:

- Form I-210 – *Voluntary Departure and Verification of Departure*

- Form G-146 – *Nonimmigration Checkout Letter*

- Form I-392 – *Notification of Departure of Alien* (Bonded)

- eVIP Notice from Department of State

- Electronic records, such as ATS-P, showing the alien's departure.

  Note: The Field Office has discretion to determine whether to follow up on such evidence by accessing passenger manifests in TECS or seeking additional evidence, as indicated above.

- Plane tickets or travel itineraries, standing alone, do **not** constitute valid proof of departure.

## E. Delivery Bond Posted Before VD Bond

Often a delivery bond is posted on behalf of the alien before the IJ orders a VD bond to be posted.

1. Under current version of the bond form (March 2008 and later), both a delivery bond and a VD bond can be in effect at the same time for the same alien.

2. Earlier versions of the bond form, however, may require that the delivery bond be canceled upon the posting of a VD bond. For further guidance on this issue, please review the chart at the end of this appendix. Follow the contract language.

33

**3.** If the obligor is an Amwest signatory (bonds posted by G&G on behalf of Farwest, Amwest, and American Surety), cancel the delivery bond when a VD bond is posted for the same alien.

## F. Automatic Termination Rule – Applies When Alien Files MTR or PFR

For all immigration cases pending before an immigration judge, the BIA, or U.S. Courts of Appeals on or after January 20, 2009, the "automatic termination" rule applies. 8 C.F.R. § 1240.26.

The automatic termination rule means that:

**1.** Filing an MTR with the IJ or the BIA within the VD period automatically terminates the VD period and the alternate order of removal goes into effect. In this situation, the VD bond must be canceled and the Field Office should issue Form I-391 to cancel the VD bond.

**2.** Filing a petition for review (PFR) with a Federal Court of Appeals within the VD time period automatically terminates the VD period and the alternate order of removal goes into effect. In this situation, the VD bond must be canceled and the Field Office should issue Form I-391 to cancel the VD bond.

**3.** Do not confuse filing an MTR or a PFR with filing an appeal to the BIA. The alien may file an appeal of the IJ's decision with the BIA without triggering the automatic termination rule.

**4.** In some cases, an alien files a BIA appeal and subsequently becomes eligible for an additional form of relief, and files a motion to remand while the case is pending at the BIA. This is different from a motion to reopen in that the alien files this motion without waiting for the BIA to rule on the appeal. The filing of this motion has no effect on the outstanding voluntary departure bond. However, if the BIA grants the motion to remand, the voluntary departure bond should be canceled.

34

## APPENDIX 7: Order of Supervision (OSUP) Bonds

When ICE issues an OSUP (Form I-220B) to an alien, it may also require the alien to post an OSUP bond.

The bond is conditioned on the alien complying with the terms of the OSUP:

1. If the alien violates a material term of the OSUP, the bond is breached. Ensure that Form I-352 contains the following section "C": "Bond conditioned upon compliance with an alien's Order of Supervision, Form I-220B attached."

2. Often, an OSUP bond is posted after a final order of removal has been entered and ICE is waiting for travel papers or other documents so that the alien may be removed. See 8 C.F.R. § 241.4 & 241.5.

3. Exercise sound judgment in determining whether a condition of the OSUP bond has been violated. Remember that the applicable breach standard is whether the alien "substantially" violated a term in the OSUP bond.

4. Delivery bonds cannot be converted into OSUP bonds. When it is appropriate to require the alien to post an OSUP bond, any pre-existing delivery bond should be canceled. A new OSUP bond must be posted.

5. If an alien is already on a delivery bond and is placed on an OSUP without an OSUP bond, the delivery bond should remain in effect. This should be rare, as persons released on OSUP are usually first taken into custody and once an alien is taken into custody, any delivery bond should be canceled.

35

## APPENDIX 8:    Bond Worksheet (Sample)

### U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
### BOND WORKSHEET

---

DETAINED ALIEN INFORMATION
INFORMACION DEL DETENIDO

Alien "A" File Number: _____    Name: _____

Date and Country of Birth: _____ / _____
(Fecha y Pais de Nacimiento)

Date, Place and Manner of Entry: _____ / _____ / _____
(Fecha, Lugar y Forma de Entrada)

U.S. Address: ----------------------------------------------------------------
(Direccion en los EEUU)

Phone: _____    Bond Amount _____
(Numero de Telephone)                (Cantidad de Fianza)

---

OBLIGOR INFORMATION
INFORMACION DEL FIADOR

Name: _____    Social Security Number: _____
(Nombre)                          (Numero de Seguro Social)

Address and Telephone: _____ / _____
(Direccion y Telephono)

Status in the United States: ☐ U.S. Citizen ☐ Legal Permanent Resident or _____
(Estado Del Fiador)               (Cuidadano)        (Residente Permanente o')

Government Issued ID and Number: _____
(Forma de Identification y numero)
Message for Detainee:
_____
(Mensaje para el Detenido)

36

**This section for DHS/ICE Use Only (Para Uso De DHS/ICE – No Escriba abajo de Esta Arca)**

☐ Cash

| | |
|---|---|
| $10.00 x _____ | = $ _____ |
| $20.00 x _____ | = $ _____ |
| $50.00 x _____ | = $ _____ |
| $100.00 x _____ | = $ _____   TOTAL $ _____ |

☐ Cashier's Check _____   $ _____

  Bank Name                                                          Amount

_____

Serial # 

U.S. Postal Money Order _____

                                    Amount / Serial Number

FCO: ................. POC: ............................................   Phone: .......................... Fax: ............

Address: _____   Time of Contact: _____

Person Taking Bond: _____   Officer: _____

37

# APPENDIX 9:  Notice to Cash Bond Obligors:  IRS Backup Withholding Rules

## (Sample)

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

### NOTICE TO CASH BOND OBLIGORS
### IRS "BACKUP WITHHOLDING" RULES

A "cash bond obligor" is the person who has paid the money to post an immigration bond. By law, immigration cash bonds can earn simple interest at the rate of 3% per year. ICE calculates interest payment and possible backup withholding after (1) the cash bond is canceled or breached and (2) the obligor submits INS Form W-9 or W-8BEN.

In certain circumstances, U.S. Immigration and Customs Enforcement (ICE) maybe required by the Internal Revenue Service (IRS) to withhold tax from some of the interest payable to you as a cash bond obligor. This requirement is based on IRS backup withholding rules. To assist DHS in determining whether some of the interest must be withheld, please complete and return to ICE either IRS Form W-9 or IRS Form W-8BEN, based on the instructions below. ICE will use the information you provide to determine whether or not you are subject to the IRS backup withholding rules.

<u>Consequences of not returning the IRS Form</u>:  If you fail to return the appropriate IRS form, ICE may withhold tax at a rate prescribed in IRS rules based on your apparent status as a citizen, resident, or non-resident alien and on information provided, such as your address, to us during the immigration bond process. If ICE does not have a valid taxpayer identification number for you, and it appears you are a U.S. citizen or lawful permanent resident, ICE may withhold 28% from interest payments made to you that equal or exceed $600.00 within a calendar year. If it appears that you are a non-resident alien, federal backup withholding will be deducted at the rate of 30% on any interest payments made.

### INSTRUCTIONS:

- If you are a U.S. citizen or lawful permanent resident, please complete Form W-9.

- If you are a non-resident alien, please complete Form W-8BEN.

- You may obtain Form W-9 or Form W-8BEN from the IRS website: www.irs.gov. A Spanish version of Form W-9 and its instructions are available on the IRS website under the "Español" link.

- If you have questions about how to fill out Form W-9 or Form W-8BEN, you may call the IRS Toll Free at 1-800-829-1040.

- After completing the appropriate form, please send it to:

  Burlington Finance Center
  U.S. Immigration and Customs Enforcement
  P.O. Box 5000
  Williston, VT 05495-5000
  **Attn: Bonds Branch**

ICE Form I-352A (2/12)

Page 1 of 1

38

AILA Doc. No. 16051730.  (Posted 6/7/16)
ICE 2016-ICLI-00005 67 of 488

## APPENDIX 10:   OTCnet Scanner Processing of Cash Bond Deposits

**A. OTCnet** check scanning satisfies Treasury's mandate that all government deposits be made electronically by 2013. Comprehensive training on using OTCnet is available on Treasury's website at (b)(7)(E)

**B. PROCEDURES:**

1. Log into OTCnet – select Check Processing Tab.

2. Select Check Scan. You will then see a white box with the message "Automated terminal detection in progress…"

3. On the right-hand side of the screen, under "Processing Method," use drop down menus to select "Back Office" and under "Item Type" select "Non-Personal."

4. Click Star Scan under "Scan Controls."

5. Insert check to scan it.

6. Insert one check at a time, face up, with the MICR line (the check tightly against the right side of the scanner).

   - MICR stands for Magnetic Ink Character Recognition

   - The MICR line is the line of numbers at the bottom of checks that includes the account number and routing number. Scanner will stamp the check and a green light will briefly appear if the scan was successful

7. Rescan the check if the scan was not successful. Manually key MICR line if necessary.

8. When the check has been scanned, an image of the check will appear on the screen. Click the arrow button to view the back of the check.

9. Enter the amount of the check, the deposit number and the bond number.

   - Only one deposit number should be used throughout the day.

   - Click save and repeat steps for each check.

   - Note: I-246 deposits are included in deposits.

   - Bond number should be in this format: SNAC123456.

10. At the end of the day, all batches scanned that day must be closed and approved. They will not be sent to Treasury unless they are closed and approved. To Close/Approve a batch of checks:

39

- Click the "Check Processing" tab and then click "Batch Management."

- Under "Cashier ID," enter the ID/OTCnet user ID of the person who created the batch & under "Batch Status," click the box for "OPEN" batches.

- Click ENTER – This will bring up all batches for this user that are in OPEN status.

- Select the batch by clicking on the blue hyperlink that appears under Batch ID.

- Enter the Batch Control Count (number of checks) and Batch Control Amount (amount of checks scanned in batch) and then click Balance button.

- A pop-up box will appear asking if you want to "CLOSE THE BATCH" – click "OK."

- Print Batch Summary Report (NEW) at the bottom of the page (CTL + P).

- Once printed, click "Confirm Report Print to Approve" button.

- Click "Return to Batch Summary" to approve other batches.

11. Print the SF-215 Report.

- You may print a SF-215 Report after 9:30 EST the next business day after the batches were scanned & closed.

- All batches that were closed the previous day will appear on the SF-215 as one "deposit."

- The G-254 will be completed as usual and contain all of the batches that were prepared and closed the previous day.

- On the OTCnet home screen, click on the Reports tab and select the "215 Deposit Ticket Report."

- Under "Start Date," enter current date.

- Under "Report Format," select HTML from drop down menu.

- Under "OTC Endpoint," select FOD.

12. Once the deposit has been completely processed, send to FINOPS-BURLINGTON the G-254, SF-215, and the Batch Summary.

13. In the event that your OTCnet check scanner is unable to process your deposit within the required timeframes established in the Treasury Financial Manual, Title 6, Chapter 8000, Section 8030.20, deposit receipts totaling **$5,000** or more on the **same day** received prior to depositary cutoff time.

40

14. Collections totaling **less than $5,000** may be accumulated and deposited when the total reaches $5,000. However, make deposits by Thursday of each week, regardless of the amount accumulated, except in extremely remote Field Offices.

15. Make all non-OTCnet scanner deposits or mail-in deposits to **U.S. Bank**.

16. Each deposit should be accompanied by and **OTCnet Deposit Ticket** created under the Deposit Processing tab in OTCnet.

17. Deposits should be enclosed in a **tamper-proof bag** and placed inside another mailing envelope or box. If you are depositing cash, cash deposits (or a mixture of cash and checks) may be sent via Registered Mail. Postal regulations require that the full value of the cash being shipped be declared and insured.

18. **Mail USPS deposits to:**

    U.S. Bank
    Cleveland Cash Vault Mail-In TGA P.O. Box 89455
    Cleveland, OH 44101

19. **Deposits containing checks only may be sent via FedEx or UPS to:**

    U.S. Bank
    Cleveland Cash Vault Mail-In TGA CN-OH-MSCL
    1300 E 9th St, Lower Level
    Cleveland, OH 44114

20. You may call the **Government Customer Service Unit** for any questions related to OTCnet confirmation, return items or processing issues at 314-425-(b)(6),(b)(7)(C) You will need to provide the following information to your OTCnet coordinator:

    Routing number (b)(6),(b)(7)(C)

    Account number: (b)(6),(b)(7)(C)

21. You may also contact the **OTCnet Helpdesk** at 866-945-(b)(6),(b)(7)(C)

41

# APPENDIX 11:   Notice – Immigration Bond Canceled (Sample)

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

**NOTICE - IMMIGRATION BOND CANCELLED**

O
B
L
I
G
O
R

| | |
|---|---|
| Alien File No | |
| Cancellation Notice Date | |
| IMMIGRATION BOND | |
| Bond Type: ☐ Cash   ☐ U.S. Bonds   ☐ Surety | |
| Bond Post Date | |
| Bond Receipt No. | |
| Amount | |
| Alien's Name | |

The conditions of the above-described immigration bond appearing to have been satisfied, the bond is canceled.  Any deposit of cash or U.S. bonds will be refunded to you upon receipt of proper documentation. Please comply with these instructions to complete your application.  Inquiries regarding this form or your deposit should be addressed to the Department of Homeland Security Debt Management Center (DMC) at the address below.

SAVE THIS FORM.  You must submit a COPY of this Form I-391 along with the ORIGINAL Form I-305, Receipt of DHS Official - U.S. Cash Accepted as Security on Immigration Bond (Delivery Confirmation recommended) to:  Department of Homeland Security, Debt Management Center, P.O. Box 5000, Williston, VT 05495-5000.  If you have lost your original Form I-305 you will be given an opportunity to submit an Original notarized Form I-395 Affidavit in Lieu of Lost Receipt.

If you wish to designate another person to receive the deposit on your behalf, you must complete a Designation of Attorney in Fact, Form I-312, designating that person and include the completed original notarized form in your application to the DMC.

If your address has changed you must furnish notice of the change of address to Department of Homeland Security, Debt Management Center, P.O. Box 5000, Williston, VT  05495-5000.

_____
Authorized DHS Signature                              Print Name/Title

You may use a copy of this form to change your address.  Complete the information below and mail the Completed form to the above address.

My address has changed. Please send all further correspondence to:

Street Address                         City or Town, State                              Zip Code

_____
Signature of Obligor                                        Date

ICE Form I-391 (9/07)                                                                      Page 1 of 1

42

## APPENDIX 12:  Final Orders of Removal

1. Under 8 C.F.R. § 1241.1, an Order of Removal issued by an IJ becomes final when
   the:

   - Alien does not attend the IJ hearing, and the IJ therefore issues the order in
     absentia.

   - Alien attends the hearing, is ordered removed, and waives appeal of the IJ's
     decision.

   - Alien is ordered removed by the IJ, fails to file a timely appeal (30 calendar days
     after the mailing of a written decision, the rendering of an oral decision, or the
     service of a summary decision, 8 C.F.R. § 1240.15).

   - BIA dismisses the appeal. Similarly, if the IJ certifies the removal order to the BIA,
     then it becomes final upon the date of the BIA's decision on removal.

   - Alien overstays the VD period granted by the IJ or the BIA.

   - IJ grants an alternate order of removal in connection with the grant of VD, and the
     alien fails to post a required VD bond within five business days of the IJ's decision,
     and subsequently does not depart within 25 days of the order. See 8 C.F.R.
     1240.6(c)(4)(i).

   - Alien files an appeal with the BIA after the IJ grants VD, and the BIA orders
     removal or the alien overstays any VD period granted or reinstated by the BIA.

   - BIA dismisses alien's appeal without reinstating VD.

2. For in absentia orders, if an alien files a motion to reopen or reconsider (MTR) with the
   IJ or the BIA, the removal order is "stayed." For all other removal orders, an MTR will
   not stay the execution of any decision made in the case unless either the IJ or the BIA
   grants a stay.

3. If an alien files a PFR with a U.S. Court of Appeals and that court grants a stay of the
   removal proceedings, the alien cannot be removed even though the order of removal
   is administratively final.  If the Court of Appeals does not grant a stay, the deportation
   officer should consult an OCC attorney before determining whether it is appropriate to
   proceed with removal.

43

## APPENDIX 13: Completing and Sending Demand Notices (Form I-340)

1. Review Part A of Form I-352 to determine the obligor(s).

   a. For surety bonds, two obligors are listed: the surety company and the agent.

   b. For cash bonds, one obligor is listed: the person or organization that funded the bond.

2. Determine whether demand notices need to be sent to more than one obligor.

   a. Part A contains three boxes: "Obligor," "Agent," and "Both."

   b. When the "Both" box on Form I-352 is checked, send demand and breach notices to both the surety and the agent.

   c. If the agent is out of business, send the demand notice to the surety regardless of which box is checked.

3. Determine the current address for the obligor(s).

   a. Because the Form I-352 is sometimes completed years before a demand notice is sent, do not rely on the address on the bond form.

   b. Form I-333, "Obligor Change of Address," may be used by obligors to notify ICE of a new address. Check for new addresses before sending notices.

   c. For cash bond obligors, review the A-file and check BMIS for the obligor's current address.

   d. For surety bond obligors, check BMIS for the obligors' current addresses. If you are unsure of the surety or agent's current address, check with FinOps-Burlington.

   e. If a certified mail receipt comes back as "Returned to Sender," you must take further action to try to deliver a copy of the demand notice to the obligor. See Appendix 14 for details.

4. Select an appropriate date to use as the surrender date.

   a. Set a date that is at least 10 business days after the date the demand issue was issued. As a best practice, give the obligor at least 30 calendar days to surrender the alien.

5. Include the purpose for issuing the demand notice:

   • **"Removal"** - the alien is subject to a final order of removal

   • **"Interview"** - you need to ask the alien immigration status questions

44

- **"Custody"** – you need to take the alien into custody

6. Complete a **"Questionnaire and Worksheet"** (Form I-340A) to send with the demand notice for bonds posted by G&G when it serves as the agent for American Surety Company.

   a. Review the A-file to determine the alien's last known address (current address). Do not rely solely on the alien's address on the bond form as this address may be out of date. If you cannot tell which address is the most current, you may include more than one address on Form I-340A.

   b. Include a photograph of the alien on Form I-340A if a photograph is available.

   c. Review the A-file to determine whether additional charges were added to the Notice to Appear (Form I-261). If so, send a copy of Form I-261 to the surety and G&G with the demand notice. Complete the section of the Questionnaire and Worksheet that addresses amendments to the Notice to Appear.

   d. Send the Questionnaire and Worksheet to the surety and agent with the demand notice. Include copies of the Questionnaire and Worksheet in the A-file. Be sure to date the Questionnaire and Worksheet to establish it was sent with the demand notice of the same date.

7. Send all demand notices by **certified mail**. Either print or affix the certified mail receipt number on the bottom of the demand notice (I-340) & staple "white" certified mail receipt to the copy of the demand notice filed in the A-file. When the certified mail receipt ("greenie") is received confirming delivery to the obligor, staple the "greenie" to the demand notice in the A-File.

   **Note**: Most breach rescissions are required because of errors made in issuing demand notices.

If you have any questions, please ask your supervisor, BCS, or the BMU for additional guidance. An annotated copy of Form I-340 follows to show you how to fill out the form.

When "notice to both" box checked on bond form, send I-340 to surety & agent (avoid cc: on same document

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

Date & A#

45

# (Sample)

## NOTICE TO OBLIGOR TO DELIVER ALIEN
### Date:

☐ To Obligor
☐ To Alien

File Number:
Name(s) of Alien(s):

**Address of Obligor**

To Obligor:

Under the terms of the Delivery Bond you posted for the above alien(s), Immigration and Customs Enforcement (ICE) is making a demand upon you to deliver or cause to appear the above alien(s) at:

Date:   00/00/0000 ← **Date**

Place: ← **Place to report**

Time: ← **Time**

Purpose: ← **Proper Purpose**

**Warning:** Failure to deliver or cause the appearance of the alien(s) in accordance with this demand may result in A DECLARATION OF A BREACH OF BOND, its forfeiture to the government, and a warrant for the arrest of the alien may be issued.

**DHS official (mailer) Date/Method**

**FOD's Designee →**

Authorized DHS Official

**Name & Signature of**

### CERTIFICATE OF SERVICE

This notice was served on the obligor by me on _____, in the following manner.

☐  In person (Obligor, alien, attorney of record)
☐  By USPS certified mail, returned receipt requested (obligor)
☐  By USPS delivery confirmation (recommended for alien, attorney of record and additional copy to Obligor)
☐  Attached is a list of field offices and their contact information

Obligor/Individual personally served:

Signature: X _____

Authorized DHS Official
Printed Name: _____              Title: _____

Signature: X _____              Date: _____

ICE Form 1-340 (08/07)

## DEPARTMENT OF HOMELAND SECURITY

Staple "white" certified mail receipt and record certified mail number →

46

# (Sample)

U.S. Immigration and Customs Enforcement

## QUESTIONNAIRE AND WORKSHEET

Last Known Addres

This form is to be completed on the basis of information available to the surety company and mailed along with Form 1-340.

## ALIEN'S IDENTITY INFORMATION

A.  Name: (or any alias)
_____

B.  A#: _____

C.  Alien's last known address _____

D.  Photo (if there is a photograph of the alien, attach a copy to this form)

## CRIMINAL BACKGROUND/DETENTION

A.  Is there any evidence in the file to indicate that the alien has been detained by a penal, mental or other institution, subsequent to posting of bond:   ☐ Yes ☐ No If yes information:

(1)   Dates of detention:
_____

(2)   Identifying Information:

Detention Information

a.   State or Federal index:
_____

b.   CII#:
_____

c.   Court Booking #:
_____

d.   State Dept. Of Correction #:
_____

(3)   Was detainer (I-247) lodged with any agency:
Check   ☐ Yes ☐ No If no, explain why not
_____

Amended NTA

## MISCELLANEOUS ISSUES

A.  Has the original OSC/NTA been amended: Check   ☐ Yes ☐ No If yes, information:

(1) Was the obligor advised of the amended and/or additional charges:
☐ Yes ☐ No

(2) Date obligor was notified of amended OSC/NTA: _____

47

I certify as an Officer of ICE, that the information provided on this form was obtained from the alien's administrative file and is correct as of the date of review to the best of my knowledge.



Attach a copy of photo

AILA Doc. No. 16051730.  (Posted 6/7/16)
ICE 2016-ICLI-00005 77 of 488

## APPENDIX 14:   Re-sending Demand Notices Returned as Undeliverable

ICE must take **additional, reasonable steps** to deliver a demand notice to an obligor when a demand notice sent by certified mail is returned to sender as undeliverable. This is in accordance with the due process clause of the U.S. Constitution and a court of appeals ruling. *Echavarria v. Pitts*, 641 F.3d 92, 96 (5th Cir. 2011).

**When a demand notice is returned as undeliverable, take the following steps to try to deliver the demand notice to the bond obligor:**

1. Double check the A-file to make sure the demand notice was sent to the obligor's current address. Thoroughly review the A-file, BMIS, ENFORCE, USCIS, and any other relevant records to determine whether a **more current address** for the obligor can be found.

2. If you find a more recent address for the obligor, send a new demand notice with a new surrender date by **certified mail** to the obligor.

3. If you do not find a more recent address for the obligor, send another demand notice by **regular mail** with a new surrender date. This step is necessary because sometimes the obligor is at the same address, but fails to claim the certified mail.

4. In the **A-file**, place a copy of the envelope by which the regular mail was sent, the date the notice was sent, and who sent it.

5. If a **breach notice** was issued before you realized that the demand notice was not delivered, issue a breach rescission (MTR) and follow the steps above.

49

## APPENDIX 15:  Timing for Issuing Form I-323: *Notice — Immigration Bond Breached*

| Bond Type | Timing Requirement | How Breach Date Determined |
|---|---|---|
| All bonds covered by the Amwest agreements (Gonzales & Gonzales acting as an agent for Farwest, Amwest, or American Surety) | I-323 must be issued within 180 days of breach event | *Delivery bonds* — breach date is surrender date specified on Form I-340 *VD bonds* — breach date is 30th day after date by which alien was to depart |

*The following information applies to non Amwest signatories (all obligors except Farwest, Amwest, American Surety, and G&G):*

| Bond Form issued 03/08 | No 180-day requirement, but best practice is to promptly issue Form I-323 to assist collection efforts | *Delivery bonds* — breach date is surrender date specified on Form I-340 *VD bonds* — breach date is 30th day after date by which alien was to depart |
|---|---|---|
| Bond Form issued 4/13/04 (rarely, if ever used) | I-323 must be issued within 180 days of breach date | *Delivery bonds* — breach date is surrender date specified on Form I-340 *VD bonds* — breach date is 30th day after date by which alien was to depart |
| Bond Form issued 06/23/00 | I-323 must be issued within 180 days of breach date | *Delivery bonds* — breach date is surrender date specified on Form I-340 *VD bonds* — breach date is 30th day after date by which alien was to depart |
| Bond Form issued 12/08/99 | I-323 must be issued within 180 days of breach date | *Delivery bonds* — breach date is surrender date specified on Form I-340 *VD bonds* — breach date is 30th day after date by which alien was to depart |
| Bond Form issued 05/27/97 | I-323 must be issued within 180 days of breach date | Breach date is when obligor fails to produce alien as demanded or fails to comply with any other term of the bond |
| Bond Form issued 06/01/84 | No 180-day requirement | No mention of date when breach occurs |

50

## APPENDIX 16:   Breached Surety Bonds -- Referral to the ICE Chief Financial Officer for Collection
### (Sample)

The following claim is being referred to the ICE Chief Financial Officer for collection against:

[                                                                 ]
        obligor

for breach of immigration bond [                                        ]
                          A-Number

in the principal amount of [                              ] posted on [                        ]
              bond dollar mount                          date posted

posted for [                                 ] [                                          ].
         alien's first name                     alien's last name

Attached is a copy of a fully completed Form I-323, *Notice - Immigration Bond Breached*. The
information contained in Form I-323 is true and correct and is fully supported by copies of
valid, executed and delivered ICE documents and other memoranda as contained in the
alien's A-file including but not limited to the following:

- Form I-323 with evidence of mailing to obligor(s) checked on Part A of Form I-352 (not
  more than 180 days after the date of breach when required by terms of the bond form)
- Form I-352 with valid power of attorney attached
- Form I-340 with proof of mailing in accordance with the box checked on Part A of
  Form I-352, (e.g. Postal Service Form 3811 ("greenie") or website tracking form)

If Form I-340 was not sent within 60 days after the final order of removal, the delay was due
to one of the following reasons:

- Based on current BMU procedures, Form I-166 was not sent to bonded alien
- For aged bonds, Form I-166 was mailed to the alien no sooner than 3 days after
  service of Form 1-340
- The A-file contains no evidence that the alien was outside the United States on the
  delivery date
- The A-file contains no evidence that any of the conditions requiring cancelation of the
  bond listed in the General Terms and Conditions of Form 1-352 exist (e.g., death of
  the alien)

51

If the alien was surrendered by an obligor after the demand date specified on Form I-340 but within 90 days of that date, Form I-323 was annotated with the date the alien was surrendered and the percentage of mitigation to which the obligor is entitled.

If the bond was posted by Gonzales & Gonzales on behalf of American Surety, Amwest Surety, or FarWest Surety, the following additional requirements were met:

- Any amended notice to appear was sent to the obligors
- The A-file contains a properly completed "questionnaire & worksheet" containing the alien's photo and the alien's most current address, sent to the obligors with Form I-340
- Form I-340 lists a proper purpose (e.g., removal is not listed as the purpose for demanding the alien's appearance when the order of removal is not final)

The declaration of breach and the information contained in the foregoing forms comply with the most current Bond Management Procedures. Copies of the above forms or other A-file documents, including proof of occurrence or non-occurrence of an event, are available and will be furnished upon request.

I certify that the foregoing statements are true and correct. I further certify that the obligor's breach of the conditions of the bond caused the bond to be due and payable as a valid claim or debt owed to the United States.

Date: _____  Name: _____

_____         _____
Field Office Director                                          Field Office Location


Signature: _____         Bond Number: _____

*This memorandum is an internal operating document of ICE. It is not intended to and does not create any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States, its departments, agencies, or other entities; its officers or employees; or any other person.*

52

# APPENDIX 17:   Notice – Immigration Bond Breached (Delivery Bond) (Sample)

This example applies to a Delivery Bond

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

## NOTICE - IMMIGRATION BOND BREACHED

Date I-323 sent

| | |
|---|---|
| Breach Number | BWA-14828 |
| Alien File Number | 000 000 000 |
| Breach Notice Date | 06/22/2012 |

**IMMIGRATION BOND**

| | |
|---|---|
| Bond Type | ☐ Cash   ☐ U.S. bonds   ☒ Surety |
| Bond Post Date | 07/03/2007 |
| Bond Receipt No. | HOU-8-15692 |
| Amount | $10,000.00 |
| Alien's Name | Doe, Jane |

D
B FINANCIAL CASUALTY & SURETY, INC.
L 3131 Eastside, Suite 600
  Houston, TX  77098
G
O
R

Surrender date on Form I-340

Date of Demand Notice (Form I-340)

The condition of the above-described immigration bond having been violated by the above-named alien(s), it has been determined that said bond has been breached on __06/16/2010__ for the following reason:

☐ Demand was made upon you on __05/16/2010__ , to deliver the above-named alien(s) at __1717 Zoy St. Harlingen, TX__ . Your failure to deliver the above-named alien as directed constitutes a substantial violation of the conditions of the bond.

☐ On _____ the above-named alien was granted Voluntary Departure, requiring departure from the United States on or before _____ . You have failed to submit, within 30 days of the expiration of the voluntary departure period, valid proof that the alien departed the United States on or before the expiration of the voluntary departure period, which constitutes a substantial violation of the conditions of the bond.

☐ The above named alien failed to comply with the conditions of the above described order of supervision bond by a breach of the following condition(s) of the bond, to wit:

☐ The above named alien failed to comply with the conditions of the above described public charge bond by becoming a public charge, to wit:

☐ The above named alien failed to comply with the conditions of the above described maintenance of Status & Departure bond by a breach of the following condition(s) of the bond, to wit:

Any cash or U.S. bonds pledged as security for the above-described bond will be forfeited to the United States, or in the case of a Surety Bond, the surety invoiced for the full amount of the bond, if this decision is not appealed in accordance with the procedures described below.

You have a right to appeal this decision by completing the enclosed Form I-290B "Notice of Appeal" and filing the form together with the appropriate filing fee and a brief written statement setting forth the reasons and evidence supporting the appeal to the nearest Enforcement and Removal Office (for location information, go to http://www.ice.gov/contact/ero/index.htm) within 30 days from the date of this Notice. If no appeal is filed within the time allowed this decision is final.

| Authorized DHS Officer | | |
|---|---|---|
| (b)(6),(b)(7)(C) | Bond Control Specialist | (b)(6),(b)(7)(C) |
| Printed Name | Title | Signature |

ICE Form I-323 (7/11)   Page 1 of 1

6/22/10 - SENT BY REGULAR MAIL TO FIN. CAS (b)(6),(b)(7)(C)   Mailing Notation

53

## APPENDIX 18:   Notice – Immigration Bond Breached (Voluntary Departure Bond)

### (Sample)

This example applies to a *Voluntary Departure* bond

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

**NOTICE - IMMIGRATION BOND BREACHED**

Date I-323 sent

Breach Number SNA-14828

Alien File Number 000 000 000

Breach Notice Date 06/22/2010

**IMMIGRATION BOND**

O
B   FINANCIAL CASUALTY & SURETY INC.
L   3131 EASTSIDE, SUITE 600
I   HOUSTON TX 77098
G
O
R

Bond Type ☐ Cash   ☐ U.S. bonds   ☒ Surety

Bond Post Date 07/03/2007

Bond Receipt No. ROU-S-15892

Date of IJ's Order

Breach Date -
30th day after VD
date

Amount 310,000.00

Alien's Name Jane Doe

The condition of the above-described immigration bond having been violated by the above-named alien(s), it has been determined that said bond has been breached on    06/16/2010    for the following reason:

☐ Demand was made upon you on _____, to deliver the above-named alien(s) at _____.  Your failure to deliver the above-named alien as directed constitutes a substantial violation of the conditions of the bond.

☒ On    01/06/2010    the above-named alien was granted Voluntary Departure, requiring departure from the United States on or before    05/17/2010    You have failed to submit, within 30 days of the expiration of the voluntary departure period, valid proof that the alien departed the United States on or before the expiration of the voluntary departure period, which constitutes a substantial violation of the conditions of the bond.

VD Date

☐ The above named alien failed to comply with the conditions of the above described order of supervision bond by a breach of the following condition(s) of the bond, to wit:

☐ The above named alien failed to comply with the conditions of the above described public charge bond by becoming a public charge, to wit:

☐ The above named alien failed to comply with the conditions of the above described maintenance of Status & Departure bond by a breach of the following condition(s) of the bond, to wit:

Any cash or U.S. bonds pledged as security for the above-described bond will be forfeited to the United States, or in the case of a Surety Bond, the surety involved for the full amount of the bond, if this decision is not appealed in accordance with the procedures described below.

You have a right to appeal this decision by completing the enclosed Form I-290B "Notice of Appeal" and filing the form together with the appropriate filing fee and a brief written statement setting forth the reasons and evidence supporting the appeal to the nearest Detention and Removal Office (for location information, go to www.ice.gov/about/dro/contact.htm) within 30 days from the date of this Notice. If no appeal is filed within the time allowed this decision is final.

| Authorized DHS Officer (b)(6),(b)(7) | | (b)(6),(b)(7)(C) |
|---|---|---|
| | Bond Control Specialist | |
| Printed Name | Title | Signature |

6/22/10 - Sent by regular mail to Financial Casualty   (b)(6),(b)(7)(C)

ICE Form I-323 (08/07)

Mailing Notation

**AILA Doc. No. 16051730.  (Posted 6/7/16)**
ICE 2016-ICLI-00005 83 of 488

## APPENDIX 19:   Notice – Immigration Bond Breached (Order of Supervision Bond)

### (Sample)

This example applies to
a *Order of Supervision*
Bond

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

NOTICE - IMMIGRATION BOND BREACHED

Date I-323 sent

| | |
|---|---|
| Breach Number SNA-14828 | |
| Alien File Number 000 000 000 | |
| Breach Notice Date 06/22/2010 | |
| **IMMIGRATION BOND** | |
| Bond Type ☐ Cash   ☐ U.S. bonds   ☒ Surety | |
| Bond Post Date 07/03/2007 | |
| Bond Receipt No. HOU-8-15892 | |
| Amount $10,000.00 | |
| Alien's Name Doe,  Jane | |

O
B   FINANCIAL CASUALTY & SURETY
L   3131 Eastside, Suite 600
I   Houston, TX 77098
G
O
R

Breach Date -
Day the OSUP
was violated

The condition of the above-described immigration bond has been violated by the above-named alien(s), it
has been determined that said bond has been breached on ___05/16/2010___ for the following reason:

☐ Demand was made upon you on _____, to deliver the above-named alien(s) at
_____. Your failure to deliver the above-named alien as directed
constitutes a substantial violation of the conditions of the bond.

☐ On _____ the above-named alien was granted Voluntary Departure, requiring departure
from the United States on or before _____. You have failed to submit, within 30 days
of the expiration of the voluntary departure period, valid proof that the alien departed the United States
on or before the expiration of the voluntary departure period, which constitutes a substantial violation of
the conditions of the bond.

☒ The above named alien failed to comply with the conditions of the above described order of
supervision bond by a breach of the following condition(s) of the bond, to wit:
Did not remain within State of Texas as required by OSUP para. 1.3

Note the specific
act that violated
OSUP

☐ The above named alien failed to comply with the conditions of the above described public charge
bond by becoming a public charge, to wit:

☐ The above named alien failed to comply with the conditions of the above described maintenance of
Status & Departure bond by a breach of the following condition(s) of the bond, to wit:

Any cash or U.S. bonds pledged as security for the above-described bond will be forfeited to the United States, or
in the case of a Surety Bond, the surety invoiced for the full amount of the bond, if this decision is not appealed in
accordance with the procedures described below.

You have a right to appeal this decision by completing the enclosed Form I-290B "Notice of Appeal" and filing
the form together with the appropriate filing fee and a brief written statement setting forth the reasons and
evidence supporting the appeal to the nearest Enforcement and Removal Office (for location information, go to
http://www.ice.gov/contact/ero/index.htm) within 30 days from the date of this Notice. If no appeal is filed within
the time allowed this decision is final.

| Authorized DHS Officer | | (b)(6),(b)(7)(C) |
|---|---|---|
| (b)(6),(b)(7)(C) | Bond Control Specialist | |
| ~~~~~~~Name~~~~~~~ | Title | Signature |

ICE Form I-323 (7/11)                                                            Page 1 of 1

6/22/10 · SENT BY REGULAR MAIL TO FIN. CAS.   (b)(6),(b)(7)(C)

Mailing Notation

AILA Doc. No. 16051730.  (Posted 6/7/16)
ICE 2016-ICLI-00005 84 of 488

55

# APPENDIX 20:   Notice of Bond Breach Reconsideration Decision (Sample)

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

**NOTICE OF BOND BREACH RECONSIDERATION DECISION**

**Alien's Name:** _____  **A-File Number:** _____

**Date:** _____

**Surety/Obligor Name and Address**                    **Co-Obligor Name and Address**

The ICE Field Office Director on his/her own motion or at the request of the bond obligor has reconsidered the decision declaring the bond breached because

☐   the decision was based upon an incorrect application of law or policy, or

☐   the decision was based upon an incorrect assessment of available evidence; or

☐   the available evidence has been supplemented by new facts.

Explanation:

_____

_____

In accordance with 8 C.F.R 103.5(a)(5)(i), the motion to reopen or reconsider is granted. The decision declaring the bond breached on form I-323 is rescinded and:

The bond is:

☐   Reinstated – The original bond is still in effect.

☐   Cancelled – A form (I-391) is attached cancelling the bond.

**BREACHED BOND:**

Surety/Obligor Name: _____

Agent/Co-Obligor Name:

Bond #: _____

Date Bond Posted:

Breach #: _____

Declaration of Breach Date:

A copy of this decision was served on the above addressees by regular mail on the above date.

_____   _____   _____
(Printed Name of Field Office Director)     (Signature of Field Office Director)          (Office)

ICE Form 71-042 (2/13)                                                                    Page 1 of 1

56

**AILA Doc. No. 16051730. (Posted 6/7/16)**
ICE 2016-ICLI-00005 85 of 488

# APPENDIX 21:  Notice of Appeal or Motion and Instructions (Form I-290B)

## SAMPLE



**Notice of Appeal or Motion**

Department of Homeland Security
U.S. Citizenship and Immigration Services

USCIS
Form I-290B
OMB No. 1615-0095
Expires 01/31/2017

| For USCIS Use Only | | Receipt | Remark: |
|---|---|---|---|
| Returned | RFE/C Sent | | |
| Date _____ | Date _____ | | |
| Date _____ | Date _____ | | |
| Resubmitted | RFE/C Rec'd | | |
| Date _____ | Date _____ | | |
| Date _____ | Date _____ | | |

Please see the USCIS Web site at www.uscis.gov/I-290B to view appeal and/or motion eligibility by form type.

▶ START HERE - Type or print in black ink.

**Part 1.  Information About Petitioner/Applicant**

1.a. Family Name
(Last Name)

1.b. Given Name
(First Name)

1.c. Middle Name

2.   Complete Name of Business/Organization (if applicable)

3.   Alien Registration Number (A-Number) (if applicable)
     ▶ A-

4.   Receipt Number

5.   USCIS ELIS Account Number (if any)

*Mailing Address (or Military APO/FPO Address, if applicable)*

6.a. In Care Of Name

6.b. Street Number and Name

6.c. Apt.    Ste.    Flr.

6.d. City or Town

6.e. State    6.f. ZIP Code

6.g. Postal Code

6.h. Province

6.i. Country

**Part 1.  Information About Petitioner/Applicant**

*Contact Information*

7.   Daytime Telephone Number (Area or Country Code)    Extension

8.   Mobile Telephone Number (if any)

9.   E-mail Address (if any)

10.  Fax Number (if any)

**Part 2.  Information About Person/Organization Filing Appeal or Motion on Behalf of Petitioner/Applicant**

*(Attorney, or Board of Immigration Appeals (BIA) Accredited Representative filing appeal or motion on behalf of the petitioner/applicant)*

If you are the petitioner or applicant filing an appeal or motion without an attorney or representative accredited by the BIA, skip this part, and proceed to **Part 3**.

1.  ☐  I am an attorney or representative accredited by the BIA. (If you check this box, you **must** attach a new Form G-28, Notice of Entry of Appearance as Attorney or Representative, signed by the attorney or representative named on Form G-28.)

2.a. Family Name
(Last Name)

2.b. Given Name
(First Name)

2.c. Middle Name

3.   Complete Name of Business/Organization (if applicable)

Form I-290B  01/23/14  N

Page 1 of 2

AILA Doc. No. 16051730.  (Posted 6/7/16)
ICE 2016-ICLI-00005 86 of 488

# Notice of Appeal or Motion and Instructions (Form I-290B)

## SAMPLE

### Part 2.  Information About Person, Organization Filing Appeal or Motion on Behalf of Petitioner/Applicant

4. Daytime Telephone Number          Extension

(    )

5. Mobile Telephone Number *(if any)*

(    )

6. E-mail Address *(if any)*

7. Fax Number *(if any)*

(    )

### Part 3.  Information About the Appeal or Motion

You must check only one box indicating that you are filing an appeal or a motion, not both. **If more than one box is selected, your filing will be rejected.**

(DO NOT use this form if you are filing an appeal of a denial or a revocation of an approved Form I-130 (Petition for Alien Relative), or a Petition for Widow(er) filed on a Form I-360. Those appeals must be filed with the Board of Immigration Appeals (BIA) using Form EOIR-29.

1. **Appeal**

   a. ☐ I am filing an appeal to the Administrative Appeals Office (AAO). My brief and/or additional evidence is attached.

   b. ☐ I am filing an appeal to the AAO. My brief and/or additional evidence will be submitted to the AAO within 30 calendar days of filing the appeal.

   c. ☐ I am filing an appeal to the AAO. No supplemental brief and/or additional evidence will be submitted.

2. **Motion**

   d. ☐ I am filing a **motion to reopen** a decision. My brief and/or additional evidence is attached.

   e. ☐ I am filing a **motion to reconsider** a decision. My brief is attached.

   f. ☐ I am filing a **motion to reopen and a motion to reconsider** a decision. My brief and/or additional evidence is attached.

3. USCIS Form for Which You Are Filing an Appeal or Motion to Reopen/Reconsider *(e.g. I-140, I-360, I-129, I-485, I-601, etc.)*    ▼

### Part 3.  Information About the Appeal or Motion

4. Specific Classification Requested *(e.g. H-1B, P-1, O-1, EB-1, EB-2, EB-3, etc., if applicable)*    ▼

5. Date of Adverse Decision

   *(mm/dd/yyyy)*  ▶

6. USCIS Office Where Last Decision Issued

    ▼

### Part 4.  Basis for the Appeal or Motion

On a separate sheet of paper, **you must provide a statement** regarding the basis for the appeal or motion. You must include your name and A-Number or USCIS ELIS Account Number on the top of each sheet.

**Appeal:** Provide a statement that specifically identifies an erroneous conclusion of law or fact in the decision being appealed.

**Motion to Reopen:** The motion must state new facts and must be supported by affidavits and/or documentary evidence that establish eligibility at the time the underlying petition or application was filed.

**Motion to Reconsider:** The motion must be supported by citations to appropriate statutes, regulations, or precedent decisions and must establish that the decision was based on an incorrect application of law or policy, and that the decision was incorrect based on the evidence of record at the time of decision.

### Part 5.  Signature of Person Filing the Appeal/Motion or His or Her Authorized Representative

**By signing below: I certify under penalty of perjury under the laws of the United States of America that the information provided on this form and the documents submitted in support are true and correct.**

1.a. Signature

1.b. Family Name *(Last Name)*

1.c. Given Name *(First Name)*

1.d. Date of Signature *(mm/dd/yyyy)*  ▶

NOTE: Make sure your appeal or motion is complete before filing.

Form I-290B  01/23/14  N                                                Page 2 of 2

58

# Notice of Appeal or Motion and Instructions (Form I-290B)

# SAMPLE



**Instructions for Notice of Appeal or Motion**

Department of Homeland Security
U.S. Citizenship and Immigration Services

USCIS
Form I-290B
OMB No. 1615-0095
Expires 01/31/2017

## What Is the Purpose of Form I-290B?

Form I-290B, Notice of Appeal or Motion, is used to file an appeal or motion to reopen or reconsider certain decisions under the immigration laws.

## When Should I Use Form I-290B?

Visit the U.S. Citizenship and Immigration Services (USCIS) Web site at www.uscis.gov/I-290B to view appeal and motion eligibility by form type.

For most appeals and motions, Form I-290B must be filed within 30 calendar days after personal service of the decision, 33 calendar days if the decision was mailed. An appeal relating to a revocation of an immigrant petition must be filed within 15 calendar days after personal service of the decision, 18 calendar days if the decision was mailed. The date of service is normally the date of the decision.

Late filed appeals that do not meet the requirements for a motion to reopen or reconsider will be rejected. Late filed motions may be dismissed, however, a late filed motion to reopen may be excused in the discretion of USCIS where it is demonstrated that the delay was reasonable and beyond the applicant's petitioner's control.

Form I-290B may be used in the following circumstances:

1. To file an appeal with the Administrative Appeals Office (AAO); or
2. To file a motion to reconsider a decision (i.e., the AAO, a field office or service center); and/or
3. To file a motion to reopen a decision (i.e., the AAO, a field office or service center), including decisions under the Northwest Immigrant Rights Project (NWIRP) Settlement, or the Special Immigrant Juvenile (SIJ) *Perez-Olano* Settlement Agreement (POSA).

## Who May Not File Form I-290B?

1. Per DHS regulations, the **beneficiary** of a visa petition that is denied or revoked by USCIS MAY NOT file an appeal or a motion of that visa petition. Only a petitioner or applicant may file an appeal or motion. Similarly, an attorney or Board of Immigration Appeals (BIA)-accredited representative MAY NOT file an appeal or motion on the behalf of a **beneficiary**.

2. A petitioner whose Petition for Alien Relative (Form I-130) or Petition for Widow(er) filed on Form I-360 was denied or was revoked by USCIS MAY NOT use Form I-290B to file an appeal with the BIA. Instead, the petitioner or the petitioner's attorney or BIA-accredited representative must file Form EOIR-29 in accordance with the instructions included in the denial or notice of revocation.

   For filing instructions of Form EOIR-29, visit the USCIS Web site at www.uscis.gov/eoir-29 or the Department of Justice Web site at www.justice.gov/eoir/forms/eoir29.pdf

3. Do not use this form to file an appeal or motion for a Form I-601A (Provisional Unlawful Presence Waiver) or Form I-821D (Consideration of Deferred Action for Childhood Arrivals) denial. There are no appeal or motion rights for Form I-601A or Form I-821D.

4. Do not use this form to appeal a Department of State overseas consular officer's denial of your visa application (i.e., DS-156, DS-156E, DS-156K, DS-217, DS-157, DS-230, or DS-260). For information about visa application denials, please reference the Department of State Web site.

5. Do not use this form to file an appeal on a Special Agricultural Worker (SAW) or Legalization Application. Appeals on these case types must be filed on Form I-694, Notice of Appeal of Decision under Sections 245A or 210 of the Immigration and Nationality Act.

59

AILA Doc. No. 16051730.  (Posted 6/7/16)
ICE 2016-ICLI-00005 88 of 488

# Notice of Appeal or Motion and Instructions (Form I-290B)

## SAMPLE

---

**General Instructions**

Each appeal or motion form must be properly signed, filed and accompanied by the appropriate filing fee. An appeal or motion is not considered properly filed until it is accepted by USCIS.

**Evidence**

**Motion**

(a) If you file a motion to reopen, the motion must be accompanied by new facts and/or documentary evidence that establish eligibility at the time of filing the initial petition or application.

(b) If you file a motion to reconsider, you must provide the citations to the statute, regulation, or precedent decisions that serve(s) as the basis for your motion to reconsider. The motion must establish that the decision was based on an incorrect application of law or policy, and that the decision was incorrect based on the evidence of record at the time of the decision.

(c) No additional time will be permitted to submit supplementary arguments or evidence in support of a motion to reopen or reconsider after the Form I-290B has been filed.

**Appeals:**

1. **Brief**

You do not need to submit a brief in support of your appeal. If you do submit a brief and/or additional evidence, you may submit these materials at the time of initial filing of Form I-290B or within 30 days of filing.

Any brief and/or additional evidence submitted after the initial filing of Form I-290B must be submitted directly to the AAO at the following address:

> USCIS Administrative Appeals Office
> U.S. Citizenship and Immigration Services
> 20 Massachusetts Avenue, NW, MS2090
> Washington, DC 20529-2090

Any brief and additional evidence must specifically reference the appeal for which it is being submitted. If an affected party has filed multiple appeals with the AAO, separate copies of the brief and evidence must be provided for each individual appeal. Failure to do so may result in the return of the brief or evidence to the individual or entity that submitted it and preclude such material from consideration.

If you need more than 30 calendar days to submit a brief, you must make a written request to the AAO within 30 calendar days of filing the appeal. The AAO may grant more time to submit a brief for good cause.

2. **Oral Argument**

You may request an oral argument before the AAO in Washington, D.C. in a letter attached to Form I-290B. The letter must explain specifically why an oral argument is necessary (i.e., why your argument cannot be adequately addressed in writing). If your request is granted, the AAO will contact you about setting the date and time. The U.S. Government does not furnish interpreters for oral arguments.

**Copies.** Unless specifically required that an original document be filed with an appeal or motion, a legible photocopy may be submitted. Original documents submitted when not required may remain a part of the record, and will not be automatically returned to you.

**Translation.** Any document submitted to USCIS with information in a foreign language must be accompanied by a full English language translation. The translator must certify that the English language translation is complete and accurate, and that he or she is competent to translate from the foreign language into English.

# Notice of Appeal or Motion and Instructions (Form I-290B)

# SAMPLE

---

How to Fill Out Form I-290B

1. Type or print legibly in black ink.

2. If extra space is needed to complete any item, attach a continuation sheet, indicate the name and Alien Registration Number (A-Number) of the petitioner applicant, USCIS Electronic Immigration System Account Identifier Number (USCIS ELIS Number), if electronically filed, the Receipt Number of the underlying petition or application, the Item Number to which your answer refers, and date and sign each sheet.

3. Answer all questions fully and accurately. If an item is not applicable, leave it blank.

4. Do not make any changes or amendments to the form. Failure to properly fill out and sign the form will result in a rejection.

---

**Specific Instructions**

Form I-290B is divided into Parts 1 through 5. The following information should help you fill out the form.

**Part 1. Information About Petitioner/Applicant**

Provide information about the individual upon whose behalf the appeal or motion is being filed.

**Item Numbers 1.a. - 1.c.  Full Name**
Provide the full legal name of the petitioner applicant. If the petitioner applicant has two last names, include both and use a hyphen (-) between the names, if appropriate.

**Item Number 2.  Complete Name of Business/Organization, if applicable**
Provide the complete name of the business or organization, without abbreviations, if applicable.

**Item Number 3.  Alien Registration Number (A-Number)**
This is the USCIS (or Immigration and Naturalization Service (INS)) file number. It begins with an "A" and can be found on a Permanent Resident Card or on correspondence that has been received from the Department of Homeland Security (DHS) or USCIS. If the person does not have an A-Number, leave this blank.

**Item Number 4.  Receipt Number**
Provide the form receipt number for the petition or application that was denied by USCIS (e.g., EAC, SRC, NSC, NBC (MSC), WAC XXXXXXXXXXX).

**Item Number 5.  USCIS ELIS Account Number** *(if any)*
If you have previously filed a benefit request using the USCIS ELIS, provide the USCIS ELIS Account Number you were issued by the system in the space provided. The USCIS ELIS Account Number is not the same as an Alien Registration Number (A-Number). If you do not have an ELIS account, leave this blank.

**Item Numbers 6.a. - 6.i.  Mailing Address**
Provide the petitioner applicant's complete mailing address (including military APO/FPO address if applicable).

**Item Number 7.  Daytime Telephone Number** *(Country or Area Code)*
Provide a telephone number with area code and extension (if any) where you can be reached during the day. If you reside within the United States, provide an area code. If you reside outside the United States, provide a country code.

**Item Number 8.  Mobile Telephone Number, if any**
Provide a mobile telephone number with area code.

**Item Number 9.  E-mail Address, if any**
Provide the petitioner applicant's E-mail address.

**Item Number 10. Fax Number, if any**
Provide a fax number with area code.

Form I-290B Instructions  01 23 14  N    Page 3 of 8

61

# Notice of Appeal or Motion and Instructions (Form I-290B)

# SAMPLE

**Part 2. Information About Person Organization Filing Appeal or Motion on Behalf of Petitioner Applicant**

If you are the petitioner or applicant filing an appeal or motion without an attorney or representative accredited by the BIA, skip this part, and proceed to Part 3.

**NOTE:** The Form G-28 must be properly completed with new dates and be properly signed by the petitioner or applicant and attorney or BIA-accredited representative. If the petitioner or applicant wishes, he or she may be represented at no expense to the U.S. Government by an attorney or BIA-accredited representative. If the appeal or motion is filed by an attorney or a BIA-accredited representative without a properly executed Form G-28, it may be rejected or dismissed.

Provide information about the individual or the organization filing the appeal or motion on behalf of the petitioner or applicant.

### Item Number 1. Attorney or BIA-Accredited Representative

If you are an attorney or a BIA-accredited representative, you must check the box and attach a new Form G-28 even if you submitted a Form G-28 with the underlying petition application.

### Item Numbers 2.a. - 2.c. Full Name

Provide your full legal name. If you have two last names, include both and use a hyphen (-) between the names, if appropriate.

### Item Number 3. Complete Name of Business/Organization, if applicable

Provide the complete name of your business or organization, without abbreviations, if applicable.

### Item Number 4. Daytime Telephone Number

Provide a telephone number with area code and extension (if any) where you can be reached during the day.

### Item Number 5. Mobile Telephone Number, if any

Provide your mobile telephone number with area code.

### Item Number 6. E-mail Address, if any

Provide your E-mail address.

### Item Number 7. Fax Number, if any

Provide a fax number with area code.

## Part 3. Information About the Appeal or Motion

Provide the following information.

### Item Numbers 1 and 2. Appeal or Motion Request *(Select only one box)*

Check a single box from items 1.a. - 1.f. Do not check more than one box or make any changes to the form.

You must clearly indicate if you are filing an appeal or a motion. The adverse decision will indicate whether you may file an appeal or a motion. Although the adverse decision may indicate that you can file an appeal and a motion, you can only file one or the other using a single Form I-290B. The requirements for motions to reopen and motions to reconsider are located at 8 CFR 103.5. If you file an appeal, the reviewing office will either take favorable action or forward the appeal to the AAO. See 8 CFR 103.3. The reviewing office is the USCIS office that denied the petition or application.

**NOTE:** An adverse decision from the AAO may not be further appealed to the AAO. However, you may file a motion to reopen and/or reconsider an AAO decision to the AAO.

### Item Number 3. Form for Which You Are Filing an Appeal, or Motion to Reopen/Reconsider

Provide the form number for the denied petition or application (e.g., Form I-140, Form I-360, Form I-129, Form I-485, Form I-601, etc.). If you use the dropdown menu and the form number is not listed, select "other" in the dropdown menu.

62

AILA Doc. No. 16051730.  (Posted 6/7/16)
ICE 2016-ICLI-00005 91 of 488

# Notice of Appeal or Motion and Instructions (Form I-290B)

## SAMPLE

**Item Number 4. Specific Classification Requested**

Provide the specific classification requested (e.g., H-1B, R-1, O-1, EB-1, EB-2, EB-3, etc., if applicable.) If you use the dropdown menu and the status is not listed, select "other" in the dropdown menu.

**Item Number 5. Date of Adverse Decision**

Provide the date of the decision that is the basis for your appeal or motion.

**Item Number 6. USCIS Office Where Last Decision Was Issued**

Provide the name of the office that denied or revoked the petition or application. If you are filing a motion on an adverse AAO decision, the correct office is "Administrative Appeals Office (AAO)." If you are using the dropdown menu and the office name is not listed, select "other" in the drop down menu.

**Part 4. Basis for the Appeal or Motion**

Write the basis for the appeal or motion on a separate sheet of paper. You must provide your name and A-Number or USCIS ELIS Account Number on the top of each sheet.

**Appeal:** Provide a statement that specifically identifies an erroneous conclusion of law or fact in the decision being appealed.

**Motion to Reopen:** The motion must state new facts and must be supported by affidavits and/or documentary evidence demonstrating eligibility at the time the underlying petition or application was filed.

**Motion to Reconsider:** The motion must be supported by citations to appropriate statutes, regulations, or precedent decisions when filed and must establish that the decision was based on an incorrect application of law or policy, and that the decision was incorrect based on the evidence of record at the time of decision.

**Part 5. Signature of Person Filing the Appeal, Motion or His or Her Authorized Representative**

You or your legal representative must sign and date Form I-290B. Form G-28, Notice of Entry of Appearance as Attorney or Representative, must be attached if Form I-290B is signed by an attorney or accredited representative.

---

| **What Is the Filing Fee?** |
| --- |

The filing fee for Form I-290B is $630. The fee will not be refunded, regardless of the action taken in your case.

Use the following guidelines when you prepare your check or money order for the Form I-290B fee:

1. The check or money order must be drawn on a bank or other financial institution located in the United States and must be payable in U.S. currency; and

2. Make the check or money order payable to U.S. Department of Homeland Security.

   NOTE: Spell out U.S. Department of Homeland Security; do not use the initials "USDHS" or "DHS."

3. If you live outside the United States, contact the nearest U.S. consulate or embassy for instructions on the method of payment.

**Notice to Those Making Payment by Check**

If you send us a check, it will be converted into an electronic funds transfer (EFT). This means we will copy your check and use the account information on it to electronically debit your account for the amount of the check. The debit from your account will usually take 24 hours, and will be shown on your regular account statement.

You will not receive your original check back. We will destroy your original check, but we will keep a copy of it. If the EFT cannot be processed for technical reasons, you authorize us to process the copy in place of your original check. If the EFT cannot be completed because of insufficient funds, we may try to make the transfer up to two times.

63

AILA Doc. No. 16051730.  (Posted 6/7/16)
ICE 2016-ICLI-00005 92 of 488

# Notice of Appeal or Motion and Instructions (Form I-290B)

## SAMPLE

### How to Check If the Fees Are Correct

The Form I-290B filing fee is current as of the edition date appearing in the lower left corner of this page. However, because USCIS fees change periodically, you can verify if the fees are correct by following one of the steps below.

1. Visit the USCIS Web site at www.uscis.gov, select "FORMS" and check the appropriate fee; or

2. Call the USCIS National Customer Service Center at 1-800-375-5283 and ask for fee information. For TDD (deaf or hard of hearing) call 1-800-767-1833

NOTE: The fee will be the same when either an appeal or motion is filed from the denial of a petition or application with one or multiple beneficiaries, provided that they are all covered by the same petition and therefore, the same decision.

For additional information on fees, fee waivers, and refunds, visit the USCIS Web site at www.uscis.gov

### Fee Waiver

The fee for Form I-290B may be waived under 8 CFR 103.7(c) if the applicant can show an inability to pay and:

1. The appeal or motion is from a denial of an immigration benefit request where the applicant or petitioner was not required to pay a fee; or

2. The fee for the underlying application or petition could have been waived.

If you believe you are eligible for a fee waiver, complete Form I-912, Request for Fee Waiver, (or a written request that complies with 8 CFR 103.7(c)), and submit it and the required evidence of your inability to pay the form fee with this form. You can review the fee waiver guidance at www.uscis.gov.

No fee is required when Form I-290B is filed to appeal a denial of a petition for a special immigrant visa by a Special Immigrant Iraqi or Afghan national who worked for or on behalf of the U.S. Government in Iraq or Afghanistan.

### Where to File?

File the appeal or motion as indicated on the USCIS Web page Direct Filing Addresses for Form I-290B, Notice of Appeal or Motion at www.uscis.gov/i-290b-addresses.

Form I-290B is not considered received by USCIS unless filed at the proper location.

If you are filing a motion to reopen/reconsider an AAO decision, file the motion with the address as indicated on the chart located at www.uscis.gov/i-290b-addresses

DO NOT FILE FORM I-290B DIRECTLY WITH THE AAO. Your form will be rejected if you improperly file it.

See the USCIS Web site at www.uscis.gov/I-290B or call the USCIS National Customer Service Center at 1-800-375-5283 for the most current information about where to file this benefit request. For TDD (deaf or hard of hearing) call 1-800-767-1833

### Address Changes

You must inform USCIS of any change of address on Form AR-11 within 10 days of such a move. For information on filing a change of address on Form AR-11 visit the USCIS Web site at www.uscis.gov/AR-11 or contact the USCIS National Customer Service Center at 1-800-375-5283. For TDD (deaf or hard of hearing) call 1-800-767-1833

NOTE: Do not submit a change of address request to the USCIS Lockbox facilities because the USCIS Lockbox facilities do not process change of address requests

AILA Doc. No. 16051730.  (Posted 6/7/16)
ICE 2016-ICLI-00005 93 of 488

# Notice of Appeal or Motion and Instructions (Form I-290B)

## SAMPLE

If you change your address while your appeal is pending, you should also send a written notice of your change of address to the AAO to ensure that you receive the decision. Include the type of case that was denied and any available tracking number (receipt number and/or A-Number).

Mail the notice to:

> USCIS Administrative Appeals Office
> U.S. Citizenship and Immigration Services
> 20 Massachusetts Avenue, NW, MS2090
> Washington, DC 20529-2090

If you change your address after you file a motion, the address where you should send your notice depends on where your motion is pending. If your motion has been forwarded to the AAO, send a written notice of your change of address to the address above. If your motion has remained with the office where you submitted it, send the notice to that office. Include the type of case that was denied and any available tracking number (receipt number and/or A-Number).

To find out where you case is currently located, call the USCIS National Customer Service Center number at 1-800-375-5283. For TDD (deaf or hard of hearing) call 1-800-767-1833.

To find out the status of your case, visit the USCIS Web site at https://egov.uscis.gov/cris/Dashboard/CaseStatus.do

## Processing Information

An appeal or motion that is not signed or is not accompanied by the proper fee will be dismissed or rejected with a notice that the appeal or motion is deficient. If time permits, you may correct the deficiency and resubmit the appeal or motion.

Once the appeal or motion is accepted, it will be reviewed. If you do not have any standing to file the appeal or motion, or if the decision is not appealable, the appeal or motion will be dismissed or rejected without further review. Further, late filed appeals that do not meet the requirements of a motion to reopen or reconsider will be rejected. Late filed motions may be dismissed.

**Decision.** You will be notified in writing of any action taken on your appeal or motion.

## USCIS Forms and Information

To ensure you are using the latest version of this form, visit the USCIS Web site at www.uscis.gov where you can obtain the latest USCIS forms and immigration-related information. If you do not have internet access, you may order USCIS forms by calling our toll-free number at 1-800-870-3676. You may also obtain forms and information by calling our USCIS National customer Service Center at 1-800-375-5283. For TDD (deaf or hard of hearing) call 1-800-767-1833.

As an alternative to waiting in line for assistance at your local USCIS office, you can now schedule an appointment through the USCIS Internet-based system, **InfoPass** (infopass.uscis.gov). To access the system, visit the USCIS Web site. Use the InfoPass appointment scheduler and follow the screen prompts to set up your appointment. **InfoPass** generates an electronic appointment notice that appears on the screen.

## Penalties

If you knowingly and willfully falsify or conceal a material fact or submit a false document with your Form I-290B, we will deny your Form I-290B, and may deny any other immigration benefit.

In addition, you will face severe penalties provided by law, and may be subject to criminal prosecution.

**AILA Doc. No. 16051730.  (Posted 6/7/16)**
ICE 2016-ICLI-00005 94 of 488

# Notice of Appeal or Motion and Instructions (Form I-290B)

# SAMPLE

---

**USCIS Privacy Act Statement**

**AUTHORITIES:** 8 CFR Sections 103.3 and 103.5 authorize USCIS to collect the information and the associated evidence on this benefit application

**PURPOSE:** USCIS will use the information you provide on this form to adjudicate appeals or motions on decisions under immigration laws, except for appeals of Form I-130, Petition for Alien Relative and Form I-360, Petition for Amerasian, Widow(er), or special Immigrant, (widow(er) only) denials in which the Board of Immigration Appeals (BIA) has appellate jurisdiction. The information you provide will be used to make a determination on an appeal or a request for a motion

**DISCLOSURE:** The information you provide is voluntary. However, failure to provide the requested information, and any requested evidence, may delay a final decision or result in denial of your appeal or motion.

**ROUTINE USES:** The information you provide on this benefit application may be shared with other Federal, State, local, and foreign government agencies and authorized organizations in accordance with approved routine uses, as described in the associated published system of records notices **DHS/USCIS-001 – Alien File, Index, and National File Tracking System of Records, DHS-USCIS-007 – Benefits Information System and DHS-USCIS-015 – Electronic Immigration System-2 Account and Case Management System of Records** which can be found at www.dhs.gov/privacy. The information may also be made available, as appropriate for law enforcement purposes or in the interest of national security

---

**Paperwork Reduction Act**

An agency may not conduct or sponsor an information collection and a person is not required to respond to a collection of information unless it displays a currently valid OMB control number. The public reporting burden for this collection of information is estimated at 90 minutes per response, including the time for reviewing instructions and completing and submitting the form and 80 minutes for the electronic submission of this request. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to U.S. Citizenship and Immigration Services, Regulatory Coordination Division, Office of Policy and Strategy, 20 Massachusetts Ave., NW, Washington, DC 20529-2140, OMB No. 1615-0095. **Do not mail your completed Form I-290B to this address.**

66

AILA Doc. No. 16051730.  (Posted 6/7/16)
ICE 2016-ICLI-00005 95 of 488

## APPENDIX 22: Record of Proceeding (ROP) for Breached Bond Appeals

When a bond obligor appeals a bond breach determination to the AAO, the Field Office assembles the **ROP** and forwards it to the AAO for review and decision.

The USCIS Adjudicator's Field Manual, Chapter 10.8(a)(3), Preparing the Appellate Case Record, requires (at a minimum) the following documents to be included in the ROP:

- G-28 Notice of Appearance (submitted with appeal if attorney is representing bond obligor)
- I-290B Notice of Appeal Form (with any brief & other attachments)
- Form I-323 Breach Notice
- Form I-166 (if any)
- Form I-340 Demand Notice
- U.S. Postal Service Form 3811, confirming delivery of the Form I-340 or printout of delivery confirmation from the USPS.com website
- Questionnaire and Worksheet (if in the A-file – not always required)
- Power of Attorney for surety bonds, or Form I-305 for cash bonds
- Form I-352 Immigration Bond
- Appellate decision of the Board of Immigration Appeals (if appeal taken)
- Final Order of the Immigration Judge
- Form I-862 Notice to Appear

The ROP is the administrative record for bond breach appeals. Therefore, also send to the AAO any other documents in the A-File that are relevant to the bond or the breach determination, such as the Form I-286 Notice of Custody Determination, any Petition for Review (PFR) filed with a U.S. Court of Appeals, and any documents showing the alien's last known address (for a bond posted by G&G). You should include in the administrative record any documents that you reviewed or considered when issuing the breach determination.

67

# Bond Appeal Process



68

## APPENDIX 23:  Best Practice Regarding Use of Form I-166

### I.  Best Practice

ERO uses Form I-166, Notice to Deportable Alien, to notify aliens of the date scheduled for their removal and to provide information about how much luggage they may carry and other details of the removal process. **As a result of court rulings, the best practice is not to send Form I-166 to bonded aliens because doing so may invalidate a later breach determination**. Although it is permissible under the terms of the bond contracts and the Amwest settlement agreements to send Form I-166 to the alien after waiting three days once a demand notice has been sent to the bond obligors, the best practice is **not** to send Form I-166 to any alien who was released on a delivery bond.

This guidance applies to bonds which have already been breached since it remains possible that a breach may be rescinded. If a deportation officer determines that there is a need to send Form I-166 to a bonded alien in any particular case, guidance should be sought from the BMU. A field office has discretion to send Form I-166 to a previously bonded alien without consulting the BMU only when the bond already has been canceled.

**Note:**  Regulatory changes are under consideration which, if approved, would make it clear that an alien who is ordered removed has an affirmative obligation to surrender even if not served with Form I-166. If this draft regulation receives final ICE approval, it will be submitted for review to DHS Headquarters and OMB and may thereafter be subject to a public comment process.

### II. Rationale Supporting Best Practice – the "Three-Day Rule"

The "Three-Day Rule" states that ICE may **not** send Form I-166 to an alien unless it has waited at least three days after having sent a demand notice to the bond obligors. The purpose of this rule was to give the bond obligors an opportunity to locate the alien before the alien might abscond upon receipt of Form I-166. While it is debatable whether receipt of Form I-166 actually causes aliens to "run," the Three-Day Rule was included in the terms and conditions of the 1997, 1999, and 2000 bond forms and in the Amwest settlement agreements. For example, paragraph 6 of the 1995 Amwest agreement states:

> "INS agrees that if INS intends to notify the alien of the date and time of deportation, such notice will not be mailed to the alien before, and not less than three days after, the demand to produce the alien is mailed to the bond obligor."

Court decisions have interpreted the language in the bond forms to mean:

> If ICE sends a demand notice to the obligors at any time after it has sent Form I-166 to an alien, any breach of that bond cannot be enforced.

> It is irrelevant whether the alien actually receives Form I-166. The Form I-166 addressed to the alien can be returned to sender, address unknown, yet the breach of the bond can still not be enforced.

69

*Safety Nat'l Cas. Corp. v. United States Dep't of Homeland Sec.*, No H-05-cv-2159, 2010 WL 2219162, at *6 (S.D. Tex. May 28, 2010), *aff'd in part, AAA Bonding Agency Inc. v. U.S. Dep't of Homeland Sec.*, 447 Fed. App'x 603, 611 (5th Cir. 2011).

Based on the courts' rulings, the best practice is **not** to send Form I-166 to any bonded alien whose bond has not been canceled because doing so may make a breach unenforceable.

70

# APPENDIX 24:  Sample Mitigation

Mitigated ___ % by
Name/Title

Signature/Date

Alien Surrendered on
Date

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. Immigration and Customs Enforcement**

**NOTICE - IMMIGRATION BOND BREACHED**

Mitigation
Annotation

O  FINANCIAL CASUALTY & SURETY INC.
B  1131 EASTSIDE, SUITE 600
L  HOUSTON TX 77098
I
G
O
R

Be sure to send
Form I-323
showing
mitigation to BFC

Breach Number  9NA-14828
Alien File Number  000 000 000
Breach Notice Date  06/22/2010

**IMMIGRATION BOND**

Bond Type  ☐ Cash   ☐ U.S. bonds   ☒ Surety
Bond Post Date  07/03/2008
Bond Receipt No.  H00-G-15692
Amount  $6,000.00
Alien's Name  John Doe

The condition of the above-described immigration bond having been violated by the above-named alien(s), it has been determined that said bond has been breeched on ___04/14/2010___ for the following reason:

☒ Demand was made upon you on ___03/10/2010___ , to deliver the above-named alien(s) at 1717 Zoy St. Harlingen, TX . Your failure to deliver the above-named alien as directed constitutes a substantial violation of the conditions of the bond.

☐ On _____ the above-named alien was granted Voluntary Departure, requiring departure from the United States on or before _____ . You have failed to submit, within 30 days of the expiration of the voluntary departure period, valid proof that the alien departed the United States on or before the expiration of the voluntary departure period, which constitutes a substantial violation of the conditions of the bond.

☐ The above named alien failed to comply with the conditions of the above described order of supervision bond by a breach of the following condition(s) of the bond, to wit:

☐ The above named alien failed to comply with the conditions of the above described public charge bond by becoming a public charge, to wit:

☐ The above named alien failed to comply with the conditions of the above described maintenance of Status & Departure bond by a breach of the following condition(s) of the bond, to wit:

Any cash or U.S. bonds pledged as security for the above-described bond will be forfeited to the United States, or in the case of a Surety Bond, the surety invoiced for the full amount of the bond. If this decision is not appealed in accordance with the procedures described below.

You have a right to appeal this decision by completing the enclosed Form I-290B "Notice of Appeal" and filing the form together with the appropriate filing fee and a brief written statement setting forth the reasons and evidence supporting the appeal to the nearest Detention and Removal Office (for location information, go to www.ice.gov/about/dro/contact.htm) within 30 days from the date of this Notice. If no appeal is filed within the time allowed this decision is final.

| Immigration DHS Officer (b)(6),(b)(7)(C) | Bond Control Specialist | (b)(6),(b)(7)(C) |
|---|---|---|
| Printed Name | Title | Signature |

6/22/10 — sent by regular mail to Financial Casualty (b)(6),(b)(7)(C)

ICE Form I-323 (08/07)

AILA Doc. No. 16051730.  (Posted 6/7/16)
ICE 2016-ICLI-00005 100 of 488

## APPENDIX 25: Creating a Manual Bond When eBONDS System is Off Line

If the eBONDS system crashes and is not available electronically:

1.  Create a manual bond number log for your office to manually track bonds.

2.  Use the following format for bond numbers:

    | | |
    |---|---|
    | XXX | 3-letter Field Office |
    | S/C | Surety or Cash |
    | FY | 2-digit Fiscal Year |
    | M | Manual bond |
    | 9999 | 4-digit track number starting with 0001 |
    | Example: | LOSC13M0001 |

3.  Manually process the bond by completing the paper version of Form I-352 (and I-305 for a cash bond). Use the bond number from your office's manual bond number log.

4.  Fax or email the deposit with the I-352 (and the I-305 for a cash bond) to FINOPS-BURLINGTON.

5.  Wait for FINOPS-BURLINGTON to process the bond.

6.  Enter the bond in the eBONDS module. Do not submit a Helpdesk ticket.

7.  The "eBONDS Admin" user for the "DCO" opens the cash bonds tab and selects the un-posted bond.

8.  The eBONDS Admin may need to first create an "Action/Decision" in order to create the un-posted bond.

9.  The eBONDS Admin selects "Post bond" from the BMIS Bond Actions.

10. The user links to the posted bond with the manual bond number to the bond from the BMIS Web.

    Note: Since the bond was completed on paper, a PDF copy of the I-352 (and I-305 for a cash bond) will not be available electronically in the Bond Documents section. The data from these forms is not needed to perform other bond actions, such as cancelling or breaching the bond.

11. Upload the bond documents into EARM once the system is back on line. The bond will appear just like a bond that was completed on line, but with a bond number entered manually.

72

# EXHIBIT G



| From: | Berg, Peter B |
|---|---|
| To: | |
| Cc: | |
| Subject: | Updated Guidance: COVID-19 Detained Docket Review-- Effective Immediately |
| Date: | Saturday, April 4, 2020 5:17:40 PM |

==**UPDATE:** Please see the updated guidance below. The previous version of this guidance is rescinded.==

This message is sent from Peter B. Berg, (a)Assistant Director, Field Operations

**To:**          **Field Office Directors and Deputy Field Office Directors**

**Subject:**      **COVID-19 Detained Docket Review**

**Background:**

U.S. Immigration and Customs Enforcement (ICE) has taken a number of significant and proactive measures in response to the Coronavirus Disease 2019 (COVID-19) pandemic, in order to mitigate the spread of COVID-19 to aliens detained in its custody, its workforce, and stakeholders at its detention facilities. As more becomes known about the virus, ERO will continue to update its practices and guidance in this regard. General ICE COVID-19 guidance is available here and will be updated and supplemented on an ongoing basis.

On March 18, 2020, you were directed to review the cases of aliens detained in your area of responsibility who were over the age of 70 or pregnant to determine whether continued detention was appropriate. The Centers for Disease Control and Prevention (CDC) has developed a list of categories of individuals identified as potentially being at higher-risk for serious illness from COVID-19. Expanding on that list, ERO has identified the following categories of cases that should be reviewed to re-assess custody:

- Pregnant detainees or those having delivered in the last two weeks
- Detainees over 60 years old
- Detainees of any age having chronic illnesses which would make them immune-compromised, including but not limited to:
  - Blood Disorders
  - Chronic Kidney Disease
  - Compromised immune system (e.g., ongoing treatment such as chemotherapy or radiation, received an organ or bone marrow transplant, taking high doses of corticosteroids or other immunosuppressant medications)
  - Endocrine disorders

- Metabolic disorders
- Heart disease
- Lung disease
- Neurological and neurologic and neurodevelopment conditions

As part of your ongoing application of the CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (available here), please identify all cases within your AOR that meet any of the criteria above and validate that list with assistance from IHSC or your Field Medical Coordinator to ensure the conditions listed are still present and do result in the detainee potentially having a higher risk for serious illness from COVID-19. After identifying a case as meeting any of the above criteria, you should review the case to determine whether continued detention remains appropriate in light of the COVID-19 pandemic.

The presence of one of the factors listed above should be considered a significant discretionary factor weighing in favor of release. To be clear, however, it may not always be determinative. Field offices must remain cognizant of the requirements of mandatory detention. Section 236(c) of the Immigration and Nationality Act (INA) mandates the detention of certain categories of criminal and terrorist aliens during the pendency of removal proceedings. Such aliens may not be released in the exercise of discretion during the pendency of removal proceedings even if potentially higher-risk for serious illness from COVID-19. INA § 236(c); 8 C.F.R. § 236.1(c)(1)(i). Such aliens may only be released following a final order issued by an immigration judge, the Board of Immigration Appeals, or a federal court granting the alien relief, dismissing proceedings, or terminating proceedings. Similarly, pursuant to section 241(a)(2), certain criminal and terrorist aliens subject to a final order of removal may not be released during the 90-day removal period even if potentially higher-risk for serious illness from COVID-19. INA § 241(a)(2). For alien's subject to discretionary detention under section 236(a), please remember that release is prohibited, even if the alien is potentially higher-risk for serious illness from COVID-19, if such release would pose a danger to property or persons. 8 C.F.R. § 236.1(c)(8).

When reviewing cases of alien's subject to discretionary detention under 236(a), the following must be completed:

- **Cases involving any arrests or convictions for any crimes that involve risk to the public regardless of the date of arrest or conviction must be reviewed and approved by a Deputy Field Office Director (DFOD) or higher before a determination is made to release.**
  - Examples of crimes that involve a risk to the public include any crime that: involves any form of violence, driving while intoxicated, threatening behaviors, terroristic threats, stalking, domestic violence, harm to a child, or any form of assault or battery. This list is not intended to be

Case 5:19-cv-01546-JGB-SHK   Document 113-1   Filed 04/09/20   Page 178 of 182   Page ID
#:1874
Case 1:19-cv-02593-JEB   Document 66-1   Filed 04/09/20   Page 3 of 8

comprehensive. If there is any doubt whether a crime involves risk to the public, consult with your Office of the Principal Legal Advisor (OPLA) field location and your respective Deputy Assistant Director for Domestic Operations before a custody redetermination is completed.

- You may consider the age of an arrest or conviction as a mitigating or an aggravating factor, but the age of an arrest or a conviction does not automatically outweigh public safety concerns.

With regard to arriving aliens and certain other aliens eligible for consideration of parole from custody, under current circumstances and absent significant adverse factors, the fact that an alien is potentially higher-risk for serious illness from COVID-19, may form the basis for a determination that "continued detention is not in the public interest," justify release under 8 C.F.R. § 212.5(b)(5).

For other aliens for whom there is discretion to release, field offices remain responsible for articulating individualized custody determinations, taking into consideration the totality of the circumstances presented in the case. The fact that an alien is potentially higher-risk for serious illness from COVID-19 should be considered a factor weighing in favor of release. You may also consider alternatives to detention consistent with ICE ATD policies, if ATD is determined to sufficiently mitigate the risk of flight.

Any releases attributed to reviews of COVID-19 susceptibility shall be documented in the ENFORCE Alien Removal Module (EARM) under Special Class - COVID-19 Chronic Care Release. As previously communicated, these individuals should be placed on ATD if possible.

Please contact your local OPLA field location should you have any questions or concerns regarding your authority to release in any individual case.

**For any questions on this guidance, please contact your respective Deputy Assistant Director for Domestic Operations.**

**Limitation on the Applicability of this Guidance**. This message is intended to provide internal guidance to the operational components of U.S. Immigration and Customs Enforcement. It does not, is not intended to, shall not be construed to, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any person in any matter, civil or criminal.

# Appendix 1

| Case | Court | Cite | Date | Westlaw cite | Released? | If released, how many people |
|------|-------|------|------|--------------|-----------|------------------------------|
| Bravo Castillo v. Barr | United States District Court Central District of California Western Division | TRO & Order to Show Cause, Bravo Castillo v. Barr, No. 20-00605 TJH (AFMx) (C.D. Cal. Mar. 27, 2020), ECF No. 32 | 3/27/2020 | 2020 WL 1502864 | Y | 2 |
| Zhang v. Barr | United States District Court Central District of California | Order Denying D's Mot. to Dismiss and Granting TRO, Zhang v. Barr, No. ED CV 20-00331-AB (RAOx) (C.D. Cal. Mar. 27, 2020), ECF No. 20 | 3/27/2020 | 2020 WL 1502607 | N (Defendants shall schedule a bond hearing within 48 hours.) | N/A |
| Bravo Castillo v. Barr | United States District Court Central District of California Western Division | TRO & Order to Show Cause, Bravo Castillo v. Barr, No. 20-00605 TJH (AFMx) (C.D. Cal. Mar. 27, 2020), ECF No. 32 | 3/27/2020 | 2020 WL 1502864 | Y | 2 |
| Fraihat v. Wolf | United States District Court Central District of California Western Division | TRO & Order to Show Cause, Fraihat v. Wolf, No. ED CV 20-00590 TJH (KSx) (C.D. Cal. Mar. 30, 2020) | 3/30/2020 | | Y | 1 |
| Hernandez v. Wolf | United States District Court Central District of California Western Division | TRO & Order to Show Cause, Hernandez v. Wolf, No. ED CV 20-00617 TJH (KSx) (C.D. Cal Apr. 1, 2020), ECF No. 17 | 4/1/2020 | | Y | 1 |
| Dacoff v. Wolf | United States District Court Central District of California Western Division | TRO & Order to Show Cause, Dacoff v. Wolf, No. EDCV 20-00627 TJH (GJSx) (C.D. Cal. Apr. 2, 2020), ECF No. 36 | 4/2/2020 | | Y | 1 |
| Hernandez Velazquez v. Wolf | United States District Court Central District of California Western Division | TRO & Order to Show Cause, Hernandez Velazquez v. Wolf, No. EDCV 20-00627 TJH (GJS) (C.D. Cal. Apr. 2, 2020), ECF No. 32 | 4/2/2020 | | Y | 1 |
| Lopez Salgado v. Wolf | United States District Court Central District of California Western Division | TRO & Order to Show Cause, Lopez Salgado v. Wolf, No. EDCV 20-00627 TJH (GJSx) (C.D. Cal. Apr. 2, 2020), ECF No. 38 | 4/2/2020 | | Y | 1 |
| Munoz v. Wolf | United States District Court Central District of California Western Division | TRO & Order to Show Cause, Munoz v. Wolf, No. EDCV 20-00625 TJH (SHKx) (C.D. Cal. Apr. 2, 2020), ECF No. 14 | 4/2/2020 | | Y | 1 |
| Robles Rodriguez v. Wolf | United States District Court Central District of California Western Division | TRO & Order to Show Cause, Robles Rodriguez v. Wolf, EDCV 20-00627 TJH (GJSx) (C.D. Cal. Apr. 2, 2020), ECF No. 37 | 4/2/2020 | | Y | 1 |
| Sudney v. Wolf | United States District Court Central District of California Western Division | TRO & Order to Show Cause, Sudney v. Wolf, No. EDCV 20-00626 TJH (JCx) (C.D. Cal. Apr. 2, 2020), ECF No. 12 | 4/2/2020 | | Y (Release or deport.) | 1 |
| Vargas Arellano v. Wolf | United States District Court Central District of California Western Division | Order, Vargas Arellano v. Wolf, No. CV 20-00627 TJH (GJSx) (C.D. Cal. Apr. 2, 2020), ECF No. 35. | 4/2/2020 | | Y | 1 |
| Vite v. Wolf | United States District Court Central District of California Western Division | TRO & Order to Show Cause,  Vite v. Wolf, No. EDCV 20-00627 TJH (GJSx) (C.D. Cal. Apr. 2, 2020), ECF No. 39 | 4/2/2020 | | Y | 1 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Ortuno v. Jennings | United States District Court Northern District of California | Order Re Pet'r's Mot. for TRO, Directions to Parties, Ortuno v. Jennings, No. 20-cv-02064-MMC (N.D. Cal. Apr. 8, 2020), ECF No. 38 | 4/8/2020 | | Y and N | 4 released (6 not released based on questions of medical necessity) |
| Dawson v. Asher | United States District Court Western District of Washington at Seattle | Order Denying Ptr's Second Mot. for a TRO, Dawson v. Asher, No. C20-0409JLR-MAT (W.D. Wash. Apr. 8, 2020), ECF No. 91 | 4/8/2020 | | N (Defendants must imform court within 24 hours if anyone at NWDC is diagnosed with COVID-19) | N/A |
| Dada v. Witte | United States District Court Eastern District of Louisiana | Order, Dada v. Witte, No. 20-1093, (E.D. La. Apr. 6, 2020), ECF No. 12 | 4/6/2020 | 2020 WL 1674129 | N (Court lacks jurisdiction and Plaintiffs can seek relief in the district they are confined) | N/A |
| Malam v. Adducci | United States District Court Eastern District of Michigan Southern Division | Op. and Order Granting in Part Pet'r's Emergency Appl. for a TRO, Malam v. Adducci, No. 20-10828 (E.D. Mich. Apr. 5, 2020), ECF No. 22 | 4/5/2020 | 2020 WL 1672662 | Y | 1 |
| Malam v. Adducci | United States District Court Eastern District of Michigan Southern Division | Op. & Order Granting in Part Pl.-Intervenor's Emergency Mot. for a TRO [20], Malam v. Adducci, No. 20-10819 (E.D. Mich. Apr. 9, 2020), ECF No. 29 | 4/9/2020 | | Y | 1 |
| Calderon Jimenez v. Wolf | United States District Court District of Massachusetts | Mem. & Order, Calderon Jimenez v. Wolf, No. 18-10225-MLW (D. Mass. Mar. 26, 2020), ECF No. 507 | 3/26/2020 | | Y | 1 |
| Savino v. Souza | United States District Court District of Massachusetts | Mem. & Order, Savino & Souza, No. 20-10617-WGY (D. Mass. Apr. 8, 2020), ECF No. 64 | 4/8/2020 | | N (Plaintiffs granted class certification.) | N/A |
| Thakker. v. Doll | United States District Court Middle District of Pennsylvania | Mem. & Order, Thakker v. Doll, No. 1:20-cv-480 (M. D. Pa. Mar. 31, 2020) | 3/31/2020 | 2020 WL 1671563 | Y | 13 |
| Hope v. Doll | United States District Court Middle District of Pennsylvania | Mem. And Order, Hope v. Doll, No. 1:20-cv-562 (M.D. Pa. Apr. 7, 2020), ECF No. 11 | 4/7/2020 | | Y | 22 |
| Basank v. Decker et al | United States District Court Southern District of New York | Mem. & Order, Basank v. Decker, No. 20 Civ. 2518 (AT) (S.D.N.Y. Mar. 26, 2020), ECF No. 11 | 3/26/2020 | 2020 WL 1481503 | Y | 10 |
| Jovel v. Decker | United States District Court Southern District of New York | R. & R., Joel v. Decker, No. 20-Civ. 308 (GBD)(SN) (S.D.N.Y. Mar. 24, 2020), ECF No. 26 | 3/26/2020 | 2020 WL 1502038 | N (orders a bond hearing and release if bond hearing is not scheduled by April 3. Note: a subsequent judge ordered release) | N/A |
| Jovel v. Decker | United States District Court Southern District of New York | Mem. Decision and Order, Jovel v. Decker, No. 20 Civ. 308 (GBD) (SN) (S.D.N.Y. Mar. 26, 2020), ECF No. 27 | 3/26/2020 | 2020 WL 1467397 | Y | 1 |
| Arana v. Barr | United States District Court Southern District of New York | R. & R., Arana v. Barr, No. 19cv7924 (PGG) (DF) (S.D.N.Y. Mar. 27, 2020), ECF No. 22 | 3/27/2020 | 2020 WL 1502039 | Y | 1 |
| Coronel v. Decker | United States District Court Southern District of New York | Op. & Order, Coronel v. Decker, No. 20-cv-2472 (AJN) (S.D.N.Y. Mar. 27, 2020), ECF No. 26 | 3/27/2020 | 2020 WL 1487274 | Y | 5 |

| Jones v. Wolf | United States District Court Western District of New York | Decision & Order, Jones v. Wolf, No. 20-CV-361 (W.D.N.Y. Apr. 2, 2020), ECF 44 | 4/2/2020 | 2020 WL 1643857 | N (Respondents required to provide detailed plan for identifying high-risk petitioners and how they will facilitate all "social distancing" measures recommended by the CDC and NY State Dept. of Health) by April 3, 2020 | N/A |
| Padilla v. U.S. Immigr. & Costoms Enf't | United States Court of Appeals Ninth Circuit | Op., Padilla v. U.S. Immigr. & Customs Enf't, No. 19-35565 (9th Cir. Mar. 27, 2020) | 3/27/2020 | 2020 WL 1482393 | Y | 4 |