UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| FAOUR ABDALLAH FRAIHAT, *et al.*, | ) ) ) | Case No. 5:19-CV-01546 JGB (SHKx) |
| *Plaintiffs*, | ) | |
| v. | ) | |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*, | ) ) ) | |
| | ) | |
| *Defendants*. | ) ) | |
| | ) ) ) ) ) ) ) ) ) ) ) | |

DECLARATION OF RUSSELL HOTT

I, Russell Hott, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

1

**PERSONAL BACKGROUND**

1. I am currently employed by the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Acting Assistant Director for the Custody Management Division (CMD). I have held this position since February 2020. CMD provides policy and oversight for the administrative custody of ICE's highly transient and diverse population of immigration detainees. CMD is composed of three divisions led by three Deputy Assistant Directors under my direct supervision: (1) the Alternatives to Detention Division; (2) the Detention Management Division; and (3) the Custody Programs Division.

2. As the Acting Assistant Director, I am responsible for the effective and proficient performance of these three Divisions and their various units, including the oversight of compliance with ICE's detention standards and conditions of confinement at ICE detention facilities generally. I am further responsible for managing ICE detention operations efficiently and effectively to provide for the safety, security, and care of an average of about 40,000 detainees daily and roughly 500,000 detainees annually, at approximately 250 facilities nationwide, including three family residential shelters located in Texas and Pennsylvania.

3. From May 2017 to February 2020, I served as the Field Office Director for the Washington, DC ERO Field Office, responsible for the District of Colombia and Virginia. In my role as Field Office Director, I provided operational and policy oversight for ERO's interior enforcement efforts within the local area of responsibility, spanning 43,000 square miles, three district courts, a cadre of nearly 200 employees, and 1,400 detention beds.

4. I began my career with the U.S. Government as a detention enforcement officer with the former Immigration and Naturalization Service in New York, NY. I advanced through a

variety of positions including Immigration Enforcement Agent, Deportation Officer, Instructor at the Federal Law Enforcement Training Center, Supervisory Detention and Deportation Officer, acting Assistant Field Office Director, National Program Manager, Unit Chief, acting Deputy Chief of Staff for ERO, Chief of Staff for the ICE Deputy Director, Deputy Field Office Director for both the Boston and Washington field offices, Field Office Director, and acting Deputy Assistant Director.

### ICE DETAINEES

5. As of this date, no ICE contractors or employees assigned to ICE facilities died from COVID-19.

6. While ICE does not track this information, ICE learned that a number of non-ICE employees (contractors) in facilities that hold ICE detainees have contracted COVID-19, and some of them died from COVID-19. Because this type of information is not regularly shared by local law enforcement, ICE is unable to determine how many non-ICE personnel in state and local jails have contracted COVID-19 or died from COVID-19.

7. ICE also learned that some non-ICE detainees in non-ICE facilities, shared with ICE detainees, also contracted COVID-19, and some of them died from COVID-19. Because these detainees are not in ICE custody and they are non-ICE detainees, information about these individuals is not regularly shared with ICE, and ICE is unable to determine how many non-ICE detainees in state, local, or other federal detention facilities have contracted COVID-19 or died from COVID-19.

8. As of this date, no ICE detainees have died in ICE detention centers or in non-ICE detention centers housing ICE detainees as a result of COVID-19. There are also no non-ICE detainees who died of COVID-19 in ICE detention centers.

9. In March 2020, ICE ERO convened a working group between medical professionals, disease control specialists, detention experts, and field operators to identify additional enhanced steps to minimize the spread of the virus. ICE has continued to evaluate its detained population based upon the CDC's guidance for people who might be at higher risk for severe illness as a result of COVID-19 to determine whether continued detention was appropriate.

10. Of this population, as of April 10, 2020, ICE has released 693 individuals after evaluating their immigration history, criminal record, potential threat to public safety, flight risk, and national security concerns. This same methodology is currently being applied to other potentially vulnerable populations currently in custody and while making custody determinations for all new arrests.

11. All release determinations, including those of aliens who are at risk of contracting or having complications as a result of COVID-19, are made on a case-by-case basis following evaluation of a detainee's medical condition, immigration history, criminal record, potential threat to the public, flight risk, and any national security concerns.  After identifying a case as meeting "at risk" criteria, ERO reviews the case to determine whether continued detention remains appropriate in light of the COVID-19 pandemic.  ICE ERO conducts these reviews continuously and expeditiously, and the time to conduct each review will depend on the complexity of each individual's circumstances.  Section 236(c) of the Immigration and Nationality Act (INA) mandates the detention of certain categories of criminal and terrorist aliens during the pendency of removal proceedings.  Such aliens may not be released in the exercise of discretion during the pendency of removal proceedings even if potentially higher-risk for serious illness from COVID-19.  INA § 236(c); 8 C.F.R. § 236.1(c)(1)(i). Similarly, pursuant

to section 241(a)(2), certain criminal and terrorist aliens subject to a final order of removal may not be released during the 90-day removal period even if potentially higher-risk for serious illness from COVID-19.  For alien's subject to discretionary detention under section 236(a), release is prohibited, even if the alien is potentially higher-risk for serious illness from COVID-19, if such release would pose a danger to property or persons.  8 C.F.R. § 236.1(c)(8).  In those cases where ICE can exercise discretion and it has determined that release is appropriate, release arrangements can take from 4 to 6 hours to several days depending on conditions of release, as well as living and transportation circumstances of each and every individual.

      12.    ICE is continuing to transfer detainees from state and local criminal custody in response to its legal obligation to detain non-citizens with certain criminal convictions who are subject to mandatory detention under INA Section 236(c), 8 U.S.C. § 1226(c); however, ERO has limited the intake of new detainees being introduced into the ICE detention system. ICE's detained population has dropped by more than 4,000 individuals since March 1, 2020 with a more than 60 percent decrease in book-ins when compared to this time last year.  When comparing the period of 22 days before and after March 18, 2020, ICE has arrested 1,982 fewer individuals in Criminal Alien Program and 3,390 fewer at-large individuals.

      13.    As previously noted, in Fiscal Year 2019, ICE housed an average daily population of 50,165 aliens nationwide, and in Fiscal Year 2020, through April 4, 2020, ICE housed an average daily population of 42,738 nationwide.  However, as of February 13, 2020, ICE had 37,662 single adults in custody, and as of March 13, 2020, ICE had 35,980 single adults in custody.  As of April 13, 2020, ICE had 31,709 single adults in custody.   Thus, ICE has taken precautionary measures and proactive steps to reduce its population through the release of highly vulnerable detainees, reducing its enforcement posture, and exercising discretion on certain

lower risk arrests. Accordingly, the detention population will neither remain the same nor increase through the midst of the pandemic.

14. On April 10, 2020, ERO issued *COVID-19 Pandemic Response Requirements* (PRR), developed in consultation with the CDC, which sets forth expectations and assists ICE detention facility operators to sustain detention operations, while mitigating risk to the safety and well-being of detainees, staff, contractors, visitors, and stakeholders due to COVID-19.[1] The PRR builds upon previously-issued guidance and sets forth specific mandatory requirements and best practices on a number of issues, including visitation, for all immigration detention facilities.

15. The continuously evolving nature of the COVID-19 emergency requires ongoing review and frequent adaptation of agency policy. ICE continues to explore all available options to ensure the health and safety of its diverse detained population while also safeguarding important detainee legal rights.

This declaration is based upon my personal and professional knowledge, information obtained from other individuals employed by ICE, and information obtained from various records and systems maintained by DHS. I provide this declaration based on the best of my knowledge, information, belief, and reasonable inquiry for the above captioned case.

Signed on this 15th day of April 2020.

_____
Russell Hott
Acting Assistant Director
Custody Management Division
ICE Enforcement and Removal Operations

---

[1] https://www.ice.gov/sites/default/files/documents/Document/2020/eroCOVID19responseReqsCleanFacilities.pdf (accessed April 13, 2020).