UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 19-1546 JGB (SHKx)** | Date | April 20, 2020 |
|---|---|---|---|
| Title | ***Faour Abdallah Fraihat, et al. v. U.S. Immigration and Customs Enforcement, et al.*** | | |

Present: The Honorable   JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**   **Order (1) GRANTING Motions to File Amicus Briefs (Dkt. Nos. 117, 119); (2) GRANTING Plaintiffs' Emergency Motion to Certify Subclass (Dkt. No. 83); (3) GRANTING Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 81); and DENYING AS MOOT Plaintiffs' Ex Parte Application to File Supplement (Dkt. No. 127) (IN CHAMBERS)**

Before the Court are: (1) two motions to file amicus briefs, (Dkt. Nos. 117, 119); (2) Plaintiffs' emergency motion to certify subclass, ("Class Certification Motion," Dkt. No. 83); (3) Plaintiffs' motion for preliminary injunction to implement protections against COVID-19, ("PI Motion," Dkt. No. 81); and (4) Plaintiffs' ex parte application for leave to file post-hearing briefing and response, (Dkt. No. 127). The Court held a telephonic hearing on the first three matters on April 13, 2020. After considering the papers filed in support of and in opposition to the matters, as well as the oral argument of the parties, the Court GRANTS motions to file amicus briefs, GRANTS the Class Certification Motion, GRANTS the PI Motion, and DENIES AS MOOT the ex parte application.

## I. BACKGROUND

The country is in the midst of an unprecedented pandemic, as a result of which hundreds of millions of people have been urged to shelter in place or stay at home. However, some of us are sheltering in more fortunate circumstances than others. The central question presented by Plaintiffs' Motions is whether the conditions in which Immigration and Customs Enforcement

---

("ICE") detainees are held during the pandemic likely violate the Constitution, and if so, what measures can and should be taken to ensure constitutionally permissible conditions of detention.

## A.  Procedural Background

On August 19, 2019, Faour Abdallah Fraihat, Marco Montoya Amaya, Raul Alcocer Chavez, Jose Segovia Benitez, Hamida Ali, Melvin Murillo Hernandez, Jimmy Sudney, José Baca Hernández, Edilberto García Guerrero, Martín Muñoz, Luis Manuel Rodriguez Delgadillo, Ruben Darío Mencías Soto, Alex Hernandez, Aristoteles Sanchez Martinez, Sergio Salazar Artaga,[1] ("Individual Plaintiffs"), Inland Coalition for Immigrant Justice ("ICIJ"), and Al Otro Lado ("Organizational Plaintiffs") (collectively, "Plaintiffs") filed a putative class action complaint for declaratory and injunctive relief.  ("Complaint," Dkt. No. 1 ¶¶ 21-126.)  The Defendants are U.S. Immigration and Customs Enforcement ("ICE"), U.S. Department of Homeland Security ("DHS"), DHS Acting Secretary Kevin McAleenan, ICE Acting Director Matthew T. Albence, ICE Deputy Director Derek N. Brenner, ICE Enforcement and Removal Operations ("ERO") Acting Executive Associate Director Timothy S. Robbins, ERO Assistant Director of Custody Management Tae Johnson, ICE Health Service Corps ("IHSC") Assistant Director Stewart D. Smith, ERO Operations Support Assistant Director Jacki Becker Klopp, and DHS Senior Official Performing Duties of the Deputy Secretary David P. Pekoske  (collectively "Defendants").  (Id. ¶¶ 127-36.)

Plaintiffs are immigration detainees with a range of serious health conditions and two organizations that provide services to detainees.  (Id. at ¶¶ 21-126.)  Together they claim Defendants have failed to ensure minimum lawful conditions of confinement at immigration detention facilities across the country.  (Id. ¶¶ 1-13.)  Plaintiffs assert four claims: (1) Due Process Clause of the Fifth Amendment - failure to monitor and prevent "Challenged Practices"[2] (all Plaintiffs and the Class against all Defendants); (2) Due Process Clause of the Fifth Amendment - failure to monitor and prevent "Segregation Practices" (Organizational Plaintiffs, Segregation Plaintiffs and Segregation Subclass against all Defendants); (3) Due Process Clause of the Fifth Amendment - failure to monitor and prevent "Disability-Related Practices" that constitute punishment (Organizational Plaintiffs, Disability Plaintiffs, and Disability Subclass against all Defendants); (4) violation of § 504 of the Rehabilitation Act ("Rehab Act"), 29 U.S.C. § 794 (Organizational Plaintiffs, Disability Plaintiffs, and Disability Subclass against DHS, ICE, and IHSC).  (Compl.)  On April 15, 2020 the Court Denied Defendants' motion to dismiss, sever, or transfer venue.  (MTD Order, Dkt. No. 126.)

---

[1] The Court will refer to Individual Plaintiffs by their last names, unless Plaintiffs have the same last name, in which case the Court will use full names.  The remainder of the Order will omit diacritical marks.

[2] The Court provides Plaintiffs' definitions of the Class and Subclasses, and of the Challenged Practices, Segregation Practices, and Disability Practices in its MTD Order.

On March 25, 2020, Plaintiffs filed the Class Certification and PI Motions.  (Class Cert. Mot.; PI Mot.)  Plaintiffs included in support of the Class Certification Motion the following documents:

- Declaration of William F. Alderman, ("Alderman Declaration," Dkt. No. 83-2 (attaching Exhibit A));
- Declaration of Michael W. Johnson, ("Johnson Declaration," Dkt. No. 83-2);
- Declaration of Stuart Seaborn, ("Seaborn Declaration," Dkt. No. 83-4 (attaching Exhibits A to J));
- Declaration of Lisa Graybill, ("Graybill Declaration," Dkt. No. 83-5);
- Declaration of Timothy P. Fox, ("Fox Declaration," Dkt. No. 83-6);
- Declaration of Alex Hernandez, ("Hernandez Declaration," Dkt. No. 83-7);
- Declaration of Aristoteles Sanchez, ("Sanchez Declaration," Dkt. No. 83-8);
- Declaration of Faour Abdallah Fraihat, ("Fraihat Declaration," Dkt. No. 83-9);
- Declaration of Jimmy Sudney, ("Sudney Declaration," Dkt. No. 83-10); and
- Declaration of Martin Munoz, ("Munoz Declaration," Dkt. No. 83-11).

In support of the PI Motion, Plaintiffs filed the following supporting documents:

- Declaration of Thomas Ragland, ("Ragland Declaration," Dkt. No. 81-2);
- Declaration of Mikhail Solomonov, ("Solomonov Declaration," Dkt. No. 81-3);
- Declaration of Maureen A. Sweeny, ("Sweeny Declaration," Dkt. Nos. 81-4, 89 (attaching Exhibit A));
- Declaration of Linda Corchado, ("Corchado Declaration," Dkt. No. 81-5);
- Declaration of Laura G. Rivera, ("Rivera Declaration," Dkt. No. 81-6);
- Declaration of Keren Zwick, ("Zwick Declaration," Dkt. No. 81-7);
- Declaration of Jamie Meyer, ("Meyer Declaration," Dkt. Nos. 81-8, 90 (attaching Exhibit A));
- Declaration of Francis L. Conlin, ("Conlin Declaration," Dkt. No. 81-9);
- Declaration of Elissa Steglich, ("Steglich Declaration," Dkt. No. 81-10);
- Declaration of Homer Venters, ("Venters Declaration," Dkt. No. 81-11 (attaching Exhibit A));
- Declaration of Dr. Carlos Franco-Paredes, ("Paredes Declaration," Dkt. Nos. 81-12, 91 (attaching Exhibit A));
- Declaration of Anne Rios, ("Rios Declaration," Dkt No. 81-13);
- Declaration of Andrew Lorenzen-Strait, ("Lorenzen-Strait Declaration," Dkt. Nos. 81-14, 92 (attaching Exhibit A)); and
- Declaration of Andrea Saenz, ("Saenz Declaration," Dkt. No. 81-15 (attaching Exhibit A)).

Defendants opposed the Class Certification and PI Motions on April 3, 2020.  ("Class Certification Opposition," Dkt. No. 94; "PI Opposition," Dkt. No. 95.)  In support of the Oppositions, Defendants included the Declaration of Lindsay M. Vick, ("Vick Declaration," Dkt. No. 95-1, 110 (attaching Exhibits 1 to 13, including declarations of Dr. Ada Rivera and

several Declarations of Captain Jennifer Moon).)  Defendants also included evidentiary objections to several of Plaintiffs' declarations.  (See Dkt. Nos. 95-15 to 95-25.)

Plaintiffs replied on April 9, 2020,  ("Class Certification Reply," Dkt. No. 111; "PI Reply," Dkt. No. 113), and responded to Defendants' evidentiary objections, (Dkt. Nos. 97-107). In support of their Replies, Plaintiffs included the declaration of Elizabeth Jordan, ("Jordan Declaration II," Dkt. No 113-1 (attaching Exhibits A to G, and Appendix 1)), and the supplemental declaration of Homer Venters, ("Venters Declaration II," Dkt. No. 113-2).

On April 9, 2020, the Court also received two motions to file amicus briefs.  (Dkt. No. 117, 119.)  The Court GRANTS the motions and accepts as filed[3] the amicus briefs of : (1) Casa de Paz, Church World Service – Jersey City, Clergy & Laity United for Economic Justice, Detention Watch Network, El Refugio, First Friends of New Jersey & New York, and Freedom for Immigrants  ("Casa de Paz, et al. Amicus," Dkt. No. 117-2); and (2) Public Health Experts ("Public Health Amicus," Dkt. No. 119-2).

On April 10, 2020, Defendants filed a supplement to their Opposition, ("Defendants' Supplement," Dkt. No. 121.)  Defendants attached the following documents to the Supplement:

- Declaration of Gabriel Valdez, ("Valdez Declaration," Dkt. No. 121-1);
- Declaration of Michael Nelson, ("Nelson Declaration," Dkt. No. 121-2);
- Declaration of John Bretz, ("Brez Declaration," Dkt. No. 121-3);
- COVID-19 Detained Docket Review Guidance, dated April 4, 2020 (April 4 Docket Review Guidance," Dkt. No 121-4).

Defendants also attached several decisions from district courts, and a recently filed case, regarding the release of immigration detainees or prisoners.  (Dkt. Nos. 121-5 to 121-11.)  On April 12, 2020, Plaintiffs submitted a supplement.  ("Jordan Declaration III," Dkt. No. 122 (attaching Exhibits A to D).)  On the morning of the April 13, 2020 hearing, Defendants submitted supplemented their filing with a recent ICE policy document.  (Dkt. No. 124-1.)

After the hearing, Defendants filed a further factual supplement at the Court's request. ("Holt Declaration," Dkt. No. 125-1.)  Plaintiffs filed an ex parte application to file a response, which Defendants opposed.  (Dkt. Nos. 127, 128.)  The ex parte application is DENIED AS MOOT

---

[3] At the April 13, 2020 hearing, the Court noted that Defendants could comment on the Amicus Motions by filing a supplement the next day, but Defendants declined to do so.  The Court finds the briefs informative, and absent Defendants' articulation of a sound reason to reject the briefs, the Court exercises its "broad discretion" to allow them.  Hoptowit v. Ray, 682 F.2d 1237, 1260 (9th Cir. 1982), abrogated on other grounds by Sandin v. Conner, 515 U.S. 472 (1995).

**B. Facts[4]**

In this Section the Court summarizes relevant background on COVID-19, the risk posed to immigration detainees, ICE's systemwide actions and inactions in response to that threat, Plaintiffs' critique of that response, and the current conditions of confinement at about a dozen facilities nationwide.

**1. Risk of COVID-19 Spread in Immigration Detention Facilities**

The novel coronavirus known as SARS-CoV-2 causes a disease known as COVID-19, and is a viral pandemic. (Meyers Decl. ¶ 20; Venters Decl. ¶ 5.) As of late March 2020, the outbreak was in its early stages in the United States, though cases had been identified in each state, and infection rates are growing exponentially. (Id. ¶ 6.) As of the drafting of this Order, more persons have tested positive for COVID-19 in the United States than in any other country. More than 41,000 deaths have been reported in the U.S., and many tens of thousands more are expected in the coming weeks.

Doctors believe the virus is transmitted from person to person by respiratory droplets and by touching surfaces, and have found transmission occurs at close quarters of 3-6 feet. (Meyers Decl. ¶ 20.) Currently there is no vaccine available, and everyone is at risk of infection. (Id.) Serious illness and death from COVID-19 is most common among individuals with underlying health conditions like heart, lung, or liver disease, diabetes, or old age. (Id. ¶ 21; Franco-Paredes Decl. at 1.) Available data show a fatality rate about 15% among these high-risk groups. (Id. at 2). Individuals who survive may experience permanent loss of respiratory capacity, heart conditions, kidney damage, and other complications. (Id. at 4-5.)

The risks of infectious disease in prisons and jails are significantly higher than outside for several reasons. (Meyer Decl.) First, social distancing to prevent the spread of the disease by respiratory droplets is often impossible in "congregate settings," due to poor ventilation and inadequate space, and jails and prisons often lack access to personal protective equipment like masks, gowns and eye shields. (Id. ¶ 9.) Second, jails and prisons often lack resources for diagnosing and treating infectious disease. (Id. ¶¶ 14-15.) Simple segregation or solitary confinement measures as an outbreak management technique tend to backfire: they result in less

---

[4] The parties have submitted hundreds of pages of documents supporting their respective filings, as well as extensive evidentiary objections and responses. To the extent that the Court relies on objected-to evidence, the objections are overruled. Capitol Records, LLC v. BlueBeat, Inc., 765 F. Supp. 2d 1198 n.1 (C.D. Cal. 2010). "District courts, though, 'may give . . . inadmissible evidence some weight . . . [to] prevent[ ] irreparable harm before trial.'" Weride Corp. v. Kun Huan, 2019 WL 1439394, at *5 (N.D. Cal. Apr. 1, 2019) (quoting Johnson v. Couturier, 572 F.3d 1067, 1083 (9th Cir. 2009)). For the purposes of the preliminary injunction, "evidentiary issues 'properly go to weight rather than admissibility.'" Id. (quoting Go Daddy Operating Co., LLC v. Ghaznavi, 2018 WL 1091257, at *14 (N.D. Cal. Feb. 28, 2018). Thus, the Court takes the objections under advisement in considering the Motions.

medical attention and increased chances of death.  (Id. ¶ 10; see also Venters Decl. ¶ 10 ("[isolated detainees] quickly experience increased psychological distress that manifests in self-harm and suicidality, which requires rapid response and intensive care outside the facility . . .").) Unless an individual is held in a negative pressure room, his or her respiratory droplets may still flow outwards to the rest of the facility.  (Meyers Decl. ¶ 10.)  Third, people held in jails and prisons are more likely than others to have chronic underlying health conditions that make them susceptible to infectious disease.  (Id. ¶ 13.)  Finally, new information about COVID-19 suggests it may be transmissible through shared bathrooms and cell toilets without lids.  (Venters Decl. II ¶ 2(a).)

On April 2, 2020, six ICE detainees and five ICE staff at detention facilities had tested positive for COVID-19.  That number has dramatically increased.  As of the drafting of this Order, ICE reports 124 confirmed detainee cases at 25 facilities around the country and thirty confirmed cases of ICE detention facility staff at many of the same locations.[5]  Due to shortages in testing nationwide and because asymptomatic individuals may spread the disease, the known cases are likely the "tip of the iceberg."  (Venters Decl. ¶ 7.)

An immigration facility outbreak would also menace the non-detained: a surge in preventable cases would further strain local hospital and healthcare resources.  (Id. at 8; Seaborn Decl., Ex. E at 4 ("a detention center with a rapid outbreak could result in multiple detainees—five, ten or more—being sent to the local community hospital where there may only be six or eight ventilators over a very short period.").)  In the "alternate scenario," a facility outbreak is averted and a community's "survival is maximized."  (Id. also noting that many detention centers are in remote areas with limited access to health facilities).)

### 2.   CDC Guidance and ICE's Systemwide Response to COVID-19

On March 6, 2020, ICE Health Services Corp ("IHSC") provided interim guidance to detention facilities.  (Venters Decl. ¶ 14.)  The ICE website also provides guidance, which is updated periodically.  See ICE Guidance on COVID-19, ICE, https://www.ice.gov/covid19. The ICE Guidance purports to incorporate or be consistent with CDC guidance. (Id.)

On March 23, 2020, the CDC issued interim guidance on management of COVID-19 in correctional and detention facilities ("CDC Interim Guidance," Jordan Decl. III, Ex. D.).  The guidance mentions many of the same risks of COVID-19 transmission noted above, and notes several others, including: the inability of detainees to exercise frequent handwashing, restrictions on soap or paper towels, the likelihood of introduction of the disease due to staff ingress and egress and detainee transfers, and limited options for medical isolation.  (CDC Interim Guidance at 2.)  The CDC Interim Guidance provides recommendations on a wide range of topics,

---

[5] The number of ICE staff at detention facilities does not appear to include individuals such as guards, vendors, or medical service providers who work at those facilities and are not employed by ICE.  ICE Guidance on COVID-19, U.S. Immigration and Customs Enforcement, https://www.ice.gov/coronavirus.

including protocols for medical isolation, quarantines, social distancing, prevention by cleaning and disinfecting, pre-intake screening, and temperature checks.  (Id. at 3.)  With respect to detainees at higher risk of severe illness from COVID-19, the guidance notes:

- They should not be cohorted with other infected individuals, and if cohorting is unavoidable, "all possible accommodations" should be made to prevent transmission;
- Detained populations have a higher prevalence of infectious and chronic diseases and are in poorer health than the general population, even at younger ages;

(Id. at 16, 20.)  Individuals who are quarantined[6] or in medical isolation,[7] should be housed, in order of preference, separately in single cells or as a cohort with 6 feet of personal space assigned each individual in all directions.  (Id. at 16, 20 (providing six more granular types of preferences based on the type of wall, door, and ventilation).)  One of the least desirable quarantine or isolation methods is to house detainees in a cohort, in multi-person cells without solid walls or a solid door, without excellent ventilation, without social distancing, and without an empty cell between occupied cells.  (Id.)

After the CDC Interim Guidance was issued, ICE released a second important policy document in the form of Memorandum dated March 27, 2020 ("Action Plan"), which is addressed to detention wardens.  (Vick Decl., Ex. 1.)  The Action Plan recognizes that the "combination of a dense and highly transient detained population" presents "unique challenges . . . to mitigate the risk of infection."  (Id. at 1.)  The Plan applies to ICE-dedicated facilities, but does not apply to "intergovernmental partners and non-dedicated facilities."  (Id. at 1.)  The Memorandum confirms that ICE views the IHSC recommendations as "best practices," not commands or even performance standards, with the further caveat that the "CDC remains the authoritative source."  (Id. at 1, 5 (providing a link to CDC Guidance on COVID-19 in Detention

---

[6] "Quarantine refers to the practice of confining individuals who have had close contact with a COVID-19 case to determine whether they develop symptoms of the disease.  Quarantine for COVID-19 should last for a period of 14 days.  Ideally, each quarantined individual would be quarantined in a single cell with solid walls and a solid door that closes. If symptoms develop during the 14-day period, the individual should be placed under medical isolation and evaluated for COVID-19."  CDC Interim Guidance at 4.  The guidance notes it is preferable to quarantine individuals in separate rooms.  A group of quarantined individuals held in the same living space is called a "cohort."  Id. at 3.

[7] "Medical isolation refers to confining a confirmed or suspected COVID-19 case (ideally to a single cell with solid walls and a solid door that closes), to prevent contact with others and to reduce the risk of transmission.  Medical isolation ends when the individual meets pre-established clinical and/or testing criteria for release from isolation, in consultation with clinical providers and public health officials . . . ."  CDC Interim Guidance at 4.  Individuals should be isolated in separate rooms.  A group of isolated individuals held in the same living space is also called a "cohort."  Id. at 3.

Facilities).)  The Action Plan includes some, but not all of the CDC policies, and provides advice that sometimes conflicts with the CDC policies.

On April 4, 2020, ICE released docket review guidance, which ordered Field Office Directors ("FODs") across the country to identify individuals in certain CDC-defined categories for heighted risk of death due to COVID-19, and to make individualized determinations regarding continued custody.  ("Docket Review Guidance," Dkt. No. 121-4.)  Per the Docket Review Guidance, vulnerable detainees who are mandatorily detained do not receive any consideration, however.  The Docket Review Guidance is described in greater detail in the next Section.  See Section I.B.3.

Most recently, on April 10, 2020, ICE Enforcement and Removal Operations ("ERO") issued COVID-19 Pandemic Response Requirements.  ("Pandemic Response Requirements," Dkt. No. 124-1.)  The Pandemic Response Requirements set forth "mandatory requirements" for all facilities housing ICE detainees as well as best practices.  (Id. at 3.)  Dedicated detention facilities—those housing only ICE detainees—as well as non-dedicated facilities with mixed populations, including local jails, "must" (1) comply with their applicable detention standards and facility contract[8]; (2) comply with the CDC Interim Guidelines and the March 27, 2020 Action Plan; (3) notify the local FOD and FMC of known or suspected COVID-19 cases; and (4) notify the FOD and FMC "as soon as practicable" of any detainee meeting CDC's criteria for higher risk of harm, (id. at 5-7).  Whereas the April 4, 2020 Docket Review Guidance drew the line for vulnerable individuals at sixty years of age and listed pregnancy as a qualifying condition for release, the Pandemic Response Requirements raise the age to 65 and omit pregnancy.

The Pandemic Response Requirements also state all facilities housing ICE detainees must:

- Instruct staff and detainees to wear cloth face coverings when PPE supply is limited;
- Provide staff and detainees with no cost unlimited access to supplies for hand cleansing, including liquid soap, water, paper towels or dryers, and no-touch receptacles;
- Require all persons in the facility to avoid touching their eyes, nose, or mouth without cleaning their hands first;
- Prohibit sharing of eating utensils, dishes, and cups;
- Prohibit non-essential contact such as handshakes, hugs, and high-fives;
- Staff should clean shared equipment like radios and weapons;
- Where possible, restrict transfers of detained non-ICE populations and facilities

---

[8] The Court observes that different detention standards apply to different facilities. Thus, some facilities will only comply with the legacy Immigration and Naturalization Service 2000 National Detention Standards, whereas others will comply with more recent Performance-Based National Detention Standards, which came out in 2008 and were revised in 2011 ("PBNDS").  See ICE Detention Standards, https://www.ice.gov/factsheets/facilities-pbnds.

- "Efforts should be made" to reduce the population to approximately 75% of capacity, to promote social distancing

(Id. at 7-14.)  In addition, the Pandemic Response Requirements for the first time acknowledge the CDC's tiered housing preferences for individuals under medical isolation (e.g. separate single cells with solid walls and door are much preferable to cohorted multi-person cells without solid barriers).  (Id. at 15.)  The Response Requirements also note that if the number of confirmed cases at a facility exceeds individual isolation spaces, ICE must be promptly notified to arrange transfer.

For additional operational background, Defendants provide the declaration of the Deputy Assistant Director for Clinical Services and Medical Director of IHSC.  (Vick Decl., Ex. 2 ¶ 1.)  The IHSC Deputy Assistant Director oversees clinical services at the 20 IHSC-staffed facilities, which hold approximately 13,500 detainees.  (Id. ¶ 2.)  The Deputy Director states that IHSC is following CDC guidance in testing for COVID-19, but does not specify what the guidance calls for.  (Id. ¶ 9.)  Similarly, she states ICE has a pandemic workforce protection plan and that ICE instituted "applicable parts of the plan" in January 2020, but she does not attach excerpts of the plan, specify what the plan requires, or explain how it will address the needs of medically vulnerable detainees.  (Id. ¶ 6.)

ICE appears to be engaging in at least some centralized monitoring of facility conditions, though Defendants do not submit evidence that they are enforcing IHSC or CDC guidelines at all ICE facilities.  The best evidence of coordinated pandemic tracking is the ICE website, which is regularly updated with information about reported staff and detainee COVID-19 cases.  Second, IHSC Field Medical Coordinators ("FMCs") receive reports from medical leadership at contract facilities.[9]  (Id. ¶ 11.)  Each facility is supposed to report to FMCs any detainee they identify as "meeting CDC requirements for cohorting monitoring, or isolation."  (Id.)  Until April 10, 2020, Defendants did not require facilities to provide ICE with information about which detainees are most vulnerable to severe illness or death from COVID-19.  Defendants do not provide information about any independent tracking they conduct with regard to disabled or medically vulnerable individuals before or during the pandemic.

### 3.  Individualized Release Determinations

The number of individuals in ICE custody has slightly decreased since the declaration of a national emergency.  As of March 13, 2020, ICE had 35,980 single adults in custody.  (Holt Decl. ¶ 13.)  More than half of ICE's average daily population at that time had not been convicted of a criminal offense and had no pending criminal charge.  (Seaborn Decl., Ex. F.)  A month later, on

---

[9] Further declarations submitted by Defendants clarify that FMCs "oversee" clinical services at Intergovernmental Service Agreement Facilities ("IGSA"), and "ensure" the medical care provided by contractors meets detention standards under the contract.  (Vick Decl., Ex. 2 ¶¶ 2-3.)  The FMCs "monitor" but do not provide hands-on care, or direct the care.  (Id.)

April 13, 2020, ICE indicated that 31,709 individuals were in its custody,  (Holt Decl. ¶ 13), of whom approximately 14,000 have no prior criminal conviction and no pending criminal charges.[10]

There are a number of tools available to ICE to decrease population density or to release medically vulnerable individuals.  ICE may choose to release people on bond or conditional parole, and in the past, has exercised detention authority to release individuals with serious vulnerabilities or medical conditions.  (Saenz Decl. ¶ 18.)  Under previous Republican and Democratic Administrations, agency policy and practice was to limit detention of noncitizens who are pregnant or nursing, elderly, or suffer from serious physical or mental illness.  (Lorenzen-Strait Decl. ¶ 4-7 (noting that this authority was also exercised to release individuals vulnerable to medical harm but not yet ill).)  Even individuals required to be detained by statute can be and were released pursuant to ICE guidelines and policies, and statutory and regulatory provisions.  (Id. ¶ 2 (citing INA §§ 212(d)(5), 235(b), 236, 241; 8 C.F.R. §§ 1.1(g), 212.5, 235.3, 236.2(b)); Sweeney Decl. ¶¶ 2-5. But see Holt Decl. ¶ 10 (noting ICE's current policy does not allow the exercise of discretion to release those subject to mandatory detention even if at higher risk for COVID-19).)

In recent years, legal services organizations observed an increase in parole denials by ICE.  (Rivera Decl. ¶¶ 14-16; Corchado Decl. ¶ 23.)  Since the pandemic, medically vulnerable detainees have had parole requests denied,  (Rivera Decl. ¶ 13), pending for weeks without decision, (Corchado Decl. ¶ 13; see also Rios Decl. ¶ 25), or have not been able to secure hearings at all.  For example, the  Chicago ICE field office indicated it was closed, leaving attorneys and clients uncertain if they would receive a decision.  (Zwick Decl. ¶ 34.)

In the absence of prompt system-wide action by ICE to address the threat of COVID-19, dozens of detainees and their counsel filed individual and group habeas petitions for release.  Plaintiffs include an appendix of twenty-nine such petitions.  (Jordan Declaration II, Appendix 1.)  In all but six of the cases the petitioners secured release.  (Id.)  In many of the cases where release was not secured, the petitioners obtained another form of relief, including a bond hearing or class certification, or their request was denied without prejudice.  Defendants, in turn, submit four immigration habeas decisions in which the court did not find a likelihood of success on the merits, one criminal release decision, and one recently filed habeas petition.  (Dkt. Nos. 121-5 to 121-11.)

On April 4, 2020, ICE issued Docket Review Guidance to ICE FODs providing for the potential release or use of alternatives to detention for detainees vulnerable to serious illness or death from COVID-19.  The Docket Review Guidance notes that on March 18, 2020, FODs were instructed to review the cases of noncitizens over the age of 70 or pregnant to determine whether continued detention was appropriate.  (Id. at 1.)  The April 4 Docket Review Guidance notes the categories are expanded to include:

- Pregnant detainees or those having delivered in the last two weeks

---

[10] ICE Currently Detained Population, https://www.ice.gov/detention-management.

- Detainees over 60 years old
- Detainees of any age having chronic illnesses which would make them immune-compromised, including but not limited to
  - Blood disorders
  - Chronic kidney disease
  - Compromised immune system
  - Endocrine disorders
  - Metabolic disorders
  - Heart disease
  - Lung disease
  - Neurological and neurologic and neuro development conditions

(Id. at 1-2.)  The Docket Review Guidance asks FODs to "please" identify "all cases within your [areas of responsibility] that meet any of the criteria above and validate that list with assistance from IHSC or your [FMC] to ensure the conditions listed are still present and do result in the detainee potentially having a higher risk for serious illness from COVID-19." (Id. at 2.)  The guidance goes on to request FODs to review these cases to determine whether ongoing detention is appropriate, but notes that presence of a risk factor "may not always be determinative." (Id.)  The guidance does not acknowledge that individuals who are detained under 8 U.S.C. § 1226(c) may be released, and remarks that even in cases of discretionary detention, an at-risk individual should not be released in cases of potential danger to property or persons. (Id.)

In a supplemental filing ICE notes individualized release determinations began prior to this April 10, 2020 Docket Review Guidance. (Holt Decl. ¶ 10.)  Since March 2020, ICE has released 693 individuals using a methodology similar to the Docket Review Guidance. (Holt Decl. ¶ 10.)  ICE does not state how many eligible detainees have been identified, and notes that the time needed for each review depends on the complexity of the case. (Id. ¶ 11.)

### 4. Plaintiffs' Criticisms of ICE's Systemwide Action or Inaction

Plaintiffs sharply criticize ICE's March 6, 2020 guidelines.  For example, the guidelines focus on questionnaires, rather than checking for active symptoms of staff, and tend to ignore that COVID-19 has arrived in full force and can be carried by asymptomatic individuals. (Venters Decl. ¶ 10(a).)  In addition, the guidelines do not include access to hand sanitizer and use of masks for individuals with a cough; do not include guidance for administrators to plan surge capacity needs; do not provide guidance on when to test patients for COVID-19 other than by reference to the CDC; do not propose identification of individuals with high risk of illness and death from COVID-19; and largely ignore CDC guidelines for social distancing strategies. (Id. ¶ 10(b)-(f).)  To the extent ICE envisions use of "isolation rooms," Plaintiffs contend, most facilities only have 1-4 rooms that fit that definition and so will be quickly overrun. (Id. ¶ 16.)

In their Reply, Plaintiffs argue that even after the March 27, 2020 Action Plan and April 4 Docket Review Guidance, ICE's systemic response to the COVID-19 pandemic falls short of

CDC benchmarks.  (PI Reply at ;Venters Decl. II.)  Dr. Venters notes several discrepancies and
gaps in  ICE's global response, including that it:

- Does not require symptomatic detainees be given a mask and placed in medical
  isolation;
- Does not mandate nose and mouth coverings for those who cannot engage in
  social distancing;
- Does not present a plan for isolation when the number of people needing to be
  isolated exceeds existing isolation rooms or cells;
- Does not limit transportation of detainees;
- Does no identify what precautions should be taken to protect people with risk
  factors in ICE custody;
- Fails to include certain risk factors identified by the CDC and which FODs and
  their staff may not be aware;
- Delegates medical screening for custody review to FODs and staff who are not
  medical professionals, and advises them to check with medical professionals only
  after the fact;
- Does not urgently command risk factor screening measures, but merely requests
  them, without any timeline;
- Fails to account for the fact that detained populations are 10-15 years more
  progressed than chronological age;
- Does not ensure risk factors reflect evolving data and science;
- Does not include nationwide surveillance, coordination, or communication
  measures.

(Venters Decl. ¶¶ 3-4.)

Plaintiffs also argue that ICE systematically fails to track individuals with disabilities and
medical vulnerabilities, both before and during the COVID-19 pandemic.  In support of this
contention, they include an Office of the Inspector General report, which discusses ICE's Risk
Classification Assessment ("RCA") tool, which was designed to assist with release and custody
classification decisions.  ("OIG Report," Jordan Decl., Ex. A.)  The OIG Report explains that
when ICE Enforcement and Removal Operations ("ERO") detains a noncitizen, it uses the RCA
to generate recommendations for detention or release, including for alternatives to detention,
unless the person is mandatorily detained.  (Id. at 5-6.)

The OIG Report provides some information on at least one of ICE's screening
mechanisms: it notes that RCA questions on "special vulnerabilities" conflict with ICE's
Performance Based National Detention Standards ("PBNDS") medical screening guidance.  For
example, an ICE ERO officer using the RCA tool does not have medical training and might not
ask questions in a private setting, whereas the PBNDS call for someone with training—a medical
professional or trained detention officer—to conduct the screening.  (Id. at 12.)  The OIG Report
contrasts the PBNDS medical screening questions, which include 31 fields, with the RCA special
vulnerabilities "checklist" which includes only yes/no data fields for (as relevant to this case)

"serious physical illness," "disabled," "elderly," and "pregnant." (OIG Report, Appendix G, at 29.)

Apart from this limited tool, and any reports provided by facilities to IHSC FMCs regarding detainee health, it appears ICE does not have a centralized screening, let alone tracking, mechanism or procedure to identify medically vulnerable or disabled individuals in its custody during the COVID-19 pandemic. Plaintiffs repeat the refrain from their Complaint that ICE has failed to ensure compliance with detention standards, and this failure extends to COVID-19 protocol compliance. (Compl. ¶¶ 522-537; PI Mot. at 12 (incorporating by reference additional OIG reports, dealing with management and oversight of detainee medical care).)

### 5. Reported Immigration Detention Facility Conditions

Plaintiffs provide evidence of the recent conditions at fourteen facilities in Alabama, California, Colorado, Georgia, Louisiana, and Texas. Plaintiffs also include anecdotal evidence of conditions in about fifteen additional facilities nationwide. Although the facts are cumulative, the Court summarizes the conditions below, by state and locality, along with any response provide by the government.

### a. Etowah County Detention Center (Gadsen, Alabama)

An Etowah County immigration detainee, Hernandez, states that as of March 24, 2020, he had not received formal education about COVID-19, though there was an informative flyer in the dorm, which is in English only. (Hernandez Decl. ¶ 3.) Hernandez had not had his body temperature checked and has not seen other individuals having their temperatures taken. (Id. ¶ 4.) Soap must be purchased at commissary, and Hernandez did not observe officers wearing gloves or masks. (Id. ¶ 4.) New detainees and guards enter the facility regularly. (Id. ¶ 5.) Recently, a transferee reported feeling sick, and went to medical, where he did not have his temperature taken or receive any treatment, but was restricted to his cell. (Id. ¶ 6.) Individuals in Hernandez's unit demanded the transferee be removed. Two individuals tied nooses around their necks and stepped onto railings of the second floor, threatening suicide unless the facility took preventive action. (Id.) After this incident, detainees in the unit were provided one surgical mask each, and the unit is on lockdown except for two half-hour increments daily. (Id. ¶¶ 6-7.)

Defendants state that Etowah screens each detainee for disabilities upon admission. (Vick Decl., Ex. 11 ¶ 7 (not stating which disabilities are screened, or how many individuals qualify as disabled at Etowah).) Defendants do not state whether Etowah has identified detainees at greater risk for contracting COVID-19, and do not say what measures are being taken to protect those detainees. However, they do note Etowah provides a list of "chronic care" detainees and two detainees over the age of 60. (Id. ¶ 11.) They state that as of April 8, 2020, there are no confirmed COVID-19 cases at Etowah. (Id. ¶ 13(a)-(c); Nelson Decl. ¶ 17(a).) The facility has increased sanitation frequency and supplies, including hand sanitizer, soap, masks, and gloves "readily available" for both staff and detainee use. (Vick Decl., Ex. 11 ¶ 15.)

An FMC assigned to Etowah reports that he has been informed of Etowah's COVID-19
protocols, and the facility is conducting intake screenings for COVID-19 symptoms (but not for
COVID-19 risk factors), and following ICE and CDC guidance. (See generally Nelson Decl.)
Etowah's population is "within . . . approved capacities." (Id. ¶ 18.) For group movements, the
detainees are reminded to practice social distancing, and are not crowded in holding areas. (Id. ¶
29.)

### b.  Adelanto ICE Processing Center (Adelanto, California)

Plaintiffs state that as of March 18, 2020, two dorms in the Adelanto West building were
in quarantine or cohorting. (Rios Decl. ¶ 17.) On the morning of March 19, 2020 the Adelanto
East building was also quarantined. (Id.) Al Otro Lado observed guards standing in groups in
close proximity, and detainees report to the organization that guards did not wear gloves or masks
in early to mid March. (Id. ¶ 22.) Detainees clean most of the facility and do not have masks
themselves, and report a shortage of cleaning supplies. (Id. ¶ 23.) One Adelanto detainee, a
sixty-three-year-old asylum seeker who is not subject to mandatory detention told his attorney on
March 20, 2020 that he was confined with about 80 detainees, none of whom appear to be ill, but
is residing in close quarters with four other individuals. (Ragland Decl. ¶ 10.) Nurses and
doctors had not visited to perform check-ups on the quarantined individuals. (Id.)

Fraihat, who was held at Adelanto until a recent successful habeas petition,[11] is fifty-eight
and suffers from asthma, among other medical conditions. (Fraihat Decl. ¶¶ 3-4.) As of March
24, 2020, he had not received information about COVID-19 from ICE or Adelanto staff, and
noted that soap was not easier to access, despite the outbreak. (Id. ¶ 6.) He stated that social
distancing is not possible due to the close quarters. (Id.) He observed newly detained individuals
still arrive at the facility, and that he had not had his temperature checked. (Id. ¶ 7; see also
Sudney Decl. ¶ 9.) A guard told Fraihat that older individuals are cohorted in a unit that shares a
door with a unit for individuals exhibiting COVID-19 symptoms. (Fraihat Decl. ¶ 8.)

Munoz, a sixty-year-old detainee released on April 2, 2020,[12] described conditions in the
Adelanto dorm for older individuals. (Munoz Decl.) He stated individuals in the unit have not
had temperature checks or tests and are not spaced more than six feet apart. (Id. ¶¶ 3-5.) Guards
move between units for count, and detainees who deliver meals also circulate between the units,
as do the pill pass nurses. (Id. ¶ 8; Fraihat Decl. ¶ 11.) Some guards wear masks and gloves, but
older detainees cannot access PPE, to his knowledge. (Id. ¶ 9.) If a detainee had a fever, he or
she would have to submit a "kite," which takes 24 hours to review. (Sudney Decl. ¶ 12.)

Defendants respond that Adelanto screens each detainee for disabilities upon admission.
(Vick Decl., Ex. 10 ¶ 7 (not stating which disabilities are screened or how many at Adelanto
qualify as disabled).) Defendants also state Adelanto has identified detainees "at greater risk for
contracting COVID-19," (Id. ¶ 11), but do not say what measures are being taken to protect those

---

[11] Fraihat v. Wolf, Case No. 20-00590 (C.D. Cal. Mar. 30, 2020).

[12] Munoz v. Wolf, Case No. 20-00625 (C.D. Cal. Apr. 2, 2020).

detainees, or whether the criteria used conform with CDC guidelines.  The facility has increased sanitation frequency and supplies.  (Id. ¶ 15.)

Defendants state that as of April 10, 2020, there are no confirmed COVID-19 cases at Adelanto, and no housing units on monitoring for COVID-19.  (Id. ¶ 13(a)-(b); Valdez Decl. ¶ 17(a))  The facility has negative pressure rooms onsite and can admit patients to the local hospital when needed.  (Valdez Decl. ¶ 16.)  Individuals believed to have been exposed to COVID-19, who are asymptomatic, are placed in cohorts with restricted movement.  (Id. ¶ 15.)  Two suspected cases received negative test results, and two more detainees are now being monitored due to unverifiable travel history and a fever.  (Id. ¶ 17 (COVID-19 test pending, in the latter case).)  Adelanto's population is "within . . . approved capacities," but it is not clear whether cohorted detainees have empty cells between them.  (Id. ¶ 18.)  Detainees are reminded to practice social distancing during "group movements," and detainees are not crowded into law libraries, intake areas, or holding rooms.  (Id. ¶ 30.)

### c.  Otay Mesa Detention Center (San Diego, California)

As of March 20, 2020, Al Otro Lado staff observed Otay Mesa employees shaking hands, patting shoulders, and working in close proximity to each other. (Rios Decl. ¶ 9.)  Attorneys were allowed to enter the facility for non-contact video teleconference visits, without screening procedures.  (Id. ¶ 8.)  Visiting attorneys did not have their temperature taken, and were not asked if they had COVID-19 symptoms.  (Id.)  Telephones were not cleaned prior to the visit.  (Id. ¶ 11.)  Detainees reported cleaning pods and laundering clothes without protective gear other than gloves. (Id. ¶¶ 15-16.)  The week prior, from March 13-17, Al Otro Lado staff could not schedule bond hearings for detainees at Otay Mesa, and as a result, medically vulnerable detainees could not be released.  (Rios Decl. ¶ 5.)  At least one client was transferred to Houston due to the delays.  (Id. ¶ 6.)  As of April 17, 2020, ICE reports that eighteen detainees and eight ICE staff at Otay Mesa have tested positive for COVID-19.[13]

### d.  Aurora Contract Detention Facility (Aurora, Colorado)

According to the reports of a detainee who was a practicing doctor in New Jersey, with medical licenses in New York and New Jersey, as of March 21, 2020, Aurora had taken few steps to prepare for COVID-19, except distributing information and implementing some screening measures. (Solomonov Decl. ¶ 4.)  Up to eighty people live in a dorm with a maximum capacity of eighty-two.  (Id. ¶¶ 6, 9.)  The dorm consists of four- to eight-person cells, where it is "impossible to stay away from other people."  Detainees do not have access to hand sanitizer, have not been tested for COVID-19, have no access to masks, and have not changed cleaning procedures.  (Id. ¶ 7.)  Eighty detainees share a single sink with a timed faucet that only stays on for a few seconds and that has low water pressure.  (Id. ¶ 8.)  According to another detainee's report, the only guaranteed way to get bar soap is to buy it for $3 at commissary. (Zwick Decl. ¶ 20.)

---

[13] ICE Guidance on Covid-19, https://www.ice.gov/coronavirus.

Colorado has been under a state of emergency since March 10, 2020. (Solomonov Decl. (attaching Elizabeth Jordan Declaration ¶ 4).) Nevertheless, Aurora added about thirteen new people to the declarant's dorm from March 18 to 21, 2020, and some purportedly came from jails with symptomatic individuals. (Id. ¶ 6.) The screening procedures for transferees consisted of a questionnaire and temperature check, and the detainees were concerned about asymptomatic individuals gaining admission to their dorm. (Id. ¶ 11.) A lieutenant declared on March 20, 2020 that there were no coronavirus cases in the facility, and told detainees to wash their hands. (Id. ¶ 11.) As of April 20, 2020, two ICE employees or facility staff have tested positive for COVID-19 at Aurora.[14]

### e.   Folkston ICE Processing Center (Folkston, Georgia)

On March 19, 2020, a detainee caller from Folkston reported he lacked access to soap and sanitizer, and at least one person in his housing unit had symptoms of cough, fever, or shortness of breath, but had not been removed from the unit. (Rivera Decl. ¶ 21.) A Southeast Immigrant Freedom Initiative ("SIFI") attorney visiting Folkston on March 16, 2020 was required to undergo a temperature check and questionnaire, and provided her own gloves and disinfectant wipes. (Id. ¶ 19.)

### f.   Stewart Detention Center (Lumpkin, Georgia)

The week before March 23, 2020, SIFI attorneys entering Stewart were not required to submit to temperature checks or to pass screening. (Rivera Decl. ¶ 22.) Some but not all facility staff wore gloves, and no staff wore masks. (Id.)

Defendants state that  Stewart screens each detainee for disabilities upon admission. (Vick Decl., Ex. 12 ¶ 7.) Defendants state Stewart has identified detainees at greater risk for contracting COVID-19, but do not say what measures are being taken to protect those detainees in particular. (Id. ¶ 11.) They state that as of April 2, 2020, there are no confirmed detainee COVID-19 cases at Stewart but there is one suspected case. (Id. ¶ 13(a)-(c).) They do not state whether any housing unit is being cohorted or quarantined. The facility has increased sanitation frequency and supplies, including hand sanitizer, soap, masks, and gloves, which are "readily available" for both staff and detainee use. (Id. ¶ 15.) Defendants do not state what special accommodations or measures have been taken to protect Stewart detainees at risk of severe illness or death as a result of COVID-19.

As of April 10, 2020, Defendants knew of thirty suspected cases of COVID-19 in the facility, and they were placed on "medical observation," and there were five confirmed cases in the facility. (Bretz Decl. ¶ 17.) Those five individuals are "isolated and receiving medical treatment" consistent with CDC guidelines. (Id. ¶ 14.) The facility now provides 24-hour

---

[14] ICE Guidance on Covid-19, https://www.ice.gov/coronavirus.

access to disinfectants, sanitizer, and soap in every housing unit, and is "encouraging . . . general population to use these tools often and liberally." (Id. ¶ 16.)  As of April 17, 2020 seven detainees and one ICE staff member tested positive for COVID-19 at Stewart.[15]

### g.  Irwin Detention Center (Ocilla, Georgia)

One detainee at Irwin reported to SIFI staff that there were confirmed cases of COVID-19 in the facility and that it was under quarantine.  (Rivera Decl. ¶ 17.)  A March 19, 2020, a detainee caller reported that neither ICE nor guards had given information about COVID-19, and that at least one person in his housing had a worsening cough, but had not been removed from the unit.  (Id. ¶ 18.)  As of April 17, ICE Reports one COVID-19 case at Irwin.[16]

### h.  South Louisiana ICE Processing Center (Basile, Louisiana)

The legal director of Las Americas Immigrant Advocacy Center reports that detainees have no access to soap or sanitizer, and that guards ran out of gloves.  (Corchado Decl. ¶ 10.)  Toilet paper is limited, adding to hygiene concerns, and multiple people in the barracks were coughing.  (Id. ¶ 10.)  One immune-compromised detainee was working in the facility kitchen until at least March 20, 2020.  (Id. ¶ 11.)  Las Americas reports HIV positive detainees are scheduled to be transferred by bus and/or plane, through various detention centers.  (Id. ¶ 12.)  Parole-eligible detainees with family in the U.S. have had pending parole applications for up to three weeks.  (Id. ¶ 13.)

### i.  LaSalle Detention ICE Processing Center (Jena, Louisiana)

SIFI staff received a March 19, 2020 call from an individual held at LaSalle who complained of fever, chest pain, difficulty breathing while trying to sleep, and of coughing blood.  (Rivera Decl. ¶ 11.)  The detainee stated he tested negative for the flu but had not been tested for COVID-19, and he could only obtain ibuprofen, syrup, and salt.  He reported sharing a unit with others with similar symptoms.  (Id. ¶ 11.)  He stated that GEO staff were not routinely using gloves.  (Id. ¶ 11.)  On March 20, 2020,  SIFI received information from two clients who had engaged in a 120-day hunger strike that they would likely be force fed on March 23 or 24, 2020.  (Id. ¶ 13.)  The ICE field office twice denied their parole applications, despite evidence of medical vulnerability.  (Id.)  ICE Response to requests for release "remains spotty" and many applications are denied or receive no decision for months.  (Id. ¶¶ 14-15.)  As of April 17, 2020, one detainee has tested positive at this facility.[17]

//
//

---

[15] ICE Guidance on Covid-19, https://www.ice.gov/coronavirus.

[16] ICE Guidance on Covid-19, https://www.ice.gov/coronavirus.

[17] ICE Guidance on Covid-19, https://www.ice.gov/coronavirus.

### j.   Pine Prairie Detention Center (Pine Prairie, Louisiana)

As of March 16, 2020, detainees informed a SIFI staff member that they lacked access to hand soap, and that the facility operator, GEO Group, had not altered protocols in response to the pandemic. (Rivera Decl. ¶ 7.) During a visit, the SIFI staff member submitted to a temperature check and questionnaire, but noted staff and detainees did not wear masks or gloves. (Id. ¶ 6.) On March 18, 2020, a detainee told SIFI staff that he and about 60 others in Charlie Alpha unit were under quarantine, after someone in the unit was suspected of having COVID-19. (Id. ¶ 8.) Individuals in the unit had to clean their own unit, and had no access to hand soap or sanitizer, except soap they had for showers. (Id.) No spacing measures had been implemented. (Id.) The following day, a detainee in another unit stated they were receiving hygiene supplies every two days, and that two individuals with COVID-19 symptoms had been removed from the unit.

On the day after that, March 20, 2020, a SIFI member visited detainees from the quarantined unit, but staff did not check her temperature. (Id. ¶ 10.) The staff member observed some staff wore masks and others did not. (Id.) The detainees stated they did not have masks inside the unit, and that detainees were still cleaning the dorm without gloves. (Id.) Transferees or newly detained individuals continued to be admitted to the unit. (Id.) As of April 17, 2020, four detainees at Pine Prairie have tested positive.[18]

### k.   Joe Corley Detention Facility (Conroe, Texas)

Las Americas received several complaints from clients concerned about the lack of preventive measures a Joe Corley Detention Facility. (Corchado Decl. ¶ 17.) The facility places 36 people in each barrack. (Id. ¶ 22.) Cafeteria workers organized a three-day strike, and access to food was disrupted, resulting in one detainee suffering an epileptic seizure. (Id. ¶ 18.) Clients report to Las Americas there are others in their dorms sick with what seems like the flu, and who have been denied medical visits. (Id. ¶ 19.) Two clients have asthma and have not received inhalers, and another detainee with bullets in his legs has not been able to obtain pain medication. (Id. ¶¶ 18-21.) Deportation Officers have informed all but one Las Americas clients that ICE will not consider their parole applications, because they were formerly placed in Migrant Protection Protocols ("MPP"), even though such individuals are eligible and similarly situated clients have obtained parole before. (Id. ¶ 23.)

### l.   Houston Contract Detention Facility (Houston, Texas)

A detainee at this facility declares that as of March 24, 2020, he did not receive formal information about COVID-19 beyond informational flyers, and observed no increase in cleaning supplies to support additional handwashing. (Sanchez Decl. ¶ 7.) Detainees with cleaning assignments had to mop and sweep without gloves or protective equipment, and guards did not wear gloves or masks. (Id. ¶ 7.) Social distancing in the 40-person open dorm with bunk beds

---

[18] ICE Guidance on Covid-19, https://www.ice.gov/coronavirus.

four feet apart was not possible.  (Id. ¶ 10.)  The week prior, new transferees from Otay Mesa were added to the facility.  (Id. ¶ 11.)  As of April 20, 2020, one ICE employee tested positive at this facility.

### m.  South Texas ICE Processing Center (Pearsall, Texas)

On March 17, 2020, six detainees reported they had not received information about COVID-19 from the facility.  (Steglich Decl. ¶ 6.)  Detainees did not know what precautionary measures they should be taking, and no protective gear was available.  (Id.)  New arrivals continued to come to the facility, without information as whether they had been screened.  (Id. ¶ 7.)  None of the detainees reported temperature checks.  (Id.)  Court rooms at the facility were functioning as normal, with judges, attorneys, court staff, and respondents in close proximity. (Id. ¶ 10.)  Respondents were held in a crowded, closed cells before and after their hearings.  (Id. ¶ 11.)

### n.  Other Facilities

Plaintiffs also provide declarations from legal service providers about the response to COVID-19 at immigration detention facilities in their region.  An immigration legal services provider covering New Jersey facilities with COVID-19 cases reports that transferees continue to arrive in housing units where people exhibited symptoms of the virus.  (Saenz Decl. ¶¶ 7-9.)  At Bergen County Jail, clients are locked down in close quarters with their cellmates for all but a few hours a day, have no recreation or phone access, and must use toilets that cannot be flushed regularly.  (Id. ¶ 13.)  The conditions at Hudson County Jail in Kearny have been similar.  (Id.) The service provider, New York Immigrant Family Unity Project, submitted release requests to ICE for 16 particularly vulnerable people, but ICE had not answered as of March 23, 2020.  (Id. ¶ 15.)

The National Immigrant Justice Center ("NIJC") covers the following facilities: McHenry County Jail in Woodstock, Illinois;  Jerome Combs Detention Center in Kankakee, Illinois; Boone County Jail in Burlington, Kentucky; Clay County Detention Center in Brazil, Indiana; Kenosha County Detention Center in Kenosha, Wisconsin; Pulaski County Detention Center in Ullin, Illinois; Dodge County Detention Center in Juneau, Wisconsin; Otay Mesa Detention Center in San Diego California; Cibola County Correctional Center in Milan, New Mexico; and South Texas Detention Complex in Pearsall, Texas.  (Zwick Decl. ¶¶ 3-4.)  NIJC notes that "[m]ost clients reported that they received no information whatsoever from ICE or facility staff, much less medical staff, about the virus, and were learning what they knew almost exclusively from watching television."  NIJC clients reported lack of access to soap, water, hand sanitizer, disinfectants, or other necessary supplies.  (Id. ¶¶ 15-25.)

Another organization, Friends of Miami-Dade Detainees ("FOMDD"), provided anecdotes regarding Krome Service Processing Center in Miami, Florida; Broward Transitional Center in Pompano Beach, Florida, and Glades County Jail in Moore Haven Florida.  (Conlin Decl. ¶ 2.)  FOMDD has not been allowed to bring cleaning supplies, masks, gloves, or hand

sanitizer to the facilities.  (Id. ¶ 4.) Detainees at these facilities reportedly lack adequate soap and
cleaning materials.  (Id. ¶ 7.)

## II.  LEGAL STANDARD

### A.  Provisional Class Certification

Courts in the Ninth Circuit "routinely grant provisional class certification for purposes of
entering injunctive relief."  Carrillo v. Schneider Logistics, Inc., 2012 WL 556309, at *9 (C.D.
Cal. Jan. 31, 2012) (citing Baharona-Gomez v. Reno, 167 F.3d 1228, 1233 (9th Cir. 1999)).
Federal Rule of Civil Procedure 23 ("Rule 23") governs the litigation of class actions.  A party
seeking class certification must establish the following prerequisites:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there
> are questions of law or fact common to the class; (3) the claims or defenses of the
> representative parties are typical of the claims or defenses of the class; and (4) the
> representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  After satisfying the four prerequisites of numerosity, commonality,
typicality, and adequacy, a party must also demonstrate one of the following: (1) a risk that
separate actions would create incompatible standards of conduct for the defendant or prejudice
individual class members not parties to the action; (2) the defendant has treated the members of
the class as a class, making appropriate injunctive or declaratory relief with respect to the class as
a whole; or (3) common questions of law or fact predominate over questions affecting individual
members and that a class action is a superior method for fairly and efficiently adjudicating the
action.  See Fed. R. Civ. P. 23(b)(1)-(3).[19]

A trial court has broad discretion regarding whether to grant a motion for class
certification.  See Bateman v. Am. Multi-Cinema, Inc., 623 F.3d 708, 712 (9th Cir. 2010).
However, "[a] party seeking class certification must affirmatively demonstrate [] compliance
with [Rule 23]—that is, [the party] must be prepared to prove that there are in fact sufficiently
numerous parties, common questions of law or fact, etc."  Wal-Mart Stores, Inc. v. Dukes, 564
U.S. 338, 350 (2011).  A district court must conduct a "rigorous analysis" that frequently "will
entail some overlap with the merits of the plaintiff's underlying claim."  Id. at 351.  "Courts
typically proceed claim-by-claim in determining whether the Rule 23 requirements have been
met, particularly as to the Rule 23(a)(2) and (b)(3) requirements of common questio[ns] and
predominance."  Allen v. Verizon California, Inc., 2010 WL 11583099, at *2 (C.D. Cal. Aug. 12,
2010).

Rule 23 further provides that "[w]hen appropriate, an action may be brought or
maintained as a class action with respect to particular issues," Fed. R. Civ. P. 23(c)(4), or the

---

[19] While some circuits have adopted an "ascertainability" prerequisite to certification, the
Ninth Circuit has not.  Briseno v. ConAgra Foods, Inc., 844 F.3d 1121, 1124 n.4 (9th Cir. 2017).

"class may be divided into subclasses that are each treated as a class under this rule," Fed. R. Civ. P. 23(c)(5). "This means that each subclass must independently meet the requirements of Rule 23 for the maintenance of a class action." Betts v. Reliable Collection Agency, Ltd., 659 F.2d 1000, 1005 (9th Cir. 1981).

## B.  Preliminary Injunction

"A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." Munaf v. Geren, 553 U.S. 674, 690 (2008) (citations omitted). An injunction is binding only on parties to the action, their officers, agents, servants, employees and attorneys and those "in active concert or participation" with them. Fed. R. Civ. P. 65(d).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). The Ninth Circuit employs the "serious questions" test, which states "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011). "A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." Munaf v. Geren, 553 U.S. 674, 690 (2008) (citations omitted).

## III.  DISCUSSION

## A.  Rule 23(a) Requirements

Plaintiffs request provisional certification of the following two subclasses ("Subclasses"):

Subclass One: All people who are detained in ICE custody who have one of the Risk Factors placing them at heightened risk of severe illness and death upon contracting the COVID-19 virus.[20]

---

[20] The Risk Factors are defined as being over the age of 55; being pregnant; or having chronic health conditions, including: cardiovascular disease (congestive heart failure, history of myocardial infarction, history of cardiac surgery); high blood pressure; chronic respiratory disease (asthma, chronic obstructive pulmonary disease including chronic bronchitis or emphysema, or other pulmonary diseases); diabetes; cancer; liver disease; kidney disease; autoimmune diseases (psoriasis, rheumatoid arthritis, systemic lupus erythematosus); severe psychiatric illness; history of transplantation; and HIV/AIDS.

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk MG

Subclass Two: All people who are detained in ICE custody whose disabilities place them at heightened risk of severe illness and death upon contacting the COVID-19 virus.[21]

(Class Cert. Mot. at 2-3.)  Plaintiffs argue that the putative class members are at risk of serious illness or death due to a systemwide failure to implement adequate preventive measures.  (Id.)

### 1.  Numerosity

A class satisfies the prerequisite of numerosity if it is so large that joinder of all class members is impracticable.  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).  To be impracticable, joinder must be difficult or inconvenient but need not be impossible.  Keegan v. American Honda Motor Co., 284 F.R.D. 504, 522 (C.D. Cal. 2012).  There is no numerical cutoff for sufficient numerosity.  Id.  However, forty or more members will generally satisfy the numerosity requirement.  Id.

The Court finds the class is sufficiently numerous that joinder of all class members would be impracticable.  Although Plaintiffs do not know the exact number of people in ICE detention with the specified Risk Factors or Covered Disabilities, the Court agrees that "general knowledge and common sense indicate that [the class] is large."  Inland Empire-Immigrant Youth Collective v. Nielsen, 2018 WL 1061408, at *7 (C.D. Cal. Feb. 26, 2018).  At the time Plaintiffs filed, about 40,000 individuals were in immigration detention facilities nationwide.  (Seaborn Decl., Ex. F (attaching ICE's published Average Daily Population as of 03/14/2020).)  Plaintiffs estimate about 1400 individuals over the age of 50 are in ICE custody, and about 2400 individuals with Chronic Obstructive Pulmonary Disease, for example.  (Class Cert. Mot. at 3-4.)

Defendants assert unconvincingly that Plaintiffs "fail to show that there are at least 40 individuals" with the defined factors.  (Class Cert. Opp'n at 11.)  However, Plaintiffs are not required to provide irrefutable proof of the number of individuals in the putative class.  Where the relief sought is "only injunctive or declaratory," the numerosity requirement is somewhat relaxed, and "even speculative or conclusory allegations regarding numerosity" are sufficient to permit certification.  Sueoka v. United States, 101 F. App'x 649, 653 (9th Cir. 2004).  In addition, Defendants do not meaningfully question Plaintiffs' estimates.  Defendants' own declarations suggest that detention facilities track the numbers of disabled detainees, and if this is true, it stands to reason that the government would counter Plaintiff's numbers with their own data.  (Vicks Exs. 10-12, ¶¶ 7, 11 (noting IHSC believes facilities are tracking the numbers of individuals with disabilities, and some are tracking those with COVID-19 risk factors).)

---

[21] Covered Disabilities include: cardiovascular disease (congestive heart failure, history of myocardial infarction, history of cardiac surgery); high blood pressure; chronic respiratory disease (asthma, chronic obstructive pulmonary disease including chronic bronchitis or emphysema, or other pulmonary diseases); diabetes; cancer; liver disease; kidney disease; autoimmune diseases (psoriasis, rheumatoid arthritis, systemic lupus erythematosus); severe psychiatric illness; history of transplantation; and HIV/AIDS.

**CIVIL MINUTES—GENERAL**   Initials of Deputy Clerk MG

Defendants next argue that a finding of impracticability of joinder is barred by the fact that two Named Plaintiffs have sought and obtained release, and "scores if not hundreds" of ICE detainees have sought release across the country. (Class Cert. Opp'n at 12.) Defendants fail to articulate why this fact is relevant to the impracticability inquiry. If anything it tends to show the turmoil, expense, and difficulty caused by a piecemeal approach. Moreover, Plaintiffs' Motions seek a centralized ICE process of COVID-19 harm reduction for the most at-risk individuals, not release on bond. It would be inconvenient and difficult, if not impossible, for detainees to obtain timely relief by filing conditions of confinement suits for each detention facility or unit in the country. Given the many obstacles to accessing counsel during the COVID-19 pandemic, the Court is concerned that many putative class members would not be able to proceed on their own, a fact which further highlights the impracticability of joinder.

### 2. Commonality

The commonality requirement is satisfied when plaintiffs assert claims that "depend upon a common contention . . . capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 564 U.S. at 350; see also id. ("What matters to class certification . . . is not the raising of common questions . . . but, rather, the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.") (internal quotation marks and citations omitted). Differences among putative class members sometimes impede the generation of such common answers. Id. In the Ninth Circuit, "Rule 23(a)(2) has been construed permissively. . . . The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." Staton v. Boeing Co., 327 F.3d 938, 953 (9th Cir. 2003).

Plaintiffs present the Court with shared factual and legal issues more than adequate to support a finding of commonality. Stated in general terms, the common question driving this case is whether Defendants' system-wide response—or the lack of one—to COVID-19 violates Plaintiffs' rights. One shared factual question is therefore what, if any, nationwide measures ICE has taken in response to COVID-19 to protect the health of vulnerable immigration detainees and whether those measures are legally sufficient. The existence, scope, and adequacy of those measures are central to all of Plaintiffs' claims.

Three shared legal questions are whether the supposed systemwide actions or inactions: (1) amount to deliberate indifference and expose detainees to a substantial risk of harm, Gordon v. County of Orange, 888 F.3d 1118, 1124-25 (9th Cir. 2018); Brown v. Plata, 563 U.S. 493, 505 n.3 (2011); (2) result in conditions of confinement more restrictive than criminal detention and that constitute punishment, Jones v. Blanas, 393 F.3d 918, 934 (9th Cir. 2004); (3) or deprive detainees of the benefits of an Executive Agency program, solely on the basis of disability, 29 U.S.C. § 794 (a). Plaintiffs identify several additional common issues that would satisfy Rule 23(a)(2)'s standard. (Class Cert. Mot. at 11-12.) Even one issue common to each class is all that is required. Haley v. Medtronic, Inc., 169 F.R.D. 643, 648 (C.D. Cal. 1996).

Defendants argue that the proposed classes "flunk" the commonality requirement due to the factual variation between facilities and between the degree of COVID-19 threat to each individual. (Class Cert. Opp'n at 14.)  For example, Plaintiffs provide evidence of the conditions at many geographically dispersed detention facilities, where the COVID-19 response differs somewhat.  In addition, Plaintiffs themselves have varying medical conditions and risk factors.

The Court disagrees that these differences defeat commonality.  Despite Plaintiffs' admitted differences, each putative class member finds herself in similar situation.  Each class member claims entitlement to a minimally adequate national rescue response from ICE.  Indeed, the variety of facility COVID-19 countermeasures tends to support Plaintiffs' contention that ICE has failed to institute the well-ordered, mandatory relief effort to which they claim entitlement.  This facility doesn't have adequate soap and handwashing facilities.  That one does not provide PPE for detainees cohorted with someone thought to be exposed to the virus.  This person may die of COVID-19 because of hypertension, and that one may die because of HIV.  Yet across all facilities and individuals, the question remains: is ICE required to adopt a global response, and is that response adequate?  Parsons, 754 F.3d at 681-82 (finding commonality satisfied where "policies and practices of . . . systemic application expose[d] all inmates in [Arizona Department of Corrections] custody to a substantial risk of serious harm.").  As a result, the factual differences are not of the sort that likely affect entitlement to relief or that are likely to change the outcome of the legal analysis.  Califano v. Yamasaki, 442 U.S. 682, 701 (1979); Dukes, 564 U.S. at 348, 358.

### 3.  Typicality

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class."  Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992).  The typicality inquiry focuses on the claims, not the specific facts underlying them.  Just Film, Inc. v. Buono, 847 F.3d 1108, 1116 (9th Cir. 2017).  "The requirement is permissive, such that 'representative claims are typical if they are reasonably coextensive with those of absent class members; they need not be substantially identical.'"  Id. (quoting Parsons v. Ryan, 754 F.3d 657, 685 (9th Cir. 2014)).  "Measures of typicality include whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  Id. (internal quotations and citations omitted).  The applicability of different defenses to the class representative will preclude typicality if "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it."  Id. (quoting Hanon, 976 F.2d at 508).

The Court finds that the putative class representatives' claims are typical of those in the proposed class, because they have the same claims and face the same or similar harms arising from the same course of conduct.  Hanon v. Dataproducts, 976 F.2d 497, 508 (9th Cir. 1992).  Each Plaintiff has either a Risk Factor or Covered Disability included in the class definitions (hypertension, diabetes, or cardiovascular disease, or over fifty-five years old) and is or was

detained at one of several facilities, across three states, impacted by Defendants' alleged inaction. (Hernandez Decl. ¶ 2; Sanchez Decl. ¶¶ 2-3; Fraihat Decl. ¶¶ 2-5; Sudney Decl. ¶¶ 2-7; Munoz Decl. ¶¶ 1-2.) The common course of conduct alleged by Plaintiffs includes ICE's inadequate oversight of detention facilities' medical care, failure to identify individuals with disabilities or with COVID-19 vulnerabilities, and failure to implement adequate precautionary measures and protocols with respect to those individuals. The failures to act are thus the same across the class as a whole, as is the legal injury: exposure to an unreasonable risk of harm resulting from COVID-19 infection, punitive conditions of confinement, or deprivation of program benefits on the basis of disability.

Defendants again raise the fact that numerous detainees have petitioned for or obtained release, and comment that individualized habeas relief is a "better avenue" for relief. (Class Cert. Opp'n at 18-19.) However, that fact would not bar a finding of typicality or result in a cessation of the class interest in ensuring an appropriate systemwide response to COVID-19. Pitts v. Terrible Herbst, Inc., 653 F.3d 1081, 1092 (9th Cir. 2011) (finding an offer of judgment for the full amount of a plaintiff's claim before class certification does not moot the class action, that "if the district court certifies the class, certification relates back to the filing of the complaint," and that in this case, the action may continue, because the individual relief "fails to satisfy the demands of the class.") Moreover, the relief sought in a habeas petition is particularized, but here, Plaintiffs claim entitlement to a comprehensive response to the pandemic. The Court also observes that some habeas petitions and TROs for individual release will be denied, and those individuals also have a continued interest in a comprehensive response, short of release, that ensures adequate protections.

Nor is the difference in legal standards across circuits a bar to typicality, as Defendants assert. (Class Cert. Opp'n at 19.) First, the representatives and the putative class members assert a similar risk of physical harm and of detriment to their rights, despite some differences in the legal standards for claims across the circuits. Second, the Supreme Court has held that a federal agency is not necessarily entitled to confine any ruling of a court of appeals to its immediate jurisdiction. In Califano v. Yamasaki, 442 U.S. 682 (1979), the Court held that there are no legal limits on the geographical scope of a class action brought in federal district court. 442 U.S. at 702; Bresgal v. Brock, 843 F.2d 1163, 1170 (9th Cir. 1987). The primary concern should be that the relief granted does not impose greater burdens than necessary to redress the complaining parties. Id. As a result, the Court finds Plaintiffs have established the typicality of the representatives' claims.

### 4. Adequacy

In determining whether a proposed class representative will adequately protect the interests of the class, the Court asks whether the proposed class representatives and their counsel have any conflicts of interest with any class members and whether the proposed class representatives and their counsel will prosecute the action vigorously on behalf of the class. Hanlon, 150 F.3d at 1020.

The proposed class representatives and class counsel can adequately represent the class. The named Plaintiffs establish their willingness to work with class counsel to effectively represent the interests of the class as a whole.  (Fraihat Decl., ¶¶ 12-14; Sudney Decl., ¶¶ 15-17; Sanchez Decl., ¶¶ 21-23; Hernandez Decl. ¶¶ 9-10; Munoz Decl. ¶¶ 13-14.)  Plaintiffs' counsel, meanwhile, has extensive experience litigating immigrants' rights and class actions.  (Fox Decl. ¶¶ 3-11; Seaborn Decl. ¶¶ 3-14; Alderman Decl. ¶¶ 1-6; Graybill Decl. ¶¶ 3-8; Johnson Decl. ¶¶ 2-6).  The Court perceives no disqualifying conflict of interest or indication that Plaintiffs and their counsel will not "vigorously" pursue the action on behalf of the class.  Hanlon, 150 F.3d at 1020 (9th Cir. 1998).

Defendants do not  argue Plaintiffs will not adequately protect the interests of the class, except to the extent that they have been released pursuant to independent habeas petitions or have different levels of COVID-19 risk.  (Class Cert. Opp'n at 20-21.)  However,  Defendants cite no authority for the proposition that release from detention prevents a finding of typicality or necessarily results in a conflict of interest.[22]  Similarly without merit is the contention that an individual with diabetes will advocate more or less vigorously to be protected from COVID-19 than an individual with cardiovascular disease or with HIV/AIDS.  The non-detained representatives may be in an even better position, of comparative liberty, to pursue claims on behalf of the class.  In sum, the Court finds the adequacy requirement is satisfied

## B.  Rule 23(b) Requirements

Plaintiffs seeks to certify their proposed sub-classes under Rule 23(b)(2).  (Certification Mot. at 14.)  Rule 23(b)(2) permits certification of a class seeking declaratory or injunctive relief where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  In the Ninth Circuit, "[i]t is sufficient to meet the requirements of Rule 23(b)(2) [when] class members complain of a pattern or practice that is generally applicable to the class as a whole."  Rodriguez I, 591 F.3d at 1125-26 (9th Cir. 2010) (internal citation and quotation marks omitted) (finding certification under Rule 23(b)(2) proper where "proposed members of the class each challenge Respondents' practice of prolonged detention of detainees without providing a bond hearing and seek as relief a bond hearing with the burden placed on the government").  Thus, the critical inquiry is "whether class

---

[22] Defendants also raise the possibility that detainees held under different statutory mandates will have different, conflicting, interests.  (Class Cert. Opp'n at 21 (raising the specter of a conflict between class members who are "mandatorily" detained and those who are not).)  The Court is not concerned about that potential conflict.  The class's interest is not in release, but in not being subjected to unlawful conditions of confinement.  Second, whatever the particular detention authority Defendants might invoke, the due process violations asserted arise from the same systematic failures, and could overcome a more generalized detention mandate.  See Rodriguez v. Marin, 909 F.3d 252, 256 (9th Cir. 2018) ("We have grave doubts that any statute that allows for arbitrary prolonged detention without any process is constitutional . . . .").

members seek uniform relief from a practice applicable to all of them." Rodriguez I, 591 F.3d at 1125.

Because Defendants' actions and inactions apply to the class generally, the Court determines that Rule 23(b)(2)'s requirements are satisfied.  The putative class seeks declaratory and injunctive relief based on the asserted inadequacies of Defendants' COVID-19 protocols and response.  For purposes of this inquiry, "[t]he fact that some class members may have suffered no injury or different injuries from the challenged practice does not prevent the class from meeting the requirements of Rule 23(b)(2)." Parsons v. Ryan, 754 F.3d 657, 689 (9th Cir. 2014) (finding Rule 23(b)(2) satisfied where the state department of corrections established policies and practices that placed "every inmate in custody in peril" and all class members sought essentially the same injunctive relief); Rodriguez I, 591 F.3d at 1125.

A related test for whether Rule 23(b)(2) certification is appropriate is "the indivisible nature of the injunctive or declaratory remedy" sought, or "the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." Dukes, 564 U.S. at 360.  Defendants again remark that Plaintiffs suffer from different conditions and are detained at different facilities, and Defendants contend on this basis the Rule 23(b)(2) requirements are not met.  (Class Cert. Opp'n at 14-15 (also noting potential individual differences with respect to flight risk, likelihood of removal, and danger to the community).)  However, Plaintiffs do not seek any individualized determination by this Court of whether they are entitled to release, and do not request a different injunction for each class member.  Rather, they ask the Court to determine whether ICE's systematic actions, or failures to act, in response to COVID-19 amount to violations of the class members' constitutional or statutory rights.  As a result, the same injunction or declaratory judgment would provide relief to all class members, or to none of them, and the Court concludes Rule 23(b)(2)'s requirements are satisfied.

## C.  Preliminary Injunction

The Court finds that Plaintiffs are likely to succeed on the merits of one or more of their claims, will suffer irreparable harm as a result of the deprivation of their rights, and that the balance of equities and public interest heavily weigh in favor of granting preliminary relief.

### 1.  Success on the Merits or Serious Questions

Plaintiffs claim Defendants' COVID-19 response gives rise to three claims for relief: (1) medical indifference in violation of the Fifth Amendment; (2) punitive conditions of confinement, in violation of the Fifth Amendment; and (3) denying persons with disabilities the benefits of Executive Agency programs and activities, in violation of Section 504 of the Rehab Act.  (PI Mot. at 9, 15, 17.)

//
//
//

### a. Standing

Defendants argue that Plaintiffs lack Article III standing,[23] and cannot therefore succeed on any of their claims.  (PI Opp'n at 14-15.)  Defendants do not raise concerns about whether the harm alleged can be fairly traced to them.  Instead they argue narrowly that the asserted harm is speculative and not redressable, because no COVID-19 cases have been identified in Plaintiffs' facilities.  That is no longer true.  Seven detainees at Stewart Detention Center in Lumpkin Georgia, where Martinez is held, have tested positive for COVID-19, and thirty more are suspected to have the disease.[24]  Even if no detainee or staff member had tested positive, for reasons described in the irreparable harm section below (Part III.C.2), the Court rejects the contention that the risk of COVID-19 is overly speculative.[25]

### b. Medical Indifference

The standard for medical indifference in violation of the Fifth Amendment was recently articulated in a case involving pretrial detainees, Gordon v. County of Orange, 888 F.3d 1118 (9th Cir. 2018).   The elements of a medical indifference claim by pretrial detainees are:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—

---

[23] "Constitutional standing concerns whether the plaintiff's personal stake in the lawsuit is sufficient to make out a concrete 'case' or 'controversy' to which the federal judicial power may extend under Article III, § 2."  Pershing Park Villas Homeowners Ass'n v. United Pacific Ins. Co., 219 F.3d 895 (9th Cir. 2000).  "[T]he irreducible constitutional minimum of standing" is comprised of three elements: (1) an injury-in-fact; (2) a causal connection between the injury and challenged conduct such that the injury is "fairly traceable" to the challenged action; and (3) it must be "likely," not merely "speculative" that the injury can be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992).  The injury-in-fact must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Id. at 560.  "The party invoking federal jurisdiction bears the burden of establishing these elements." Id. at 561.

[24] (Bretz Decl. ¶ 14.)  See also ICE Guidance on COVID-19, https://www.ice.gov/coronavirus.

[25] Defendants cite no authority for, and the Court rejects the implication that it lacks authority to enter class-wide relief to require a constitutionally adequate response to COVID-19 from ICE.  (PI Opp'n at 4-5 (arguing that "this Court lacks the authority to redress such injuries," and not disputing that Plaintiffs' proposed injunction would provide them with relief).) See also Padilla v. Immigration & Customs Enf't, 2020 WL 1482393, at *11 (9th Cir. Mar. 27, 2020) (discussing authority of district courts to enter class wide relief).

making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

888 F.3d at 1125.  "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[ ] on the facts and circumstances of each particular case.'"  Id. (quoting Castro v. Cty. of Los Angeles, 833 F.3d 1060, 1070-71 (9th Cir. 2016)).  Objective unreasonableness is "more than negligence but less than subjective intent—something akin to reckless disregard."  Id.

Plaintiffs are likely to succeed on the merits of their medical indifference claim.  The Court analyzes each element below.

### i.  Intentional Decision

A failure to act with respect to a known condition of confinement may constitute an intentional decision.  See Castro v. Cty. of Los Angeles, 833 F.3d 1060 (9th Cir. 2016) (permitting a failure-to-protect due process claim under 42 U.S.C. § 1983 where officers knew of the risk); Flentoil v. Santa Clara Cty. Dep't of Corr., 2020 WL 571025, at *7 (N.D. Cal. Feb. 5, 2020) (refusal to provide medication).  Some courts have found that where the defendant did not have time to act, however, there is not an intentional decision.  Pajas v. Cty. of Monterey, 2018 WL 5819674, at *8 (N.D. Cal. Nov. 5, 2018) (finding no jury could find the sheriff acted intentionally towards a condition of confinement by his "failure to revamp jail policies and procedures," because he had just taken office less than three weeks earlier).

Defendants made an intentional decision to promulgate only non-binding guidance for the first month of the pandemic, despite some knowledge of the risk posed by COVID-19.  The March 6, March 27, and April 4, 2020 ICE guidance documents illustrate Defendants' awareness of a grave risk, but their failure to mandate a facility-wide response.  Cf. Brown v. Trejo, 2018 U.S. Dist. LEXIS 193389, *28 (C.D. Cal. Sept. 24, 2018) (finding that failure to act with regard to a condition, without knowledge of that condition or the risk posed, is not intentional).  From March 11, 2020, when the pandemic was declared by the World Health Organization, until April 10, 2020, Defendants' policy documents equivocated dangerously, and the IHSC guidance counseled both "follow me" and "defer to the CDC."  (Action Plan; Docket Review Guidance.)

ICE's systemwide inaction specifically towards individuals with disabilities or certain risk factors also likely constitutes an "intentional decision."  Defendants do not directly dispute that ICE itself does not track medically vulnerable and/or disabled detainees with specificity.[26]  Nor

---

[26] Defendants' Declarations state that some facilities are tracking detainees with disabilities and COVID-19 vulnerabilities, but the declarations fail to address whether Defendants themselves track these individuals or required facilities to track them.  The declarations do not explain whether the disabilities facilities screen for are coextensive with the CDC-defined risk factors, and do not explain if a procedure is available for obtaining that

does the Docket Review Guidance mandate action aimed at them.  It asks Field Office Directors to "please" make individualized determinations of the necessity of ongoing detention, and only as to some detainees.  (Docket Review Guidance.)  Defendants have not made the Court aware of a requirement that FODs make individualized determinations as to eligible detainees.  Under current policy, ineligible medically vulnerable individuals who are mandatorily detained will not be identified, or offered any accommodation beyond that available to the general population to protect from this deadly disease.

A final relevant decision is ICE's apparent failure to enforce compliance with its policy documents.  To the extent COVID-19 risk was addressed by individual facilities from March 11, 2020 to April 10, 2020, it seems to have been voluntary.  Now, there is a Pandemic Response Requirement document.  This document also includes no mention of enforcement mechanisms.  Plaintiffs incorporated by reference into their Complaint several OIG reports about ICE's medical care system, which the Court finds persuasive on this point.  (Compl. ¶¶ 160 n.45, 186 n.97, 347 n.303.)  The OIG reports discuss at greater length ICE's monitoring and oversight failures, with particular regard to inadequate medical care, limited hygiene, and long wait times for urgent medical procedures.

### ii.  Substantial Risk of Serious Harm

Whether "a substantial risk of serious harm" exists is a largely a question of fact.  <u>Lemire v. Cal. Dep't. of Corr. and Rehab.</u>, 726 F.3d 1062, 1074-75 (9th Cir. 2013).  "[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk . . . for reasons personal to him or because all prisoners in his situation face such a risk."  <u>Farmer v. Brennan</u>, 511 U.S. 825, 843 (1994).

Plaintiffs also demonstrate that ICE's policies and delayed response likely subject Subclass members to a substantial risk of serious harm.  It is undisputed that COVID-19 finds its way into almost every workplace and communal setting, and the Defendants provide little explanation why immigration detention facilities will be different.  Defendants also do not dispute that 15% of individuals in the Subclasses who ultimately contract COVID-19 will die, or that those who survive are likely to suffer life-altering complications.  At the larger detention facilities, a COVID-19 outbreak could result in dozens of deaths.  And as recent ICE COVID-19 case numbers indicate, once a facility has a few cases, the disease spreads rapidly, despite IHSC and CDC protocols.

//
//



information.  The declarations are also extremely vague as to the level of oversight and monitoring conducted by FMCs, whether FMCs can obtain medical information on particular detainees, and many other pertinent questions.  Only as of April 10, 2020, did ICE mandate all facilities to report to ICE FODs or FMCs the A-number, location, and medical condition of any detainee with the CDC-defined risk criteria.  (Pandemic Response Requirements at 6.)

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk <u>MG</u>

### iii. Objective Unreasonableness or Reckless Disregard

Substantive due process imposes a standard of deliberate indifference or reckless disregard.  See Gantt v. City of L.A., 717 F.3d 702, 708 (9th Cir. 2013); Tennison v. City and Cnty. of S.F., 570 F.3d 1078, 1089 (9th Cir. 2009).  In Gantt, the Ninth Circuit explained: "Deliberate indifference is the conscious or reckless disregard of the consequences of one's acts or omissions.  It entails something more than negligence but is satisfied by something less than acts or omission for the very purpose of causing harm or with knowledge that harm will result." 717 F.3d 702, 708 (9th Cir. 2013).

Defendants' failures to act are likely "akin to reckless disregard."  Gordon, 888 F.3d at 1125.  As of the drafting of this Order, Defendants have not provided even nonbinding guidance to detention facilities specifically regarding medically vulnerable detainees, pending individualized determinations of release or denial of release.  Second, Defendants delayed mandating adoption of the CDC guidelines, and unreasonably delayed taking steps that would allow higher levels of social distancing in detention.[27]  Although Defendants state three of their facilities are within population limits, they do not explain whether the population has been reduced so that quarantined or medically isolated cohorts can comply with CDC recommendations, which are now mandated.  (CDC Interim Guidance at 16, 20; Pandemic Response Requirements, Attach. E.)  As a result, any medically vulnerable individual in an ICE facility likely confronts an unreasonable risk of infection, severe illness, and death.

While Defendants took some available measures to mitigate the threat of COVID-19,  (see generally, Holt Decl.; Action Plan; Docket Review Guidance; Pandemic Response Requirements), there is a serious question whether the issuance of non-binding recommendations is an objectively "reasonable" response to a pandemic, given the high degree of risk and obvious consequences of inaction.  The Court has noted at least two probable serious failures to act: first, the month-long failure to quickly identify individuals most at risk of COVID-19 complications and to require specific protection for those individuals; and second, the failure to take measures within ICE's power to increase the distance between detainees and prevent the spread of infectious disease, for example by promptly releasing individuals from detention to achieve greater spacing between medically vulnerable individuals and the general population.

---

[27] On April 6, 2020, ICE's website stated that ERO decided to "reduce the population of all detention facilities to 70 percent or less" to increase social distancing.  ICE Guidance on COVID-19, https://www.ice.gov/coronavirus.  The Pandemic Response Requirements state that all facilities "should . . . to the extent practicable . . . [make efforts] to reduce the population to approximately 75% of capacity."  (Pandemic Response Requirements at 13.)  However, it is not clear how facilities could achieve this objective without ICE assistance, nor is it clear that ICE is close to meeting this objective.  Defendants provide  evidence that the population of single adult detainees has decreased only slightly in the past month.  (Holt Decl. ¶ 13 (from 35,980 on March 13, 2020 to 31,709 on April 13, 2020).).

Plaintiffs point to several additional global failures they deem objectively unreasonable, which bolster their chances of success on this claim.  Plaintiffs raise serious questions about the reasonableness of the IHSC guidance at the time it was promulgated and updated.  (Reply at 5.) The IHSC guidance omits aspects of the CDC recommendations and is incommensurable with others  (Venters Decl. II ¶ 3.)  Again, the Court is particularly disturbed that IHSC guidance did not more strongly recommend social distancing[28] or even PPE for the most at risk detainees stuck in cohorts, even assuming social distancing and PPE for the whole detained population is impracticable.

Plaintiffs also provide several reasons the Docket Review Guidance is objectively unreasonable.  (Reply at 7.)  First, it omits a CDC-defined risk factor.[29]  Second, it does not apply to medically vulnerable individuals held in "mandatory" detention, who remain in harm's way.  Third, it does not protect individuals while release determinations are being made.  Fourth, it gives ICE FODs responsibility for identifying individuals at risk, not medical professionals.  Fifth, it does not require action within a specific period of time.  Sixth, it fails to provide clinical guidance.  Seventh, it is, and remains, mere guidance and is not determinative.  Eighth, it does not have a strong presumption of release.  (Reply at 8.)

As a result of these deficiencies, many of which persist more than a month into the COVID-19 pandemic, the Court concludes Defendants have likely exhibited callous indifference to the safety and wellbeing of the Subclass members.  The evidence suggests systemwide inaction that goes beyond a mere "difference of medical opinion or negligence."  Bell v. Mahoney, 2019 WL 6792793 (C.D. Cal. Aug. 29, 2019).  (Seaborn Decl., Ex. E, Letter from Dr. Scott Allen and Dr. Josiah Rich to Congressman Bennie Thompson et al. (Mar. 19, 2020); id., Ex. J, Open Letter to ICE from Medical Professionals to ICE Acting Director.)  Plaintiffs are likely to satisfy the objective element[30] of their deliberate indifference claim.

---

[28] Defendants state the CDC Interim Guidance does not require social distancing, (PI Opp'n at 21), but the Court disagrees.  The policy only recognizes that social distancing is "challenging" and then goes on to emphasize, "it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19."  CDC Interim Guidance at 4.  The guidance also recommends making a list of possible social distancing strategies, id. at 6, which may be implemented at the individual, group, or operational levels.

[29] This flaw remains in place even after April 10, 2020.  Although the Pandemic Response Requirements order facilities to report to ICE any detainee with a high body mass index (BMI), the Docket Review Guidance omits BMI from the categories of person who will receive individualized consideration.  The reverse problem exists with regard to pregnant detainees.  The Pandemic Response Requirements do not require facilities to report pregnant detainees, but the Docket Review Guidance purports to provide individualized consideration for these individuals.

[30] Defendants' Class Certification Opposition notes that some circuits require plaintiffs to satisfy both an objective and subjective component for a medical indifference claim.  (Class Cert. Opp'n at 19.)  The Court rejected that argument in the class certification analysis.  The Court pauses to note, however, that in one recent habeas decision in the District of Maryland, the court

### iv. Causation

Defendants' action, or inaction, has caused harm to the Subclasses.  First, Defendants exercise control over the size of the detainee population as a whole, and thus determine one of the most important factors in the spread of disease: the density of the detained population.[31] Defendants also discretion to release individuals, including those who are "mandatorily detained" and to use alternatives to detention to achieve governmental objectives.  (Jordan Decl., Ex. A.)  Across facilities, it is ICE—not the facility—that decides whether an individual may be released.[32]

Next, as Defendants' own declarations attest, (Vicks Decl. Exs. 10-13), ICE purports to exercise oversight and monitoring powers at contract detention facilities, and to correct any observed deficiencies.  Defendants do not dispute that they have the authority to mandate compliance, but a month into the pandemic merely "recommended" compliance.  As the exhaustive list of facility conditions in the fact section above illustrates, most facilities had significant compliance gaps even in mid to late March 2020, despite the fact that ICE issued guidance on March 6, 2020.  As a result, the dangerous conditions to which detainees are subjected can be laid at Defendants' doorstep.  In sum, Plaintiffs are likely to succeed on their medical indifference claim.

### c. Punitive Conditions of Confinement

Plaintiffs are also likely to succeed on their claim of punitive conditions of confinement. If a civil detainee is not afforded "more considerate" treatment than that available in a criminal pretrial facility, this creates a rebuttable presumption of punitiveness, which defendants may

---

found the subjective component to be satisfied because "there is no dispute that Respondents were and are subjectively aware of the risk that COVID-19 poses to both healthy and high-risk individuals" and "evidence supports the conclusion that as of the time of the filing . . . Respondents were disregarding the risk."  Coreas v. Bounds, Case No. 8:20-cv-00780 (D. Md. Apr. 4, 2020), ECF No. 56.  A similar analysis could support a finding of the subjective prong in this case, were that necessary.

[31] Notably, ICE could reduce the detained population by about half, simply by releasing detainees with no prior convictions and no pending charges,  (Seaborn Decl. Ex. F), but it has not elected to do so.  This would not require individualized determinations, could be achieved quickly, and would provide significant protection to the Subclass members who remain in detention.

[32] Perhaps contract facilities could refuse to maintain dangerous population levels during the pandemic.  However, the Court is unaware of a facility that has done so, and finds facilities are unlikely to take independent or decisive action given the economic imperative to maintaining full capacity and the contractual obligation to make a certain number of beds available for ICE detainees.

---

**CIVIL MINUTES—GENERAL**
Initials of Deputy Clerk MG

counter by offering legitimate, non-punitive justifications for the restrictions.  Jones v. Blanas, 393 F.3d 918, 934 (9th Cir. 2004) (citing Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982)). Restrictions are also presumptively punitive where they are "employed to achieve objectives that could be accomplished in so many alternative and less harsh methods."  Id. (citing Hallstrom v. City of Garden City, 991 F.2d 1473, 1484 (9th Cir. 1993)).

During a pandemic such as this, it is likely punitive for a civil detention administrator to fail to mandate compliance with widely accepted hygiene, protective equipment, and distancing measures until the peak of the pandemic, and to fail to take similar systemwide actions as jails and prisons.  Here, the protective actions taken by comparable prison and jail administrators have been as favorable or more favorable than Defendants'.  For example, the federal Bureau of Prisons ("BOP") has issued a more decisive and urgent call to action.  (Reply at 10-11; Jordan Declaration, Ex. D, Memorandum from Att'y Gen. William Bar to Director of BOP (April 3, 2020).)  The Attorney General directed BOP to prioritize the use of home confinement, noting "[w]e have to move with dispatch . . . to move vulnerable inmates out of these institutions."  Id. at 1.  The Memorandum commands the Director of BOP to "IMMEDIATELY MAXIMIZE" appropriate transfers to home confinement, and goes so far as to authorize transfer to home confinement where electronic monitoring is not available.  Id. at 1-2.  In contrast, the Docket Review Guidelines ask FODs to "please" make individualized determinations as to release, and arguably fails to communicate the same sense of urgency or concern.  To the Court's knowledge, there is still no requirement that FODs take such action.

Defendants only weakly argue a legitimate, non-punitive justification for their month-long failure to meaningfully track medical vulnerabilities and to issue more than proposals.  The legitimate purpose advanced by immigration detention is to secure attendance at hearings and to ensure the safety of the community.  See Zadvydas v. Davis, 533 U.S. 678, 699 (2001).  However, attendance at hearings cannot be secured reliably when the detainee has, is at risk of having, or is at risk of infecting court staff with a deadly infectious disease with no known cure.  Participation in immigration proceedings is not possible for those who are sick or dying, and is impossible for those who are dead.  Another purpose of detention, public safety, is not advanced by delay. Plaintiffs establish that public safety as a whole is seriously diminished by facility outbreaks, which further tax community health resources.  (Meyers Decl.; Venters Decl.)  As a result, Defendants' inactions are likely "arbitrary or purposeless," and are excessive given the nature and purpose civil detention.  Bell v. Wolfish, 441 U.S. 520, 539 (1979).

### d.  Section 504 of the Rehab Act

Plaintiffs are also likely to succeed on their Section 504 claim.  To bring a Section 504 claim, a plaintiff must show that "(1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance."  Updike v. Multnomah Cty., 870 F.3d 939, 949 (9th Cir. 2017) (quoting Duvall v. Cty. of Kitsap, 260 F.3d 1124, 1135

(9th Cir. 2001)).  Section 504 includes an "affirmative obligation" to make benefits, services, and programs accessible to people with disabilities.[33]  Id. (citations omitted).

Plaintiffs contend that persons with health conditions putting them at risk of severe illness or death if exposed to COVID-19 qualify as persons with disabilities under Section 504.  (PI Mot. at 17.)  The Defendants do not argue otherwise.  (PI Opp'n at 28-29.)  As a result, the Court finds that the medical conditions defined in the Subclass Two likely qualify under the Rehab Act.  See 29 U.S.C. § 705(2)(B); 42 U.S.C. § 12102.

The programmatic "benefit" in this context is shared by all class members and is best understood as participation in the removal process.  The "accommodation" Plaintiffs seek is also the same across the class: effective systemwide practices, such as disability tracking, and related life-preserving directives from ICE.  (PI Mot. at 19.)  Although Defendants assert that three facilities screen for disability at intake, they do not specify: (1) what those disabilities are, (2) to what extent they overlap with COVID-19 vulnerabilities, or (3) whether ICE required the facility to share that information with ICE before April 10, 2020.  (Vick Decl., Exs. 10-12 (discussing screening in the same paragraphs, 7 and 11); Valdez Decl. ¶ 12; Reply at 14 n.31 (remarking that Stewart Detention facility purports to track disability yet "identified no detainees who would be at greater risk for contracting COVID-19").)  The only reasonable accommodation, which was likely denied here, was for ICE to mandate identification of all detainees with CDC-defined COVID-19 vulnerabilities, and to provide them with minimally adequate protection, whether that be detention with social distancing or protective equipment, an alternative to detention, or some other epidemiologically sound intervention.

The Court is not persuaded by Defendants' argument that each detainee must individually request a reasonable accommodation and provide notice to the facility.  (PI Opp'n at 29 (citing Mark H. v. Hamamoto, 620 F.3d 1090, 1097 (9th Cir. 2010)).)  It is not reasonable to expect each detainee to utilize facility grievance mechanisms and ICE request boxes to obtain this kind of systemwide response to a pandemic.  The argument also ignores the systematic nature of the relief sought here.  Subclass members face the prospect of quick successions of transfers among ICE's network of facilities, and cannot be expected to provide separate notice to each.

In addition, Defendants do not respond to Plaintiffs' claim that ICE has an affirmative duty to track disabilities and provide accommodations, because the population is detained.  See, e.g., Armstrong v. Brown, 732 F.3d 955, 962 (9th Cir. 2013) (affirming district court's order to track and accommodate class member's disabilities, and noting jails had an obligation to prevent future violations); Updike v. Multnomah Cty., 870 F.3d 939, 949 (9th Cir. 2017) (noting Title II and § 504 include an affirmative obligation for public entities to make benefits, services, and programs accessible to people with disabilities).  One month into the crisis, Defendants tacitly

---

[33] Section 504's implementing regulations also prohibit entities receiving federal financial assistance from utilizing "criteria or methods of administration" that "have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons."  34 C.F.R. § 104.4(b).

**CIVIL MINUTES—GENERAL**

acknowledged the importance of tracking medical vulnerabilities and the inadequacy of their existing detainee tracking tools when they ordered facilities to provide that information to them. (Pandemic Response Requirements at 5-7.)  As a result of these systemwide failures, Plaintiffs are likely to succeed on their Rehab Act claims, and have met the first requirement for a preliminary injunction.

### 2.  Likelihood of Irreparable Harm

A plaintiff must demonstrate she is likely to suffer irreparable harm in the absence of a preliminary injunction.  See Winter, 555 U.S. at 20.  The Ninth Circuit cautions that "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."  Caribbean Marine Servs. v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988).  A plaintiff seeking injunctive relief must demonstrate that "remedies available at law, such as monetary damages, are inadequate to compensate" for the injury.  Herb Reed Enters., LLC v. Fla. Entm't Mgmt., 736 F.3d 1239, 1249 (9th Cir. 2013).  "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"  Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)).

Plaintiffs have established they will suffer the irreparable harm of increased likelihood of severe illness and death if a preliminary injunction is not entered.  The Constitution protects those in detention against "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year."  Helling v. McKinney, 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."); see also Unknown Parties v. Johnson, 2016 WL 8188563, at *15 (D. Ariz. No. 18, 2016), aff'd sub nom Doe v. Kelly, 878 F.3d 710 (9th Cir. 2017) (finding evidence of "medical risks associated with . . . being exposed to communicable diseases" adequate to establish irreparable harm).

Even in the early days of the pandemic, and with few exceptions, courts did not hesitate to find irreparable harm as a result of potential COVID-19 exposure in prison and detention, including in facilities where there had not been a confirmed case.  (See Jordan Decl., Appendix 1 (collecting cases).)  At this stage of the pandemic, the threat is even clearer.  The number of immigration detainees testing positive for COVID-19 continues to increase at an alarming rate. (Jordan Decl. II, Ex. A (charting the increase).)  Defendants do not argue that the curve is likely to flatten in the near future.  They do not deny that about 15% of individuals vulnerable to COVID-19 will die, if they are infected or that more will suffer lasting consequences.  Defendants also fail to respond to Plaintiffs' evidence that detained populations tend to have worse health outcomes than the population as a whole.  (Franco-Paredes Decl. at 1-2; Public Health Amicus at 18 (noting HIV among incarcerated population is ten times that of the general population, and tuberculosis is 2,500 times more prevalent); Venters Decl. at 7 (referencing study concluding that the uniform age definition of a geriatric or older prisoner should be fifty-five years).)

//

---

**CIVIL MINUTES—GENERAL**

### 3.  Balance of the Equities and Public Interest

Where the government is the opposing party, balancing of the harm and the public interest merge.  See Nken v. Holder, 556 U.S. 418, 435 (2009).  Thus, the Court asks whether any significant "public consequences" would result from issuing the preliminary injunction.  Winter, 555 U.S. at 24.

The balance of equities and public interest sharply incline in Plaintiffs' favor.  "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." Melendres, 695 F.3d at 1002 (quotation omitted).  Moreover, there can be no public interest in exposing vulnerable persons to increased risks of severe illness and death.  "Faced with . . . preventable human suffering, [the Ninth Circuit] ha[s] little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor."  Hernandez v. Sessions, 872 F.3d 976, 996 (9th Cir. 2017) (quoting Lopez v. Heckler, 713 F.2d 1432, 1437 (9th Cir. 1983)).  Plaintiffs also attach evidence suggesting that a failure to protect the most vulnerable detainees could quickly overwhelm local hospitals with insufficient ICU beads or respirators, diminishing the available health resources for all.  (Seaborn Decl., Ex. E at 4.)  If a preliminary injunction is entered, however, survival is maximized.  (Id.; see also Public Health Amicus at 19-23.)

### 4.  Scope of Relief

The most serious systemic deficiencies noted, and which must be addressed to provide relief to the Subclasses, are as follows: (1) lack of any requirement, to the Court's knowledge, that Field Offices make individualized custody determinations for at risk detainees, as opposed to a mere request that they do so; (2) discrepancy between the risk factors identified in the Subclass definition and the risk factors triggering individualized custody determinations under the Docket Review Guidance; (3) lack of a performance standard for the safe detention of at risk detainees pending custody decisions, or in the event ICE deems detainees ineligible for release; (4) inconstant adherence to ICE detention standards pertinent to COVID-19.  In the Conclusion below, the Court orders relief narrowly tailored to resolve these deficiencies.

Defendants ask that the Court limit the scope of injunctive relief by excluding detainees who have filed separate actions.  However, the fact that some detainees have started down one avenue should not prevent ICE from exploring more expeditious paths to relief.  See Pride v. Correa, 719 F.3d 1130, 1137 (9th Cir. 2013).  In addition, some of those individuals have been or will be denied relief, and will still require safe conditions of confinement.

Until this point, the Order has tended to use a systems perspective, weighing public health or other structural factors.  The Court therefore pauses to note the possibility of differences in detainee perspective.  To proceed in the safest manner, it would also be in the public interest for FODs adhering to the Docket Review Guidance to consider the willingness of each vulnerable detainee to be released, if this is not considered already.  Plaintiffs' expert declaration notes that "[f]rom a medical and epidemiologic standpoint, people are safer from COVID-19 infection when not detained, and the epidemic curve of COVID-19 on the general

community is flattened by having fewer people detained." (Venters Decl. II ¶ 6.) While this may be true as a general proposition, given the many dangers and uncertainties of the pandemic, involuntary release of the most vulnerable detainees could be counterproductive.

Finally, it is possible that Defendants' actions since the hearing, or actions of which the Court is unaware, have addressed some of the Court's concerns. However, Defendants' halting start to pandemic response does not remove the need for preliminary relief, because Defendants have not argued or shown that delays or non-enforcement of ICE facility-wide policies will cease. McCormack v. Herzog, 788 F.3d 1017, 1025 (9th Cir. 2015) ("an executive action that is not governed by any clear or codified procedures cannot moot a claim").

## IV.  CONCLUSION

For the above reasons, the Court GRANTS the motions to file amicus briefs. The Court DENIES AS MOOT the ex parte application for leave to file a supplement. The Court GRANTS Plaintiffs' emergency motion to certify subclasses. A separate order defining the Subclasses and Risk Factors, and appointing representatives and class counsel will issue concurrently. The Court further GRANTS Plaintiffs' motion for preliminary injunction as follows:

- Defendants shall provide ICE Field Office Directors with the Risk Factors identified in the Subclass definition;

- Defendants shall identify and track all ICE detainees with Risk Factors. Most should be identified within ten days of this Order or within five days of their detention, whichever is later;

- Defendants shall make timely custody determinations for detainees with Risk Factors, per the latest Docket Review Guidance. In making their determinations, Defendants should consider the willingness of detainees with Risk Factors to be released, and offer information on post-release planning, which Plaintiffs may assist in providing;

- Defendants shall provide necessary training to any staff tasked with identifying detainees with Risk Factors, or delegate that task to trained medical personnel;

- The above relief shall extend to detainees with Risk Factors regardless of whether they have submitted requests for bond or parole, have petitioned for habeas relief, have requested other relief, or have had such requests denied;

- Defendants shall promptly issue a performance standard or a supplement to their Pandemic Response Requirements ("Performance Standard") defining the minimum acceptable detention conditions for detainees with the Risk Factors, regardless of the statutory authority for their detention, to reduce their risk of COVID-19 infection pending individualized determinations or the end of the pandemic;

- Defendants shall monitor and enforce facility-wide compliance with the Pandemic Response Requirements and the Performance Standard.

These measures shall remain in place as long as COVID-19 poses a substantial threat of harm to members of the Subclasses.  The parties may apply to modify or terminate the injunction.

**IT IS SO ORDERED.**