UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FAOUR ABDALLAH FRAIHAT, *et al.*, </br></br> *Plaintiffs*, </br></br> v. </br></br> U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*, </br></br> *Defendants*. | Case No. 5:19-CV-01546 JGB (SHKx) |

DECLARATION OF RUSSELL HOTT

I, Russell Hott, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

**PERSONAL BACKGROUND**

1. I am currently employed by the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal

1

Operations (ERO) as the Acting Assistant Director for the Custody Management Division (CMD).  I have held this position since February 2020.  CMD provides policy and oversight for the administrative custody of ICE's highly transient and diverse population of immigration detainees.  CMD is composed of three divisions led by three Deputy Assistant Directors under my direct supervision: (1) the Alternatives to Detention Division; (2) the Detention Management Division; and (3) the Custody Programs Division.

2. As the Acting Assistant Director, I am responsible for the effective and proficient performance of these three Divisions and their various units, including the oversight of compliance with ICE's detention standards and conditions of confinement at ICE detention facilities generally.  I am further responsible for managing ICE detention operations efficiently and effectively to provide for the safety, security, and care of an average of about 40,000 detainees daily and roughly 500,000 detainees annually, at approximately 250 facilities nationwide, including three family residential shelters located in Texas and Pennsylvania.

3. From May 2017 to February 2020, I served as the Field Office Director for the Washington, DC, ERO Field Office, responsible for the District of Colombia and Virginia.  In my role as Field Office Director, I provided operational and policy oversight for ERO's interior enforcement efforts within the local area of responsibility, spanning 43,000 square miles, three district courts, a cadre of nearly 200 employees, and 1,400 detention beds.

4. I began my career with the U.S. Government as a detention enforcement officer with the former Immigration and Naturalization Service in New York, NY.  I

advanced through a variety of positions including Immigration Enforcement Agent, Deportation Officer, Instructor at the Federal Law Enforcement Training Center, Supervisory Detention and Deportation Officer, acting Assistant Field Office Director, National Program Manager, Unit Chief, acting Deputy Chief of Staff for ERO, Chief of Staff for the ICE Deputy Director, Deputy Field Office Director for both the Boston and Washington field offices, Field Office Director, and acting Deputy Assistant Director.

5. I am familiar with the District Court's orders granting Plaintiffs' emergency motion to certify subclass and Plaintiffs' motion for a Preliminary Injunction (PI). I am also familiar with Plaintiffs' ex parte application for an order requiring issuance of notice to class members of the PI, and to obtain information and documents to monitor compliance with the court's PI order.

6. ICE ERO will be able to post a notice, containing agreed upon language, of the court's PI order, in English and Spanish, in the common areas of its over 72-hour detention facilities.  ICE can post notice at all over 72-hour detention facilities within 10 days.  ICE estimates that it will take 7 to 10 days to translate the notice. ERO will also be able to identify the third language most commonly used in ICE facilities generally, but not the 3 languages most used in each facility, because they change on a regular basis depending on the facility's population.  ERO can place copies of the translated notice in the library of the detention facility.

7. ICE is unable to provide additional interpretation services in each facility, due to limited availability and the fact that the language lines are already being used at their maximum capacity.

8. ICE will not be able to provide audio and braille notice, unless there is an existing sign language interpreter at the facility.  However, each facility is already required to ensure that hearing and visually impaired detainees are able to understand any communications, and the facilities would be able to facilitate the interpretation.

9. ICE can provide notices in large print to detainees with a vision impairment.

10. ICE can add two numbers that plaintiffs provide to a pro bono platform at all detention facilities.  The pro bono platform is an ICE provided free telephone access for all detainees**.**

11. ICE does not administer a Legal Orientation Program (LOP); the LOP is administered by the Executive Office for Immigration Review, and therefore, ICE will not be able to respond as to whether the notice should be read at LOP presentation.

12. Upon request, ICE can provide a list of its over 72-hour detention facilities, as well as the number of detainees in each facility, although this number changes daily.

13. On April 26, 2020, and on April 28, 2020, ICE ERO sent a message to all Field Office Directors and Assistant Field Office Directors entitled, *Detained Docket Review Pursuant to the Nationwide Preliminary Injunction in Fraihat v. ICE, --- F. Supp. 3d ---, 2020 WL 1932570 (Apr. 20, 2020)*, directing them to identify and track subclass members by April 29, 2020.  ICE ERO also had a teleconference with the field on Monday April 27, 2020, to inform its personnel of the District Court's order.

14. Following the court's April 20, 2020 order, ICE has identified 4,409 detainees in all ICE over the 72-hour facilities (both IHSC staffed and non-IHSC staffed), who belong to one or both of the *Fraihat* subclasses.

15. Pursuant to the court's order, ICE continues to identify all incoming detainees within five days of them coming into ICE custody for "risk factors" listed in the court's order.

16. Identification for "risk factors" takes place in the course of medical screening and examination, as well as review of medical histories, done by medical personnel.

17. ICE has been identifying and tracking the subclass members by using alert codes.

18. ICE has been conducting new custody reviews as soon as possible following the identification of subclass members.

19. Additionally, ICE is overseeing the implementation and compliance with its PRR. During the week of April 21, 2020, ICE federal Detention Service Managers and Detention Service Compliance Officers, assigned to its on-site detention monitoring program, conducted checks at 53 detention facilities housing over 60 percent of ICE's current detention population to assess whether detention service providers are implementing the COVID-19 guidance.  The spot-checks reviewed a variety of CDC recommendations related to environmental health and safety; facility cleanliness and sanitation; medical screening, cohorts, isolation and quarantine; personal hygiene; availability and use of personal protective equipment (PPE); information sharing, signage and postings; visitation, communication and telephone access; and detainee transportation.

20. On-site ICE Detention Service Managers and Detention Service Compliance Officers, in conjunction with ICE ERO Field Office Compliance Teams, will continue to monitor facility compliance to the CDC's COVID-19 guidelines. ICE can enforce the CDC guidelines via its Performance Based National Detention Standards and National Detention Standards, which require compliance with CDC guidelines.

21. ICE Pandemic Response Requirements (PRR) incorporates and follows the CDC's *Interim Guidance on Management of Coronavirus Disease 2019 (COVID 19) in Correctional and Detention Facilities.*

22. All immigration detention facilities are bound by strict detention standards to ensure that detainees in ICE custody reside in safe, secure and humane environments and under appropriate conditions of confinement. The standards established consistency of program operations and management expectations, accountability for compliance with CDC and medical requirements as well as a culture of professionalism.

23. ICE contracts issued in accordance with the Federal Acquisition Regulation (FAR) contain a Quality Assurance Surveillance Plan (QASP), which the government uses to assess contractor performance relative to the requirements and performance standards listed in the agreement. These performance standards address all facets of detainee care, including safety, health, legal rights, detainee services and records management. The QASP ensures that required performance levels and contract requirement are measurable and fully defined.

24. When unacceptable contractor performance occurs, the Contracting Officer's Representative (COR) may determine that formal written communication is required and issue a Contract Discrepancy Report (CDR). Any CDR may become a part of the supporting documentation for contract payment deductions, fixed fee deductions, award fee nonpayment, or other contractual actions deemed necessary by the Contracting Officer. From February 2017 to June 2019, ICE issued 42 contract deficiency reports. In 18 of the CDRs, the COR proposed financial sanctions for failure to meet requirements of the ICE detention standards.

25. If a contractor continues to miss performance and contractual obligations despite the issuance of CDRs, ICE may seek to terminate a contract and/or decline to renew a contract.

I declare, under penalty of perjury under 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED: May 5, 2020

_____
Russell Hott