Timothy P. Fox (CA Bar 157750)
*tfox@creeclaw.org*
Elizabeth Jordan*
*ejordan@creeclaw.org*
CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER
1245 E. Colfax Avenue, Suite 400
Denver, CO 80218
Tel: (303) 757-7901
Fax: (303) 872-9072

Lisa Graybill*
*lisa.graybill@splcenter.org*
Jared Davidson*
*jared.davidson@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
201 St. Charles Avenue, Suite 2000
New Orleans, Louisiana 70170
Tel: (504) 486-8982
Fax: (504) 486-8947

Stuart Seaborn (CA Bar 198590)
*sseaborn@dralegal.org*
Melissa Riess (CA Bar 295959)
*mriess@dralegal.org*
DISABILITY RIGHTS ADVOCATES
2001 Center Street, 4th Floor
Berkeley, California 94704
Tel: (510) 665-8644
Fax: (510) 665-8511

Attorneys for Plaintiffs (continued on next page)

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### EASTERN DIVISION – RIVERSIDE

| | |
|---|---|
| FAOUR ABDALLAH FRAIHAT, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*, <br><br> Defendants. | Case No.: 19-cv-01546-JGB(SHKx) <br><br> **Plaintiffs' Response to Declaration of Russell Hott** |

William F. Alderman (CA Bar 47381)
*walderman@orrick.com*
Jake Routhier (CA Bar 324452)
*jrouthier@orrick.com*
ORRICK, HERRINGTON &
SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
Tel: (415) 773-5700
Fax: (415) 773-5759

Michael W. Johnson**
*mjohnson1@willkie.com*
Dania Bardavid**
*dbardavid@willkie.com*
Jessica Blanton**
*jblanton@willkie.com*
Joseph Bretschneider**
*jbretschneider@willkie.com*
WILLKIE FARR &
GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Tel: (212) 728-8000
Fax: (212) 728-8111

Maia Fleischman*
*maia.fleischman@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
2 South Biscayne Boulevard
Suite 3750
Miami, FL 33131
Tel: (786) 347-2056
Fax: (786) 237-2949

Christina Brandt-Young*
*cbrandt-young@dralegal.org*
DISABILITY RIGHTS
ADVOCATES
655 Third Avenue, 14th Floor
New York, NY 10017
Tel: (212) 644-8644
Fax: (212) 644-8636

Mark Mermelstein (CA Bar 208005)
*mmermelstein@orrick.com*
ORRICK, HERRINGTON &
SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA 90017
Tel: (213) 629-2020
Fax: (213) 612-2499

Leigh Coutoumanos**
*lcoutoumanos@willkie.com*
WILLKIE FARR &
GALLAGHER LLP
1875 K Street NW, Suite 100
Washington, DC 20006
Tel: (202) 303-1000
Fax: (202) 303-2000

Shalini Goel Agarwal
(CA Bar 254540)
*shalini.agarwal@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
106 East College Avenue
Suite 1010
Tallahassee, FL 32301
Tel: (850) 521-3024
Fax: (850) 521-3001

Maria del Pilar Gonzalez Morales
(CA Bar 308550)
*pgonzalez@creeclaw.org*
CIVIL RIGHTS EDUCATION
AND ENFORCEMENT CENTER
1825 N. Vermont Avenue, #27916
Los Angeles, CA 90027
Tel: (805) 813-8896
Fax: (303) 872-9072

Attorneys for Plaintiffs (continued from previous page)
*Admitted Pro Hac Vice
**Pro Hac Vice Application Forthcoming

# TABLE OF CONTENTS

**Page**

I.  Introduction ........................................................................................1

II. Plaintiffs' Requested Documents and Information Are
Necessary Because the Evidence Shows that Defendants Are
Failing to Comply with the Order to Identify People with Risk
Factors and Properly Conduct Custody Redeterminations..........................2

    A.  Defendants have failed to identify all people with Risk
Factors within the time prescribed by the Court. .................................2

    B.  Defendants' exclusive reliance on medical record review
is deficient and fails to ensure that people with Risk
Factors are properly identified. ............................................................2

    C.  Defendants' categorical bar on release for people with
Risk Factors subject to mandatory detention violates this
Court's order...........................................................................................4

    D.  The on-the-ground evidence shows that Defendants are
failing to ensure implementation of this Court's order
across the country. .................................................................................6

III. Plaintiffs' Requested Information and Documents Are
Necessary Because Defendants Have Not Implemented a
Performance Standard or Revised the PRR Pursuant to this
Court's Order..........................................................................................8

IV. Plaintiffs' Document and Information Requests Concerning
Oversight Are Crucial Because the Evidence Shows that
Defendants are Relying Upon Their Already Broken Oversight
System. ....................................................................................................9

V.  The Explosion of New COVID-19 Cases Confirms the
Inadequacy of Defendants' Compliance and the Urgent Need
for the Requested Information.............................................................11

VI. Plaintiffs' Document Requests are Narrowly Tailored to
Identify Compliance Failures. .............................................................12

VII. This Court Has Authority to Oversee and Ensure Compliance
with its Order.........................................................................................15

VIII. Conclusion...........................................................................................15

# TABLE OF AUTHORITIES

**Case**                                                                                    **Page(s)**

*Bent v. Barr*,
    No. 19-CV-06123-DMR, 2020 WL 1812850 (N.D. Cal. Apr. 9, 2020).........5

*Dada v. Witte*,
    No. 1:20-CV-458 (W.D. La. Apr. 30, 2020) ...................................................5

*Damus v. Nielsen*,
    328 F.R.D. 1 (D.D.C. 2018)........................................................................15

*Fraihat v. ICE*,
    ---F. Supp. 3d ---, 2020 WL 1932570 (Apr. 20, 2020) .................................13

*In re of Joseph*,
    22 I&N Dec. 799 (BIA 1999).......................................................................5

*Lane v. Brown*, Case
    No. 3:12-cv-00138-ST, 2016 WL 589684 (D. Or. Feb. 11, 2016)..............12

*Malam v. Adducci*,
    No. 20-10829, 2020 WL 1672662 (E.D. Mich. Apr. 5, 2020) .....................5

## I.   INTRODUCTION

Shortly before the May 5 hearing on Plaintiffs' *ex parte* application to obtain information from Defendants necessary to monitor compliance with the April 20 Preliminary Injunction Order ("PI Order"), Defendants filed a supplemental declaration of Russell Hott, the Acting Assistant Director for ICE's Custody Management Division ("Hott Decl.").  At the hearing, Plaintiffs offered a few preliminary observations from an initial time-limited review of the declaration: ICE has not yet supplemented the Pandemic Response Requirements ("PRR") as required by the PI Order (¶ 21); ICE on April 28 represented to another court that it would take significant time to identify Risk Factors as required by the PI Order (¶ 13); only a small percentage of ICE's contracts contain a Quality Assurance Surveillance Plan ("QASP") (¶ 23); and only two of the 14,000 deficiencies noted in an OIG report led to financial penalties (¶ 24).

We now address the Court's invitation to provide a more comprehensive response to the Hott Declaration. As we detail below, both the declaration and subsequent events confirm Defendants' numerous failures to comply with the PI Order.  They have still not completed the review of detained people with Risk Factors, notwithstanding the April 30 deadline established by the PI Order.  They continue to conduct that review only by reviewing medical records, notwithstanding the Court's direction at the May 5 hearing that it was inadequate and that a current assessment was required. They continue to categorically exclude all people in mandatory detention from the individualized custody determinations required by the PI Order. They have still not issued a new performance standard as required by the PI Order.  Beyond these and other examples of non-compliance, the continuing escalation of confirmed cases in ICE's facilities—788 as of May 8, a 30% increase just since the May 5 hearing—confirms that the steps outlined in the Hott Declaration not only fail to comply with the PI Order but are failing to protect the people in ICE's custody and care from the obvious peril of COVID-19.

The Hott Declaration only amplifies the critical imperative that Defendants provide regular and timely disclosure of information and documents that will enable the Court to monitor their compliance with the PI Order.

**II.   PLAINTIFFS' REQUESTED DOCUMENTS AND INFORMATION ARE NECESSARY BECAUSE THE EVIDENCE SHOWS THAT DEFENDANTS ARE FAILING TO COMPLY WITH THE ORDER TO IDENTIFY PEOPLE WITH RISK FACTORS AND PROPERLY CONDUCT CUSTODY REDETERMINATIONS.**

**A.   Defendants have failed to identify all people with Risk Factors within the time prescribed by the Court.**

The Court's preliminary injunction order provided that people with Risk Factors "should be identified within ten days of this Order or within five days of their detention, whichever is later." Now 18 days following this Court's order, Defendants continue to fail to comply with this mandate.

The Hott declaration provides that, as of May 5, 2020, Defendants had identified only 4,409 people with Risk Factors. Hott Decl. at ¶ 14. This number represents only a fraction of people with Risk Factors. *See, e.g.*, Pl's Memorandum in Support of Provisional Class Certification, ECF 83-1, at 7-8 (noting that there are likely at least 2,400 people in ICE custody with Chronic Obstructive Pulmonary Disease *alone*). At the parties' May 6 meet and confer, Defendants' counsel conceded that the review process is ongoing.

Plaintiffs' requests for information and documents are, in large part, squarely aimed at information to determine how this process is being completed in order to ensure Defendants' compliance. Defendants' admitted failure to comply with this Court's order by identifying most people with Risk Factors further buttresses the need for disclosure.

**B.   Defendants' exclusive reliance on medical record review is deficient and fails to ensure that people with Risk Factors are properly identified.**

The Hott declaration provides that Defendants are relying upon review of medical records in order to identify individuals with Risk Factors. Hott Decl. at

¶ 16. At the parties' meet and confer of March 6, 2020, Defendants' counsel further confirmed that medical record review is the *exclusive* process by which Defendants are identifying such individuals.

Defendants' process will fail to identify untold numbers of subclass members in direct contravention of this Court's order. As an initial matter, Defendants' medical record system is itself inadequate. Numerous reports have documented Defendants' systemic failures to implement an accurate medical record system. *See, e.g*, Darius Tahir, *'Black hole' of medical records contributes to deaths, mistreatment at the border,* POLITICO (Dec. 1, 2019), https://www.politico.com/news/2019/12/01/medical-records-border-immigration-074507; HUMAN RIGHTS WATCH & CIVIC, SYSTEMIC INDIFFERENCE: DANGEROUS AND SUBSTANDARD MEDICAL CARE IN U.S. IMMIGRATION DETENTION, at 77-78 (May 2017), https://www.hrw.org/sites/default/files/report_pdf/usimmigration0517_web_0.pdf; Pl's Complaint, ECF 1 at ¶¶ 414-29 (documenting failures in ICE's medical system). Of acute concern here, these reports also document failures to ensure "crucial medical information" is contained in medical records. HUMAN RIGHTS WATCH & CIVIC, SYSTEMIC INDIFFERENCE: DANGEROUS AND SUBSTANDARD MEDICAL CARE IN U.S. IMMIGRATION DETENTION, at 77-78. These reports further show that ICE routinely fails to ensure that medical records actually follow people when they are transferred between facilities. *Id*. Indeed, many of the Plaintiffs in the underlying case did not have their complete medical records follow them when they were transferred to a new facility. Pl's Complaint, ECF 1 at ¶¶ 419-22.

These troubling reports of Defendants' inadequate medical recordkeeping are corroborated by Detainee Death Reviews (DDRs) conducted by ICE itself. *Id*. ¶¶ 424-28 (citing evidence from DDRs reflecting deficiencies in medical records). A recent review of DDRs by Politico troublingly revealed "malfunctioning software and troubling gaps in use of technology, such as failure to properly

document patient care or scribbling documentation in the margins of forms."
Darius Tahir, *'Black hole' of medical records contributes to deaths, mistreatment at the border,* POLITICO (Dec. 1, 2019),
https://www.politico.com/news/2019/12/01/medical-records-border-immigration-074507.

This evidence shows that exclusive reliance on ICE's medical records will almost certainly ensure that many subclass members will not be identified, which is further buttressed by the small fraction of individuals identified thus far. In fact, the evidence already reveals that ICE's reliance on medical records has failed to capture individuals who have risk factors. Fleischman Decl. ¶¶ 6-8. For example, Plaintiffs' counsel has learned that numerous people with Risk Factors have been denied custody redeterminations simply because there was not an adequate record of their conditions in ICE's medical records—notwithstanding clear evidence demonstrating their conditions. Fleischman Decl. ¶¶ 6-8.

### C.   Defendants' categorical bar on release for people with Risk Factors subject to mandatory detention violates this Court's order.

Defendants also stated at the meet and confer that ICE's position is that individuals held under mandatory detention are categorically ineligible for reconsideration under *Fraihat*. This categorical ban contradicts the plain language of the Court's Order, ignores ICE's continued discretion to grant release to individuals who are subject to mandatory detention, and violates each person's constitutional right to an individualized assessment of their medical needs.

The Order requires ICE to "identify and track <u>all</u> ICE detainees with Risk factors." ECF 132 at 38 (emphasis added). ICE is then required to make timely custody determinations "for detainees with Risk Factors[.]" *Id.* The order does not qualify individuals with Risk Factors; they are all entitled to a custody determination because of those Risk Factors. Defendants' intentional decision to carve out vulnerable people who are entitled to review solely because of their confinement

under "mandatory detention" is a clear violation of the Court's PI Order. Indeed, this policy was specifically identified in finding that Defendants have likely been deliberately indifferent to the medical needs of detained people with Risk Factors during the pandemic. *See id.* at *30. Furthermore, Defendants' misconstruction of their statutory authority does not allow them to detain medically vulnerable individuals whose due process rights require an individualized determination. The Court asserted, "whatever the particular detention authority Defendants might invoke, the due process violations asserted arise from the same systematic failures, and could overcome a more generalized detention mandate." *Id.* at 26 n.22 (citing *Rodriguez v. Marin*, 909 F.3d 252, 256 (9th Cir. 2018)).

Defendants' position also ignores that courts across the country have ordered release for individuals in ICE custody, notwithstanding the statutory "mandatory detention," which must "give way to the dictates of the Constitution." Report & Recommendation, *Dada v. Witte*, No. 1:20-CV-458 (W.D. La. Apr. 30, 2020), ECF No. 17; *see also Malam v. Adducci*, No. 20-10829, 2020 WL 1672662, at *13 (E.D. Mich. Apr. 5, 2020), as amended (Apr. 6, 2020). Defendants' blanket denial for release without consideration—under the guise of this statute—is an attempt to relitigate what courts have repeatedly rejected. *See Bent v. Barr*, No. 19-CV-06123-DMR, 2020 WL 1812850, at *2 (N.D. Cal. Apr. 9, 2020) ("To the extent that Respondents claim Bent is absolutely prohibited from seeking release because he is mandatorily detained under 18 U.S.C. § 1226(c), the court has already rejected that argument") (citing *Basank v. Decker*, 2020 WL 1481503, at 6 (S.D.N.Y. Mar. 26, 2020)).[1]

---

[1] As but one example, ICE places some people in mandatory detention based solely on past violations of drug statutes, without any other allegations or convictions. Further, the determination of who is subject to mandatory detention under INA § 236(c) is significantly litigated in many immigration court cases involving immigrants with criminal records, *See Matter of Joseph*, 22 I&N Dec. 799 (BIA 1999). Finally, whether someone is detained mandatorily and whether ICE can prove that they are a danger to their community is not the same question.

Finally, ICE's position is a misconstruction of Defendants' statutory authority. As explained at length in Plaintiffs' declarations attached to their PI briefing, people who are detained subject to "mandatory detention" under 8 U.S.C. §1226(c)(1) are nevertheless entitled to release under certain conditions, "particularly where the nature of their illness could impose substantial health care costs or the humanitarian equities mitigating against detention were particularly compelling." Declaration of Andrew Lorenzen- Strait ECF 81-14, ¶¶ 11-13 ; *see also* Declaration of Maureen Sweeney ECF 81-4, ¶¶3-6 (providing an example where ICE exercised discretion to release an individual who was subject to mandatory detention due to a previous theft conviction because of the seriousness of his medical conditions and the risk created by his detention). There are few—if any—circumstances as particularly compelling and demanding as the present pandemic. And, indeed, upon information and belief from immigration attorneys across the country, ICE continues to exercise its discretion to release people who are subject to mandatory detention amid this pandemic. Yet, at the same time, Defendants have already applied their categorical ban on *Fraihat* redetermination requests for extremely medically vulnerable individuals subject to mandatory detention out of the San Antonio, Newark, San Francisco, Miami, and New York City Field Offices. Fleischman Decl. ¶ 17.

Accordingly, Plaintiffs' requests for information are necessary in order to assess Defendants' compliance with the PI Order so that Plaintiffs may properly assert the rights of subclass members subject to mandatory detention.

### D. The on-the-ground evidence shows that Defendants are failing to ensure implementation of this Court's order across the country.

Plaintiffs' requests for information and documents to monitor Defendants' compliance are also necessary in light of troubling evidence that Defendants are failing to properly implement this Court's PI order.

Practitioners around the country are reporting egregious denials of *Fraihat*

Subclass Members' reconsideration requests that violate the Court's PI Order. One common response from the Field Offices includes stating that the individual is receiving adequate medical care, or is not exhibiting COVID-19 symptoms, and thus does not require release. Fleischman Decl. ¶¶ 5, 13. Some Field Offices refuse to recognize individuals as *Fraihat* Subclass Members despite medical records showing that the person has the qualifying diagnosis and/or disability. *Id*. at ¶¶ 6, 8. For example, the Los Angeles Field Office reportedly has not recognized severe psychiatric illness as a qualifying Risk Factor in certain cases—despite the fact that it is listed as a Risk Factor in the Court's PI Order. *Id*. at ¶ 7. Over 11 Field Offices have reportedly failed to respond to submitted redetermination requests altogether. *Id.* at ¶ 4.

Moreover, ICE Field Offices around the country evade their obligation to consider individuals for release based on their immigration case, citing that individuals are subject to mandatory detention, have a final removal order, or have an upcoming immigration court hearing. *Id.* at ¶¶ 16-18. One of these individuals is a woman whose health is continuously deteriorating as a result of her uncontrolled diabetes, lupus, hypertension, and fatty liver disease and who an independent doctor opined was at "a high risk of dying." *Id*. at ¶ 16. Still, ICE refuses to release her. In addition, recent filings from ICE reveal the paltry number of people released pursuant to *Fraihat*. For example, in a declaration filed on May 8, the Acting Officer in Charge of the Miami Field Office informed a federal court that, out of nearly 1,400 individuals detained in three detention facilities, ICE only identified and released two individuals because of COVID-19 Risk Factors from May 1 to May 8, 2020. These denials reflect Defendants' systemic failures to comply with this Court's Order that all individuals with Risk Factors must be meaningfully evaluated for release.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III.   PLAINTIFFS' REQUESTED INFORMATION AND DOCUMENTS ARE NECESSARY BECAUSE DEFENDANTS HAVE NOT IMPLEMENTED A PERFORMANCE STANDARD OR REVISED THE PRR PURSUANT TO THIS COURT'S ORDER.

In direct contravention of this Court's order, Defendants flagrantly refuse to issue a new Performance Standard defining the acceptable conditions for people with Risk Factors to reduce their risk of COVID-19 infection. Instead, according to the Hott Declaration, Defendants merely intend to rely upon the pre-existing April 10 PRR without any revisions whatsoever. Hott. Decl. ¶¶ 19-25. Defendants confirmed through counsel at the May 6 meet and confer that Defendants have no intention whatsoever of issuing a new Performance Standard notwithstanding the explicit mandate of the Court's PI Order.

However, the PRR itself is deficient in a number of different crucial respects—which is precisely why this Court ordered a new Performance Standard. For example, as this Court recognized in its PI Order, the PRR itself fails to identify at least two of the Risk Factors: people above the age of 55 (the PRR uses the age of 65) and people who are pregnant. *See* ECF 132 at pp. 8, 32. n.29.[2] In addition, there are numerous other deficiencies in the PRR that threaten harm to people with Risk Factors. Although the Hott Declaration insists that the PRR "incorporates and follows" CDC guidance, that is plainly untrue. As outlined in the Second Supplemental Declaration of Plaintiffs' medical expert Homer Venters,[3] the PRR contradicts the CDC guidance in important respects. For example, the CDC explicitly recommends against the transfer of individuals, but the PRR only bars transfer of people who are not in ICE detention. *See* Second Supplemental Declaration of Homer Venters, ECF 127-3 ("Venters Second Decl.") at ¶ 6(d). And

---

[2] The PRR also fails to include another risk factor identified by this Court: severe psychiatric illness. Class Certification Order at 2.

[3] In its PI Order, the Court denied as "moot" Plaintiffs' *ex parte* application responding to Defendants' last-minute disclosure of the PRR. Dr. Venters's Second Supplemental Report was attached thereto. Plaintiffs re-attach Dr. Venters's report to this Response and respectfully request that the Court consider it given its crucial detail of the PRR's variations from the CDC.

transfers are continuing, thereby placing subclass members at heightened risk of infection, complications and death. *See, e.g.*, Fleischman Decl. ¶¶ 22-24; Freedom for Immigrants, *COVID-19 in ICE Custody: Biweekly Analysis & Update* (Apr. 29, 2020) at 4-5,

https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/5ea9b7c7774c731ba9a19892/1588180936750/FFI+April+29+COVID-19+Updated.pdf.  This is merely the tip of the iceberg in terms of the PRR's failure to follow the CDC guidance. *See generally* Venters Second Decl. at ¶¶ 6-7 (describing variations on CDC guidance concerning social distancing, education about risk reduction, disinfecting/cleaning, transfer, handwashing, respiratory protection programs, and reentry needs). Critically, the PRR also fails to implement important precautionary measures to protect people with risk factors from COVID-19, including but not limited to implementation of social-distancing procedures—which is precisely what the PI Order requires Defendants to do. To the extent that Defendants contend the PRR's references to following CDC guidance are sufficient, that argument is also flawed given the clear variations between the PRR and CDC, because staff trying to apply the PRR will still be left to wonder whether they should apply the provisions of that guidance, or the differing provisions in the CDC guidance.

In sum, Defendants' admitted refusal to issue a Performance Standard directly violates this Court's order. In light of that clear violation, Plaintiffs' requests for information and documents are all the more reasonable.

## IV.   PLAINTIFFS' DOCUMENT AND INFORMATION REQUESTS CONCERNING OVERSIGHT ARE CRUCIAL BECAUSE THE EVIDENCE SHOWS THAT DEFENDANTS ARE RELYING UPON THEIR ALREADY BROKEN OVERSIGHT SYSTEM.

As described in Plaintiffs' complaint, there are major structural deficiencies in ICE's contract and oversight system. See Complaint, ECF 1, ¶¶ 170-202. Nevertheless, the Hott Declaration explains how Defendants dangerously continue

to rely on this broken oversight system to enforce the PI Order.

Paragraph 19 of the Hott Declaration (ECF 144-1) describes how ICE depends on federal Detention Service Managers ("DSMs") and Detention Service Compliance Officers ("DSCOs" also known as "Deportation Officers") to monitor whether detention facilities are in compliance with the PRR (which itself is inadequate as described above). A 2018 report by DHS's Office of the Inspector General ("OIG") specifically identified numerous problems with monitoring by DSMs. *First*, DSMs are in place at only 52 Detention Facilities. OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., OIG-18-47: ICE'S INSPECTIONS AND MONITORING OF DETENTION FACILITIES DO NOT LEAD TO SUSTAINED COMPLIANCE OR SYSTEMIC IMPROVEMENTS, at 14-15 (Jun. 26, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf. *Second*, DSMs are not medical professionals, nor is their monitoring focused on the provision of medical care (nor could it in light of their lack of qualifications); rather, they are tasked with "monitoring food services and kitchen operations, observing housing units for cleanliness, checking the status of detainees' medical requests, looking at special management units (segregation), reviewing grievances, and talking to detainees and addressing their concerns." *Id*. As a result, they are not equipped to meaningfully ensure compliance with the PRR, even if it were a sufficient standard.

Further, the Hott Declaration describes how Defendants employ the QASP to monitor contractors' compliance with relevant standards, including the PRR, at contract facilities. However, a 2019 OIG report noted that ICE contracts are not required to include the QASP, resulting in only 28 contracts incorporating the plan out of 106 contracts reviewed for the report. OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., OIG-19-18: ICE DOES NOT FULLY USE CONTRACTING TOOLS TO HOLD DETENTION FACILITY CONTRACTORS ACCOUNTABLE FOR FAILING TO MEET PERFORMANCE STANDARDS, at 7 (Jan. 29, 2019),

https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf.

In addition, even in the facilities covered by the QASP, the report found that ICE did not consistently apply it, nor did ICE effectively track reports of noncompliance with the QASP when reported. *See id.* at 8.

Lastly, in paragraph 24 of the Hott Declaration, ICE claims that it has the power to assess penalties for unacceptable contractor performance. However, in the same 2019 report, the OIG determined that from October 2015 to June 2018, there were over 14,000 deficiencies found in contract facilities, yet ICE imposed financial penalties **only twice**, and one of those was for underpayment of wages. *See id.* at 8. Further, from February 2017 to June 2019, ICE issued 42 contract deficiency reports—only 18 of which resulted in proposed financial sanctions for failure to meet requirements of the ICE detention standards.

These examples are merely illustrative of ICE's long-deficient oversight system. Defendants' reflexive reliance on this already deficient system clearly fails to comply with the mandate of the PI Order to "monitor and enforce facility wide compliance" with the PRR and Performance Standard. It is therefore crucial that Plaintiffs and the Court have necessary information from Defendants regarding oversight to assess how that they are implementing and overseeing the PI Order.

## V. THE EXPLOSION OF NEW COVID-19 CASES CONFIRMS THE INADEQUACY OF DEFENDANTS' COMPLIANCE AND THE URGENT NEED FOR THE REQUESTED INFORMATION.

In addition, the rapid escalation of confirmed COVID-19 cases in detention facilities confirms that more rapid reporting of ICE's efforts to comply with the PI Order is essential to protecting the health of people in ICE's custody and care. ICE's own reports of daily numbers make the point.

The number of confirmed cases in ICE facilities continues to escalate rapidly and outstrip ICE's testing efforts. ICE reported 84 new cases on May 4 (a 16.1% daily increase) and another 182 through May 8, bringing the total to 788. That is a 1192% increase over the 61 cases ICE had reported when the Court heard

Plaintiffs' PI motion on April 13. The 68 new cases reported on May 5 exceed the 61 new tests reported that day. And the total number of confirmed cases reported by ICE is now nearly 50% of the tests conducted to date.  Given the lag time between testing and results, the actual percentage of positive tests is undoubtedly far larger. *See* Exhibit A to Declaration of William Alderman.

The rapid increase in cases at particular detention facilities highlights the critical need for real-time reporting to the Court on a facility-by-facility basis.  Just between the time of the May 5 hearing and May 8, for example, the number of confirmed cases jumped from 3 to 34 at Rolling Plains, from 7 to 31 at South Texas, from 3 to 12 at IAH, from 6 to 12 at Otero, from 30 to 52 at La Palma, and from 106 to a staggering 139 at Otay Mesa. Four other facilities experienced their first cases during that time.  Every day's reports tell a comparable story of rapid multiplication of cases at particular facilities.  *See* Alderman Decl. Ex. B. Moreover, on May 6, Carlos Escobar-Mejia, died while in ICE custody because of their inadequate response to COVID-19.  ICE News Release, *Salvadoran man in ICE custody passes away in San Diego*, (May 7, 2020), https://www.ice.gov/news/releases/salvadoran-man-ice-custody-passes-away-san-diego. Going forward, it is critical that ICE provide timely information that puts the Court in a position to closely monitor its compliance with the PI Order and to examine whether modifications of the Order are essential to protecting the health, safety and Constitutional rights of the people in ICE's custody and care.

## VI.  PLAINTIFFS' DOCUMENT REQUESTS ARE NARROWLY TAILORED TO IDENTIFY COMPLIANCE FAILURES.

Plaintiffs' counsel have an obligation to monitor Defendants' compliance with the PI Order to ensure the interests of subclass members are protected.  *See Lane v. Brown*, Case No. 3:12-cv-00138-ST, 2016 WL 589684, at *3 (D. Or. Feb. 11, 2016) ("Class counsel have an ethical duty to ensure that defendants achieve substantial compliance with any remedial order . . . ."). Additionally, Plaintiffs

understand, based on the Court's comments at the May 5, 2020 hearing, that the Court also seeks production of information sufficient to determine whether Defendants are complying with the Court's Order.  Plaintiffs' document request regarding compliance with the PI Order is targeted enough to achieve this purpose while, at the same time, imposing minimal burdens on Defendants.

For example, the Court's PI Order requires Defendants to identify and track all detained people with Risk Factors, noting that most should be identified within ten days of the Order or five days of their detention, whichever is later—and that Defendants conduct custody determinations for all detainees with Risk Factors. *See* ECF 132 at 38.  In order to better understand how Defendants are complying with these instructions, Plaintiffs seek copies of any instructions and guidance Defendants have provided to Field Offices, including any guidance regarding Risk Factors and how to conduct custody redeterminations. *See* Ex. B to Plaintiffs' *Ex Parte* Application No. 2.  Not only is such information directly related to implementation of the PI Order, Defendants admit that they have provided instructions and guidance to Field Office Directors and Assistant Field Office Directors; so, to comply with the request, they would merely need to produce what they have done. *See* Hott Decl. ¶ 13 (discussing a message to all Field Office Directors and Assistant Field Office Directors entitled, Detained Docket Review Pursuant to the Nationwide Preliminary Injunction in *Fraihat v. ICE*, ---F. Supp. 3d ---, 2020 WL 1932570 (Apr. 20, 2020), directing them to identify and track subclass members by April 29, 2020, as well as a teleconference with field to inform its personnel of the Order).

Additionally, the PI Order requires that Defendants provide necessary training to any staff tasked with identifying detainees with Risk Factors, or delegate that task to trained medical personnel. *See* ECF 132 at 38.   Plaintiffs seek information regarding the personnel identifying persons with Risk Factors, including their training, experience and background. *See* Ex. B to Plaintiffs' *Ex*

*Parte* Application at No. 3.b. This information is particularly relevant to assessing Defendants' compliance with the PI Order, since Defendants have stated that they do not need to provide any training to staff on identifying Risk Factors, due to their assertion that all identifications regarding Risk Factors are conducted by medical professionals. Hott Decl. at ¶ 16. Thus, to ensure that Defendants are complying with the Court's order by not providing training, it is necessary to assess whether the only individuals making Risk Factor determinations are, in fact, medical personnel who are qualified to do so absent training. Moreover, Defendants represented through counsel at the meet and confer that Plaintiffs could identify themselves as having Risk Factors by utilizing facilities' sick call processes; however, custody staff often plays a material role in the sick call process at many facilities, *e.g.*, by collecting sick call slips. For that reason, Plaintiffs are deeply concerned that Defendants' failure to provide training will impede the identification of people with Risk Factors.

Plaintiffs' request for information regarding Defendants' efforts to monitor compliance with the PRR and Performance Standards further illustrates the targeted nature of the proposed discovery. *See* Ex. B to Plaintiffs' *Ex Parte* Application at No. 8.  In addition to the fact that the Court has ordered such monitoring (*see* ECF 132 at 39)—making it logical for the parties to have access to information regarding Defendants' efforts to comply with that portion of the Order—Defendants assert that ICE is overseeing the implementation and compliance with its PRR and that ICE has conducted spot checks at over 53 facilities. *See* Hott Decl. ¶ 19. Thus, to the extent any documentation of this asserted oversight exists (*e.g.*, checklists, metrics, reports), it should not be difficult or burdensome to produce.

Finally, Class Counsel conducted an extensive meet and confer with Defendants on the scope and nature of these requests, pursuant to the Court's instructions. As described in the Parties' concurrently filed joint statement,

Plaintiffs agreed to limitations on multiple requests, where possible, to address concerns Defendants raised about the production being more burdensome than necessary. As an example, Plaintiffs agreed to accept a list of the individuals who are responsible for making determinations regarding Risk Factors, rather than seeking the names the persons who made the specific Risk Factor determination for each detained person as originally requested.

## VII.   THIS COURT HAS AUTHORITY TO OVERSEE AND ENSURE COMPLIANCE WITH ITS ORDER.

In addition to Class Counsel's need to ensure implementation of this Court's order to fulfill Counsel's duties to the Class, the Court itself has authority to ensure compliance with its preliminary injunction order.

The Court need not find that Plaintiffs have established "good cause" to grant discovery regarding compliance with a preliminary injunction order. *See Damus v. Nielsen*, 328 F.R.D. 1, 3 (D.D.C. 2018) (finding that "Plaintiffs have the better of [the] dispute" where the defendants attempted to argue that "the appropriate standard for Plaintiffs' request for discovery [following the grant of a preliminary injunction motion] is . . . whether the discovery request is warranted under a multi-factor test").  In any event, however, Defendants' failures to abide by this Court's order as detailed above, as well as other evidence of their inadequate response, plainly constitute "good cause" to order Defendants to provide the requested information.

## VIII.  CONCLUSION

For these reasons, and all those assigned in their *ex parte* application and at the hearing, Plaintiffs respectfully request this Court order Defendants to produce the requested documents and information.

DATED: May 8, 2020

Respectfully submitted,

/s/ Jared Davidson
Jared Davidson
Lisa Graybill
Shalini Goel Agarwal
Maia Fleischman
SOUTHERN POVERTY LAW
CENTER

/s/ Timothy P. Fox
Timothy P. Fox
Elizabeth Jordan
Maria del Pilar Gonzalez Morales
CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER

/s/ Stuart Seaborn
Stuart Seaborn
Christina Brandt-Young
Melissa Riess
DISABILITY RIGHTS
ADVOCATES

Attorneys for Plaintiffs

/s/ William F. Alderman
William F. Alderman
Mark Mermelstein
Jake Routhier
ORRICK, HERRINGTON &
SUTCLIFFE LLP

/s/ Michael W. Johnson
Michael W. Johnson
Dania Bardavid
Leigh Coutoumanos
Jessica Blanton
Joseph Bretschneider
WILLKIE FARR &
GALLAGHER LLP