Timothy P. Fox (CA Bar 157750)
*tfox@creeclaw.org*
Elizabeth Jordan*
*ejordan@creeclaw.org*
CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER
1245 E. Colfax Avenue, Suite 400
Denver, CO 80218
Tel: (303) 757-7901
Fax: (303) 872-9072

Lisa Graybill*
*lisa.graybill@splcenter.org*
Jared Davidson*
*jared.davidson@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
201 St. Charles Avenue, Suite 2000
New Orleans, Louisiana 70170
Tel: (504) 486-8982
Fax: (504) 486-8947

Stuart Seaborn (CA Bar 198590)
*sseaborn@dralegal.org*
Melissa Riess (CA Bar 295959)
*mriess@dralegal.org*
DISABILITY RIGHTS ADVOCATES
2001 Center Street, 4th Floor
Berkeley, California 94704
Tel: (510) 665-8644
Fax: (510) 665-8511

Attorneys for Plaintiffs (continued on next page)

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### EASTERN DIVISION – RIVERSIDE

| | |
|---|---|
| FAOUR ABDALLAH FRAIHAT, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*,<br><br>Defendants. | Case No.: 19-cv-01546-JGB(SHKx)<br><br>**JOINT MEET AND CONFER STATEMENT CONCERNING PLAINTIFFS' NOTICE AND INFORMATION/DOCUMENT REQUESTS** |

William F. Alderman (CA Bar 47381)
*walderman@orrick.com*
Jake Routhier (CA Bar 324452)
*jrouthier@orrick.com*
ORRICK, HERRINGTON &
SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
Tel: (415) 773-5700
Fax: (415) 773-5759

Michael W. Johnson**
*mjohnson1@willkie.com*
Dania Bardavid**
*dbardavid@willkie.com*
Jessica Blanton**
*jblanton@willkie.com*
Joseph Bretschneider**
*jbretschneider@willkie.com*
WILLKIE FARR &
GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Tel: (212) 728-8000
Fax: (212) 728-8111

Maia Fleischman*
*maia.fleischman@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
2 South Biscayne Boulevard
Suite 3750
Miami, FL 33131
Tel: (786) 347-2056
Fax: (786) 237-2949

Christina Brandt-Young*
*cbrandt-young@dralegal.org*
DISABILITY RIGHTS
ADVOCATES
655 Third Avenue, 14th Floor
New York, NY 10017
Tel: (212) 644-8644
Fax: (212) 644-8636

Mark Mermelstein (CA Bar 208005)
*mmermelstein@orrick.com*
ORRICK, HERRINGTON &
SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA 90017
Tel: (213) 629-2020
Fax: (213) 612-2499

Leigh Coutoumanos**
*lcoutoumanos@willkie.com*
WILLKIE FARR &
GALLAGHER LLP
1875 K Street NW, Suite 100
Washington, DC 20006
Tel: (202) 303-1000
Fax: (202) 303-2000

Shalini Goel Agarwal
(CA Bar 254540)
*shalini.agarwal@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
106 East College Avenue
Suite 1010
Tallahassee, FL 32301
Tel: (850) 521-3024
Fax: (850) 521-3001

Maria del Pilar Gonzalez Morales
(CA Bar 308550)
*pgonzalez@creeclaw.org*
CIVIL RIGHTS EDUCATION
AND ENFORCEMENT CENTER
1825 N. Vermont Avenue, #27916
Los Angeles, CA 90027
Tel: (805) 813-8896
Fax: (303) 872-9072

Attorneys for Plaintiffs (continued from previous page)
*Admitted Pro Hac Vice
**Pro Hac Vice Application Forthcoming

Joseph H. Hunt
Assistant Attorney General
William C. Peachey
Director
Jeffrey S. Robins
Deputy Director
Lindsay M. Vick (MA 685569)
*lindsay.vick@usdoj.gov*
Anna L. Dichter (NJ 304442019)
*anna.l.dichter@usdoj.gov*
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
OFFICE OF IMMIGRATION LITIGATION
DISTRICT COURT SECTION
450 5th Street, N.W., Rm 5223
Washington, D.C. 20530
Tel.: (202) 532-4023
Fax: (202) 305-7000

Pursuant to the May 5, 2020 Civil Minutes, the parties hereby submit this meet and confer statement concerning Plaintiffs' requests for issuance of notice to the class and for production of documents and information.

**Notice to Class**

The parties set forth below their respective positions concerning notice. Plaintiffs have provided the Court with their position on each specific issue concerning notice, and Defendants have provided a single response covering all issues.

I.   **Plaintiffs' Position**

A.   **Content of Notice**

Status: At the Meet and Confer, Plaintiffs proposed that the notice describe how detained individuals can let ICE know that they have risk factors, which are not always reflected in ICE's medical records. Defendants responded that detained individuals can inform ICE of risk factors is by submitting a "sick call," and that advocates and attorneys for detained individuals can inform ICE of risk factors, although ICE requests that medical documentation accompany the notification. Defendants have now proposed that the notice be amended to inform class members that they can notify medical staff of their risk factors.

Plaintiffs' Position: Using "sick call," "medical requests," or whatever terminology individual facilities use to signify a request for medical attention, is a beleaguered, cumbersome process that is rife with problems and delay under non-pandemic circumstances. For example, on April 13, 2017, Sergio Alonso Lopez died from an upper gastrointestinal bleed while detained at Adelanto. The DDR found that Mr. Lopez never received a response to his sick call requests within 48 hours unless he was already scheduled for a follow-up appointment. Compl. at 68, ECF No. 1. According to a facility nurse at Eloy, there were up to 110 sick call encounters per day, and the facility was grossly understaffed to handle these needs.

*Id*. at 119.

In the context of this case, the request would conceivably need to proceed through several steps: detained individuals would fill out the sick call in English on a form not designed for this purpose, submit the form, which would then be passed from medical contractor staff responsible for collecting requests, to the reviewer of such requests, to whoever ICE's liaison is at the facility, to whatever staff ICE has determined is conducting risk factor identification, to whatever staff ICE has determined is conducting custody reviews. Not only does that many steps increase the likelihood for error, it will not move quickly.

Defendants have indicated that advocates and attorneys for detained people may inform ICE of risk factors. Defendants request that medical records be included. Plaintiffs' position is that records should not be required, that it is important and useful for advocates and attorneys to be able to inform ICE of conditions that may not be reflected in ICE medical records, and to the extent that records from outside ICE's record system are available (i.e., from medical care provided before someone was detained), they should be considered.

Plaintiffs' position is that it is strongly preferable to have a method that allows a detained person who is pro se to communicate their risk factors and request review, in writing, directly with their Deportation Officer and a clear process for ERO custody staff to communicate with medical staff about such requests. Similarly, for advocates and attorneys, the same clear process for ERO to communicate these requests to medical staff should be employed.

Plaintiffs agree that the notice should be amended to inform class members that they can tell medical staff of their risk factors, and that their advocates and attorneys can also inform ICE of these risk factors. If the Court agrees, plaintiffs will include this language in a revised notice.

**B.    Dissemination of Notice**

**i.    Translation of Class Notice**

<u>Status:</u> In their *ex parte* application, Plaintiffs requested that the notice

**2**

be translated into Spanish as well as the three most spoken languages at each facility. Defendants have agreed to translate the notice into Spanish, but have stated that they cannot determine the three most spoken languages at each facility. In response, Plaintiffs have proposed that they will provide translations of the notice in eight languages. Defendants have agreed to this proposal, and have stated that it will take approximately two to three days to verify translated notices once those notices are provided by Plaintiffs. Plaintiffs agree with this proposal as long as the translated notices are posted within four days of their receipt from plaintiffs to ICE.

## ii.   Interpreters to Read Notice

Status: In their *ex parte* application, Plaintiffs requested that an interpreter read the notice to individuals who speaks any other language beyond English, Spanish or the three most common languages at the facility. Defendants stated they cannot provide additional interpretation.

Plaintiffs' Position: If Defendants will post the notice in the additional languages translated by Plaintiffs, Plaintiffs will forgo the request for an interpreter.

## iii.   Communicating Notice to Individuals with Vision Disabilities or Who Cannot Read

Status: In their *ex parte* application, Plaintiffs requested that Defendants effectively communicate the content of the notice to people with vision disabilities, by, for example, providing the notice in braille and large print, and also providing audio announcements with the contents of the notice. Defendants stated that accommodations will be provided to communicate the notice to people with vision disabilities, including translating the notice into braille, reading the notice, and having the notice printed in large print. Defendants have further stated that "ICE currently has processes in place to ensure that facilities identify individuals with communication disabilities and subsequently notify ICE ERO of the

disability and plan for accommodation."

Plaintiffs' Position: As set forth in the Complaint, ICE has a history of failing to identify and accommodate detained individuals with disabilities, and Plaintiffs are skeptical that this will change now. This reinforces the need for monitoring to ensure that individuals with disabilities actually received accommodations.

### iv.   Posting of Notice in Common Areas

Status: In their *ex parte* application, Plaintiffs requested that the notice be posted in each dormitory, all common areas, law library, the reception area and that it be hand-provided to individuals in segregation or isolation. Defendants have agreed to post the notice in all common areas of dormitories and the library, and "high traffic areas in segregation sections of all detention facilities."

Plaintiffs' Position: Plaintiffs agreed to Defendants' proposal except with respect to individuals in segregation. Plaintiffs understand that there are very few high-traffic areas in segregation that people can find in those settings are allowed to pause and read the notice. As a result, the notice should be individually provided to each such person.

### v.   Written Notice at Intake Communicated in the Individual's Language

Status: In their *ex parte* application, Plaintiffs requested that written notice be provided to all newly detained people during the intake process and that it be communicated in the language of the individual. In their response, Defendants stated that they will not provide written notice, or read the notice, during the intake process.

Plaintiffs' Position: Plaintiffs request that, during the intake process, newly detained individuals be informed of the notices and given the opportunity to take one.

### vi.   Written Notice Read at Legal Orientation Program ("LOP")

4

Status: In their *ex parte* application, Plaintiffs requested that a notice be read during the LOP presentations at each facility. Defendants responded that they do not administer those presentations. Plaintiffs do not dispute that Defendants do not administer LOP presentations and drop their request that the notice be read at LOP presentations.

### vii.    Copies of Court Orders in Law Library

Status: In their *ex parte* application, Plaintiffs requested that, in addition to the notice, copies of the PI and Class Certification Orders be available at the law library of each facility, and Defendants have agreed to this.

### viii.    Provision of a Free, Confidential, Telephone Hotline

Status: In their *ex parte* application, Plaintiffs requested the provision of a free, confidential, telephone hotline. Plaintiffs have also requested that Defendants provide a point of contact for technical support for any technical issues related to the hotline and the removal of the positive acceptance requirement (this requirement prevents detained individuals from leaving voicemails). Defendants agreed to adding two phone numbers provided by Plaintiffs to a pro bono platform at all detention facilities which will permit free, confidential telephone access, and that these phones are passive acceptance only so no one needs to answer the call in order for the call to go through. They have also agreed to provide accommodations for people who are deaf or hard of hearing, including for example use of Video Relay Service and/or Teletypewriter (TTY). Defendants assert that the phone systems are not operated by ICE, and thus it cannot provide a point of contact.

Plaintiffs' Position: Plaintiffs agree to Defendants' proposals with the following exceptions. TTYs are outdated, and thus Plaintiffs request that deaf and hard of hearing people be provided with Video Relay Service. With respect to a point of contact for technical support issues, while the detention

**5**

*Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)
Joint Meet and Confer Statement Concerning Notice and Information/Document Requests

1  centers may be operated by contractors, ICE remains responsible for the
2  conditions of confinement in those centers. Plaintiffs request that at a
3  minimum, ICE provide a point of contact with their contractors for any
4  technical issues that may arise concerning the hotline.

## II.    Defendants' Position

7      Class notice must be reasonable and comport with due process. *Frank v.*
8  *United Airlines, Inc.*, 216 F.3d 845, 851 (9th Cir. 2000) ("In a Rule 23(b)(2) class
9  action, by contrast, there is no requirement for individualized notice beyond that
10 required by due process, and class members are not allowed to opt out."); *Crawford*
11 *v. Honig*, 37 F.3d 485, 487 n.2 (9th Cir. 1994) ("In a Rule 23(b)(2) class action for
12 equitable relief, the due process rights of absent class members generally are
13 satisfied by adequate representation alone[,]" rather than procedural safeguards such
14 as class notice and opt-out provisions). Plaintiffs have not shown why anything less
15 than the form and dissemination methods of notice they demand is unreasonable or
16 does not satisfy due process. Nevertheless, amended to reflect the agreement
17 concerning the pro bono platform, Defendants accept Plaintiffs' proposed class
18 notice as written and can post the notice in English as soon as it is ready. However,
19 Defendants suggest that Plaintiffs add language to the notice indicating that
20 detainees may identify themselves to medical staff if they believe they have a risk
21 factor. ICE will accept Plaintiffs' proposal to provide notice in eight languages. ICE
22 can validate these translations, if provided by Plaintiffs, in two to three days,
23 depending upon the availability of translators in the languages requested. ICE will
24 post the notice in the common areas of dormitories, libraries, and high traffic areas
25 in segregation sections of all detention facilities.

26     Defendants do not accept all of Plaintiffs' terms for dissemination of notice.
27 Defendants cannot accept Plaintiffs' request to post the notice in additional areas.

28

*Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)
**Joint Meet and Confer Statement Concerning Notice and Information/Document Requests**

ICE regularly posts all class notices in the same location in the common areas of its facilities and Plaintiffs have not provided any reason why class notice should be disseminated more widely than other class notices commonly posted at detention facilities. Class notices are not provided at detainee intake.

With respect to communicating notice to detainees with hearing or visual impairment, ICE can provide large print notices to detainees with vision impairment. Declaration of Russell Hott ¶ 9, ECF No. 144-1. Additionally, "each facility is already required to ensure that hearing and visually impaired detainees are able to understand any communications, and the facilities would be able to facilitate the interpretation." *Id.* at ¶ 8. ICE and its contractors are aware of their obligations to comply with Section 504 of the Rehabilitation Act, which requires the identification, assessment, and accommodations of detainees with disabilities, including individuals who are deaf, hard of hearing, blind and low vision. The accommodation process provides equal access to all facility programs and services, and includes individualized, interactive, and ongoing assessment. ICE currently has processes in place to ensure that facilities identify individuals with communication disabilities and subsequently notify ICE ERO of the disability and plan for accommodation. This ensures ICE ERO's tracking of disability cases and that legal obligations are being met. ICE reports that it can affirmatively reach out to disabled detainees whose disabilities require it. Accommodations include providing auxiliary aids and services that allow for individuals who are deaf to communicate externally (e.g. detainee phone calls with an attorney, accessing the newly created hotline for the *Fraihat* injunction), such as Video Relay Service, and/or Teletypewriter (TTY). Accommodations for individuals who are blind or low vision may include translation into Braille, ICE and facility personnel reading documents to detainees, and/or assistance using phones and other equipment. Accommodations may be

*Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)
Joint Meet and Confer Statement Concerning Notice and Information/Document Requests

individualized based on the needs of individual detainees in order to ensure effective communication.

As part of their class notice dissemination proposal, Plaintiffs further request that a hotline be provided for detainees to have free access to class counsel. With respect to Plaintiffs' hotline request, Defendants will add two telephone numbers provided by Plaintiffs to the pro bono platform at all detention facilities, which provides free telephone access to all detainees. *Id.* at ¶ 10. ICE cannot provide a point of contact for technical issues with the pro bono platform because the phone systems are not operated by ICE. ICE is able to input the hotlines into the platform but does not operate the technical requirements. The pro bono platform is passive acceptance only so no one needs to answer the call in order for the call to go through.

Finally, Defendants will ensure that the Court's preliminary injunction and class certification orders are in the libraries at all detention facilities.

**Information and Document Requests**

Plaintiffs' statement on the meet and confer process: The parties held their meet and confer call on May 6, 2020, and shortly after the call, Plaintiffs sent to Defendants a list of questions on which Defendants had agreed to pose to their clients. Defendants have not yet provided answers to the following questions:

- How many facilities and individuals still have to undergo the process of being identified for risk factors.
- How many people have been released so far pursuant to Fraihat custody redeterminations.

Plaintiffs received the Defendants' inserts below at 5:30 PM Pacific on May 8, 2020.

**Request 1.** A spreadsheet listing all facilities in which people detained by ICE are held ("Facilities"), the number of such people currently held at each

*Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)
**Joint Meet and Confer Statement Concerning Notice and Information/Document Requests**

Facility, which field office the Facility falls within, and the name and contact information of the field office director (including email and mailing address)

Status: Defendants have agreed to provide the spreadsheet without the contact information for field office directors, and Plaintiffs agree to this limitation.

**Request 2.** Documents showing that ICE has informed all field office directors of all of the steps required by the Preliminary Injunction order, and the substance and date of those communications. This includes any documents advising field office directors what the risk factors are, as well as any additional guidance as to risk factors and how to conduct custody assessments.

Plaintiffs' Position: Defendants have agreed to provide the information responsive to this request. Nevertheless Defendants again raise the argument rejected by this Court during the May 5, 2020, hearing that Plaintiffs must show that the Defendants have violated the PI Order in order to obtain documents and information relevant to implementation of that Order. Plaintiffs have repeatedly demonstrated that this is not the case. *See* ECF 136 at 4; ECF 146 at 15. In any event, as set forth in their Response to Hott Declaration (ECF 146), Plaintiffs have more than sufficiently shown that Defendants are not implementing or complying with the PI Order.

Defendants' Position: Defendants will produce this information immediately. ICE will produce the broadcast message that ICE ERO sent to all FODs and Deputy Field Office Directors ("DFOD") on April 26, 2020, entitled, *Detained Docket Review Pursuant to the Nationwide Preliminary Injunction in Fraihat v. ICE, --- F. Supp. 3d ---, 2020 WL 1932570 (Apr. 20, 2020)*, directing them to identify and track subclass members by April 29, 2020. *See* Hott Decl. ¶ 13, ECF No. 144-1. As indicated in the Hott Declaration, ICE ERO held a teleconference with the field on Monday, April 27, 2020. There is no transcript or recording of the teleconference. ICE will produce the April 28, 2020, broadcast message after entry of a protective order because that message included

**9**

spreadsheets, which contained sensitive personally protected information.

While Defendants have agreed to produce some information in response to Plaintiffs' requests for discovery into Defendants' compliance with the Court's Order, Defendants maintain that Plaintiffs have not raised significant questions or a serious concern regarding Defendants' compliance necessary to support their requests. *See Cal. Dep't of Soc. Servs. v. Leavitt*, 523 F.3d 1025, 1034 (9th Cir. 2008). Plaintiffs do not tie their discovery requests to noncompliance with the procedures in the Court's Order, and thus, the class-wide discovery that Plaintiffs seek is premature and unfounded. Nor have Plaintiffs made a showing of a significant change in circumstances to support modification given that many of their requests ultimately appear aimed at creating procedures that do not presently exist in the Court's Order. *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 384 (1992); *see also Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000) ("A party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction.") (citation omitted). For example, most of Plaintiffs' discovery requests are directed at a release request process for which there is no basis in the preliminary injunction in this case.

**Request 3(A). Determination of whether Current Detainees have risk factors:** For people who, as of April 30, 2020, have been in ICE custody for at least five days ("Current Detainees"), we request the following information to be produced no later than May 4, 2020: The number of Current Detainees for whom ICE has not yet determined whether they have one or more risk factors, the Facilities in which they are detained, the reasons why this determination has not yet occurred, and when that determination is expected to occur.

Status: Defendants have not agreed to provide this information.

Plaintiffs' Position: It is essential that the Court and the parties know where ICE is in the process of identifying people with risk factors, particularly given the

time-constraints set forth in the Court's order for identifying individuals with Risk Factors (that deadline passed more than a week ago). Plaintiffs would be willing to accept biweekly information on the number of current detained individuals who have not yet undergone the review process, the facilities at which they are confined, and when that review is expected to occur. Defendants' position below does not explain why they will not provide information about the number of people who have been identified as having risk factors but have not yet undergone a custody redetermination. This is vital information to make sure that these redeterminations are conducted in a timely manner.

Defendants' Position: Pursuant to the Court's Order, ICE has identified and tracked 4,409 aliens in custody for risk factors, and identification is ongoing. Hott Decl. ¶ 14, ECF No. 144-1. ICE reports that the agency continues to identify and track existing and new detainees with risk factors and disabilities that qualify them as subclass members. As noted, ICE ERO sent two messages to all of the FODs and DFODs instructing detention facilities to identify all subclass members according to the subclass definitions in the Order within their respective areas of responsibility by April 29, 2020. Hott Decl. ¶ 13. The broadcast message contained the definition of the subclasses as well as the lists of qualifying risk factors and disabilities. ICE HQ directed FODs and DFODs identify all cases within their AORs that meet any of the criteria enumerated by the court and validate the cases with assistance from the Field Medical Coordinator and/or facility medical staff to ensure the conditions listed are still present and update the ENFORCE Alien Removal Module (EARM). See Hott Decl. ¶ 13. ICE reports that identification of subclass members occurs when a medical professional conducts a file review of a detainee's medical records. ICE reports that depending upon the facility, medical records may be electronic or paper based as not all facilities have electronic medical record systems. ICE reports that when the medical professional identifies a medical condition that qualifies as a risk factor under the Court's Order, then a

specific alert code created for purposes of this litigation is entered into an ICE database. ICE reports that risk factor presence is strictly a medical determination made by medical personnel. ICE reports that ERO offices making custody determinations do not review medical files and do not determine if a detainee has or does not have a risk factor.

**Request 3(B)**: With respect to Current Detainees for whom ICE has made a determination as to whether they have one or more risk factors, and, on a weekly basis, those Current Detainees for whom such determination is made after April 30, 2020 (preferably in the form of an electronic spreadsheet):

A. The person or persons who made that determination;

B. The training, experience and/or background that made those people competent to make such determinations;

C. When the determinations were made;

D. A list with the names, countries of origin, A-numbers, dates of birth, Facility at which each is detained, and custody status of each person identified as having a risk factor, and the risk factor or factors they were determined to have.

E. For Current Detainees who claim to have a risk factor, but ICE finds otherwise, a spreadsheet listing the names, countries of origin, A-numbers, dates of birth, Facility at which each is detained, custody status and claimed risk factor of each such person, and the basis for ICE's determination that the person did not have a risk factor.

Status: The parties have agreed to seek entry of a protective order. Once that order is in place, Defendants agree to provide, on a biweekly basis, the names, A-numbers, and facilities of detained individuals identified as having risk factors. Defendants have also agreed to provide the two messages referenced in paragraph

*Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)
**Joint Meet and Confer Statement Concerning Notice and Information/Document Requests**

13 of the Hott Declaration (ECF 144-1).[1] In addition, to the extent that Plaintiffs learn of detained individuals with risk factors who have not yet been identified by ICE, they will provide the names of those individuals to ICE. Defendants have refused to provide any other information sought by Request 3(B).

   <u>Plaintiffs' Position on disputed items.</u> Plaintiffs are willing to limit this request to the following: (1) the information that Defendants have agreed to provide; and (2) the remaining information sought under this request, but only as to those detained individuals who claim to have a risk factor, but ICE determined otherwise. This second category of information is essential because ICE's guidance does not specifically say that only people with medical training should be making risk factor determinations. The PI Order requires that, when risk factor determinations are made by people who do not have medical training, they must be provided with training. To the extent that Defendants assert that only medical professionals are making risk determinations, Plaintiffs request that Defendants provide documents or other information confirming this assertion. Rather than providing the names of individuals who made the determinations vis-à-vis each detained person, Plaintiff will accept a list of all individuals who are responsible for making risk determinations with their title. Finally, Defendants have stated that they have prepared a report identifying all detained individuals who are 55 years old or older. Plaintiffs request that Defendants provide this list, including the names of these individuals, their A-numbers, and the facility at which they are detained. Defendants' position below asserts that people who claim to have a risk factor, but for whom ICE determines otherwise, are not members of the subclass, but this is based on the presumption that ICE has correctly made that determination. Plaintiffs are entitled to information and documents to understand the reasons that ICE determines that people who claim to have risk factors, in

---

[1] It is not clear to Plaintiffs whether these messages, and the teleconference, concerned risk factor identification, custody redeterminations, or both, but in any event, Defendants have agreed to produce this information.

*Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)
**Joint Meet and Confer Statement Concerning Notice and Information/Document Requests**

1 ICE's opinion, do not.

2     <u>Defendants' Position:</u> Subject to the entry of a protective order, Defendants

3 can produce a spreadsheet on a biweekly basis of detainees who ICE has identified

4 as subclass members. The spreadsheet would include the following fields: name,

5 alien number ("A number"), detention facility, custody status (detained or

6 released). ICE cannot provide the name or type of risk factor(s) for each detainee

7 because this would require manual review of the medical records for thousands of

8 detainees. When ICE identifies detainees with a risk factor that qualifies them as a

9 *Fraihat* subclass member, then an alert code created for purposes of this litigation

10 is entered into the database. This alert code does not identify any specific risk

11 factor.

12     Likewise, ICE cannot provide the identity of the person who made the risk

13 factor determination, that individual's qualifications, nor the date the determination

14 was made because such information would require the manual review of thousands

15 of records and is disproportionate to the needs of this case. The Court ordered ICE

16 to identify and track subclass members. However, producing information to the

17 level of granularity that Plaintiffs seek would sidetrack this litigation and only

18 operate to impede ICE from implementing the Court's Order. *See Alaska Elec.*

19 *Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126 (JMF), 2016 WL 6779901,

20 at *3 (S.D.N.Y. Nov. 16, 2016) ("Rule 26(b)(1)'s proportionality requirement

21 means [that a document's] 'marginal utility' must also be considered.") (citations

22 omitted); *Updike v. Clackamas County,* No. 3:15-CV-00723-SI, 2016 WL 111424,

23 at *1 (D. Or. Jan. 11, 2016) ("There is a tension, however, among the objectives of

24 Rule 1. As more discovery is obtained, more is learned. But at some point,

25 discovery yields only diminishing returns and increasing expenses. In addition, as

26 more discovery is taken, the greater the delay in resolving the dispute. Finding a

27 just and appropriate balance is the goal, and it is one of the key responsibilities of

28

*Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)
**Joint Meet and Confer Statement Concerning Notice and Information/Document Requests**

the court in managing a case before trial to assist the parties in achieving that balance."); *see also Nat.-Immunogenics Corp. v. Newport Trial Grp.*, No. SACV152034JVSJCGX, 2019 WL 3110021, at *7 (C.D. Cal. Mar. 19, 2019) (citing *Alaska Elec. Pension Fund* and *Updike*).

ICE does not identify or track detainees who claim to have a risk factor, but were determined not to have a qualifying risk factor. Plaintiffs' request for information concerning non-subclass members has nothing to do with Defendants' compliance with the specific terms of the Court's Order. This request is not actually a discovery request but amounts to a request for modification of the preliminary injunction for which Plaintiffs have made no showing of a significant change in circumstances to support modification. *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 384 (1992); *see also Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000) ("A party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction.") (citation omitted). By way of their purported discovery requests into compliance with the Court's Order, Plaintiffs seek to establish an affirmative release request process such that detainees can seek review for class membership and custody redetermination. However, Plaintiffs' release request process does not comport with the specific terms of the Order and is unnecessarily duplicative of the identification and tracking that ICE is conducting as ordered by the Court. *See Armstrong Pump, Inc. v. Hartman*, No. 10-CV-446S 2016 WL 7208753, *3 (W.D.N.Y. Dec. 13, 2016) (discussing the assessment of when discovery is duplicative as part of the proportionality analysis under Federal Rule 26(b)(1)). Furthermore, Plaintiffs' desired process for *Fraihat* release requests is duplicative of procedures that already exist nationwide. Detainees in ICE custody already have access to a sick call system wherein a detainee can request to see a medical professional the same day or within several

days of making the request, depending upon the facility. *See* Defs.' Opp. to Pls.' Prelim. Inj., Declaration of Dr. Ada Rivera ¶¶ 16-17, ECF No. 95-3; Declaration of Captain Jennifer Moon ¶ 12, 16, ECF No. 95-11. By utilizing the sick call process, a detainee can consult with a medical professional who can diagnose, identify, and track the detainee for the qualifying risk factor, which will then trigger a custody review in light of the newly identified subclass member in the tracking system. Moreover, detainees have several opportunities to meet with a medical professional and raise any medical issues. When new detainees are brought into the facility, they see a medical professional as part of an initial medical intake. Rivera Decl. ¶ 12; Moon Decl ¶ 8. Thereafter, detainees all have access to the sick call process at each facility. Thus, Plaintiffs' request for discovery concerning non-subclass members is disproportionate to the needs of the case at this stage of the litigation.

Plaintiffs' counsel and advocates may also inform local ICE Field Office Directors or other custody staff of detainees that they believe have risk factors, but they should support those requests with medical documentation.

With respect to the risk factor involving individuals 55 years of age and older, a report was gathered, for purposes of this litigation, for all detainees in ICE custody, and then filtered for anybody age 55 or older. ICE can agree to produce this report within a reasonable timeframe and pursuant to a protective order. Date of birth is standard biographic information gathered at the time of processing, by oral statement by the alien and/or any identity documents available at the time of processing into removal proceedings. Staff manually enter this information into ICE's systems at the time of processing, and the systems can be updated as new information becomes available.

**Request 4.** This Request seeks the same information as Request 3, but as to Future Detainees (people who, as of April 30, 2020, have been in ICE custody for less than five days) rather than Current detainees. The Parties' positions on

Request 4 are the same as their positions on Request 3.

**Request 5. Custody redeterminations.** On a weekly basis, beginning on May 4, 2020, for each Facility (preferably in the form of the spreadsheet):

    A. The number of detained people determined to have one or more risk factors;

    B. The name, country of origin, date of birth and A-Number, of each such person;

    C. For each such person that has undergone a custody redetermination:

        1. The result of that redetermination;

        2. The identity and position of the person who made the redetermination;

        3. Where ICE determines that the detained person will be released, when that release occurred, and any conditions placed on release (e.g. ankle monitor). If the person has not yet been released, when release is anticipated to occur.

        4. Where ICE determines that the detained person will not be released, the specific basis for that determination, and the provision under the Immigration and Naturalization Act under which ICE alleges such person is detained.

    D. For each person identified as having one or more risk factors that has not yet undergone a custody redetermination, when that determination will take place.

    Status: Defendants have agreed, on a biweekly basis, to provide a list of detained individuals (including their name, date of birth and A-number) who have been identified as having risk factors, and whether each such individual has been released. Defendants have refused to provide any other information responsive to this request.

    Plaintiffs' Position: Plaintiffs are willing to limit this request to: (1) the information that Defendants have agreed to provide; (2) the information requested

**17**

*Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)
**Joint Meet and Confer Statement Concerning Notice and Information/Document Requests**

in Request 5(C)(2) and 5(C)(4) as to detained individuals with risk factors who were not released after a custody redetermination; and (3) the information requested in Request 5(D). Under the PI Order (at 32), there should be a strong presumption of release for people with risk factors, which is consistent with ICE's own April 4 guidance, which states that the presence of a risk factor should be a "significant" factor in favor of release. Without information concerning the reasons that ICE refused to release people with risk factors, the Court and Plaintiffs will be unable to determine whether ICE is actually conducting these redeterminations using a strong presumption of release pursuant to its own guidance; in addition, absent this information, the Court and Plaintiffs will not be able to determine whether ICE is improperly making determinations that are not based on the individualized needs of the people in its custody. Further, the provision of the INA under which an individual is detained is relevant to determining whether ICE is engaging in categorical refusals to release people detained under particular provisions (for example, ICE has taken the position that no one under mandatory detention will be released). Plaintiffs contend that ICE's position is inconsistent with this Court's order and also fails to account for the individual circumstances of Class members. Finally, the information sought by Request 5(D) is necessary to determine whether custody redeterminations are occurring in a timely manner. Defendants' statement below, that custody redeterminations are made "as soon as possible," leave this Court and Plaintiffs without any information whatsoever about how long people are waiting to get custody redeterminations. This pandemic is spreading at an exponential rate, and delays in the process of identifying people with risk factors, and conducting custody redeterminations for those people, will literally cost lives.

     Defendants' Position: As noted above, Defendants can produce a spreadsheet of detainees who have been identified as subclass members because they have one or more qualifying risk factors or disabilities. This spreadsheet will include the

*Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)
**Joint Meet and Confer Statement Concerning Notice and Information/Document Requests**

name, date of birth, and A-Number, of each person. With respect to custody determinations, however, all Defendants are able to provide is the custody status of each person, which will indicate whether that person has been released or remains in custody. Defendants cannot agree to provide the information requested in Request 5(C)(2), 5(C)(4), or 5(D). Custody determinations are conducted as soon as possible once a detainee is identified as a subclass member. Hott Decl. ¶ 18, ECF No. 144-1. It would be disproportionate to the needs of the case for Defendants to manually research thousands of files to determine whether there are detainees who were identified as having a risk factor, but are still waiting for a custody determination when such determinations are occurring as soon as possible. *Id.* Defendants' position with respect to detainees who are mandatorily detained pursuant to 8 U.S.C. § 1226(c) is that such detention authority bars detainees from release pursuant to discretionary consideration.

ICE does not track the "result" of a custody determination; rather, if a detainee remains in custody, it follows that the detainee's custody redetermination was unfavorable. In order for ICE to provide any further detail about custody determinations, including notes about the result and the identity of the staff member who conducted the redetermination, ICE would need to conduct individual, manual review of thousands of detainee records. Such manual review is disproportionate to the needs of this case because it does not relate to any specific terms of the Court's Order. The Order required ICE to identify and track detainees with risk factors; however, it did not require any similar tracking related to the custody redeterminations. To produce information unrelated to the Order would sidetrack this litigation and only operate to impede ICE from implementing the Court's Order. *See Alaska Elec. Pension Fund*, 2016 WL 6779901, at *3 ("Rule 26(b)(1)'s proportionality requirement means [that a document's] 'marginal utility' must also be considered.") (citations omitted); *Updike*, 2016 WL 111424, at *1 ("There is a tension, however, among the objectives of Rule 1. As more discovery

**19**

is obtained, more is learned. But at some point, discovery yields only diminishing returns and increasing expenses. In addition, as more discovery is taken, the greater the delay in resolving the dispute. Finding a just and appropriate balance is the goal, and it is one of the key responsibilities of the court in managing a case before trial to assist the parties in achieving that balance."); *see also Nat.-Immunogenics Corp.*, 2019 WL 3110021, at *7 (citing *Alaska Elec. Pension Fund* and *Updike*).

**Request 6. Training.** By May 4, 2020, all materials related to training of people tasked with identifying detained people with risk factors, including timing of such trainings.

Status: Defendants assert that there are no training materials because only medical professionals are determining whether people have risk factors.

Plaintiffs' Position: Plaintiffs request that Defendants provide documents and information for their assertion that only medical professionals are determining whether people have risk factors. Further, Plaintiffs are skeptical of Defendants' broad assertion in light of the fact that Defendants contend that people with risk factors may utilize the sick call process in order to access medical care to self-report risk factors. At many facilities, non-medical custody staff collect sick call forms. Therefore, Plaintiffs are concerned that—contrary to Defendants' position—custody staff still play a material role in the process of risk factor identification. *See* Pls.' Resp. to Decl. of Russell Hott ("Response to Hott Declaration") filed simultaneously with this joint statement.

Defendants' Position: Defendants will not produce anything in response to this request because, according to the terms of the Order, if the identification of subclass members is performed by medical personnel, then no additional training is required. As previously noted, the identification of detainees with risk factors is performed by medical personnel nationwide. Defendants note that ICE indicates, because age is not a medical condition or a disability, there is no medical code for age, and therefore, review for individuals 55 years of age and older is not

necessarily done by a medical professional. Further, Plaintiffs have not shown that just because custody staff collect sick call requests, this somehow impedes a detainee's ability to see medical personnel for a sick call appointment.

**Request 7. Performance Standards.** By May 4, 2020, the following information and documents concerning the Performance Standards (as defined in the Preliminary Injunction order):

    A. If Performance Standards have not been issued by May 4, 2020, the date that such Standards will be issued, as well as any drafts of those Standards.

    B. To whom ICE is issuing the Standards.

    C. Any training materials concerning the Standards.

    D. Any additional guidance addressing implementation, or meaning, of the Standards.

Status: Defendants have not issued any additional performance standards on the grounds that the April 10 guidance (the "PRR") incorporated the CDC guidance and Defendants contend that they can enforce the PRR through the Performance-Based National Detention Standards.

Plaintiffs' Position: It is Plaintiffs' position that the PI Order requires Defendants to issue new or supplemental guidance. *See* Response to Hott Declaration. For purposes of this meet and confer statement, however, if Defendants do not have new or submental guidance, then they cannot produce any such guidance.

Further, Plaintiffs object to Defendants' attempt to yet again introduce late, last-minute evidence via another declaration from Russell Hott (which was apparently signed yesterday) as not relevant to this report.

Defendants' Position: Defendants will not produce any additional performance standards or supplement to the performance standards because the ICE Detention Standards set the minimum requirements for all facilities that house

ICE detainees. *See* Declaration of Russell Hott ¶ 6-10, dated May 8, Ex. 1 (describing how ICE obtains detention capacity, how ICE detention standards are incorporated in each contract, and how those standards are monitored and enforced). Defendants submit the Hott Declaration to elaborate on ICE's detention standards and the monitoring and enforcement mechanisms incorporated therein. Defendants submit this declaration in support of their positions with respect to Plaintiffs' Requests 7 and 8. Statements by counsel are not evidence, and therefore, Defendants must submit a declaration to support any factual representations. *See Shiley, Inc. v. Bentley Laboratories, Inc.*, 115 F.R.D 169, 171 (C.D. Cal 1987). Plaintiffs fault Defendants for having the declaration dated yesterday; however, all this shows is that Defendants have been working diligently to provide Plaintiffs with answers to questions that continue to multiply with each conference and communication.

**Request 8. Monitoring and enforcement.** By May 4, 2020, and on a monthly basis thereafter:

    A. The name, position and contact information (email and mailing address) of the people tasked with monitoring and ensuring compliance with the PRR and the Performance Standard, and for each, the Facilities for which he or she is responsible. This request extends to individuals at ICE central office or IHSC with oversight over the entire system or multiple Facilities.

    B. Documents showing specifically how this will be accomplished, including whether each Facility will be subject to in-person inspections, how often, what forms or documents will be used in connection with this, and the consequences if a Facility is determined not to be in compliance with the PRR and the Performance Standard.

    C. On an ongoing basis, documents that are generated from this process.

    <u>Status</u>: Defendants have refused to provide any responsive information or

documents.

Plaintiffs' Position: This request seeks information and documents directly relevant to Defendants' implementation of the PI Order. As this Court pointed out in its PI Order (at 30), Defendants have a long history of "monitoring and oversight failures," and there is no reason to believe that that is going to change now. Further, the Court's order specifically ordered Defendants to monitor compliance with the new performance standard. Therefore, without this information, the Court and Plaintiffs will be completely in the dark about whether Defendants are actually taking affirmative steps to ensure implementation and compliance with the PI Order, or what those steps are. *See* Response to Hott Declaration.

Defendants' Position: Defendants will not produce any documents in response to this request as this request is disproportionate to the needs of the case. The Court did not order Defendants to track anything concerning monitoring and enforcement of detention standards or the PRR. Defendants have provided information concerning the compliance, monitoring, and enforcement that ICE conducted the week of April 21, 2020, and such monitoring and enforcement is ongoing. Hott Decl. ¶ 19; *see also* Hott Decl. ¶¶ 6-12, Ex. 1.

**Timing of production of documents and information**. Defendants state that they can immediately provide communications concerning the PI Order sent on April 26 and 28, but that any information pulled from electronic files will not be produced until two weeks after entry of a protective order.

Plaintiffs' Position: Plaintiffs do not object to entry of a protective order, but waiting two weeks for production of information that is stored electronically is simply too long of a delay in light of the dangers posed by the pandemic. Plaintiffs request that any such electronic information be produced no later than one week after entry of a protective order.

1  DATED: May 8, 2020                    Respectfully submitted,

2

3  /s/ Jared Davidson                    /s/ William F. Alderman
4  Jared Davidson                        William F. Alderman
   Lisa Graybill                         Mark Mermelstein
5  Shalini Goel Agarwal                  Jake Routhier
6  Maia Fleischman                       ORRICK, HERRINGTON &
   SOUTHERN POVERTY LAW                  SUTCLIFFE LLP
7  CENTER

8                                        /s/ Michael W. Johnson
   /s/ Timothy P. Fox                    Michael W. Johnson
9  Timothy P. Fox                        Dania Bardavid
   Elizabeth Jordan                      Leigh Coutoumanos
10 Maria del Pilar Gonzalez Morales      Jessica Blanton
11 CIVIL RIGHTS EDUCATION AND            Joseph Bretschneider
   ENFORCEMENT CENTER                    WILLKIE FARR & GALLAGHER
12                                       LLP
13 /s/ Stuart Seaborn
14 Stuart Seaborn
   Christina Brandt-Young
15 Melissa Riess
16 DISABILITY RIGHTS
   ADVOCATES
17
18 *Attorneys for Plaintiffs*

19

20 Joseph H. Hunt
   William C. Peachey
21 Jeffrey S. Robins
   Anna L. Dichter
22 /s/ Lindsay M. Vick
23 Lindsay M. Vick
   UNITED STATES DEPARTMENT
24 OF JUSTICE
25 CIVIL DIVISION
   OFFICE OF IMMIGRATION
26 LITIGATION
27
28 *Attorneys for Defendants*

**24**

*Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)
**Joint Meet and Confer Statement Concerning Notice and Information/Document Requests**

# EXHIBIT 1

Exhibit 1
25

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| FAOUR ABDALLAH FRAIHAT, *et al.*, | ) | Case No. 5:19-CV-01546 JGB (SHKx) |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*, | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

DECLARATION OF RUSSELL HOTT

I, Russell Hott, declare the following under 28 U.S.C. § 1746, and state that under

penalty of perjury the following is true and correct to the best of my knowledge and belief:

**PERSONAL BACKGROUND**

1. I am currently employed by the U.S. Department of Homeland Security (DHS),

   U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal

**Exhibit 1**
**26**

Operations (ERO) as the Acting Assistant Director for the Custody Management Division (CMD).  I have held this position since February 2020.  CMD provides policy and oversight for the administrative custody of ICE's highly transient and diverse population of immigration detainees.  CMD is composed of three divisions led by three Deputy Assistant Directors under my direct supervision: (1) the Alternatives to Detention Division; (2) the Detention Management Division; and (3) the Custody Programs Division.

2. As the Acting Assistant Director, I am responsible for the effective and proficient performance of these three Divisions and their various units, including the oversight of compliance with ICE's detention standards and conditions of confinement at ICE detention facilities generally.  I am further responsible for managing ICE detention operations efficiently and effectively to provide for the safety, security, and care of an average of about 40,000 detainees daily and roughly 500,000 detainees annually, at approximately 250 facilities nationwide, including three family residential shelters located in Texas and Pennsylvania.

3. From May 2017 to February 2020, I served as the Field Office Director for the Washington, DC, ERO Field Office, responsible for the District of Colombia and Virginia.  In my role as Field Office Director, I provided operational and policy oversight for ERO's interior enforcement efforts within the local area of responsibility, spanning 43,000 square miles, three district courts, a cadre of nearly 200 employees, and 1,400 detention beds.

4. I began my career with the U.S. Government as a detention enforcement officer with the former Immigration and Naturalization Service in New York, NY.  I

**Exhibit 1**
27

advanced through a variety of positions including Immigration Enforcement

Agent, Deportation Officer, Instructor at the Federal Law Enforcement Training

Center, Supervisory Detention and Deportation Officer, acting Assistant Field

Office Director, National Program Manager, Unit Chief, acting Deputy Chief of

Staff for ERO, Chief of Staff for the ICE Deputy Director, Deputy Field Office

Director for both the Boston and Washington field offices, Field Office Director,

and acting Deputy Assistant Director.

5.   I am familiar with the District Court's orders granting Plaintiffs' emergency

motion to certify subclass and Plaintiffs' motion for a Preliminary Injunction (PI).

I am also familiar with Plaintiffs' ex parte application for an order requiring

issuance of notice to class members of the PI, and to obtain information and

documents to monitor compliance with the court's PI order.

**ICE DETENTION FACILITIES**

6.   The ICE detention standards are designed to ensure that individuals in ICE

custody are housed in a safe, secure and orderly environment, free from injury

and harm, with access to families, legal representatives, consulates, and courts, as

well as to a continuum of health care services, including emergency care.

7.   ICE acquires access to detention capacity in one of three ways. With Federal

Acquisitions Regulations (FAR) based contracts, ICE posts a request for proposal

(RFP) or request for quotation (RFQ) for interested vendors to respond with

proposals for detention space. The RFP or RFQ includes a statement of work

(SOW) that defines the detention requirements, including the applicable ICE

detention standards.  With intergovernmental service agreements (IGSAs), ICE

**Exhibit 1**
**28**

enters into a negotiated agreement with a county or local government for detention services. As part of the negotiation process, prior to contract award, the two parties agree on the applicable ICE detention standards, which are identified in the written agreement. With U.S. Marshals Service (USMS) intergovernmental agreements (IGAs), ICE is provided access to beds at a local or county jail as a rider on an existing Marshals' agreement. While the IGA identifies only the applicable USMS standards, prior to ICE use of the facility, the local or county jail is notified in writing of the date of a pre-occupancy review and the detention standards against which ICE will inspect the facility.

8.  Prior to ICE use of any detention facility, ICE inspectors conduct a pre-occupancy review to determine whether the facility is appropriate to house detainees.   Any deficiencies identified during a pre-occupancy inspection must be addressed prior to ICE use of the facility or through a corrective action plan, depending on the type of the deficiency found.

9.  If the facility is found appropriate to house ICE detainees, within 90 days of accepting the first detainee, ICE inspectors will conduct a post-occupancy review of the facility. Post occupancy reviews are conducted because some components of the ICE detention standards cannot be adequately assessed until after detainees are using the facility.  Any deficiencies identified during the post-occupancy inspection must be addressed while inspectors are on site or through a corrective action plan.

10. ICE detention standards are enforced through annual facility inspections, which take place after written notice of inspection is provided. The notice states what

Exhibit 1
29

will be inspected and against what ICE detention standards.  If the facility fails to comply with any component of ICE standards, ICE provides an opportunity for the facility to implement corrective action.  If the plan does not satisfy ICE standards, ICE may reduce its population at the facility, move all detainees out of the facility, and/or permanently discontinue using the facility, depending on the type of deficiency and severity of non-compliance. For facilities operating under a FAR-based contract, ICE includes a Quality Assurance Surveillance Plan (QASP) to assess contractor performance relative to the requirements and performance standards listed in the agreement.  These standards address all facets of detainee care, including safety, health, legal rights, detainee services, and records management. When deficiencies or unacceptable contractor performance occurs, the Contracting Officer's Representative (COR) may determine that formal written communication is required and issue a Contract Discrepancy Report (CDR).  Any CDR may become a part of the supporting documentation for contract payment deductions, fixed fee deductions, award fee nonpayment, or other contractual actions deemed necessary by the Contracting Officer.  From January 2017 to April 30, 2020, ICE issued 58 contract discrepancy reports. In 26 of the CDRs, the COR proposed financial sanctions for failure to meet requirements of the ICE detention standards.

11. Since 2009, language in the congressional appropriations bills for DHS prohibits ICE from using appropriated funds for detention services at any facility that receives two consecutive overall deficient ratings. As soon as a facility fails an inspection, ICE sends written notification to the facility advising of the failed

**Exhibit 1**
**30**

inspection and the congressional mandate. The facility is then scheduled for a re-inspection within 180 days. If the facility receives a rating of "Deficient" or "Does Not Meet Standards" during the re-inspection, ICE must remove its detainees and discontinue use of the facility.

12. On April 10, 2020, ICE's Pandemic Response Requirements were sent via e-mail to all ICE ERO Field Office Directors to be communicated locally to the wardens and superintendents.

I declare, under penalty of perjury under 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED:  May 7, 2020

_____
Russell Hott

**Exhibit 1**
**31**