UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 19-1546 JGB (SHKx)** | Date | May 15, 2020 |
|---|---|---|---|
| Title | *Faour Abdallah Fraihat, et al. v. U.S. Immigration and Customs Enforcement, et al.* | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**    Order (1) GRANTING Plaintiffs' Ex Parte Application (Dkt. No. 136); and (2) DENYING Defendants' Ex Parte Applications to Strike (Dkt. Nos. 141, 148) (IN CHAMBERS)

Before the Court are: (1) Plaintiffs' ex parte application for issuance of notice to class members of the preliminary injunction order and to obtain information and documents from Defendants necessary to monitor compliance with that order, ("Application," Dkt. No. 136); and (2) Defendants' ex parte applications to strike ("Defendants' Ex Parte Applications," Dkt. Nos 141, 148). The Court held a telephonic hearing on the Application on Tuesday May 5, 2020. After considering the papers filed in support of and in opposition to the matters, and the oral argument of the parties, the Court GRANTS the Application, as set forth below, and DENIES the Defendants' Ex Parte Applications.

## I.    BACKGROUND

On August 19, 2019, Faour Abdallah Fraihat, Marco Montoya Amaya, Raul Alcocer Chavez, Jose Segovia Benitez, Hamida Ali, Melvin Murillo Hernandez, Jimmy Sudney, José Baca Hernández, Edilberto García Guerrero, Martín Muñoz, Luis Manuel Rodriguez Delgadillo, Ruben Darío Mencías Soto, Alex Hernandez, Aristoteles Sanchez Martinez, Sergio Salazar Artaga, ("Individual Plaintiffs"), Inland Coalition for Immigrant Justice ("ICIJ"), and Al Otro Lado ("Organizational Plaintiffs) (collectively, "Plaintiffs") filed a putative class action complaint for declaratory and injunctive relief. ("Complaint," Dkt. No. 1 ¶¶ 21-126.) They named as Defendants U.S. Immigration and Customs Enforcement ("ICE"), U.S. Department

of Homeland Security ("DHS"), DHS Acting Secretary Kevin McAleenan, ICE Acting Director Matthew T. Albence, ICE Deputy Director Derek N. Brenner, ICE Enforcement and Removal Operations ("ERO") Acting Executive Associate Director Timothy S. Robbins, ERO Assistant Director of Custody Management Tae Johnson, ICE Health Service Corps ("IHSC") Assistant Director Stewart D. Smith, ERO Operations Support Assistant Director Jacki Becker Klopp, and DHS Senior Official Performing Duties of the Deputy Secretary David P. Pekoske  (collectively "Defendants").  (Id. ¶¶ 127-36.)

On April 15, 2020, the Court denied Defendants' motion to sever and dismiss.  ("MTD Order," Dkt. No. 126.)  On April 20, 2020, the Court granted Plaintiffs' emergency motion for provisional class certification and motion for preliminary injunction.  ("PI Order," Dkt. No. 132 (providing further background on Plaintiffs, Defendants, and the history of this action); "Class Certification Order," Dkt. No. 133).  The Court certified the following two subclasses under Fed. R. Civ. P. 23(b)(2):

> 1. Subclass One: All people who are detained in ICE custody who have one or more of the Risk Factors placing them at heightened risk of severe illness and death upon contracting the COVID-19 virus.  The Risk Factors are defined as being over the age of 55; being pregnant; or having chronic health conditions, including: cardiovascular disease (congestive heart failure, history of myocardial infarction, history of cardiac surgery); high blood pressure; chronic respiratory disease (asthma, chronic obstructive pulmonary disease including chronic bronchitis or emphysema, or other pulmonary diseases); diabetes; cancer; liver disease; kidney disease; autoimmune diseases (psoriasis, rheumatoid arthritis, systemic lupus erythematosus); severe psychiatric illness; history of transplantation; and HIV/AIDS.
>
> 2. Subclass Two: All people who are detained in ICE custody whose disabilities place them at heightened risk of severe illness and death upon contacting the COVID-19 virus.  Covered disabilities include: cardiovascular disease (congestive heart failure, history of myocardial infarction, history of cardiac surgery); high blood pressure; chronic respiratory disease (asthma, chronic obstructive pulmonary disease including chronic bronchitis or emphysema, or other pulmonary diseases); diabetes; cancer; liver disease; kidney disease; autoimmune diseases (psoriasis, rheumatoid arthritis, systemic lupus erythematosus); severe psychiatric illness; history of transplantation; and HIV/AIDS.

(collectively, "Subclasses") (Class Certification Order.)  The Court also issued a preliminary injunction ("Preliminary Injunction"), ordering as follows:

- Defendants shall provide ICE Field Office Directors with the Risk Factors identified in the Subclass definition;

- Defendants shall identify and track all ICE detainees with Risk Factors. Most should be identified within ten days of this Order or within five days of their detention, whichever is later;

- Defendants shall make timely custody determinations for detainees with Risk Factors, per the latest Docket Review Guidance. In making their determinations, Defendants should consider the willingness of detainees with Risk Factors to be released, and offer information on post-release planning, which Plaintiffs may assist in providing;

- Defendants shall provide necessary training to any staff tasked with identifying detainees with Risk Factors, or delegate that task to trained medical personnel;

- The above relief shall extend to detainees with Risk Factors regardless of whether they have submitted requests for bond or parole, have petitioned for habeas relief, have requested other relief, or have had such requests denied;

- Defendants shall promptly issue a performance standard or a supplement to their Pandemic Response Requirements ("Performance Standard") defining the minimum acceptable detention conditions for detainees with the Risk Factors, regardless of the statutory authority for their detention, to reduce their risk of COVID-19 infection pending individualized determinations or the end of the pandemic;

- Defendants shall monitor and enforce facility-wide compliance with the Pandemic Response Requirements and the Performance Standard.

(PI Order at 38-39.)

Plaintiffs filed the Application on April 24, 2020, four days after the PI and Class Certification Orders. (App.) In support of the Application, Plaintiffs attach a proposed notice to the Subclasses ("Proposed Notice," App., Ex. A.), a list of categories of information and documents they seek from Defendants, ("Document Request," App., Ex. B), and the declaration of Timothy Fox, ("Fox Declaration," Dkt. No. 136-1 (attaching email correspondence as exhibits).).

Defendants opposed the Application on April 28, 2020. ("Opposition," Dkt. No. 139). Defendants did not attach any exhibits or declarations. Plaintiffs replied on April 29, 2020, ("Reply," Dkt. No. 140), and included in support of the Reply a declaration and exhibits. ("Fleischman Declaration," Dkt. No. 140-1 (attaching Exhibits A through C).) On April 30, 2020 Defendants filed an ex parte application to strike Plaintiffs' new evidence submitted in their Reply, (Dkt. No. 141). The Court DENIES this Ex Parte Application.

A few hours before the May 5, 2020 hearing, Defendants submitted a supplemental declaration. ("Hott Declaration," Dkt. No. 144.) At the hearing, the Court granted Plaintiffs leave to respond to the Hott Declaration and ordered the parties to meet and confer and to

submit a joint filing as to any unresolved issues. (Dkt. No. 145.) On May 8, 2020, Plaintiffs filed a response, ("Plaintiffs' Response," Dkt. No. 146), and included several declarations in support of the Response, ("Fleischman Declaration II," Dkt. No. 146-1; "Alderman Declaration," Dkt. No. 146-2; "Venters Declaration," Dkt. No. 146-3). The parties filed their joint statement the same day. ("Joint Statement," Dkt. No. 147 (attaching "Hott Declaration II" as Exhibit 1).) Two days later, Defendants filed an ex parte application to strike Plaintiffs' declarations attached in support of their Response to the first Hott Declaration. (Dkt. No. 148.) The next day, Plaintiffs opposed Defendants' second ex parte application. (Dkt. No. 149.) The Court also DENIES Defendants' second Ex Parte Application.

The Court ADMONISHES all Counsel to refrain from submitting ex parte applications and from submitting unsolicited or tardy supplemental declarations without adequate notice to opposing counsel. For example, Defendants have twice ambushed Plaintiffs—and the Court—just hours before a hearing with new policy documents or declarations. In the future, Counsel is ORDERED to submit any supplements at least 24 hours before a scheduled hearing, and to provide opposing counsel with another 24 hours' oral and electronic notice of the supplement. The Court emphasizes that any document or argument not filed pursuant to Court order or regular notice procedures, for example a supplement or ex parte application, must include the L.R. 7-19.1 declaration under oath and be supported by good cause. Failure to comply with these requirements will result in sanctions.

## II. LEGAL STANDARD

A Rule 23(b)(2) class is considered "mandatory," as "[t]he Rule provides no opportunity for . . . (b)(2) class members to opt out, and does not even oblige the District Court to afford them notice of the action." Wal–Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2558 (2011). Nevertheless, notice may be appropriate depending on the circumstances. See Fed. R. Civ. P. 23(c)(2)(A) ("For any class certified under Rule [23(b)(2)], the court may direct appropriate notice to the class."); Lilly v. Jamba Juice Co., 2015 WL 1248027, at *8 (N.D. Cal. Mar. 18, 2015) ("Courts typically require less notice in Rule 23(b)(2) actions, as their outcomes do not truly bind class members").

Courts have inherent authority to monitor and enforce their prior orders. See Shillitani v. United States, 384 U.S. 364, 370 (1966). That authority extends to allowing post judgment discovery to aid the court in determining whether a party has complied with the order. See Richmark Corp. v. Timber Falling Consultants, Inc., 937 F.2d 1444, 1449 (9th Cir. 1991). A district court "should give careful attention to a request for discovery to establish noncompliance with one of its judgments." California Dep't of Soc. Servs. v. Leavitt, 523 F.3d 1025, 1033 (9th Cir. 2008); Hallett v. Morgan, 296 F.3d 732, 740 (9th Cir. 2002) (concluding failure to allow discovery regarding noncompliance was not an abuse of discretion, after a two-week evidentiary hearing on compliance, because the material subject to the request was minimally relevant).

//
//

# III. DISCUSSION

Plaintiffs request issuance of the Class Notice to the class members informing them of the PI Order requirements, and they seek information and documents from Defendants necessary to monitor compliance with the PI Order. (App. at 2-3; Class Notice; Document Request.) In light of the exigent circumstances of the COVID-19 pandemic and the interest of class members in being informed of the action, the Court GRANTS the Application.

## A. Class Notice

While rigorous class notice is certainly not required for the Rule 23(b)(2) subclasses, it is equally clear that the Court has broad discretion to order an "appropriate" level of notice for members of the Subclasses. Fed. R. Civ. P. 23(c)(2)(A). Although "notice seems to be favored" under Rule 23(c)(2)(A), a court should "decide against requiring notice if the court determines that the benefits of notice are outweighed by the risk that notice costs may deter the pursuit of class relief." 5 Moore's Federal Practice - Civil § 23.100 (2020). Here, the costs of notice will not deter the pursuit of class relief, and the burdens and costs involved are negligible. The Subclass Members are a captive population with whom Defendants may readily communicate, for example by posting notice in designated common areas of detention facilities. Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 358–359 (1978) (holding cost of notice may incur to defendant, if it is insubstantial); Barahona-Gomez v. Reno, 167 F.3d 1228, 1236–1237 (9th Cir. 1999) (holding the district court did not err in ordering the defendant INS to provide notice to class, because INS was uniquely positioned to ascertain class membership and could easily attach notice to other distributions). As a result, the Court finds it is appropriate to require Defendants to provide Subclass Members with notice of the action, as detailed in the Conclusion below.

## B. Document Request

Limited but regular document production is needed in this case to ensure that Defendants comply with the requirements of the Preliminary Injunction. When the Court issued the Preliminary Injunction on April 20, 2020, ICE reported 124 confirmed detainees cases of COVID-19 across twenty-five facilities. (PI Order at 6.) Today, ICE reports 986 detainee cases across more than forty facilities.[1] In its PI Order, the Court detailed Defendants' lethargic response to the COVID-19 pandemic. In light of the exploding number of detainees testing positive, the Court is concerned that Defendants continue to slow walk their systemwide pandemic response. The documents requested by Plaintiffs are necessary to ascertain Defendants' level of compliance.

The Court is underwhelmed with the amount of information regarding compliance—which is to say, virtually no information beyond conclusory assurances—provided by Defendants in the Opposition. Opp'n at 2 ("ICE is implementing procedures pursuant to the PI Order that

---

[1] ICE Guidance on COVID-19, U.S. Immigration and Customs Enforcement, https://www.ice.gov/coronavirus

benefit all class members.") Defendants' cavalier approach to the Preliminary Injunction is disturbing. So is their argument the Court did not order "immediate" action or compliance, so no proof of compliance is or can be required at this time. (Opp'n at 3.) Defendants' stance on compliance ignores the acute threat posed by COVID-19 to the Subclasses and that their response to date has been lackadaisical and likely objectively deliberately indifferent. (PI Order at 31-32.) The Court imposed a strict timeline of ten days for ICE to identify and begin tracking nearly all Subclass Members, required "timely" custody determinations, and commanded "prompt" issuance of a Performance Standard or Pandemic Response Requirements ("PRR") supplement. Certain aspects of the Preliminary Injunction specified no timeline and so were intended to have immediate or near-immediate effect, for example, that Defendants expand the categories of individuals eligible for custody determinations under the Docket Review Guidance. (Id. at 38-39.)

Even after Defendants' supplemental filings, the Court has little difficulty finding Defendants are not complying with multiple aspects of the Preliminary Injunction. For example, Defendants have completely ignored the Court's order to develop a Performance Standard or supplement to the PRR with more detailed minimum requirements for the detention of individuals with Risk Factors.[2] (See Joint Response at 21-22.) Similarly, Defendants state that the Court "did not order Defendants to track anything" concerning monitoring and enforcement of detention standards or the PRR. (Id. at 23.) That is not correct. The Preliminary Injunction orders Defendants to "monitor and enforce facility-wide compliance with the [PRR]." (PI Order at 38-39.) Defendants' nonsensical position appears to be that they can monitor and enforce the PRR by utilizing pre-pandemic annual compliance mechanisms not updated to reflect the PRR, (Hott Decl. II), or that they can monitor and enforce the PRR without also "tracking" their efforts to do the same. These responses provide ample basis for the Court to require proof of compliance beyond the conclusory Hott Declarations.

---

[2] The PRR leave excessive wiggle room for facilities when it comes to Subclass Members. Although the PRR purport to mandate the CDC "Interim Guidance," it is not clear what facilities are to understand by this now mandatory "guidance," which itself provides only vague protections to Subclass Members. Three examples come to mind. First, the CDC Interim Guidance provides only that higher risk individuals "ideally . . . should not" be cohorted with other infected individuals and that if this is "unavoidable, then all possible accommodations," should be provided. (See PI Order at 7.) A facility might read this and conclude that Subclass members who are not sick can be cohorted in an infected unit, with unspecified accommodations. Second, the Interim Guidance suggests changing the work duties of detention facility staff with Risk Factors, but does not suggest the same for at risk detainees who work within the facility. Finally, the Interim Guidance takes as a given but does not appear to explicitly require immediate identification and protection of detainees with Risk Factors. Risk Factor screening is only mentioned after a detainee has become symptomatic. (Interim Guidance at 23.) To restate what should by now be obvious, these gaps are very likely to result in unconstitutional conditions of confinement for Subclass Members who remain detained. For this reason, the Court ordered Defendants to provide a more concrete standard to protect Subclass Members.

Defendants repeatedly argue that Plaintiffs fail to establish discovery concerning compliance is warranted, because they fail to raise a "significant question" regarding compliance. (Opp'n at 3 (citing Leavitt, 523 F.3d at 1034).) Yet, as the Court has observed, Defendants' own statements raise significant questions. Moreover, as Leavitt makes clear, the standard for allowing discovery is permissive:

> When considering whether to permit discovery prior to resolution of [a motion to enforce a judgment], the kind and amount of evidence of noncompliance required to justify discovery is, necessarily, considerably less than that needed to show actual noncompliance.

Leavitt, 523 F.3d 1025, 1034 (9th Cir. 2008). Plaintiffs' declarations satisfy this standard. (See Fleischman Decl., Fleischman Decl. II.)

The Court also rejects Defendants' contention that there is not "good cause" to allow discovery prior to the Rule 26(f) conference. (Opp'n at 4 (citing Am. LegalNet, Inc. v. Davis, 673 F. Supp. 2d 1063, 1067 (C.D. Cal. 2009).) Although a preliminary injunction has been issued, the Court noted it will endure as long as COVID-19 poses a substantial threat of harm to the Subclasses and that the parties could apply to modify the order. (PI Order at 39.) The need for rapid information exchange is illustrated by Defendants' slow response to date and the vicissitudes of the pandemic. Finally, the request is not unreasonably far in advance of the Rule 26(f) conference, as the Court recently ruled on Defendants' motion to dismiss and ordinary discovery may begin shortly.

Defendants did not initially object to the scope of the information requested or quarrel with the content of the Document Request, which includes a list of eight categories of information and a production schedule. (App. at 3; Document Request.) The Court has reviewed the Joint Statement and Defendants' objections to each category of information. The Court finds the document production ordered below is proportional to the needs of this case and will not impose any undue burden on Defendants.

//
//
//
//
//
//
//
//
//
//
//
//
//

## IV.  CONCLUSION

The Court DENIES Defendants' ex parte applications to strike.  (Dkt. Nos. 141, 148).  The Court GRANTS Plaintiffs' application for class notice and to obtain information to monitor compliance.

The Court ORDERS Defendants to provide Subclass Members with Notice as follows:

1. Regarding the form and method of Notice:

   o   Defendants shall translate the Notice into Spanish, and Plaintiffs will provide translations in eight languages, which Defendants may verify and which Defendants shall post within four days of receipt;

   o   Defendants shall post the Notice in common areas of each dormitory and in law libraries for the duration of the Preliminary Injunction.  Copies of the Preliminary Injunction and Class Certification Orders shall be available in law libraries;

   o   Defendants shall provide written notice in the appropriate language to detainees who are unable to access common areas for at least four hours a day, whether due to segregation, quarantine, or medical isolation.  Such notice shall also be provided to the newly detained, and shall be refreshed in the event of transfer.  Defendants shall accommodate individuals who are blind and low vision, or who otherwise have difficulty reading the notice;

   o   Defendants shall add two phone numbers provided by Plaintiffs to a pro bono platform at all detention facilities which will permit free, confidential access, with passive acceptance only.  For individuals who are hard of hearing or who are deaf, Defendants shall provide Video Relay Service and/or Teletypewriters.

2. Regarding content:

   o   The Notice is approved as written, but shall be modified to include information regarding the free call platform and shall advise detainees[3] of how to inform ICE, facility medical staff, and/or Class Counsel that they have risk factors, which are not always reflected in ICE's medical records.

---

[3] The parties agree that Class Counsel may provide the names of individuals to ICE, to the extent they learn of detained individuals with risk factors who have not yet been identified by the facilities or by ICE.

The Court ORDERS Defendants to provide the following records to Plaintiffs' Counsel:

1. A spreadsheet listing all ICE facilities, the number of individuals held at each facility, the number of beds available to ICE at that facility, and the field office responsible for that facility;

2. Documents showing whether and when Defendants informed all field office directors ("FODs") of all of the steps required by the Preliminary Injunction order, and the substance and date of those communications.

    o This includes documents advising FODs what the Risk Factors are, any guidance as to these or other factors weighed in custody determinations, the procedures for custody determinations, the titles or positions of individuals who make the determinations, and any future updates or supplements regarding custody determinations or compliance with the Preliminary Injunction;

3. On a biweekly basis, the following information about "current detainees"—those in custody for at least five days as of April 30, 2020—determined to have a Risk Factor:

    o A spreadsheet with the following fields: name, alien number, detention facility, custody status (detained/released in the United States), alleged basis for detention, and the Risk Factor identified,[4] for each Subclass Member;

    o If the individual has been hospitalized or deported, this information should also be reflected in the spreadsheet;

---

[4] The Court finds it would not be burdensome to include these last two fields. Defendants argue that they cannot provide a field with the name or type of Risk Factor for each Subclass Member identified because "this would require manual review of the medical records for thousands of detainees." (Joint Response at 14.) But that is exactly the review process they already purport to be conducting to comply with this Court's Preliminary Injunction and pursuant to their own Docket Review Guidance. If compiling information for the Risk Factor field would delay the production of the first spreadsheet, Defendants may wait until the second biweekly production to include that field in the spreadsheets. Defendants provide no reason they cannot readily compile the alleged statutory basis for each Subclass Member's detention. (Id.) Accordingly, the alleged basis for detention field shall be included in all spreadsheets. The field must reveal whether Defendants allege the Subclass Member is detained pursuant to 8 U.S.C. § 1226(c).

4. The same information on a biweekly basis as in item three (3), but for "future detainees"—those who have been in ICE custody for less than five days as of April 30, 2020, or who were not in custody as of that date;

5. A document disclosing which Subclass Members have been released in the United States pursuant to custody determinations for each two-week period, and the conditions of their release;

6. A list of the titles and level of medical training of personnel making risk factor determinations for each facility;

7. Records showing the extent of compliance with the order to issue a new Performance Standard or supplement for individuals with Risk Factors;

8. Records regarding monitoring and enforcement of facility-wide compliance with the PRR and subsequent Performance Standard, including:

    o Positions and titles of individuals, including contractors, tasked with monitoring and ensuring compliance with the PRR;

    o Documents illustrating whether, since March 11, 2020, any facility has been or will be subject to noticed or un-noticed in-person inspections,[5] what forms or documents have been or will be used in connection with this, and the consequences if a facility is determined not to be in compliance with the PRR and the Performance Standard;

    o On a biweekly basis, updates to the above documents, as well as reports generated from inspections;

9. Miscellaneous records referenced in the Joint Statement:

    o The ICE-generated list of individuals 55 years and older[6];

    o A document clarifying how many of the 4,409 noncitizens with risk factors, (see Hott Declaration), were identified after the Court's April 20, 2020 Preliminary Injunction;

---

[5] (See Hott Decl. II ¶ 10.)

[6] (Joint Statement at 13 ("Defendants have stated that they have prepared a report identifying all detained individuals who are 55 years old or older.").)

- The messages referenced in paragraph 13 of the Hott Declaration[7];

The Court DIRECTS the parties to meet and confer and to provide a protective order for the Court's approval by **May 25, 2020**.  The Court ORDERS Defendants to provide the referenced non-electronic[8] records to Plaintiffs' Counsel immediately.  Other records shall be produced one week after entry of the protective order, and every two weeks after that, until the Court directs otherwise.

**IT IS SO ORDERED.**

---

[7] (Joint Statement at 9 ("ICE will produce the broadcast message that ICE ERO sent to all FODs and Deputy Field Office Directors ("DFOD") on April 26, 2020, entitled, Detained Docket Review Pursuant to the Nationwide Preliminary Injunction in Fraihat v. ICE, --- F. Supp. 3d ---, 2020 WL 1932570 (Apr. 20, 2020), directing them to identify and track subclass members by April 29, 2020.").)

[8] (Joint Statement at 23 (mentioning "communications concerning the PI Order sent on April 26 and 28").)