Timothy P. Fox (CA Bar 157750)
*tfox@creeclaw.org*
Elizabeth Jordan*
*ejordan@creeclaw.org*
CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER
1245 E. Colfax Avenue, Suite 400
Denver, CO 80218
Tel: (303) 757-7901
Fax: (303) 872-9072

Lisa Graybill*
*lisa.graybill@splcenter.org*
Jared Davidson*
*jared.davidson@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
201 St. Charles Avenue, Suite 2000
New Orleans, Louisiana 70170
Tel: (504) 486-8982
Fax: (504) 486-8947

Stuart Seaborn (CA Bar 198590)
*sseaborn@dralegal.org*
Melissa Riess (CA Bar 295959)
*mriess@dralegal.org*
DISABILITY RIGHTS ADVOCATES
2001 Center Street, 4th Floor
Berkeley, California 94704
Tel: (510) 665-8644
Fax: (510) 665-8511

Attorneys for Plaintiffs (continued on next page)

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION – RIVERSIDE

| | |
|---|---|
| FAOUR ABDALLAH FRAIHAT, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*, <br><br> Defendants. | Case No.: 19-cv-01546-JGB(SHKx) <br><br> **Plaintiffs' Opening Brief in Support of Motion to Enforce the April 20, 2020 Preliminary Injunction Order** <br><br> Hearing Date: July 13, 2020 <br> Time: 2:00 pm <br> Hon. Jesus G. Bernal |

1

William F. Alderman (CA Bar 47381)
*walderman@orrick.com*

2

Jake Routhier (CA Bar 324452)
*jrouthier@orrick.com*

3

ORRICK, HERRINGTON &
SUTCLIFFE LLP

4

405 Howard Street
San Francisco, CA 94105

5

Tel: (415) 773-5700
Fax: (415) 773-5759

6

7

Michael W. Johnson*
*mjohnson1@willkie.com*

8

Dania Bardavid*
*dbardavid@willkie.com*

9

Jessica Blanton*
*jblanton@willkie.com*

10

Joseph Bretschneider**
*jbretschneider@willkie.com*

11

WILLKIE FARR &
GALLAGHER LLP

12

787 Seventh Avenue
New York, NY 10019

13

Tel: (212) 728-8000
Fax: (212) 728-8111

14

15

Maia Fleischman*
*maia.fleischman@splcenter.org*

16

SOUTHERN POVERTY LAW
CENTER

17

2 South Biscayne Boulevard
Suite 3750

18

Miami, FL 33131
Tel: (786) 347-2056

19

Fax: (786) 237-2949

20

Christina Brandt-Young*
*cbrandt-young@dralegal.org*

21

DISABILITY RIGHTS
ADVOCATES

22

655 Third Avenue, 14th Floor
New York, NY 10017

23

Tel: (212) 644-8644
Fax: (212) 644-8636

24

Mark Mermelstein (CA Bar 208005)
*mmermelstein@orrick.com*
ORRICK, HERRINGTON &
SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA 90017
Tel: (213) 629-2020
Fax: (213) 612-2499

Leigh Coutoumanos*
*lcoutoumanos@willkie.com*
WILLKIE FARR &
GALLAGHER LLP
1875 K Street NW, Suite 100
Washington, DC 20006
Tel: (202) 303-1000
Fax: (202) 303-2000

Shalini Goel Agarwal
(CA Bar 254540)
*shalini.agarwal@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
106 East College Avenue
Suite 1010
Tallahassee, FL 32301
Tel: (850) 521-3024
Fax: (850) 521-3001

Maria del Pilar Gonzalez Morales
(CA Bar 308550)
*pgonzalez@creeclaw.org*
CIVIL RIGHTS EDUCATION
AND ENFORCEMENT CENTER
1825 N. Vermont Avenue, #27916
Los Angeles, CA 90027
Tel: (805) 813-8896
Fax: (303) 872-9072

25

26

Attorneys for Plaintiffs (continued from previous page)
*Admitted Pro Hac Vice

27

**Pro Hac Vice Application Forthcoming

28

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................... iii

I.    Introduction ........................................................................1

II.   Background ........................................................................1

III.  Legal Standard ...................................................................3

IV.   Defendants' Revised PRR Continues to Permit Dangerous
      Practices that Threaten People with Risk Factors. ........................4

      A.    Defendants' Inadequate Testing Protocols Threaten the
            Subclass. ...................................................................6

      B.    Defendants' Failure to Issue Revised Guidance to Limit
            Transfers Threatens the Subclass. ...................................7

      C.    Defendants' Failure to Implement Adequate Standards
            for Quarantine and Medical Isolation Threatens the
            Subclass. ...................................................................9

      D.    Defendants' Revised PRR Still Threatens Subclass
            Members with Exposure to Dangerous Disinfectant
            Cleaner......................................................................12

      E.    Defendants Have Failed to Issue Other Necessary
            Precautions to Protect People with Risk Factors. ...............13

V.    ICE Is Failing to Adequately Monitor the PRR ...........................14

VI.   Defendants Are Violating the Provisions of the PI Order
      Governing Custody Redeterminations .......................................16

      A.    Defendants Fail to Provide Adequate Oversight and
            Monitoring to Ensure Custody Redeterminations Occur
            in Compliance with the PI Order......................................17

      B.    Defendants' Lack of Oversight to Ensure Compliant and
            Consistent Custody Redeterminations Has Led to
            Horrific Results ..........................................................18

      C.    Defendants Refuse to Consider for Release Subclass
            Members Subject to Mandatory Detention in Violation of
            the PI Order. ..............................................................21

      D.    Defendants Fail to Conduct Custody Redeterminations
            for All People with Qualifying Severe Psychiatric
            Illnesses ....................................................................22

VII.   A Special Master Is Necessary in Light of Defendants' Non-
       Compliance ...................................................................................23

VIII.  Defendants' Failure to Respond to the Severe Risks Addressed
       in the PI Order Warrants a Presumption of Release for Subclass
       Members .......................................................................................24

IX.    Conclusion ....................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*A&M Records Inc. v. Napster, Inc.,*
284 F.3d 1091 (9th Cir. 2002) ................................................................4

*Armstrong v. Brown,*
857 F. Supp. 2d 919 (N.D. Cal. 2012) ....................................................3

*Coleman v. Wilson,*
912 F.Supp. 1282 (E.D. Cal. 1995) .......................................................23

*Flores v. Sessions,*
No. CV 85-4544-DMG, 2018 WL 6133665 (C.D. Cal. Nov. 5, 2018).............23

*Hook v. State of Ariz.,*
120 F.3d 921 (9th Cir. 1997) ...............................................................23

*Melendres v. Arpaio,*
784 F.3d 1254 (9th Cir. 2015) ..............................................................23

*Nat'l Org. for the Reform of Marijuana Laws v. Mullen,*
828 F.2d 536 (9th Cir. 1987) ...............................................................23

*Salazar v. Buono,*
559 U.S. 700 (2010) ........................................................................3, 4

*Sharp v. Weston,*
233 F.3d 1166 (9th Cir. 2000) ..............................................................4

*System Federation No. 91 v. Wright,*
364 U.S. 642 (1961) ...........................................................................4

*United States v. United Shoe Mach. Corp.,*
391 U.S. 244 (1968)........................................................................4, 24

**Other Authorities**

Fed. R. Civ. P. 62(c) ...........................................................................4

## I.    Introduction

Six weeks ago, the Court had "little difficulty finding Defendants are not complying with multiple aspects of the Preliminary Injunction," referencing the Preliminary Injunction Order ("PI Order") (ECF 132) it had issued less than a month earlier (ECF 150, the "May 15 Order," at 6). Variously describing Defendants' response to the PI Order as "lethargic," a "slow walk," "cavalier" and "lackadaisical" (*id*. at 5-6), the Court directed Defendants to rapidly provide specified information to Plaintiffs' counsel that would permit them to monitor, and the Court to enforce, compliance with the PI Order.

Now, 40 days after the May 15 Order and 65 days after the PI Order, it is painfully evident that Defendants are not complying with the Court's orders. In direct contravention of this Court's command to "promptly" revise the PRR, Defendants failed to do so until June 22 in apparent anticipation of this motion. Defendants have again deployed the "ambush" strategy decried by the Court (ECF 150 at 4). In any event, those revisions are still woefully deficient and fail to provide necessary precautions to protect people with Risk Factors. In addition, Defendants continue to refuse to implement meaningful oversight measures and to conduct good faith custody re-determinations. In the meantime, the COVID-19 crisis continues to escalate, ever-more-acutely the subclass with serious illness and death.  Accordingly, Plaintiffs respectfully ask the Court to exercise its "inherent authority to monitor and enforce" its prior orders (*id.*) by entering the proposed enforcement order for the reasons discussed below.

## II.    Background

At the time the Court issued the PI Order on April 20, ICE had reported 124 confirmed COVID-19 cases among the immigrant population it detained nationwide (Fox Decl. ¶ 18 & Ex. 13). By the time the Court entered the May 15 Order less than a month later, the number of confirmed cases had ballooned nearly eight-fold to 986. *Id.* Now the number has reached a staggering total of 2,489 (*id.*).

This month alone, massive increases at individual facilities vividly confirm the scope of the crisis and the inadequacy of Defendants' response; *e.g.*, the June numbers have risen from 132 to 252 at Bluebonnet, from 1 to 208 at Eloy, from 22 to 133 at Montgomery, from 44 to 117 at El Paso, from 2 to 64 at Glades, and from 3 to 61 at Port Isabel. *Id.*

The PI Order directed Defendants to:

- Provide ICE Field Office Directors with the Risk Factors identified in the Subclass definition;

- Identify and track all ICE detainees with Risk Factors;

- Make timely custody determinations for detainees with Risk Factors;

- Provide necessary training to any staff tasked with identifying detainees with Risk Factors, or delegate that task to trained medical personnel;

- Provide the above relief to all detainees with Risk Factors, regardless of whether they have submitted requests for bond or parole, have petitioned for habeas relief, have requested other relief, or have had such requests denied;

- Promptly issue a performance standard or supplement to their Pandemic Response Requirements ("PRR") defining the minimum acceptable detention conditions for detainees with Risk Factors, regardless of the statutory authority for their detention, to reduce their risk of COVID-19 infection pending individualized determinations or the end of the pandemic; and

- Monitor and enforce facility-wide compliance with the PRR and Performance Standard.

While Defendants purport to have complied with some of these requirements, they have entirely failed to comply with others. Defendants waited more than two months after the PI Order to revise their PRR and, as explained

below, those revisions fail to provide comprehensive, medically necessary precautions to protect people with Risk Factors from harm. Defendants have also violated the PI Order's requirement that they monitor and enforce facility-wide compliance with the PRR, instead relying on pre-existing broken oversight mechanisms. Defendants have also failed to timely and meaningfully conduct the custody determinations required by the PI, refusing to release the vast majority of people with Risk Factors, often issuing *pro forma* denials without explanation, and arbitrarily denying release to all people in mandatory detention in violation of the PI Order's requirement that they make individualized custody determination for all people with Risk Factors "regardless of the statutory authority for their detention."

Defendants' widespread failures to fully comply with the PI Order require strong enforcement measures from the Court to ensure immediate compliance and protect the subclass members at critical risk in ICE's custody.  And, given that Defendants have continued to "slow walk" their compliance for another six weeks after the Court called them to task for that behavior (ECF 150 at 5), Plaintiffs respectfully request that this Court appoint a Special Master to monitor Defendants' future compliance and provide real-time reports that will inform the Court's efforts to protect all subclass members from grave harm.

## III.   Legal Standard

As the Court has noted earlier in these proceedings, "[c]ourts have inherent authority to monitor and enforce their prior orders. ECF 150 at 4 (citing *Shillitani v. United States*, 384 U.S. 364, 370 (1966)). When it becomes clear that defendants continue to engage in conduct contrary to an injunction, the party who sought the injunction may move the court to issue an order mandating compliance. *Armstrong v. Brown*, 857 F. Supp. 2d 919, 951 (N.D. Cal. 2012); *Salazar v. Buono*, 559 U.S. 700, 712 (2010) ("A party that obtains a judgment in its favor acquires a 'judicially cognizable' interest in ensuring compliance with that judgment."). And if the court determines a violation is occurring, the court has broad discretion to grant the relief

1 necessary to prevent the infringement of its injunction. *Id.* at 712-13.

2    The Court also has authority to modify its injunction, which is appropriate

3 where there has been "a significant change in facts or law." *Sharp v. Weston*, 233

4 F.3d 1166, 1170 (9th Cir. 2000). Modification is also appropriate to "achieve the

5 purposes" of the original injunction. *United States v. United Shoe Mach. Corp.*,

6 391 U.S. 244, 249 (1968). Courts have "wide discretion" to modify an injunction.

7 *System Federation No. 91 v. Wright*, 364 U.S. 642, 647 (1961); *A&M Records Inc.*

8 *v. Napster, Inc.*, 284 F.3d 1091, 1098 (9th Cir. 2002). Finally, a district court

9 retains jurisdiction to enforce and modify its injunctions during the pendency of

10 any interlocutory appeal.  Fed. R. Civ. P. 62(c); *A&M Records*, 284 F.3d at 1099.

11 **IV.   Defendants' Revised PRR Continues to Permit Dangerous Practices**
      **that Threaten People with Risk Factors**

12

13    The PI order explicitly required that Defendants "promptly" issue a

14 comprehensive standard "for the safe detention of at risk detainees pending

15 custody decisions, or in the event ICE deems detainees ineligible for release . . . ."

16 ECF 132 at 38. Rather than "promptly" doing so, Defendants waited over two

17 months—until they were on notice of Plaintiffs' intent to file this motion.

18    During Defendants' two-month delay, people with Risk Factors continued to

19 face dangerous conditions of confinement. Indeed, the exponentially increasing

20 rate of COVID-19 cases in ICE detention confirms the dire consequences of

21 Defendants' unreasonable delays. Today, ICE has reported 2,489 confirmed

22 COVID-19 positive cases among the detained population.[1]  This means that the

23

24 ─────────────────────
[1] ICE.gov/coronavirus (updated June 24, 2020). *But see,* "[T]he true number of
people who have been infected in ICE detention may be 15 times higher

25 than official numbers and is still increasing." Nina Siulc, *Vera's new
prevalence model suggests COVID-19 is spreading through ICE detention at much
higher rates than publicized*, VERA INSTITUTE OF JUSTICE (June 4, 2020)

26 https://www.vera.org/blog/covid-19-1/veras-new-prevalence-model-suggests-
covid-19-is-spreading-through-ice-detention-at-much-higher-rates-than-publicized;

27 *see also* Michael Irvine, *Modeling COVID-19 and impacts on U.S. Immigration
and Enforcement (ICE) detention facilities,* 2020 JOURNAL OF URBAN HEALTH (in

28 press) https://whistleblower.org/wp-

number of infections has multiplied by a factor of 20 since entry of the PI order when there were only 124 confirmed cases.[2]

These dangers are confirmed by DHS's own reports. An OIG report addressing COVID-19 in detention facilities recently reached some startling conclusions: (1) only 54% of the 157 nondedicated detention facilities had on-site testing capacity, and only 20% of these facilities had actually conducted tests; (2) 34% of nondedicated facilities did not have any negative pressure ventilation rooms, and overall, "facilities reported concerns with their inability to practice social distancing . . . and to isolate or quarantine individuals who may be infected with COVID-19;" and (3) "many facilities expressed concern about maintaining sufficient supplies of PPE, as well as future shortages, if the pandemic continues. " Fox Decl. ¶ 22 & Ex. 17 at 6, 7-8, 10, 13.

In addition, the attached declarations from detained people and legal service providers show in harrowing detail how conditions in detention continue to pose grave dangers. *See*, *e.g.*, Gonzalez Morales Decl.; Zwick Decl.; Doubossarskaia Decl.; Vosburgh Decl.; Mencias-Soto Decl.; King Decl.; Page Decl.; Perez Aguirre Decl.; Hernandez Decl.; Saenz Decl.; Rios Decl.; Corchado Decl.; Feldman Decl.; Lunn Decl.; Flewelling Decl.; Schneider Decl.; Lienhard Decl.; Navarro Garcia Decl.; Bailey Decl.; Edgerton Decl.; Dobbins Decl.; Russell Decl.; Rivera Decl.; Pasch Decl. As detailed below and in the attached expert reports, there are numerous precautionary measures that ICE should have implemented in a revised PRR or standard to protect people with Risk Factors. Such measures include expansion of testing, prohibitions on dangerous transfers, safe conditions for medical isolation and quarantine, proper use of disinfectant, and additional medical screening for people with Risk Factors, among other precautionary measures. That

---

content/uploads/2020/04/Irvine_JUH_ICE_COVID19_model.pdf (72% of individuals in ICE custody are expected to be infected over a 90-day period).
[2] ICE.gov/coronavirus (updated June 24, 2020).

Defendants failed to include these necessary precautions in its delayed revisions reflects callous indifference to the risk of harm to people with Risk Factors.

### A. Defendants' Inadequate Testing Protocols Threaten the Subclass

With rare exceptions, Defendants provide COVID-19 testing only for individuals who exhibit symptoms[3]—a dangerous practice that threatens people with Risk Factors. As of June today, ICE has tested just over one third of the detained population, yielding a test-positivity rate of 28%. Fox Decl. Ex. 13.While ICE's test-positivity rate is already higher than that of the United States (10%) and much higher than the target rate recommended by the World Health Organization (5%), it is likely just the tip of the iceberg.[4] Indeed, "the overall lack of testing by ICE, combined with the fact that many people show no or few symptoms, means that the current number of infected detainees are likely just a small fraction of overall positive cases." Venters Decl. ¶ 18.

In practice, however, even people with symptoms are not guaranteed testing. By Defendants' own admissions, individuals who exhibit symptoms are not immediately tested but rather "considered for testing."[5] Defendants also only test detained individuals they transfer if they are "actively ill," or "showing symptoms."[6] Such dangerous practices comport with the experiences of detained individuals across the country. *See* Zwick Decl. ¶¶ 21-22, 33, 38; Doubossarskaia Decl. ¶¶ 26-28; Vosburgh Decl. ¶¶19-21; Mencias-Soto Decl. ¶¶ 7, 14; Corchado

---

[3] *COVID-19 IN ICE CUSTODY Biweekly Analysis & Update*, FREEDOM FOR IMMIGRANTS at 2 (June 18, 2020) https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/5eebc846c4275f35d9c6c110/1592510535009/FFI+June+18+COVID-19+update.pdf.

[4] Anna Duffy, *What ICE's Numbers Tell Us. And What They Don't*, DETAINED IN DANGER (June 9, 2020) http://www.detainedindanger.org/article.

[5] @ReynaldoLeanos, TWITTER (June 16, 2020, 4:48 PM) https://twitter.com/ReynaldoLeanos/status/1272994502765096962?s=20; Feldman Decl. ¶ 41 (detailing hunger strike for testing even for symptomatic people).

[6] Monique O Madan, *ICE admits to transferring detainees with COVID-19, says it can't test everybody*, MIAMI HERALD (May 28, 2020) https://www.miamiherald.com/news/local/immigration/article243031176.html.

Decl. ¶35; Pasch ¶20; Navarro Garcia Decl. ¶¶4-5.

Defendants' inadequate testing practices not only risk delayed diagnosis for people with Risk Factors but also heighten the probability that people with Risk Factors will be infected by un-tested asymptomatic people. The need for testing is widely understood to be necessary for mitigation efforts. This is especially true in detention centers. Universal testing, even for asymptomatic individuals, is critical to reducing infection. *See* Venters Decl. ¶ 18; Vassallo Decl. ¶ 34. That Defendants have offered voluntary COVID-19 testing in only two detention centers, a decision that came in response to litigation in one of the facilities, and still plan to evaluate testing at these locations "before expanding to the other ICE detention facilities over the next few months"[7] exhibits callous indifference as well as a sharp contrast to actions by prisons and jails.[8] Failure to expand testing will undoubtedly increase infection rates overall as well as for medically vulnerable people. Defendants' revisions to the PRR fail to address these deficiencies, which continue to threaten people with Risk Factors. Venters Decl. ¶ 18; Vassallo Decl. ¶ 34.

## B. Defendants' Failure to Issue Revised Guidance to Limit Transfers Threatens the Subclass

Defendants have likewise failed to issue additional standards to protect medically vulnerable people from the inherent dangers of inter-facility transfers. Indeed, as detailed in the attached declarations, ICE continues to aggressively and unnecessarily transfer people without proper screening for COVID-19 in direct contravention of the CDC guidelines, which state that the transfers should be

---

[7] *ICE offers voluntary COVID-19 testing to all detainees at 2 facilities* (June 9, 2020) https://www.ice.gov/news/releases/ice-offers-voluntary-covid-19-testing-all-detainees-2-facilities.

[8] *See, e.g.*, Cary Aspinwall, *These Prisons Are Doing Mass Testing For COVID-19—And Finding Mass Infections*, THE MARSHALL PROJECT (Apr. 24, 2020) https://www.themarshallproject.org/2020/04/24/these-prisons-are-doing-mass-testing-for-covid-19-and-finding-mass-infections.

postponed unless "absolutely necessary."[9] Hundreds of immigrants are continuously shuttled between different detention facilities with confirmed cases of COVID-19. King Decl. ¶ 16 (reporting a group of people being transferred from Florida to Georgia to Florida to Louisiana within two days); Lunn Decl. ¶ 13 (reporting 21 people being transferred into Aurora within the last week); Vosburgh Decl. ¶ 17 (reporting 30 individuals transferred to ICE custody at Etowah within the last two weeks); Page Decl. ¶ 16 (transferring detained individuals from facility to the airport for deportation only to be brought back to the facility and placed in the general population); Fox Decl. ¶¶ 15-16. One detained individual reports being transferred a total of 18 times since mid-April. King Decl. ¶ 19.

During transfers, Defendants fail to provide adequate safeguards to protect detained individuals from COVID-19, and detained individuals typically travel in unsanitary conditions. Zwick Decl. ¶ 32 (describing transfers in which detained individuals do not have PPE and are in tight spaces with people exhibiting COVID-19 symptoms). When detained individuals leave from or arrive at a facility, ICE does not conduct universal testing, unlike the Bureau of Prisons (BOP), which tests all individuals upon arrival and before departure.[10] ICE admits that it does not test individuals prior to transferring them between facilities, and only tests individuals presenting clear COVID-19 symptoms.[11] This dangerous practice ignores the high rate of contagion posed by asymptomatic carriers.

---

[9] Centers for Disease Control, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, at 9 (Mar. 23, 2020) https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[10] *See Hearing on Examining Best Practices for Incarceration and Detention During COVID-19 Before the S. Comm. Of the Judiciary*, 116th Congress (2020) (statement of Henry Lucero, Executive Associate director of Enforcement and Removal Operations), https://www.judiciary.senate.gov/imo/media/doc/Lucero%20Testimony.pdf.

[11] Madan, *supra* note 6.

ICE's unnecessary transfer of detained individuals between facilities has
further spread the virus, and in some instances, seemingly brought the virus to new
facilities.[12]  For example, 16 out of 33 detained individuals tested positive for
COVID-19 within hours of being transferred from Krome to Broward.[13]  Similarly,
on June 16, 2020, the Director of Farmville Detention Center confirmed that 34
people who had been recently transferred to Farmville tested positive for COVID-
19 upon arrival. Feldman Decl. ¶¶ 27-29. For that very reason, the CDC guidelines
advise that "transfer should be avoided due to the potential to introduce infection to
another facility; proceed only if no other options are available."[14]

These ongoing transfers exponentially increase the likelihood that people
with Risk Factors will become infected with COVID-19. Venters Decl. ¶¶ 9-17.
Had ICE adequately revised its standards to protect medically vulnerable people as
required by the PI Order, those standards would have prohibited the dangerous
practice of interfacility transfers. Moreover, to the extent Defendants maintain that
transfers are necessary to prevent overcrowding or for other measures, such
measures can be more easily effectuated simply by releasing—rather than
transferring—people. Venters Decl. ¶ 13.

### C.   Defendants' Failure to Implement Adequate Standards for Quarantine and Medical Isolation Threatens the Subclass

Defendants have likewise failed to promulgate necessary standards to ensure
that medically vulnerable people are not subjected to conditions equivalent to
solitary confinement as a means of medical isolation, quarantine, or other infection
control. *See* ECF 132 at 38 (requiring Defendants to develop a comprehensive

---

[12] *See Hearing on Examining Best Practices for Incarceration and Detention During COVID-19 Before the S. Comm. Of the Judiciary*, 116th Congress (2020) (statement of Dr. Scott A. Allen, MD), https://www.judiciary.senate.gov/imo/media/doc/Scott%20Allen%20Testimony.pdf.

[13] Madan, *supra* note 6.

[14] Madan, *supra* note 6.

standard "for the safe detention of at risk detainees pending custody decisions, or in the event ICE deems detainees ineligible for release . . . ."). To the contrary, the attached declarations depict in disturbing detail how Defendants are dangerously and inappropriately utilizing solitary confinement as means of infection control.

For example, after potential exposure to COVID-19, Plaintiff Ruben Mencias Soto was placed in the disciplinary segregation unit of the Adelanto Detention Center for two weeks. Mencias Soto Decl. ¶ 7. Mr. Mencias Soto was locked down 23 hours a day with insufficient monitoring by medical and mental health staff, and mere "pro forma" checks by security staff. *Id.* at ¶ 13; Haney Decl. ¶ 20. Alarmingly, the same solitary confinement unit was used to quarantine newly arrived people. Mencias Soto Decl. ¶ 7; Lienhard Decl. ¶¶ 8-9. This violates CDC guidelines on quarantining. Haney Decl. ¶ 28.[15]

At the Aurora Detention Center in Aurora, Colorado, class member Oscar Perez Aguirre describes living for roughly two weeks in the area of the facility normally used for punitive solitary confinement upon returning from the hospital due to COVID-19 infection and complications. Perez Aguirre Decl. ¶¶ 8-10. Mr. Perez Aguirre was so weak that he could barely stand. While there, he had no doctor's appointments and no mental health checks. His request for something to ease the burden of isolation, such as playing cards, was denied. *Id.* at ¶ 9. Further, before he was taken to the hospital, he was living in a cell in the medical unit. There, he was only allowed to leave to shower and had no reading material or access to television. *Id.* at ¶ 4.

In addition, Defendants use extended, harmful lockdown as a means of attempting to control the pandemic. For example, since March 2020, Plaintiff Alex Hernandez has been locked in his cell at the Etowah Detention Center for nearly 20 hours a day or more, much of that time while sharing his cell with another person,

---

[15] Dr. Haney notes that both the CDC and both versions of the PRR are violated by numerous ICE practices like this one. Haney Decl. ¶¶ 14-15.

where social distancing is not possible. Hernandez Decl. ¶¶ 8-10. Mr. Hernandez describes insufficient monitoring by medical and mental health staff and a rising feeling of anxiety and stress during his months in lockdown. *Id.* at ¶¶ 9, 11.

The other evidence shows that these examples are far from anomalous but rather systemic in nature. *See, e.g.*, Zwick Decl. ¶¶ 40-41; Rivera ¶¶ 26-27; Doubossarskaia Decl. ¶ 35; Saenz Decl. ¶ 6; Page Decl. ¶ 15; Rios Decl. ¶ 19; Corchado Decl. ¶ 27; Feldman Decl. ¶ 29.

As Dr. Haney's expert declaration makes clear, the adverse implications of the Defendants' practices are profound. Class members are at significant risk of grave harm, both because these practices do not, in fact, prevent the spread of COVID-19 and because "lockdowns and solitary confinement subject persons to a separate set of very serious harmful effects, ones that significantly undermine their mental and physical well-being and risk doing far more harm than good." Haney Decl. ¶ 33. The mental health support offered to detained people subject to Defendants' isolation practices is insufficient, *id.* at ¶ 36, and the stark conditions Defendants subject people to may deter them from reporting symptoms, potentially exacerbating outbreaks. *Id.* at ¶ 5.F.

Imposing these conditions is not only dangerous to people's physical and mental health but also altogether unnecessary in order to achieve the objectives of medical isolation and quarantine. Indeed, as Dr. Venters and Dr. Vassallo note, both medical isolation and quarantine can and should be effectuated without imposing conditions equivalent to solitary confinement. *See* Venters Decl. ¶¶ 14, 16, 29-40; Vassallo Decl. ¶ 33; *accord* ECF 132 at 5-6 ("[s]imple segregation or solitary confinement measures as an outbreak management technique tend to backfire: they result in less medical attention and increased chances of death").[16]

---

[16] *See also, e.g.*, Dr. Brie Williams et al., *The Ethical Use of Medical Isolation—Not Solitary Confinement—to Reduce COVID-19 Transmission in Correctional Facilities*, AMEND (Apr. 9, 2020)

Despite having over two months to correct these dangerous omissions from its PRR, Defendants' revised PRR continues to fail to provide necessary guidance to ensure that solitary confinement is not improperly used in the guise of infection control. Venters Decl. ¶¶ 29-41.

### D.   Defendants' Revised PRR Still Threatens Subclass Members with Exposure to Dangerous Disinfectant Cleaner

As discussed above, the PI Order mandates that Defendants develop a comprehensive response to ensure "safe detention" of people with Risk Factors pending custody redeterminations. ECF 132 at 38. One critical aspect of such a standard should be the proper and safe use of disinfectant cleaning supplies in the detention centers. Venters Decl. ¶ 6. Defendants have issued no such standard.

To the contrary, reports from facilities throughout ICE's detention system evince that cleaning measures are inconsistent and, when disinfectant is being used, Defendants fail to ensure that detained people are not exposed to their harsh and irritating effects. For example, at Adelanto, it has been repeatedly publicly reported that staff are regularly spraying a harsh chemical agent in non-ventilated areas, irritating vulnerable peoples' eyes, noses, and throats. *See, e.g.*, Gonzalez Decl. ¶¶ 2-3; Valdez Bracamontes Decl. ¶ 5. Reports further indicate that the chemical being sprayed is likely HDQ Neutral, which is not indicated for household use. *Id.* at ¶ 4. Freedom for Immigrants, an advocacy group, has received similar reports of harsh chemicals being used to disinfect at the Houston Contract Detention Facility in Texas; at Glades Detention Center in Florida; and at Yuba County Jail, which holds detained people for ICE, in California. Gonzalez Decl. ¶ 2. At Glades, detained people have identified the spray as produced by the same company as HDQ Neutral. *Id.* Similarly, providers at South Texas ICE Processing Center report that their clients are having adverse reactions such as

https://amend.us/wpcontent/uploads/2020/04/Medical-Isolation-vs-Solitary_Amend.pdf.

coughing and sneezing to a chemical spray being used there. Russell Decl. ¶ 18.

These reports are inconsistent with Defendants' obligations under the Court's order for several reasons. First, as Dr. Venters has noted, improperly using disinfectant cleaning agents can disincentivize proper cleaning. Venters Decl. ¶ 6. Second, this practice further endangers vulnerable class members by triggering adverse physical responses to the chemical, and further straining medical resources in the detention centers as detained people seek help for the bad reactions they're experiencing. *See* Valdez Bracamontes Decl. ¶ 5. Although cleaning and disinfecting are important components of infection control, Defendants must ensure that proper disinfectants are utilized and that people are not dangerously exposed to them during their use. Venters Decl. ¶ 6. This is yet another area where Defendants completely disregard CDC recommendations and this Court's order by refusing to develop and implement proper detention standards. Defendants' revised PRR does not remediate this omission. *Id.*

### E.  Defendants Have Failed to Issue Other Necessary Precautions to Protect People with Risk Factors

The deficiencies outlined above are merely illustrative of other dangerous omissions in Defendants' COVID-19 response stemming from their delayed, insufficient revision to the PRR. Indeed, as outlined in the attached declarations, other dangerous conditions persist in the facilities, including failures to implement social distancing, lack of PPE, and substandard healthcare. As detailed in the declarations of Dr. Venters and Dr. Vassallo, there are numerous other precautionary measures that Defendants should also implement to protect people with Risk Factors from such dangerous conditions, which the revised PRR wholly fails to address. These include but are not limited to: release of all people with Risk Factors; twice daily screening of symptoms and temperature consistent with CDC recommendations using a structured screening tool; development of care protocols for detained people who test positive, particularly those with Risk Factors;

cohorting of high-risk detainees into specialized housing areas with enhanced

infection control measures and training among staff, who are assigned to these

units; healthcare evaluations by appropriately trained staff to assess high-risk

patients' current conditions, symptoms and medications, and to make a plan for

COVID-19 infection; increased social distancing measures and PPE for high-risk

people; increased medical and mental health surveillance of people with Risk

Factors, including contact tracing; expansion of testing to people with Risk Factors

and close contacts/staff; increased education of people with Risk Factors; enhanced

training of staff with any responsibility over people with Risk Factors; audits of

medical staffing ratios at facilities to ensure proper staffing where medically

vulnerable people are detained; hospitalization protocols for people with Risk

Factors. *See* Venters ¶¶ 7, 43-47; Vassallo ¶¶ 22-34. Defendants' revised PRR

wholly fails to address such crucial measures. *See id.*

## V.   ICE Is Failing to Adequately Monitor the PRR

This Court has made clear several times that ICE must engage in robust,

effective monitoring and oversight of the PRR. First, the PI Order required ICE to

"monitor and enforce facility-wide compliance with" revised or supplemental

Pandemic Response Requirements. ECF 132 at 30, 38-39. Second, after ICE

subsequently contended that the PI Order did not require "Defendants to track

anything concerning monitoring and enforcement of" the PRR, the Court described

that position as "nonsensical," and ordered ICE to produce, on an ongoing basis,

records regarding monitoring and enforcement of the PRR. ECF 150 at 6, 10.

Notwithstanding these admonitions, ICE continues to reluctantly engage in

lax oversight and monitoring that, to the extent that it exists at all, relies on the

same broken system that existed before the pandemic hit. ICE's monitoring of the

PRR consists solely of sending a bare-bones, incomplete questionnaire to each

detention facility, allowing facility staff to complete the form, and then having

Detention Service Managers ("DSMs") and Detention Standards Compliance

1  Officers ("DSCOs") review the forms and conduct follow-up where they deem

2  necessary. Fox Decl. Ex. 18 at 10. This ineffective system allows an intolerable

3  level of risk to continue for many reasons.

4      First, the survey questionnaires omit important topics. For example, this

5  Court determined that one of the most "serious systemic deficiencies" by ICE was

6  its failure to have measures in place for the safe detention of at-risk individuals

7  (ECF 132 at 37), and for this reason, the Court ordered Defendants "to provide a

8  more concrete standard to protect" subclass members. ECF 150 at 6 n.2.

9  Nevertheless, the vast majority of questionnaires omit any questions concerning

10  the measures taken, if any, by each detention facility to protect medically

11  vulnerable people. Schlanger Decl. ¶ 47. Further, most of the questionnaires do not

12  ask for any information on such crucial preventative measures as the circumstances

13  under which testing should occur, or the number of tests. *Id.*

14      Second, relying on DSMs and DSCOs is the same ineffective approach to

15  monitoring and oversight that ICE used before the pandemic, one that has been

16  repeatedly criticized by OIG,[17] and one that has led—as this Court pointed out in

17  its PI Order—to a long history of "monitoring and oversight failures." ECF 132 at

18  30. Further, there is no reason to believe that DSMs and DSCOs have the

19  necessary medical training to be able to spot problems in questionnaires,

20  appropriately engage with the content required to answer the questions, or to

21  determine how to address those problems. Venters Decl. ¶ 59.

22      Third, even if DSMs were qualified to conduct follow-up about medical care

23  (they are not), ICE has not produced any information that any follow-up on the

24

25  [17] *See, e.g.,* Office of Inspector Gen., U.S. Dep't of Homeland Sec., OIG-18-67*:*
*ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to*

26  *Sustained Compliance or Systemic Improvements* at 2 (Jun. 26, 2018)
https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf;

27  Office of Inspector Gen., U.S. Dep't of Homeland Sec., OIG-19-18: *ICE Does Not*
*Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable*

28  *for Failing to Meet Performance Standards*, at 5 (Jan. 29, 2019)
https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf.

surveys has yet occurred, notwithstanding the clear need for such follow-up. For example, many responses appear to be drafted by attorneys and do not at all provide the requested information. Survey responses from GEO (a contractor for ICE) make this clear by, for example, responding as follows to the question how often are cleaners and disinfectants used on surfaces: "GEO is following applicable sanitation policies, standards, CDC, and ICE guidance to determine the facility's sanitation schedule." Fox Decl. Exs. 15, 16.

Finally, many questions simply ask whether a particular policy is in place, but do not ask about the substance of that policy, or other necessary specific information. Schlanger Decl. ¶ 55. For example, the surveys ask whether medical procedures are in place governing such topics as handling infected/exposed detainees, processing new admissions, and isolation, but there are no questions asking for the substance of those policies. *Id*. This makes it impossible for anyone reviewing these questionnaires to know whether or not the policies/procedures in place at a particular facility comply with CDC or ICE protocols.[18]

## VI.   Defendants Are Violating the Provisions of the PI Order Governing Custody Redeterminations

Defendants have further violated the PI Order by not ensuring that meaningful custody redeterminations occur for of *all* detained individuals with Risk Factors, and not making the presence of Risk Factor a significant factor weighing in favor of release.  The PI Order requires that:

> "Defendants shall make timely custody determinations for detainees with Risk Factors, per the latest Docket Review Guidance. In making their determinations, Defendants should consider the willingness of detainees with Risk Factors to be released, and offer information on post-release planning, which Plaintiffs may assist in providing."  ECF 132 at 38.

---

[18] Many of the questions are poorly phrased or difficult to understand. *See* Schlanger Decl. ¶¶ 49-59, 60-61.

The Docket Review Guidance requires that the presence of Risk Factors "should be considered a significant discretionary factor weighing in favor of release."[19] The Court later clarified that the aspects of the preliminary injunction with no specified timeline "were intended to have immediate or near immediate effect, for example, *that Defendants expand the categories of individuals eligible for custody determinations under the Docket Review Guidance*." ECF 150 at 6 (emphasis added). This instruction, combined with the Court's mandate that the PRR apply to people with Risk Factors regardless of the statutory authority for their detention (ECF 132 at 38), demonstrates that Defendants should have processes in place to ensure swift custody determinations for *all* people with any Risk Factors with a strong presumption of release to ensure their safety.

Further, Defendants must monitor and oversee this process.  Indeed, the Court rejected Defendants' initial argument that the Court "did not order Defendants to track anything." ECF 150 at 6. Defendants continue to refuse to maintain any centralized mechanisms to oversee and ensure consistent, compliant custody redeterminations throughout their networks of detention facilities.

### A.    Defendants Fail to Provide Adequate Oversight and Monitoring to Ensure Custody Redeterminations Occur in Compliance with the PI Order

In the meet and confer discussions regarding compliance with the Court's orders, Defendants have confirmed that:

" . . . other than as set forth in the March 27, 2020 and April 4, 2020 guidance letters, there is no *process in place covering custody redeterminations*. Specifically, there are no protocols or guidance addressing: (1) how detained individuals can seek custody redeterminations; (2) which factors other than the presence of a COVID-19 risk factor should be used in making custody redeterminations, including those factors that weigh

---

[19] ECF 121-4 at 2. Although the risk factors in that guidance referred to those described at the time by the CDC, the PI Order refers to the Risk Factors covered by the subclasses. *See* ECF 132 at 21-22, fns. 20, 21.

against release; (3) what weight should be placed on various factors for purposes of determining whether detained individuals should be released; and (4) whether a detained individual with risk factors who is denied release should be informed of that denial and the reasons for that denial" Fox Decl. Ex. 4. (emphasis added).

Defendants also clarified that ICE has taken no steps to review custody redeterminations to see whether they are being done correctly and consistently, claiming that the PI Order does not require any process to be put in place governing custody redeterminations.

## B.   Defendants' Lack of Oversight to Ensure Compliant and Consistent Custody Redeterminations Has Led to Horrific Results

As a result of Defendants' failures in oversight, subclass members who seek custody redeterminations pursuant to the PI Order are faced with a nebulous and unpredictable process lacking meaningful review, as well as arbitrary and inconsistent approaches across different facilities and field offices, resulting in many extremely vulnerable people remaining detained and at extreme risk.

Evidence indicates that Defendants have failed to engage in meaningful review of class members' custody redetermination requests. First, multiple field offices have denied custody redetermination requests within hours—and some even within minutes—of their submission. *See, e.g.*, Zwick Decl. ¶ 11; Feldman Decl. ¶ 13; Dobbins Decl. ¶ 12; Bailey Decl. ¶¶ 6, 10; *see generally* Gonzalez Morales Decl. Even more field offices have refused to provide explanations for why release is denied. Gonzalez Morales Decl. ¶ 8; Feldman Decl. ¶¶ 15-17; Rivera Decl. ¶ 19. Some field offices issue denials using boilerplate language. Feldman Decl. ¶¶ 10-18; Rivera Decl. ¶¶ 20-23; Schneider Decl. ¶ 8.  Even those that provide a modicum of individualized detail indicate a lack of meaningful review.[20] For example, denials claiming to be based on *Fraihat* reviews have been

---

[20] *See, e.g.*, Edgerton Decl. ¶¶ 10, 22. For example, many requests were seemingly automatically denied for class members with criminal records regardless of the

issued days before the related requests were submitted,[21] and in one instance, the Las Vegas Field Office denied two subclass members' release, claiming to have conducted custody reviews under *Fraihat* on April 15, five days before the preliminary injunction was issued. *See* Flewelling Decl. ¶ 13.

Second, few subclass members have been released under the PI Order, further indicating Defendants' mere *pro forma* custody redetermination process. Defendants reported that, as of June 19, 2020, only 1,909 of the nearly 6,000 identified subclass members have been released under the PI Order, leaving approximately 67% of subclass members in ICE custody, including 2,735 subclass members who are not subject to mandatory detention. Fox Decl. ¶ 10. Critically, it appears that the actual number of releases under the PI order is substantially lower than reported by Defendants. Of the 1,901 on Defendants' list of released class members, 74 were identified as relief granted by order of immigration judges,[22] and 769 were deported. *Id.* ¶ 12. Notably, Defendants' *Fraihat* release list includes "death" as a reason for release, listing three class members who died in custody among those "released" under the PI Order.[23] In other words, Defendants are inflating the number of releases pursuant to this Court's order. At the same time,

---

[21] Feldman Decl. ¶¶ 14-15.

[22] The subclass members listed as "released" under the preliminary injunction include Marco Montoya Amaya, one of the *Fraihat* named plaintiffs, whose custody redetermination was denied twice but who was later released on bail under *Zepeda Rivas v. Jennings*, No. 20-CV-02731-VC, 2020 WL 2059848 (N.D. Cal. Apr. 29, 2020). Fox Decl. ¶ 14. The list also incorrectly includes Adrian Rodriguez Alcantara, who was released on judicial order under *Alcantara v. Archambeault*, No. 20CV0756 DMS (AHG), 2020 WL 2315777 (S.D. Cal. May 1, 2020). Fox Decl. ¶ 14.

[23] Carlos Escobar Mejia and Santiago Baten Oxlaj are listed among those released under *Fraihat*, both of whom passed away in ICE custody from COVID-19. Fox Decl. ¶ 13. The *Fraihat* release list also includes Choung Ahn, a 74-year-old class member with multiple risk factors whose death is thought to have resulted from suicide while he was quarantined in solitary confinement upon return to Mesa Verde ICE Processing Center after hospitalization for severe chest pain. Fox Decl. ¶ 13.

seriousness of their risk factors. Bailey Decl. ¶¶ 6-7, 10; Rios Decl. ¶ 11; Rivera Decl. ¶ 23.

1   the number of overall subclass members is likely much higher than that which

2   Defendants report (which evinces low releases overall). Indeed, Jose Baca

3   Hernandez, Ruben Dario Mencias Soto, and Alex Hernandez, all three *Fraihat*

4   named plaintiffs for whom Class Counsel submitted custody redetermination

5   requests that were denied, are excluded from Defendants' produced list of class

6   members, as were others, strongly suggesting that Defendants have failed to

7   identify and review the custody status of countless other subclass members. Fox

8   Decl. ¶¶ 14,17. Defendants' own records evidence their failure to meaningfully

9   implement the custody redetermination process.

10      Third, and as detailed further below, Defendants improperly bar anyone

11   subject to mandatory detention from release. But the PI Order requires

12   individualized redeterminations "regardless of the statutory authority for their

13   detention (ECF 132 at 38), and in any case, more than 70% of people Defendants

14   have refused to release are not subject to mandatory detention. Fox Decl. ¶ 11.

15      Defendants' failure in oversight has also contributed to arbitrary and

16   inconsistent custody review across different facilities. While some facilities accept

17   custody redetermination requests via email,[24] others have insisted that requests be

18   submitted in hard copy by mail.[25] Some field offices appear to have established

19   their own "priority" for release.[26] Furthermore, some field offices have begun

20   refusing to acknowledge subclass members' Risk Factors despite records of such,[27]

21   and others have created barriers for subclass members to access their medical

---

[24] Feldman Decl. ¶ 10; Russell Decl ¶ 8.

[25] Gonzalez Decl. ¶ 19; Russell Decl. ¶ 8; King Decl. ¶ 8.

[26] For example, the Otay Mesa Field Office denied a subclass member's release because they were "not the 'agency's priority'". Rios Decl. ¶ 9. Similarly, the Newark Field Office denied a subclass member's release because the individual was not on a "list" of people with certain conditions. Gonzalez Decl. ¶ 17.

[27] For example, though a subclass member submitted medical records corroborating their Risk Factor, the San Francisco Field Office denied release due to "no evidence of complications." Gonzalez Decl. ¶ 23.

records while in custody, which wholly prevents them from substantiating their claims that they have Risk Factors warranting release.[28] Lastly, while some facilities and field offices respond within minutes of requests being submitted, others take weeks to respond or fail to respond at all. *See* Bailey Decl. ¶¶ 6, 10; Gonzalez Decl. ¶ 15.Feldman Decl. ¶ 11; Saenz Decl. ¶ 16; Rios Decl. ¶ 9; Rivera Decl. ¶ 16. Overall, Defendants' lack of oversight has contributed to a confusing "patchwork" response, leaving thousands of class members at continued risk of infection, death, or complication by COVID-19. *See* Gonzalez Decl. ¶ 6.

### C.   Defendants Refuse to Consider for Release Subclass Members Subject to Mandatory Detention in Violation of the PI Order

This Court's PI Order makes clear that its remedial provisions apply equally to all subclass members regardless of the statutory basis for their detention. *See, e.g.*, ECF 132 at 10, 38; ECF 150 at 3. Yet, Defendants continue to maintain that the mandatory detention provisions of INA § 236(c) continue to apply and that people in detention subject to these provisions may not be released pursuant to *Fraihat* even if they have Risk Factors for serious illness from COVID-19.  *See* ECF 121-4 at 2; ECF 146 at 21; Fox Decl. Exs. 1, 2. In addition to Defendants' express admissions, it is clear that this bar is being implemented throughout the country. *See* Zwick Decl. ¶ 12 (denials for criminal history), ¶ 14 (ICE says "waste of time" to request release for people with criminal histories), ¶ 27 (criminal history leads to *per se* denial); Russell Decl. ¶¶ 10-13 (blanket denials for anyone with a criminal history at Pearsall, with no change since the new order has been issued), ¶ 15 (same at Laredo); Schneider Decl. ¶ 12.

---

[28] For example, the South Texas ICE Processing Center and Laredo Detention Center abruptly modified their policy such that ICE would no longer release records to attorneys, only to the detained people themselves. Of note, this policy change occurred within a week of notices regarding the PI Order being posted at the facilities. Russell Decl. ¶ 9.

### D. Defendants Fail to Conduct Custody Redeterminations for All People with Qualifying Severe Psychiatric Illnesses

Defendants have also violated the Court's Order by issuing unnecessarily stringent guidelines on the Risk Factor of "severe psychiatric illness." The Court's PI Order required Defendants to "provide ICE Field Office Directors with the Risk Factors identified in the Subclass definition" and to "provide necessary training to any staff tasked with identifying detainees with Risk Factors" (ECF 132 at 38). The Risk Factors listed in the PI Order included "severe psychiatric illness" (ECF 132 at 21 n.20 and 22 n.21). The guidance that Defendants sent to field office directors on April 28, 2020 directed they interpret "severe psychiatric illness" as "defined in *Franco-Gonzalez v. Holder*, 2013 WL 8115423 (C.D. Cal. 2013), to include: (1) Psychotic Disorder; (2) Bipolar Disorder; (3) Schizophrenia or Schizoaffective Disorder; (4) Major Depressive Disorder with Psychotic Features; (5) Dementia and/or a Neurocognitive Disorder; (6) Intellectual Development Disorder (moderate, severe or profound)." Fox. Decl. Ex. 19; *see also id.* Ex. 2 at 2. This list is based on an inapposite legal situation—competency in immigration proceedings—and fails to account for the risks that people with other severe psychiatric illnesses face as a result of COVID-19.

Psychiatric illness is relevant to this case because it is "especially difficult for psychiatrically vulnerable persons to initiate and consistently maintain" the "preventive strategies depend[ing] heavily on various forms of self-care" that are necessary to prevent the spread of the virus. Haney Decl. ¶ 10; Vassallo Decl. ¶ 18; Venters Decl. ¶ 32. The importance of consistency in maintaining these precautionary measures over many months means that "those who are diagnosed as mentally ill or those with sub-clinical symptoms such as depression or anxiety [] are especially vulnerable in the Pandemic." Haney Decl. ¶ 7. Post-traumatic stress disorder, anxiety, and depression are a few examples of psychiatric illnesses that may make someone vulnerable to COVID-19 that ICE's directive fails to include.

*See* Haney Decl. ¶ 8; Venters Decl. ¶ 32.  In addition, dementia or subclinical symptoms like confusion, distress, or pain may make it difficult for a COVID-19 patient to participate in their care or express symptoms, increasing their risk of complications from the virus. *See* Vassallo Decl. ¶ 18. Defendants' narrow definition continues to place subclass members with psychiatric illness in harm's way.

## VII.   A Special Master Is Necessary in Light of Defendants' Non-Compliance

This Court has the authority to appoint a special master under Fed. R. Civ. P. 53(b) and the All Writs Act (28 U.S.C. § 1651(a)) to monitor compliance with the PI Order.  Appointment of a special master is appropriate where, as here, the underlying injunction enjoins systemic conduct; the case is complex; the defendant has violated the injunction and there is a strong prospect of future noncompliance; and there are ongoing disputes regarding the implementation of the court's orders. *See Flores v. Sessions*, No. CV 85-4544-DMG, 2018 WL 6133665, at *2 (C.D. Cal. Nov. 5, 2018); *Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015); *Coleman v. Wilson*, 912 F.Supp. 1282, 1324 (E.D. Cal. 1995).

An exceptional condition under Rule 53(b) does not require a final determination of a constitutional violation or a determination of intentional disregard of court orders.  In fact, the complexity of compliance with a court's order itself can be sufficient to warrant the appointment of a monitor, and no finding of prior noncompliance is necessary in such circumstances. *See Nat'l Org. for the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 542 (9th Cir. 1987) (holding that "the prospect of noncompliance is an 'exceptional condition' that justifies reference to a master"). Although actual noncompliance is not necessary for the Court to appoint a special master, a history of noncompliance may require that a court appoint a monitor to ensure an agency's compliance moving forward where the court determines that it lacks the resources to constantly monitor the agency's compliance directly. *See Hook v. State of Ariz.*, 120 F.3d 921, 926 (9th

Cir. 1997) (affirming appointment of monitor where district court had determined "it lacked the resources to constantly monitor compliance with the decree, as it was required to do because of the Department's noncompliance").

Applying these principles here, the evidence demonstrates the need for a Special Master to ensure Defendants' compliance. In addition to the complexity of this case, the evidence above demonstrates Defendants' ongoing noncompliance with the PI Order. The parties' disputes as to the implementation of the PI Order and the risk of future noncompliance further militate in favor of a Special Master.

## VIII. Defendants' Failure to Respond to the Severe Risks Addressed in the PI Order Warrants a Presumption of Release for Subclass Members

Defendants' slow-walk approach in the wake of a fast-moving pandemic—in particular, their delayed issuance and lax enforcement of performance standards to protect detained persons with Risk Factors, as well as their deficient and inconsistent approach to required custody determinations—has created an immediate need for additional action. Defendants' inaction means that detained people with Risk Factors are still facing the same, if not greater, risks as those faced prior to the issuance of the PI Order. This is especially true given Defendants' ongoing failures to include medically necessary precautions in its revised PRR, as detailed by Dr. Venters and Dr. Vassallo. As a result, with respect to custody determinations, a presumption of release is necessary to ensure that Defendants fully comply with the custody determination requirements of the PI Order, including ensuring that *all* subclass members are assessed, with the presence of a Risk Factor weighing heavily in favor of release.[29]

---

[29] This inclusion of this presumption is necessary to "achieve the purposes" of the original injunction. *See United Shoe Mach. Corp.*, 391 U.S. at 249.

## IX.    Conclusion

For these reasons, and in light of Defendants' continued non-compliance with the PI Order, Plaintiffs respectfully request that the Court grant the Motion to Enforce and order the remedies requested in the proposed order.


DATED: June 24, 2020

Respectfully submitted,

/s/ Jared Davidson          /s/ William F. Alderman
Jared Davidson              William F. Alderman
Lisa Graybill               Mark Mermelstein
Shalini Goel Agarwal        Jake Routhier
Maia Fleischman             ORRICK, HERRINGTON &
SOUTHERN POVERTY LAW        SUTCLIFFE LLP
CENTER

/s/ Timothy P. Fox          /s/ Michael W. Johnson
Timothy P. Fox              Michael W. Johnson
Elizabeth Jordan            Dania Bardavid
Maria del Pilar Gonzalez Morales   Leigh Coutoumanos
CIVIL RIGHTS EDUCATION AND  Jessica Blanton
ENFORCEMENT CENTER          Joseph Bretschneider
                            WILLKIE FARR &
                            GALLAGHER LLP

/s/ Stuart Seaborn
Stuart Seaborn
Christina Brandt-Young
Melissa Riess
DISABILITY RIGHTS
ADVOCATES


Attorneys for Plaintiffs