Timothy P. Fox (CA Bar 157750)
*tfox@creeclaw.org*
Elizabeth Jordan*
*ejordan@creeclaw.org*
CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER
1245 E. Colfax Avenue, Suite 400
Denver, CO 80218
Tel:  (303) 757-7901
Fax: (303) 872-9072

Lisa Graybill*
*lisa.graybill@splcenter.org*
Jared Davidson*
*jared.davidson@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
201 St. Charles Avenue, Suite 2000
New Orleans, Louisiana 70170
Tel:  (504) 486-8982
Fax: (504) 486-8947

Stuart Seaborn (CA Bar 198590)
*sseaborn@dralegal.org*
Melissa Riess (CA Bar 295959)
*mriess@dralegal.org*
DISABILITY RIGHTS ADVOCATES
2001 Center Street, 4th Floor
Berkeley, California 94704
Tel:  (510) 665-8644
Fax: (510) 665-8511

Attorneys for Plaintiffs (continued on next page)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION – RIVERSIDE**

| | |
|---|---|
| FAOUR ABDALLAH FRAIHAT, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*, <br><br> Defendants. | Case No.: 19-cv-01546-JGB(SHKx) <br><br> **DECLARATION OF MARGO SCHLANGER IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE APRIL 20, 2020 PRELIMINARY INJUNCTION ORDER** |

William F. Alderman (CA Bar 47381)
*walderman@orrick.com*
Jake Routhier (CA Bar 324452)
*jrouthier@orrick.com*
ORRICK, HERRINGTON &
SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105
Tel:  (415) 773-5700
Fax: (415) 773-5759

Michael W. Johnson**
*mjohnson1@willkie.com*
Dania Bardavid**
*dbardavid@willkie.com*
Jessica Blanton**
*jblanton@willkie.com*
Joseph Bretschneider**
*jbretschneider@willkie.com*
WILLKIE FARR &
GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Tel:  (212) 728-8000
Fax: (212) 728-8111

Maia Fleischman*
*maia.fleischman@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
2 South Biscayne Boulevard
Suite 3750
Miami, FL 33131
Tel:  (786) 347-2056
Fax: (786) 237-2949

Christina Brandt-Young*
*cbrandt-young@dralegal.org*
DISABILITY RIGHTS
ADVOCATES
655 Third Avenue, 14th Floor
New York, NY 10017
Tel:  (212) 644-8644
Fax: (212) 644-8636

Mark Mermelstein (CA Bar 208005)
*mmermelstein@orrick.com*
ORRICK, HERRINGTON &
SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA 90017
Tel:  (213) 629-2020
Fax: (213) 612-2499

Leigh Coutoumanos**
*lcoutoumanos@willkie.com*
WILLKIE FARR &
GALLAGHER LLP
1875 K Street NW, Suite 100
Washington, DC 20006
Tel:  (202) 303-1000
Fax: (202) 303-2000

Shalini Goel Agarwal
(CA Bar 254540)
*shalini.agarwal@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
106 East College Avenue
Suite 1010
Tallahassee, FL 32301
Tel:  (850) 521-3024
Fax: (850) 521-3001

Maria del Pilar Gonzalez Morales
(CA Bar 308550)
*pgonzalez@creeclaw.org*
CIVIL RIGHTS EDUCATION
AND ENFORCEMENT CENTER
1825 N. Vermont Avenue, #27916
Los Angeles, CA 90027
Tel:  (805) 813-8896
Fax: (303) 872-9072

Attorneys for Plaintiffs (continued from previous page)
*Admitted Pro Hac Vice
**Pro Hac Vice Application Forthcoming

I, Margo Schlanger, declare as follows:

1.      I am the Wade H. and Dores M. McCree Collegiate Professor of Law at the University of Michigan. I have substantial expertise in the law, policy, and procedures affecting both criminal and civil detention, including standards and practices relating to immigration detention oversight. I have been retained by Plaintiffs' counsel in this case as an expert on this topic, among others.

2.      I have been asked to render my opinion with respect to ICE and DHS oversight of civil immigration detention.

3.      A true and correct copy of my *curriculum vitae* is attached as **Exhibit A**.

## I.      PROFESSIONAL QUALIFICATIONS

**Appointments and Experience**

4.      I have been a tenured law professor at the University of Michigan since 2009, except for a two-year period in 2010 and 2011 when I was on leave to serve as the presidentially-appointed Officer for Civil Rights and Civil Liberties (CRCL) at the U.S. Department of Homeland Security.  CRCL reviews and investigates civil rights and civil liberties complaints filed by the public regarding DHS policies and activities, including violation of rights while in immigration detention or as a subject of immigration enforcement.

5.      I teach a variety of courses at the University of Michigan, including Torts; Constitutional Law, including advanced classes about the Equal Protection Clause; and Prisons and the Law. I have taught seminars on a variety of topics, including Homeland Security and Civil Rights. I also founded and serve as the Director of the Civil Rights Litigation Clearinghouse, http://clearinghouse.net. I am a faculty affiliate of the University of Michigan Center for Forensic Psychiatry Fellowship in Forensic Psychiatry and in that capacity teach and advise forensic psychiatrists-in-training.

6.      I previously held faculty appointments at Harvard Law School (associate professor), Washington University Law School (professor), and UCLA

Law School (visiting professor).

7.     I have had many relevant non-academic appointments in the past. Among them (in reverse chronological order):

a.   After appointment by DHS Secretary Jeh Johnson, I served from November 2015 through October 2016 as a member of the Immigrations and Customs Enforcement (ICE) Advisory Committee on Family Residential Centers, which recommended improved policies and practices relating to family immigration detention of noncitizens.

b.   In 2012-2013, as part-time Counsel to the Secretary, I advised DHS Secretary Janet Napolitano on civil rights matters, including reducing the use of restrictive housing and minimizing sexual assault and abuse in immigration detention, and the appropriate oversight and administrative mechanisms to implement those goals.

c.   As the Officer for Civil Rights and Civil Liberties at DHS in 2010 and 2011, I was the head of civil rights for DHS, with responsibility for, among other things, civil rights complaints and advice on immigration detention policy and practices. In that role, I was also the senior DHS official with responsibility for assessing and improving compliance with Section 504 of the Rehabilitation Act of 1973, the statute banning disability discrimination by federal agencies.

d.   From 2007 to early 2010, I served as the Reporter for the American Bar Association task force on Standards relating to the Treatment of Prisoners. In that capacity, I was the principal drafter of both the standards themselves and the associated commentary.

e.   From 2006 to 2008, I served as a member of the Commission on Safety and Abuse in America's Prisons, a blue-ribbon panel

3

sponsored by the Vera Institute of Justice and chaired by former Attorney General Nicholas de B. Katzenbach and former Judge John Gibbons, which made recommendations for civil rights improvements in prisons and jails.

    f.    From 1995 to 1998, I served as a Trial Attorney and then a Senior Trial Attorney in the U.S. Dept. of Justice, Civil Rights Division, Special Litigation Section; among other activities, I conducted investigations of jails and prisons and their compliance with the Constitution and the Americans with Disabilities Act, and related litigation.

8.    Outside of my academic appointment, I have served since June 2015 as the court-appointed Settlement Monitor in *Adams & Knights v. Kentucky Department of Corrections*, No. 3:14-cv-00001 (E.D. Ky.), a state-wide case about deaf and hard-of-hearing prisoners' access to programs, services, and activities offered by the Kentucky Department of Corrections and the constitutionality of their conditions of confinement. In that capacity, I have conducted many inspections of correctional facilities, both on-site and by way of a written "self-audit" instrument that I developed.

9.    I have also been retained as an expert in: *Sabata v. Nebraska Department of Correctional Services*, Case No. 4:17-cv-03107-RFR-MDN, 2019 WL 3975373, at *4 (D. Neb. Aug. 22, 2019), where the Court held my expert declaration on disability-related policies, practices, and procedures appropriate under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Novoa v. GEO Group*, No. 5:17-cv-02514 (C.D Cal.), a class action challenging the GEO Group's use of detained immigrants' labor in their facilities.

10.    I serve as one of four class counsel in *Hamama v. Adducci*, 2:17-cv-11910-MAG-DRG (E.D. Mich.), a case in which plaintiffs challenge planned mass deportations of Iraqi nationals.

**Relevant Publications**

11.    I have written widely on the topic of civil rights, incarceration/detention, and agency governance structures that assist with effective civil rights implementation. My *curriculum vitae* includes a list of both academic and non-academic publications. I am the lead author of a new edition of a leading casebook on the Law of Incarceration, due out in 2020. Among my published writing is:

a.   INCARCERATION AND THE LAW, CASES AND MATERIALS (10th Edition 2020), with Sheila Bedi, David Shapiro, and Lynn Branham (I am the lead author).

b.   *Accommodating Disabilities*, in Public Health Behind Bars—From Prisons to Communities (forthcoming 2020).

c.   *Maximalist vs. Incrementalist Reform Strategies: Solitary Confinement Case Studies*, 115 NORTHWESTERN L. REV. (forthcoming 2020).

d.   *The Constitutional Law of Incarceration, Reconfigured*, 103 CORNELL L. REV. 357 (2018)

e.   *Prisoners with Disabilities: Individualization and Integration*, in ACADEMY FOR JUSTICE, A REPORT ON SCHOLARSHIP AND CRIMINAL JUSTICE REFORM (Erik Luna ed., 2017)

f.   *Anti-Incarcerative Remedies for Illegal Conditions of Confinement*, 6 U. MIAMI RACE & SOCIAL JUSTICE L. REV. 1 (2016)

g.   *How the ADA Regulates and Restricts Solitary Confinement for People with Mental Disabilities*, ACS Issue Brief (May 19, 2016)

h.   *The Just-Barely-Sustainable California Prisoners' Rights Ecosystem*, 664 ANNALS OF THE AM. ACAD. OF POL. & SOC. SCI. 62 (2016)

i.   *Trends in Prisoner Litigation, as the PLRA Enters Adulthood*, 5

U.C. IRVINE L. REV. 153 (2015)

j.  *Prisoners' Rights Lawyers' Strategies for Preserving the Role of the Courts*, 69 U. MIAMI L. REV. 519 (2015)

k.  *Intelligence Legalism and the National Security Agency's Civil Liberties Gap*, 6 Harv. Nat. Sec. L.J. 112 (2015).

l.  *Offices of Goodness: Influence Without Authority within Federal Agencies*, 36 Cardozo L. Rev. 53 (2014).

m.  *Plata v. Brown and Realignment: Jails, Prisons, Courts, and Politics*, 48 HARV. CIV. RGHTS-CIV. LIB. L. REV. 165 (2013)

n.  *Regulating Segregation: The Contribution of the ABA Criminal Justice Standards on the Treatment of Prisoners*, 47 AM. CRIM. L. REV. 1421 (2010)

o.  *Operationalizing Deterrence: Claims Management (in Hospitals, a Large Retailer, and Jails and Prisons)*, 2 J. TORT L., issue 1, article 1 (2008)

p.  *Civil Rights Injunctions Over Time: A Case Study of Jail and Prison Court Orders*, 81 N.Y.U. L. REV. 550 (2006)

q.  *Determinants of Civil Rights Filings in Federal District Court by Jail and Prison Inmates*, 1 J. EMPIRICAL LEGAL STUD. 79 (2004) (with Anne Morrison Piehl)

r.  *Inmate Litigation*, 116 HARV. L. REV. 1555 (2003)

s.  *Beyond the Hero Judge: Institutional Reform Litigation as Litigation*, 97 MICH. L. REV. 1994 (1999)

12.  I have substantial expertise in quantitative and qualitative social science methods. I am the former Chair of the Association of American Law School's Section on Law and the Social Sciences. I have taught a law school class titled "Empirical Inquiries in Civil Litigation." I also have published both quantitative and qualitative empirical papers in both law reviews and peer-reviewed journals such as the Journal of Empirical Legal Studies and the Annals of

6

the American Academy of Political and Social Science.

## II.   FACTUAL BASES AND SUMMARY OF OPINIONS

13.     I have been asked to render my opinion on the oversight of civil immigration detention, and in particular on the current oversight of COVID-19 pandemic-related operations in immigration detention facilities.

14.     My opinions, as outlined herein, are informed by my knowledge, skill, experience, training, and education, including my substantial experience in this area at the Department of Homeland Security as head of DHS's CRCL, special counsel to the Secretary, and member of the Advisory Committee on Family and Residential Centers; as well as my knowledge of standards relating to incarceration/detention such as the American Correctional Association's *Performance-Based Standards for Adult Correctional Institutions* and *Performance-Based Standards for Adult Local Detention Facilities*, and the American Bar Association's *Treatment of Prisoners Standards* (2011), which I played a lead role in drafting.

15.     In addition, over the past several years, I have read a wide variety of documents and reports relating to ICE oversight of immigration detention; the most pertinent are cited below.

16.     My opinions herein are also informed by my review of documents related to COVID-19 policies and practices share by ICE with plaintiffs in this case.

17.     My work on this matter is ongoing and my opinions are partial and preliminary, based on the available information I have reviewed to date. It is my understanding that additional documents and information may be forthcoming during the course of this litigation, and that discovery is ongoing. Based on the information I have reviewed, I am confident in the preliminary opinions contained in this declaration. I reserve the right to supplement my opinions as additional information becomes available.

18.     Based on my review of the materials available to me, it is my opinion

that the administrative structure of ICE immigration detention renders the need for ICE oversight particularly acute. Yet ICE has a long and documented history of poor oversight. Its routine oversight mechanisms are insufficient to detect non-compliance or induce compliance with applicable detention standards. And its follow-up when problems *are* detected is inconsistent and unsystematic, failing to correct even known problems.

19.    From what I have been told about ICE's COVID-19 oversight, these same problems apply. ICE's self-reporting checklist is apparently the centerpiece of the compliance regime. But the document is deeply flawed and entirely inappropriate for such a role.

20.    Moreover, even a well-designed checklist cannot be more than one small part of an oversight system that provides clear policy and sets clear expectations; evaluates compliance (both proactively and responsively); and that ensures corrective actions where needed. The documentation I have been shown does not evidence such a system.

21.    Based on the information I have reviewed, ICE does not have in place the elements of appropriate oversight of COVID-19 response by immigration detention facility operators.

## III.    BACKGROUND ON ICE OVERSIGHT OF IMMIGRATION DETENTION

22.    ICE oversees an extremely diffuse detention system, with hundreds of facilities housing tens of thousands of detainees. It does not play the chief operating role for any of those facilities, instead contracting with private and public entities who actually run the facilities. The administrative structure renders the need for ICE oversight particularly acute.

23.    ICE oversight is further complicated by the many applicable detention standards. ICE has issued four different sets of standards governing ICE detention:

the 2000 National Detention Standards (NDS), revised in 2019;[1] the Family
Residential Standards, issued in 2007;[2] the 2008 Performance Based National
Detention Standards[3] (PBNDS 2008); and the 2011 Performance Based National
Detention Standards (PBNDS 2011), revised in 2016[4] largely to reflect civil rights
initiatives—sexual abuse prevention, disability and language access, and use of
solitary confinement, use-of-force reporting, and some others.[5] The standards
applicable to each detention facility are negotiated as part of ICE's contract with its
operator.

24.    DHS has several overlapping detention conditions oversight
processes. Some types of oversight happen routinely on a set schedule; others—
generally the more thorough inquiries—occur much more rarely, and based on
complaints, adverse incidents, or special initiatives.

25.    In general, those more rare and thorough inquiries demonstrate that
the routine oversight mechanisms are insufficient to detect non-compliance or
induce compliance with the applicable detention standards. There is abundant
evidence that the routine inspections and monitoring fail to reliably induce
compliance with ICE's detention standards; they do not reliably deter, detect, and
cure problems.

26.    The routine inspections—which may be conducted by contractors or
by ICE personnel—have frequently and persuasively been criticized as
insufficient. For example, the contracted inspections have been found to focus on

---

[1] The 2000 version is available at https://www.ice.gov/detention-standards/2000; the 2019
amended version was posted in December 2019, and is available at https://www.ice.gov/
detention-standards/2019.

[2] https://www.ice.gov/detention-standards/family-residential.

[3] https://www.ice.gov/detention-standards/2008.

[4] https://www.ice.gov/detention-standards/2011. The pre-revision versions are available at
https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

[5] See ICE, Summary of Revisions to the ICE Performance-Based National Detention Standards
(December 2016), https://www.ice.gov/detention-standards/2011#tab1.

written policies and procedures, rather than on actual practice. According to a DHS Inspector General report, contact inspectors do not take steps to "ensure the facility was actually implementing" those policies.[6] They do not include effective detainee interviews.[7]  And the reports of inspections did not reflect the observed results.[8] Evidence suggests that ICE's own inspectors focus somewhat more on practice, rather than merely announced policies.  But they too are demonstrably incomplete.[9]

27.     For both the contracted and non-contracted routine inspections, even when deficiencies are identified, the DHS IG has documented "ICE's failure to ensure that identified deficiencies are consistently corrected."[10] Some of this is a failure of ICE follow-through. Sometimes, detention facilities asked about deficient practices simply decline to fix them. More generally, ICE "does not appear to have a comprehensive process to verify whether facilities implemented all the corrective actions until the next Nakamoto [contracted] or ODO [non-contracted] inspection."[11] ICE simply does not have any system by which it (a) requires development of corrective action plans, or (b) monitors whether any such plan has been successfully implemented.[12] Unsurprisingly, even observed

---

[6] Office of Inspector Gen., U.S. Dep't of Homeland Sec., OIG-18-67: ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements, at 6-7 (June 26, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf [hereinafter OIG, June 2018 Report].

[7] *Id.* at 8.

[8] *Id.* at 9.

[9] I have read many of the non-contracted reports disclosed under the Freedom of Information Act. See https://www.ice.gov/foia/library, Office of Detention Oversight - Detention Facility Compliance Inspections (visited June 22, 2020). My conclusion that they are incomplete is based on a comparison between several of them and disclosed Detainee Death Reviews for the same facilities at close to the same time.

[10] OIG, June 2018 Report, *supra* note 6, at 11.

[11] *Id.* at 12.

[12] *Id.* at 4.

deficiencies go uncorrected.[13]

28.    The problems with ICE's detention inspection methodology, resourcing, and follow-up are longstanding. A June 2018 report on inspections by the DHS Inspector General pointed out:

> As some of our previous work indicates, ICE's difficulties with monitoring and enforcing compliance with detention standards stretch back many years and continue today. In 2006, the Office of Inspector General (OIG) identified issues related to ICE detention facility inspections and implementation of corrective actions. In our 2006 report, we recommended that ICE "improve the inspection process and ensure that all non-compliance deficiencies are identified and corrected." In a December 2017 report, which related to OIG's unannounced inspections of five detention facilities, we identified problems in some of the same areas noted in the 2006 report.[14]

29.    In 2016, a subcommittee of the Homeland Security Advisory Council (HSAC), an independent (but DHS-appointed) committee that advises the Secretary of Homeland Security, suggested that if DHS was going to continue using private contractors and local jails for immigration detention, it needed a "more robust, effective and coordinated inspection regime," including:

- Conducting "qualitative review of outcomes"
- Doing unannounced inspections
- Improving "recognition of, and follow-up on, problematic practices identified in earlier inspections"

---

[13] *Id.* at 13.

[14] *Id.* at 4-5, citing Office of Inspector Gen., Dept. of Homeland Sec., Treatment of Immigration Detainees Housed at Immigration and Customs Enforcement Facilities, OIG-07-01 (Dec. 22, 2006), https://www.oig.dhs.gov/assets/Mgmt/OIG_07-01_Dec06.pdf; Office of Inspector Gen., Dept. of Homeland Sec., Concerns About ICE Detainee Treatment and Care at Detention Facilities, OIG-18-32 at 7 (Dec. 11, 2017), https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf.

- Improving "the array of tools and procedures used to assure effective response to identified deficiencies, including monetary withholding or contract reductions, plus rigorous follow-on review by ERO and other personnel"

- Adding processes apart from inspections that would "connect[] more directly to timely remedy of deficiencies"[15]

30.     As far as I have been able to determine, very little has been done along the lines of the HSAC subcommittee report. DHS Inspector General John V. Kelly testified to a House Appropriations subcommittee in March 2019, "neither the inspections nor the onsite monitoring ensure consistent compliance with detention standards, nor do they promote comprehensive deficiency corrections."[16] Neither do the more thorough inquiries themselves induce such compliance; they demonstrate problems but not their correction. The oversight deficits that prompted the HSAC subcommittee's recommendations remain.

31.     ICE could, but does not, supplement its inspection regime with contract-based oversight.[17]

32.     ICE has non-inspection monitoring methods, as well: Its Enforcement and Removal Operations unit has several dozen onsite Detention Service Managers—ICE employees who have, since 2010, monitored compliance at selected facilities. In December 2017, 35 DSMs monitored compliance with ICE detention standards at 54 facilities.[18]

---

[15] Homeland Security Advisory Council, U.S. Dep't of Homeland Sec., Report of the Subcommittee on Privatized Immigration Detention Facilities, at 11-17 (Dec. 1, 2016), https://www.dhs.gov/sites/default/files/publications/DHS%20HSAC%20PIDF%20Final%20Report.pdf.

[16] Testimony of Acting Inspector General John V. Kelly (March 16, 2019),  https://www.oig.dhs.gov/sites/default/files/assets/TM/2019/oigtm-jvk-030619.pdf.

[17] Office of Inspector Gen., U.S. Dep't of Homeland Sec., OIG-19-18: ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards, at 7 (Jan. 29, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf

[18] OIG, June 2018 Report, supra note 6, at 3.

33.     DSMs spend time at the larger ICE facilities, and one of their roles is to routinely identify deficiencies and get them corrected. The June 2018 DHS OIG reports that "DSMs noted 6,216 and resolved 4,331 deficiencies in FY 2017." But even though it is their job to "provide technical guidance to the facilities on implementing corrective action plans," the IG report explains that DSMs do not solve the monitoring gap:

> Although ICE's inspections, follow-up processes, and DSMs'
> monitoring of facilities help correct some deficiencies, they do not
> ensure adequate oversight or systemic improvements in detention
> conditions; certain deficiencies remain unaddressed for years.[19]

34.     Among the reasons is that the DSMs "typically must rely on local ERO field office assistance because corrective actions are a field office responsibility."[20] This can lead to inaction:

> DSMs at a few facilities portrayed local ERO management as
> "disengaged" or "reluctantly responsive" in detention issues; they
> described the relationship between DSMs and ERO field
> management as "not very productive." One Custody Management
> supervisor said that some ERO field office managers are "hands off"
> and consider DSMs "a nuisance."[21]

35.     In sum, ICE oversight of detention facilities suffers from well-documented and longstanding flaws. Too often, ICE's monitoring consists of "check-the-box" type efforts that are not actually effective at detecting noncompliance with its standards or curing deficiencies once identified.

36.     From what I have been told about the ad-hoc COVID-19 oversight currently underway, these same problems apply to it, as ¶¶ 37-65 develop.

---

[19] *Id.* at 4.

[20] *Id.* at 14.

[21] *Id.* at 14-15.

13

## IV.   COVID-19 OVERSIGHT

**COVID-19 Facility Checklist and Other Oversight Documents**

37.   I have been provided with several types of COVID-19 oversight documents, filled out for all or nearly all the facilities that house ICE detainees. The most common is titled, "Detention Oversight Unit (DOU) COVID-19 Facility Checklist." It asks several dozen yes-or-no questions. (E.g., "Has the facility ensured adequate stock of Personal Protective Equipment (PPE) for staff usage (masks, N95 respirators, medical disposable gloves, eye protection, face shields, etc.)?").

38.   There are a few other questionnaires which have several dozen more open ended questions. For example:

- "Explain everything happening at the facility in regards to detainees and PPE, including such things as when/where detainees are mandated to wear it; when/where it is optional; what type of PPE they are wearing; how much PPE do they receive; how often; how is it cleaned or exchanged, etc."

- "Give examples of the many ways the facility has implemented social distancing for detainees in the facility, covering the various areas of the facility (such as housing units, common areas, EOIR, law library, recreation, chapel, cafeteria)."

39.   And there are other questionnaires that are more limited, and have many fewer questions, but still somewhat open ended. E.g., "If detainees are [receiving masks] how many does each detainee get and what types?"

40.   In this declaration, I chiefly address the Y/N checklist document, because that is what nearly all the facilities received and filled out.

**Checklists as an Oversight Method**

41.   Obviously self-reporting has flaws as an oversight method; facility staff or leadership can lie or make self-interested mistakes. Nonetheless, given the large number of facilities that ICE oversees, it is reasonable to begin oversight by

information gathering. A checklist can be a useful part of this kind of effort. A checklist can serve multiple goals:

    a.   Informing facility leadership about rules and objectives.

    b.   Eliciting information about whether the rules are being followed and/or the objectives are being met.

    c.   Elicit information to trigger or inform more detailed evaluation and follow-up.

42.    To perform any of these functions, a checklist needs to be clear, organized, and appropriately granular. In areas in which it is difficult to obtain sufficient information from a response, or in which there is some reason to fear misunderstanding, it should request supporting documentation.

43.    Even if a checklist-type monitoring instrument has these characteristics, it cannot be more than one small part of an oversight system. It must fit in a system that provides clear policy and sets clear expectations; that thoroughly evaluates whether the facility is complying with policy and meeting expectations, both proactively and responsive to signs of a problem; and that ensures corrective actions where needed.

44.    Overseers can inquire into inputs or outputs. For example, an inquiry into inputs might ask whether the facility has a particular number of medical staff per 1000 detainees; an inquiry into outputs might ask, instead, about waiting times for sick-call. Both types of inquiries can be very helpful, but ICE detention is so varied that output inquiries may be particularly important.

**ICE's Checklists and Its Flaws**

45.    In my opinion, the COVID-19 Checklist (the Checklist beginning at Bates number ICE000000211, attached as **Exhibit B**) I reviewed is an entirely inadequate instrument for ICE oversight of immigration detention.  It has several basic flaws, discussed in ¶¶ 46-65.

46.    To summarize, even if every single answer provided to the Checklist were completely forthcoming and reliable, it would not be a good instrument. The

document has so many flaws that it really reads like a first draft; I simply cannot see how it would be a functional oversight step for ICE. It does not educate facilities about what is needed, it does not elicit information about whether appropriate policy is being implemented, and it does not elicit information appropriate for follow-up. As described below, it omits some crucial topics completely, and others in part; it asks compound questions that mean that answers are unreliable; it seeks uninformative responses; it asks leading questions; it assumes knowledge that should be the very topic of oversight; it is often difficult to understand, and it asks about inputs with respect to topics that would be better served by inquiry into results.

*Omissions:*

47.    The Checklist does not ask anything about many of the topics of interest. For example, it does not cover the measures a particular facility has taken to protect medically vulnerable people, the circumstances when detained individuals should be tested for COVID-19, or the number of such tests that have been conducted.

48.    Even for questions that are included, there are odd omissions. For example, the checklist asks: "Are officers/staff wearing a mask and gloves during the classification?" But there is nothing special about classification to warrant it being singled out in this way. Why not the rest of admissions processing or other similar meetings with detainees?

*Compound questions:*

49.    The Checklist asks compound questions, encouraging "check-the-box" response rather than careful consideration of each component of the answer. For example, if ICE really wants to know whether there is sufficient Personal Protective Equipment (PPE) on hand for staff, rather than asking, "Has the facility ensured adequate stock of Personal Protective Equipment (PPE) for staff usage (masks, N95 respirators, medical disposable gloves , eye protection, face shields, etc.)?" it could ask something like, "For each type of PPE, please list how many

are used in a typical week by staff, how many week's worth the facility has on hand, and whether you have an adequate source for additional supplies if needed:

| Item | Used per week by staff | Weeks' worth on hand | Adequate source for more? |
|------|------------------------|----------------------|---------------------------|
| Masks | | | |
| N95 respirators | | | |
| Medical disposable gloves | | | |
| Eye protection | | | |
| Face shields | | | |
| Other (please list) | | | |

50.    A question like the suggested one about staff PPE would accomplish several goals:

      a.    It would educate the survey-taker about what kinds of PPE are required.

      b.    It would clearly elicit information about each type of PPE.

      c.    It would be detailed enough that someone answering in good faith would need to go find out the answer, not just guess or say "yes" without thought.

      d.    It would inform both the survey-taker and ICE of a problem—if there are too few of some item or another on hand, or if no adequate additional sources exist.

51.    Not every question would have to as complex as this. Sometimes, a simple Y/N can be sufficient—but a Y/N about something that is clear.  For example, the current question, "Are the sanitizing products available and placed at

strategic locations?" assumes that the facility knows what "strategic locations" means. Such assumptions undermine oversight. Instead, ICE should itself identify what it means by "strategic locations" and then ask about each such location. E.g,

        Are sanitizing products available for detainees in:

                Housing units (Y/N)

                Gym (Y/N)

                Etc. (including other)

        Are sanitizing products available for staff in:

                Break rooms (Y/N)

                Control rooms (Y/N)

                Supply rooms (Y/N)

                Etc.

52.    Other similarly flawed compound/imprecise questions include, for example, "Have social distancing strategies implemented during facility operations (e.g. interviewing, escorting, etc.)?"

*Eliciting uninformative responses.*

53.    Many of the survey questions do not really get at any information of interest; they ask something in the area, but fail to quite hit the item of interest. For example, the second question in the checklist is, "Has the facility reviewed existing pandemic emergency plans and made any adjustments due to COVID-19?"

54.    I infer that the point of this question is that facilities *should* have a pandemic emergency plan, and that such a plan has certain required features—so if the existing plan lacks those features, it should be amended. But the question does not say this. I cannot see why it matters whether there was an existing plan that got amended or a new one. An appropriately revised question might ask something more like:

        a.   Does the facility have a pandemic emergency plan?

        b.   What is the most recent revision date?

c.  Does the plan, as it currently exists, have the following features: (With key features listed, each on their own line with a Y/N.)

d.  Please provide a copy of the pandemic emergency plan.

Again, a question like this would educate facilities about what is needed, and also facilitate ICE follow-up.

55.     Similar problems exist for many of the other questions.  E.g., "Does the facility have a policy for protecting staff and detainees while transporting positive or suspected COVID-19 detainees?"; "Does the facility have a laundry room procedure for COVID-19 cases?"; "Has the Facility Administrator modified programs within the facility during the COVID-19 crisis i.e. food service, religious services, recreation, law library etc.?" "Is there a policy/procedure to sanitize/disinfect hold rooms that held detainees that are suspected of COVID-19?" "Does the facility have staff training plans?" For each, a more appropriate approach would not ask "Is there a policy?" or "Has the policy been changed?" but rather "What is the current policy, and does it have the necessary elements?"— sharing what those necessary elements are and asking about each separately. And where it is difficult to itemize what the elements should be, a request could be made for a copy of the plan/policy.

*Leading questions*

56.     Some questions in the Checklist invite Y answers where more care should be elicited. For example, instead of "Are cleaners and EPA-registered disinfectants used on surfaces effective against the virus that causes COVID-19 and are the label instructions being followed?" ICE would be more likely to get accurate information if it asked, "What cleaners and disinfectants are being used on surfaces? List brand or active ingredient and concentration." And separately, "How can you be confident that label instructions are being followed?" with room for response.

*Assuming knowledge*

57.     Some questions assume knowledge that good oversight would require

to be evaluated. For example, "Is ICE/ERO being informed of all issues related to COVID-19?" Instead, this question should say something like:

Is ICE/ERO being informed of the following COVID-19 issues:

| Issue | How ICE/ERO are informed | Timing of ICE/ERO notice |
|---|---|---|
| Positive COVID-19 test result for detainee | | |
| Positive COVID-19 test result for staff/contractor | | |
| Etc. | | |

58.     Similarly, the existing question, "Is a screening for COVID-19 symptoms and temperature check worked into the release planning?" assumes that the facility knows how release planning should incorporate these items. And "Is correspondence and other mail to include legal mail compliant with the applicable standard?" assumes that the facility knows what that standard is.

59.     A slightly different example of an existing question that assumes knowledge that a facility may well not have is, "Is signage outside visiting areas explaining the COVID-19 screening, temperature check, and hygiene process in place? Is it readable and understandable for non-English speakers and with low literacy?"  The first sentence is fine. The second part is not. By "readable and understandable for non-English speakers and with low literacy," does ICE intend to say that the information should be translated, or turned into pictures? If the latter, that may be quite difficult; if ICE really wants it to happen, it probably needs to offer support/expertise. If it wants to be confident of compliance, it should ask for a copy of the low-literacy version.

*Difficult to understand.*

60.     Some of the questions are simply difficult to figure out. For example, "Is medical urging the postponement of non-urgent outside medical visits?" Urging who? And why "urging," rather than simply postponing (if that's the preferred answer)? Or "Are there reporting requirements for suspected and positive COVID-19 cases?" Reporting to who? "In facilities where detainees are able to retain personal property are the items being sanitized accordingly?"   What does "accordingly" mean?

61.     Some questions are difficult to understand because they seem to be asking the same thing as other questions. E.g., "Are operational procedures in place for Quarantine Housing for symptomatic or confirmed COVID-19 detainees?" and "Are detainees exhibiting COVID-19 symptoms separated or isolated?"

*Asking about inputs when what matters is results.*

62.     In some questions, ICE asks about inputs it has no way to evaluate, and should, instead, ask about outputs. For example, rather than, "Has the medical unit increased its staffing to allow for Covid-19 procedures to occur while still addressing ordinary medical treatments throughout the day?" ICE might ask:

> With respect to medical care: for each of the following non-COVID medical needs, what is the current wait time, and has it increased?

- Routine physicals
- Chronic care clinics
- Non-urgent sick-call
- Urgent sick-call
- Urgent out-of-facility health care visits

**The Need for Follow-up**

63.     Even a perfect checklist instrument would only be a start of appropriate oversight; follow-up is needed. Follow-up would obviously need to

21

press when an unsatisfactory answer is provided. In addition, there are likely to be areas in which the best way to assess policy or practice is to ask for it to be documented, and then follow-up would evaluate that documentation.

64.     ICE has a very poor record with respect to follow-up like this. See ¶¶ 27-34, *supra*.

65.     In addition, follow-up would be far easier if responses were digitized; the fact that ICE used a paper process undermines its ability to follow up and to assess ICE detention systemwide.

## V.     CONCLUSION

66.     All my opinions contained herein are based upon my review of the pertinent records currently available to me and my training, education, and experience, and are offered to a reasonable degree of probability.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed on June 24, 2020 at Ann Arbor, Michigan.

Margo Schlanger
_____
Margo Schlanger

# EXHIBIT A

Exhibit A

# MARGO SCHLANGER

http://margoschlanger.net
mschlan@umich.edu
734-615-2618

## EMPLOYMENT

**Professor of Law, University of Michigan** (2009–present; on leave 2010 and 2011)(Wade H. and Dores M. McCree Collegiate Prof. of Law, 2017-present; Henry M. Butzel Professor of Law, 2014-2017; Professor of Law, 2009-2014; Visiting Professor of Law, Fall 2009). **Director**, Civil Rights Litigation Clearinghouse, http://clearinghouse.net. Faculty affiliate, UM Center for Forensic Psychiatry Fellowship in Forensic Psychiatry (May 2017-present).

**Litigating Expert**, Sabata v. Nebraska Dep't of Correctional Services, No. 4:17-cv-3107 (D. Neb.) (2018 to present) (disability and corrections); Fraihat v. U.S. Immigration and Customs Enforcement, No. 5:19-cv-01546 (C.D. Cal.) (2019 to present) (detention oversight); Novoa v. GEO Group, No. 5:17-cv-02514 (C.D Cal.) (2019 to present) (detention oversight).

**Settlement Monitor**, Adams & Knights v. Kentucky Department of Corrections, No. 3:14-cv-00001 (E.D. Ky.) (June 2015–present). Court-appointed monitor in settlement of state-wide case about deaf prisoners.

**Counsel to the Secretary**, U.S. Department of Homeland Security (Special Government Employee, part-time, 2012-2013). Advised Secretary of Homeland Security on civil rights matters.

**Officer for Civil Rights and Civil Liberties**, U.S. Department of Homeland Security (Presidential appointment, 2010 & 2011). (Chair, Privacy, Civil Rights, and Civil Liberties Subcommittee of the federal Information Sharing Environment's Information Sharing and Access Interagency Policy Committee; Chair, Interagency Coord. Council on Emergency Preparedness and Individuals with Disabilities; Member, U.S. Delegation, Universal Periodic Review.)

**Visiting Professor of Law**, University of California, Los Angeles (Spring 2009).

**Professor of Law**, Washington University in St. Louis (2004–2009); Director, Civil Rights Litigation Clearinghouse. Elected 2008 "David M. Becker Professor of the Year" by law students.

**Faculty Fellow**, Harvard University Center for Ethics and the Professions (2001/02).

**Assistant Professor of Law**, Harvard Law School (1998–2004).

**Senior Trial Attorney**, U.S. Dept. of Justice, Civil Rights Division, Special Litigation Section (1995–1998). Division Special Achievement Awards, 1996 and 1997.

**Law clerk,** Justice Ruth Bader Ginsburg; Supreme Court of the United States (1993–1995).

**Fact-checker,** *The New Yorker* (1989–1990).

## OTHER APPOINTMENTS

Class Counsel, Hamama v. Adducci (E.D. Mich. 2:17-cv-11910) (nationwide class action challenging mass deportation of Iraqi nationals)

Member, Michigan Advisory Committee to the U.S. Commission on Civil Rights (May 2017-present).

Member, Dep't Homeland Sec'y Residential Center Fed. Advisory Committee (Nov. 2015–Oct. 2016).

Reporter, American Bar Association task force on Standards relating to the Treatment of Prisoners (2007–Jan. 2010). See https://www.americanbar.org/groups/criminal_justice/publications/criminal _justice_section_archive/crimjust_standards_treatmentprisoners/.

Comm'r, Comm'n on Safety and Abuse in America's Prisons (2006–2008), http://www.prisoncommission.org.

**Exhibit A**

---

## EDUCATION

**Yale Law School**, J.D. 1993.
Book Reviews Editor, *Yale Law Journal* (Vol. 102); Vinson Prize for excellence in clinical casework.

**Yale College**, B.A. 1989.
Honors: *magna cum laude*, distinction in the History major, National Merit Scholar.

---

## COURSES TAUGHT

Torts; Prisons and the Law; Equal Protection; Constitutional Law. Seminars include Police and Surveillance Reform; Sexual Orientation, Gender Identity, and the Law; Civil Rights and Homeland Security; Empirical Inquiries into Civil Litigation; Institutional Reform Litigation.

---

## SCHOLARLY PUBLICATIONS, forthcoming and published (for links, see margoschlanger.net)

*Accommodating Disabilities*, in PUBLIC HEALTH BEHIND BARS—FROM PRISONS TO COMMUNITIES (forthcoming 2020).

INCARCERATION AND THE LAW: CASES AND MATERIALS (West Academic Publishing 2020) (with David Shapiro and Sheila Bedi); also associated website, http://incarcerationlaw.com.

*Maximalist vs. Incrementalist Reform Strategies: Solitary Confinement Case Studies*, 115 NORTHWESTERN L. REV. (forthcoming 2020).

*The Civil Rights Litigation Clearinghouse: Origins and Goals,* KULA: KNOWLEDGE CREATION, DISSEMINATION, AND PRESERVATION STUDIES (2018).

*The Constitutional Law of Incarceration, Reconfigured*, 103 CORNELL L. REV. 357 (2018).

*Prisoners with Disabilities*, in 4 REFORMING CRIMINAL JUSTICE: PUNISHMENT, INCARCERATION AND RELEASE (Erik Luna ed., 2017).

*Anti-Incarcerative Remedies for Illegal Conditions of Confinement*, 6 U. MIAMI RACE & SOCIAL JUSTICE L. REV. 1 (2016).

*How the ADA Regulates and Restricts Solitary Confinement for People with Mental Disabilities,* ACS Issue Brief (May 19, 2016).

*The Just-Barely-Sustainable California Prisoners' Rights Ecosystem*, 64 ANNALS OF THE AM. ACAD. POL. & SOC. SCI. 62 (2016).

*No Reason To Blame Liberals (Or, The Unbearable Lightness of Perversity Arguments*, THE NEW RAMBLER REVIEW (online, June 15, 2015) (reviewing NAOMI MURAKAWA, THE FIRST CIVIL RIGHT: HOW LIBERALS BUILT PRISON AMERICA).

*Against Solitary Confinement: Jonah's Redemption and Our Need for Mercy*, 16 RUTGERS J. LAW & RELIGION 345 (2015) (symposium: People of the Book).

*Stealth Advocacy Can (Sometimes) Change the World* (review of ALISON L. GASH, BELOW THE RADAR: HOW SILENCE CAN SAVE CIVIL RIGHTS (2015)), 113 U. MICH. L. REV. 897 (2015).

*Trends in Prisoner Litigation as the PLRA Enters Adulthood*, 5 U.C. IRVINE L. REV 153 (2015) (updated and reprinted as *Trends in Prisoner Litigation, as the PLRA Approaches 20*, 28 CORR. LAW REP. 69 (2017).

*Prisoners' Rights Lawyers' Strategies for Preserving the Role of the Courts*, 69 U. MIAMI L. REV. 519 (2015).

**Exhibit A**

*Intelligence Legalism and the National Security Agency's Civil Liberties Gap*, 6 HARV. NAT. SEC. L.J. 112 (2015).

*Offices of Goodness: Influence Without Authority within Federal Agencies*, 36 CARDOZO L. REV. 53 (2014).

*The Equal Employment Opportunity Commission and Structural Reform of the American Workplace* (with Pauline Kim), 91 WASH. U. L. REV. 1519 (2014).

*Prison Segregation: Symposium Introduction and Preliminary Data on Racial Disparities*, 18 MICH. J. RACE & LAW 241 (2013).

Plata v. Brown *and Realignment: Jails, Prisons, Courts, and Politics*, 48 HARV. CIV. RIGHTS-CIV. LIB. L. REV. 165 (2013).

*Women Behind the Wheel:  Gender and Transportation Law, 1860-1930*, in Tracy A. Thomas & Tracey Jean Boisseau, eds., FEMINIST LEGAL HISTORY: ESSAYS ON WOMEN AND LAW (2011).

*Regulating Segregation: The Contribution of the ABA Criminal Justice Standards on the Treatment of Prisoners*, 47 AM. CRIM. L. REV. 1421 (2010)

*Against Secret Regulation: Why and How We Should End the Practical Obscurity of Injunctions and Consent Decrees*, 59 DEPAUL L. REV. 515 (2010).

*How to Study District Judge Decision-Making*, 29 WASH. U. J. LAW & POL'Y 83 (2009) (with Pauline Kim, Christina Boyd, Andrew D. Martin).

*Preserving the Rule of Law in America's Prisons: The Case for Amending the Prison Litigation Reform Act*, 11 U. PENN. J. CONST. LAW 139 (2008) (with Giovanna Shay).

*Jail Strip-Search Cases: Patterns and Participants*, 71 LAW & CONTEMP. PROB. 65 (2008).

*Operationalizing Deterrence: Claims Management (in Hospitals, a Large Retailer, and Jails and Prisons)*, 2 JOURNAL OF TORT LAW (Aug. 2008).

*Hedonic Damages, Hedonic Adaptation, and Disability*, 60 VAND. L. REV. 745 (2007) (with Samuel Bagenstos).

*The Washington University Civil Rights Litigation Clearinghouse:  Using Court Records for Research, Teaching, and Policymaking*, 75 UMKC L. REV. 153 (2006) (Symposium: Federal Civil Court Records of the National Archives:  Opportunities for Empirical, Historical and Legal Research  and Curriculum Design) (with Denise Lieberman).

*What We Know and What We Should Know About American Trial Trends*, 2006 J. DISP. RES. 35 (2006) (Vanishing Trial Symposium).

*Civil Rights Injunctions Over Time: A Case Study of Jail and Prison Court Orders*, 81 N.Y.U. L. REV. 550 (2006).  Reprinted in 23 CIVIL RIGHTS LITIGATION AND ATTORNEY FEES ANNUAL HANDBOOK (Steven Saltzman, ed., 2007).

*Second Best Damage Action Deterrence*, 55 DEPAUL L. REV. 517 (2006) (Clifford Symposium on Tort Law and Social Policy).

*Determinants of Civil Rights Filings in Federal District Court by Jail and Prison Inmates*, 1 J. EMPIRICAL LEG. STUD. 79 (2004) (with Anne Piehl).

*The Reliability of the Administrative Office of the U.S. Courts Database: An Initial Empirical Analysis*, 78 NOTRE DAME L. REV. 1455 (2003) (with Theodore Eisenberg) (symposium issue)

**Exhibit A**

26

*Inmate Litigation*, 116 HARV. L. REV. 1555 (2003).

*Gender Matters: Teaching a Reasonable Woman Standard in Personal Injury Law*, 45 ST. LOUIS U. L.J. 769 (2001).

*Beyond the Hero Judge: Institutional Reform Litigation as Litigation*, 76 MICH. L. REV. 1994  (1999).

*Injured Women Before Common Law Courts, 1860–1930*, 21 HARV. WOMEN'S L.J. 79 (1998).

## NON-SCHOLARLY PUBLICATIONS

Commentary on *Lomax v. Ortiz-Marquez*, SCOTUSblog: *Opinion analysis: Strike out* (June 8, 2020); *Argument analysis: Does prejudice matter?* (Feb. 27, 2020); *Argument preview: Calling (PLRA) strikes* (Feb. 19, 2020), https://www.scotusblog.com/case-files/cases/lomax-v-ortiz-marquez/

*Let's Pause Iraqi Deportations*, THE HILL (July 24, 2019), https://thehill.com/opinion/immigration/454376-lets-pause-iraqi-deportations

*What You Need to Know About the Crisis at the Border*, SLATE (June 24, 2019) (with Dahlia Lithwick), https://slate.com/news-and-politics/2019/06/trump-border-crisis-how-to-help.html

*Where are the Jews*,  THE FORWARD (Sh'ma Now), Sept. 28, 2018, https://forward.com/shma-now/kavod-habriyot/410479/where-are-the-jews/

*Restoring Objectivity to the Constitutional Law of Incarceration*, ACS ISSUE BRIEF, Sept. 2018, https://www.acslaw.org/issue_brief/briefs-landing/restoring-objectivity-to-the-constitutional-law-of-incarceration/

*Podcast: RBG, Beyond Notorious*, CNN, Aug. 20, 2018 (A Higher Court: 1990s), https://itunes.apple.com/us/podcast/rbg-beyond-notorious/id1424366161?mt=2

*Clerking for Ginsburg: The Equality Lessons*, LAW360, Aug. 1, 2018, https://www.law360.com/aerospace/articles/1068210

*You've heard the calls to #AbolishICE. Here's what that could mean*, WASH. POST: MONKEY CAGE, July 9, 2018 (with Seth Grossman), https://www.washingtonpost.com/news/monkey-cage/wp/2018/07/09/youve-heard-the-calls-to-abolishice-heres-what-that-could-mean/?utm_term=.48e3c8a1fa4c

*Here's how you can help fight family separation at the border: Lawyers, translators, donations, protest*, SLATE, June 15, 2018 (with Dahlia Lithwick), https://slate.com/news-and-politics/2018/06/how-you-can-fight-family-separation-at-the-border.html

*Teachout: Civil Rights in the Trump Era*, University of Michigan, June 2018, https://www.youtube.com/playlist?list=PL5-TkQAfAZFYIA5QRJUMbAaQvVWLuEoee

*Why the Trump Administration is Treating Immigration Detainees Like Criminals (Q&A),* Mother Jones, June 8, 2018, https://www.motherjones.com/politics/2018/06/ice-detainees-federal-prison-interview/

*This is what's really happening to kids at the border*, WASH. POST: MONKEY CAGE, May 30, 2018 (with Michelle Brané), https://www.washingtonpost.com/news/monkey-cage/wp/2018/05/30/this-is-whats-really-happening-to-kids-at-the-border

*Could this be the end of plenary power?* SCOTUSBlog, July 14, 2017, http://www.scotusblog.com/2017/07/symposium-end-plenary-power/.

*Illegal Immigration and the Book of Ruth*, TABLET MAGAZINE, May 26, 2017, http://www.tabletmag.com/jewish-life-and-religion/235465/illegal-immigration-book-of-ruth.

Exhibit A

*Obama should finish what he started and end NSEERS*, The Hill, Dec. 6, 2016,
http://thehill.com/blogs/congress-blog/homeland-security/308955-obama-should-finish-what-he-started-and-end-nseers.

*Equality Matters in the National Security Context, Too*, American Constitution Society Blog, Sept. 14,
2016, Sept. 14, 2016, http://www.acslaw.org/acsblog/equality-matters-in-the-national-security-context-too.

*Where Scalia's Vote was Decisive*, Prospect.org, Feb. 15, 2016, http://prospect.org/article/where-scalia's-vote-was-decisive.

*Class-Action Suit Brings Sweeping Changes to Solitary Confinement in New York*, Prospect.org, Dec.
23, 2015 (with Amy Fettig), http://prospect.org/article/class-action-suit-brings-sweeping-changes-solitary-confinement-new-york.

*Solitary Reform Milestones*, Solitary Watch (with Amy Fettig), http://solitarywatch.com/milestones.

*Eight Principles for Reforming Solitary Confinement*, American Prospect, Fall 2015 (with Amy Fettig),
http://prospect.org/article/eight-principles-reforming-solitary-confinement-0.

*With one decision, Obama and Lynch could reshape the criminal justice system*, WashingtonPost.com,
Aug. 3, 2015 (with Robert Ferguson & Judith Resnik),
https://www.washingtonpost.com/posteverything/wp/2015/08/03/with-one-decision-obama-could-totally-reform-the-criminal-justice-system/.

*A Civil Rights Vision for Countering Violent Extremism*, The Hill (Congress Blog), July 14, 2015,
http://thehill.com/blogs/congress-blog/civil-rights/247769-a-civil-rights-vision-for-countering-violent-extremism.

*The Declining Prisoner Docket*, Alliance for Justice Blog, Feb. 25, 2015, http://www.afj.org/blog/the-declining-prison-litigation-docket.

*U.S. Intelligence Reforms Still Allow Plenty of Suspicionless Spying on Americans*, JustSecurity.org,
Feb. 13, 2015, http://justsecurity.org/20033/guest-post-intelligence-reforms-plenty-suspicionless-surveillance-americans/.

*When is it Ok to Racially Profile?* Politico Magazine, Dec. 18, 2014, http://justsecurity.org/20033/guest-post-intelligence-reforms-plenty-suspicionless-surveillance-americans/.

*Intelligence Legalism and the Torture Report*, JustSecurity.org, Dec. 17, 2014,
http://justsecurity.org/18510/intelligence-legalism-torture-report/.

Infiltrate the NSA, Democracy (Issue #35, Winter 2015); Dec. 15, 2014  and TheAtlantic.com, Dec.
30, 2014, http://www.democracyjournal.org/35/infiltrate-the-nsa.php.

*A Civil Rights Lawyer Explains Why Obama's Immigration Order is an Even Bigger Deal than it
Seems*, TheNewRepublic.com, Nov. 25, 2014, available at http://justsecurity.org/17117/cult-rules-origins-intelligence-legalism/.

*The Problem with Legalism in the Surveillance State*, JustSecurity.org, Nov. 7, 2014, available at
http://justsecurity.org/17163/problem-legalism-surveillance-state/.

*A Cult of Rules: The Origins of Legalism in the Surveillance State*, JustSecurity.org, Nov. 5, 2014,
available at http://justsecurity.org/17117/cult-rules-origins-intelligence-legalism/.

*Justice Alito Would Be Just Fine if Congress Undid Yesterday's Landmark Privacy Decision*,
TheNewRepublic.com, June 26, 2014, available at http://www.newrepublic.com/article/118403/justice-alito-privacy-reading-his-concurring-opinion-privacy.

**Exhibit A**

*The Bigger No Fly List Problem*, JustSecurity.org, June 25, 2014, available at http://justsecurity.org/12215/guest-post-no-fly-list-problem/.

*The Supreme Court Gives a Subtle Boost to Free Speech*, The New Republic, May 28, 2014, available at http://www.newrepublic.com/article/117925/wood-v-moss-subtle-victory-free-speech.

*Even Conservative Judges Can't Deny the Constitutional Logic of Same-Sex Marriage*, Daily Beast, May 18, 2014, available at http://www.thedailybeast.com/articles/2014/05/18/even-conservative-judges-can-t-deny-the-constitutional-logic-of-same-sex-marriage.html.

*In the Story of Jonah, an Urgent Lesson About the Dangers of Solitary Confinement,* TABLET MAGAZINE, Sept. 11, 2013, available at http://www.tabletmag.com/jewish-life-and-religion/143081/jonah-solitary-confinement.

*ABA Criminal Justice Standards on the Treatment of Prisoners*, CRIM. JUSTICE MAG., Summer 2010, at 14 (with Margaret Colgate Love & Carl Reynolds).

*Prison Litigation Reform Act Update*, in THE STATE OF CRIMINAL JUSTICE, 2007-2008 (American Bar Association, Criminal Justice Section, Apr. 2008).

*Professor Notes PLRA Flaws: Will Congress Act to Correct Them?*, CORRECTIONAL LAW REP., Feb./Mar. 2008, at 65 (reprints testimony before the House Judiciary Committee, Subcommittee on Crime, Terrorism, and Homeland Security: *Review of the Prison Litigation Reform Act: A Decade of Reform or an Increase in Prison Abuses* (Nov. 2007)).

*The Political Economy of Prison and Jail Litigation*, PRISON LEGAL NEWS, June 2007, at 1.

*Preserving the Rule of Law in America's Prisons: The Case for Amending the Prison Litigation Reform Act*, American Constitution Society Issue Brief, Mar. 28, 2007 (with Giovanna Shay).

*National Prison Commission Begins Work*, CORRECTIONAL LAW REP., June/July 2005, at 1, and PRISON LEGAL NEWS, July 2005, at 17.

*Inmate Litigation: Results of a National Survey*, NATIONAL INSTITUTE OF CORRECTIONS LARGE JAIL NETWORK EXCHANGE, July 2003, at 1.

## OTHER WORKS IN PROGRESS

Constitutional Rights at the Border; Unpublished Opinions in the District Courts

## GRANTS

National Science Foundation SES-0718831 (co-PI, with Pauline Kim and Andrew Martin), "The Litigation Process in Government-Initiated Employment Discrimination Suits" (2007), $213,999.

Harvard University William F. Milton Fund (with Anne Morrison Piehl), "Litigated Intervention in the Management of Correctional Facilities" (2002), $33,607.

## SERVICE AND MEMBERSHIPS

### Professional

Bar admissions: New York, District of Columbia (inactive), Missouri, Michigan; Supreme Court; 9th Cir.; 6th Cir.; Eastern District of Missouri.

Organizing committee member, Prisoners' Advocates COVID-19 Webinars (Spring/Summer 2020); Prisoners' Advocates Conference (Denver, Oct. 2018; Los Angeles, Sept. 2016; New Orleans, Feb. 2014). Chair, Prison Litigation: A Workshop for Plaintiffs' Attorneys (DC, Mar. 2008).

Exhibit A

Solitary confinement resources development project, with Vera Institute of Justice. See
https://www.safealternativestosegregation.org/promising-practices/.

Counsel for amici curiae former corrections officials, Prison Legal News v. Florida (11th Cir. 2015).

Member, expert advisory committee on data collection and confidential reporting, Prison Rape
Elimination Act Commission (2007).

Drafter, ABA Litigation Section Project, The Rule of Law in Times of Calamity (2006).

Counsel of record for amici curiae ACLU and other prison advocacy organizations, Woodford v. Ngo,
05-416 (U.S. Supreme Court, filed Feb. 2, 2006).

## General Academic
Member, Editorial Board, Journal of National Security Law & Policy (2015-present)
Co-editor (with Sharon Dolovich), SSRN abstracting "journal," Corrections & Sentencing Law &
     Policy (2006–2009, 2012-present).  See http://ssrn.com.
Chair, American Association of Law Schools, Remedies Section (2014)
Chair, American Association of Law Schools, Section on Law & the Social Sciences (2007/08).
Member, Law & Society Association Dissertation Prize Committee (2007).
Member, Law & Society Association.

## University of Michigan
Chair, Intellectual Community Committee (2019-present)
Convenor, Prison Law & Scholarship Roundtable (2019, 2017, 2014, 2012)
Convenor, Social Movements cross-university faculty interest group (2014-present), Prison and Reentry
     cross-university faculty interest group (2016-present)
Chair, Law School Tenure Committee (2016/17, 2013/14), Member (2015/16, 2012/2013)
Member, Provost's Faculty Advisory Committee (2015-2017)
Chair, Senate Advisory Committee on University Affairs, Committee on Civil Rights and Liberties
     (2014-16), Member (2013/2014)
Member, Law School Curriculum Committee (2014-2016)
Faculty Advisor, Journal of Race & Law symposia: "Innocent until Proven Poor" (2016); solitary
confinement (2013)

## Washington University in St. Louis
Member, Law School Promotions Committee (2007/08)
Advisory Board, Washington University Center for Empirical Research in the Law (2007/08)
Standing participant: Workshop on Empirical Research in Law (2004–2009)
Chair, Law School Lateral Appointments Committee (2006/07)
Chair, Law School Dean's Advisory Group on Improving Student Career Prospects (2005/06)
Chair, Law School Rules and Petitions Committee (2005/06)
Chair, Law School Ad Hoc Committee on Tenure Standards and Process (2004/5)
Member, University Committee on Senate By-Laws (2004/5)
Member, Law School Clerkship Committee (Fall 2004)

## PRESENTATIONS (2004–present)

*Maximalist vs. Incrementalist Reform Strategies: Solitary Confinement Case Studies,*
- Law & Society Association Annual Conference (May 2020)
- Northwestern Law School (Nov. 2019)

# Exhibit A

*Mapping the Iceberg: The Impact of Data Sources on the Study of District Courts*
- Law & Econ workshop, University of Michigan (April 2020)

Panelist/Discussant, 2019/20:
- COVID-19 Prisoners' Advocates Webinars (many, spring/summer 2020)
- *Discovery in Prison Cases*, and *Immigration Detention*, Practicing Law Institute, Prison Law 2019 (Nov. 2019)
- *Teaching Civil Rights*, Michigan Civil Rights Academy (Oct. 2019)

U. Mich. Student Organizations presentations, 2019/20:
- Careers in civil rights law (Mar. 2020)
- Criminal justice reform opportunities (Feb. 2020)
- Prison litigation in Mississippi (with Judge Carlton Reeve) (Feb. 2020)

U. Mich. Student Organizations presentations, 2018/19:
- Lawyers and mental health collaborations to improve prison conditions (Apr. 2019)
- Gender issues in law school classrooms (April 2019)
- Women and the legal profession (March 2019)
- Children and immigration enforcement (March 2019)
- Hamama v. Adducci (Feb. 2019, March 2019)
- Transgender advocacy in Japan and the U.S. (March 2019)
- The Dilley Project (Feb. 2019)
- Challenging incarceration related to fines and fees (Feb. 2019)
- Family detention (Feb. 2019)
- Korematsu and current immigration detention policies (Jan. 2019)
- Law reform and Jewish ethics (Oct. 2018)
- The Trump Administration's policy on transgender discrimination (Oct. 2018)
- The Kavanaugh hearings (Sept. 2018)
- What would it mean to "abolish ICE" (Sept. 2018)

Panelist/Discussant, 2018/19:
- *The Constitution at the Border*, Osher Lifelong Learning Institute (June 2019)
- *What Do Federal Agency Civil Rights Offices Need?* U.S. Commission on Civil Rights (Nov. 2018)
- *Mental Health and Corrections: Legal Issues*, Michigan Dep't of Health and Human Services Conference (June 2018)

U. Mich. Student Organizations presentations, 2018/19:
- Lawyers and mental health collaborations to improve prison conditions (Apr. 2019)
- Gender issues in law school classrooms (April 2019)
- Women and the legal profession (March 2019)
- Children and immigration enforcement (March 2019)
- Hamama v. Adducci (Feb. 2019, March 2019)
- Transgender advocacy in Japan and the U.S. (March 2019)
- The Dilley Project (Feb. 2019)
- Challenging incarceration related to fines and fees (Feb. 2019)
- Family detention (Feb. 2019)

**Exhibit A**

- Korematsu and current immigration detention policies (Jan. 2019)
- Law reform and Jewish ethics (Oct. 2018)
- The Trump Administration's policy on transgender discrimination (Oct. 2018)
- The Kavanaugh hearings (Sept. 2018)
- What would it mean to "abolish ICE" (Sept. 2018)

*Mental Health and Corrections: Legal Issues*
- Michigan Dep't of Health and Human Services Conference (June 2018)
- Midwest American Academy of Psychiatry and the Law (March 2018)

*Civil Rights in the Trump Era*, a "teachout" available via Youtube (May 2018)

*Gender Discrimination Law in the Age of #MeToo*, Michigan Society of Active Retirees (April 2018)

Panelist/Discussant, 2017/18:
- *Solitary Confinement and Prisoners with Disabilities*, John Jay Center for Media, Crime, and Justice (April 2018)
- *Multi-forum Litigation Challenging Iraqi Deportations*, Levin Center at Wayne State University Law School (Nov. 2017)
- Vanderbilt Criminal Law/Procedure Roundtable (Nov. 2017)
- *The Shrinking Plenary Power Doctrine*, Yale Law School Reunion Panel (Oct. 2017)

U. Mich. Student Organizations presentations, 2017/18:
- Federalist Society, Fighting Domestic Terrorism (March 2018)
- Reproductive Rights and Justice, NIFLA v. Becerra (abortion rights and speech) (March 2018)
- ACLU, Bail Reform (March 2018)
- Attica (Jan. 2018)
- Hamama v. Adducci (Jan. 2018)
- National Security Law Society, The Abdulmutallab Case (Nov. 2017)
- Federalist Society, Right on Crime (Can the Right and Left Agree?) (Oct. 2017)
- Reproductive Rights and Justice, Garza v. Hargan (abortion access for immigrant minors in federal custody) (Oct. 2017)
- Michigan Immigration & Labor Law Ass'n, DACA and the Law (Sept. 2017)

*Civil Rights at the Border: National Security, Border Screening, and the Muslim Ban*, Robert H. Jackson Center (June 2017)

*The Constitutional Law of Incarceration, Reconfigured*
- Prison Scholarship roundtable, University of Michigan (Mar. 2017)
- Vanderbilt Law faculty workshop (Jan. 2017)

*Teaching Civil Rights: The Constitution on the Ground*,
- James Madison Legacy Project, Michigan Center for Civic Education Professional Learning Conference (July 2017)
- Institute for Innovation in Education (June 2017)
- Oakland County, day-long workshop for high school teachers (Oct. 2016)

*Disabled Prisoners and Reform*, Conference presentation at Arizona State University, Bridging the Gap Between Scholars and Criminal Justice Reform (Feb. 2017)

# Exhibit A

*The Supreme Court and Prisoner Treatment Standards* & *Trends in Solitary Confinement Litigation and Policy*, Michigan Department of Health and Human Services (Feb. 2017)

U. Mich. Student Organizations presentations, 2016/17:
- Young Scholars Conference (Apr. 2017)
- American Constitution Society, Private Prisons (Mar. 2017)
- Women Law Students Ass'n, Women Who Lead: Cross-School Viewpoint (Feb. 2017)
- American Constitution Society, The President and the courts (Feb. 2017)
- Women's rights and the presidential election (Nov. 2016)
- U. Mich. Women Law Students Association, Incarcerated women (Oct. 2015)
- OUTLAWS, LGBT issues facing the next president (Sept. 2016)

Panelist/Discussant, 2016/17:
- Practicing Law Institute, Prison Litigation 2017: Practical Strategies (June 2017)
- Arizona State University, Bridging the Gap Between Scholars and Criminal Justice Reform (Feb. 2017)
- Police reform and Black Lives Matter (Oct. 2016)
- Security and privacy in an age of terrorism, UM cybersecurity conference (Oct. 2016)
- Prison Litigation Reform Act 101, Prisoners' Advocates conference (Sept. 2016)
- Decarceration and disability, Prisoners' Advocates conference (Sept. 2016)
- Landmark cases in prisoner civil rights, UM forensic psychiatry fellows seminar (Aug. 2016)

*A New Generation of Noncarcerative Remedies for Unconstitutional Conditions of Confinement*, University of Miami Race & Social Justice Law Review symposium (Mar. 2016)

*Detention of Immigrant Families*, invited lecture, Albion College (Mar. 2016)

U. Mich. Student Organizations presentations, 2015/16:
- Reforming Police Use of Force (Mar. 2016)
- The Prospects of Bail Reform (Mar. 2016)
- Black Law Students Association, Racial Disparities in Drug-Related Policing and Treatment (Feb. 2016)
- U. Mich. American Constitution Society, Is This When Mass Incarceration Ends (Nov. 2015)
- U. Mich. Women Law Students Association, Incarcerated Women (Oct. 2015)

Panelist/Discussant, 2015/16:
- Reimagining Prison, Vera Institute of Justice (June 2016)
- Recent Reforms in the Law of Solitary Confinement, ABA Webinar (May 2016)
- Bazelon Center workshop on decarcerating people with mental illness (Mar. 2016)
- ACLU workshop on solitary confinement litigation (Mar. 2016)
- Innocent until Proven Poor (Feb. 2016)
- 9th Circuit Corrections Summit, Grievances & Gripes: A Problem Solving Approach (Nov. 2015)
- U. Mich. Institute for Research on Women and Gender, Incarcerated Women: A Conversation about Realities (Oct. 2015)
- Society for Empirical Legal Studies annual conference. Discussant for Aziz Huq, The Predicates of Military Detention at Guantanamo; Chang, Chen & Lin, Attorney and Judge Experience in Torts Litigation: An Empirical Study (Oct. 2015)

**Exhibit A**

*Studying Injunctions Quantitatively*, Center for Political Studies, Interdisciplinary Workshop on Politics and Policy (Mar. 2015)

*Intelligence Legalism and the NSA's Civil Liberties Gap*
- Ass'n of Am. Law Schools, Annual Conference, Nat'l Security Section (chosen in call for papers) (Jan. 2015)
- University of Iowa Law School Faculty Workshop (Nov. 2014)
- University of Michigan Law School Legal Theory Workshop (Sept. 2014)
- 7th Annual National Security Law Workshop (May 2014)

*Offices of Goodness: Influence without Authority in Federal Agencies*
- Emory Law School (Mar. 2014)
- Cardozo Law School (Feb. 2014)
- Law & Society Ass'n (May 2013)

Panelist/Discussant (2014/15)
- Brennan Center: Strengthening Intelligence Oversight--Executive Branch Oversight (May 2015)
- Michigan Department of Education, Teaching the Movement in Michigan: Civil Rights Education Forum (May 2015)
- Clifford Symposium (DePaul Law): The Supreme Court, Business and Civil Justice--Civil Procedure (Apr. 2015)
- Columbia University, Deliberate Resistance: LGBT Prisoner Rights 20 Years After Farmer v. Brennan (Nov. 2014)
- 9th Circuit Court of Appeals Pro Se Conference--the Prison Rape Elimination Act (Sept. 2014)

*The Equal Employment Opportunity Commission and Structural Reform of the American Workplace*
- EEOC Datanet Conference (May 2014)
- Labor Law Research Network (June 2013)
- Stanford Law Faculty Workshop (Oct. 2009)
- Brooklyn Law School Faculty Workshop (Sept. 2009)
- Building Theory Through Empirical Legal Studies, Berkeley Ctr for Study of Law & Society (Apr. 2009)
- UCLA Law Faculty Workshop (Feb. 2009)
- University of Arizona Law Faculty Workshop (Feb. 2009)

*The Prison Litigation Reform Act and Litigation Dynamics*
- Loyola University New Orleans College of Law, Prisoners' Advocates Conference (Feb. 2014)

*The Present and Future of Institutional Reform Litigation: Current Trends in Prisoner Cases*
- U.C. Irvine Law School, Prisoners Access to Justice Symposium (Feb. 2014)
- University of Miami Law School, Leading from Below Symposium (Feb. 2014)

*Marriage Equality and the Constitution*, Alma College Constitution Day Speaker (Sept. 2013)

Plata v. Brown *and Realignment: Jails, Prisons, Courts, and Politics*,
- Law & Society Ass'n (May 2013) (as discussant in panel on *Plata v. Brown*)
- University of Illinois faculty workshop (Mar. 2013)

*Race and civil rights injunctions,* Ass'n of American Law Schools, Remedies Section (Jan. 2013)

**Exhibit A**

Chair/discussant, panel on Immigration, Law & Society Association Conference (June 2012)

*Operationalizing Deterrence: Claims Management (in Hospitals, a Large Retailer, and Jails and Prisons)*
- University of Michigan Law Faculty Workshop (Sept.  2008)
- Insurance & Society Seminar, Boston (May 2008)
- Southern Methodist University Law Faculty Workshop (Jan. 2008)
- Law & Society Ass'n, Berlin (July 2007)
- University of North Carolina Law Faculty Workshop (Nov. 2006)
- Law & Society Ass'n, Baltimore (July 2006)

*Seminar teaching*
- Ass'n of American Law Schools, Workshop for New Law Teachers (June 2008)
- Ass'n of American Law Schools, Workshop for New Law Teachers (June 2007)

*Hedonic Damages, Hedonic Adaptation, and Disability*
- University of Illinois Law School, Seminar on Law, Psychology & Economics (Apr. 2008)
- Washington University Law Faculty Workshop (Aug. 2006)

*Civil Rights Injunctions Over Time: A Case Study of Jail and Prison Court Orders*
- University Management Team, Washington University in St. Louis (Apr. 2008)
- Prison Litigation: A Workshop for Plaintiffs' Attorneys (Washington, D.C., Mar. 2008)
- Law and Society Ass'n (Las Vegas, NV, June 2005)
- Junior Scholars Empirical Legal Studies conference, Cornell Law School (Oct. 2004)

The Prison Litigation Reform Act
- *Preserving the Rule of Law in America's Prisons: The Case for Amending the PLRA,* Symposium, Penn. J. of Constitutional Law, Litigating the Eighth Amendment (Feb. 2008)
- Witness, National Prison Rape Elimination Comm'n, *The Role of Courts and Litigation in Regulating Prison and Jail Prevention of Sexual Violence and Misconduct* (Dec. 2007)
- Witness, House Judiciary Committee, Subcommittee on Crime, Terrorism, and Homeland Security, hearing:  *Review of the Prison Litigation Reform Act: A Decade of Reform or an Increase in Prison Abuses* (Nov. 2007)
- Congressional staff briefing, proposed amendments to the PLRA (Sept. 2007)
- *Preserving the Rule of Law in America's Prisons: The Case for Amending the PLRA* American Constitution Society issue brief presentation, Washington DC (Apr. 2007)
- *The Past and Future of the PLRA,* National Association of Attorneys General, Baltimore, MD (Feb. 2007)
- Witness, ABA Criminal Justice Section Council, on proposed ABA policy to amend the Prison Litigation Reform Act (Nov. 2006).

*The Civil Rights Litigation Clearinghouse:  Using Court Records for Research, Teaching, and Policymaking*
- Association of American Law Schools annual conference, Washington University Law breakfast (Jan. 2008)
- Presentation to social studies coordinators, Missouri Cooperating School Districts (Feb. 2007)
- Conference presentation ("Federal Civil Court Records of the National Archives: Opportunities for Empirical, Historical and Legal Research  and Curriculum Design"), University of Missouri at Kansas City & National Archives and Records Administration (Oct.

**Exhibit A**

2005)

Moderator/discussant, panel on Race, Empirical Legal Studies Conference (Nov. 2007).

*Fault and the Constitutional Law of Equality.* Invited response to David Strauss, Childress Lecture (Little Rock and the Legacy of *Brown*), Saint Louis University (Oct. 2007)

*Teaching the Equal Protection Clause.* Presentation to high school teachers, Street Law (Oct. 2007)

*The Plaintiffs' Bar and the Conceptualization of Litigation*
- Law & Society Ass'n, Berlin (July 2007)
- Washington University Law Faculty Workshop (May 2007)
- Conference presentation (The Plaintiff's Bar), New York Law School (Mar. 2006)

*The Litigation Process in Government-Initiated Employment Discrimination Suits* (hypotheses and preliminary evidence). Duke Law School Faculty Workshop (Apr. 2007)

Discussant, Katherine Barnes et al., *Life and Death Decisions: Prosecutorial Discretion and Capital Punishment in Missouri*, St. Louis U. conference (Mar. 2007).

Discussant, J.J. Prescott, *Empirical Evidence of Prosecutorial Charging Manipulation: And What it Tells Us About What Prosecutors are Trying to Do*, Empirical Legal Studies Conference, Austin Texas (Oct. 2006).

Moderator, panel on *Empirical Inquiries in Criminal Justice*, Law and Society Ass'n (July 2006).

*Women and the New Supreme Court*: University of Missouri–St. Louis, Sue Shear Institute for Women in Public Life (Jan. 2006).

Moderator, panel discussion of *Problems and Solutions in American Criminal Justice*, in conjunction with hearing held at Washington University in St. Louis by the Commission on Safety and Abuse in America's (Oct. 2005).

*What We Know and What We Could Know About the Vanishing Trial*: Featured Comment on Marc Galanter, "A World Without Trials," University of Missouri at Columbia, Distinguished Lecture on Alternative Dispute Resolution (Sept. 2005).

*Incarceration, Reform, and Politics*: presentation to undergraduate student groups (Apr. 2005).

*Second Best Damage Action Deterrence*
- University of Missouri at Columbia (Apr. 2005).
- Clifford Conference on Torts and Social Policy, DePaul University College of Law (Apr. 2005).
- UCLA faculty workshop (Mar. 2005)

*Collateral Consequences of Incarceration: Background on the Scope of the Carceral System*: Symposium on Poverty, Wealth & the Working Poor (Apr. 2005).

Respondent to James B. Jacobs, *The Future of Imprisonment: Leadership, and Prison Reform*, St. Louis University Ass'n of Criminal Justice and Sociology (Oct. 2004).

**Exhibit A**

# EXHIBIT B

Exhibit B

Bergen County

## ENVIRONMENTAL HEALTH AND SAFETY

➢ Has the facility ensured adequate stock of Personal Protective Equipment (PPE) for staff usage (masks, N95 respirators, medical disposable gloves, eye protection, face shields, etc.)?

⊠Yes                              ☐ No

➢ Has the facility reviewed existing pandemic emergency plans and made any adjustments due to COVID-19?

⊠ Yes                             ☐ No

➢ Is the facility adequately supplied with enough products (sanitizer, detergent cleaner, anti-microbial) to sufficiently maintain a sterile work environment for 30 days?

⊠ Yes                             ☐ No

➢ Are the sanitizing products available and placed at strategic locations?

⊠ Yes                             ☐ No

➢ Are cleaners and EPA-registered disinfectants used on surfaces effective against the virus that causes COVID-19 and are the label instructions being followed?

➢ How often?

| Multiple times daily |
|---|

➢ Is ICE/ERO being informed of all issues related to COVID-19?

⊠ Yes                             ☐ No

➢ Have signs been posted on COVID-19 related information and temporary changes in protocols in English?

⊠ Yes                             ☐ No

➢ Have signs been posted on COVID-19 related information and temporary changes in protocols in Any other languages?

⊠ Yes                             ☐ No

**Exhibit B**

ICE_00000211

➢ If a staff member has confirmed COVID-19 infection, does the facility plan to inform other facility staff of the positive test?

☒ Yes                   ☐ No

➢ Are telephones, chairs, chin up bars, tables, sinks, door handles, tablets, and any other type of surface being cleaned several times throughout the day and is thus being documented?

☒ Yes                   ☐ No

➢ Has information sharing with local authorities been implemented, i.e. public health department?

☒ Yes                   ☐ No

➢ Does the facility have a Contingency Plan for COVID-19?

☒ Yes                   ☐ No

➢ Does the facility have a laundry room procedure for COVID-19 cases?

☒ Yes                   ☐ No

## TRANSPORTATION BY LAND

➢ Does the facility have a policy for protecting staff and detainees while transporting positive or suspected COVID-19 detainees?

☒ Yes                   ☐ No

➢ Does the facility have a disinfecting and/or sanitizing protocols for transportation assets?

☒ Yes                   ☐ No

**Exhibit B**

ICE_00000212

## ADMISSION AND RELEASE

> Is there a policy/procedure in place for identifying detainees that are exposed or infected by COVID-19?

        ☒ Yes                 ☐ No

> In facilities where detainees are able to retain personal property are the items being sanitized accordingly.

        ☐ Yes                 ☒ No

> Are detainees being educated and provided video or handout for additional knowledge regarding COVID-19?

        ☒ Yes                 ☐ No

> Are new intakes being separated at booking until Covid-19 can be diagnosed on each detainee?

        ☒ Yes                 ☐ No

> Are intake officers/staff wearing PPEs during admission and release?

        ☒ Yes                 ☐ No

> Is a screening for COVID-19 symptoms and temperature check worked into the release planning?

        ☐ Yes                 ☒ No

## CUSTODY CLASSIFICATION SYSTEM

> Are officers/staff wearing a mask and gloves during the classification?

        ☒ Yes                 ☐ No

**Exhibit B**

ICE_00000213

➢  Are the detainees wearing a mask during the classification?

☒ Yes                               ☐ No

**Exhibit B**

## FACILITY SECURITY AND CONTROL

➢ Has the Facility Administrator modified programs within the facility during the COVID-19 crisis i.e.
food service, religious services, recreation, law library etc.?

☒ Yes                    ☐ No

➢ Is there a screening procedure in the lobby for all people (contract, ICE, medical, EOIR, OPLA)
entering the facility?

☒ Yes                    ☐ No

➢ Is there a procedure should a temperature reveal 100.4 degrees for staff?

☒ Yes                    ☐ No

For Detainees?

☒ Yes                    ☐ No

➢ Is the social distancing guideline (6 feet apart) enforced in the lobby?

☒ Yes                    ☐ No

➢ Are detainees exhibiting COVID-19 symptoms separated or isolated?

☒ Yes                    ☐ No

➢ Are there advisories posted throughout the facility regarding COVID-19?

☒ Yes                    ☐ No

➢ Have alternate work arrangements deemed feasible in Operational Preparedness been implemented?

☒ Yes                    ☐ No

➢ Is signage outside visiting areas explaining the COVID-19 screening, temperature check, and
hygiene process in place? Is it readable and understandable for non-English speakers and with low
literacy?

☒ Yes                    ☐ No

**Exhibit B**

ICE_00000215

➤ Does the facility have staff training plans?

        ☒ Yes                 ☐ No

➤ Have social distancing strategies implemented during facility operations (e.g. interviewing, escorting, etc.)?

        ☒ Yes                 ☐ No

➤ Are staff and incarcerated/detained persons trained to correctly don, doff, and dispose of PPE?

        ☒ Yes                 ☐ No

## FUNDS AND PERSONAL PROPERTY

➤ Is there a policy/procedure in place to disinfect/sanitize detainees funds and personal property?

        ☐ Yes                 ☒ No

## HOLD ROOMS IN DETENTION FACILITIES

➤ Is there a policy/procedure to sanitize/disinfect hold rooms that held detainees that are suspected of COVID-19?

        ☒ Yes                 ☐ No

**Exhibit B**

## POST ORDERS

➢ Are staff being monitored and checked for COVID-19 prior to entering the facility and assuming any post?

☒ Yes                    ☐ No

## STAFF-DETAINEE COMMUNICATION

➢ To limit contact with detainees during the pandemic, is there a process for Staff Detainee Communication for both ICE and Facility Staff?

☒ Yes                    ☐ No

## FOOD SERVICE

➢ Are quarantined detainees fed meal separately from the general population?

☒ Yes                    ☐ No

➢ Is there a policy/procedure in place to ensure food is not exposed to or infected by COVID-19?

☒ Yes                    ☐ No

**Exhibit B**

ICE_00000217

## MEDICAL CARE

➢ Is there a medical procedure in place to handle COVID-19 infected/exposed detainees?

      ☒ Yes            ☐ No

➢ Is there a procedure for processing new admissions in light of the COVID-19 pandemic?

      ☒ Yes            ☐ No

➢ Has the medical unit increased its staffing to allow for Covid-19 procedures to occur while still addressing ordinary medical treatments throughout the day?

      ☐ Yes            ☒ No

➢ Are operational procedures in place for Quarantine Housing for symptomatic or confirmed COVID-19 detainees?

      ☒ Yes            ☐ No

➢ Are multiple Quarantine Housing units available if necessary?

      ☒ Yes            ☐ No

➢ Is medical staff using tracking tools to monitor cohorted, symptomatic and confirmed COVID-19 detainees?

      ☒ Yes            ☐ No

➢ Are detainee releases that are symptomatic or confirmed COVID-19 coordinated with state & local health authorities prior to release?

      ☒ Yes            ☐ No

➢ Is medical urging the postponement of non-urgent outside medical visits?

      ☒ Yes            ☐ No

➢ Are daily dorm visits being conducted and promoting access to care through sick call and urgent care services?

9

**Exhibit B**

           ICE_00000218

☒ Yes            ☐ No

➢ Are there reporting requirements for suspected and positive COVID-19 cases?

☒ Yes            ☐ No

➢ Are masks changed at least daily, when visibly soiled or wet?

☒ Yes            ☐ No

➢ Are there isolation procedures in place (individual in their own housing unit with a dedicated bathroom, etc.)?

☒ Yes            ☐ No

## PERSONAL HYGIENE

➢ Does the facility have a policy/procedure for reminding detainees of proper hygiene?

☒ Yes            ☐ No

## CORRESPONDENCE AND OTHER MAIL

➢ Is there a process of disinfecting/sanitizing incoming mail?

☐ Yes            ☒ No

➢ Is correspondence and other mail to include legal mail compliant with the applicable standard?

☒ Yes            ☐ No

10

**Exhibit B**

ICE_00000219

## RECREATION

➢ Is there a policy/procedure to temporarily accommodate recreation in the facility?

☒ Yes                    ☐ No

## RELIGIOUS PRACTICES

➢ If there is a policy/procedure to accommodate religious practices, is social distancing being observed and PPEs worn as applicable?

☒ Yes                    ☐ No

## TELEPHONE ACCESS

➢ Are telephones sanitized regularly and appropriately after use?

☒ Yes                    ☐ No

➢ Does the facility ensure that all detainees are able to make calls to the ICE-provided list of free legal service providers and consulates at no charge to the detainee or the receiving party, and that indigent detainees may request a call to immediate family or others in personal or family emergencies or on an as-needed basis to maintain community ties?

11

**Exhibit B**

☒ Yes                              ☐ No

## VISITATION

➢ Has social visitation been canceled?

☒ Yes                              ☐ No

➢ What types of visitation is being offered?  Video, skype, face time etc.?

➢ Does the facility offer legal visitation during the pandemic?

☒ Yes                              ☐ No

➢ Do attorneys use PPE when entering the facility?

☐ Yes                              ☐ No

➢ Does the facility offer contact visitation during the pandemic?

☐ Yes                              ☒ No

➢ If so, are visitors instructed to postpone visits if they have symptoms of respiratory illness?

☒ Yes                              ☐ No

➢ Does the facility offer non-contact visitation during the pandemic?

☒ Yes                              ☐ No

12

**Exhibit B**

ICE_00000221

## VOLUNTARY WORK PROGRAM

➤ Does the facility offer voluntary work program during the pandemic?

    ☐ Yes             ☒ No

## LEGAL RIGHTS GROUP PRESENTATIONS

➤ Is Legal Orientation Program (LOP) available during the pandemic?

    ☒ Yes             ☐ No

➤ Are volunteers still being allowed in the facility during the pandemic?

    ☐ Yes             ☒ No

## DETAINEE TRANSFERS

➤ Is there a notification process for detainees who are exposed or infected of COVID-19 before and after transfer during the pandemic?

    ☒ Yes             ☐ No

➤ Have all transfers of incarcerated/detained persons been suspended from other jurisdictions and facilities, unless necessary for medical evaluation, isolation/quarantine, care, extenuating security concerns, or to prevent overcrowding?

    ☒ Yes             ☐ No

13

**Exhibit B**

ICE_00000222

Under 18 USC Section 1001, it is a felony to make a false statement to an agency of the federal government. I, the respondent, understand and certify that based on information and belief formed after reasonable inquiry, the statements and information contained in this submittal are true, accurate, and complete.

4/21/20

| Printed Name | Signature | Date |

14

**Exhibit B**