Timothy P. Fox (CA Bar 157750)
*tfox@creeclaw.org*
Elizabeth Jordan*
*ejordan@creeclaw.org*
CIVIL RIGHTS EDUCATION AND ENFORCEMENT CENTER
1245 E. Colfax Avenue, Suite 400
Denver, CO 80218
Tel: (303) 757-7901
Fax: (303) 872-9072

Lisa Graybill*
*lisa.graybill@splcenter.org*
Jared Davidson*
*jared.davidson@splcenter.org*
SOUTHERN POVERTY LAW CENTER
201 St. Charles Avenue, Suite 2000
New Orleans, Louisiana 70170
Tel: (504) 486-8982
Fax: (504) 486-8947

Stuart Seaborn (CA Bar 198590)
*sseaborn@dralegal.org*
Melissa Riess (CA Bar 295959)
*mriess@dralegal.org*
DISABILITY RIGHTS ADVOCATES
2001 Center Street, 4th Floor
Berkeley, California 94704
Tel: (510) 665-8644
Fax: (510) 665-8511

Attorneys for Plaintiffs (continued on next page)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION – RIVERSIDE**

FAOUR ABDALLAH FRAIHAT, *et al.*,

Plaintiffs,

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*,

Defendants.

Case No.: 19-cv-01546-JGB(SHKx)

**Plaintiffs' Reply Brief in Support of Motion to Enforce the April 20, 2020 Preliminary Injunction Order**

Hearing Date: July 13, 2020
Time: 2:00 pm
Hon. Jesus G. Bernal

William F. Alderman (CA Bar 47381)
*walderman@orrick.com*
Jake Routhier (CA Bar 324452)
*jrouthier@orrick.com*
ORRICK, HERRINGTON &
SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
Tel: (415) 773-5700
Fax: (415) 773-5759

Michael W. Johnson*
*mjohnson1@willkie.com*
Dania Bardavid*
*dbardavid@willkie.com*
Jessica Blanton*
*jblanton@willkie.com*
Joseph Bretschneider**
*jbretschneider@willkie.com*
WILLKIE FARR &
GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Tel: (212) 728-8000
Fax: (212) 728-8111

Maia Fleischman*
*maia.fleischman@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
2 South Biscayne Boulevard
Suite 3750
Miami, FL 33131
Tel: (786) 347-2056
Fax: (786) 237-2949

Christina Brandt-Young*
*cbrandt-young@dralegal.org*
DISABILITY RIGHTS
ADVOCATES
655 Third Avenue, 14th Floor
New York, NY 10017
Tel: (212) 644-8644
Fax: (212) 644-8636

Mark Mermelstein (CA Bar 208005)
*mmermelstein@orrick.com*
ORRICK, HERRINGTON &
SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA 90017
Tel: (213) 629-2020
Fax: (213) 612-2499

Leigh Coutoumanos*
*lcoutoumanos@willkie.com*
Timothy Ryan**
tryan@willkie.com
WILLKIE FARR &
GALLAGHER LLP
1875 K Street NW, Suite 100
Washington, DC 20006
Tel: (202) 303-1000
Fax: (202) 303-2000

Shalini Goel Agarwal
(CA Bar 254540)
*shalini.agarwal@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
106 East College Avenue
Suite 1010
Tallahassee, FL 32301
Tel: (850) 521-3024
Fax: (850) 521-3001

Maria del Pilar Gonzalez Morales
(CA Bar 308550)
*pgonzalez@creeclaw.org*
CIVIL RIGHTS EDUCATION
AND ENFORCEMENT CENTER
1825 N. Vermont Avenue, #27916
Los Angeles, CA 90027
Tel: (805) 813-8896
Fax: (303) 872-9072

Veronica Salama*
Veronica.salama@splcenter.org
SOUTHERN POVERTY LAW
CENTER
P.O. Box 1287 Decatur, GA, 30031
Tel: (404) 221-5825
Fax: (404) 221-5857

Attorneys for Plaintiffs (continued from previous page)
*Admitted Pro Hac Vice
**Pro Hac Vice Application Forthcoming

## Table of Contents


I. Introduction ..... 1

II. Defendants' Declarations Establish Noncompliance ..... 1

III. The Court Has Jurisdiction to Enforce Compliance ..... 3

IV. Defendants Have Not Rebutted the Need to Revise the PRR ..... 5

- A. Defendants Have Not Rebutted the Need for Expanded Testing ..... 5
- B. An Adequately Revised PRR Would Limit Transfers ..... 6
- C. Defendants Do Not Refute Their Dangerous Segregation Practices ..... 6
- D. An Adequate PRR Would Address Harmful Disinfectants ..... 7
- E. Defendants Do Not Refute the Need for Other Precautions ..... 8

V. Defendants' Brief Confirms Inadequate Monitoring of the PRR ..... 8

VI. Defendants Fail to Refute Facts Demonstrating Their Failure to Adequately Implement Court-Ordered Custody Redeterminations ..... 9

VII. Appointment of a Special Master Is Necessary ..... 12

VIII. Conclusion ..... 12

# Table of Authorities

Case Page(s)

*A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091 (9th Cir. 2002) ....4

*Armstrong v. Brown*, 732 F.3d 955 (9th Cir. 2013) ....4

*Hoffman v. Beer Drivers & Salesmen's Local Union No. 888*, 536 F.2d 1268 (9th Cir. 1976); ....4

*Hoptowit v. Ray*, 682 F.2d 1237 (9th Cir. 1982) ....12

*Meinhold v. U.S. Dep't of Def.*, 34 F.3d 1469 (9th Cir. 1994) ....4

*Nat'l Org. for the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536 (9th Cir. 1987) ....12

*Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163 (9th Cir. 2001) ....4, 11

*Roman v. Wolf*, No. EDCV2000768TJHPVCX, 2020 WL 3481564 (C.D. Cal. June 17, 2020) ....4

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546 (5th Cir. 1996) ....4

*State v. Trump*, 263 F. Supp. 3d 1049 (D. Haw. 2017) ....4

## I. Introduction

Unable to rebut Plaintiffs' evidence of noncompliance, Defendants instead resort to erecting a straw man. Both their legal positions and their factual assertions address a motion to hold them in contempt for their violation of the PI Order. But no such motion has been made. Plaintiffs seek an order compelling Defendants to comply with the PI Order rather than punishing them for having failed to do so.[1] Nor have Defendants shown compliance in any case. They do not seriously contest the crucial need for the enforcement measures requested by Plaintiffs, instead attempting to convince the Court that the PI Order requires lip service rather than meaningful compliance. Not only have they failed to rebut Plaintiffs' evidence regarding custody redeterminations, testing, transfer, segregation, disinfectants, and other precautionary measures, their own declarations in fact strengthen the reasons why Plaintiffs' motion should be granted.

## II. Defendants' Declarations Establish Noncompliance

Defendants urge the Court to credit Defendants' declarations rather than Plaintiffs'. Opp. at 5-6.[2] But their proposed comparison of the parties' respective evidence only digs them a deeper hole. Their declarations routinely mislead the Court or undermine their arguments altogether.

For example, Defendant Tae Johnson falsely claims that ICE has tested "nearly 46% of the ICE detained population" (ECF 204-2 ¶ 21). He derives that figure by comparing the total number of tests since testing began (~10,500) with only the *current* population in detention (~23,000). But since March 1, ICE has

---

[1] Thus, while Plaintiffs have shown by "clear and convincing evidence" that Defendants are non-compliant with the PI Order, that evidentiary standard is inapposite here because Plaintiffs seek only enforcement of the PI Order—not a finding of civil contempt.

[2] Defendants' argument that Plaintiffs' evidence is inadmissible hearsay is also meritless. The Court has already rejected Defendants' argument, ECF 132 at 5 n.4, and, in any event, they have failed to comply with the Standing Order's requirements for evidentiary objections. Standing Order at 9-10; Opp. at 5.

removed over 41,000 people from detention and has released another 18,000 (*id.* ¶¶ 11, 13). Thus, at least 82,000 people have been in detention since March 1, and ICE has tested fewer than 13% of them.[3]

Defendants' declarations contradict their claim that transfers are perfectly acceptable under the PI Order (Opp. at 21). For example, Juan Acosta notes that the El Paso Processing Center is the central intake locale for people entering facilities managed by that field office (ECF 204-14 ¶ 9), such that everyone now at Otero and Torrance has been transferred from EPC. There are currently 133 cases at EPC, 142 at Otero, and 55 at Torrance (Alderman Decl. Ex. D).

A number of Defendants' declarations point out that IHSC provides health care at 20 facilities managed by ICE (*e.g.*, ECF 204-3 ¶ 17). But Defendants' 21 declarations relating to particular facilities address conditions exclusively at facilities run by contractors rather than by ICE/IHSC. They also betray the fact that ICE is hiding the ball when it reports cases among ICE staff at facilities—45 as of June 18 in its most recent reports (Alderman Decl. Ex. E)—but ignores the larger number of cases among contractor staff at the vast majority of facilities. For example, at Hudson County, 103 staff members have tested positive and five have died (ECF 204-13 ¶¶ 20-21). At Essex County, 98 correctional and civilian staff have tested positive (ECF 204-12 ¶ 44). At Bergen County, 32 cases among staff have occurred (ECF 204-5 ¶ 9(p)(4)). The 233 staff cases at just these three contract facilities dwarf the 45 cases among ICE personnel.

Despite Defendants' cherry-picking of facilities, the actual numbers of cases even at those facilities starkly belie Defendants' claims of compliance with the PI

[3] As another example, the declaration of Liana Castano likewise seeks to mislead, claiming that as of June 14 there were no people under cohort at Glades (ECF 204-20 ¶ 9), but hiding the fact that there were 62 positive cases at that time and 111 at the time the declaration was signed on July 1; and claiming that 10 of the previously-cohorted people at Krome tested positive (*id.* ¶ 11), but hiding the fact that there were 37 positive cases when the declaration was signed (Alderman Decl. Ex. C).

Order. Since June 1, the number of cases has risen from 2 to 106 at Farmville (Jackson, ECF 204-8); from 44 to 133 at El Paso (Acosta, ECF 204-14); from 2 to 114 at Glades (Castano, ECF 204-20); and from 51 to 108 at Catahoula (Rodriguez, ECF 204-21) (Alderman Decl. Ex. A, D). Cases more than doubled at Irwin (Musante, ECF 204-7), Aurora (Davies, ECF 204-10), Folkston (Sterling, ECF 204-11), Stewart (*id.*), Torrance (Acosta, ECF 204-14), Etowah (Pitman, ECF 204-18) and Krome (Castano, ECF 204-20), consistent with the collective jump in overall cases from 1461 to 3090. *Id.*[4]

## III. The Court Has Jurisdiction to Enforce Compliance

Defendants incorrectly contend that the pending appeal divests this Court of jurisdiction. Opp. at 16-17. They frame Plaintiffs' requests as seeking modification rather than enforcement but rely on the false premise that the PI Order did not require meaningful compliance. For example, Defendants characterize Plaintiffs' requested revisions to the PRR as "new." But the unrebutted expert evidence shows that all of Plaintiffs' requests should have been included in a revised PRR to ensure that subclass members are adequately protected. Rather than contesting the merits of these measures, Defendants contend that the PI Order did not require them to ensure their revisions to the PRR were adequate. This Court has rejected such a cavalier attitude to the PI Order and should reject it again. ECF 150 at 6.

Nor would Plaintiffs' requests alter the status quo. The PI Order already

---

[4] Moreover, those declarants who are acting or assistant field office directors have failed to stem the rise in cases at facilities they oversee. Since June 1, the cases have grown 49% in the facilities overseen by the New Orleans field office (Chamberlain, ECF 204-3 and 204-24); 116% at El Paso facilities (Acosta, ECF 204-14); 160% at Atlanta facilities (Musante, ECF 204-7); 416% at Miami facilities (Lopez Vega, ECF 204-23); and 2080% at Washington, D.C. facilities (Jackson, ECF 204-8). Notably absent from Defendants' roster of declarants is anyone attempting to reconcile ICE's supposed compliance with the PI Order and the explosion in cases since June 1 at numerous other facilities, *e.g.* from 132 to 286 at Bluebonnet; from 1 to 250 at Eloy; from 22 to 202 at Montgomery; from 92 to 142 at Otero; and from 3 to 84 at Port Isabel (Alderman Decl. Ex. A, C, D).

requires that Defendants conduct meaningful custody redeterminations, adequately revise the PRR to protect subclass members, and conduct meaningful oversight, and Plaintiffs merely seek enforcement of those requirements. And even if any specific requests constituted modifications, they would not alter the status quo or impact the questions on appeal because they are "minor adjustments that effectuate[] the underlying purposes of the original [PI]." *Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163, 1167 (9th Cir. 2001) (approving of minor modifications that made more concrete the original PI's requirements, like substituting an 18-month deadline for the original requirement of "reasonably expeditious" action). Moreover, because the PI Order itself expressly contemplated modification, ECF 132 at 39, "part of the 'status quo' of this action is that the court's injunction has ongoing effect, and that effect [is] subject to change depending upon subsequent developments." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 578 (5th Cir. 1996).

Regardless of whether Plaintiffs' requests are framed as enforcement, clarification, or modification[5] of the PI Order, this Court retains jurisdiction. A district court retains jurisdiction to issue enforcement orders that "protect plaintiffs' rights in direct response to defendants' . . . non-compliance" with an earlier injunction pending an appeal. *Armstrong v. Brown*, 732 F.3d 955, 959 n.6 (9th Cir. 2013). That is true even where a district court amends a preliminary injunction in a way that "broaden[s] the scope of injunctive relief," beyond the order on appeal, "to clarify its original injunction and to supervise compliance." *Meinhold v. U.S. Dep't of Def.*, 34 F.3d 1469, 1480 n.14 (9th Cir. 1994).[6]

---

[5] Defendants wrongly contend that Plaintiffs have waived any request for modification, ECF 204 at 16, but Plaintiffs' moving brief specifically addresses modification in the alternative to enforcement. ECF 172-1 at 4.

[6] *See also e.g.*, *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1099 (9th Cir. 2002); *Sw. Marine Inc.*, 242 F.3d at 1166; *Hoffman v. Beer Drivers & Salesmen's Local Union No. 888*, 536 F.2d 1268, 1276 (9th Cir. 1976); *Roman v. Wolf*, No. EDCV2000768TJHPVCX, 2020 WL 3481564, at *1 (C.D. Cal. June 17, 2020); *State v. Trump*, 263 F. Supp. 3d 1049, 1056 (D. Haw. 2017).

## IV. Defendants Have Not Rebutted the Need to Revise the PRR

Defendants do not rebut Plaintiffs' significant expert evidence demonstrating that an adequately revised PRR would include the measures outlined in Plaintiffs' motion. Instead, Defendants contend that Plaintiffs' requests are "new requests." Defendants ignore not only the crucial need for additional precautions but also this Court's command that Defendants revise the PRR to create "safe" detention conditions to protect subclass members and "reduce their risk of COVID-19 infection." ECF 132 at 37-38.

### A. Defendants Have Not Rebutted the Need for Expanded Testing

Defendants proffer no evidence to refute Plaintiffs' experts' conclusions that expanded testing is crucial for protecting the subclass. Nor could they. Instead, Defendants' declarations evince how they continue to slow-walk expanding testing while fully aware of the need for more testing. Indeed, Defendants have launched limited "pilot efforts" at a handful of facilities to expand testing, but they fail to reasonably justify why these efforts are restricted to so few facilities. Opp. at 21. Likewise, Defendants state that the 20 IHSC facilities are now testing people at intake. Opp. at 20. But they ignore the fact that the vast majority of facilities are not run by IHSC, and they fail to justify why testing at intake is not mandated at non-IHSC facilities. Defendants' failure to expand testing ignores the rapidly increasing rate of infection, the ease of transmission among even asymptomatic individuals, the documented harm that Defendants' limited testing has caused,[7] the imminence of a "second wave" of infections,[8] and the CDC's updated guidelines for Correctional Facilities—which urges a broader testing strategy, including re-testing of detained individuals every 3 to 7 days.[9]

---

[7] *See, e.g.*, Emily Kassie and Barbara Marcolini, How ICE Exported the Coronavirus, THE MARSHALL PROJECT (July 10, 2020). https://www.themarshallproject.org/2020/07/10/how-ice-exported-the-coronavirus

[8] Gonsalves Dec. ¶ 7.

[9] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html

**B. An Adequately Revised PRR Would Limit Transfers**

Defendants fail to rebut Plaintiffs' evidence showing that an adequately revised PRR would substantially curtail transfers and that Defendants' transfer practices continue to place subclass members at substantial risk. Defendants contend that their "COVID-19 Checklist for All ICE ERO Transfers, Removals and Release" provides sufficient protection.[10] But even assuming *arguendo* that the Checklist were comprehensive, and it is not,[11] the evidence shows—and Defendants' declarations corroborate—that the Checklist and Defendants' other transfer policies are not preventing the spread of the virus and that Defendants are not actually following the Checklist.[12] For example, Scot Jackson notes that 74 people were transferred into Farmville from facilities in Arizona and Florida on June 2 (ECF 204-8 ¶ 12). There were 2 positive cases at Farmville at that time; there are now 106 (Alderman Decl. Ex. D). The ballooning numbers at Farmville exemplify increasing infection rates system-wide that stem directly from Defendants' transfer practices and overall failure to revise the PRR to protect subclass members.

**C. Defendants Do Not Refute Their Dangerous Segregation Practices**

Defendants do not contest Plaintiffs' assertion that they are imposing conditions equivalent to punitive solitary confinement for purposes of medical isolation, quarantine, or other infection control, placing class members at risk of profound harm to their mental health. Rather, claiming helplessness ("Facilities

[10] Notably, Defendants have not produced this document notwithstanding its responsiveness to Plaintiffs' request, and refused to produce the document prior to today's deadline, finally filing it only this morning after multiple requests. ECF 205.

[11] *See* Venters Fourth Supp. Decl. ¶ 7.

[12] *See, e.g.*, Emily Kassie and Barbara Marcolini, How ICE Exported the Coronavirus, THE MARSHALL PROJECT (July 10, 2020). https://www.themarshallproject.org/2020/07/10/how-ice-exported-the-coronavirus; Ernesto Decl. At ¶¶ 6-11 (detained individual who was transferred while sick and without testing or appropriate social distancing).

have been forced to utilize all their available housing space . . . ," Opp. at 21), they fully admit that "[t]he use of segregated housing units may be necessary at times." *Id.*[13] Defendants' argument that they are "forced" to impose conditions equivalent to solitary confinement seeks to evade their obligation to ensure that conditions in their facilities are adequate and medically appropriate. To be sure, Defendants have numerous options to avoid imposing solitary confinement as a means of medical isolation, such as releasing people or mandating that facilities increase the number of medical isolation rooms. Defendants proffer no evidence whatsoever showing that they have attempted to utilize such measures.

Nor do Defendants refute the dangerous consequences of imposing solitary confinement as a means of infection control. They offer no evidence showing that they disagree that there are material distinctions between the improper and harmful use of solitary confinement and the ethical use of medical isolation and quarantine.[14] To the contrary, Defendants' evidence shows that they are aware of these dangers but simply refuse to meaningfully address them. Rivera ¶¶ 23-27, ECF 204-17. And critically, Defendants concede an adequately revised PRR would have addressed this issue by admitting that future revisions may address "updates in this area." Opp. at 22.

### D. An Adequate PRR Would Address Harmful Disinfectants

Plaintiffs presented substantial evidence that harmful disinfectants are being used in detention facilities. Defendants do not dispute this contention, and in fact acknowledge that several lawsuits have been brought based on this precise issue.

---

[13] ICE terms units outside of general population "Administrative Segregation" and "Disciplinary Segregation." In practice, both resemble solitary confinement. *See, e.g.*, Disability Rights Cal., *There is No Safety Here*, at 2 (Mar. 2019), https://www.disabilityrightsca.org/system/files/file-attachments/DRC_REPORT_ADELANTO-IMMIG_DETENTION_MARCH2019.pdf.

[14] David H. Cloud et al., *Medical Isolation and Solitary Confinement: Balancing Health and Humanity in US Jails and Prisons During COVID-19*, J. GEN. INTERN. MED. 2020 at 1, Jul 6; Gonsalves ¶ 4.

Opp. at 22. Instead, Defendants recycle their flawed argument that the use of harmful disinfectants is unrelated to the PI Order. Opp. at 22. Not so. As explained above, the PI Order required Defendants to develop a comprehensive PPR that provides for "the safe detention of at risk detainees" (ECF 132 at 37). Plaintiffs presented substantial evidence showing that an adequately revised PRR would include safeguards regarding disinfectants.

**E. Defendants Do Not Refute the Need for Other Precautions**

Plaintiffs' experts identified numerous precautionary measures that an adequately revised PRR must address. *See, e.g.*, Vassallo, ECF 189 ¶¶ 22-34 (the PRR "altogether fails to provide crucial guidance regarding the treatment and care of people with COVID"); Venters, ECF 172-10 ¶ 7 (identifying need for, *inter alia*, increased monitoring of subclass members, care planning, and increased staff training). Rather than addressing these concerns, Defendants dismiss Plaintiffs' evidence regarding the revised PRR's deficiencies as a "wish list." However, Defendants completely ignore the fact that the precautionary measures identified by Plaintiffs' experts are the "best practices" that have been identified by medical professionals "through this pandemic" and constitute the "minimum acceptable detention conditions." *See, e.g*., Venters, ECF 172-10 ¶ 47. Moreover, Defendants suggest that the PRR is not the proper place for these precautionary measures. Johnson, ECF 204-2 ¶ 35. This argument is meritless because the PI Order specifically mandates revisions to the PRR to protect medically vulnerable people *and* because the evidence shows the need for centralized guidance to protect the subclass. *See* Venters, Fourth Supp. Dec. ¶¶ 4-6.

**V. Defendants' Brief Confirms Inadequate Monitoring of the PRR**

Defendants admit that their bare-bones survey questionnaires – the only measure they have taken to monitor the PRR – "do not contain quality of medical care categories" or other essential questions, and further admit that the people reviewing these questionnaires – DSMs and DSCOs – are not qualified to

"evaluate medical care process, effectiveness of care or patient outcome." Johnson, ECF 204-2 ¶ 36.[15] Indeed, topics that are covered by the PRR (albeit inadequately) – such as use of PPE and medical isolation[16] – are virtually ignored in the questionnaire, which simply asks if operational and isolation procedures are in place, without eliciting information as to the substance of those procedures.

Defendants further admit that they have not issued new protocols to follow up on questionnaires that show deficiencies.[17] Rather, Defendants rely on the same "long-standing policies and procedures"[18] that have resulted in a long history of "monitoring and oversight failures." ECF 132 at 30. For example, although the revised PRR states that in facilities that operate under QASPs, deficiencies may result in financial penalties (ECF 173 at 110), this is meaningless because many facilities do not operate under QASPs, and because Defendants historically have virtually never issued financial penalties in response to violations.[19]

## VI. Defendants Fail to Refute Facts Demonstrating Their Failure to Adequately Implement Court-Ordered Custody Redeterminations

Notably absent from Defendants' Opposition are facts refuting their admitted failure to maintain centralized mechanisms to oversee and ensure compliant custody redeterminations. Despite this Court requiring a centralized

---

[15] Defendants contend that Field Medical Coordinators generally work with detention staff and monitor quality of care (*id.*), but they have not produced a single document showing monitoring by these coordinators (or anyone else) of COVID-19 medical practices and policies in detention facilities, notwithstanding this Court's order requiring them to do so. ECF 150 at 10.

[16] ECF 173 at 124-25.

[17] For example, Defendants have failed to follow up on questionnaire responses from late April that, instead of providing the requested information, responded with legalese answers. Opp. at 15-16.

[18] Johnson, ECF 204-2 ¶ 37.

[19] Office of Inspector Gen., U.S. Dep't of Homeland Sec., *OIG-19-18: ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards*, at 7-8 (Jan. 29, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf

process for review,[20] Defendants gloss over the extreme variances in custody redeterminations.[21] They offer declarations decrying the purported "threat" posed by *all* persons with Risk Factors without showing any objective assessment of such threats or consideration of release as a significant discretionary factor as required by the PI Order and by ICE policy. Defendants thus continue to refuse to take the PI Order's custody redetermination process seriously.[22]

Additionally, Defendants' blanket refusal to even consider release for persons subject to mandatory detention, without providing binding authority for such a refusal, directly contradicts the PI Order's instruction that its remedial provisions apply equally to all subclass members regardless of the statutory basis for their detention. *See, e.g.*, ECF 132 at 10, 38; ECF 150 at 3.

Defendants also fail to justify their unnecessarily restricted definition of the Risk Factor of "severe psychiatric illness." ECF 132 at 21 n.20 and 22 n.21. Defendants neither explain their rationale nor provide any clinical basis for adopting the *Franco* definition. Whereas *Franco* concerned competency to

---

[20] ECF 132 at 38-39. This Court also reiterated how Defendants agreed to external requests for review of individual subclass members, including a process whereby "Class Counsel provide the names of . . . detained individuals with risk factors who have not yet been identified by the facilities or by ICE." ECF 150 at 8 n. 3.

[21] Opp. at 7-8. Despite recognizing that the PI Order calls for "timely" custody redeterminations, Defendants wrongly contend that some field offices' failure to respond at all to requests is not evidence of a violation. *Id.* at 8.

[22] Defendants also erroneously contend that ICE is not required to identify subclass members released solely based on the *Fraihat* PI Order. Opp. at 8. The PI Order itself is an independent mechanism of release, and the subsequent May 15 order explicitly requires Defendants to produce to Plaintiffs documents "disclosing which Subclass Members have been released in the United States *pursuant to custody determinations*." *Id.* at 10 (emphasis added). To the extent Defendants are unable to identify which subclass members were released solely as a result of *Fraihat* custody redeterminations (as opposed to bond or parole), this is evidence of Defendants' inadequate oversight. Finally, Defendants have failed to persuasively justify their failure to include Plaintiffs Baca-Hernandez, Hernandez, and Mencias Soto from their records of subclass members. Although Defendants contend plaintiffs Baca-Hernandez and Hernandez were excluded due to the protective order, they fail to reconcile this with the fact that they have identified thousands of other class members. And while Defendants contend that plaintiff Mencias Soto was determined to not have any Risk Factors, they do not contest that he was hospitalized while under their custody due to cardiovascular and respiratory distress. Mencias Soto, ECF 187 ¶¶ 4-5.

participate in immigration proceedings, the mental health disabilities relevant here are those that affect ability to participate in medical treatment, specifically those "that would impair the ability to engage in COVID-19 prevention, diagnosis and treatment efforts." Venters, ECF 172-10 ¶ 43; Haney, ECF 172-8 ¶ 7. Expert testimony establishes that Defendants are excluding many diagnoses, including, but not limited to, major depressive disorder, post-traumatic stress disorder, anxiety disorders, dementia, and related subclinical diagnoses. Venters, ECF 172-10 ¶ 43; Haney, ECF 172-8 ¶ 8; Vassallo, ECF 189 ¶ 18.

Defendants also misconstrue Plaintiffs' explicit request for a presumption of release as "fundamentally alter[ing] the status quo." Opp. at 18. Not so. The Court's PI Order and ICE policy make clear that release should be a significant factor,[23] and this Court can clarify that the PI Order mandated this presumption. *See Meinhold*, 34 F.3d at 1480 n.14. Further, individuals in ICE custody are in civil detention, the purpose of which is merely to assure that they are present for proceedings. There are numerous other ways of accomplishing this.[24] ICE's data demonstrates that only 15 percent of people detained in detention centers are classified as a high security threat, and that the vast majority of those people who are released show up for removal proceedings.[25] Release would thus be consistent with agency practice of releasing detainees for humanitarian reasons.[26] And given evidence of increased infections and Defendants' failure to implement custody redeterminations, mandating a presumption of release would "effectuate[] the underlying purposes of the original [PI]." *Sw. Marine Inc.*, 242 F.3d at 1167.

---

[23] *See* ECF 121-4, Defendants' April 4, 2020 COVID 19 Detained Docket Review Guidance at 2, incorporated by the Court's Order, ECF 132 at 38.

[24] ICE has identified home confinement where released persons check in telephonically on a periodic basis or wear ankle monitors as options. *See* Jordan, ECF 113-1, Ex. A.

[25] *See id.*, Exs. B and C.

[26] *See, e.g.*, Lorenzen-Strait (ECF 81-14); Sweeney (ECF 81-4).

**VII. Appointment of a Special Master Is Necessary**

Defendants fail to rebut Plaintiffs' evidence demonstrating the need for a Special Master. Opp. at 23. *First*, Defendants concede the factual complexity of this case due to "the number of detention facilities . . . and given the number of class members who vary in medical issues and disabilities." *Id.* at 23-24.Courts have held that Special Masters are appropriate in other conditions-of-confinements cases even less complex than this one. *See Hoptowit v. Ray*, 682 F.2d 1237, 1263 (9th Cir. 1982). *Second*, Defendants' assertion that there exists no history of noncompliance is contradicted by Plaintiffs' evidence, and even "the prospect of noncompliance is an 'exceptional condition' that justifies" appointment of a Special Master. *See Nat'l Org. for the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 542 (9th Cir. 1987). The recent decision by DHS's OIG to forgo in-person inspections[27]—while also announcing new findings of non-compliant detention conditions[28] —further evinces the need for a Special Master. *Finally*, a Special Master will not materially change the status quo because the PI Order already mandates oversight.

**VIII. Conclusion**

For these reasons and those in their opening brief, Plaintiffs respectfully request the Court grant the Motion to Enforce.

[27] Adolfo Flores and Hamed Aleaziz, *A Government Watchdog Group Will No Longer Conduct Onsite Inspections Of Immigration Facilities Because Of The Coronavirus*, Buzzfeed News (July 2, 2020), https://www.buzzfeednews.com/article/adolfoflores/an-government-watchdog-group-will-no-longer-conduct-onsite.

[28] Office of Inspector Gen., U.S. Dep't of Homeland Sec., OIG-20-45, *Capping Report: Observations of Unannounced Inspections of ICE Facilities in 2019* (July 1, 2020), https://www.oig.dhs.gov/sites/default/files/assets/2020-07/OIG-20-45-Jul20.pdf.

DATED: July 13, 2020

Respectfully submitted,

/s/ Jared Davidson
Jared Davidson
Lisa Graybill
Shalini Goel Agarwal
Maia Fleischman
Veronica Salama
SOUTHERN POVERTY LAW CENTER

/s/ Timothy P. Fox
Timothy P. Fox
Elizabeth Jordan
Maria del Pilar Gonzalez Morales
CIVIL RIGHTS EDUCATION AND ENFORCEMENT CENTER

/s/ Stuart Seaborn
Stuart Seaborn
Christina Brandt-Young
Melissa Riess
DISABILITY RIGHTS ADVOCATES

/s/ William F. Alderman
William F. Alderman
Mark Mermelstein
Jake Routhier
ORRICK, HERRINGTON & SUTCLIFFE LLP

/s/ Michael W. Johnson
Michael W. Johnson
Dania Bardavid
Leigh Coutoumanos
Jessica Blanton
Joseph Bretschneider
Timothy Ryan
WILLKIE FARR & GALLAGHER LLP

Attorneys for Plaintiffs