EXHIBIT 1

# EXHIBIT A

**Amended Declaration of**

**Jeffrey Crawford**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

CHRISTIAN ALBERTO )
SANTOS GARCIA, *et al.*, )
)
               Plaintiffs, )
)
v. )      Civil Action No. 1:20-cv-00821
)
CHAD F. WOLF, in his official capacity )
as Acting Secretary, U.S. Department of )
Homeland Security, *et al.*, )
)
              Defendants. )

### **AMENDED DECLARATION OF JEFFREY CRAWFORD**

I, Jeffrey Crawford, declare under penalty of perjury as follows:

1.     I am of the age of majority, of sound mind, and make this declaration based upon my personal knowledge or, if so identified, upon my own information and belief.

2.     I am presently employed by Immigration Centers of America-Farmville ("ICA Farmville") in the role of Director.  I have knowledge of the facts relating to the efforts undertaken at ICA Farmville by myself, my staff, Armor Correctional Services, Inc. ("Armor"), its staff, ICA Farmville's Medical Director Teresa Moore, M.D. ("Dr. Moore"), officials of the U.S. Immigration and Customs Enforcement ("ICE"), and others in response to the novel coronavirus pandemic in contrast to the facts asserted in Plaintiffs' Complaint for Declaratory and Injunctive Relief ("Compl.").

3.     The factual circumstances known to me regarding the circumstances at ICA Farmville which refute many of the facts recited by each Plaintiff, are described more below. The following specific allegations are patently untrue as explained in more detail below:

a. The allegation that ICA Farmville has failed to implement accepted measures to protect its detainees is false, as shown by the extensive measures set forth in this Declaration.  (Compl. at ¶¶ 4, 56.)

b. The allegation that ICA Farmville's testing remains inadequate is false.  (Compl. at ¶¶ 63, 97.)  ICA Farmville has at all times tested detainees that required testing per guidance provided by the Virginia Department of Health ("Health Department") and, since June 22, 2020, has undertaken to test every detainee as expeditiously as possible.  As detailed below, every detainee has been tested at least once as of the date of this declaration, and in most cases, more than once.

c. The allegations that detainees are not receiving medical treatment or care for days is false. (Compl. at ¶¶ 5, 82-83.)  Likewise, the allegation that detainees are not given over-the-counter medications for days is false. (Compl. at ¶¶ 72, 82.)  Further, the allegation that detainees' temperature is or has been taken by "lining them up and pressing their foreheads against a glass window without cleaning the glass between temperature readings" is false.  (Compl. at ¶ 82.)  Each detainee is evaluated by a medical professional once a day and given over-the-counter medications upon request.  The thermometers used by the facility are non-contact.

d. The allegation that ICA Farmville detainees have insufficient access to personal protective equipment, like masks and hand sanitizer, is false.  (Compl. at ¶ 4.)  Likewise, the allegation that detainees have only received one N95 mask is false.  (Compl. at ¶ 61.)  Further, the allegation that detainees are denied access to soap or a shower for days is false.  (Compl. at ¶ 108.)  Contrary to these statements, soap and hand sanitizer are readily available to all and the facility has posted signs

2

explaining the importance of hand-washing, wearing masks, and social distancing as a means of reducing the spread of the novel coronavirus in both English and Spanish. Additionally, every detainee has been provided with four (4) N95 masks, two cloth masks, and two surgical masks for individual use with signs posted in the dorms explaining the purpose and use of these masks in English and Spanish. Cloth masks were provided on a schedule that permits them to be washed with all other clothing every three (3) days.

e. Allegations concerning the density of conditions at Farmville ICA are false. (Compl. at ¶¶ 166, 183, 198.) Each dorm houses between 42 and 100 detainees and is between 2270 and 5058 square feet in total space. Thus, there is a little more than 50 square feet per detainee in each dorm when the facility is at 100% capacity. Currently, the facility is at less than fifty percent capacity, thereby permitting at minimum 100 square feet per detainee.

f. The allegation that ICA Farmville did not have the capacity to isolate or adequately screen the 74 transferees from Florida and Arizona facilities is false. (Compl. at ¶¶ 2, 52.) All 74 transferees were screened at intake and cohorted from the rest of the facility's general population.

g. The allegation that ICA Farmville "waited several days" to test its detainees for COVID-19 and "waited . . . several additional days" to inform them of their test results is false. (Compl. at ¶ 4.) Since June 22, 2020, ICA Farmville has tested all of its detainees in an expeditious manner and has not unreasonably delayed providing detainees their test results, which take several days to receive from Bio Reference Labs (the "Lab").

3

h.  The allegation that ICA Farmville guards, not kitchen staff, have been preparing food for the detainees is false. (Compl. at ¶ 138.)  Because some detainees have refused to serve food during the pandemic, detention staff have assisted in the serving line, but have not aided in the preparation of the food.

i.  The allegation that detainees exhibiting COVID-19 symptoms are permitted to work in the kitchen is false. (Compl. at ¶¶ 87, 139.)  All detainee workers are screened for any COVID-related symptoms prior to being permitted to work.

j.  The allegation that the detainees are served "inedible food, including expired milk, undercooked foods, and uncooked foods, such as raw rice, potatoes, and beans," is false.  (Compl. at ¶ 140.)  Likewise, the allegation that there are insects in the food is false.  (Compl. at ¶¶ 6, 141, 152, 169, 186, 197.)  As detailed below, I have no reason to believe that food served to the detainees is inadequate.

k.  The allegation that detainees are rarely let outside is false.  (Compl. at ¶ 55.) Detainees are given access to outdoor recreation for four hours per day, weather permitting.

l.  The allegation that ICA Farmville guards deployed pepper spray on detainees "who were too weak to stand due to illness and exhibiting symptoms consistent with the known symptoms of COVID-19" is false.  (Compl. at ¶ 64.)  I have authorized the use of pepper spray only when necessary to diffuse potentially violent and dangerous situations in accordance with the facility's policies and ICE Detention Standards, as detailed further below.

m.  The allegation that ICA Farmville guards gave disciplinary complaints to detainees who wished to use the restroom is false.  (Compl. at ¶ 85.)

4

n.  The allegation that the ICA Farmville facility lacks adequate ventilation is false. (Compl. at ¶¶ 55, 62, 64.)  To the best of my knowledge, after investigation, I understand that there are no issues with the facility's HVAC system or overall ventilation.

o.  The allegation that detainees are not provided the individual result of their COVID-19 tests is false. (Compl. at ¶ 71.)  Dr. Moore informed each detainee in-person of their test results shortly after ICA Farmville received results.

p.  The allegation that no ICA Farmville guards speak Spanish is false. (Compl. at ¶ 107.)  To the contrary, there are translators on every shift who speak Spanish and communicate in both English and Spanish with detainees.  Additionally, we have three telephone-based translation providers that can be used if further translation services are required.

4.  ICA Farmville first received and immediately participated in the implementation of Armor's Coronavirus Protocol on January 27, 2020, six weeks before anyone in Virginia tested positive for COVID-19.  The protocol implemented on that date included increased intake screening for symptoms and any suspected cases, and coordination with state, local and federal healthcare authorities.  The protocol applied to both Armor healthcare personnel and all security personnel who may come in contact with suspected cases.  It also included training for security staff and an immediate assessment of all respiratory, barrier, and eye protection supplies as of January 27, 2020.  From January through April of this year, Armor maintained and updated a weekly COVID-19 Response Plan.  Since then, because the guidelines and plans have remained constant, Armor has updated the Response Plan only as needed and continues to do so.  The COVID-19 Response Plan includes guidance such as:

5

a. Current data about the COVID-19 situation in the United States.

b. Resources for staff training from HealthStream or the CDC website.

c. Updated CDC guidance including information about high-risk individuals based on age and chronic medical conditions such as heart disease, lung disease, diabetes, and other conditions.

d. Identification of high-risk detainees and separation of high-risk detainees from the facility's general population.

e. Daily entry process for staff members completing flu/Coronavirus symptom screening tools and nurses performing temperature checks. Symptoms screened include temperature over 99.6 degrees Fahrenheit, taking Acetaminophen or Ibuprofen in the previous 24 hours for fever or chill, severe headache, shortness of breath, chills, sore throat, cough, nausea, vomiting, or diarrhea. Employees presenting with any of these symptoms are not permitted to report for his or her shift and are paid in full during their leave.

f. Return to work criteria for employees prohibits their return until either of the following occurs:

  i. Resolution of fever without the use of fever-reducing medications **and** improvement in symptoms, or

  ii. At least 24 hours have passed since recovery defined as resolution of fever without the use of fever-reducing medications **and** improvement in symptoms **and** at least 10 days have passed since symptoms first appeared, unless a healthcare provider believes the individual can safely return sooner.

Previously, the criteria required only that at least 7 days had passed since symptoms first appeared, but CDC guidelines have changed.

g. Requirement that employees: wear personal protective equipment at all times while in the facility, including, at the very least, a N95 mask and, in some areas of the facility, a face shield, gloves and coveralls as well; avoid contact with severely immunocompromised detainees until 14 days after illness onset; adhere to hand hygiene, respiratory hygiene, and cough etiquette; and self-monitor for symptoms and re-evaluation if symptoms recur or worsen.

h. An intake screening flowchart that directs anyone who does not pass screening in the Sally Port, the secured, controlled entryway to the facility, to be sent to a hospital until cleared **before** being allowed into the facility.

i. Instruction that all detainees must wear facemasks. Until June 2020, we required that only quarantined or cohorted individuals wear facemasks.

j. Directions that if the number of quarantined individuals exceeds the number of individual quarantine spaces available at the facility, special attention should be given to those in the high-risk categories, preventing them from being cohorted with other quarantined individuals.

k. Medical isolation should be done first in single cells with solid walls and solid doors that fully close, secondarily in single cells with solid walls but without solid doors.

l. A COVID-19 Zone Tool providing instructions for when respirators, facemasks, eye protection, gloves and gowns should be worn.

m. How to discontinue isolation based on resolution of fever without the use of fever-reducing medications **and** improvement in symptoms.

n.  Instructions about the use of personal protective equipment ("PPE") such as facemasks, gloves, and eye protection.

o.  Instructions for decontamination.

p.  Telehealth options for use when necessary.

q.  Although this guidance is directed primarily at Armor healthcare staff, at ICA Farmville I have followed the same protocol for staff screenings upon entry and have put any employees who show even a single symptom on paid leave in compliance with the timeframes recommended by Armor, CDC and the local Piedmont Health District of the Virginia Department of Health.

5.  Between January and mid-April of this year, on several occasions dorms were quarantined or staff was sent home due to symptoms or failed screening.  In those situations, during that time, six detainees and one staff member were tested for COVID-19 as directed by the Health Department, and in each instance the test results were negative. Any staff member showing symptoms was required to stay home on paid leave as set forth in Paragraph 4(f) above. Between January and mid-April, 2020, seven COVID-19 tests were administered per Health Department guidelines to both staff and detainees, and every test yielded a negative result during that time.

6.  By early February 2020, Armor had fully implemented its enhanced screening protocols to identify any possible symptoms related to coronavirus.  Flyers placed in the lobby at that time asked visitors to report trips overseas to then-affected countries and offered hand sanitizer, gloves and masks to visitors.  Masks were then also available for staff and detainees in the event needed, but they were not then deemed necessary for the entire population of staff and detainees.

8

7. On March 2, 2020, I began sharing with other ICA Farmville stakeholders daily COVID-19 updates that ICA Farmville was then receiving from its governmental affairs consultant. These updates summarize recent information about international and federal responses to the pandemic, key healthcare officials' responses, daily updates to CDC guidance, including recommendations concerning best practices to prevent the spread of infection, and daily updates to national and international infection data.

8. On March 10, 2020, we were informed of a potential case of COVID-19 in the surrounding community within the Piedmont Health District of the Virginia Department of Health. I learned that the suspected case may have involved a student at Longwood University. Although there was no indication that this student ever participated in any volunteer programs at ICA Farmville, I made the decision to immediately suspend any volunteer programs at ICA Farmville.

9. On March 12, 2020, I convened a meeting of the ICA Farmville Multidisciplinary Committee to ensure review and implementation of the facility's COVID-19 response plan, including the then-updated COVID-19 Response Plan from Armor, a review of the respiratory precaution signs then-posted in the lobby and visitation, a review of the logistical supplies ordered (i.e., styrofoam food trays, toilet paper), and a review of new disinfectants approved for the novel coronavirus. The committee discussed and reviewed these measures. One of the participant board members, James Chapparo, is a retired ICE employee who had been responsible for emergency management planning for pandemics and communicable diseases during his career with ICE. I outlined for him all measures taken and he confirmed all measures were appropriate but added that we should offer masks, gloves, and hand sanitizer for visitors, which we implemented that very day. ICE cancelled further social visitation at all facilities nationwide the next day.

10.     On March 12, 2020, I approved an order of 64 gallons of a "Spray n Go" cleaning solution that contains components approved by CDC to kill the novel coronavirus for use in sinks, showers, toilets, bathrooms generally, and kitchens at ICA Farmville. Since obtained, the solution has been used on a regular basis and continues to be used at least three times per day. We have since procured a second disinfectant that is also used on a daily basis throughout the facility.

11.     On March 16, 2020, I participated in a nationwide conference call between law enforcement leadership and the White House. I was informed that the federal government would not implement a nationwide quarantine but would leave those decisions to the states. I was further informed that standard screening for staff and inmates was in place at facilities around the country, as well as visitation restrictions. Based in part on what I learned from this call, I informed ICA Farmville leadership that we would start screening all staff by taking temperatures when they arrive for work and that anyone with any fever would be sent home, compensating employees for their sick time if necessary.

12.     On March 17, 2020, I learned from Armor of its intention to implement telehealth capabilities so that detainees could obtain access to medical services by remote means should it become necessary. Armor inquired whether we had the infrastructure and equipment necessary to do so or whether we needed anything from Armor to make that happen. I informed Armor that we already had that capability and would be able to accommodate this need. I instructed our Information Technology manager to fully test all related systems to ensure their functionality in the event they were needed. He completed those tests before the end of that business day.

13.     On March 19, 2020, I received an inquiry from Ben Shih, Section Chief of Detention, Compliance & Removals for ICE, asking whether we had any issue taking temperatures

10

of everyone entering our facility, including employees. I informed him that we had no such issue and had been doing so already for approximately one week at that point.

14.     On March 20, 2020, I received from ICE Health Service Corps an Interim Reference Sheet on 2019-Novel Coronavirus (COVID-19). All guidance in that directive had already been implemented or has since been implemented at ICA Farmville. These directives are essentially the same as the intake protocols implemented by Armor.

15.     On March 21, 2020, I received updated guidance for management of COVID-19 from James Mullan, Assistant Field Office Director of ICE. I provided this guidance to ICA Farmville's leadership team and directed them to ensure everything in it had already been implemented and, if not, directed that it be implemented immediately. I received updated guidance from James Mullan again on April 12, 2020, and July 2, 2020. Every requirement stated has been implemented at ICA Farmville. The measures recommended include, among other things, requirements that Directors such as myself:

    a.  Maintain personnel staffing criteria including those for delivery of medical and mental health care services.

    b.  Ensure adequate inventories of food, medicine, cleaning supplies, PPE, soap, hand sanitizer, and assess facility operational practices to ensure safety, security, health and wellbeing of detainees.

    c.  Update pandemic plans and establish quarantine/isolation areas.

    d.  Suspend in-person social visitation while continuing legal visitation with legal visitors required to provide and wear gloves, N95 masks, and eye protection, as well as to undergo the same screening requirements of ICA Farmville staff.

e.  Suspend volunteer visits and tours until further notice with the exception of members of Congress, their delegations, and their staffs, provided they undergo the same PPE and screening requirements of staff and legal visitors.

f.  Enhance and mandate screening of staff pursuant to CDC requirements, to include symptom screening and temperature checks.  Anyone refusing participation or failing the screening would be denied entry.

g.  Screen all detained individuals with potential exposure according to CDC guidelines.

h.  Educate all detainees in a language that each fully understands about the basic hygiene measures that combat the spread of coronavirus based on CDC guidelines.

i.  Modify operations to maximize social distancing as much as practicable and limit congregate gatherings.  Examples of such strategies include:

    i.  Enforcing increased space between individuals in holding cells, in lines and waiting spaces;

    ii.  Staggering time in recreation spaces;

    iii.  Staggering meals and rearranging seating in the dining areas;

    iv.  Limiting the size of group activities;

    v.  Increasing space between individuals during group activities;

    vi.  Reassigning bunks where possible to provide more space and arrange bunks so that detained persons sleep head to foot in bunks;

    vii.  Thoroughly cleaning bunks when assigned to a new occupant;

    viii.  Suspending programs where participants are likely to be in close contact;

    ix.  Rearranging scheduled movements to minimize mixing of dorms;

    x.   Providing meals inside housing units;

    xi.   Restricting recreation space to a single housing unit if possible;

    xii.   Designating separate space near each housing unit to evaluate sick individuals rather than moving them through the entire facility for medical evaluation if possible; and

    xiii.   Staggering sick call.

j.   Suspend all community service projects.

k.   Offer the seasonal influenza vaccine to all existing detainees and new intakes.

l.   Review sick leave policies to ensure all staff can stay at home when sick.

m.   Require any staff that test positive for COVID-19 to inform the workplace.

n.   Identify staff whose duties could allow them to work from home.

o.   Determine minimum levels of staff in all categories for the facility to function.

p.   Adhere to CDC recommendations for cleaning and disinfection including use of approved EPA-registered disinfectants to disinfect all frequently touched surfaces (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, shared staff equipment, vehicles).

q.   Reinforce CDC recommended hygiene practices and ensure adequate supplies of necessary supplies (e.g., hand sanitizer with at least 60% alcohol).

r.   Post appropriate signage reminding detainees and staff of hygiene requirements.

s.   Screen all new intakes for fever, cough, shortness of breath, and other CDC listed symptoms before entering the facility and require those who are symptomatic to wear a facemask, maintain six feet of social distance when necessarily interfacing

with staff, isolating the individual, referring the individual for further healthcare

staff evaluation.

t.   Quarantine any new intakes for 14 days if they had close contact of a known

COVID-19 case or traveled to an affected area.

16.   By way of example of how staff are being isolated in appropriate circumstances, a

staff member of the maintenance department was kept home from work and given a COVID-19

test which came back negative on March 17, 2020. ICA Farmville management followed-up with

him about a second test by email on March 19, 2020, and the employee indicated incorrectly that

he did not believe he needed a second test since the first was negative. Management instructed

him that he would need to meet one of the following criteria to be cleared to return to work: (1)

No fever for at least 72 hours **and** other symptoms have improved **and** at least 7 days have passed

since symptoms first appeared or (2) no fever without the use of fever reducing medicine **and** other

symptoms have improved **and** he receives two negative tests in a row, taken more than 24 hours

apart. He was further told to follow his physician's instructions. Consistent with his physician's

instructions and CDC guidance, ICA Farmville management instructed him to remain at home

until March 31, 2020, even though his second test results obtained on March 23, 2020, were

negative for COVID-19.

17.   Pursuant to guidelines to reduce staff traffic to and from ICA Farmville, on March

23, 2020, I delegated all overhead staff to an "A" break or "B" break. Each break would be "on

duty" for alternating seven-day periods, thus reducing by half the group of overhead staff coming

and going over any seven-day period and allowing anyone who becomes symptomatic during an

"off duty" period to develop symptoms before returning to work. I further instructed all staff that

they must stay at home if they feel sick for any reason, compensated for all such sick time. Each

person on an "A" break would have a counterpart on the "B" break whose break the counterpart would cover if the other fell ill. I also cancelled all further Authentication Officer duty to further reduce foot traffic in and out of the facility (this is where a member of management makes weekend shift visits as a form of general inspection about climate and activities). These measures are currently still in place.

18.     On March 27, 2020, I sent an updated COVID-19 staff brief to all ICA Farmville staff members by email. I commended them for following guidance and protocols and for thus far avoiding any COVID-19 infections. I also updated them about detainees who were moved to medical, both of whom had shown improvement and were then fever free. Despite this, I informed all staff that Dorms 3 and 7 would remain on quarantine as a precaution. I emphasized that we would "take the high road" and "proceed with care" and avoid taking any risks that could harm our staff or detainees in our care. I noted that we had some staff out sick but also informed everyone that, thankfully, Lab tests confirmed that each was negative for COVID-19, stressing that everyone affiliated with ICA Farmville who has had a COVID-19 test had been negative up to that time. I also informed them of the remarkable work of Dr. Moore who I asked to talk to each shift, answering questions and addressing any concerns among my staff. I noted that she was then talking with the Health Department on a daily basis.

19.     On April 1, 2020, Dr. Moore learned from the Piedmont Health District of the Virginia Department of Health that there were six new positive test results in the community served by this health district. To address concerns about likely increased exposure in the local community, Dr. Moore asked me to address further intakes. I sent her concerns to ICE to explore whether ICE could eliminate further intakes to Farmville. This recommendation to eliminate further intakes was later supported by other officials at Armor on April 13, 2020, in part because

the number of existing negative pressure and solid door / solid wall rooms, while thus far a sufficient number to isolate individual cases of symptomatic or potentially exposed individuals, may be too few to also quarantine all intakes in blanket fashion in the event of a large influx of transferees. ICE proposed a solution whereby any new intakes would be quarantined in individual cells at Caroline County, Virginia's facility (the "Caroline Facility") for 14 days before further transfer to ICA Farmville. Both Dr. Moore and Armor indicated that this solution would reduce the risk of an outbreak from an infected person at intake upon implementation. This solution was approved and implemented on April 17, 2020.

20. On April 1, 2020, I requested additional PPE from ICE. Within approximately one week, I was informed that ICE procured 2,000 expired N95 masks. From this supply, in addition to other PPE provided before this time, we then distributed two N95 masks to each detainee and staff member for their continued use. CDC guidelines have indicated that such masks are appropriate for repeat use and even if expired to help reduce the spread of COVID-19. Dr. Moore agrees. As explained below, we have since procured a second and third shipment of N95 masks and have distributed a third and fourth mask to each detainee, in addition to surgical and cloth masks previously provided.

21. On April 2, 2020, I approved an additional informational flyer to be posted in English and Spanish in all the dorms informing detainees of the precautionary measures taken against COVID-19. I informed them that there have been no cases in the facility, we have followed all CDC recommendations, and have used EPA approved cleaning products on a regular basis to disinfect the facility from the coronavirus. The flyer encouraged appropriate hand washing, hygiene, and to make a sick request as soon as any detainee becomes ill.

16

22.     On April 6, 2020, with the help of Dr. Moore and/or her employees, ICA Farmville began notifying ICE of detainees identified as high-risk based on underlying health conditions. The most high-risk detainees—three total—were moved to Medical for housing in June.  Of that group, one detainee remains in ICA Farmville's custody and is still housed in Medical at this time. He has tested negative for COVID-19 throughout the pandemic.

23.     On April 7, 2020, I commended my leadership team for vigilantly reminding all staff about the social distancing requirements.  This was precipitated by concerns raised by Dr. Moore that some of the shift commanders who she reminded about the requirement seemed to be unsure of how to enforce it.  ICA Farmville's Chief of Security, Audey Moree, informed them that any resistance to enforcement of social distancing requirements among the staff should be reported to him immediately to discuss.  My leadership team and I are committed to enforcing these requirements whenever any staff members fail to abide by them.

24.     On April 10, 2020, I shared with all staff a briefing by email about the COVID-19 response at Farmville ICA, commending them for their continued vigilance.  I also took the opportunity to share with them an example of how our screening procedures were going above and beyond to prevent any COVID-19 infections at ICA Farmville at that time.  On that day we received a new arrival who failed our pre-entry screening in the Sally Port by answering "yes" to all of the medical questions.  He was diverted to the local hospital's emergency room instead of being admitted to the facility.  While he was at the hospital for further evaluation, I contacted the ICE field office to determine his previous location and learn of any details about possible exposure. I learned that he had been at his previous facility for 30 days.  I called the superintendent of that facility who confirmed that he had no inmates or staff sick and had not yet had to quarantine any personnel or inmates.  I was able to further confirm that upon arrival to his previous facility more

than 30 days prior, the detainee reported a cold, was treated, made no further requests for medical care at that facility, and passed a medical screen before being released into ICE custody for transport to ICA Farmville.  Despite the apparent lack of exposure, this detainee was given a flu test, strep test, and COVID-19 test at the hospital.  All three tests were negative.  Nevertheless, upon admission to ICA Farmville after release from the hospital, he was placed in quarantine in a negative pressure room where he remained until 7 days past the onset of reported symptoms and being fever free for more than 72 hours without fever reducing medicine.  This example demonstrates how under ICA Farmville's strict enforcement of COVID-19 protocols, any "yes" answer to the intake screening questions will result in appropriate healthcare measures.

25.     On April 13, 2020, I approved language for instructions to be posted in both English and Spanish in all dorms explaining to detainees why ICA Farmville would be giving each of them two N95 masks to be used to protect themselves, in addition to cloth and surgical masks previously provided.

26.     On April 13, 2020, the Virginia Department of Health informed our colleagues at Armor (who in turn informed us) that due to the wide range of symptoms they were updating the guidelines, which were constantly changing.  Dr. Moore and our staff at ICA Farmville continue to attend to the most up-to-date guidance and are committed to continue following the instructions of the CDC and Health Department.

27.     On April 14, 2020, ICA Farmville received the stock of N95 masks procured through ICE and distributed two each to detainees and staff.  Staff were also provided additional supply of surgical masks. All detainees signed for the masks they each received, including each of the Plaintiffs who filed this case.

28.     On April 24, 2020, two detainees—who were transferred from the Caroline Facility after their 14-day isolation period and screened consistent with ICA Farmville's protocols—were tested for COVID-19.  They were isolated, asymptomatic, and they subsequently tested positive for the virus. They were then tested every five days and remained in isolation until they tested negative in two consecutive tests administered two days apart, which occurred on June 7, 2020. At that time, these detainees were cleared by the Virginia Department of Health to be released to the general population, where they have remained since.

29.     On June 2, 2020, due to an operational need of ICE, ICE transferred 74 detainees from Florida and Arizona to ICA Farmville.  Because the Caroline Facility could not accommodate such a large group, with less than 24 hours' notice, the detainees were sent directly to Farmville rather than first undergoing the usual 14-day isolation period at the Caroline Facility.  When I was alerted to the detainees' impending transfer on June 1, 2020, at 4:41 p.m., I inquired about their level of potential exposure to COVID-19 at their previous facilities.  In response, ICE stated that there were no active COVID-19 cases at the Arizona facility and that there were very few cases at the Florida facility.  As of the time I was informed of the circumstances of the transfer, there was no indication that ICA Farmville could not accommodate the needs of these transferees. Additionally, although ICA Farmville has the right to refuse transfer of anyone whose needs cannot be accommodated at our facility, doing so here would have been impractical because we would have still been required to accept the transferees temporarily until ICE found a suitable alternative location, which could have taken weeks.  Even then, at that time, there were no facts to indicate that ICA Farmville could not accommodate these transferees.  Moreover, once transferees have remained at our facility for any significant period of time, further transfer for purposes of avoiding

COVID-19 infection would only put transfer personnel and other facilities at greater risk of spreading any then-unidentified infection.

30. During intake prescreening, ICA Farmville's medical staff identified one detainee with COVID-19 symptoms and sent him to a hospital. That detainee tested positive for COVID-19 and was housed in medical isolation at ICA Farmville. Based on this result, ICA Farmville tested all 74 detainees transferred on June 2nd. Fifty-one of those detainees tested positive and ICA Farmville immediately cohorted those individuals in a previously-vacant dorm and isolated the individuals that tested negative in another vacant dorm. None of the 74 detainees transferred to ICA Farmville on June 2nd were exposed to the general population while positive for COVID-19 and none have exhibited serious symptoms or required hospitalization due to COVID-19 symptoms.

31. Between June 8 and June 11, 2020, the Office of Detention Oversight (the "ODO") from the U.S. Department of Homeland Security inspected the ICA Farmville facility. The ODO conducts compliance inspections at detention facilities that hold detainees for periods exceeding 72 hours to ensure compliance with applicable Performance Based National Detention Standards and ICE detention policies. During their inspection, representatives from the ODO randomly inspected various departments through the facility, such as the Law Library and Environmental Health and Safety Department. ICA Farmville has not yet received the results from ODO's inspection, but during the exit meeting I learned there were no deficiencies noted in the following departments at ICA Farmville:

    a. Visitation;

    b. Recreation;

    c. Disability Accommodations;

    d.  Law Library;

    e.  Environmental Health and Safety;

    f.  Food Service;

    g.  Restricted Housing;

    h.  Use of Force and Restraints;

    i.  Detainee Funds;

    j.  Detainee Classification; and

    k.  Detainee Grievances.

32.    On June 15, 2020, ICA Farmville purchased portable hand wash stations for the dorm that housed detainees who tested positive for COVID-19 to increase the availability of hand washing for the detainees. ICA Farmville procured additional PPE for its staff, including coveralls and face shields. ICA Farmville provided its staff additional gloves and N95 masks that it had previously procured.

33.    On June 18, 2020, one of ICA Farmville's staff members was tested for COVID-19 and on June 20, 2020, I learned that this employee's test was positive, marking the first positive COVID-19 test among ICA Farmville staff at that time. I required the employee to take paid leave for at least 14 days. On June 29, 2020, the employee in question asked to return to work, but I told her she needed to remain at home for at least 14 days as required by our current policies.

34.    On June 20, 2020, several detainees from Dorm 2 were taken to Dorm 9 after their COVID-19 tests returned positive. Three of the detainees refused to remain in the new dorm, demanding that they be placed elsewhere. They became violent, and an officer was forced to deploy pepper spray on two of the detainees to diffuse the situation. All three detainees were removed from Dorm 9 and placed in isolation as a safety precaution.

35.     On June 22, 2020, a detainee from Dorm 4 reported to the medical unit and tested positive for COVID-19.  This detainee had been at ICA Farmville since April 10, 2020, without symptoms up to that point.  As a result of that development, ICA Farmville began to test all of its detainees at its own expense.  ICA Farmville then began conducting contact tracing of its staff.  Where possible, ICA Farmville leadership then began assigning its staff to the same dorms and locations throughout the facility, a practice which has continued to present whenever practical.

36.     Throughout the morning of June 22, 2020, ICA Farmville's deputy director, medical director, and medical doctor toured each of our housing units and provided the detainees with a briefing on the status of COVID-19 in the facility and information regarding the precautionary measures being taken by the facility, including testing each detainee.  The briefing was given in English and Spanish.  The staff answered all of the detainees questions regarding the situation and measures being taken, and encouraged the detainees to continue wearing their masks and washing their hands, and to report any symptoms to the nursing staff who screen the individuals and take their temperature twice per day.  During these briefings, many detainees reacted in a hostile manner and some expressed their desire to speak with an ICE representative.  At my request, the Assistant Field Officer Director of ICE agreed to visit the facility the next day, June 23, 2020, and I informed the detainees of his upcoming visit.

37.     Later in the day on June 22, 2020, the detainees in Dorm 1 refused to eat lunch, many of whom reported to ICA Farmville staff that they felt pressure from other detainees to do so.  Subsequently, several of the detainees in Dorm 1 refused to comply with count, but I authorized a more relaxed procedure given the then-tense quarantine situation.  That evening, four detainees in Dorm 1 ate dinner, followed by hostility towards them from the other detainees in Dorm 1.  Later that evening, ten detainees who had not eaten dinner made repeated demands of the officers,

threatening to physically harm the detainees who had eaten dinner if they were not removed from Dorm 1.  In response to the escalating situation, and at the request of the deputy director of the facility, I authorized our Special Operations Unit team to intervene and assist the officers in diffusing the situation.   The detainees who had threatened other detainees made increasing demands, including expressing their desire to speak with President Trump, Homeland Security, and ICE, their desire to be released or for certain individuals at the facility to be released, and their desire to be tested for COVID-19.  The detainees repeatedly threatened to harm the detainees who had eaten dinner and to physically damage the dorm.  Upon the deputy director's request, I authorized the removal of the four threatened detainees for their safety.  I further authorized the Special Operations Unit to enter Dorm 1 and remove the ten detainees who were creating the hostile situation.  While they were doing so, two more detainees began yelling obscenities and being disruptive, so they were removed with the other ten detainees as well.  The twelve detainees were moved to the Processing Unit to be housed in two different holding rooms.  The twelve detainees who were removed were investigated and had disciplinary hearings.  They have all returned to general population or are no longer in our custody due to deportation or release.

38.     On June 23, 2020, the Assistant Field Officer Director of ICE visited each housing unit within the facility, addressing the detainees' concerns about COVID-19 in English and Spanish.

39.     On June 27, 2020, all detainees received a third N95 mask after we procured a new shipment earlier in the week.  On July 24, 2020, all detainees received a fourth N95 mask after we received another shipment.  To date, each detainee has been given four N95 masks, two cloth masks, and two surgical masks to use as directed to protect them from spread of COVID-19.  The

guards are all required to wear PPE, including, at the very least, a mask and, in some areas of the facility, a face shield, gloves, and coveralls as well.

40.     On June 27, 2020, a detainee passed out while standing for count and was immediately taken to Farmville Hospital, where he was later transferred to Lynchburg General Hospital for respiratory issues. He was tested for COVID-19 and his test was positive. He returned from the hospital on July 3, 2020. Since then, he has made a full recovery and was returned to general population on July 14, 2020.

41.     On June 28 and 29, 2020, I learned that detainees in Dorm 4 made demands that certain detainees in Dorm 4 be sent to medical as they believed they had COVID-19. Over the course of the subsequent weekend, six detainees passed out. The detainees who had made the demands for removal informed the officers that responded that they would continue to pass out until they had all been taken to medical. Although it was not then known whether these detainees had COVID-19, out of an abundance of caution, each detainee who had passed out was taken to medical and rehoused in Processing.

42.     On June 29, 2020, two detainees were taken to the Lynchburg General Hospital, one for low oxygen saturation levels and the other for stroke-like symptoms, which was later confirmed to have not been a stroke. They have both since been released from the hospital and returned to general population at the facility.

43.     On June 30, 2020, I learned that a detainee from Dorm 7 was being evaluated by medical and that he had a fever of 104 degrees. He was tested for COVID-19, and his test came back positive.

44.     On July 1, 2020, the detainees in Dorm 7 refused to comply with the 10:30 a.m. count, instead congregating in the Day Room. Several officers and supervisors spoke with them

24

and attempted to persuade them to return to their bunks in Dorm 7 on their own.  After about thirty minutes without compliance, I authorized the use of pepper spray.  Four of the detainees picked up chairs and used them as weapons against the officers.  A total of 11 detainees became violent and were isolated from the rest of Dorm 7 for disciplinary and safety reasons.  Four of the detainees were charged with assault and arrested by Farmville Police Department and are currently awaiting trial for charges in local courts.

45.     On July 21 and July 22, 2020, 11 detainees made complaints regarding the taste of their milk during breakfast.  In response, we inspected all of the milk at the facility and noted that none of it was expired based on review of the expiration dates on the cartons.  On July 21, 24 cartons of milk were sampled, one of which had a bad smell and taste.  On July 22, the kitchen staff discarded all of the milk at the facility as a precaution.  Our Food Service Manager reported the issue to the Virginia Department of Corrections, which supplies all of the facility's milk.  The Virginia Department of Corrections representative with whom our Food Service Manager spoke informed him that there had been issues with milk supplies at other facilities throughout the state. There have not been any complaints about milk since July 22.  At all times, detainees may submit complaints about any issue they experience while in detention, including food related issues.  Since January 1, 2020, out of the approximate 325,895 meals served, the facility has received 42 food complaints from detainees, representing an approximately 0.01% complaint rate.  None of the complaints involved allegations of insects in the food.  Most of the complaints involved requests for special food accommodations, larger portions, or allegations of expired food.

46.     As of August 4, 2020, ICA Farmville has conducted 718 COVID-19 tests of detainees, some of which included tests administered to detainees more than once.  Retesting of detainees continues as required by CDC guidelines and as supplies allow—we receive a certain

25

number of test kits from the Lab and once we have returned 85 percent of those test kits to the Lab, they send us more test kits.

47. As of August 5, 2020, one detainee was being hospitalized at Lynchburg General Hospital for complications related to COVID-19. He was admitted to the hospital on July 10, 2020. On August 6, 2020, I learned that the individual had been taken off life support at the request of his family and passed away at 11:42 p.m. on August 5, 2020.

48. Plaintiff Santos Garcia and Plaintiff Castillo Gutierrez both tested positive for COVID-19 on July 2, 2020; their test results were received by the facility on July 5, 2020. Plaintiff Santos Garcia and Plaintiff Castillo Gutierrez are not currently exhibiting COVID-19 symptoms and have not been hospitalized since testing positive. Plaintiff Bolanos Hernandez tested negative for COVID-19 on July 16, 2020, the results of which were received on July 30, 2020. Plaintiff Perez Garcia was released from ICA Farmville's custody on July 31, 2020.

49. Earlier this week I learned that representatives from the CDC and the Virginia Department of Health would be conducting a site assessment of the facility on August 4, 2020. That visit was cancelled, but to my understanding the site assessment is still planned for the near future.

50. As of August 5, 2020, all detainees have been tested for COVID-19 and are being evaluated on an ongoing basis pursuant to new CDC guidelines. Over 718 COVID-19 tests have been administered at ICA Farmville. There are currently 299 detainees at ICA Farmville, which is less than 50 percent capacity. As of the execution of this Declaration, I am aware that 261 of those tested yielded a positive result and 38 of those tested yielded a negative result. As of the execution of this declaration, there are 138 re-tests still pending.

51.     As of August 6, 2020, no ICA Farmville employees are positive for COVID-19. All staff who have tested positive for COVID-19 have been compensated in accordance with their normal work schedule as if they were still on duty.

52.     No detainees at the facility have exhibited COVID-19-related symptoms since July 10, 2020.  Based on updated CDC guidance as implemented by Dr. Moore and Armor, the facility will only be retesting detainees who present with symptoms of COVID-19 and those who have previously tested negative going forward.

53.     As of the execution of this declaration and based on updated CDC guidance as implemented by Dr. Moore and Armor, all detainees currently housed at ICA Farmville have been cleared of COVID-19.

54.     As of the execution of this declaration, ICA Farmville is not accepting new detainees at this time.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

This 7th day of August, 2020.

_____
Jeffrey Crawford