UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | EDCV 19-1546 JGB (SHKx) | Date | October 7, 2020 |
| Title | *Faour Abdallah Fraihat, et al. v. U.S. Immigration and Customs Enforcement, et al.* | | |

| | |
|---|---|
| Present: The Honorable | JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE |

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:** Order (1) GRANTING IN PART AND DENYING IN PART Plaintiffs' Motion to Enforce April 20, 2020 Preliminary Injunction (Dkt. No. 172) (IN CHAMBERS)

Before the Court is Plaintiffs' motion to enforce the Court's April 20, 2020 preliminary injunction. ("Motion," Dkt. Nos. 172, 172-1.) The Court held hearings on the matter on Friday, July 17, 2020 at 2:00 p.m. and Wednesday August 5, 2020 at 2:00 p.m. After considering the oral argument of the parties, as well as the papers filed in support of and in opposition to the matter, the Court GRANTS IN PART AND DENIES IN PART the Motion.

**I. BACKGROUND**

On August 19, 2019, Faour Abdallah Fraihat, Marco Montoya Amaya, Raul Alcocer Chavez, Jose Segovia Benitez, Hamida Ali, Melvin Murillo Hernandez, Jimmy Sudney, José Baca Hernández, Edilberto García Guerrero, Martín Muñoz, Luis Manuel Rodriguez Delgadillo, Ruben Darío Mencías Soto, Alex Hernandez, Aristoteles Sanchez Martinez, Sergio Salazar Artaga, ("Individual Plaintiffs"), Inland Coalition for Immigrant Justice ("ICIJ"), and Al Otro Lado ("Organizational Plaintiffs") (collectively, "Plaintiffs") filed a putative class action complaint for declaratory and injunctive relief. ("Complaint," Dkt. No. 1 ¶¶ 21-126.) They named as Defendants U.S. Immigration and Customs Enforcement ("ICE"), U.S. Department of Homeland Security ("DHS"), DHS Acting Secretary Kevin McAleenan, ICE Acting Director Matthew T. Albence, ICE Deputy Director Derek N. Brenner, ICE Enforcement and Removal Operations ("ERO") Acting Executive Associate Director Timothy S. Robbins, ERO Assistant Director of

Custody Management Tae Johnson, ICE Health Service Corps ("IHSC") Assistant Director Stewart D. Smith, ERO Operations Support Assistant Director Jacki Becker Klopp, and DHS Senior Official Performing Duties of the Deputy Secretary David P. Pekoske (collectively, "Defendants"). (Id. ¶¶ 127-36.)

On April 15, 2020, the Court denied Defendants' motion to sever and dismiss. ("MTD Order," Dkt. No. 126.) On April 20, 2020, the Court granted Plaintiffs' emergency motion for provisional class certification and motion for preliminary injunction. ("PI Order," Dkt. No. 132 (providing further background on Plaintiffs, Defendants, and the history of this action); "Class Certification Order," Dkt. No. 133.) The Court certified two subclasses (collectively, "Subclasses") under Fed. R. Civ. P. 23(b)(2). (Class Certification Order.) The Court also issued a preliminary injunction ("Preliminary Injunction"). (PI Order at 38-39.) On May 15, 2020, the Court granted Plaintiffs' ex parte application for issuance of notice to Subclass members of the preliminary injunction order and to obtain information and documents from Defendants necessary to monitor compliance with that order. ("Notice and Discovery Order," Dkt. No. 150.) Defendants appealed the Court's PI Order, and the appeal is pending before the Ninth Circuit. (Dkt. Nos. 161, 164.)

Plaintiffs filed the Motion on June 24, 2020. (Mot.) In support of the Motion, Plaintiffs attached thirty declarations and associated exhibits. ("Declaration of Alex Hernandez," Dkt. No. 172-3; "Declaration of Allyson Page," Dkt. No. 172-4; "Declaration of Anne Rios," Dkt. No. 172-5; "Declaration of Bill Lienhard," Dkt. No. 172-6; "Declaration of Charlie Flewelling," Dkt. No. 172-7; "Declaration of Craig Haney," Dkt. No. 172-8; "Declaration of Favio Navarro Garcia," Dkt. No. 172-9; "Declaration of Homer Venters," Dkt. No. 172-10; "Declaration of Jessica Schneider," Dkt. No. 172-11; "Declaration of Jessica Vosburgh," Dkt. No. 172-12; "Declaration of Julie Pasch," Dkt. No. 172-13; "Declaration of Timothy Fox," Dkt. No. 173; "Declaration of Andrea Saenz," Dkt. No. 174; "Declaration of Kathrine Russell," Dkt. No. 175; "Declaration of Keren Zwick," Dkt. No. 176; "Declaration of Kyle Edgerton," Dkt. No. 177; "Declaration of Laura Lunn," Dkt. No. 178; "Declaration of Laura Rivera," Dkt. No. 179; "Declaration of Linda Corchado," Dkt. No. 180; "Declaration of Lindsay Bailey," Dkt. No. 181; "Declaration of Liza Doubossarskaia," Dkt. No. 182; "Declaration of Margo Schlanger," Dkt. No. 183; "Declaration of Maria del Pilar Gonzalez Morales," Dkt. No. 184; "Declaration of Mark Feldman," Dkt. No. 185; "Declaration of Oscar Perez Aguirre," Dkt. No. 186; "Declaration of Ruben Mencias Soto," Dkt. No. 187; "Declaration of Shyrissa Dobbins," Dkt. No. 188; "Declaration of Susi Vassallo," Dkt. No. 189; "Declaration of Wendy King," Dkt. No. 190; "Declaration of Ramon Valdez Bracamontes," Dkt. No. 191.)

Defendants opposed the Motion on July 8, 2020. ("Opposition," Dkt. No. 204.) In support of the Opposition, Defendants include twenty-three declarations. ("Vick Declaration," Dkt. No. 204-1 (attaching further declarations as Exhibits 1 to 23).) Defendants also include a demonstrative chart, which lists assertions by Plaintiffs' declarants next to rebuttals from

Defendants' declarants.[1] ("Rebuttal Chart," Dkt. No. 204-25.)  On July 13, 2020, Defendants filed a document referenced in their declarations but that they neglected to attach and neglected to disclose to Plaintiffs in earlier document productions.  (Dkt. No. 205.)

Plaintiffs replied on July 13, 2020.  ("Reply," Dkt. No. 207-1.)  In support of the Reply, Plaintiffs attached further declarations and exhibits, ("Alderman Declaration," Dkt. No. 207-1; "Venters Declaration II," Dkt. No. 207-2; "Ernesto Declaration," Dkt. No. 207-3; "Gonsalves Declaration," Dkt. No. 207-4).

On July 27, 2020, Plaintiffs filed supplemental authorities, including July 22, 2020 Interim Guidance on Management of Coronavirus in Correctional and Detention Facilities, ("July 27 CDC Guidance," Dkt. No. 212), and a news article, (Dkt. No. 212).  On July 30, 2020, Defendants submitted supplemental authority including the third iteration of the PRR, ("PRR III," Dkt. No. 218, Ex. 1), and further declarations, ("Moon Declaration," Dkt. No. 218, Ex. 2; "Hagan Declaration," Dkt. No. 218, Ex. 3; and "Valdez Declaration," id., Dkt. No. 4).  The parties filed further supplements on August 7 and 12, 2020.  (Dkt. Nos. 223, 224.)

---

[1] To the extent that the Court relies on the objected-to evidence, the objections are overruled.  Defendants' "demonstrative chart" with rebuttal declarations is not particularly helpful or persuasive.  Although it reveals a few potential inconsistencies, the chart often contrasts detainee and administrator characterizations of fact that are not necessarily incommensurable, or that are not time bound.  Some objections even seem helpful to Plaintiffs.  (See, e.g., Pitman Decl. ¶¶ 36, 38, (asserting "[t]here has been no need to increase medical staffing since the onset of COVID-19," and conceding the last time Subclass member Alex Hernandez had a temperature check would have been several months ago, in March 2020).)  See also ICE Detainee Statistics, https://www.ice.gov/coronavirus (noting more than a dozen detainees were under isolation or monitoring at Pitman's facility, Etowah).

The Court accords significant weight to Plaintiffs' declarations for four reasons.  First, Defendants are free to offer their own expert opinions but have declined to do so.  Second, Plaintiffs offer diverse views, including from detainees themselves, legal service organizations, attorneys who speak to detainees regularly, and area experts (a doctor with corrections experience, an emergency room physician, an epidemiologist, and a professor and former officer and head of civil rights at DHS).  Third, Defendants' declarations contain significant flaws.  Defendants submit the views of their own supervisory officials and facility directors, as well as an IHSC health official.  These officials often describe conditions in conclusory terms, most often at facilities with comparably low numbers of COVID-19 cases.  A lead declarant provided incorrect statistics on the rate of testing.  (Opp'n at 1 ("Defendant Tae Johnson falsely claims that ICE has tested "nearly 46% of the ICE detained population") (noting that in fact less than 13% have been tested); see also Venters Decl. ¶ 8 (noting that in Texas, Ohio, Tennessee, and at some BOP facilities, mass testing was initiated as of April and May).)  Fourth, Defendants' supervisors' own views of the extent of systemwide compliance are only as reliable as their instruments for measuring facts on the ground.  As discussed below, Plaintiffs raise serious questions about the adequacy of Defendants' surveys and other PRR monitoring mechanisms.

## II. LEGAL STANDARD

Once a notice of appeal is filed, the district court is divested of jurisdiction over the matters being appealed. Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58 (1982) (per curiam). This rule promotes judicial economy and avoids the confusion that would ensue if the same issues were before two courts simultaneously. Masalosalo v. Stonewall Ins. Co., 718 F.2d 955, 956 (9th Cir. 1983). An exception is that the district court "retains jurisdiction during the pendency of an appeal to act to preserve the status quo." Nat. Res. Def. Council, Inc. v. Sw. Marine Inc., 242 F.3d 1163, 1166 (9th Cir. 2001).

This exception is codified in the Federal Rules of Civil Procedure, which allow a district court to "suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(c), (d) ("Rule 62"); Nat. Res. Def. Council, 242 F.3d at 1166. Rule 62 "does not restore jurisdiction to the district court to adjudicate anew the merits of the case," McClatchy Newspapers v. Cent. Valley Typographical Union No. 46, Int'l Typographical Union, 686 F.2d 731, 734 (9th Cir. 1982), and district court action taken pursuant to Rule 62 "may not materially alter the status of the case on appeal." Nat. Res. Def. Council, 242 F.3d at 1166 (citation omitted). Rule 62 does authorize a district court to continue supervising compliance with the injunction pending appeal and to modify the injunction consistent with its original purposes. A&M Records, Inc. v. Napster, Inc., 284 F.3d 1091, 1099 (9th Cir. 2002); Meinhold v. United States Dep't of Def., 34 F.3d 1469, 1480 n.14 (9th Cir. 1994) (holding modification of preliminary injunction during pendency of appeal was proper to clarify the injunction and supervise compliance, in light of new facts).

## III. DISCUSSION

The Court begins by summarizing relevant events and policy documents since the Preliminary Injunction. The Court then examines the evidence of noncompliance and whether there is a need to clarify or modify any of the Preliminary Injunction's terms. The Court finds several areas where clarification is warranted. Finally the Court determines that more active monitoring of Defendants' compliance is needed.

**A. Developments Since the Court's April 20, 2020 Preliminary Injunction**

**1. COVID-19 Pandemic**

Outbreaks of COVID-19 continue and are "unlikely to be controlled anywhere over the long term in this country." (Gonsalves Decl. ¶ 7.) Even where the number of new COVID-19 cases has declined, epidemiologists warn of further waves this fall and even in coming years. (Id. ¶¶ 7, 9, 13, 16, 31 (noting that deaths tend to lag over five weeks behind a spike in confirmed cases).) Experts continue to advise that detention centers are closed environments that increase the risk of COVID-19 outbreaks and are institutional amplifiers of the virus, not unlike factories or nursing homes. (Id. ¶¶ 18-22.) Detention centers with lax social distancing

or other COVID-19 prevention measures continue to pose a grave threat of harm to individuals residing and working in them, as well as to the community as a whole. On July 22, 2020, the CDC updated its interim guidance on managing COVID-19 in detention facilities. (July 22 CDC Guidance.) The document remarks that the risk of COVID-19 outbreaks is especially acute at detention facilities with "high turnover, admitting new entrants daily who may have been exposed . . . in the surrounding community" and in networks of facilities with "daily staff movements [and] transfer . . . between facilities and systems." (Id. at 1-2.)

Significant numbers of ICE detainees have been infected with COVID-19. More than 700 ICE detainees currently in custody have tested positive and are under active isolation or monitoring for the disease.[2] This figure does not include the many detainees who tested positive but have been returned to general population, deported, or released. The number of ICE detainees that cycle through facilities each year is far greater than the number detained at any given moment.

### 2. Revised Policy Documents from Defendants and the CDC

The Preliminary Injunction requires Defendants to "promptly" issue a "Performance Standard" or a supplement to their April 10, 2020 Pandemic Response Requirements ("PRR I"). (See PI Order at 8 (referencing the PRR I, Dkt. No. 124-1)). The Performance Standard must define the minimum acceptable detention conditions for detainees with defined Risk Factors, (id. at 38). On June 23, 2020, Defendants issued revised pandemic response requirements.[3] ("PRR II," Fox Decl., Ex. 14.)

The Preliminary Injunction also requires Defendants to "monitor and enforce facility-wide compliance" with the PRR and Performance Standard/PRR II. (PI Order at 38-39.) Defendants purport to be monitoring compliance with COVID-19 requirements in part by using detention facility questionnaires or checklists ("Facility Checklists"). (See Fox. Decl. ¶ 3, Exs. 10-12 (noting Defendants produced about 105 such checklists and attaching examples, which were completed by detention facilities in April 2020).) The Facility Checklists rely on detention facility administrators to self-report conditions of confinement and degree of COVID-19 preparedness. (Id.)

Another monitoring tool is Defendants' "COVID-19 Checklist for All ICE ERO Transfers, Removals, and Releases," which must be completed for any detainee who will be transferred, removed, or released. ("Individual Checklist," Dkt. No. 205-1; Vick Decl., Ex. 1 ¶ 8.) The Individual Checklist includes a space for the noncitizen and the detention staff to sign. (Id.) The form has been available since May 5, 2020. (Vicks Decl., Ex. 17 ¶ 8.) According to the Individual Checklist, detainees should not be transferred or deported if they are in medical isolation,

---

[2] ICE Guidance on COVID-19, ICE Detainee Statistics, https://www.ice.gov/coronavirus.

[3] The PRR II are available at https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf.

experiencing COVID-19 symptoms, awaiting test results, or are cohorted due to COVID-19 exposure.  (Individual Checklist.)

The Preliminary Injunction also directs Defendants to mandate—instead of merely suggest—that Field Office Directors ("FODs") conduct custody determinations pursuant to the "Docket Review Guidance."  (PI Order at 38-39; Dkt. No. 121-4 (attaching detained docket review guidance dated April 4, 2020).)  On April 26, 2020, Defendants issued an update requiring, rather than suggesting, detained docket review of Subclass Members pursuant to the Preliminary Injunction.  ("Docket Review Guidance II," Fox Decl., Ex. 19.)  The Docket Review Guidance II also updates the risk factors triggering custody review.  (Id.)

The Centers for Disease Control ("CDC") has continued to update its Interim Guidance periodically.  The latest Interim Guidance provided to the Court is dated July 22, 2020.  (July 22 CDC Guidance.)  On July 28, 2020, Defendants issued a third iteration of the PRR.  (PRR III.)  On September 4, 2020, Defendants issued a fourth iteration of the PRR.  (PRR IV.)

### 3. June 18, 2020 OIG Report

On June 18, 2020, the DHS Office of the Inspector General ("OIG") issued a report entitled "Early Experiences with COVID-19 at ICE Detention Facilities."  ("OIG Report," Fox Decl., Ex. 17.)[4]  The Report noted the number of detainees who have tested positive for COVID-19 has risen 496% in just four weeks, from April 20 to May 26, 2020.  (Id.)  The OIG report surveyed 188 ICE facilities from April 8 to 20, 2020,[5] and noted facilities were concerned with their "inability to practice social distancing . . . and to isolate or quarantine individuals who may be infected with COVID-19."  (OIG Report at 6.)  29% of the surveyed facilities did not have negative pressure rooms to isolate airborne infections, and 33% had only one or two such rooms.  (Id.)  Facilities also expressed concerns with the availability of personal protective equipment ("PPE"), in the event COVID-19 continued to spread.  (Id. at 11.)

### 4. Subclass Members and Detention Statistics

The Notice and Discovery Order requires Defendants to provide data on the Subclasses.  A June 19, 2020 "Current Detainees" spreadsheet identifies 5,736 Subclass members.  (Fox

---

[4] The OIG Report is available at https://www.oig.dhs.gov/sites/default/files/assets/2020-06/OIG-20-42-Jun20.pdf#page=1&zoom=auto,-200,289.

[5] It is important to note facilities were surveyed before the issuance of the PI Order.  Nevertheless, the responses are informative and the Report includes more recent statistics provided by ICE.  The responses also demonstrate the importance of mandatory guidelines and a coordinated response from Defendants.  For example, the OIG report noted 27% of non-dedicated facilities surveyed had not received any guidance from ICE regarding COVID-19.  (OIG Report at 14 (also noting that at that time, only certain facilities were required to comply).)

Decl. ¶ 10.) Of these, 3,827 (67%) are detained. (Id.) Presumably, the remaining 1,909 non-detained individuals on this list have been "released." Defendants mark a Subclass member as "released" for several reasons. For example, three "released" individuals died, seventy-four were granted relief by an immigration judge, and 769 have been deported. It would appear, then, that only 1,063 individuals have been released pursuant to either the PI Order or other discretionary procedures such as bond, conditional parole, or "arriving alien" parole, (see 8 U.S.C. § 1226(a) (bond and conditional parole); 8 U.S.C. § 1182(d)(5) (parole for "arriving aliens")). Although a few have obtained relief, most have not. 2,735 (70%) of the detained Subclass members are not subject to mandatory detention, yet remain detained. (Id. ¶ 11.)

Plaintiffs also provide transfer statistics. In a two-week period, 140 detained Subclass members were transferred from one facility to another (over forty detention facilities), and remained in custody after the transfer. (Id. ¶¶ 15-16.) This figure does not include Subclass members who were transferred through one or more facilities before being deported.

Defendants continue to arrest, detain, and deport large numbers of noncitizens, including individuals with Risk Factors. (Id.; King Decl. ¶ 19.) Over a four-month period—March 1, 2020 through June 27, 2020—ICE removed over 41,000 individuals from the United States. (Vick Decl., Ex. ¶ 11.) Over the same period, the detained population decreased from 38,596 to 23,185.[6] (Id.) As of July 4, 2020, Defendants detained 22,579 individuals, of whom 7,956 were never convicted of a crime and have no pending criminal charges.[7] However, Plaintiffs estimate that 82,000 individuals have been in detention since March 1, 2020. (Reply at 2.) Of these, Defendants tested fewer than 13% . (Reply at 2.)

**B. Necessary Clarifications of the Preliminary Injunction in Light of Noncompliance**

The pandemic is accelerating, and Defendants' spotty compliance to date necessitates clarification of the Preliminary Injunction's terms. In particular, the Court is dismayed that more than five months after the issuance of the Preliminary Injunction, Defendants have not issued a Performance Standard to address the substantial risk of death to Subclass members during the pandemic. Defendants' weak monitoring of facility-wide compliance with the Performance Standard is also perplexing. Current monitoring efforts rely on a meager survey that allows facilities to self-report their level of compliance. Defendants have made strides

---

[6] The Court acknowledges Defendants' progress in reducing the average daily population of detainees across facilities. However, these daily snapshots do not account for the rapid turnover in detainee population. In the span of a year, far more than are in custody on any given day will ultimately be detained and cycled through Defendants' network of facilities, on path to eventual deportation or release. And as the parties' supplements illustrate, (Dkt. Nos. 223, 224), even facilities at half capacity and that have attempted to follow ICE's guidelines up to this point can suffer dangerous outbreaks and death.

[7] Currently Detained Population by Arresting Agency as of 07/04/2020, https://www.ice.gov/detention-management.

identifying Subclass members, but the Court is gravely concerned that <u>Fraihat</u> custody decisions are a disorganized patchwork of non-responses or perfunctory denials.  The Court is especially distressed that about 70% of the detained Subclass members are not subject to mandatory detention yet have not benefited from the Docket Review Guidance, which instructs that the presence of a risk factor should be a significant discretionary factor in favor of release.

These results fall far short of compliance with the Preliminary Injunction.  To ensure the twin goals of compliance and not disturbing the appeal, the Court modifies and clarifies the Preliminary Injunction only as necessary, and in keeping with the original purposes of the PI Order.

1. **"Defendants shall promptly issue a performance standard . . . defining the minimum acceptable detention conditions for detainees with Risk factors . . . to reduce their risk of COVID-19 infection . . ."**

More than five months into this Court's Preliminary Injunction, Defendants have yet to issue a performance standard that unequivocally sets the minimum acceptable conditions of confinement for Subclass members across ICE facilities.  Although the PRR II, III, and IV include slight improvements for all detainees, they do not substantially comply with the Preliminary Injunction, which focused on the plight of the elderly and medically vulnerable.  (<u>See</u> PRR II at 3-4 (chart with summary of changes, none of which provide specific protections to Subclass members); PRR III at 3-4 (same); PRR IV at 3 (same).)  For example, the PRR IV merely state that transfer of ICE detainees should be limited "where possible,"[8] do not provide clear-cut guidance for acceptable quarantine and isolation of Subclass members, and do not expand testing for the group.  The PRR III and IV alternately muddle, alter, or fail to highlight significant changes in the CDC's Interim Guidance since late March 2020.

   i. **Standards Protecting Subclass Members**

Defendants' existing detention standards specifically addressing Subclass member detention conditions are either exceedingly vague or hard to find.  The first relevant standard is buried in policy documents as follows.  First, the PRR IV state all ICE facilities "<u>must</u> . . . comply with the CDC's Interim Guidance . . . (Attachment F)." (PRR IV at 7, 9 (incorporating CDC Guidance for both dedicated and non-dedicated facilities).)  (<u>Id.</u> at 27.)  The July 22 CDC Guidance, once located, provides the following advice with respect to detainees at increased risk for severe illness from COVID-19:

---

[8] Prior iterations of the PRR only discussed transfers of "detained <u>non-ICE populations</u>" but said nothing about ICE detainees, let alone Subclass members.  (PRR I at 13; PRR II at 19; PRR III at 20.)  Although the PRR III summary of changes states transfers of both non-ICE and ICE populations have been "suspend[ed]," with six exceptions, (PRR III at 4), neither the PRR III nor the PRR IV main text appears to include that requirement.  Rather, PRR IV repeats previous PRR III, II and I language: "Where possible, limit transfers. . . ." (<u>Id.</u> at 19.)

> If cohorting close contacts is absolutely necessary, be especially mindful of those who are at increased risk for severe illness from COVID-19. Ideally, they should not be cohorted with other quarantined individuals. If cohorting is unavoidable, make all possible accommodations to reduce exposure risk for the increased-risk individuals. (For example, intensify social distancing strategies for increased-risk individuals.)

(July 22 CDC Guidance at 19.) This advice is located in the section on quarantining close contacts. Only the most assiduous reader would locate this standard and also know how to apply it. The standard alone does not comply with the PI Order, because it only addresses one issue: how to quarantine individuals who have had "close contact" with a COVID-19 case, a technical term that depends on duration and type of exposure. The protection ultimately afforded Subclass members is limited to one area, and wobbles: the facility "must comply" with "guidance" that states increased-risk individuals should "ideally" not be cohorted during close-contact quarantines.

The second standard protecting Subclass members is located twenty-one pages into the PRR IV, subsumed under a bullet point on "suspected or confirmed cases of COVID-19 cases." Defendants direct:

> In the event that a facility requires more isolation beds for detainees, ICE must be
> promptly notified so that transfers to other facilities, transfers to hospitals, or releases can be coordinated immediately. Until such time as the transfer or release is arranged, the facility must be especially mindful of cases that are at higher risk of severe illness from COVID-19. Ideally, symptomatic detainees should not be isolated with other individuals. If isolating of symptomatic COVID-positive detainees as a group is unavoidable, make all possible accommodations until transfer occurs to prevent transmission of other infectious diseases to the higher-risk individual (e.g., allocate more space for a higher-risk individual within a shared isolation room).

(PRR IV at 21-22.) The direction is confusing. Whereas the CDC Guidance discusses at-risk detainees in the context of quarantining close contacts, the PRR IV uproot that language for use in a different context: cohorting symptomatic COVID-19 positive detainees. Second, the PRR IV excerpt does not contemplate accommodations for Subclass members until conditions at a facility are so dire that the facility requires more isolation beds. The PRR IV countenances placement of Subclass members with other symptomatic, COVID-19 positive detainees, then advises the facility give Subclass members "more space" to prevent transmission of (unspecified) "other infectious diseases." Presumably, at this point, Subclass members have already been infected with COVID-19. A minimally adequate Performance Standard would include preventative

measures, and would not begin to offer accommodations only after elderly and medically vulnerable individuals are sick or dying from COVID-19.

The Court could not locate other Subclass-specific guidance in Defendants' PRR IV that would assist detention facility operators in protecting the most medically vulnerable detainees. Under each PRR iteration, a 70-year-old with multiple Risk Factors will be held in essentially the same conditions as a 20-year-old, "ideally" with further accommodations once they become infected or have already been in close contact with COVID-19. Plaintiffs identify a long list of additional PRR lacunae, which illustrate Defendants' failure to issue a comprehensive Performance Standard for the Subclasses. (See generally Venters Decl.)

Defendants argue these gripes are outside the scope of the Preliminary Injunction. (Opp'n at 11-15 ("[Plaintiffs'] wish list . . . does not establish Defendants' noncompliance with the PI Order.").) The Court disagrees. The failure to provide a concrete and comprehensive protocol specifically addressed to Subclass members does establish noncompliance. Although the Preliminary Injunction did not list each area to be addressed in the Performance Standard, a compliant Standard would mitigate risk by addressing these "wish list" issues.

### ii.  Necessary Clarifications of the Preliminary Injunction

"[T]he nature of the violation determines the scope of the remedy." Swann v. Charlotte-Mecklenburg Bd. of Ed., 402 U.S. 1, 16 (1971). Here, the nature of the violation is a failure to adopt sufficiently comprehensive protocols to protect Subclass members. Plaintiffs' proposed areas for clarification are minor and would "effectuate[] the underlying purposes of [the Preliminary Injunction's] original requirements." Nat. Res. Def. Council, 242 F.3d at 1163. Accordingly, the Court clarifies the Preliminary Injunction Performance Standard requirements and ORDERS as follows:

- Defendants shall issue a comprehensive Performance Standard directed to the Subclasses within twenty days.

- Defendants shall mandate more widespread and regular testing of the Subclasses, consistent with CDC Guidelines and above the level provided by the BOP and state prisons.

- Defendants shall develop minimum care and hospitalization protocols for Subclass Members who test positive.

- Defendants shall mandate that medical isolation and quarantine are distinct from solitary, segregated, or punitive housing, that extended lockdowns as a means of COVID-19 prevention are not allowed, and that access to diversion (books, television, recreation) and to telephones must be maintained to the fullest extent possible.

- Defendants shall mandate that safe cleaning products be utilized in safe quantities and in the manner intended for those products.[9] Defendants shall promptly investigate and redress reports of adverse reactions to harsh cleaning products or chemical sprays.

- Defendants shall provide more protective, and more concrete, transfer protocols to protect the Subclasses, including a suspension of transfers with a narrow and well-defined list of exceptions consistent with CDC Guidance.[10]

- Defendants shall mandate twice daily screening of the Subclass members for symptoms and temperature, consistent with CDC recommendations and utilizing a structured screening tool.

- Defendants shall continue to update the Performance Standard, consistent with expert guidance and CDC Interim Guidance, with the goal of exceeding BOP and state prison system response levels.

- Defendants shall ensure subsequent iterations of the PRR do not dilute or distort CDC Interim Guidance, and shall ensure that facility operators are promptly notified of changes in CDC Interim Guidance.

2. **"Defendants shall monitor and enforce facility-wide compliance with . . . the Performance Standard."**

Defendants' Facility Checklists were apparently issued in April 2020 and do not monitor, let alone enforce, compliance with the recently-issued PRR III and IV. Nor do the Checklists focus on Subclass member protection. Taken together, Facility Checklist responses would present to ICE administrators at best an assemblage of brief vignettes, inadequate to command meaningful PRR enforcement. As Plaintiffs' expert indicates, the surveys' yes/no questions: are often compound; include serious omissions (e.g., do not include measures taken to protect medically vulnerable people); elicit uninformative responses; assume knowledge; and ask about inputs but not results. (Schlanger Decl. ¶¶ 45-62.) The Court is also concerned that such surveys cannot bridge the gap between self-report and reality, which should be an obvious component of monitoring.

Although Defendants have pre-pandemic procedures for inspection and enforcement, the extent to which they have activated these procedures in response to the pandemic is unclear. Defendants state that Detention Service Managers ("DSMs") and Detention Standards Compliance Officers ("DSCOs") "use a COVID-19 checklist to confirm the facility has the

---

[9] See also CDC Guidance on cleaning agents and on cleaning and disinfecting practices.

[10] See July 22 Interim Guidance at 8.

necessary plans and processes in place," but admit these officers "cannot evaluate medical care process, effectiveness of care, or patient outcome." (Vick Decl., Ex. 1 ¶ 36.) Moreover, Defendants do not explain how many facilities are covered by the DSMs and DSCOs, and neglect to mention whether DSMs and DSCOs are empowered to and in fact enforce compliance with relevant facility-wide standards. (Id.) Defendants' statements regarding ICE Health Service Corps ("IHSC") Field Medical Coordinators ("FMCs") are similarly vague. (Id.) In contrast, Plaintiffs note that in 2017, DSMs monitored compliance at just 54 facilities. (Schlanger Decl. ¶ 32.) Similarly, IHSC provides direct care only at a small number of facilities, and it is not clear what mandates, if any, IHSC has issued, beyond the conclusory Detainee Checklist, a tool with many of the same faults as the Facility Checklist.[11]

The PRR II, III and IV do include monitoring and enforcement provisions, but they are so vague that the Court concludes they are unlikely to result in substantial compliance with the PRR or a future Performance Standard across facilities. The PRR state that ICE will conduct "bi-weekly spot checks" of facilities, may issue deficiency notices, and may impose consequences on non-compliant facilities. (PRR IV at 6.) The PRR offer no definition of "spot check." Defendants state that the documents concerning spot checks were produced to Plaintiffs on June 10, 2020. (Fox. Decl., Ex. 4 at 30; Opp'n at 15.) Thus, the biweekly "spot checks" envisioned by the PRR II, III and IV are none other than the deeply flawed Facility Checklists, which are completed by the facility itself or are exceedingly vague.[12] As previously noted, the Facility Checklist does not reflect PRR II or III additions. (Opp'n at 15.)

Accordingly, the Court clarifies the Preliminary Injunction monitoring and enforcement requirement and ORDERS as follows:

- The Facility Survey shall be immediately and continuously updated to reflect the most current Performance Standard, shall include a section on Subclass member numbers and present conditions, and shall be corrected to address flaws noted by Plaintiffs' expert. (See Schlanger Declaration ¶¶ 46-65.)

- Defendants shall require DSMs, DSCOs or other trained ICE compliance personnel to verify in person the facility self reports. These in-person checks should occur at least monthly.

---

[11] The sole example before the Court of something approaching a centralized health protocol is the Detainee Checklist that must be completed prior to any transfer. As Plaintiff's expert notes, there is no place on the form to indicate whether the person is high-risk or not. (Venters Decl. ¶ 7.) Similarly, the form has an overbroad checkbox for symptoms screening but does not include the screening questions actually used. (Id.)

[12] Defendants represented in the July 17 and August 5, 2020 hearings that the spot checks may be more involved. The scope and meaning of the term "spot check" in the PRR II, III and IV remains unclear, and the record is devoid of evidence to support Defendants' assertion that spot checks go beyond self-report surveys, however.

- Defendants shall centrally track notices of non-compliance, action plans, corrective action plans, and notices of intent, (see PRR IV at 6), and shall document their follow-up. These documents shall be included in the bi-weekly disclosures to Plaintiffs.

   3. **"Defendants shall make timely custody determinations for detainees with Risk Factors per the latest Docket Review Guidance . . . ."**

The parties strongly disagree on how Risk Factor identification and custody determinations are to proceed under the Preliminary Injunction and Docket Review Guidance. After summarizing these positions, the Court reviews key features of the PI Order and Docket Review Guidance. The Court notes other relevant injunctions on pre-pandemic custody review procedures, and then clarifies and outlines the Preliminary Injunction's risk identification and custody review procedures.

   i. **The Parties' Contentions**

Plaintiffs contend that Defendants are violating this provision of the Preliminary Injunction, because Defendants do not conduct meaningful custody determinations for all Subclass members, and do not maintain centralized mechanisms to ensure consistent determinations throughout their network of facilities. (Mot. at 16-17.) Plaintiffs interpret the Preliminary Injunction as permitting release of Subclass members regardless of the statutory authority for their detention. (Mot. at 17.) Plaintiffs also remark that 70% of the elderly and medically vulnerable detained Subclass members identified are not subject to mandatory detention, yet have not been released pursuant to a Fraihat custody review. (Fox Decl. ¶ 10.) They add that Defendants inflate the number of individuals "released" by including elderly and vulnerable detainees who have been deported, who have died, or who have been released pursuant to Immigration Judge orders. (Mot. at 19-20.)

Defendants respond that the Preliminary Injunction and Docket Review Guidance never contemplated a release request process wherein a detainee can request custody review pursuant to Fraihat and receive a decision within a certain amount of time. (Opp'n at 7-8.) They admit different ICE field offices permit submission of custody determination requests and that practices vary nationwide. (Id.) Defendants state they are "unable to identify detainees who were released solely based on the custody determination" and that everyone released after the Preliminary Injunction "would have received a Fraihat custody determination." (Id. at 8.) ICE maintains that individuals held pursuant to 8 U.S.C. § 1226(c) may not be released under the Docket Review Guidance and Preliminary Injunction. (Id.)

At the August 4, 2020 hearing, the parties clarified their positions on the Docket Review Guidance. They agreed the PI Order and Docket Review Guidance together require Defendants to (1) affirmatively seek out subclass members and (2) allow detainees to identify themselves at any time as potentially having Risk Factors by informing facility staff or submitting medical

records.  Plaintiffs, however, sought a more streamlined and organized process for detainees and advocates to obtain and submit medical files.  The parties were much further apart on the subject of custody determinations under the Docket Review Guidance, as reflected in their papers.  Plaintiffs reiterated the need for greater consistency and oversight of the process, and emphasized Docket Review Guidance language requiring that significant weight be given to the presence of Risk Factors.  Plaintiffs interpret the Docket Review Guidance as mandating individualized findings supported by evidence and reasoning as to why alleged flight risk or danger outweighs the extreme risk of illness or death.  Defendants repeated that some released Subclass members would have received Fraihat custody determinations.  Defendants could not point to evidence that field offices consistently give significant weight to the presence of a Risk Factor.

### ii.   The Process Envisioned by the PI Order

The Preliminary Injunction envisions the following two-step process: determine if one or more of the defined Risk Factors are present, and if so, timely evaluate or re-evaluate whether continued detention is appropriate, according significant weight to the presence of a Risk Factor and to public health.  (Docket Review Guidance; PI Order at 38-39.)  The process is meant to ensure medically vulnerable and elderly detainees are quickly identified and released where possible, and in all cases are accorded minimally adequate conditions of confinement to protect them from severe illness and death from COVID-19.  The PI Order assumed the Docket Review Guidance—once mandated instead of merely requested—would result in meaningful reviews and the release of significant numbers of Subclass members.

Indeed, the Docket Review Guidance states that the presence of a risk factor is a "significant discretionary factor weighing in favor of release" and provides only limited exceptions to that rule.  (Docket Review Guidance at 2.)  For example, Section 1226(a) detainees  should generally be released absent a specific finding they would pose a danger to property or persons.  (Id.)  It is reasonable to infer that only in rare cases would Defendants fail to release a Subclass member not subject to mandatory detention.

For "arriving aliens," the Docket Review Guidance envisions reviews consistent with its existing parole directive issued pursuant to 8 U.S.C. § 1182(d)(5).  That directive states release is in the public interest where significant adverse factors are not present, and already encouraged consideration of medical vulnerabilities.  (Id. at 3; Vick Decl., Ex. 15 ¶ 22 (referencing ICE Directive 11002.1).)

The Docket Review Guidance states that for other categories of detainees, field offices are "responsible" for articulating individualized custody determinations. (Docket Review Guidance at 3.)  The Guidance then repeats that the presence of a COVID-19 risk factor weighs in favor of release.  (Id.)

The Preliminary Injunction equivocates on the validity of the Docket Review Guidance rule against releasing Subclass members subject to mandatory detention under 8 U.S.C.

1226(c).[13] True, the PI Order noted previous administrations had permitted release of Section 1226(c) detainees in some circumstances. (PI Order at 10.) However, the Docket Review Guidance and Preliminary Injunction included seemingly inconsistent commands: field offices must identify and review the files of all detainees with Risk Factors and conduct individualized custody determinations, yet per the Docket Review Guidance the custody determination of a Section 1226(c) detainee can only be denied. (Docket Review Guidance.)

If the Court had left matters there, it might conclude that opining on the mandatory detention question now would materially alter the status of the case on appeal and would constitute more than a "minor adjustment" to the Preliminary Injunction. Nat. Res. Def. Council, 242 F.3d at 1163. However, the Court did not leave matters there. The Class Notice approved by the Court on May 15, 2020—before the notice of appeal—clarified that all Subclass Members, including those subject to mandatory detention, must receive custody reviews and can potentially be released under the Docket Review Guidance. (Notice and Discovery Order at 8 (approving class notice content); "Class Notice," Dkt. No. 136 at 9 ("If you have any of these Risk Factors above, then ICE must review whether it can continue to hold you in detention. This applies even if you have previously been denied parole, bond, or habeas. This also applies no matter your custody classification, even if you have previously been convicted of a crime that subjects you to mandatory detention.").) Defendants did not object to this content in their response to the notice and discovery ex parte, (Dkt. No. 139), and did not object to this content in the joint report after the first hearing on the notice and discovery, (Dkt. No. 147 at 19 (neglecting to mention the content of the proposed notice, but repeating the view that Section 1226(c) is an absolute "bar" to the exercise of discretion)). In keeping with the spirit of the Preliminary Injunction, which requires tracking and individualized consideration of each elderly and medically vulnerable detainee, the Court approved the Notice content. Accordingly, the Court expected that some individuals subject to mandatory detention would be released under the Docket Review Guidance and Preliminary Injunction, due to the public health emergency and extremely high degree of risk posed to some Section 1226(c) detainees. Detention under Section 1226(c) is still civil detention and detention cannot be punitive, or deliberately indifferent.

---

[13] Defendants cite two cases from the Southern District of Florida for the proposition that mandatory detainees are not eligible for release. (Opp'n at 10 (citing Hamilton v. Acosta, 2020 WL 3035350, at *1 (S.D. Fla. June 4, 2020), adopting report and recommendation 2020 WL 3036782 (May 8, 2020); Gayle v. Meade, 2020 WL 2086482, at *7 (S.D. Fla. Apr. 30, 2020).) However those cases uncritically repeat and apply the PRR and Docket Review Guidance. They do not endorse or provide a legal basis for Defendants' view that Section 1226(c) detainees cannot be released under any circumstances. As the Court noted in the PI Order, under prior Republican and Democratic Administrations, ICE released individuals subject to "mandatory detention," pursuant to then-operative guidelines and policies, and statutory and regulatory provisions. (PI Order at 10 (citing INA §§ 212(d)(5), 235(b), 236, 241; 8 C.F.R. §§ 1.1(g), 212.5, 235.3, 236.2(b)).)

### iii.    Other Decisions on ICE Custody Determinations

The need for clarification and monitoring of this process is underscored by two recent district court decisions, which are directed to Defendants' pre-pandemic custody decision-making procedures.  First, in March, a district court enjoined ICE's New York Field Office from:

> using or applying practices or policies relating to the discretion by ICE officers to release to the community on recognizance or pursuant to bond, under Section 236 of the [INA], 8 U.S.C. § 1226(a), and all implementing regulations, to any person now or hereafter arrested by Defendants . . . in any manner more stringent or more onerous than those used or applied prior to June 6, 2017.

Velesaca v. Decker, Case No. 1:20-cv-1803 (S.D.N.Y. March 31, 2020), ECF No. 67 (notice of interlocutory appeal filed July 6, 2020) (granting preliminary relief from an alleged "No Release Policy" that precluded ICE officers from conducting individualized custody determinations).  Then on July 22, 2020, in Heredia Mons v. Mcaleenan, another district court concluded plaintiffs had raised significant questions regarding Defendants' compliance with a court order to provide "arriving alien" parole applicants with individualized determinations of parole eligibility and to comply with the agency's own parole directive.  Case No. 1:19-cv-1593 (D.D.C. Jul. 22, 2020), ECF No. 89 (referencing ICE Directive No. 11002.1).  Plaintiffs in both cases highlighted a troubling pattern of alleged custody determination malfeasance, and courts granted them preliminary injunctive relief based on their likelihood of success.

### iv.    Clarifications

Given the acceleration of the pandemic, the evidence of Defendants' non-compliance, and the fact that an appeal is pending, the Court must vindicate without enlarging the preliminary injunction.  Court supervision and clarification are necessary, because Defendants have not provided evidence that the Docket Review Guidance standards are being meaningfully implemented, such that Risk Factors receive significant weight.

Defendants attempt to evade the question by stating anyone released "would have" received a Fraihat custody review.  (Mot. at 8.)  However, many would have received custody reviews, been denied, and then secured release by alternate means, such as an IJ order or habeas petition.  Although one would expect an increase in releases since the PI Order, Defendants have not documented a change.  About 70% of Subclass members not subject to mandatory detention are still detained.  Compounding the problem, Defendants have used inconsistent risk factor identification and custody review procedures.  The result has been increased detainee anxiety and attorney frustration. (Mot. at 16-22; Saenz Decl. ¶¶ 16-17; Russel Decl. ¶¶ 7-16; Edgerton Decl. ¶¶ 5-29; Feldman Declaration ¶¶ 8-18; Zwick Decl. ¶¶ 10-27; Lunn Decl. ¶¶ 7-12; Rivera Decl. ¶¶ 10-34; Corchada Decl. ¶¶ 10-24; Bailey Decl. ¶¶ 4-14; Doubossarskaia Decl. ¶¶ 5-9; Morales Decl. ¶¶ 7-21 (describing patchwork response across several field offices); Dobbins Decl. ¶¶ 4-12; King ¶¶ 6-11.)

As a result, the following clarifications are necessary to achieve the original purposes of the Preliminary Injunction and ensure meaningful compliance:

- The Preliminary Injunction requires Defendants to identify and track detainees with risk factors within five days of their detention (step one) then to make a "timely" custody determination (step two). (PI Order at 38.)

    o At step one, Defendants must affirmatively identify and track detainees with Risk Factors. However, detainee medical files might be incomplete. To account for this likelihood, a detainee or their counsel may promptly obtain a copy of the medical file and may supplement medical records at any time. Defendants shall streamline and clarify procedures for such requests. Defendants' medical personnel shall review newly submitted records within five days and inform the detainee and his or her counsel of the result.

    o At step two, Defendants must complete a "timely" custody determination. Only in rare cases should the determination take longer than a week.

    o Defendants shall provide notice of the result of the custody determination to the Subclass member and his or her counsel. The notice shall mention the Risk Factor(s) identified, and in cases of non-release shall reference a basis for continued detention in the Docket Review Guidance.

- In order to increase compliance and reduce detainee and attorney confusion, Defendants shall advertise and implement consistent procedures across field offices, for both steps outlined above. Defendants shall ensure that the presence of a Risk Factor is given significant weight and that the custody reviews are meaningful.

    o Blanket or cursory denials do not comply with the Preliminary Injunction or with the Docket Review Guidance's instruction to make individualized determinations.

    o Only in rare cases should a Subclass member not subject to mandatory detention remain detained, and pursuant to the Docket Review Guidance, a justification is required. (See also PRR IV at 20 (requiring case-by-case decisions and emphasizing public health).)

    o Subclass members subject to mandatory detention shall also receive custody determinations. Defendants shall not apply the Docket Review Guidance rule against release of Section 1226(c) detainees so inflexibly

       that none of these Subclass members are released.  Section 1226(c) Subclass members should only continue to be detained after individualized consideration of the risk of severe illness or death, with due regard to the public health emergency.

- o   Defendants shall centrally track and report in their biweekly productions the results of the Risk Factor and custody determinations.

- o   To the extent <u>Fraihat</u> conflicts with another injunction regarding custody determination practices or procedures at particular field offices or facilities, the other court orders take precedence.

- The Risk Factor "Severe psychiatric illness" includes psychiatric illnesses that make it difficult for the individual to participate in their own care, that make it unlikely the individual will express symptoms, or that increase the risk of complications from the virus.[14]

       Finally, the Court reiterates that the above relief extends to Subclass members regardless of their bond or parole requests or habeas petitions.  (<u>See</u> PI Order at 38.)  The Preliminary Injunction and subsequent orders address only Defendants' <u>systemwide</u> response to the pandemic.  The case does not opine on the lawfulness of conditions faced by any individual detainee, nor does it determine the lawfulness of conditions at any particular facility.  As a result, this action should not be understood to preclude emergency habeas petitions on either an individual or a group basis.  Such petitions should continue to be directed to the courts where venue is appropriate.

**C.  Special Master**

       Defendants have established a pattern of noncompliance or exceedingly slow compliance that calls for more active Court monitoring than has heretofore been the case.  The Court defers for now the question of whether and how a special master could assist.  Plaintiffs may renew their request in the future.

### IV.  CONCLUSION

       Accordingly, the Court GRANTS IN PART AND DENIES IN PART the motion to enforce.

**IT IS SO ORDERED.**

---

[14] Defendants did not provide a reason or a clinical basis for their narrow definition of severe psychiatric illness, whereas Plaintiffs did include expert declarations on this subject.  (Reply at 10-11.)  The PRR III and IV appear to concede the point by abandoning the previous narrow definition.