1
2
3
4
5
6

Timothy P. Fox (CA Bar 157750)
*tfox@creeclaw.org*
Elizabeth Jordan*
*ejordan@creeclaw.org*
CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER
1245 E. Colfax Avenue, Suite 400
Denver, CO 80218
Tel:  (303) 757-7901
Fax: (303) 872-9072

Stuart Seaborn (CA Bar 198590)
*sseaborn@dralegal.org*
Melissa Riess (CA Bar 295959)
*mriess@dralegal.org*
Rosa Lee V. Bichell (CA Bar 331530)
*rbichell@dralegal.org*
DISABILITY RIGHTS ADVOCATES
2001 Center Street, 4th Floor
Berkeley, California 94704
Tel:  (510) 665-8644
Fax: (510) 665-8511

7
8
9
10

Veronica Salama*
*veronica.salama@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
P.O. Box 1287 Decatur, GA, 30031
Tel: (404) 221-5825
Fax: (404) 221-5857

11
12

Attorneys for Plaintiffs (continued on next page)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION – RIVERSIDE**

| | |
|---|---|
| FAOUR ABDALLAH FRAIHAT, *et al.*, | Case No.: 19-cv-01546-JGB(SHKx) |
| Plaintiffs, | |
| v. | **MEMORANDUM IN SUPPORT OF MOTION FOR APPOINTMENT OF SPECIAL MASTER** |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*, | |
| Defendants. | Hearing Date: February 22, 2021 |
| | Time: 9:00 a.m. |
| | Hon. Jesus G. Bernal |

1  William F. Alderman (CA Bar 47381)
   *walderman@orrick.com*
2  Jake Routhier (CA Bar 324452)
   *jrouthier@orrick.com*
3  ORRICK, HERRINGTON &
   SUTCLIFFE LLP
4  405 Howard Street
   San Francisco, CA 94105
5  Tel: (415) 773-5700
   Fax: (415) 773-5759
6

7  Michael W. Johnson*
   *mjohnson1@willkie.com*
8  Jessica Blanton*
   *jblanton@willkie.com*
9  Joseph Bretschneider*
   *jbretschneider@willkie.com*
10 WILLKIE FARR &
   GALLAGHER LLP
11 787 Seventh Avenue
   New York, NY 10019
12 Tel: (212) 728-8000
   Fax: (212) 728-8111
13

14 Benjamin R. Salk*
   *benjamin.salk@splcenter.org*
15 SOUTHERN POVERTY LAW
   CENTER
16 111 E. Capitol Street, Suite 280
   Jackson, MS 39201
17 Phone: 601-948-8882
   Fax: 601-948-8885
18 Maya Rajaratnam*
   *maya.rajaratnam@splcenter.org*
19 400 Washington Ave,
   Montgomery, AL 36104
20 Tel: 334-956-8307
   Fax: 334-956-8307
21

22 Christina Brandt-Young*
   *cbrandt-young@dralegal.org*
23 DISABILITY RIGHTS
   ADVOCATES
24 655 Third Avenue, 14th Floor
   New York, NY 10017
25 Tel: (212) 644-8644
   Fax: (212) 644-8636
26

27

28 Attorneys for Plaintiffs (continued from previous page)
   *Admitted Pro Hac Vice

Mark Mermelstein (CA Bar 208005)
*mmermelstein@orrick.com*
ORRICK, HERRINGTON &
SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA 90017
Tel: (213) 629-2020
Fax: (213) 612-2499

Leigh Coutoumanos*
*lcoutoumanos@willkie.com*
Timothy Ryan*
*tryan@willkie.com*
WILLKIE FARR &
GALLAGHER LLP
1875 K Street NW, Suite 100
Washington, DC 20006
Tel: (202) 303-1000
Fax: (202) 303-2000

Maria del Pilar Gonzalez Morales
(CA Bar 308550)
*pgonzalez@creeclaw.org*
CIVIL RIGHTS EDUCATION
AND ENFORCEMENT CENTER
1825 N. Vermont Avenue, #27916
Los Angeles, CA 90027
Tel: (805) 813-8896
Fax: (303) 872-9072

Lisa Graybill*
*graybill@nilc.org*
NATIONAL IMMIGRATION LAW
CENTER
P.O. Box 40476
Austin, TX 78704

# TABLE OF CONTENTS

Page

I.   Introduction..................................................................................................1

II.   Procedural Background ...............................................................................3

III.   Legal Standard ..........................................................................................5

IV.   Appointment of a Special Master is Appropriate Because of the Complexities of the Case and Defendants' Ongoing Noncompliance With the Court's Orders. ........................................................7

   A.   Defendants have failed to conduct custody redeterminations as required by the Court's Order. .............................7

      1.   Defendants have failed to adequately and affirmatively identify class members..........................................7

      2.   Defendants have failed to make timely custody redeterminations...........................................................10

      3.   Defendants continue to provide cursory denials.......................11

      4.   Defendants continue to detain a large number of Subclass Members not subject to mandatory detention and without a justification.........................12

      5.   Defendants continue to deny release to Subclass Members who are subject to mandatory detention without individualized consideration.......................................13

      6.   Defendants have failed to communicate procedures for custody determinations in order to ensure compliance across field offices.................................14

   B.   Defendants continue to transfer people between facilities in contravention of the Court's Orders...............................17

   C.   Defendants' PRR is still inadequate and not enforced.......................19

      1.   The most recent PRR does not address the concerns raised by the Court.....................................19

      2.   Defendants do not adequately monitor or enforce compliance with the PRR.........................................22

V.   Conclusion .................................................................................................24

**i**

*Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)
**Memorandum in Support of Motion for Appointment of Special Master**

1

## TABLE OF AUTHORITIES

2
3
*A&M Records, Inc. v. Napster, Inc.*,
    284 F.3d 1091 (9th Cir. 2002) .................................................................6

4
5
6
*Flores v. Sessions*,
    No. CV 85-4544-DMG (AGRx), 2018 WL 6133665
    (C.D. Cal. Nov. 5, 2018) ......................................................................6

7
8
*Hernandez-Roman v. Wolf*,
    No. 5:20-cv-00768-TJH-PVC (C.D. Cal. Oct. 20, 2020) ....................6

9
10
*Hook v. State of Ariz.*,
    120 F.3d 921 (9th Cir. 1997) .............................................................5, 6

11
12
*Local 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*,
    478 U.S. 421 (1986) .............................................................................6

13
14
*Nat'l Org. For the Reform of Marijuana Laws v. Mullen*,
    828 F.2d 536 (9th Cir. 1987) ..............................................................5

15
16
*Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*,
    242 F.3d 1163, 1166 (9th Cir. 2001) ..................................................7

17
18
*Dorce v. Wolf*,
    No. 20-CV-11306, 2020 WL 7264869, at *1 (D. Mass. Dec. 10, 2020) ......19

19
Statutes

20
Fed. R. Civ. P. 53 ..........................................................................................5

21
22
Fed. R. Civ. P. 53(a)(1)(B)(i) .......................................................................5

23
24
25
26
27
28

ii

# I.    INTRODUCTION

Nine months ago, in April 2020, this Court ordered Defendants to implement a system to identify individuals in civil immigration detention who are at risk of serious illness or death from exposure to COVID-19 due to certain specified Risk Factors and to prioritize their release. The Court also ordered Defendants to take appropriate precautions, supported by public health guidance, to protect individuals in their custody from COVID-19. In October 2020, presented with evidence that Defendants had failed to comply with this Order, the Court clarified its April Preliminary Injunction, warning that appointment of a Special Master would be appropriate if Defendants continued their "pattern of non-compliance." ECF No. 240 ("Enforcement Order") at 18.

Since the Enforcement Order, Defendants have continued that pattern. They continue to drastically under-identify individuals with Risk Factors for serious illness due to COVID-19. When they do identify individuals with Risk Factors, they continue to let them languish, sometimes for months, without conducting the Court-ordered custody redeterminations. And when they do conduct those redeterminations, they routinely refuse to release high risk individuals in spite of the Court's order stating such denials should be "rare" and based on individualized determinations. Defendants' Pandemic Response Requirements document still does not incorporate current guidance from the CDC regarding preventing and containing COVID-19 outbreaks, and reports from individuals, advocates, and experts with experience of conditions in the facilities show that Defendants in some cases are not even following the limited guidance in the Pandemic Response Requirements. Defendants are not effectively and centrally monitoring and enforcing system-wide compliance with their own guidelines and this Court's Orders.

1

1    As a result, COVID-19 has spread rapidly through Defendants' facilities.

2    ICE itself has reported nearly 9,000 cases at 118 facilities since March 2020.[1]

3    These numbers are widely believed to under-report the extent of COVID-19's

4    spread and the harm it has caused individuals detained by Defendants.[2] Within the

5    facilities, public health standards are disregarded, there is a low level of hygiene,

6    lack of access to soap and PPE, and an inadequate supply of food.[3] Defendants

7    continue to use solitary confinement for medical quarantine.[4] There have even been

8    reports that Defendants have withheld custody redeterminations ordered by this

9    Court as retaliation for peaceful protests, as well as requests for information or

10   access to COVID-19 tests.[5] One group has estimated that ICE's disastrous

11   mismanagement of COVID-19 within its facilities is responsible for the infection

---

[1] *ICE Guidance on COVID-19: ICE Detainee Statistics*, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, updated Jan. 13, 2021, www.ice.gov/coronavirus.

[2] *See, e.g.*, *Tracking COVID-19 in Immigration Detention: A Dashboard of ICE Data*, VERA INSTITUTE, https://www.vera.org/tracking-covid-19-in-immigration-detention; *see also Praying for Hand Soap and Masks: Health and Human Rights Violations in U.S. Immigration Detention during the COVID-19 Pandemic*, PHYSICIANS FOR HUMAN RIGHTS (Jan. 12, 2021), https://phr.org/our-work/resources/praying-for-hand-soap-and-masks/?CID=7015G000001dEmcQAE&ms=FY21_COVID_in_Detention_fullfile&dm_i=4GV7%2CD6R5%2C1IF88W%2C1DKCV%2C1 at 8; *see also* Dan Glaun, *How ICE Data Undercounts COVID-19 Victims*, FRONTLINE (Aug. 11, 2020), https://www.pbs.org/wgbh/frontline/article/how-ice-data-undercounts-covid-19-victims/.

[3] Salama Decl., Ex. B; *see also* PHYSICIANS FOR HUMAN RIGHTS, *supra* note 2.

[4] Salama Decl., Ex. B at 12-13; *see also* PHYSICIANS FOR HUMAN RIGHTS, *supra* note 2 at 30-31.

[5] Salama Decl., Ex. B at 27-29; *see also* Saenz Decl. ¶ 6.

*Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)
**Memorandum in Support of Motion for Appointment of Special Master**

1  of over 245,000 individuals.[6] This has proven fatal for medically vulnerable

2  detained people.[7]

3  Defendants have repeatedly shown themselves to be incapable of or

4  unwilling to comply with the Court's Orders. Plaintiffs therefore move for

5  appointment of a Special Master to oversee the implementation of a system for

6  expeditiously identifying and releasing high risk individuals and ensuring the

7  ongoing safety of individuals who continue to be detained.

## II.   PROCEDURAL BACKGROUND

9  On April 20, 2020, this Court issued a Preliminary Injunction Order

10  requiring Defendants to take precautions to limit the spread of COVID-19 among

11  the detained immigrant population. ECF No. 132 ("PI Order"). Defendants failed

12  to comply with the PI Order. On May 15, this Court had "little difficulty finding

13  Defendants [were] not complying with multiple aspects" of the PI Order, and set

14  out a mechanism for Plaintiffs to monitor Defendants' compliance. ECF No. 150

15  ("May 15 Order"). Yet Defendants still failed to comply. Plaintiffs moved to

16  enforce the PI Order, and on October 7, the Court granted in part Plaintiffs'

17  motion, expressing "dismay" at Defendants' "spotty compliance" and "weak

18  monitoring," and "grave[] concern[]" that Defendants' custody redeterminations

19  were a "disorganized patchwork of non-responses or perfunctory denials."

20  Enforcement Order at 7-8. The Court concluded that "Defendants have established

---

22  [6] *Hotbeds of Infection: How ICE Detention Contributed to the Spread of COVID-19 in the United States*, DETENTION WATCH NETWORK at 9-23 (Dec. 9, 2020)

23  https://www.detentionwatchnetwork.org/sites/default/files/reports/DWN_Hotbeds%20of%20Infection_2020_FOR%20WEB.pdf.

24  [7] Sophie Terp et al., *Deaths in Immigration and Customs Enforcement (ICE) detention: FY2018–2020.* AIMS Public Health 8(1) 81-89 (2021) (finding the

25  majority of deaths in ICE custody since Apr. 2020 were COVID-related, many of whom were people with Risk Factor-like characteristics).

3

1    a pattern of noncompliance or exceedingly slow compliance that calls for more

2    active Court monitoring than has heretofore been the case," *id.* at 18, and signaled

3    that a Special Master could assist in monitoring compliance in the future. *Id.* at 17–

4    18.

5         Plaintiffs did not immediately move for a Special Master. Rather, Plaintiffs

6    proactively and repeatedly highlighted ongoing noncompliance directly to

7    Defendants based on information gathered by Plaintiffs' counsel from reports by

8    individuals in detention facilities and those representing them, as well as from data

9    and documents produced by Defendants themselves.[8] Plaintiffs provided

10   Defendants with lists of potential Subclass Members entitled to individualized

11   custody redeterminations who were omitted from data produced by Defendants,

12   which Defendants failed to respond to for weeks.[9] Plaintiffs provided Defendants

13   with a letter discussing the requirements set out by the Court as necessary for a

14   compliant Performance Standard and requested information about how Defendants

15   intended to implement those requirements. Bichell Decl., Ex. H. After Defendants

16   issued a new Pandemic Response Requirements document ("PRR") on October 27,

17

_____

18   [8] For example, Plaintiffs emailed Defendants regarding the lack of an individualized
     custody determination for a named plaintiff (October 8); use of extended lockdowns
19   as a means of COVID-19 prevention at Aurora Detention Facility (October 10); a
     Miami Assistant Field Office Director who disregarded custody redetermination
20   requests submitted by non-attorney advocates and family members (October 16); use
     of the Special Housing Unit (SHU) to quarantine new arrivals at the Buffalo Federal
21   Detention Facility (October 22); logistics for subclass members scheduled for
     release from Etowah County Detention Center (November 22); and difficulties
22   stemming from the use of I-286 and I-831 forms for *Fraihat* requests and the urgent
     need for ICE to disseminate or advertise Field Office contact information (December
23   1). *See* Bichell Decl. ¶¶ 2-3, Exs. A-Q.

24   [9] Plaintiffs requested individualized custody redeterminations be conducted within
     7 days, as instructed by the Court. (Enforcement Order at 17). Defendants
25   requested more time. Almost three weeks later, on November 5, Plaintiffs
     requested an update on the October 16 requests and sent another list of potential
26   Subclass Members entitled to custody redeterminations. To date, over 60 of these
     individuals remain omitted from Defendants' records.

27                                                              4

     *Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)
28   **Memorandum in Support of Motion for Appointment of Special Master**

2020, Plaintiffs followed up with clarifications. Throughout this correspondence, and during the parties' two telephone conferences, Defendants consistently reiterated their position that Plaintiffs' efforts to ensure compliance were "premature" but refused to provide information demonstrating that they were in the process of implementing a system as set out in the Court's Enforcement Order. Bichell Decl., Ex. Q at 1. Finally, on December 16, 2020, Plaintiffs notified Defendants that they intended to move this Court for appointment of a Special Master and provided Defendants with a list of proposed names. The parties met and conferred on December 23, during which Defendants' counsel made clear that they did not think a Special Master is warranted, and they reiterated this point in a letter on January 8, 2021. Bichell Decl. ¶ 3.i-m.[10]

## III. LEGAL STANDARD

Pursuant to Rule 53, the Court may appoint a Special Master to "hold trial proceedings and make or recommend findings of fact on issues to be decided without a jury if appointment is warranted by [] some exceptional condition." Fed. R. Civ. P. 53(a)(1)(B)(i).[11]  One such exceptional condition is a history or prospect of noncompliance with a preliminary injunction. *See Hook v. State of Ariz.*, 120 F.3d 921, 926 (9th Cir. 1997) (upholding the district court's appointment of a Special Master where there was a history of noncompliance); *Nat'l Org. For the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 542 (9th Cir. 1987) ("[T]he prospect of noncompliance is an 'exceptional condition' that justifies reference to a master."). Particularly when the enjoined party fails to comply with the court's

---

[10] Plaintiffs will submit a list of proposed names to the Court at the Court's request.

[11]  Rule 53 does not require – nor do Plaintiffs request at this time – that the Court find Defendants in contempt in order to appoint a special master.  *See* Fed. R. Civ. P. 53; *see also, e.g.*, *Hook v. State of Ariz.*, 120 F.3d 921 (9th Cir. 1997) (appointing special master to monitor compliance with consent decree without a finding of contempt).

5

*Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)
**Memorandum in Support of Motion for Appointment of Special Master**

orders, and the case's inherent complexities render monitoring compliance difficult, appointing a Special Master to monitor and oversee compliance is "well within the District Court's discretion." *Local 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*, 478 U.S. 421, 482 (1986); *see also Flores v. Sessions*, No. CV 85-4544-DMG (AGRx), 2018 WL 6133665, at *2 (C.D. Cal. Nov. 5, 2018) (appointing a Special Master "because [the case] is particularly complex, Defendants have previously failed to comply with this Court's Orders, and there are ongoing disputes regarding the implementation of those orders"); Order Appointing Special Master at 2, *Hernandez-Roman v. Wolf*, No. 5:20-cv-00768-TJH-PVC (C.D. Cal. Oct. 20, 2020) (ECF No. 726) ("Numerous cases have approved the appointment of Special Masters where a party failed to comply with court orders, displayed intransigence or required close supervision.").

Given Defendants' continued noncompliance with this Court's PI and Enforcement Orders (collectively, "the Orders"), including their inability to implement a cohesive, system-wide policy for review of Subclass members' custody redetermination requests, and the emergent nature of this Court's Orders given the worsening COVID-19 pandemic, it is both proper and necessary for the Court to appoint a Special Master.[12]  *See Hook*, 120 F.3d at 926.

---

[12]  As with the Motion to Enforce, the Court maintains jurisdiction pursuant to Rule 62 to supervise Defendants' compliance with the Court's Orders pending appeal and to modify the Orders consistent with their original purposes. *See A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1099 (9th Cir. 2002). Given that the appointment of a Special Master will not "materially alter the status of the case on appeal," the Court may appoint a Special Master to monitor and oversee Defendants' compliance with the Orders. *See Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001).

*Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)
**Memorandum in Support of Motion for Appointment of Special Master**

## IV.   APPOINTMENT OF A SPECIAL MASTER IS APPROPRIATE BECAUSE OF THE COMPLEXITIES OF THE CASE AND DEFENDANTS' ONGOING NONCOMPLIANCE WITH THE COURT'S ORDERS.

### A.   Defendants have failed to conduct custody redeterminations as required by the Court's Order.

The Court ordered Defendants to implement a consistent, effective system for conducting custody redeterminations in April 2020, ECF No. 132 at 38, and unequivocally clarified this requirement in its Enforcement Order, ECF No. 240 at 17.  Nearly nine months later, Defendants have failed to adequately communicate such a procedure to Plaintiffs or to their own staff, much less actually implement one. A Special Master is needed to ensure that Defendants communicate and implement compliant procedures as the pandemic continues to rage.

### 1.   Defendants have failed to adequately and affirmatively identify class members.

Defendants have failed to comply with their obligation to identify Subclass Members with Risk Factors in their custody. In the weeks after the Enforcement Order was issued, Plaintiffs identified for Defendants approximately 300 people with documented Risk Factors whom Defendants had failed to identify as Subclass Members.[13] As of January 11, 2021, Defendants still had not identified 63 of those Subclass Members as having Risk Factors, even after multiple follow-up communications from Plaintiffs' counsel. Bichell Decl. ¶¶ 4-7. It is reasonable to assume that Defendants are similarly failing to identify many others who are not individually known to Plaintiffs' counsel and lack advocates to push for their redeterminations.

At least one expert has observed systemic failures to identify Subclass

---

[13] *See* Bichell Decl., Exs. H, M.

7

*Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)
**Memorandum in Support of Motion for Appointment of Special Master**

1  Members within facilities. *See, e.g.*, Venters Decl. ¶¶ 13-17; Bichell Decl., Ex. X

2  ¶¶ 51(b)-51(e) ("Calhoun [County Correctional Center] lacks adequate procedures

3  for identifying those who are high-risk").  Furthermore, attorneys across the system

4  report that Defendants have not identified their clients as being entitled to custody

5  redeterminations, even when those individuals' Risk Factors are well known to

6  Defendants. *See, e.g.*, Saenz Decl. ¶ 10 (client with asthma and PTSD was told that

7  they had no qualifying risk factors "as confirmed by IHSC," even though IHSC is

8  not the medical provider for the facility); *id.* ¶ 11 (client who is over 60 years old

9  denied membership in subclass because they presented "no medical conditions"

10  and "age is not the only factor" despite the Court's inclusion of age as a factor); St.

11  John Decl. ¶¶ 23-26 (client who submitted evidence regarding "BMI readings over

12  30, hypertension benign, and diagnosis of severe depression, anxiety, and somatic

13  symptom disorder" received a form response listing that he had "failed to

14  demonstrate" that he is "an alien who has a serious medical condition").

15       Defendants also fail to identify people with "severe psychiatric illness" as

16  described in the Enforcement Order. Defendants claim that this Risk Factor is

17  limited to those who are class members in *Franco-Gonzalez v. Holder*, No. 10-cv-

18  02211 DMG, 2013 WL 8115423 (C.D. Cal. Apr. 23, 2013), but the Court rejected

19  this narrow definition in the Enforcement Order. ECF No. 240 at 18 and 18 n.14.

20  Even so, Defendants have not followed their own narrow definition, leaving many

21  *Franco* class members unidentified as *Fraihat* Subclass Members as well. *See,*

22  *e.g.*, St. John Decl. ¶¶ 35-38 (Phoenix Field office issued denial almost

23  immediately for a *Franco* class member, stating that the "client does not meet the

8

*Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)
**Memorandum in Support of Motion for Appointment of Special Master**

criteria for inclusion into one of the *Fraihat* subclasses at this time.").[14]

Defendants' routine failure to identify individuals with Risk Factors makes clear that their process for conducting risk factor assessments is deficient. Venters Decl. ¶¶ 13-17. Medical assessments conducted on intake are brief and easily miss the presence or severity of chronic health problems included in the COVID-19 Risk Factors. Venters Decl. ¶¶ 14-16 (recommending that all new admissions be assessed by a physician or "mid-level provider" within 24 hours). Defendants' PRR does not require that the assessments be conducted by a physician or mid-level provider, and Defendants' own documents indicate a lack of qualified medical personnel to review people for Risk Factors. PRR at 13. The assessments may not be conducted by individuals who are qualified to identify Risk Factors, such as psychiatric illness, which would entitle an individual to a custody redetermination.[15] Venters Decl. ¶ 15. Additionally, the PRR does not provide a clear protocol for assessing individuals currently in custody for new conditions that would trigger a custody redetermination, or for whom new information has become

---

[14] This does not even address Defendants' failure to identify Subclass Members under the Court's clarified broader standard. *See, e.g.*, Millner Decl. ¶¶ 5-11 (San Francisco Field Office denied *Fraihat* Subclass membership for client with diagnoses of PTSD, psychotic disorder, and "mild neurocognitive disorder" because his conditions was "stable," despite the individual's recently escalating suicidal ideation); Wilkinson Decl. ¶ 9 (Buffalo Field Office denied *Fraihat* request for client under non-mandatory detention with diagnoses of "adjustment disorder with depressed mood and a cognitive disability" on the grounds that he had not established that he was "not a flight risk"); Feldman Decl. ¶¶ 23-31 (Washington Field Office denied request for nonmandatory client diagnosed with a number of serious psychiatric illnesses including paranoia disorder, post-traumatic stress disorder, major depressive disorder and generalized anxiety disorder, who an immigration judge had deemed "mentally incompetent." The client's mental health condition deteriorated to such an extent after his request was denied that he had to be transferred to another facility due to his elevated needs.).

[15] In Defendants' January 11, 2021 production, for 90 of the 154 ICE facilities, the credentials of medical professionals reviewing medical records and identifying Subclass Members are described as, "unknown." Salama Decl. ¶ 17. As of the January 11, 2021 production, 1,838 Subclass Members are detained in 46 different facilities at which the credentials of the medical staff are "unknown." *Id.* ¶ 18.

9

available that could indicate Risk Factors. Venters Decl. ¶ 17 (recommending that all individuals in custody have a record review weekly for Risk Factors.)

> ### 2. Defendants have failed to make timely custody redeterminations.

Given the rapid spread of COVID-19 within facilities, the Court clarified that custody review should "[o]nly in rare cases . . . take longer than a week." ECF No. 240 at 17. Yet, Defendants' own records, as well as the experiences of detained individuals and their advocates, demonstrate that Defendants are not complying with the Court's Order.

Defendants, on a biweekly basis, produce spreadsheets with information concerning detained individuals with Risk Factors, including when those individuals were provided with a custody determination. These spreadsheets demonstrate Defendants' failure to provide custody determinations in a timely manner. For example, according to Defendants' most recent production, which occurred on January 11, 2021, there are 2,889 detained individuals with risk factors for whom custody determinations have not yet been conducted. Fox Decl. ¶ 4. Likewise, there are almost 1,000 people that ICE identified as having risk factors in its November 30, 2020 production that still had not had a custody determination as of the January 11, 2021 spreadsheet, seven weeks later. *Id*. at ¶ 5.

Further, advocates for people in detention facilities nationwide describe requests for custody determinations that go unanswered for weeks, with some never receiving any answer. *See, e.g.*, Rios Decl. ¶ 8 (San Diego Field Office took over six weeks to respond to request of person who is over 55 years old, with thyroid cancer, heart disease, stage 2 hypertension, hypothyroidism, and psychotic disorder); Feldman Decl. ¶¶ 12-15 (three weeks to respond). *See also id.* ¶ 21 (no response for renewed request for client who is over the age of 55, and has

10

1 "Hypertension, Hyperlipidemia, Diabetes, Anxiety and Explosive Disorder");

2 Mantikas Decl. ¶¶ 12-13 (no response to renewed request for client with diagnoses

3 of Bipolar Disorder and Complex Post Traumatic Stress Disorder, and intellectual

4 disability); Flewelling Decl. ¶¶ 18-21. For example, as of January 11, a request

5 submitted on November 4, 2020 on behalf of a Subclass Member who is over 55

6 years old with diagnoses of hypertension and diabetes had received no responses at

7 all. *See* Wilkinson Decl. ¶ 7d.

8                      3.    <u>Defendants continue to provide cursory denials.</u>

9         The Court made clear that blanket or cursory denials would be noncompliant

10 with the Enforcement Order, but Subclass Members and their attorneys and

11 advocates continue to receive cursory denials. For example, Subclass Members

12 across the country have received responses to their requests for release that merely

13 state that their criminal history precludes their release. *See, e.g.*, Anderson Decl. ¶¶

14 7-8 (Los Angeles Field Office at Adelanto denied request by phone stating it was a

15 "higher level decision" with no further explanation and stating another client was "a

16 danger and a threat to the community" with no explanation); Flewelling Decl. ¶¶ 17,

17 20 (El Paso Field Office responded that "based on [Subclass Member's] criminal

18 history" he would not be released and later reiterating that "[Subclass Member] is to

19 remain in ICE custody due to his criminal history"); Frankel Decl. ¶ 11 (Philadelphia

20 Field Office provided boilerplate denial that Subclass Member was "threat to public

21 safety" without explanation); Philabaum Decl. ¶¶ 10, 12 (El Paso Field Office denied

22 requests on basis of "extensive criminal history" and "threat to public safety" with

23 no further explanation); Rios Decl. ¶ 7 (San Diego Field Office denied release

24 because it would not "conform to this agency's priority"); Wilkinson Decl. ¶¶ 6-7,

25 11 (New York Field Office stated release request was denied without reasons for

26 denial; New Orleans Field Office denied a request without explanation; *sua sponte*

27                                         11

28

denials from New York Field Office tend to be "cursory").

The forms ICE uses to communicate custody redetermination results to Subclass Members contribute to the problem of cursory denials, and are an example of Defendants' larger failure to provide a clear, formal process for Subclass Members, discussed *infra*. The forms are confusing and simply have check boxes that reviewing officers appear to check off without providing further explanation. *See* Frankel Decl., Ex. A. Although Defendants have instructed their field officers to write in further information on the forms they are using, *see* Bichell Decl., Ex. V (Broadcast Message), Plaintiffs have evidence that no such information is written in. *See, e.g.*, Wilkinson Decl. ¶ 7b (New Orleans Field Office denied a request using a form "that consisted only of boxes that were checked off"). Defendants apparently do not have any oversight mechanism in place to ensure the officers are following instructions, despite Plaintiffs' requests for information about such mechanisms. *See* Section II (describing Plaintiffs' attempts to request information from Defendants).

4.  <u>Defendants continue to detain a large number of Subclass Members not subject to mandatory detention and without a justification.</u>

The Court made clear in its Enforcement Order that the ongoing detention of Subclass Members who are not subject to mandatory detention should be "rare" and "a justification is required" to do so. ECF No. 240 at 17. Despite this, Defendants continue to detain a large number of Subclass Members not subject to mandatory detention, often without justification.

Defendants' January 11, 2020 biweekly production includes the results of custody redeterminations. This data demonstrates that of those Subclass Members whom Defendants have identified and who are not subject to mandatory detention, Defendants have refused to release more than 30 percent of them, in direct contradiction of the Court's admonition that continued detention of such persons

12

1   should only occur in rare cases. Fox. Decl. ¶ 6. This percentage is likely higher

2   because Defendants continue to fail to identify all Subclass Members.

3        Moreover, Plaintiffs have received numerous reports that Defendants often do

4   not provide justification for the continued detention to the Subclass Member or their

5   counsel as required by the Court's Order. For example, the New York Field Office

6   refused to reconsider a Subclass Member's ongoing detention after conceding that

7   his detention was not, in fact, mandatory. Saenz Decl. ¶ 11.

8        5.   Defendants continue to deny release to Subclass Members who
             are subject to mandatory detention without individualized
9            consideration.

10       The Court made clear in its Enforcement Order that, rather than provide

11  cursory or blanket denials to Subclass Members subject to mandatory detention,

12  Defendants must provide individualized consideration of their risk of severe illness

13  or health. ECF No. 240 at 17-18. However, Defendants have not provided any

14  indication that such individualized analysis is taking place. Rather, as discussed

15  above, Defendants largely issue cursory denials to Subclass Members with criminal

16  contact that make them subject to mandatory detention, based only on their criminal

17  history—no matter how old,[16] minor,[17] or non-violent[18]—and without any

18  individualized consideration of their risk of severe illness or death.

19       For example, a 69-year-old Subclass Member with criminal convictions from

20  2000 or earlier[19] has several Risk Factors that jeopardize his health while detained,

21  including his age and diabetes, which put him at serious risk of complication or death

22  should he contract COVID-19. ICE's denial of his release request fails to explain

23

24  ---------------
    [16] Feldman Decl.

25  [17] Wilkinson Decl.

26  [18] Frankel Decl.

    [19] His more recent convictions are immigration-related. Feldman Decl. ¶ 16.

27                                    13
    *Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)

28  **Memorandum in Support of Motion for Appointment of Special Master**

1  how they are outweighed by criminal convictions that are nearly two decades old

2  and/or immigration-related. Feldman Decl. ¶¶ 16-17. In one fatal example,

3  Defendant's failure to release individuals subject to mandatory detention led to the

4  death of Anthony Jones, a 51-year old man with hypertension, who, on December

5  17, 2020, became the first person to die in ICE custody in FY2021.[20]

6        6.   <u>Defendants have failed to communicate procedures for custody
   determinations in order to ensure compliance across field</u>

7  <u>offices.</u>

8      Defendants are required to "advertise and implement consistent procedures

9  across field offices" for identifying Subclass members and conducting custody

10  redeterminations. *See* Enforcement Order at 17. However, the Docket Review

11  Guidance, revised PRR, and October 27 broadcast message ("Broadcast

12  Message")—which Defendants claim together provide "consistent instructions" for

13  making custody redeterminations[21]—lack sufficient detail, and internal

14  inconsistencies remain within and between them.[22] For example, Defendants

15  provide vague and internally inconsistent guidance concerning which staff are

16  _____

17  [20] *See Bahamian man in ICE custody passes away in Mississippi*, U.S.
   IMMIGRATION AND CUSTOMS ENFORCEMENT (Dec. 18, 2020)

18  https://www.ice.gov/news/releases/bahamian-man-ice-custody-passes-away-
   mississippi#:~:text=NEW%20ORLEANS%20%E2%80%94%20A%20Bahamian

19  %20man,is%20from%20a%20heart%20attack.

   [21]*See* Bichell Decl., Ex. N at 3.

20  [22] Notably absent in Defendants' guidance is a formal process whereby Subclass
   Members may submit requests for review. Defendants insist that the Court has not

21  ordered them to create such a process. *See* Bichell Decl., Exs. G, Q at 8. However,
   the class notice explicitly provides that an "attorney, family member, or other

22  advocate" can contact the ICE ERO Field Office or medical department to identify
   Risk Factors and provide supporting medical documentation. ECF No. 150.

23  Furthermore, during the hearing on the Motion to Enforce, the Court discussed the
   appropriateness of a process whereby class counsel, individual Subclass Members,

24  and their attorneys alert Defendants of Risk Factors in order to initiate the custody
   redetermination process. *See* Bichell Decl., Ex. W at 11-14. Defendants agreed,

25  admitting that this process "is specifically provided in the class notice" and the
   PRR, *id.*, making their continued denial of such a process baffling.

26

27                                14
   *Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)

28  **Memorandum in Support of Motion for Appointment of Special Master**

responsible for making *Fraihat* custody decisions.[23] The Broadcast Message also

lacks clear instruction on who is tasked with providing notice of the result of

custody redeterminations.[24] Such vague and inconsistent guidance leads to

confusion among field offices and inconsistent outcomes. At least one expert has

identified uncertainty over who is responsible for conducting reviews at facilities.

*See, e.g.*, Bichell Decl., Ex. X ¶ 51(a)] ("[I]t is unclear who conducts the reviews"

at Calhoun County Correctional Facility). Similarly, an Assistant Field Office

Director recently rejected *Fraihat* requests outright because they did not believe

they were meant to process the requests, despite that same individual receiving

requests.[25] *Compare* Garcia Decl. ¶ 3 *with* Kurichety Decl. ¶¶ 5, 7; *see also* Bichell

Decl., Ex. O (in which Plaintiffs' counsel notified Defendants about an AFOD

refusing requests).

---

[23] The Broadcast Message sent to Field Office Directors and Deputy Field Office
Directors on October 27 indicates that, "when making a custody re-determination
for a Fraihat subclass member, the SDDO shall ensure that the presence of a Risk
Factor is given significant weight." Bichell Decl., Ex. V at 1. Yet, this instruction
does not make clear whether it is the SDDOs in every field office who are tasked
with making the Fraihat custody decisions. In contrast, the updated October PRR
states on one page that "facility medical staff shall review newly submitted records
within five days of receipt and inform the detainee and his or her counsel of the
result of the review," indicating that medical staff undertake the review, rather than
SDDOs, Bichell Decl., Ex. K at 13; however, it later states that SDDOs are
responsible for the review process. *Id.* at 19.

[24] The Broadcast Message states that "ERO shall provide the Fraihat subclass
member and his or her counsel with notice of the result of the custody
determination," but fails to explain who from ERO is tasked with providing the
notice, and whether this information has been advertised. Bichell Decl., Ex. V at 1.
Advocates for Subclass Members report a variety of confusing, inconsistent
practices regarding notification. *See, e.g.*, Kurichety Decl. ¶ 7 (denial received via
letter); Anderson Decl. ¶ 12 (denial received by phone call). This also conflicts
with the PRR's instruction for medical staff to provide notice to Subclass Members
after reviewing updated medical records. *See* Bichell Decl., Ex. K at 13.

[25] Plaintiffs' counsel have requested guidance from Defendants on the correct
contacts where Subclass Members may submit *Fraihat* requests so as to mitigate
this confusion. Defendants have refused to provide this information. *See* Bichell
Decl., Ex. F.

*Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)
**Memorandum in Support of Motion for Appointment of Special Master**

1    Defendants have also failed to comply with their obligations to clarify and

2    streamline the process by which a detained person or their counsel may request

3    medical records and submit them for additional review. ECF No. 240 at 17.

4    Defendants insist that the Broadcast Message has provided sufficient guidance to

5    ensure consistent mechanisms across the detention system, but Subclass Members

6    and their attorneys continue to face unclear processes and barriers to accessing

7    medical records for their clients.[26] Some even describe being turned away when

8    they try to supplement their clients' medical records for review. *See* St. John Decl.

9    ¶¶ 13-22. To mitigate confusion arising from Defendants' unclear processes,

10   Plaintiffs sought the appropriate contact for medical records requests from

11   Defendants,[27] but Defendants refused to make this information publicly available.

12   Defendants' failures to adequately communicate have led to unacceptably

13   variable, non-uniform, and ad hoc decision-making about custody redeterminations

14   across Defendants' network of detention facilities. This lack of systemized,

15   uniform procedure exposes Subclass Members to the arbitrary risk that they will

16   remain in detention, risking serious illness or death from COVID-19, solely based

17   on the facility in which they happen to be detained or which of Defendants' staff

18   happens to decide their custody redeterminations.

19   In sum, this evidence shows that Defendants have failed to comply with this

20   Court's Orders. Although they have had nine months to do so, Defendants still

21   have not implemented an effective system for identifying individuals with Risk

22

23   _____

[26] For example, one practitioner describes how the form required to request records for facilities under the Philadelphia Field Office states that the process may take up to 30 days. *See* Frankel Decl. ¶ 5. *See also* Flewelling Decl. ¶¶ 13-14 (practitioner describes ICE staff at Otero County Processing Center telling them that the only way to receive medical records for *Fraihat* Subclass Member client is via FOIA request).

[27] *See* Bichell Decl., Ex. F.

16

*Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)
**Memorandum in Support of Motion for Appointment of Special Master**

Factors. Moreover, Defendants continue to provide cursory denials and detain individuals without weighing their Risk Factors. As a result, Defendants continue to detain thousands of individuals who are at risk of serious illness from exposure to COVID-19. The only appropriate method of ensuring compliance with the Court's Orders is the appointment of a Special Master to oversee the process of identifying Subclass Members and conducting custody redeterminations.

**B.**   **Defendants continue to transfer people between facilities in contravention of the Court's Orders.**

Although the Court ordered more concrete transfer protocols, including a suspension of transfers "with a narrow and well-defined list of exceptions," Defendants have not complied, and continue facility-to-facility transfers at approximately the same rate as before the Court's Enforcement Order. Defendants' revised PRR does not narrow transfer restrictions from prior PRR iterations.[28] Further, Defendants have continued facility-to-facility transfers unabated, transfers from jails and prisons to ICE detention, new arrests and intake, and even re-arrests following initial release.[29]

---

[28] Defendants issued a revised PRR on October 27, 2020, which changed the language about transfers from being "suspended" to "discontinued" and then listed the same set of six broad exceptions under which transfers were permitted in the previous iterations of the PRR. In another section, the revised PRR states that medical transfers should be limited, "if possible," which is not substantively different from the previous PRR's language, "*where* possible" (emphasis added). Finally, the revised PRR also added that transfers for, "any other reason," require justification and pre-approval. Bichell Decl., Ex. K at 28.

[29] *COVID-19 In Immigration Detention: Monthly Analysis & Update*, FREEDOM FOR IMMIGRANTS (Nov. 23, 2020), https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/5fbd24f0197e6261ba2ac6a6/1606231280550/COVID-19+November+24+report+FINAL.pdf.

17

*Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)
**Memorandum in Support of Motion for Appointment of Special Master**

Defendants are aware of the deadly risk of these transfers, especially for medically vulnerable individuals.[30] Nonetheless, Defendants transferred an average of 237 individuals with Risk Factors making them vulnerable to COVID-19 every two weeks between October 17, 2020 and December 26, 2020. Salama Decl. ¶ 27.[31]  Additionally, between October 17, 2020 and December 26, 2020, Defendants transferred at least 92 Subclass Members multiple times between facilities. Salama Decl. ¶ 29.[32] At least 25 of the Subclass Members who were transferred twice in this period were brought back to the same facility where they were originally detained. *Id.*[33] Although Defendants have asserted that any transfers of Subclass Members "fell under the list of narrow exceptions,"[34] they provided no evidence to support this assertion.

---

[30] *See, e.g.*, Hamed Aleaziz, *A Judge Ordered Him Released From Prison Due to COVID-19 Concerns. He Died of The Disease Two Months Later in ICE Custody*, BUZZFEED (Sept. 21, 2020), https://www.buzzfeednews.com/article/hamedaleaziz/immigrant-released-then-dies-of-covid-in-ice-custody (discussing the death of 61-year-old Cipriano Chavez-Alvarez in ICE custody due to COVID-19 complications on September 21, 2020). On July 15, 2020, Mr. Chavez-Alvarez was granted compassionate release from a federal prison in South Carolina due to his medical conditions (lymphoma, diabetes, kidney disease, and hypertension). He was immediately transferred into ICE custody, Irwin County Detention Center in Ocilla, Georgia. Shortly before his death, ICE transferred Mr. Chavez-Alvarez from Irwin to Stewart County Detention Center in Lumpkin, Georgia.

[31] Defendants transferred at least 322 Subclass Members between October 17, 2020 and October 31, 2020; 225 Subclass Members between November 1, 2020 and November 14, 2020; 218 Subclass Members between November 15, 2020 and November 28, 2020; 210 Subclass Members between November 29 and December 12; and 210 Subclass Members between December 13 and December 26, 2020. Salama Decl. ¶ 27.

[32] In this time period, at least 74 Subclass Members were transferred twice; 14 Subclass Members were transferred three times; and 2 Subclass Members were transferred four times. Salama Decl. ¶ 29

[33] Defendants' records show that at least one Subclass Member was transferred into Elizabeth Detention Center amid a reported COVID-19 outbreak at Elizabeth Detention Center.  Salama Decl. ¶¶ 34-37

[34] Bichell Decl., Ex. Q at 13.

18

Most importantly, these numbers just reflect transfers of individuals who ICE has identified as having Risk Factors that them vulnerable to COVID-19— they do not include transfers of individuals in the general population in detention, nor do they include transfers of Subclass Members prior to ICE's identification of them.[35]

Additionally, Defendants appear to have made no effort to ensure safety precautions when transporting individuals being transferred between facilities. One court noted that individuals are "crowded into a plane or vans with numerous other detainees, some of whom are picked up from several different locations during the trip," and do not have room to "socially distance" or avoid contact with other individuals. *Dorce v. Wolf*, No. 20-CV-11306, 2020 WL 7264869, at *1 (D. Mass. Dec. 10, 2020) (stating that although Plaintiff was likely to succeed in demonstrating that ICE "knowingly exposed him to an increased risk of COVID-19 when they transferred him").

### C. Defendants' PRR is still inadequate and not enforced.

#### 1. The most recent PRR does not address the concerns raised by the Court.

The Court ordered Defendants to issue a "comprehensive Performance Standard directed to the Subclass" that addresses each of the issues identified in the papers supporting Plaintiffs' enforcement motion. See ECF No. 240 at 10 ("[A] compliant Standard would mitigate risk by addressing [the issues addressed in Dr. Venters' declaration]"). Defendants issued an updated PRR document on October 27, 2020, Bichell Decl., Ex. K, with the addition of eight pages regarding "High Risk (Vulnerable) Populations." This document does not sufficiently address the concerns raised by the Court in its Enforcement Order.

---

[35] Salama Decl. ¶ 26.

19

1    For example, the Court ordered Defendants to continue to update their PRR

2    to reflect changes to CDC guidelines. ECF No. 240 at 11. Although the CDC has

3    updated its guidelines since October 27, 2020, Defendants have not updated their

4    PRR to reflect these changes.[36]  Indeed, Defendants did not even incorporate

5    updates from the CDC guidelines issued before October 27. For example, the CDC

6    updated its definition of "close contact" on October 21, 2020, but the PRR does not

7    even contain a reference to this definition.[37]  Following a December facility

8    inspection, Dr. Venters reported that "no changes" had been made to the close

9    contact investigation process in response to the CDC's updated definition at a

10   facility housing individuals detained by ICE. Bichell Decl., Ex. Y at 13. Moreover,

11   the PRR makes no mention of emerging issues such as how Defendants will

12   administer vaccines to individuals in detention, or how they will adjust their

13   protocols to address the new, more virulent strain of COVID-19. Venters Decl. ¶ 7.

14   Additionally, as described in more detail above, the PRR still does not set

15   out clear and detailed guidelines for identifying individuals with Risk Factors both

16   upon admission and those who were either missed at admission or developed Risk

17   Factors while in custody. See also Venters Decl. ¶¶ 13-17.  Contrary to the Court's

18   order to cease transfers except in narrow circumstances, Enforcement Order at 11,

19   Defendants' rate of transfers appears to continue largely unabated, and without the

20   testing and screening required by the CDC guidelines.

21

22   [36] *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, CENTERS FOR DISEASE CONTROL AND PREVENTION (updated Dec. 31, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

24   [37] *See* "Close contact of someone with COVID-19," *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, CENTERS FOR DISEASE CONTROL AND PREVENTION (updated Dec. 31, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#Definitions.

27   20

*Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)
**Memorandum in Support of Motion for Appointment of Special Master**

28

The Court's Order states that "Defendants shall mandate more widespread and regular testing of the Subclasses, consistent with CDC Guidelines and above the level provided by the BOP and state prisons." ECF No. 240 at 11. The PRR's language regarding testing is far from clear. In one place the PRR calls for "Testing of all new admissions before they join the rest of the population in the facility," PRR at 33, but elsewhere it simply says to "consider" doing so. PRR at 27. The Bureau of Prisons recommends institution-wide testing if "substantial transmission is confirmed." Bichell Decl., Ex Y. Conversely, the PRR cautions against widespread testing until "facility leadership have a plan in place for how they will modify operations based on test results." PRR at 33.[38] The PRR also fails to address how facilities operated by ICE and its contractors should prioritize testing and fails to advise facility management on contact tracing and widespread testing in cases of facility-wide transmission. Additionally, the PRR does not provide for on-going testing of high-risk individuals in the Subclasses, as required by the Court and recommended by Dr. Venters.

Furthermore, a section of the PRR entitled "Additional Measures to Facilitate Social Distancing" remains unchanged from the June iteration of the PRR. It simply states that "efforts should be made" to reduce the population to 75 percent capacity and recommends that detained individuals sleep "head-to-foot." PRR at 28.[39] These deficiencies are just examples of the many ways in which

---

[38] That the revised PRR still does not mandate widespread testing of all asymptomatic individuals in ICE custody exhibits deliberate indifference for the safety and well-being of those in detention. *See, e.g.*, Salama Decl. ¶ 47 Ex. C. (Defendants' documents show the results of COVID-19 testing in ICE facilities between March 2020, and August 2020, wherein most COVID-19 positive cases were of asymptomatic individuals).

[39] *But see* Salama Decl. ¶ 20 (Each of Defendants' productions between October 19, 2020, and January 11, 2021, showed that the populations at several facilities where Defendants are detaining Subclass Members, were over capacity).

21

*Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)
**Memorandum in Support of Motion for Appointment of Special Master**

Defendants' PRR still falls far short of the basic and reasonable steps needed to ensure safe conditions for Subclass Members those in ICE custody. *See generally* Venters Decl. ¶¶ 6-23 (providing a detailed review of the PRR's deficiencies). Nine months after the Preliminary Injunction was issued, Defendants still have not implemented a comprehensive Performance Standard, putting all Subclass Members at risk.

2.   <u>Defendants do not adequately monitor or enforce compliance with the PRR.</u>

The Enforcement Order held that Defendants' only tool for monitoring compliance with the PRR, the facility checklists, "do not monitor, let alone enforce, compliance with" the PRR. ECF No. 240 at 11. The Court required Defendants to update the facility checklist to reflect updates to the PRR, correct the checklist to "address the flaws noted by Plaintiffs' expert," citing the Declaration of Margo Schlanger, ECF No. 183 ¶¶ 46-65, ensure in-person verification by ICE personnel of facility self-reports, centrally track notices of non-compliance, action plans, corrective action plans, and notices of intent, document their follow-up, and produce this documentation to Plaintiffs in bi-weekly disclosures. ECF No. 240 at 12-13.

Defendants have updated the facility survey forms; however, their incorporation of the changes required by the Court is inconsistent. *See* Bichell Decl. ¶¶ 9-10, Exs. R-T. For example, consistent with Dr. Venters' recommendations, see ECF No. 172-10 at 5, the PRR calls for twice-daily screening of high-risk individuals. Bichell Decl. K at 14. However, the facility checklist does not include a space where the facility can confirm whether it is complying with this requirement. Bichell Decl. ¶¶ 8-10. Local reports from within facilities indicate that facility staff are not following this requirement of the PRR.

22

1  *See, e.g.*, Bichell Decl., Ex. X at 14 (Dr. Venters' report states that "testing logs

2  show that this biweekly testing [of high-risk individuals] had not been

3  implemented consistently: although testing started October 27, the next round did

4  not occur until December 9."). Indeed, Dr. Venters' report concerning the

5  outbreaks at Calhoun County Correctional Center indicated that even where the

6  facility leadership was aware of the requirements set out in the PRR, documents

7  and reports from detained individuals and staff indicated that many of these

8  requirements were not being followed. *Id.*

9       Moreover, neither the PRR nor the facility checklist provides any metrics

10  which would allow Defendants or external observers to objectively measure

11  compliance with the requirements of the PRR. *See* Venters Decl. ¶ 10 (noting that

12  use of metrics is a "standard approach to quality assurance and compliance in

13  health and law enforcement" settings.) Additionally, the PRR includes a number of

14  mandates which cannot be assessed without input from detained people, but

15  Defendants' monitoring tool provides no mechanism for eliciting feedback from

16  those who are detained. Venters Decl. ¶ 11.

17       Defendants' monitoring based on these facility surveys appears to be

18  extremely limited. Defendants' January 11, 2021 production included over one

19  hundred facility surveys, but only approximately 18 requests for corrective action

20  plans, only approximately four corrective action plans or other responses, and no

21  evidence of additional follow-up or monitoring to ensure that the corrective action

22  plans were implemented. Bichell Decl. ¶ 9. Many of the surveys do not indicate

23  who completed them, and some are incomplete and lack signatures. Bichell Decl.

24  ¶ 10. Defendants clearly have not implemented an electronic system for centrally

25  tracking and monitoring compliance with the PRR. Many of the facility surveys are

26  handwritten, and thus were obviously not recorded in a central, electronic format

27                                          23

28  *Fraihat v. ICE*, Case No. 19-cv-01546-JGB(SHKx)
**Memorandum in Support of Motion for Appointment of Special Master**

that would enable tracking. *See* Bichell Decl. ¶ 10. Additionally, Defendants appear to be uploading facility surveys and related documents on an "internal SharePoint" site so they can "pull them for production to Plaintiffs," indicating that they misunderstand the purpose of an electronic system—to ensure better oversight, rather than to expedite production of the documents to Plaintiffs. Bichell Decl., Ex. N at 8.

## V.     CONCLUSION

Defendants continue to place individuals in their custody at risk of serious illness or death resulting from COVID-19 and have demonstrated an ongoing pattern of non-compliance with the Court's Orders. Plaintiffs respectfully request that the Court appoint a Special Master.

DATED: January 21, 2021

Respectfully submitted,

/s/ Benjamin Salk
Benjamin Salk
Veronica Salama
Maya Rajaratnam
SOUTHERN POVERTY LAW
CENTER

/s/ Timothy P. Fox
Timothy P. Fox
Elizabeth Jordan
Maria del Pilar Gonzalez Morales
CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER

/s/ Stuart Seaborn
Stuart Seaborn
Christina Brandt-Young
Melissa Riess
Rosa Lee V. Bichell
DISABILITY RIGHTS
ADVOCATES

/s/ William F. Alderman
William F. Alderman
Mark Mermelstein
Jake Routhier
ORRICK, HERRINGTON &
SUTCLIFFE LLP

/s/ Michael W. Johnson
Michael W. Johnson
Leigh Coutoumanos
Jessica Blanton
Joseph Bretschneider
Timothy Ryan
WILLKIE FARR & GALLAGHER
LLP

/s/ Lisa Graybill
Lisa Graybill
NATIONAL IMMIGRATION LAW
CENTER

24