BRIAN M. BOYNTON
Acting Assistant Attorney General
U.S. Department of Justice
Civil Division
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
District Court Section
JEFFREY S. ROBINS
Deputy Director
NICOLE N. MURLEY
Senior Litigation Counsel
ANNA L. DICHTER (NJ 304442019)
LINDSAY M. VICK (MA 685569)
Trial Attorneys
United States Department of Justice
P.O. Box 868 Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 353-2405
Facsimile: (202) 305-7000
Anna.l.dichter@usdoj.gov
*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FAOUR ABDALLAH FRAIHAT, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*,<br><br>*Defendants*. | Case No. 19-CV-01546-JGB (SHKx)<br><br>**Defendants' Opposition to Plaintiffs' Renewed Request for the Appointment of a Special Master**<br><br>**Before The Honorable Jesus G. Bernal** |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES................................................................................i

I.      Introduction................................................................................1

II.     Background................................................................................1

III.    Legal Standard.........................................................................5

IV.     Argument...................................................................................5

      a.  Plaintiffs have not demonstrated that appointment of a special master is warranted for effective and timely resolution of pretrial matters...............5

      b.  Plaintiffs' assertion that a Special Master is warranted due to noncompliance with the PI Order is incorrect because Defendants' overall efforts are in furtherance of—and in compliance with—the Court's orders.....................................................................................8

            1.      Defendants are conducting custody redeterminations.....................8

                 i.      Defendants have adequately identified class members and continue to do so...............................................................8

                 ii.     Plaintiffs' argument that Defendants failed to adequately identify class members is nothing more than a complaint that Defendants.....................................................................12

                 iii.    Defendants provide adequate notice of , and justification for, continued detention ............................................................14

                 iv.     Defendants are complying with the standard for continued detention of subclass members not subject to mandatory detention.....................................................................15

                 v.      Defendants are complying with the standard for continued detention of subclass members who are subject to mandatory detention.....................................................................16

i

             vi.    Defendants communicate procedures for custody determinations and ensure compliance across field offices ........................... 18

      2.    Defendants have suspended transfers of people between facilities and are complying with the Court's Orders............................... 20

      3.    Defendants' PRR is in compliance with the Court's order ............ 22

             i.    The revised PRR addresses the concerns raised by the Court... 22

      4.    Defendants are adequately monitoring and enforcing compliance with the PRR. 26

    c.  If the Court is inclined to grant Plaintiffs request and appoint a special master, the Court should order the parties to meet and confer regarding the special masters parameters. .............................................................. 29

V.    Conclusion ...........................................................................................29

# TABLE OF AUTHORITES

## CASES

*Bell v. Wolfish,*
  441 U.S. 520 (1979)...............................................................................8

*Burlington N. v. Dep't of Revenue,*
  934 F.2d 1064 (9th Cir. 1991)..........................................................5, 6

*Demore v. Kim,*
  538 U.S. 510 (2003)..............................................................................6

*Derek & Constance Lee Corp. v. Kim Seng Co.,*
  No. 05-3635, 2010 WL 11508468 (C.D. Cal. Apr. 5, 2010)..........7, 22, 28

*Dorce v. Wolf,*
  No. 20-CV-11306, 2020 WL 7264869 (D. Mass. Dec. 10, 2020)...........22

*Fraihat v. ICE,*
  No. 19-01546 (C.D. Cal. Apr. 20, 2020).....................................*passim*

*Franco-Gonzalez v. Holder,*
  No. 10-cv-02211, 2013 WL 8115423 (C.D. Cal. Apr. 23, 2013)...........12

*Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.,*
  No. 1701613, 2020 WL 816135 (C.D. Cal. Jan. 23, 2020)......................7

*Hernandez Roman v. Wolf,*
  829 F. App'x 165 (9th Cir. 2020)..........................................................6

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.,*
  10 F.3d 693 (9th Cir. 1993)...................................................................7

*Lewis v. Casey,*
  518 U.S. 343 (1996)..............................................................................8

*Local 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.,*
  478 U.S. 421 (1986)..............................................................................5

*Lust By and Through Lust v. Merrell Dow Pharmaceuticals, Inc.*,
  89 F.3d 594 (9th Cir. 1996)..........................................................................11

*Orr v. Bank of America*, NT & SA,
  285 F.3d 764 (9th Cir. 2002) ......................................................................12

*S. Bay United Pentecostal Church v. Newsom*,
  No. 19A1044, 2020 WL 2813056 (U.S. May 29, 2020).............................8

*United States v. Microsoft Corp.*,
  147 F.3d 935 (9th Cir. 1998) ........................................................................5

*United States v. Suquamish Indian Tribe*,
  901 F.2d 772 (9th Cir. 1990) .....................................................................5, 6

## RULES

Fed. R. Civ. P. 53...............................................................................................5

Fed. R. Civ. P. 53(a)(1)(C)............................................................................1, 7

Fed. R. Civ. P. 53(a)(3)......................................................................................5

## OTHER AUTHORITIES

Elizabeth Chamblee Burch & Margaret S. Williams,
Judicial Adjuncts in Multidistrict Litigation, 120 Colum. L. Rev. 2129 (2020)..............6

## WEBSITES

http://www.ice.gov/coronavirus/prr.................................................................22

https://www.bop.gov/coronavirus/covid19_status.jsp.....................................25

## I.      Introduction

The Court should deny Plaintiffs' renewed request for the appointment of a special master.  Plaintiffs' renewed request for appointment of a special master puts the cart before the horse. The Court should not allow Plaintiffs to catalog a litany of poorly supported and nonspecific allegations merely for the purpose of having the Court appoint a special master—proposed to be at the government's expense—to first investigate those allegations many of which, even if established, would not demonstrate any noncompliance nor noncompliance at the systemic and pervasive level to warrant such appointment. To that end, Plaintiffs have not shown that exceptional circumstances exist such that this Court cannot effectively and timely address pretrial matters in this case. *See* Fed. R. Civ. P. 53(a)(1)(C). First, Plaintiffs have not demonstrated that this case is so complex that appointment of a special master is required. Second, Plaintiffs have not shown that Defendants are not now in compliance with the Court's preliminary injunction or enforcement orders or that a history of noncompliance exists that would warrant appointment of a special master. The Court should deny Plaintiffs' motion. In the alternative, if the Court is inclined to grant Plaintiffs' request and appoint a special master, Defendants request that the Court order the parties to meet and confer regarding potential appointees, rate of compensation, allocation of compensation, and the special master's parameters, rather than adopt Plaintiffs' proposed order.

## II.     Background

On April 20, 2020, the Court granted preliminary injunctive relief for two nationwide subclasses. Preliminary Injunction Order (PI Order), ECF No. 132; *see also* Class Certification Order, ECF No. 133. Subclass One includes "[a]ll people who are detained in ICE custody who have one of the Risk Factors placing them at heightened risk of severe illness and death upon contracting the COVID-19 virus." Class Certification Order 1. Subclass Two includes "[a]ll people who are detained in ICE custody whose disabilities place them at heightened risk of severe illness and death upon contracting the COVID-19 virus." *Id.* at 2. Although the classes are broad, the PI Order directed relatively

limited relief. The Court directed the government to identify and track detainees with risk factors, make timely custody determinations based on those risk factors under ICE's Docket Review Guidance, supplement ICE's Pandemic Response Requirements (the PRR—ICE's nationwide policy on COVID-19 in its detention facilities), define minimum acceptable detention conditions for detainees with risk factors, and monitor and enforce facility-wide compliance with those requirements. PI Order 38-39. The Court did not order ICE to release any detainees, but it noted the existence of "tools available to ICE to decrease population density or to release medically vulnerable individuals" and focused on release as a way to promote social distancing. *Id.* at 10. Notably, the Court did not address Plaintiffs' request for appointment of a special master that they included in their preliminary-injunction motion. *See* ECF No. 81 at 4, 10. Defendants appealed the PI Order. That appeal is briefed, and the Ninth Circuit heard argument on December 9, 2020.

On June 24, Plaintiffs filed a motion to enforce the PI Order. Pls.' Mot., ECF No. 172. Plaintiffs alleged that ICE was taking too long to update the PRR and argued that ICE was not following its own Docket Review Guidance, as reflected in ICE's purportedly inconsistent responses or nonresponses to requests for custody redeterminations. *Id.* Plaintiffs also made new allegations unrelated to the preliminary injunction, including allegations on testing, transfers, medical isolation, and the use of disinfectants in facilities. *Id.* Plaintiffs also requested appointment of a special master. *Id.* On October 7, 2020, the Court partially granted Plaintiffs' motion. Enforcement Order, ECF No. 240. The Court concluded that ICE had not issued a performance standard setting the minimum acceptable conditions of confinement for class members across ICE facilities, and that ICE's compliance with the injunction had otherwise been spotty. *Id.* at 7-8. The Court issued an order enforcing (and modifying) the injunction in three respects.

First, the Court ordered that ICE again revise its PRR to mandate several things: minimum care and hospitalization protocols; that medical isolation and quarantine be distinct from solitary housing; changes in cleaning protocol and investigation into reports of adverse reactions to cleaning products; and suspension on most transfers. Enforcement

2

Order at 5, 10-11. On testing, the Court ordered that ICE mandate more widespread and regular COVID-19 testing of class members; that the testing be above the level provided by the Bureau of Prisons (BOP) and state prisons; that ICE mandate twice-daily screening of the class members for symptoms and temperature using a structured screening tool; and that ICE continue updating the Performance Standard, with the goal of exceeding BOP and state-prison-system response levels. *Id.* at 10-11.

Second, the Court required ICE to update its internal compliance tools and procedures to confirm compliance, *id.* at 11-13, because the PRR's monitoring and enforcement provisions "are so vague that the Court concludes they are unlikely to result in substantial compliance with the PRR or a future Performance Standard across facilities." *Id.* at 12. Third, the Court imposed requirements on ICE's custody-review process because of the Court's concerns with ICE's ability to demonstrate compliance with its Docket Review Guidance and based on the Court's expectation that "some individuals subject to mandatory detention would be released under the Docket Review Guidance and Preliminary Injunction." *Id.* at 15. The Court specified procedures for access to detainee medical records, submission of additional medical information, and ICE's consideration of that information to determine class membership. *Id.* at 16-17. The Court also detailed procedures for ICE's custody-determination process, generally requiring custody review to occur within seven days, notifying the class member and their counsel of the result, and requiring that the notice mention the risk factor identified and basis for continued detention. *Id.* at 16-18. The Court emphasized that in only rare cases should a class member not subject to mandatory detention remain detained and that some class members subject to mandatory detention should be released. *Id.* at 16-18. The Court did not order any specific releases; however, the Court permitted ICE to continue detaining aliens subject to mandatory detention and discretionary detention if it supplied an adequate justification. Finally, the Court deferred "the question of whether and how a special master could assist" but said Plaintiffs could renew their request in the future. *Id.* at 18.

On October 24, 2020, Plaintiffs sent Defendants a letter requesting a meet and confer concerning Defendants' implementation of the Enforcement Order. Pls.' Ex. I, ECF No. 255-9. On October 27, ICE issued the updated PRR (within the 20-day period prescribed by the order). Pls.' Ex. K, ECF No. 255-11. The parties met and conferred on October 31. On November 17, Defendants responded to Plaintiffs' meet and confer letter explaining the steps ICE had taken to comply with the order. Pls.' Ex. N, ECF No. 255-14. On December 16, Plaintiffs sent Defendants another letter concerning Defendants' implementation of the Enforcement Order, and on December 23, the parties met and conferred. Pls.' Ex. O, ECF No. 255-15. Plaintiffs sent Defendants an email summarizing the meet and confer on December 24. Pls.' Ex. P, ECF No. 255-16. Defendants responded to Plaintiffs' letter on January 8, 2021. Pls.' Ex. Q, ECF No. 255-17.

In addition, over the past four months, the parties have exchanged numerous emails and letters concerning myriad compliance concerns raised by Plaintiffs. Defendants have responded substantively to each compliance issue Plaintiffs have raised since October. On October 8, 2020, Plaintiffs emailed Defendants regarding a named plaintiff, and Defendants investigated and then responded on October 9. *See* Pls.' Ex. A, ECF No. 255-1; Defs.' Ex. 1, Defs.' Oct. 9 Email. On October 16, 2020, Plaintiffs emailed Defendants regarding custody reviews involving a Miami Assistant Field Office Director, Defendants investigated, and then responded on October 27. *See* Pls. Ex. C, ECF No. 255-3; Defs.' Ex. 2, Defs.' Oct. 27 Email. On October 22, 2020, Plaintiffs emailed Defendants regarding the use of segregation at the Buffalo Federal Detention Facility. Defendants investigated, and then responded on October 26. *See* Pls.' Ex. D, ECF No. 255-4; Defs.' Ex. 3, Defs.' Oct. 26 Email. On November 22, 2020, Plaintiffs emailed Defendants regarding releases from Etowah County Detention Center, Defendants investigated, and then responded on November 25. *See* Pls.' Ex. E, ECF No. 255-5; Defs.' Ex. 4, Defs.' Nov. 25 Email. On December 1, Plaintiffs emailed Defendants concerning the use of Forms I-286 and I-831. Defendants investigated, and then responded, as Plaintiffs acknowledged in their motion, on December 10. *See* Pls.' Exs. F, G, ECF Nos. 255-6, 255-7. In addition, on October 16,

4

1    Plaintiffs emailed Defendants a list of potential subclass members (totaling 288) entitled
2    to identification and custody determinations, Defendants investigated, and then responded
3    on December 22. *See* Pls.' Ex. H, ECF No. 255-8; Defs.' Ex. 5, Defs.' Dec. 22 Email.
4    Plaintiffs' motion omits many of Defendants' responses, including Defendants' December
5    22 response concerning potential class members and the spreadsheet of information that
6    Defendants completed at Plaintiffs' request. Pls.' Mot. for Spec. Master 7-8.

7    **III.    Legal Standard**

8        A court "should appoint a special master only in exceptional circumstances."
9    *Burlington N. v. Dep't of Revenue*, 934 F.2d 1064, 1071 (9th Cir. 1991). Courts have found
10   exceptional circumstances in cases involving extremely complex litigation or where there
11   have been problems with compliance with court orders. *See United States v. Suquamish*
12   *Indian Tribe*, 901 F.2d 772, 775 (9th Cir. 1990) (concluding that litigation which began
13   in 1974 involving "14 sub-proceedings and over 11,000 papers had been filed with the
14   district court" was complex enough to warrant a special master); *cf. Burlington N.*, 934
15   F.2d at 1072-73 (concluding that the case brought for injunctive relief under the Railroad
16   Revitalization and Regulatory Reform Act was not so complex as to require reference of
17   the entire case to a special master simply for reasons of judicial efficiency); *see also Local*
18   *28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*, 478 U.S. 421, 482 (1986) (appointing
19   a Special Master and noting the parties' "established record of resistance to prior state and
20   federal court orders"); *cf. United States v. Microsoft Corp.*, 147 F.3d 935, 954-55 (9th Cir.
21   1998) (concluding that the civil contempt proceeding brought against software developer
22   for violation of antitrust consent decree was not so complex as to require reference to a
23   special master and expressing doubt that "that complexity tends to legitimate references
24   to a master at all"). The Court's decision to appoint a master "must consider the fairness
25   of imposing the likely expenses on the parties and must protect against unreasonable
26   expense or delay." Fed. R. Civ. P. 53(a)(3).  Indeed, "[p]articular attention should be paid
27   to the prospect that a magistrate judge may be available for special assignments."  Fed. R.
28   Civ. P. 53 2003 Committee Notes.

## IV.    Argument

### a.  Plaintiffs have not demonstrated that appointment of a special master is warranted for effective and timely resolution of pretrial matters.

The Court should deny Plaintiffs' renewed request to appoint a Special Master because Plaintiffs do not argue and have not shown that exceptional circumstances exist to warrant appointment. *See generally* Pls.' Mot. for Spec. Master. Much of what Plaintiffs seek aims not to enforce the Court's order, but rather to impose additional fine-grained changes to ICE's detention practices. Moreover, Plaintiffs' suggested changes do not consider the needs of individual detention settings, whether the required actions are consistent with federal or CDC guidelines, or what ICE is already doing to comply with the injunction and address the pandemic. Plaintiffs thus ask the Court to disregard the discretion and flexibility ICE needs as a federal agency to address an unprecedented pandemic, and were the Court to grant the requested relief, such an order would constitute improper micromanagement of ICE operations. *See Demore v. Kim*, 538 U.S. 510, 523 (2003); *see also Hernandez Roman v. Wolf*, 829 F. App'x 165, 175 (9th Cir. 2020) ("the district court should, to the extent possible, avoid imposing provisions that micromanage the Government's administration of conditions at [immigration detention facilities]").

Plaintiffs fail to show that exceptional circumstances warrant the appointment of a Special Master because they have not established that this litigation is particularly complex, nor is there a history of noncompliance with the PI Order that warrants such appointment. *See Suquamish Indian Tribe*, 901 F.2d at 775; *Burlington N.*, 934 F.2d at 1072-73. This case does not possess the type of technical or legal complexities—like those typically found in multidistrict or patent litigation, which ordinarily benefit from the appointment of a special master with particularized expertise. *See Elizabeth Chamblee Burch & Margaret S. Williams*, Judicial Adjuncts in Multidistrict Litigation, 120 Colum. L. Rev. 2129, 2133-34 (2020) (presenting an empirical study into "court-appointed adjuncts," including special masters, in products liability multidistrict litigation, noting that the American Bar Association's recommendation about appointing special masters

6

was not based on "systematic empirical support," and concluding that courts should be cautious "about outsourcing judicial duties to private adjuncts"). Further, as demonstrated by Plaintiffs' voluminous letters and the numerous attorneys who have appeared in this matter, *see generally* Docket, *Fraihat v. ICE*, No. 19-01546; *see also* ECF Nos. 255-1 to 255-17, Plaintiffs cannot demonstrate—nor do they even try—that either they or the Court are incapable of establishing and addressing actual allegations of noncompliance such that the appointment of special master is warranted.

Instead, Plaintiffs attempt to justify the appointment of a special master by alleging non-compliance with the Court's Order. As discussed more fully below, Plaintiffs raise a handful of vague reports of alleged noncompliance, but these allegations fail to demonstrate that the Court cannot effectively and timely address pretrial matters in this case. Fed. R. Civ. P. 53(a)(1)(C). A "few technical violations cannot defeat [Defendants'] substantial compliance with the injunction" and they certainly do not show exceptional circumstances to warrant appointment of a special master. *Derek & Constance Lee Corp. v. Kim Seng Co.*, No. 05-3635, 2010 WL 11508468, at *6 (C.D. Cal. Apr. 5, 2010) (finding that the defendant "does admit to some technical violations, but those alone do not support contempt sanctions"). Isolated alleged lapses also must be viewed in the context of Defendants' overall efforts to comply with the injunction. *See Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, No. SACV1701613CJCDFMX, 2020 WL 816135, at *8 (C.D. Cal. Jan. 23, 2020); *see also In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993) (holding that a showing of single instances of non-compliance is not enough to compel an enforcement action because "'[s]ubstantial compliance' with the court order is a defense to civil contempt."). Here, Defendants' overall efforts—including updating the PRR, custody determination guidance, and facility surveys as well as implementing and documenting these updates—have been in compliance with and in furtherance of the Court's orders. Thus, any technical violations or isolated lapses in compliance with the PI and Enforcement Orders should not affect this Court's effective and timely administration of pretrial matters because the parties have

7

been resolving these issues between themselves, and they certainly do not constitute exceptional circumstances warranting appointment of a special master.

The Supreme Court also has long cautioned judicial restraint in the field of detention and correctional settings. *Lewis v. Casey*, 518 U.S. 343, 362 (1996) (noting that Supreme Court opinions have counseled against courts becoming "'enmeshed in the minutiae of prison operations'" (quoting *Bell v. Wolfish*, 441 U.S. 520, 562 (1979)); *see also id*. at 364 (Thomas, Souter, JJ. concurring) ("The Constitution charges federal judges with deciding cases and controversies, not with running state prisons. Yet, too frequently, federal district courts in the name of the Constitution effect wholesale takeovers of state correctional facilities and run them by judicial decree."). Plaintiffs' proposed granular oversight of Defendants is entirely at odds with the principle of judicial restraint. The existence of a pandemic does not give license to the judiciary to expand its powers in the manner urged by Plaintiffs. Public officials have wide latitude to deal with crisis, and exercises within that latitude should "not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *S. Bay United Pentecostal Church v. Newsom*, No. 19A1044, 2020 WL 2813056, at *1 (U.S. May 29, 2020) (Roberts, C.J., concurring) (citations omitted). The Court should reject Plaintiffs' attempt to circumvent these limits through the appointment of special master where the parties or this Court would be able to just as effectively address these matters.

**b. Plaintiffs' assertion that a Special Master is warranted due to noncompliance with the PI Order is incorrect because Defendants' overall efforts are in furtherance of—and in compliance with—the Court's orders.**

**1. Defendants are conducting custody redeterminations.**

Plaintiffs broadly allege that Defendants have failed to conduct custody redeterminations as required by the Court's Orders, and they break this argument down into six sub-arguments. Pls.' Mot. for Spec. Master 7. All six of those arguments fail.

8

### i. Defendants have adequately identified class members and continue to do so.

First, Plaintiffs contend that "Defendants have failed to adequately and affirmatively identify class members." *Id.* This is incorrect. The PI Order required Defendants to "identify and track all ICE detainees with Risk Factors," and specified "[m]ost should be identified within ten days of this Order or within five days of their detention, whichever is later." PI Order at 38. The Court's Enforcement Order clarified that Defendants must "identify and track detainees with risk factors within five days of their detention (step one) and then make a 'timely' custody determination (step two)." Enforcement Order at 17. This is the process outlined in the PRR and the Broadcast Message sent to all ICE detention facilities. *See* Pls.' Ex. K, ECF No. 255-11, PRR at 19; Pls. Ex. 8, ECF No. 260-8, Broadcast Message; *see also* Defs.' Ex. 7, Declaration of Robert Guadian ¶ 7-8.

Defendants have repeatedly asked Plaintiffs to identify the specific issues or individuals they are referring to so that Defendants can investigate and resolve those issues without Court intervention. *See e.g.*, Pls.' Ex. N, ECF No. 255-14 at 2 (Defendants' November 17 letter requesting names and A numbers concerning the allegation that ICE had not identified individuals as class members on the basis of severe psychiatric illness); Pls.' Ex. Q, ECF No. 255-17 at 2 (Defendants' January 8, 2021 letter requesting names and A numbers concerning PI noncompliance allegation). Plaintiffs consistently use vague anecdotes as evidence of noncompliance, but such anecdotes—often with little to no identifying information concerning the individuals involved—simply are not evidence that ICE can investigate to determine the truth of the allegations or that the Court can accept for the truth of the matter asserted. *See* Pls.' Ex. P, ECF No. 255-16 (Plaintiffs' December 24 letter requesting specific names and A numbers in order to investigate Plaintiffs' claims). Defendants still do not have this information.

In addition, Defendants have provided a specific response to Plaintiffs' requests for custody reviews of certain individuals. *See* Defs.' Exs. 1, 5; Pls.' Ex. A, ECF No. 255-1.

9

Nonetheless, Plaintiffs now allege for the first time that "[o]f the 288 Subclass Members who Class Counsel identified to Defendants, [plaintiffs were] unable to locate 63 in Defendants' January 11, 2021 'Current Detainee' spreadsheet." Bichell Decl. ¶ 7, ECF No. 255. Plaintiffs fail to mention that Defendants already responded directly to Plaintiffs' emails requesting information about the 288 identified individuals. *See* Defs.' Ex. 5. Plaintiffs also make no mention of any of the information Defendants provided in that correspondence, which included updated information for each of the 288 individuals. Defendants reviewed each of the 288 individuals listed for class membership and provided a response to Plaintiffs indicating why the individuals either did or did not qualify for class membership. *Id.* (attaching spreadsheet with updated information for Plaintiffs' list 288 individuals). Defendants also explained that some of the information Plaintiffs provided was inaccurate and therefore impossible to investigate. Plaintiffs' disagreement with the result of Defendants' review does not mean that Defendants have "failed to adequately and affirmatively identify class members." Pls.' Mot. for Spec. Master 7. Ultimately, Plaintiffs are not satisfied unless each individual they follow up about is determined to be a class member. But ICE's conclusion that some individuals are not class members after review of the individual's circumstances does not warrant appointment of a special master. In fact, it indicates the opposite—that when Plaintiffs bring issues to ICE's attention, ICE investigates, addresses the issues with Plaintiffs, and resolves them when possible without the need for judicial intervention.

Notably, Plaintiffs failed to compare their list of 288 individuals with the responsive spreadsheet Defendants sent Plaintiffs on December 22, 2020. *See* Bichell Decl. ¶ 7, ECF No. 255. In the responsive spreadsheet that Defendants sent to Plaintiffs on December 22, 2020, Defendants included a column indicating the result of ICE's review of whether the individual qualified as a class member and a column indicating whether the individual's class membership was pending verification by IHSC—in other words, and explanation why some individuals were not identified as class members. *See* Defs.' Ex. 5. Plaintiffs never followed up about Defendants' December 22 response with additional questions or

concerns. Plaintiffs' lack of diligence to investigate this in response to their vague allegations of noncompliance is not sufficient grounds for the Court to appoint a special master.

Moreover, because Plaintiffs do not provide names, A numbers, or the methodology used for their calculations, Defendants are unable to identify the 63 individuals that Plaintiffs claim remain unidentified and whether their class member status has already been provided in the spreadsheet sent to Plaintiffs on December 22, 2020—all of which could have been discussed during the meet and confer on December 23, 2020. Plaintiffs' preferred method of providing vague anecdotal information to Defendants and the Court, as noted in all of Defendants' letters to Plaintiffs, makes it impossible for Defendants to properly investigate and respond to Plaintiffs' allegations. *See e.g.*, Saenz Decl. ¶¶ 10-13, ECF No. 254-14; Rios Decl. ¶¶ 7-9, ECF No. 254-15; Herr Decl. ¶¶ 9-21, ECF No. 254-19; *see also* Pls.' Ex. P, ECF No. 255-16 (Plaintiffs' December 24 email listing anecdotal information only in response to Defendants' request at the meet and confer for more specific information). This does not provide the justification for appointing a special master.

Further, without qualifying Homer Venters, MD as an expert,[1] Plaintiffs incorrectly assert that "one expert has observed systemic failures to identify Subclass Members within facilities." Pls.' Mot. for Spec. Master 7-8. Plaintiffs also cite the declarations of a few attorneys to contend that Defendants are knowingly not identifying detainees with risk factors as class members. *Id.* at 8. However, these anecdotes do not provide specific

---

[1] Plaintiffs have not qualified Dr. Venters as an expert in this litigation, and even if they had, Plaintiffs fail to explain how his medical expertise qualifies him as an expert concerning ICE's administrative procedures and databases for identifying detainees who have risk factors and who are class members in litigation. The proponent of expert testimony has the burden of proving the admissibility of the testimony under Rule 702. *Lust By and Through Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

identifying information so that Defendants can adequately investigate and respond to these allegations. Where a large part of the evidence Plaintiffs are relying on is inadmissible and/or unreliable (including Plaintiffs' self-reported medical diagnoses with no indication whether that information has been shared with ICE), Plaintiffs cannot establish any credible violation of the PI Order, let alone one that warrants imposition of a special master.[2]

Plaintiffs also allege that Defendants "fail to identify people with 'severe psychiatric illness' as described in the Enforcement Order." Pls.' Mot. for Spec. Master 8. Plaintiffs further incorrectly accuse Defendants of continuing to hold the position that this risk factor "is limited to those who are class members in *Franco-Gonzalez v. Holder*, No. 10-cv-02211 DMG, 2013 WL 8115423 (C.D. Cal. Apr. 23, 2013)." *Id.* This is wrong. Defendants do not take this position, and Defendants have updated the PRR to reflect the definition of "severe psychiatric illness" required by the Court. *See* Pls.' Ex. K, ECF No. 255-11, PRR at 11, 13. Defendants have engaged with Plaintiffs about several lists of *Franco/Fraihat* class members and provided information as to why certain individuals do or do not qualify as class members. *See* Defs.' Ex. 6 (Plaintiffs' and Defendants' emails between September 18 and November 10, 2020). Plaintiffs' use of unsupported claims and alleged medical diagnoses (the sources of which are not stated) to allege that ICE medical staff have erred when the medical staff reached a different conclusion does not equate to an automatic error by ICE's medical staff. *See* Pls.' Mot. for Spec. Master 9 & n.14.

---

[2] In addition to containing vague allegations, the declarations of Saenz, ECF No. 254-14, Salama, ECF No. 254-2, Flewelling, ECF No. 254-6, Philabaum, ECF No. 254-7, St. John, ECF No. 254-10, Mantikas, ECF No. 254-12, Wilkinson, ECF No. 254-13, Rios, ECF No. 254-15, Cook, ECF No. 254-16, Millner, ECF No. 254-18, Herr, ECF No. 254-19, Anderson, ECF No. 254-21, Kurichety, ECF No. 254-22, Fieldman, ECF No. 254-23, Bichell, ECF No. 255, are based in part on hearsay allegations and are inadmissible evidence. *Orr v. Bank of America*, NT & SA, 285 F.3d 764, 773-74 (9th Cir. 2002) (evidence submitted to the Court on motion practice must meet all requirements for admissibility of evidence if offered at the time of trial).

Plaintiffs' argument that Defendants failed to adequately identify class members is nothing more than a complaint that Defendants have not implemented the injunction in the exact manner Plaintiffs prefer. The Court ordered Defendants to "provide necessary training to any staff tasked with identifying detainees with Risk Factors, or delegate that task to trained medical personnel," PI Order at 38, and the Enforcement Order clarified that a process was needed for review of medical records that may be incomplete. Enforcement Order at 17. To that end, the Court ordered that "a detainee or their counsel may promptly obtain a copy of the medical file and may supplement medical records at any time. Defendants shall streamline and clarify procedures for such requests. Defendants' medical personnel shall review newly submitted records within five days and inform the detainee and his or her counsel of the result." Enforcement Order at 17. Contrary to the recommendation of Plaintiffs' purported expert, Dr. Venters, *see* Pls.' Mot. for Spec. Master 9, the Court did not order all new admissions be assessed by certain medical personnel or within a particular timeframe, except that new detainees must be identified and tracked within five days of their admission. Enforcement Order at 17. Nor did the Court order weekly record review for risk factors. Pls.' Mot. for Spec. Master 10. Therefore, ICE has done what the Court ordered with respect to the identification of subclass members, and Plaintiffs' desire that ICE do more does not justify appointment of a special master.

### ii. Defendants make timely custody redeterminations.

Plaintiffs argue that Defendants fail to conduct timely custody redeterminations, and they point to the Current Detainee spreadsheet produced on January 11, 2021, to argue that there are 2,889 detainees awaiting custody determinations.[3] Pls.' Mot. for Spec.

---

[3] However, Plaintiffs merely submit a declaration from one of Plaintiffs' counsel, who has not been established as a data expert in this litigation, to describe how he looked at the spreadsheets and came to this conclusion. *See* Fox Decl., ECF No. 254-17. Mr. Fox does

Master 10. This is not accurate. Defendants have provided timely custody redeterminations and have added relevant language to the PRR in compliance with the Court's Orders. Pls.' Ex. K, ECF No. 255-11, PRR at 19. Of note, the custody redeterminations of several thousand class members has proven more burdensome than expected both in terms of conducting *and* documenting the ongoing reviews. Defs.' Ex. 8, Declaration of Donna Vassilio-Diaz ¶¶ 5-6, 8. ICE expects to continue making custody redeterminations and update all reporting on custody redeterminations in the coming weeks. *Id.* ¶ 8. Moreover, Plaintiffs' vague, anecdotal accounts from attorneys about requests for custody determinations that allegedly go "unanswered for weeks" is not evidence of ICE's failure to comply with the Orders. Pls.' Mot. for Spec. Master 10-11. Notably, the Enforcement Order appears to specify a seven-day guideline for new custody determinations only—not custody *re*determinations. *See* Enforcement Order 17 (holding that "[o]nly in rare cases should the determination take longer than a week" but not specifying a timeframe for the thousands of custody redeterminations required under the Order). Thus, the Court's Order is cognizant of exceptions from the seven-day guideline, and notwithstanding Plaintiffs' prior arguments, Pls.' Mot. for Spec. Master 10-11, the Court's Order still has not adopted Plaintiffs' characterization of a custody determination process based on requests for release and responses. *See generally* Enforcement Order. Therefore, Defendants have complied with implementation of the Court's Order to conduct timely custody determinations, and Plaintiffs' allegations in this respect do not justify appointment of a special master.

### iii. Defendants provide adequate notice of, and justification for, continued detention.

---

not explain his methodology for how he analyzed the data or how he arrived at the conclusion he did. It is nearly impossible for Defendants to adequately respond to such data-driven allegations without even an explanation as to the methodology used.

Plaintiffs contend that Defendants continue to provide only cursory denials of release to *Fraihat* class members and that ICE's forms used to communicate custody redetermination results are problematic. Pls.' Mot. for Spec. Master 11-12. This is also inaccurate. The Court ordered that: "Defendants shall provide notice of the result of the custody determination to the Subclass member and his or her counsel. The notice shall mention the Risk Factor(s) identified, and in cases of non-release shall reference a basis for continued detention in the Docket Review Guidance." Enforcement Order at 17. Defendants have done so and are in compliance with the Court's order. Guardian Decl. ¶ 7, Defs.' Ex. 7. ICE has instructed the field to use Forms I-286, Notice of Custody Determination, and I-831, Continuation Page, to convey the required notice to class members and their counsel. *See* Pls.' Ex. 8, ECF No. 260-8 (Broadcast Message); Guadian Decl. ¶ 7, Defs.' Ex. 7. Specifically, the I-831 form, which can be attached as a continuation page to a variety of DHS forms, provides a space for identification of risk factors and the basis for continued detention, where applicable. And with respect to ICE's oversight of the custody redeterminations, ICE has an existing oversight and supervision structure whereby cases are reviewed initially by first line supervisors and, in appropriate cases, with oversight of a second line supervisor in consultation with the field office director or their designee. Guadian Decl. ¶ 8, Defs.' Ex. 7. The Court's Order requires nothing more than what ICE's adapted forms provide in terms of notice and justification for continued detention. Again, Plaintiffs' vague anecdotal accounts, largely based on hearsay, are not evidence of noncompliance, let alone the type of noncompliance sufficient to warrant appointment of a special master.

### iv. Defendants are complying with the standard for continued detention of subclass members not subject to mandatory detention.

Plaintiffs argue that Defendants are not complying with the custody review process ordered by the Court and continue to detain individuals subject to non-mandatory

detention without justification. Pls.' Mot. for Spec. Master 12-13. This is not correct. The ongoing docket review guidance, revised PRR, and October 27 Broadcast Message provide consistent instructions about procedures for making custody re-determinations for *Fraihat* subclass members and ensure that the presence of a Risk Factor is given significant weight and that a justification for continued detention is required. Pls.' Ex. K, ECF No. 255-11, PRR at 19; Guadian Decl. ¶ 7, Defs.' Ex. 7; Pls.' Ex. 8, ECF No. 260-8, Broadcast Message. The Enforcement Order provides that "[o]nly in rare cases should a Subclass member not subject to mandatory detention remain detained" after receiving a custody determination. Enforcement Order at 17. The Court, however, did not order release and did not define "rare."

Defendants, therefore, have reasonably interpreted the definition of the term "rare" as used in the Court's Order to result in the release of, as of January 23, 2021, 88% of subclass members not subject to mandatory detention. Vassilio-Diaz Decl. ¶ 6, Defs.' Ex. 8. Thus, where Plaintiffs argue in their Motion that Defendants have refused to release more than 30% of individuals not subject to mandatory detention, that is not correct. Pls.' Mot. for Spec. Master 12; Fox Decl. ¶ 6, ECF No. 254-17. Moreover, many non-mandatory detention detainees have been convicted or charged with a range of serious criminal offenses, including violent felonies, which ICE has considered as dangers to the community regardless of the presence of any of *Fraihat* risk factors. Guadian Decl. ¶ 9, Defs.' Ex. 7. Many others are scheduled for imminent removal and ICE's position is that those individuals fit the Court's "rare" circumstance provision. *Id.* Accordingly, ICE has reasonably interpreted and complied with the requirement that "[o]nly in rare cases should a Subclass member not subject to mandatory detention remain detained." Enforcement Order at 17.

> ### v. Defendants are complying with the standard for continued detention of subclass members who are subject to mandatory detention.

Plaintiffs contend that Defendants also issue cursory denials to individuals subject to mandatory detention and do not conduct an individualized analysis of the custody redetermination for those individuals. Pls.' Mot. for Spec. Master 13. This is wrong. The Court's order specifies that ICE "shall not apply the Docket Review Guidance rule against release of Section 1226(c) detainees so inflexibly that none of these Subclass members are released." Enforcement Order at 17-18. The Court recognized that even fewer individuals subject to mandatory detention would be released (some but not none) compared to the non-mandatory detention individuals. ICE has implemented the Court's standard for class members subject to mandatory detention in the PRR and through the Broadcast Message. *See* Pls.' Ex. K, ECF No. 255-11, PRR at 19; Pls.' Ex. 8, ECF No. 260-8, Broadcast Message.

Defendants have reasonably interpreted the Court's Order requiring the release of some detainees subject to mandatory detention based on an assessment of their risk factors in light of the public health emergency. In fact, as of January 23, 2021, a review of the data reflects that the continued detention rate for subclass members subject to mandatory detention is less than 35%. Vassilio-Diaz Decl. ¶ 7, Defs.' Ex. 8. Therefore, where Plaintiffs contend in their Motion that Defendants have not released approximately 64% of individuals subject to mandatory detention, that is not correct. *See* Fox Decl. ¶ 7, ECF No. 254-17. That more than 60% of mandatory detention individuals have been released shows that Defendants are complying with the custody review process ordered by the Court that Defendants release "some but not none" of the subclass members subject to mandatory detention. *See* Pls.' Ex. Q, ECF No. 255-17 (Defendants' letter responding to Plaintiffs' allegation concerning the rate of continued detention of individuals subject to mandatory detention).

Further, Plaintiffs' anecdotes about the "cursory" justification for continued detention for some individuals based only on their criminal history is not evidence of noncompliance with this provision of the Court's Order. Pls.' Mot. for Spec. Master 13.

Plaintiffs broadly allege that ICE denies release to mandatorily detained individuals "no
matter how old, minor, or nonviolent" the "criminal contact." *Id.* As support, Plaintiffs
cite generally to three declarations from attorneys discussing numerous unnamed clients
and other issues without any elaboration or citation to specific paragraphs in the
declarations. *Id.* at n.16, n.17, n.18.  ICE deeply regrets the death of anyone in its custody
and takes the investigation into such deaths very seriously. However, Plaintiffs' reference
to the death of Anthony Jones is misleading because, while he was a class member,
currently there is no evidence that his death was related to COVID-19. *See* Pls.' Mot. for
Spec. Master 14 & n. 20 (citing information about Mr. Jones's death from ICE's website);
Guadian Decl. ¶ 13, Defs.' Ex. 7. Like individuals who unfortunately contract COVID,
the passing of any of those individuals, while tragic, is not evidence of noncompliance—
especially system-wide compliance, or the type of noncompliance that would warrant
appointment of a special master.

### vi.  Defendants communicate procedures for custody determinations and ensure compliance across field offices.

Plaintiffs contend that Defendants' have failed to adequately advertise and
communicate procedures across field offices for conducting custody redeterminations and
for requesting medical records and additional medical review. Pls.' Mot. for Spec. Master
14-15. This is wrong. Defendants have communicated procedures for custody
determinations and ensure compliance across field offices. *See* Pls.' Ex. K, ECF No. 255-
11, PRR at 19; Pls.' Ex. 8, ECF No. 260-8, Broadcast Message. The revised PRR and the
Broadcast Message outline clear and detailed instructions for custody determinations. *See
id.* Here, Plaintiffs continue to conflate step one and step two of the Court's Order. The
Court ordered, "*At step one*, Defendants must affirmatively identify and track detainees
with Risk Factors. . . Defendants medical personnel shall review newly submitted records
within five days and inform the detainee and his or her counsel of the result." Enforcement
Order at 17. Accordingly, the updated PRR instructs facility medical staff to review newly

18

submitted records within five days of receipt and inform the detainee and his or her counsel of the result of the review, pursuant to step one in the Court's Order. Pls.' Ex. K, ECF No. 255-11, PRR at 8, 10-13. At step two, pursuant to the Court's order, "Defendants must complete a 'timely' custody determination." Enforcement Order at 17. The SDDO performs the *custody* review, which the Court's order explains is a separate step (step 2). Pls.' Ex. K, ECF No. 255-11, PRR at 19. This is the step that pertains to whether the individual will be released or continue in detention in light of their risk factor and the public health emergency.

The Court ordered that "Defendants shall advertise and implement consistent procedures across field offices, for both [identification and tracking of risk factors, and timely completion of custody determinations and notice of the results]." Enforcement Order at 17. Advertisement in this context meant ICE's advertisement of consistent procedures to its employees in the field. The Court did not order ICE to advertise any information to the general public. However, when Plaintiffs requested contact information for the centralized mailbox for custody determinations referenced in the Broadcast Message, Defendants clarified that the request process outlined by the Court was concerning requests for medical review and not release requests. *See* Pls.' Ex. G, ECF No. 255-7; *see also* Enforcement Order at 17 ("[A] detainee or their counsel may promptly obtain a copy of the medical file and may supplement medical records at any time. Defendants shall streamline and clarify procedures for such requests."). Therefore, Defendants provided Plaintiffs with a list of email addresses for each field office for submission of additional medical records and requests for copies of medical records. *See* Pls.' Ex. G, ECF No. 255-7. This list was not marked confidential and Defendants did not refuse to make it publicly available when it was provided to Plaintiffs with the understanding that Plaintiffs "share [it] with class members, their counsel, and non-attorney advocates." *See id.* at 2. Thus, Plaintiffs' claim that Defendants have refused to provide contact information for where they can submit *Fraihat* requests is inaccurate, Pls.' Mot. for Spec. Master 15 & n.25, and their allegation that "Defendants refused to make

19

this information publicly available," Pls.' Mot. for Spec. Master 16, is false. Rather than support appointment of a special master, this level of cooperation beyond what the Court has ordered demonstrates why a special master is not needed here.

Plaintiffs also complain that Defendants' guidance does not contain "a formal process whereby Subclass Members may submit requests for review." Pls.' Mot. for Spec. Master 14 & n.22. This is also wrong. Defendants' guidance provides instructions on the medical review request process as described above, but it does not provide instructions on requests for release because the Court did not order such a release request process. This is exactly what Defendants' explained at the hearing on the motion to enforce that Plaintiffs continue to find "baffling." *See* Pls. Ex. W, ECF No. 255-23 at 15 ("it seems that when plaintiffs and their advocates are reaching out to ICE personnel, they are attempting or, it seems, they are attempting to challenge the results of a custody determination. So they will also reach out and demand that the person be reevaluated or, basically, a custody determination reoccur."). Plaintiffs' aggressive and continual efforts to refine the provisions of this Court's orders in ways that go far beyond allegations of noncompliance do not make appointment of a special master appropriate.

Moreover, Plaintiffs' assertion that their purported expert found confusion about who conducts custody reviews at one facility in separate litigation is not evidence of non-compliance here. Pls.' Mot. for Spec. Master 15. The Court did not order specific employees at ICE's detention facilities to conduct custody reviews, and ICE requires the necessary flexibility to delegate tasks to different individuals at different types of facilities. Enforcement Order at 17. In addition, Plaintiffs cite to their October 16 correspondence concerning an AFOD in Miami who they allege was "refusing requests" in attempt to highlight internal confusion about who conducts custody reviews. Pls.' Mot. for Spec. Master 15.[4]   When Defendants investigated this issue in October, Defendants confirmed

---

[4] Notably, Plaintiffs' October 16 email attached a letter dated May 18 purportedly as evidence that the Miami AFOD was refusing to receive custody redetermination requests.

that "all detainees at Krome have had custody reviews under *Fraihat*. ERO MIA is responding to requests for release and inquires [*sic*], including from non-attorney advocates." *See* Defs.' Ex. 2. Thus, Plaintiffs have failed to show confusion concerning custody reviews that would warrant a noncompliance finding, let alone one sufficient to support appointment of a special master.

### 2. Defendants have suspended transfers of people between facilities and are complying with the Court's Orders.

Plaintiffs allege that Defendants have not complied with the Court's Order to suspend transfers "with a narrow and well-defined list of exceptions" and "continue facility-to-facility transfers at approximately the same rate as before the Court's Enforcement Order." Pls.' Mot. for Spec. Master 17. This is wrong. The Court's Order states that "Defendants shall provide more protective, and more concrete, transfer protocols to protect the Subclasses, including a suspension of transfers with a narrow and well-defined list of exceptions consistent with CDC Guidance." Enforcement Order at 11. Based on the Court's Order, Defendants updated the PRR, which now states that transfers of ICE detainees and non-ICE detained populations to and from other jurisdictions and facilities have been discontinued unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, release or removal, or to prevent overcrowding. Detainee transfers for any other reason require justification and pre-approval from the local ERO Field Office Director." Pls.' Ex. K, ECF No. 255-11, PRR at 26; Guadian Decl. ¶ 10, Defs.' Ex. 7. All detainees who are transferred, removed or released must be cleared medically in accordance with ERO guidelines. Guadian Decl. ¶ 10, Defs.' Ex. 7.

Plaintiffs also allege that "Defendants' revised PRR does not narrow transfer restrictions from prior PRR iterations" Pls.' Mot. for Spec. Master 17. But the Court did

---

However, Plaintiffs' citation to this inquiry fails to show anything close to noncompliance given the passage of time between the May letter and Plaintiffs' October email and Plaintiffs' failure to show that what may have been an issue in May remained an issue in October.

not order Defendants to narrow transfer restrictions from prior PRR iterations. *See* Enforcement Order at 11 ("Defendants shall provide more protective, and more concrete, transfer protocols to protect the Subclasses, including a suspension of transfers with a narrow and well-defined list of exceptions consistent with CDC Guidance."). Defendants updated the transfer protocol in the revised PRR and addressed the Court's concerns. *See* PRR at 27-28. The revised PRR now includes improved guidance on transferring ICE detainees and outlines the six well-defined exceptions, consistent with CDC Guidance. *Id.*; *see* Pls.' Ex. N, ECF No. 255-14 at 7 (Defendants' November 17 letter providing Plaintiffs a detailed response on this issue). All transfers are based on mission needs or may be due to requirements imposed by other litigations. Guadian Decl. ¶ 10, Defs.' Ex. 7. Defendants have asked Plaintiffs for specific details about any transfers that Plaintiffs believe did not fall under the list of narrow exceptions so that Defendants could investigate and adequately respond, but Plaintiffs provided no further information. *See* Pls. Ex. Q, ECF No. 255-17 at 13. Regarding Plaintiffs' footnote alleging, for the first time, that an individual in ICE custody died "due to COVID-19 complications" after being transferred from federal prison to an ICE detention facility, Plaintiffs fail to show that this transfer did not fall under the narrow list of exceptions. In fact, this individual was transferred to stage for a removal flight, which fits squarely within an exception. Guadian Decl. ¶ 13, Defs.' Ex. 7.

Contrary to Plaintiffs' assertion that "Defendants appear to have made no effort to ensure safety precautions when transporting individuals being transferred between facilities," Pls.' Mot. for Spec. Master 19, the revised PRR contains guidance on safety precautions during transfers that fall under the narrow list of exceptions. PRR at 26-27. For example, the revised PRR states that "When necessary to transport individuals with confirmed or suspected COVID-19, if the vehicle is not equipped with emergency medical service (EMS) features, at a minimum, drive with the windows down and ensure that the fan is set to high, in non-recirculating mode. If the vehicle has a ceiling hatch, keep it open. Everyone in the vehicle must wear a mask." PRR at 27; Guadian Decl. ¶ 11, Defs.'

Ex. 7. To the extent Plaintiffs cite to *Dorce v. Wolf*, No. 20-CV-11306, 2020 WL 7264869, at *1 (D. Mass. Dec. 10, 2020) to support their argument that Defendants are not complying with the Court's orders, a single example of a detainee transfer in the beginning of the pandemic, when the PRR was not updated with the current transfer guidance, is not enough to show nationwide, systemic noncompliance. *See Derek & Constance Lee Corp.*, 2010 WL 11508468, at *6; *see* ICE's Enforcement and Removal Operations COVID-19 Pandemic Response Requirements, https://www.ice.gov/coronavirus/prr (previous versions show that in June, the PRR did not include updated transfer restrictions). Furthermore, this case does not comment on the reason for the detainee transfer, which may have fallen under one of the narrow exceptions. Thus, Plaintiffs have not shown noncompliance with the Court's order sufficient to support appointment of a special master.

### 3. Defendants' PRR is in compliance with the Court's order.

#### i. The revised PRR addresses the concerns raised by the Court.

Plaintiffs assert that the "Court ordered Defendants to issue a 'comprehensive Performance Standard directed to the Subclass' that addresses each of the issues identified in the papers supporting Plaintiffs' enforcement motion[,]" and note that the Court explicitly cited to the Declaration of Homer Venters when referencing the elements of a compliant standard. Pls.' Mot. for Spec. Master 19 (citing Enforcement Order at 10). This is incorrect.[5]

Plaintiffs also allege that the revised PRR "does not sufficiently address the concerns raised by the Court in its enforcement order." Pls.' Mot. for Spec. Master 19. But the PRR does address the concerns raised by the Court in its Enforcement Order. *See generally* Enforcement Order; PRR. Defendants have complied fully with the Court's Order regarding the contents of the PRR. *See* PRR; *see also* Guadian Decl., Defs.' Ex. 7;

---

[5] The only declaration the court referenced in the actual order portion of the decision was the Schlanger declaration. Enforcement Order at 10-18.

23

Declaration of Ricardo A. Wong, Defs.' Ex. 9; Declaration of Dr. Ada Rivera, Defs.' Ex. 10.

For the first time, Plaintiffs allege that Defendants fail to continually update the PRR to reflect changes in CDC guidelines, Pls.' Mot. for Spec. Master 20, including the new close contact definition and emerging issues like administration of vaccines and how ICE will adjust to new strains of the virus. *Id*. The current PRR is in the process of being updated and upon completion, will be broadcasted to all stakeholders as version 6.0. Wong Decl. ¶ 7, Defs.' Ex. 9.  With regard to vaccines, Plaintiffs' arguments are not tied to changes in CDC guidance, and ICE proactively reported the number of COVID-19 vaccine doses needed for ICE detainees at IHSC and non-IHSC facilities to DHS vaccine planners who conveyed that information to Operation Warp Speed earlier in the pandemic. Rivera Decl. ¶ 5, Defs.' Ex. 10. The detainee vaccine allotment is incorporated with the total COVID-19 vaccine amount that is distributed by the federal government to each state and ICE detainees are waiting to receive their vaccine through the distribution prioritization process that is occurring in each state. *Id.* ¶ 6-7, 9-10. Regarding ICE's plan to deal with the new strain of the virus, there are no specific recommendations from health authorities other than standard guidance, which ICE is following. *Id.* ¶ 8. So once again, Plaintiffs' arguments amount to nothing more than a wish list of new and expansive provisions that do not demonstrate noncompliance with this Court's order or show why appointment of a special master is warranted.

To the extent Plaintiffs allege that the PRR "does not set out clear and detailed guidelines for identifying individuals with Risk Factors both upon admission and those who were either missed at admission or developed Risk Factors while in custody," Pls.' Mot. for Spec. Master 20, the revised PRR does exactly that, outlining clear and detailed instructions for requesting review of medical files. PRR at 19. And to the extent Plaintiffs provide specific complaints, Defendants asked for that information in their December 10, 2020 email. *See* Pls.' Ex. G, ECF No. 255-7. Defendants explicitly told Plaintiffs that they were unaware of any complaints concerning the medical file review process, asked if there

24

is a specific field office where Plaintiffs believe this is an issue, and asked Plaintiffs to "provide the names and A numbers of the cases at issue" so that Defendants could investigate and respond. *Id*.

Next, Plaintiffs assert that the Court's Order states that "Defendants shall mandate more widespread and regular testing of the Subclasses, consistent with CDC Guidelines and above the level provided by the BOP and state prisons." Enforcement Order at 11. Plaintiffs assert that the PRR's language regarding testing is not clear because "[i]n one place the PRR calls for 'Testing of all new admissions before they join the rest of the population in the facility,' PRR at 33, but elsewhere it simply says to 'consider' doing so. PRR at 27." Pls.' Mot. for Spec. Master 21. Plaintiffs further assert that the "Bureau of Prisons recommends institution-wide testing if 'substantial transmission is confirmed.'" PRR at 33 (citing Bichell Decl., Pls.' Ex Y). And that "conversely, the PRR cautions against widespread testing until 'facility leadership have a plan in place for how they will modify operations based on test results.'" PRR at 33.

Here, Plaintiffs misrepresent the testing section of the PRR and BOP guidance. The PRR mandates testing for all new admissions and recommends testing in other situations. PRR at 33-34. This is consistent with CDC Guidance and above BOP testing protocol, which says that new admissions *should* be tested and offers no mandate or requirement. Pls.' Ex. Y, ECF No. 255-25 at 3. In Defendants' November 17, 2020 letter to Plaintiffs, Defendants advised that "BOP does not *mandate* specific testing or procedures for vulnerable populations. *See* BOP Modified Operations at https://www.bop.gov/coronavirus/covid19_status.jsp, and BOP COVID-19 Pandemic Response Plan, August 2020." After asking Plaintiffs several times for the BOP standards they keep referring to, Plaintiffs now, for the first time, refer to the Bichell Decl., Ex. Y, for the Bureau of Prisons *recommendation* of "institution-wide testing if 'substantial transmission if confirmed.'" Pls.' Mot. for Spec. Master 21. But Plaintiffs leave out key words. The BOP Guidance that Plaintiffs attached states that "institution-wide testing *may be considered* . . . if substantial transmission is confirmed." Pls.' Ex. Y, ECF No. 255-25

25

at 3. Plaintiffs' cherry-picking of language to make the BOP Guidance appear to state a
higher standard is deceptive. ICE continues to follow CDC guidance on testing and
contrary to Plaintiffs' assertion that "the PRR cautions against widespread testing," as
noted in Defendants' November 17 letter to Plaintiffs, ICE is expanding testing in various
settings to include more frequent testing of asymptomatic exposed individuals when there
is an ongoing outbreak in a facility in order to identify new cases and isolate those who
test positive from other detainees. Rivera Decl. ¶ 5, Defs.' Ex. 10. ICE has made
considerable strides in detainee testing by providing Abbott ID NOW test machines and
supplies to most detention facilities. Wong Decl. ¶ 9, Ex. 9. ICE will continue this trend
as additional equipment and supplies are identified by the contract for ICE's use. *Id.*

Furthermore, Plaintiffs still have not provided guidance on the standard that they
believe applied to BOP or what they interpret "more widespread and regular testing" as
well as "above the level" of BOP and state prisons to mean. Instead, they admit that the
BOP merely recommends institution-wide testing if "substantial transmission is
confirmed," yet they contend that ICE is deliberately indifferent when ICE does not
"mandate widespread testing of all asymptomatic individuals in ICE custody." Pls.' Mot.
for Spec. Master 21, n.38. Plaintiffs' contention contradicts BOP's guidance, which
recognizes the limited effectiveness and feasibility of such testing in the absence of known
or suspected contacts with a COVID-19 case. *See* Pls. Ex. Y, ECF No. 255-25 at 3-4.
Notably, BOP does not *mandate* specific testing or procedures for vulnerable populations
or any other population; thus, ICE's requirement for testing of new admissions goes
"above the level" of BOP. *See* BOP Guidance, Pls.' Ex. Y, ECF No. 255-25 at 2-4. Further,
the standard "more widespread and regular testing" as well as "above the level" of BOP
and state prisons is imprecise, vague, and subject to interpretation. ICE's testing
requirements constitute a reasonable interpretation of the Court's Order.

Plaintiffs also assert that the PRR fails to address how facilities operated by ICE
and its contractors should prioritize testing, fails to advise facility management on contact
tracing and widespread testing in cases of facility-wide transmission, and does not provide

26

for on-going testing of high-risk individuals in the Subclasses, as required by the Court and recommended by Dr. Venters. Pls.' Mot. for Spec. Master 21. But none of these assertions were ordered by the Court. The PRR sufficiently addresses testing and protection of high-risk individuals and the Court's Order does not require ICE to take specific measures in those respects.

Lastly, Plaintiffs assert that a section of the PRR entitled "Additional Measures to Facilitate Social Distancing" remains unchanged from the June iteration of the PRR. Pls.' Mot. for Spec. Master 21. Plaintiffs complain that it simply states that "efforts should be made" to reduce the population to 75 percent capacity and recommends that detained individuals sleep "head-to-foot." PRR at 28. The language in the PRR is consistent with the Court's Order and Plaintiffs' dissatisfaction with the way Defendants follow the Court's Order does not amount to noncompliance—certainly not noncompliance sufficient to support appointment of a special master.

### 4. Defendants are adequately monitoring and enforcing compliance with the PRR.

As Plaintiffs acknowledge, "Defendants have updated the facility forms," in compliance with the Court's Order. Pls.' Mot. for Spec. Master 22. Plaintiffs, however, allege that Defendants have not incorporated the changes required by the Court consistently. *Id*. Plaintiffs also allege that "Defendants clearly have not implemented an electronic system for centrally tracking and monitoring compliance with the PRR" as evidenced by handwritten reports. Pls.' Mot. for Spec. Master 23. And "Defendants appear to be uploading facility surveys and related documents on an "internal SharePoint" site so they can "pull them for production to Plaintiffs," indicating that they misunderstand the purpose of an electronic system—to ensure better oversight, rather than to expedite production of the documents to Plaintiffs. Bichell Decl., Ex. N at 8." Pls.' Mot. for Spec. Master 24. Plaintiffs complain that "Defendants' January 11, 2021 production included over one hundred facility surveys, but only approximately 18 requests for corrective action plans, only approximately four corrective action plans or other responses, and no evidence

27

of additional follow-up or monitoring to ensure that the corrective action plans were implemented. Bichell Decl. ¶ 9." Pls.' Mot. for Spec. Master 23.

The Court ordered the following: "The Facility Survey shall be immediately and continuously updated to reflect the most current Performance Standard, shall include a section on Subclass member numbers and present conditions, and shall be corrected to address flaws noted by Plaintiffs' expert." Enforcement Order at 12. Defendants already provided Plaintiffs with a response to these allegations in their January 8, 2021 letter responding to Plaintiffs' December 16, 2020 letter and provided Plaintiffs with an updated facility survey that Plaintiffs could review. Pls.' Ex. Q, ECF No. 255-17. The updated Facility Survey incorporated the suggestions included at ¶¶ 46-65 of the Schlanger Declaration, as ordered by the Court. *See* Defs.' Ex. 11, Declaration of Gordon Lyle Carlen (explaining how ICE used the Schlanger declaration to inform their updated facility survey). ICE created a working group to update the facility survey based on the Schlanger Declaration and went from 75 questions to 134 questions. *Id.* ICE is also now performing monthly spot checks instead of the biweekly spot checks, since they are now doing in-person visits, and ICE has created a SharePoint folder for documentation related to the monthly in-person spot checks. *See* Pls.' Ex. Q, ECF No. 255-17 at 14. This central repository is used to report to the courts and Plaintiffs on compliance of the monthly spot checks and is also used as a way of ensuring oversight. *See* Wong Decl. ¶ 10, Defs.' Ex. 10. ICE has been conducting facility checks as of November 27, 2020, but because of the updated survey, the reports were not due back to ICE until the end of December. *See* Pls.' Ex. Q, ECF No. 255-17 at 14. Defendants notified Plaintiffs of this delay in the January 8, 2021 letter. *Id.* In that letter, Defendants provided that ICE was not certain if the facilities reviewed will have a uniform corrective action plan (UCAP) immediately after the spot check, so a month catchup period would be expected to start providing any necessary UCAPs, which would be the end of January 2021. *Id.* That ICE has already provided four UCAPs only underscores that ICE is complying—at a faster speed than originally anticipated.

Plaintiffs assert that "the PRR calls for twice-daily screening of high-risk individual . . . [h]owever, the facility checklist does not include a space where the facility can confirm whether it is complying with this requirement." Pls.' Mot. for Spec. Master 22 (citing Bichell Decl. ¶¶ 8-10). Plaintiffs also assert that "local reports from within facilities indicate that facility staff are not following this requirement of the PRR . . . and the Dr. Venters' report states that "testing logs show that this biweekly testing [of high-risk individuals] had not been implemented consistently: although testing started October 27, the next round did not occur until December 9." Pls.' Mot. for Spec. Master 22-23. This is incorrect. Here, Plaintiffs are discussing the Court's order for twice-daily screening, but cite to the Venters report about Calhoun concerning Calhoun's policy to begin biweekly testing – which is a totally different issue from screening and, in any event, was or is a policy specific to only that facility and not a nationwide testing policy required by the Court to be part of the PRR. Moreover, the revised facility survey explicitly asks at number 11, "Do high risk detainees (Subclass) receive twice daily temperature and verbal screening? Y/N." And in Plaintiffs exhibit, ECF No. 255-21, the facility circled "Y." *See* Pls.' Ex. U, ECF No. 255-21 at 4. The facility survey further asks, "Is there a structured screening tool? Y/N" and "Are the screenings documented in the facilities records?" At the Morrow County Correctional Facility, both were answered "Y." Pls.' Ex. U, ECF No. 255-21 at 4. To the extent Plaintiffs allege that some facility staff are not following this requirement, Plaintiffs have not provided Defendants with any specific examples and even if they had, a few examples would not be enough to establish noncompliance for a nationwide injunction. *See Derek & Constance Lee Corp.*, 2010 WL 11508468, at *6.

Finally, Plaintiffs assert that

> neither the PRR nor the facility checklist provides any metrics which would allow Defendants or external observers to objectively measure compliance with the requirements of the PRR. *See* Venters Decl. ¶ 10 (noting that use of metrics is a "standard approach to quality assurance and compliance in health and law enforcement" settings.) Additionally, the PRR includes a number of mandates which cannot be assessed

29

1
2

without input from detained people, but Defendants' monitoring tool provides no mechanism for eliciting feedback from those who are detained. Venters Decl. ¶ 11.

3
4
5
6

Pls.' Mot. for Spec. Master 23. None of this was ordered by the Court or part of the recommendations in paragraphs 45-65 of the Schlanger declaration. Thus, Plaintiffs have not shown noncompliance with the Court's order sufficient to support appointment of a special master.

7
8

**c. If the Court is inclined to grant Plaintiffs request and appoint a special master, the Court should order the parties to meet and confer regarding the special masters parameters.**

9
10
11
12
13
14

If the Court is inclined to grant Plaintiffs request and appoint a special master, Defendants request that rather than adopt Plaintiffs' proposed order, the Court order the parties to meet and confer regarding the special master parameters. After the meet and confer, Defendants request that the parties be ordered to  submit a joint report that outlines the areas of agreement and disagreement for the Court to then adopt the final order appointment a special master.

15

## V.   Conclusion

16
17
18
19
20
21
22
23

Because Plaintiffs' renewed request for the appointment of a special master because Plaintiffs have not argued or shown exceptional circumstances exist, this Court should deny Plaintiffs' request to appoint a special master. If the Court is inclined to grant Plaintiffs request and appoint a special master, Defendants request that rather than adopt Plaintiffs' proposed order, the court order the parties to meet and confer regarding the special master parameters. The parties will then submit a joint report that outlines the areas of agreement and disagreement for the court to then adopt the final order appointment a special master.

24
25
26
27
28

30

Dated: February 15, 2021                          Respectfully submitted,


BRIAN M. BOYNTON                                  */s/ Lindsay M. Vick*
Acting Assistant Attorney General                 LINDSAY M. VICK
                                                  Trial Attorney
WILLIAM C. PEACHEY                                United States Department of Justice
Director                                          Office of Immigration Litigation
                                                  District Court Section
JEFFREY S. ROBINS                                 *Attorneys for Defendants*
Deputy Director

NICOLE N. MURLEY
Senior Litigation Counsel

ANNA L. DICHTER
Trial Attorney