Hon. Patrick J. Walsh (Ret.)
Special Master
Signature Resolution
633 W. 5th Street, Ste. 1000
Los Angeles, CA 90071
judgewalsh@signatureresolution.com
(323) 395-4970

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| FAOUR ABDALLAH FRAIHAT, et al., | ED CV 19-1546 JGB(SHKx) |
| Plaintiffs, | SPECIAL MASTER'S SECOND REPORT AND RECOMMENDATION |
| v. | |
| U.S. IMMIGRATION AND CUSTOMS, et al., | |
| Defendants. | |

This Report and Recommendation is submitted to the Honorable Jesús G. Bernal. For the reasons set forth below, it is recommended that the Court order:

1. Defendant United States Immigration and Customs Enforcement ("ICE") to detain no more than 15% of subclass members who are not subject to mandatory detention.

2. Share with immigration counsel information pertaining to the government's decision not to release their clients from custody.

3. Deliver to each subclass member the letter prepared by Plaintiffs' doctor explaining the benefits of the COVID vaccine and encouraging them to be vaccinated.

# I.

## SUMMARY OF FACTS AND PROCEEDINGS

This class action was filed in 2019 on behalf of detainees in ICE detention throughout the United States. Plaintiffs complained, among other things, that ICE was not providing constitutionally mandated medical care to detainees at its own facilities and in facilities run by private companies that housed detainees for the government. Six months after the case was filed, the pandemic struck. In the wake of the pandemic, Plaintiffs moved for certification of two subclasses of detainees who were particularly vulnerable to serious illness or death from COVID-19. In April 2020, the Court certified the subclasses and entered a preliminary injunction, ordering the government to identify subclass members within five days of their detention and to consider within one week thereafter whether they should be released.

Plaintiffs subsequently moved for an order to compel compliance with the Court's Preliminary Injunction, complaining that the government was not adhering to it, particularly the requirement that the government release most subclass members not subject to mandatory detention. In October 2020, the Court granted the motion and instructed the government that subclass members not subject to mandatory detention should be denied release in only "rare cases." (Enforcement Order, ECF No. 240 at 17.)

After Plaintiffs complained to the Court again, in March 2021, the Court granted their motion to appoint a Special Master to monitor the government's compliance with the orders. Since then, the number of detainees testing positive for COVID has surged.

II

DISCUSSION

A. <u>Releasing Subclass Members</u>

Before the Court is Plaintiffs' most recent complaint that the government is still not adhering to the Court's order that it rarely detain subclass members who are not subject to mandatory detention. Plaintiffs maintain that, depending on how you calculate it, the government is currently detaining either 66% or 75% of subclass members who were denied *Fraihat* release. The government sets the number at either 20% or 46%. The discrepancy stems from the way the parties are calculating the release percentages and the time periods they are using to calculate compliance. Plaintiffs focus only on detainees currently in custody or recently released as of June 25, 2021. They exclude detainees who were in custody before then and those who died in custody, were bonded out, or were removed.

The government considered all detainees since the pandemic hit and counted as released all detainees who are no longer in custody, whether they were released pursuant to a custody review or for any other reason. Using this standard, it contends that, as of June 17, 2021, there were 29,638 subclass members detained since March 2020, of which 16,007, or 54%, were released. The government explains further that, if you consider the 6,276 that were removed and the 1,400 who were bonded out, that number rises to almost 80%.

Resolving the conflict in the parties' positions requires a determination as to whether subclass members who have been released on bond or removed/deported should be taken into account when determining the number of subclass members who have been detained. Plaintiffs argue that Court did not intend for these subclass members to be

considered when calculating release rates. The government maintains that the Court's orders focus on the number of subclass members detained and argues that subclass members who are no longer detained because they were bonded out or removed/deported should be counted.

The Special Master sides with the government here. The Court ordered that "only in rare cases should a Subclass member not subject to mandatory detention *remain detained*." (October 2020 Enforcement Order at 17 (emphasis added).) Subclass members who were initially detained and who were then removed, deported, or bonded out seem to fit within the language of the Court's order, i.e., they were detained and are no longer in detention.

Even accepting the government's numbers, however, it is still detaining too many subclass members to satisfy the Court's mandate that it only rarely detain subclass members. If one were to accept Plaintiffs' numbers focused on recent detainees, the spread between the Court's order that detention be rare and the number of subclass members who are being detained would be even greater.[1]

It appears that more guidance is needed to effectuate the Court's orders. Though the Court did not quantify the term "rare" as it applied to non-mandatory detainees, the Court did give some guidance when it noted that 33% was too high for detainees subject to mandatory detention. Presumably, the Court intended for the number of detainees not subject to mandatory detention to be significantly lower. Based on a fair reading of the Court's orders, the Special Master concludes that the right number is 15% and recommends that, going forward, the

---

[1] At a hearing on July 30, 2021, Plaintiffs' counsel represented that, according to Plaintiffs' most recent numbers, the government is only releasing 43% of subclass members.

4

government be allowed to detain no more than 15% of the subclass members not subject to mandatory detention. To calculate this number, the government will report as the denominator the total number of subclass members in ICE custody at the beginning of the month. The government will use as the numerator the number of subclass members still in detention at the end of the month. The quotient derived by dividing the numerator by the denominator will provide the percentage of subclass members who have not been released. This number may not exceed 15%. If it does, ICE will be required to release a sufficient number of subclass members to reduce that number to 15%. In calculating this number, the government may count as released those subclass members who have been granted bond and deported or removed.

The government argues that 15% is an arbitrary number and that it should be given the discretion to detain as many subclass members as it sees fit, provided it gives each subclass member a meaningful and individualized review. That, apparently, is what the government has been doing and it is not working. There are too many subclass members still confined.

The government argues that Special Master's finding that the government's efforts to comply with the Court's orders are not working is devoid of analysis and contrary to the facts. The Special Master disagrees. The Court ordered the government to only rarely detain subclass members not subject to mandatory detention. Depending on whose numbers you use, the government is detaining between 20% and 50% of these subclass members. Either figure is not "rare" under anyone's definition. Further, as the government notes, the number of positive COVID cases in its facilities is staggering and continues to rise.

The government contends that, based on its numbers, it is detaining only 12% of subclass members. Nevertheless, it argues that the Court should not impose a 15% cut-off because that would be arbitrary. The government argues further that, if the government were to be limited to 15%, it would have to release violent criminals and subclass members with COVID.

The government's argument does not make sense and is emblematic of the difficulty the Special Master and Plaintiffs' counsel have had throughout this case trying to figure out what is the real numbers are. Either the government is detaining more than 15% of the subclass members or it is not. There should not be subjectivity in the numbers. Assuming, arguendo, the government is detaining only 12%, it does not need to do anything different. Assuming, instead that the number is much higher, it needs to adjust and detain less. In doing so, it will, presumably, continue its practice of not releasing violent criminals and subclass members with COVID.

The government points out that it has a legal right and reasonable interest in continuing to detain subclass members. That is true. But the subclass members have rights too. At the top of the list of their rights is their right not to be subjected unnecessarily to sickness and death from COVID. On balance, the subclass members' rights are paramount.

Plaintiffs' argue that 15% is too high. They contend that "rare" means almost never and that the government should, essentially, be required to release all subclass members unless extraordinary circumstances justify detaining someone. Clearly, that is not the answer, either. The Court could have imposed such a requirement from the beginning and it chose not to.

1    Plaintiffs point out that, in the medical profession, "rare" is
2 much less than 5%.  They argue that since COVID is a medical condition
3 the Court must have intended that the word "rare" be defined as the
4 term is defined in the medical profession.  Plaintiffs' argument
5 misses the mark.  The Court was not speaking in medical terms when it
6 used the term "rare."  It was setting a standard in the context of a
7 legal case, balancing the equities of competing parties within the
8 structure of controlling law.

        B.   <u>Allowing Immigration Counsel Access to Information Pertaining to Denials of Release Requests</u>

11    Plaintiffs' counsel seeks permission to share with subclass
12 members and their counsel certain information provided by the
13 government relating to the government's decisions to deny release to
14 subclass members.  The government requests that counsel be required to
15 sign the protective order before receiving the information.
16 Plaintiffs' counsel objects, arguing that requiring counsel to sign
17 the protective order is burdensome.  They also contend that it is
18 unnecessary because counsel are already entitled to the information.
19    The record supports Plaintiffs' position.  In its October 7,
20 2020, Enforcement Order, the Court ordered the government to provide
21 most if not all of this information to subclass members and their
22 counsel.  (Enforcement Order at 17.)  The Court did not require that
23 counsel sign a protective order before receiving that information and
24 there is no reason to impose that condition on them now.  The
25 government's arguments to the contrary are not compelling.  The
26 immigration lawyers will, however, be required to provide Plaintiffs'
27 counsel with a copy of a completed G-28 or E-28 prior to receiving the

information. And the information that can be shared with them will be limited to the information contained in current detainee spreadsheet.

C. <u>Distribution of Vaccine Education Letter</u>

The government has encountered significant vaccine resistance at its facilities. In the last month, about 46% of detainees who were offered the vaccine declined it. In response to the high rate of vaccine hesitancy, Plaintiffs have had one of their doctors prepare a letter directed to the subclass members touting the benefits of the vaccine and encouraging them to take it. Counsel are having the letter translated into several languages.

Plaintiffs have asked the government to distribute a copy of the letter to all subclass members. The government has objected on the ground that it is cumbersome to do so. In lieu of delivering it to each subclass member, the government has directed that it be posted in all facilities. Plaintiffs insist that this is not enough and that the government should be required to deliver it to all subclass members.

There is no doubt that requiring the government to deliver the letter to all subclass members will be burdensome. But, when balanced against the importance of convincing subclass members that they should be vaccinated, the equities tip in Plaintiffs' favor. The government will be required to distribute the letter to each subclass member. That distribution should begin at once and continue until all subclass members have received the letter in their native language. Going forward, all new subclass members who are detained shall also be provided a copy of the letter. In addition, the government should immediately post the letter at all facilities in English and Spanish. Finally, the government must continue its efforts to educate detainees

on the importance of the vaccine and continue to encourage them to take it.

The government complains that having the letter translated beyond the seven most common languages spoken by detainees would be cumbersome and expensive. It proposes that it be allowed to offer oral translations through a language line for detainees who do not speak one of those languages. That is a reasonable proposal and the Special Master recommends that the Court adopt it.

Finally, the government argues that it has already posted the letter in its facilities and, therefore, the Special Master's recommendation that it post the letter is moot. Here, again, the Special Master disagrees. The government's decision to post the letter was a voluntary one. Absent a court order, the government could change its mind tomorrow and take the letter down. By incorporating the requirement into the Court's order, the government will not be at liberty to do so.

## IV

## CONCLUSION

For these reasons, the Special Master recommends that the Court enter an order accepting and adopting this Report and Recommendation and ordering:

1. Defendant United States Immigration and Customs Enforcement ("ICE") to detain no more than 15% of subclass members who are not subject to mandatory detention.
2. Share with immigration counsel information pertaining to the government's decision not to release their clients from custody.

3.  Deliver to each subclass member in his or her native language the letter prepared by Plaintiffs' doctor explaining the benefits of the COVID vaccine and encouraging them to be vaccinated.[2]

DATED: July 31, 2021.

*Patrick J. Walsh*

HON. PATRICK J. WALSH (Ret.)
Special Master

C:\Users\judge\OneDrive\Documents\Legal\Signature\Special Master-Referee\Fraihat v. ICE\Second R&R.wpd

---

[2] Under Federal Rule of Civil Procedure 53(f), the parties have 21 days to file objections to this Report and Recommendation.

10