Hon. Patrick J. Walsh (Ret.)
Special Master
Signature Resolution
633 W. 5th Street, Ste. 1000
Los Angeles, CA 90071
judgewalsh@signatureresolution.com
(323) 395-4970

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| FAOUR ABDALLAH FRAIHAT, et al., | ED CV 19-1546 JGB(SHKx) |
| Plaintiffs, | SPECIAL MASTER'S AMENDED SECOND REPORT AND RECOMMENDATION |
| v. | |
| U.S. IMMIGRATION AND CUSTOMS, et al., | |
| Defendants. | |

This Amended Second Report and Recommendation is submitted to the Honorable Jesús G. Bernal. For the reasons set forth below, it is recommended that the Court order:

1. Defendant United States Immigration and Customs Enforcement ("ICE") to detain no more than 15% of subclass members who are not subject to mandatory detention.
2. Share with immigration counsel information pertaining to the government's decision not to release their clients from custody.

3. Deliver to each subclass member the letter prepared by Plaintiffs' doctor explaining the benefits of the COVID vaccine and encouraging them to be vaccinated.[1]

I.

SUMMARY OF FACTS AND PROCEEDINGS

This class action was filed in 2019 on behalf of detainees in ICE detention throughout the United States. Plaintiffs complained, among other things, that ICE was not providing constitutionally mandated medical care to detainees at its own facilities and in facilities run by private companies that housed detainees for the government. Six months after the case was filed, the pandemic struck. In the wake of the pandemic, Plaintiffs moved for certification of two subclasses of detainees who were particularly vulnerable to serious illness or death from COVID-19. In April 2020, the Court certified the subclasses and entered a preliminary injunction, ordering the government to identify subclass members within five days of their detention and to consider within one week thereafter whether they should be released.

Plaintiffs subsequently moved for an order to compel compliance with the Court's Preliminary Injunction, complaining that the government was not adhering to it, particularly the requirement that the government release most subclass members not subject to mandatory detention. In October 2020, the Court granted the motion and instructed the government that subclass members not subject to mandatory detention should be denied release in only "rare cases." (Enforcement Order, ECF No. 240 at 17.)

---

[1] The Second Report and Recommendation has been amended to address the parties' Objections. The parties were not given an additional opportunity to object to the Amended Second Report and Recommendation because the recommendations remain unchanged.

After Plaintiffs complained to the Court again, in March 2021, the Court granted their motion to appoint a Special Master to monitor the government's compliance with the orders.

## II

## DISCUSSION

### A. Releasing Subclass Members

Before the Court is Plaintiffs' most recent complaint that the government is still not adhering to the Court's order that it rarely detain subclass members who are not subject to mandatory detention. Plaintiffs maintain that, depending on how you calculate it, the government is currently detaining either 66% or 75% of subclass members who were denied *Fraihat* release. The government sets the number at 20% or 46%. The differences between the parties' numbers stem from the way they are calculating the release percentages and the time periods they are using to calculate them. Plaintiffs focus only on detainees currently in custody or recently released as of June 25, 2021. They exclude detainees who were in custody before then and those who died in custody, were bonded out, or were removed.

The government considered all detainees since the Preliminary Injunction and counted as released all detainees who are no longer in custody, whether they were released pursuant to a custody review or for any other reason. Using this standard, it contends that, as of June 17, 2021, there were 29,638 subclass members detained since March 2020, of which 16,007, or 54%, were released. The government explains further that, if you consider the 6,276 that were removed and the 1,400 who were bonded out, that number rises to almost 80%. In its

objections to the Second Report and Recommendation, it calculates the number at closer to 89%.[2]  (Objections at p.3, fn. 1.)

Resolving the conflict in the parties' positions requires a determination as to whether subclass members who have been released on bond or removed/deported should be taken into account when determining the number of subclass members who have been detained.  Plaintiffs argue that the Court did not intend for these subclass members to be considered when calculating release rates.  The government maintains that the Court's orders focus on the number of subclass members detained and argues that subclass members who are no longer detained because they were bonded out or removed/deported should be counted.

The Special Master sides with the government here.  The Court ordered that "only in rare cases should a Subclass member not subject to mandatory detention *remain detained*."  (October 2020 Enforcement Order at 17 (emphasis added).)  Subclass members who were initially detained and who were later removed, deported, or bonded out seem to fit within the language of the Court's order, i.e., they were detained and are no longer in detention.

Even accepting the government's numbers, however, it still appears that it is detaining too many subclass members for too long to satisfy the Court's mandate that it only rarely detain subclass members.  If one were to accept Plaintiffs' numbers focused on recent detainees, the spread between the Court's order that detention be rare

---

[2] The government's argument that it was releasing 89% and detaining only 11% was first presented in its Objections to the Second Report and Recommendation and, therefore, the Special Master does not accord it substantial weight.

4

and the number of subclass members who are being detained would be even greater.[3]

It appears that more guidance is needed to effectuate the Court's orders. Though the Court did not quantify the term "rare" as it applied to non-mandatory subclass members, the Court did give some guidance when it noted that 33% was too high for subclass members subject to mandatory detention. Presumably, the Court intended for the number of detainees not subject to mandatory detention to be significantly lower. Based on a fair reading of the Court's orders, the Special Master concludes that the right number is 15% and recommends that, going forward, the government detain no more than 15% of the subclass members not subject to mandatory detention. To calculate this number, the government will report on the 15th of each month the number of subclass members not subject to mandatory detention taken into custody in the previous month and the number of those detainees still in custody as of the date of the reporting. The quotient derived by dividing the number of subclass members still in custody by the number taken into custody may not exceed 15%. If it does, ICE will be required to release a sufficient number of subclass members to reduce the percentage to 15%. In calculating this number, the government may count as released those subclass members who have been granted bond and deported or removed.

The government argues that 15% is an arbitrary number and that it should be given the discretion to detain as many subclass members as it sees fit, provided it gives each subclass member a meaningful and

---

[3] At a hearing on July 30, 2021, Plaintiffs' counsel argued that, according to Plaintiffs' most recent numbers, the government is only releasing 43% of subclass members.

individualized review.  That is not consistent with what the Court ordered, i.e., that subclass members not subject to mandatory detention be detained only rarely.

The government argues that Special Master's finding that the government's efforts to comply with the Court's orders are not working is devoid of analysis and contrary to the facts.  The Special Master disagrees.  The Court ordered the government to only rarely detain subclass members not subject to mandatory detention.  Depending on whose numbers you use, the government is detaining between 20% and 50% of these subclass members.  Either number is not "rare" under any definition.

The government points out that it has a legal right and reasonable interest in continuing to detain subclass members.  That is true.  But subclass members have rights too.  At the top of the list is their right not to be unnecessarily and unreasonably subjected to sickness and death from COVID.  On balance, the subclass members' rights are paramount.

Plaintiffs argue that 15% is too high.  They contend that "rare" means almost never and that the government should, essentially, be required to release all subclass members unless extraordinary circumstances justify detaining someone.  Clearly, that is not the answer, either.  The Court could have imposed such a requirement from the beginning had that been its intent and it chose not to.

Plaintiffs point out that, in the medical profession, "rare" is much less than 5%.  They argue that since COVID is a medical condition the Court must have intended the word "rare" to be understood in medical terms.  Plaintiffs' argument misses the mark.  The Court was not speaking in medical terms when it used the term "rare."  It was

setting a standard in the context of a legal case, balancing the equities of competing parties within the structure of controlling law. Plaintiffs' request that the number be set well below 15% is denied.[4]

    B.    <u>Allowing Immigration Counsel Access to Information Pertaining to Denials of Release Requests</u>

Plaintiffs' counsel seeks permission to share with subclass members and their counsel certain information provided by the government relating to the government's decisions to deny release to subclass members. The government requests that counsel be required to sign the protective order before receiving the information. Plaintiffs' counsel objects, arguing that requiring counsel to sign the protective order is burdensome. They also contend that it is unnecessary because counsel are already entitled to the information.

The record supports Plaintiffs' position. In its October 7, 2020, Enforcement Order, the Court ordered the government to provide most if not all of this information to subclass members and their counsel. (Enforcement Order at 17.) The Court did not require that counsel sign a protective order before receiving that information and there is no reason to impose that condition on them now. The government's arguments to the contrary are not compelling. The immigration lawyers will, however, be required to submit a G-28 or E-

---

[4] The government argues that there should be an exception for subclass members who have been offered the vaccine, whether they accepted it or not. (Objections at 5.) The Special Master declines to recommend such an exception. It appears that people who have had the vaccine are still susceptible to COVID, though in most cases it appears that the symptoms are mild. In addition, many detainees are refusing the vaccine. Finally, the number of positive cases is surging in the detention facilities. For these reasons, it would not be prudent to exclude subclass members who have been offered the vaccine, whether they accepted it or not.

7

28 to verify that they are a detainee's counsel of record prior to receiving the information.  Further, the information that can be shared with them will be limited to the results of the custody determinations from the current detainee spreadsheet that is produced to Plaintiffs as part of the government's biweekly productions.

      C.   <u>Distribution of Vaccine Education Letter</u>

The government has encountered significant vaccine resistance at its facilities.  In recent months, a large percentage of detainees who were offered the vaccine declined it.  In response to the high rate of vaccine hesitancy, Plaintiffs have had one of their doctors prepare a letter directed to the subclass members touting the benefits of the vaccine and encouraging them to take it.  Counsel are having the letter translated into several languages.

Plaintiffs have asked the government to distribute a copy of the letter to all subclass members.  The government has objected on the ground that it is cumbersome to do so.  In lieu of delivering it to each subclass member, the government has directed that it be posted in all facilities.  Plaintiffs insist that this is not enough and that the government should be required to deliver it to all subclass members.

There is no doubt that requiring the government to deliver the letter to all subclass members will be burdensome.  But, when balanced against the importance of convincing subclass members that they should be vaccinated, the equities tip in Plaintiffs' favor.  The government will be required to distribute the letter to each subclass member. That distribution should begin at once and continue until all subclass members have received the letter in their native language.  Going forward, all new subclass members who are detained shall also be

8

provided a copy of the letter. In addition, the government should immediately post the letter in all facilities in English and Spanish. Finally, the government must continue its efforts to educate detainees on the importance of the vaccine and continue to encourage them to take it.

The government complains that having the letter translated beyond the seven most common languages spoken by detainees would be cumbersome and expensive. It proposes that it be allowed to offer oral translations through a language line for detainees who do not speak one of those languages. That is a reasonable proposal and the Special Master recommends that the Court adopt it.

Finally, the government argues that it has already posted the letter in its facilities and, therefore, the Special Master's recommendation that it post the letter is moot. Here, again, the Special Master disagrees. The government's decision to post the letter was a voluntary one. Absent a court order, the government could change its mind tomorrow and take the letter down. By incorporating the requirement into the Court's order, the government will not be at liberty to do so.

IV

CONCLUSION

For these reasons, the Special Master recommends that the Court enter an order accepting and adopting this Report and Recommendation and ordering:

1. Defendant United States Immigration and Customs Enforcement ("ICE") to detain no more than 15% of subclass members who are not subject to mandatory detention.

2. Share with immigration counsel information pertaining to the government's decision not to release their clients from custody.
3. Deliver to each subclass member in his or her native language the letter prepared by Plaintiffs' doctor explaining the benefits of the COVID vaccine and encouraging them to be vaccinated.

DATED: September 12, 2021.

*Patrick J. Walsh*

HON. PATRICK J. WALSH (Ret.)
Special Master