**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FAOUR ABDALLAH FRAIHAT; MARCO MONTOYA AMAYA; RAUL ALCOCER CHAVEZ; JOSE SEGOVIA BENITEZ; HAMIDA ALI; MELVIN MURILLO HERNANDEZ; JIMMY SUDNEY; JOSE BACA HERNANDEZ; EDILBERTO GARCIA GUERRERO; MARTIN MUNOZ; LUIS MANUEL RODRIGUEZ DELGADILLO; RUBEN DARIO MENCIAS SOTO; ALEX HERNANDEZ; ARISTOTELES SANCHEZ MARTINEZ; SERGIO SALAZAR ARTAGA; INLAND COALITION FOR IMMIGRANT JUSTICE; AL OTRO LADO, <br>         *Plaintiffs-Appellees*, <br><br> v. <br><br> U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS; TAE D. JOHNSON; STEVE K. FRANCIS; COREY A. PRICE; PATRICK J. LECHLEITNER; STEWART D. SMITH; JACKI BECKER KLOPP; DAVID P. PEKOSKE, <br>         *Defendants-Appellants.* | No. 20-55634 <br><br> D.C. No. 5:19-cv-01546- JGB-SHK <br><br><br> OPINION |

2                         FRAIHAT v. USICE

Appeal from the United States District Court
for the Central District of California
Jesus G. Bernal, District Judge, Presiding

Argued and Submitted December 9, 2020
Seattle, Washington

Filed October 20, 2021

Before:  Marsha S. Berzon, Eric D. Miller, and
Daniel A. Bress, Circuit Judges.

Opinion by Judge Bress;
Dissent by Judge Berzon

## SUMMARY[*]

### Immigration

The panel reversed the district court's grant of a preliminary injunction in a class action in which plaintiffs contended that as to all immigration detention facilities nationwide, U.S. Immigration and Customs Enforcement's directives in response to the COVID-19 pandemic reflected "deliberate indifference" to medical needs and "reckless disregard" of known health risks; and remanded with instructions that all orders premised on the preliminary injunction be vacated.

In April 2020, the district court entered a preliminary injunction and provisionally certified two nationwide subclasses: (1) ICE detainees with certain risk factors placing them at heighted risk of severe illness and death from COVID-19; and (2) ICE detainees whose disabilities placed them at heighted risk of severe illness and death from COVID-19. The district court found that plaintiffs were likely to succeed on the merits of three claims: (1) deliberate indifference to the medical needs of detainees, in violation of the Fifth Amendment; (2) punitive conditions of confinement, in violation of the Fifth Amendment; and (3) violation of section 504 of the Rehabilitation Act, 29 U.S.C. § 794. The district court's preliminary injunction applied to all immigration detention facilities in the United States and imposed a broad range of obligations on the federal government, including ordering ICE to identify and track detainees with certain risk factors; requiring ICE to

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

4                                    FRAIHAT v. USICE

issue a comprehensive Performance Standard covering COVID-19-related topics, and setting directives for releasing detainees from custody altogether. The government appealed in June 2020, but did not seek a stay pending appeal.

In September 2021, the parties asked to refer this case to the Court's mediation program. The panel denied that request, concluding that it came much too late. Given the substantial judicial and court resources that the parties already required be expended on their behalf, the panel declined their request to now use further resources in the form of the mediation program—itself a not unlimited resource.

On appeal, the government argued that the district court erred both in issuing a preliminary injunction and in granting provisional class certification. Noting that it had jurisdiction to reach the latter issue, the panel concluded it need not do so here. The panel explained that the district court's class certification ruling depended on, and was in service of, its preliminary injunction, and therefore, if the preliminary injunction was infirm, the class certification order necessarily fell as well.

In concluding that the preliminary injunction must be set aside, the panel held that plaintiffs failed to demonstrate a likelihood of success or serious questions on the merits. The panel wrote that neither the facts nor the law supported a judicial intervention of the magnitude here, and that the standards governing plaintiffs' request reflected not only the all-embracing relief they sought but the core principle, grounded in the separation of powers, that far-reaching intrusion into matters initially committed to a coordinate

Branch requires a commensurately high showing sufficient to warrant such a significant exercise of judicial power.

First, the panel addressed plaintiffs' claim that ICE "failed to promulgate and implement medically necessary protocols and practices to protect medically vulnerable people" from COVID-19. The panel concluded that plaintiffs did not make a clear showing that ICE acted with deliberate indifference to medical needs or in reckless disregard of health risks, explaining that the various ICE mandates and guidance documents demonstrated that far from recklessly disregarding the threat of COVID-19, ICE in the spring of 2020 (and earlier) took steps to address COVID-19. The panel also rejected plaintiffs' contrary arguments, which the district court had accepted, and held that plaintiffs had not made a clear showing of entitlement to relief commensurate with the scope of their request.

Second, the panel concluded that plaintiffs had not shown a likelihood of success on their claim that ICE's COVID-19 policies reflected unconstitutional "punishment." The panel observed that if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment. The panel easily concluded that there was a legitimate governmental objective here, explaining that ICE was holding detainees because they were suspected of having violated the immigration laws or were otherwise removable. The panel concluded that just as ICE's national directives did not reflect deliberate indifference, they did not create excessive conditions of "punishment" either. The panel also rejected plaintiffs' theory that a presumption of punitive conditions arose here.

6                          FRAIHAT V. USICE

Third, the panel concluded that plaintiffs had not established a likelihood of success on their statutory claim under the Rehabilitation Act, which prohibits a program receiving federal financial assistance from discriminating based on disability.  As relevant here, plaintiffs bringing a section 504 claim must show that they were denied the benefits of the program solely by reason of a disability. Here, the panel concluded that plaintiffs had not identified any "benefit" that they were denied.  Plaintiffs at most demonstrated that they were subjected to inadequate national policies; they did not show they were treated differently from other detainees "solely by reason" of their disabilities.

Finally, the panel concluded that because plaintiffs had not demonstrated a likelihood of success on any claim, it need not address the other preliminary injunction factors that plaintiffs also would have needed to establish.

Judge Berzon dissented from both the majority's opinion vacating the district court's preliminary injunction and its order denying the parties' joint request for mediation. Judge Berzon wrote that, in vacating the district court's preliminary injunction, the majority applied incorrect standards three times.  First, the majority recited but did not engage with the applicable sliding scale approach for reviewing a preliminary injunction.  Second, it correctly identified but then flouted the court's mandate to review the grant of a preliminary injunction for abuse of discretion, not de novo.  Third, it evaluated plaintiffs' Fifth Amendment reckless disregard claim under a subjective, instead of the proper, objective, standard.

Judge Berzon wrote that the majority repeatedly characterized as "sweeping," "far-reaching" and of great "magnitude," an injunction that was actually limited,

modest, and deferential to the government's primary role in crafting policy and administering the detention facilities. Beyond these analytical errors, Judge Berzon concluded that the majority did precisely what it chastised the district court for: by declining the parties' joint request for mediation, the majority imposes its own will on the parties.

## COUNSEL

Scott G. Stewart (argued), Deputy Assistant Attorney General; Anna L. Dichter and Lindsay M. Vick, Attorneys; William K. Lane III, Counsel; Christopher A. Bates, Senior Counsel; Jeffrey S. Robins, Deputy Director; William C. Peachey, Director; Ethan P. Davis, Acting Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Brian P. Goldman (argued), William F. Alderman, Mark Mermelstein, and Jake Routhier, Orrick Herrington & Sutcliffe LLP, San Francisco, California; Matthew R. Shahabian and Melanie R. Hallums, Orrick Herrington & Sutcliffe LLP, New York, New York; Katherine M. Kopp, Orrick Herrington & Sutcliffe LLP, Washington, D.C.; Timothy P. Fox and Elizabeth Jordan, Civil Rights Education and Enforcement Center, Denver, Colorado; Jared Davidson, Southern Poverty Law Center, New Orleans, Louisiana; Stuart Seaborn, Melissa Riess, and Rosa Lee Bichell, Disability Rights Advocates, Berkeley, California; Maria del Pilar Gonzalez Morales, Civil Rights Education and Enforcement Center, Los Angeles, California; Shalini Goel Agarwal, Southern Poverty Law Center, Tallahassee, Florida; Christina Brandt-Young,

8                          FRAIHAT V. USICE

Disability Rights Advocates, New York, New York; Michael W. Johnson, Dania Bardavid, Jessica Blanton, and Joseph Bretschneider, Willkie Farr & Gallagher LLP, New York, New York; Leigh Coutoumanos, Willkie Farr & Gallagher LLP, Washington, D.C.; Veronica Salama, Southern Poverty  Law Center, Decatur, Georgia; for Plaintiffs-Appellees.

Stephen J. McIntyre, Marissa Roy, and Kevin Kraft, O'Melveny & Myers LLP, Los Angeles, California; Lisa B. Pensabene, O'Melveny & Myers LLP, New York, New York; for Amici Curiae Casa de Paz, Church World Service—Jersey City, Clergy & Laity United for Economic Justice, Detention Watch Network, El Refugio, and Freedom for Immigrants.

Clifford W. Berlow, Michele L. Slachetka, Jonathan A. Enfield, E.K. McWilliams, and Reanne Zheng, Jenner & Block LLP, Chicago, Illinois, for Amici Curiae Public Health Experts.

## OPINION

BRESS, Circuit Judge:

In March 2020, toward the beginning of the COVID-19 pandemic, the plaintiffs in this case sought a preliminary injunction that would effectively place this country's network of immigration detention facilities under the direction of a single federal district court. The named plaintiffs were five detainees housed at three detention centers. But plaintiffs made allegations and requested preliminary injunctive relief that far transcended their individual circumstances. They contended that as to all of the approximately 250 immigration detention facilities nationwide, U.S. Immigration and Customs Enforcement's (ICE) directives in response to the COVID-19 pandemic reflected "deliberate indifference" to medical needs and "reckless disregard" of known health risks, in violation of the Fifth Amendment.

The district court agreed with the plaintiffs. In April 2020, it certified two nationwide classes and issued a preliminary injunction that applied to all immigration detention facilities in the United States. The injunction imposed a broad range of obligations on the federal government, including ordering ICE to identify and track detainees with certain risk factors that the district court identified; requiring ICE to issue a comprehensive Performance Standard covering a myriad of COVID-19-related topics, such as social distancing and cleaning policies; and setting directives for releasing detainees from custody altogether. Several months later, the district court issued a further order imposing more detailed requirements, such as twice-daily temperature checks, as well as procedures expressly designed to result in the release of

substantial numbers of detainees from ICE custody.  The government has now appealed the preliminary injunction.

We hold that the preliminary injunction must be set aside because plaintiffs have not demonstrated a likelihood of success on the merits of their claims.  Our holding is a function of the sweeping relief plaintiffs sought and the demanding legal standards that governed their request.  Plaintiffs did not seek individualized injunctive relief.  Nor did they seek relief specific to the conditions at the detention centers in which they were housed.  They instead challenged ICE's nationwide COVID-19 directives, asking a district court mid-pandemic to assume control over the top-level policies governing ICE's efforts to combat the viral outbreak.  To obtain the extraordinary relief they sought, plaintiffs needed to come forward with evidence of constitutional and statutory violations on a programmatic, nationwide level.  Plaintiffs did not do so.

Like many aspects of government that were potentially unprepared for a highly contagious airborne virus, ICE's initial response to the COVID-19 pandemic may have been imperfect, even at times inadequate.  But the slew of national guidance, directives, and mandatory requirements that the agency issued and then frequently updated in the spring of 2020 belies the notion that ICE acted with the "reckless disregard" necessary to support a finding of unconstitutional, system-wide deliberate indifference.

ICE's nationwide policies included instructions on sanitation, hygiene, and social distancing; treatment of detainees who may have been exposed to the virus; which programs and activities to suspend; and when to release detainees from custody because of their vulnerabilities to viral infection.  Like all parts of our government, ICE took

actions in the face of scientific uncertainty and a constantly developing understanding of COVID-19.

Whatever shortcomings could be discerned in ICE's mandates in the spring of 2020, plaintiffs have not shown that ICE acted with deliberate indifference in issuing extensive nationwide directives that sought to mitigate the very health risks that plaintiffs claim ICE recklessly disregarded. The district court therefore erred in entering a preliminary injunction and in assuming the authority to dictate, at both a macro and a granular level, ICE's national response to the COVID-19 pandemic.

We appreciate plaintiffs' and the district court's concerns about the public health consequences of COVID-19 and the importance of protecting immigration detainees from harmful viral exposure. We of course share those concerns. Plaintiffs have identified COVID-19 infections among immigration detainees and have raised potentially valid questions about conditions at individual detention facilities, which other cases have likewise identified. We thus do not minimize the dangers that COVID-19 presents and the unique risks it imposes for persons in custody. The government here does not deny those risks, nor does it seek to absolve itself of responsibility for ensuring the safety of those whom it detains.

But the question here is not whether COVID-19 poses health risks to detainees generally or even the individual plaintiffs in this case. While a preliminary injunction is always an extraordinary remedy, the relief sought here was extraordinary beyond measure. Based on claimed deficiencies in ICE's national directives, plaintiffs sought a sweeping injunction that would and did place the district court in charge of setting the COVID-19 policies that apply to every immigration detention facility in the United

States—for which the Executive Branch bears primary authority.  As ICE was in the middle of confronting an unprecedented and evolving public health problem, it found its nationwide policies almost immediately subject to judicial revision.

Neither the facts nor the law supported a judicial intervention of that magnitude.  The standards that governed plaintiffs' request reflected not only the all-embracing relief they sought but the core principle, grounded in the separation of powers, that far-reaching intrusion into matters initially committed to a coordinate Branch requires a commensurately high showing sufficient to warrant such a significant exercise of judicial power.  Plaintiffs here did not make the showing required to justify the extraordinary relief they requested.

For these reasons and those that we now explain, we reverse the preliminary injunction and direct that all orders premised on it be vacated.

I

A

ICE, an agency of the Department of Homeland Security (DHS), is tasked with detaining certain non-citizens.  Some of these persons were apprehended attempting to enter the United States without authorization.  8 U.S.C. § 1225(b)(1)(A)(i), (B)(iii)(IV); *see also id.* § 1182(a). Others are in detention pending proceedings in which the government seeks to remove them from the United States, *id.* § 1226(a), or following orders of removal, *id.* § 1231(a)(1)–(2).  Still others are held are under mandatory detention because they committed crimes in the United

States, or on terrorism-related grounds. *Id.* § 1226(c).[1]  In Fiscal Year 2020 through April 4, 2020, ICE reportedly held an average daily population of 42,738 adult non-citizens across a nationwide network of over 250 detention facilities.

These facilities differ in various ways.  ICE owns some of the detention facilities; others are operated under contract with state or local agencies or government contractors. Some of the centers are "dedicated" facilities, which hold only ICE detainees, whereas others are "non-dedicated" facilities, which also hold non-ICE detainees.  Some facilities are in remote or rural areas, while others are located closer to cities.  Facilities also house differing numbers of detainees and are configured differently.

Facilities also vary based on who provides medical care. Government employees, as part of the ICE Health Services Corps (IHSC), provide direct medical care at twenty facilities, which together hold about 13,500 detainees.  The remaining facilities employ medical staff that the federal government does not directly employ.  However, IHSC Field Medical Coordinators provide oversight of the medical care at those facilities.

---

[1] The parties dispute whether detention under 8 U.S.C. § 1226(c) is in fact mandatory in every circumstance.  Plaintiffs filed declarations from a former Deputy Assistant Director for Custody Programs at ICE's Office of Enforcement and Removal Operations and from an immigration practitioner asserting that ICE had previously released individuals held under "mandatory" detention "pursuant to ICE's guidelines and policies, particularly where the nature of their illness could impose substantial health care costs or the humanitarian equities mitigating against detention were particularly compelling."  We need not decide whether the government may release individuals detained under section 1226(c) for circumstances other than those in section 1226(c)(2).

14                     FRAIHAT v. USICE

B

In December 2019, the virus SARS-CoV-2 was identified in China as causing an outbreak of a new, communicable respiratory illness, now known as coronavirus disease 2019, or COVID-19.  Following the spread of the virus to the United States, the Secretary of Health and Human Services on January 31, 2020 declared a nationwide public health emergency.

This case focuses on ICE's centralized actions in response to the COVID-19 outbreak.  Because plaintiffs allege that ICE acted with deliberate indifference on a national level, it is necessary for us to review in some detail ICE's system-level COVID-19 guidance and requirements. We do so through the period leading up to the district court's preliminary injunction in April 2020.

1

We begin in January 2020.  As an initial response to the virus, ICE implemented applicable parts of its pre-existing "pandemic workforce protection plan," which "provides specific guidance for biological threats such as COVID-19." That same month, DHS also issued "additional guidance to address assumed risks and interim workplace controls, including the use of masks, available respirators, and additional personal protective equipment."

By March 2020, ICE Enforcement and Removal Operations (ERO) had convened a group of experts, including "medical professionals, disease control specialists, detention experts, and field operators to identify additional enhanced steps to minimize the spread of the virus."  As more information about the novel coronavirus became available, ICE responded by issuing multiple guidance

documents specifically directed at reducing the risk of COVID-19 infections among its detainee population.

On March 6, 2020, IHSC promulgated "Version 6.0" of its "Interim Reference Sheet on 2019-Novel Coronavirus (COVID-19)."  Although this version is the only one in the record, it is apparent that multiple previous versions existed. This document contained six pages of "recommendations" on managing COVID-19, including detailed procedures for screening, monitoring, assessing, isolating, and testing detainees.

The document first called for "intake medical screening" to determine a detainee's "exposure risk."  This involved assessing whether detainees had traveled through countries with "widespread or sustained community transmission," as defined by the Centers for Disease Control and Prevention (CDC), or had "close contact" with a person confirmed to have had COVID-19.  "Close contact" was defined as "being within approximately 6 feet (2 meters) of a COVID-19 case for a prolonged period of time" (such as "while caring for, living with, visiting, or sharing a healthcare waiting area or room with a COVID-19 case") or "having direct contact with infectious secretions of a COVID-19 case (e.g., being coughed on)."  If a detainee had such defined "exposure risk," he or she was to be assessed for fever and respiratory symptoms.

The results of IHSC's recommended intake screening process were to inform the facility's subsequent actions. Detainees with exposure risk but who did not exhibit COVID-19 symptoms were to be monitored for fever or respiratory complications on a daily basis for 14 days.  These detainees were to be housed "in a single cell room if available," or else "as a cohort."  (According to the CDC, "[c]ohorting refers to the practice of isolating multiple

16                    FRAIHAT v. USICE

laboratory-confirmed COVID-19 cases together as a group, or quarantining close contacts of a particular case together as a group.")  In addition, ICE detention facilities were to document each at-risk detainee on a centralized tracking tool, request a medical alert, and (if the detainee was not being held at an IHSC-staffed facility) notify the Field Medical Coordinator in charge of that facility.

Detainees with no known exposure risk but who were symptomatic were to be considered for a possible COVID-19 test.  (Although such tests have become more widely available, that was not the case at the beginning of the outbreak; the IHSC document indicates that at the time it was issued, testing through commercial laboratories had only recently become possible.)  IHSC indicated that "[d]ecisions on which patients receive testing should be based on the epidemiology of COVID-19, as well as the clinical course of illness."   Additionally, "[p]roviders [we]re strongly encouraged to test for other causes of respiratory illness, including infections such as influenza."   The document included a link to instructions for collecting specimens to facilitate testing.

IHSC provided a different set of recommendations for symptomatic detainees with known exposure risk.  These detainees were to be isolated following a detailed procedure. A "tight-fitting surgical mask" was to be placed on the detainee.  A medical provider, "preferably the Clinical Director or designee," was to be "[p]romptly consult[ed]," and the detainee was to be documented on the centralized tracking tool.  The detainee was to be placed "in a private medical housing room, ideally in an airborne infection isolation room if available"; if no such room was available, the detainee was to be housed "separately from the general

detention population." When detainees left these isolation rooms, they "should wear a tight-fitting surgical mask."

IHSC also recommended a system of notifications related to this group of symptomatic detainees. For these detainees, the local or state health department was to be notified and consulted for guidance, and, if the detainee had "underlying illness" or was "acutely ill," or if symptoms did not resolve, the ICE Regional Clinical Director or Infectious Disease program was to be consulted. ICE healthcare staff were also to be notified through the Infection Prevention Officer, the Facility Healthcare Program Manager, the Infection Prevention Group, or (for non-IHSC facilities) the Field Medical Coordinator assigned to the facility. In turn, ICE officials were to "immediately" "notify the Regional Infection Prevention Supervisory Nurse."

In bold, oversized font, the Interim Reference Sheet also recommended implementing additional hygiene protocols for symptomatic detainees with exposure risk. Detention facilities should "**[i]mplement strict hand hygiene and standard, airborne and contact precautions, including use of eye protection**." They should also "**[i]ncrease hand hygiene and routine cleaning of surfaces**," with the guidance document noting that "**[a]ppropriate personal protective equipment includes gloves, gowns, N95 respirators, and goggles or face shields**." During the initial screenings and in later consultations, IHSC further recommended that facilities "[e]ducate all detainees to include the importance of hand washing and hand hygiene, covering coughs with the elbow instead of with hands, and requesting sick call if they feel ill." This recommendation is repeated throughout the document.

Finally, the Interim Reference Sheet contained a list of "[i]infectious disease public health actions." Detainees with

"[k]nown exposure to a person with confirmed COVID-19" were recommended to be cohorted "with restricted movement" for 14 days, during which time they would be monitored for symptoms daily.  Detainees with "exposure to a person with fever or symptoms being evaluated or under investigation for COVID-19 but not confirmed to have COVID-19" were to be similarly cohorted and monitored for 14 days, unless the individual in question received a diagnosis that excluded COVID-19.  All such cohorting was to be reported through IHSC's routine protocols, and all "asymptomatic and afebrile" detainees being cohorted were to be documented in the tracking tool.

ICE also issued separate guidance to reduce its detainee population where possible.  On March 18, 2020, one week after the World Health Organization first characterized the COVID-19 outbreak as a "pandemic," ICE issued guidance that "directed" its Field Office Directors (FODs) and Deputy Field Office Directors (DFODs) "to review the cases of aliens detained in your area of responsibility who were over the age of 70 or pregnant to determine whether continued detention was appropriate" in light of the pandemic.  The record indicates that FODs have considerable authority within ICE.  One former FOD described his duties in that role as "provid[ing] operational and policy oversight for ERO's interior enforcement efforts within the local area of responsibility, spanning 43,000 square miles, three district courts, a cadre of nearly 200 employees, and 1,400 detention beds."

2

On March 23, 2020, soon after States began issuing stay-at-home orders for the first time, the CDC published a document entitled "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and

Detention Facilities."  ICE soon thereafter would reference and incorporate the CDC's Interim Guidance in its own directives.  But we discuss the CDC's guidance now as part of the chronological history.

The Interim Guidance document was dedicated to providing "recommended best practices specifically for correctional and detention facilities," based on "what is currently known about the transmission and severity of coronavirus disease 2019 (COVID-19)."  The Guidance included among its "intended audience" those "law enforcement agencies that have custodial authority for detained populations (i.e., US Immigration and Customs Enforcement . . . )."  But the CDC acknowledged (in bold) that its Guidance document did not "**differentiate[]**" between "**different facilities types . . . and sizes**" and that "**[a]dministrators and agencies should adapt [its] guiding principles to the specific needs of their facility**."

The CDC Interim Guidance provided approximately 20 pages of "detailed recommendations," including on the following topics: "Operational and communications preparations for COVID-19"; "Enhanced cleaning/disinfecting and hygiene practices"; "Social distancing strategies to increase space between individuals in the facility"; "How to limit transmission from visitors"; "Infection control, including recommended personal protective equipment (PPE) and potential alternatives during PPE shortages"; "Verbal screening and temperature check protocols for incoming incarcerated/detained individuals, staff, and visitors"; "Medical isolation of confirmed and suspected cases and quarantine of contacts, including considerations for cohorting when individual spaces are limited"; "Healthcare evaluation for suspected cases, including testing for COVID-19"; "Clinical care for

confirmed and suspected cases"; and "Considerations for persons at higher risk of severe disease from COVID-19." The CDC provided extensive recommendations on each of these topics.

A few days later, on March 27, 2020, ICE issued a six-page memorandum containing an "Action Plan" for addressing COVID-19, for the stated purpose of "ensur[ing] a unified and preventative response." The memorandum, addressed to ICE "Detention Wardens and Superintendents," directly applied to dedicated or IHSC-staffed facilities. "For intergovernmental partners and non-dedicated facilities," the memorandum instead deferred to governmental public health authorities. But the Action Plan nevertheless "recommend[ed] [the] actions contained in this memorandum be considered as best practices" for all facilities. The document contained guidance from various ICE components, consisting of IHSC, ERO, Custody Management Division (which "provides policy and oversight for the administrative custody" of ICE detainees), and Field Operations.

ICE's Action Plan acknowledged that "[t]he combination of a dense and highly transient detained population presents unique challenges for ICE efforts to mitigate the risk of infection and transmission." Among other things, the Action Plan provided guidance on how to limit visits and gatherings within detention facilities to reduce the risk of coronavirus introduction and spread. Detainee visitations, in-person staff training, volunteer visits, and non-oversight facility tours were suspended. But in recognition of the "considerable impact of suspending personal visitation" and the importance of detainees "maintain[ing] community ties," detention facilities were advised to "maximiz[e]" detainee use of telephone,

FRAIHAT v. USICE                    21

videoconferencing, and email, "with extended hours where possible."    Visits by contractors performing essential services, legal visits, and presentations by legal rights groups remained permitted, but the Action Plan provided guidance for minimizing exposure risk from those activities.

The Action Plan addressed a variety of other topics as well, including hygiene and social distancing practices. Facilities were to make alcohol-based hand sanitizer available to detainees and staff "to the maximum extent possible."  Hand sanitizer "with at least 60 percent alcohol" was also to "be available in visitor entrances, exits, and waiting areas."   In addition, facilities were directed to "implement modified operations to maximize social distancing," such as "staggered mealtimes and recreation times."   The document also provided a procedure for ensuring the safety of detainees being released from custody.

Additionally, and while referring to previously disseminated guidance on how to screen detainees, the March 27, 2020 Action Plan also provided detailed instructions for "[e]nhanced health screening[s]" of ICE and facility staff to prevent staff from bringing the virus into the detention facility.  This guidance applied to "ICE detention facilities in geographic areas with 'sustained community transmission,'" as defined by the CDC.   Finally, the document explained that "[t]he CDC remains the authoritative source for information on how to protect individuals and reduce exposure to COVID-19," and it referred to multiple CDC documents, including the Interim Guidance document discussed above.

3

On April 4, 2020, ICE replaced its March 18, 2020 detention review guidance with new guidance, entitled

"COVID-19 Detained Docket Review," that governed determinations whether to release detainees from custody because of the risk of COVID-19.  The theory behind reducing the detainee population was not only to remove from detention facilities those non-citizens with particular vulnerabilities to disease, but to create additional social distancing opportunities for those who remained in custody. This new April 2020 guidance was again addressed to Field Office Directors and deputies, and it expanded the risk factors that would prompt a review of a detainee's continued detention.

The April 4, 2020 Docket Review guidance listed several categories of detainees "that should be reviewed to re-assess custody."  This new list expanded on "a list of categories of individuals identified as potentially being at higher-risk for serious illness from COVID-19," which the CDC had previously developed.  As of April 4, 2020, ICE now directed FODs and DFODs to "re-assess" the custody of detainees who were pregnant, who had delivered babies in the last two weeks, who were over 60 years old, or who had chronic, immunocompromising conditions.  Conditions in this latter category included, but were not limited to, blood disorders, chronic kidney disease, illnesses or treatment that would result in compromised immune systems (such as radiation therapy or chemotherapy, transplants, or "high doses of corticosteroids or other immunosuppressant medications"), endocrine disorders, metabolic disorders, heart disease, lung disease, and neurological, neurologic, and neurodevelopment conditions.

The April 4, 2020 guidance instructed FODs and DFODs, "[a]s part of [the] ongoing application of the CDC's Interim Guidance," to "please identify all cases within your [area of responsibility] that meet any of the criteria above

and validate that list with assistance from IHSC or your Field Medical Coordinator." Once a detainee was verified as meeting one of those criteria, the Docket Review guidance instructed officers to "review the case to determine whether continued detention remains appropriate in light of the COVID-19 pandemic." However, while "[t]he presence of one of the factors listed above should be considered a significant discretionary factor weighing in favor of release," the ultimate determination was to depend on the basis for the detainee's detention.

The April 4, 2020 guidance explained that aliens subject to mandatory detention under 8 U.S.C. § 1226(c) "may not be released in the exercise of discretion during the pendency of removal proceedings even if potentially higher-risk for serious illness from COVID-19." Additionally, the guidance observed that "pursuant to [8 U.S.C. § 1231(a)(2)], certain criminal and terrorist aliens subject to a final order of removal may not be released during the 90-day removal period even if potentially higher-risk for serious illness from COVID-19."

The document then turned to detainees being held under discretionary detention under 8 U.S.C. § 1226(a). It mandated that "[c]ases involving any arrests or convictions for any crimes that involve risk to the public . . . must be reviewed and approved by a Deputy Field Office Director . . . or higher before a determination is made to release." The document provided examples of such crimes: those that "involve[] any form of violence, driving while intoxicated, threatening behaviors, terroristic threats, stalking, domestic violence, harm to a child, or any form of assault or battery." But the guidance noted that "[t]his list is not intended to be comprehensive." "[T]he age of an arrest or a conviction" could be a mitigating or aggravating factor but would not

"automatically outweigh public safety concerns." Furthermore, citing 8 C.F.R. § 236.1(c)(8), the Docket Review guidance reminded officers that even for non-citizens under discretionary detention, "release is prohibited, even if the alien is potentially higher-risk for serious illness from COVID-19, if such release would pose a danger to property or persons."

Finally, the Docket Review guidance addressed "arriving aliens and certain other aliens eligible for consideration of parole from custody." "[A]bsent significant adverse factors," that a detainee was "potentially higher-risk for serious illness from COVID-19" may justify his release under 8 C.F.R. § 212.5(b)(5), based on a determination that "continued detention is not in the public interest." Furthermore, "field offices remain[ed] responsible for articulating individualized custody determinations" for "other aliens for whom there is discretion to release," "taking into consideration the totality of the circumstances presented in the case." The April 4, 2020 guidance mandated that "[t]he fact that an alien is potentially higher-risk for serious illness from COVID-19 should be considered a factor weighing in favor of release."

The record contains evidence that ICE reduced its detainee population under the guidance described above. As of April 10, 2020, ICE reported that it had released 693 individuals from custody after evaluating their immigration histories and criminal records. Furthermore, in response to the virus, ICE sought to "limit[] the intake of new detainees being introduced into the ICE detention system." As a result, ICE reported a decrease in "book-ins" of over 60 percent when comparing March 2020 to March 2019. ICE also "arrested 1,982 fewer individuals in [the] Criminal Alien Program and 3,390 fewer at-large

individuals," "comparing the period of 22 days before and after March 18, 2020." All told, by "releas[ing] . . . highly vulnerable detainees, reducing [ICE's] enforcement posture, and exercising discretion on certain lower risk arrests," ICE reduced its detainee population from 37,662 single adults on February 13, 2020, to 35,980 on March 13, 2020, to 31,709 on April 13, 2020.

4

On April 10, 2020, ICE ERO issued an 18-page document entitled "COVID-19 Pandemic Response Requirements." "[I]ntended for use across ICE's entire detention network," the Pandemic Response Requirements "appl[ied] to all facilities housing ICE detainees" and provided detailed instructions for managing the detainee population in the face of COVID-19. ICE ERO explained that these measures were "necessary" given the "seriousness and pervasiveness of COVID-19." Thus, ICE was "providing guidance on the minimum measures required for facilities housing ICE detainees to implement to ensure consistent practices throughout its detention operations and the provision of medical care across the full spectrum of detention facilities to mitigate the spread of COVID-19."

The Pandemic Response Requirements, which were also developed in consultation with the CDC, imposed mandatory requirements on all facilities holding ICE detainees.[2] As the Requirements stated under "Objectives,"

---

[2] The Pandemic Response Requirements imposed virtually identical requirements on both dedicated and non-dedicated ICE facilities. There were only two apparent distinctions. First, the Pandemic Response Requirements noted that the cross-referenced March 27, 2020 Action Plan was mandatory for dedicated facilities but not for non-dedicated

ICE's purpose in issuing them was to "establish consistency across ICE detention facilities by establishing mandatory requirements and best practices all detention facilities housing ICE detainees are expected to follow during the COVID-19 pandemic."

The Pandemic Response Requirements began by mandating that all facilities "*must* . . . [c]omply with the CDC's [Interim Guidance]" document, which we described above. Furthermore, each facility "*must*" have its Health Services Administrator notify the Field Office Director and Field Medical Coordinator responsible for the facility "as soon as practicable, but in no case more than 12 hours after identifying any detainee who meets the CDC's identified populations potentially being at higher-risk for serious illness from COVID-19."

The Pandemic Response Requirements described those "higher-risk" populations as "including" "[p]eople aged 65 and older" and "[p]eople of all ages with underlying medical conditions, particularly if not well controlled." The specified medical conditions "includ[ed]" chronic lung disease, moderate to severe asthma, serious heart conditions, immunocompromising conditions, severe obesity (defined as "body mass index . . . of 40 or higher"), diabetes, chronic kidney disease undergoing dialysis, and liver disease. Furthermore, each facility "*must*" "[r]eport all confirmed and suspected COVID-19 cases to the local ERO Field

---

facilities. And second, dedicated facilities were required to notify the local FOD and FMC by email within 12 hours of identifying a higher-risk detainee while non-dedicated facilities were authorized to make notifications within 12 hours either via email or some "[o]ther standardized means of communicati[on]."

Office Director (or designee), Field Medical Coordinator, and local health department immediately."

The Pandemic Response Requirements additionally "required" "all facilities housing ICE detainees" to establish a "COVID-19 mitigation plan" to protect detainees from the pandemic. The mitigation plan was "required" to "meet[] the following four objectives":

- To protect employees, contractors, detainees, visitors to the facility, and stakeholders from exposure to the virus;

- To maintain essential functions and services at the facility throughout the pendency of the pandemic;

- To reduce movement and limit interaction of detainees with others outside their assigned housing units, as well as staff and others, and to promote social distancing within housing units; and

- To establish means to monitor, cohort, quarantine, and isolate the sick from the well.

Consistent with these objectives, the Pandemic Response Requirements also imposed a wide range of additional operational requirements that "*all detention facilities housing ICE detainees must also comply with*." These requirements were divided into three sections.

*First*, under the heading "Preparedness," the Pandemic Response Requirements provided detailed directives on

information-sharing with partner agencies, staffing, supplies (such as soap and facemasks), hygiene, and cleaning and disinfecting practices. In particular, the Pandemic Response Requirements mandated that facilities follow CDC guidance on optimizing the supply of personal protective equipment, such as facemasks and N95 respirators. The Pandemic Response Requirements also specified that when PPE such as N95 masks were limited in supply, "[c]loth face coverings should be worn by detainees and staff . . . to help slow the spread of COVID-19."

"Preparedness" also included requirements for ensuring personal and facility-wide hygiene. Among other things, all detainees and staff were to be provided "no-cost, unlimited access to supplies for hand cleansing, including liquid soap, running water, hand drying machines or disposable paper towels, and no-touch trash receptacles." Facilities were also to "[p]rovide alcohol-based hand sanitizer with at least 60% alcohol where permissible based on security restrictions." To educate detainees and staff, facilities were required to post signage (such as that provided by the CDC) about hand hygiene and cough etiquette in English, Spanish, and "any other common languages for the detainee population at the facility."

ICE detention facilities were also required to "[a]dhere to CDC recommendations for cleaning and disinfection," and the Pandemic Response Requirements provided a link to the CDC guidance on the subject. The Pandemic Response Requirements contain a lengthy list of "Cleaning/Disinfecting Practices" and recommendations for cleaning "Hard (Non-porous) Surfaces," "Soft (Porous) Surfaces," "Electronics," and "Linens, Clothing, and Other Items That Go in the Laundry."

*Second*, under the heading "Prevention," the Pandemic Response Requirements provided directives for screening detainees and staff, visitation, and social distancing, emphasizing that "[b]oth good hygiene practices and social distancing are critical in preventing further transmission" of COVID-19. As to screening, for example, the Requirements detailed how facilities should screen for COVID-19 symptoms and what facilities should do when they determined during the screening process that a detainee or staff member may have COVID-19 exposure. As to social distancing, the Pandemic Response Requirements discussed various measures for sleeping, dining, and recreation that could lead to greater physical distance between detainees during more hours of the day.

While the Pandemic Response Requirements recognized that "strict social distancing may not be possible in congregate settings such as detention facilities," it required facilities, "to the extent practicable," to reduce detainee populations and population movement as part of creating greater social distancing. Facilities specifically were advised to "reduce the population to approximately 75% of capacity." The Pandemic Response Requirements also required facilities, "**[w]here possible, [to] restrict transfers of detained non-ICE populations to and from other jurisdictions and facilities unless necessary for medical evaluation, isolation/quarantine, clinical care, or extenuating security concerns.**" Notwithstanding this new guidance, continued detention review, as specified in the April 4, 2020 "COVID-19 Detained Docket Review," remained ongoing.

*Third*, under the heading "Management," the Pandemic Response Requirements provided detailed instructions on managing suspected or confirmed COVID-19 cases. All

such detainees were to be isolated "immediately" with their own individual "housing space[s] and bathroom[s] where possible," and were to "always wear[] a face mask (if it does not restrict breathing) when outside of the isolation space, and whenever another individual enters the isolation room." The Pandemic Response Requirements acknowledged cohorting as an option, but it "should only be practiced if there are no other available options." Furthermore, "[i]f the number of confirmed cases exceeds the number of individual isolation spaces available in the facility, then ICE must be promptly notified so that transfer to other facilities, transfer to hospitals, or release can be coordinated immediately."

The Pandemic Response Requirements also reproduced the CDC's list of medical isolation methods, ranging from the most preferred option ("[s]eparately, in single cells with solid walls (i.e., not bars) and solid doors that close fully") to the option of last resort ("[a]s a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells"). Isolation was to be maintained, the Pandemic Response Requirements mandated, "until all the CDC criteria" for ending isolation have been met.

With this important background in place, we now turn to the litigation at hand.

C

On August 19, 2019, several months before the COVID-19 outbreak began, a group of fifteen non-citizens in immigration detention and two non-profit organizations filed the underlying complaint in this case against DHS, ICE, and various DHS and ICE officials. Plaintiffs filed the case as a putative nationwide class action on behalf of "all people currently detained, or who in the future will be detained, in

ICE custody who are now, or will in the future be, subjected to" certain detention conditions. The complaint broadly alleged that the government had failed to "provide constitutionally adequate medical and mental health care" at ICE detention facilities, had unconstitutionally housed detainees in near-solitary confinement, and had discriminated against detainees with disabilities.

Months into the litigation, COVID-19 began to grip the United States. The focus of this case then became ICE's handling of the pandemic. On March 24 and 25, 2020, and before some of the ICE directives described above had been issued, plaintiffs filed emergency motions seeking a preliminary injunction and certification of two subclasses. Plaintiffs sought an injunction requiring ICE, *inter alia*, to identify all detainees at greater risk from COVID-19 because of certain medical conditions, and to release all such detainees "if medically necessary safeguards cannot be immediately (within 24 hours) provided to ensure [their] health and safety[] and absent an individualized finding of dangerousness to community."

On April 20, 2020, the district court entered a preliminary injunction and an accompanying provisional class certification order. *Fraihat v. ICE*, 445 F. Supp. 3d 709, 750–51 (C.D. Cal. 2020); *Fraihat v. ICE*, No. EDCV 19-1546 JGB (SHKx), 2020 WL 1932393, at *1 (C.D. Cal. Apr. 20, 2020). The district court certified two subclasses. 2020 WL 1932393, at *1. The first subclass consisted of "[a]ll people who are detained in ICE custody who have one or more of the Risk Factors placing them at heightened risk of severe illness and death upon contracting the COVID-19 virus." *Id.* "Risk Factors" meant "being over the age of 55; being pregnant; or having chronic health conditions." *Id.*

The class certification order defined "chronic health conditions" as "including" the following list of conditions:

> cardiovascular disease (congestive heart failure, history of myocardial infarction, history of cardiac surgery); high blood pressure; chronic respiratory disease (asthma, chronic obstructive pulmonary disease including chronic bronchitis or emphysema, or other pulmonary diseases); diabetes; cancer; liver disease; kidney disease; autoimmune diseases (psoriasis, rheumatoid arthritis, systemic lupus erythematosus); severe psychiatric illness; history of transplantation; and HIV/AIDS.

*Id.* The second subclass consisted of "[a]ll people who are detained in ICE custody whose disabilities place them at heightened risk of severe illness and death upon contacting the COVID-19 virus." *Id.* The list of "Covered disabilities" was identical to the list of "chronic health conditions." *Id.*

The district court appointed five of the fifteen original individual plaintiffs as class representatives for the provisionally certified subclasses: Faour Abdallah Fraihat, Jimmy Sudney, Aristoteles Sanchez Martinez, Alex Hernandez, and Martín Muñoz. *Id.* At the time, Sanchez Martinez was detained at the Stewart Detention Center in Georgia, and Hernandez was detained at the Etowah County Detention Center in Alabama. Fraihat, Sudney, and Muñoz previously had been detained at the Adelanto ICE Processing Center in California, but all three had been released by the time the district court issued the injunction and appointed them as class representatives.

With the exception of Sanchez Martinez, the class representatives had lengthy criminal histories, including convictions for manufacturing methamphetamine, robbery, and felony hit-and-run causing death or injury. At least two had previously been denied bond by Immigration Judges for presenting a danger to the community, and at least one previously had been found to be a flight risk.

Simultaneously with its class certification order, the district court entered a preliminary injunction. 445 F. Supp. 3d at 750–51. The court found that Plaintiffs were likely to succeed on the merits of three claims. First, ICE had likely acted with "medical indifference in violation of the Fifth Amendment" by failing to promulgate minimally adequate systemwide requirements in response to the pandemic. *Id.* at 742–46. The district court also noted deficiencies in hygiene, medical care, and social distancing at certain facilities. *Id.* at 728–734, 742–46.

Second, the court held that ICE's actions likely created "punitive conditions of confinement" in violation of the Fifth Amendment because the conditions in ICE detention facilities were worse than those in federal prisons. *Id.* at 746–47. Third, the district court found that ICE likely violated section 504 of the Rehabilitation Act by failing to accord detainees with disabilities a "benefit," which the court found was "best understood as participation in the removal process." *Id.* at 747–48.

Additionally, the district court found that plaintiffs showed a likelihood of irreparable harm based on an increase in COVID-19 cases among ICE detainees, a 15 percent mortality rate for "individuals vulnerable to COVID-19" and the possibility of "lasting consequences" for those who contract the virus and survive, and evidence that "detained populations tend to have worse health outcomes than the

population as a whole." *Id.* at 749. The district court also found that the balance of the equities and public interest "sharply incline[d] in Plaintiffs' favor." *Id.*

The district court entered a preliminary injunction that ordered ICE to undertake extensive measures in response to COVID-19. *Id.* at 750–51. Because it is important to appreciate the scope of the district court's preliminary injunction, we quote its commands in full:

- Defendants shall provide ICE Field Office Directors with the Risk Factors identified in the Subclass definition;

- Defendants shall identify and track all ICE detainees with Risk Factors. Most should be identified within ten days of this Order or within five days of their detention, whichever is later;

- Defendants shall make timely custody determinations for detainees with Risk Factors, per the latest Docket Review Guidance. In making their determinations, Defendants should consider the willingness of detainees with Risk Factors to be released, and offer information on post-release planning, which Plaintiffs may assist in providing;

- Defendants shall provide necessary training to any staff tasked with identifying detainees with Risk Factors, or delegate that task to trained medical personnel;

- The above relief shall extend to detainees with Risk Factors regardless of whether they have submitted requests for bond or parole, have petitioned for habeas relief, have requested other relief, or have had such requests denied;

- Defendants shall promptly issue a performance standard or a supplement to their Pandemic Response Requirements ("Performance Standard") defining the minimum acceptable detention conditions for detainees with the Risk Factors, regardless of the statutory authority for their detention, to reduce their risk of COVID-19 infection pending individualized determinations or the end of the pandemic;

- Defendants shall monitor and enforce facility-wide compliance with the Pandemic Response Requirements and the Performance Standard.

*Id.* at 751. These measures, the district court ordered, were to "remain in place as long as COVID-19 poses a substantial threat of harm to members of the Subclasses." *Id.* at 751.

## D

On June 19, 2020, the government timely appealed the district court's injunction and class certification order but did not seek a stay pending appeal. Briefing in this appeal was completed in early September 2020. Several weeks later, on October 7, 2020, the district court issued a further order granting in part plaintiffs' motion to enforce the injunction.

*Fraihat v. ICE*, No. EDCV 19-1546 JGB (SHKx), 2020 WL 6541994 (C.D. Cal. Oct. 7, 2020).  In this order, the district court explained that there were "several areas" of the preliminary injunction "where clarification is warranted," based on the government's non-compliance with the original injunction.  *Id.* at *3.  Although the district court's October 2020 order is the subject of a separate appeal, we discuss the order here because it demonstrates the district court's understanding and interpretation of its earlier April 20, 2020 injunction.

In the October 7, 2020 order, the district court noted that the government had since revised its Pandemic Response Requirements, but the court concluded that those revisions were inadequate.  While noting it was not "enlarging the preliminary injunction," the district court issued substantial clarification in three areas.  *Id.* at *5–13.

*First*, explaining that "the nature of the violation is a failure to adopt sufficiently comprehensive protocols to protect Subclass members," the district court's October 7, 2020 order provided a detailed set of directives governing the manner in which ICE was to provide medical care.  *Id.* at *8.  We quote those in full:

- Defendants shall issue a comprehensive Performance Standard directed to the Subclasses within twenty days.

- Defendants shall mandate more widespread and regular testing of the Subclasses, consistent with CDC Guidelines and above the level provided by the [Bureau of Prisons] and state prisons.

- Defendants shall develop minimum care and hospitalization protocols for Subclass Members who test positive.

- Defendants shall mandate that medical isolation and quarantine are distinct from solitary, segregated, or punitive housing, that extended lockdowns as a means of COVID-19 prevention are not allowed, and that access to diversion (books, television, recreation) and to telephones must be maintained to the fullest extent possible.

- Defendants shall mandate that safe cleaning products be utilized in safe quantities and in the manner intended for those products.    Defendants shall promptly investigate and redress reports of adverse reactions to harsh cleaning products or chemical sprays.

- Defendants shall provide more protective, and more concrete, transfer protocols to protect the Subclasses, including a suspension of transfers with a narrow and well-defined list of exceptions consistent with CDC Guidance.

- Defendants shall mandate twice daily screening of the Subclass members for symptoms and temperature, consistent with CDC recommendations and utilizing a structured screening tool.

- Defendants shall continue to update the Performance Standard, consistent with expert guidance and CDC Interim Guidance, with the goal of exceeding [Bureau of Prisons] and state prison system response levels.

- Defendants shall ensure subsequent iterations of the [Pandemic Response Requirements] do not dilute or distort CDC Interim Guidance, and shall ensure that facility operators are promptly notified of changes in CDC Interim Guidance.

*Id.* (footnotes omitted).[3]

*Second*, citing the government's "weak monitoring of facility-wide compliance with the Performance Standard," the district court in its October 7, 2020 order issued clarifications and directives on the issue of "monitoring and enforcement." *Id.* at *6, *8–9. We quote those in full:

- The Facility Survey shall be immediately and continuously updated to reflect the most current Performance Standard, shall include a section on Subclass member numbers and present conditions, and shall

---

[3] According to the district court's preliminary injunction, the referenced "Performance Standard" was to be a supplemented and more comprehensive version of ICE's Pandemic Response Requirements that complied with the district court's orders. 445 F. Supp. 3d at 751.

be corrected to address flaws noted by
Plaintiffs' expert.

- Defendants shall require [Detention
  Service Managers], [Detention Standards
  Compliance Officers] or other trained
  ICE compliance personnel to verify in
  person the facility self reports. These in-
  person checks should occur at least
  monthly.

- Defendants shall centrally track notices
  of non-compliance, action plans,
  corrective action plans, and notices of
  intent, and shall document their follow-
  up. These documents shall be included in
  the bi-weekly disclosures to Plaintiffs.

*Id.* at *9 (citations omitted).[4]

*Third*, and most significantly, the district court found that
ICE had not conducted sufficiently "meaningful" custody
determinations. *Id.* at *9. The court was "especially
distressed that about 70% of the detained Subclass members
are not subject to mandatory detention yet have not benefited
from the Docket Review Guidance, which instructs that the
presence of a risk factor should be a significant discretionary
factor in favor of release." *Id.* at *6.

---

[4] The referenced Facility Surveys were questionnaires completed by
individual detention facility administrators that, according to the district
court, allowed "self-report[ing] [of] conditions of confinement and
degree of COVID-19 preparedness." 2020 WL 6541994, at *4.

This, the district court explained, contravened its prior orders. The court characterized its initial injunction as "assum[ing]" that making the Docket Review guidance mandatory would, consistent with the court's orders, "result in meaningful reviews and the release of significant numbers of Subclass members." *Id.* at \*10. This meant that under the injunction, "only in rare cases would Defendants fail to release a Subclass member not subject to mandatory detention." *Id.* But the court also indicated it had "expected that some individuals subject to mandatory detention would be released under the Docket Review Guidance and Preliminary Injunction." *Id.* at \*11. The district court faulted the government for failing to release more detainees, finding that its "expect[ation]" of an "increase in releases" since the injunction had not been fulfilled. *Id.*

To remedy this issue, the district court issued further "clarifications" that it described as "necessary to achieve the original purposes" of the injunction. *Id.* at \*12. The court first clarified that under the original injunction, ICE was required to follow a two-step process for custody determinations. *Id.* at \*12. The district court provided this further direction, as follows:

- The Preliminary Injunction requires Defendants to identify and track detainees with risk factors within five days of their detention (step one) then to make a "timely" custody determination (step two).

    o At step one, Defendants must affirmatively identify and track detainees with Risk Factors. However, detainee medical files might be incomplete. To account for

this likelihood, a detainee or their counsel may promptly obtain a copy of the medical file and may supplement medical records at any time. Defendants shall streamline and clarify procedures for such requests. Defendants' medical personnel shall review newly submitted records within five days and inform the detainee and his or her counsel of the result.

o At step two, Defendants must complete a "timely" custody determination. Only in rare cases should the determination take longer than a week.

o Defendants shall provide notice of the result of the custody determination to the Subclass member and his or her counsel. The notice shall mention the Risk Factor(s) identified, and in cases of non-release shall reference a basis for continued detention in the Docket Review Guidance.

*Id.* (citation omitted).

The district court then specified the manner in which ICE was to make custody determinations, as well as the frequency with which ICE was to release detainees. We quote the district court's clarifications in full:

• In order to increase compliance and reduce detainee and attorney confusion,

Defendants shall advertise and implement consistent procedures across field offices, for both steps outlined above. Defendants shall ensure that the presence of a Risk Factor is given significant weight and that the custody reviews are meaningful.

o Blanket or cursory denials do not comply with the Preliminary Injunction or with the Docket Review Guidance's instruction to make individualized determinations.

o Only in rare cases should a Subclass member not subject to mandatory detention remain detained, and pursuant to the Docket Review Guidance, a justification is required.

o Subclass members subject to mandatory detention shall also receive custody determinations. Defendants shall not apply the Docket Review Guidance rule against release of Section 1226(c) detainees so inflexibly that none of these Subclass members are released. Section 1226(c) Subclass members should only continue to be detained after individualized consideration of the risk of severe illness or death, with due regard to the public health emergency.

○ Defendants shall centrally track and report in their biweekly productions the results of the Risk Factor and custody determinations.

○ To the extent *Fraihat* conflicts with another injunction regarding custody determination practices or procedures at particular field offices or facilities, the other court orders take precedence.

• The Risk Factor "Severe psychiatric illness" includes psychiatric illnesses that make it difficult for the individual to participate in their own care, that make it unlikely the individual will express symptoms, or that increase the risk of complications from the virus.

*Id.* (citation and footnote omitted).

The district court reiterated, however, that "[t]he Preliminary Injunction and subsequent orders address only Defendants' *systemwide* response to the pandemic." *Id.* at \*13. As a result, the district court went on, "[t]he case does not opine on the lawfulness of conditions faced by any individual detainee, nor does it determine the lawfulness of conditions at any particular facility." *Id.*

The government then filed a separate notice of appeal from the district court's October 7, 2020 clarification order. After we heard oral argument in the original appeal of the preliminary injunction and class certification orders, we ordered that the second appeal be held in abeyance pending the resolution of the first appeal. In the meantime, the

district court has issued a further order granting plaintiffs' motion to appoint a special master to "monitor and oversee" ICE's compliance with the injunction. The government has since filed a third notice of appeal of a further order of the district court accepting the special master's May 21, 2021 recommendations on additional oversight of ICE relating to the release and transfer of detainees and vaccinations.

In the meantime, and following the change in presidential administrations, the government reiterated its opposition to the district court's April 20, 2020 injunction. In a February 26, 2021 letter to this Court, the government maintained that "individual findings of likely deliberate indifference are not enough to show systemic harm or enough to warrant certification of sweeping nationwide classes or class-wide relief." Citing "ICE's extensive nationwide approach and response to COVID-19," the government renewed its position that "ICE's policies in response to COVID-19" did not "violate[] due process on a nationwide basis."

On September 9, 2021, nine months after this case was argued and submitted and nearly fifteen months after the government had filed its notice of appeal, the parties asked us to refer this case to our Court's mediation program. This request comes much too late, and we deny it. This matter has long been poised for resolution on appeal. The parties were free to resolve their dispute at any time and remain free to reach any private agreement. But given the substantial judicial and court resources that the parties already required be expended on their behalf, we decline their request to now use further court resources in the form of the Court's mediation program—itself a not unlimited resource. *See* Ninth Circuit General Order 7.1 ("The goals of the [Circuit mediation] program are to facilitate the voluntary resolution

of appeals in order to reduce the Court's workload and to offer parties an alternative to litigation to resolve their disputes."). Mediation is also not a sound use of court resources when the court has already fully evaluated and reached a decision on the merits, and when there are obvious reasons to question whether a circuit mediator could efficiently resolve this sprawling dispute, itself but one part of a much larger litigation.[5]

## II

The government argues on appeal that the district court erred both in issuing a preliminary injunction and in granting provisional class certification. Although we have jurisdiction to reach the latter issue, *see Paige v. State of California*, 102 F.3d 1035, 1039 (9th Cir. 1996), we need not do so here. The district court's class certification ruling depended on, and was in service of, its preliminary injunction. If the preliminary injunction is infirm, the class certification order necessarily falls as well, regardless of whether class certification was otherwise proper under Federal Rule of Civil Procedure 23.

We thus turn our attention to the district court's preliminary injunction. We have jurisdiction under 28 U.S.C. § 1292(a)(1) to "review for an abuse of discretion the district court's decision to grant a preliminary injunction." *Ramos v. Wolf*, 975 F.3d 872, 888 (9th Cir. 2020). "Within this inquiry, we review the district court's legal conclusions de novo and its factual findings for clear error." *Id.* In addition, "[a]n overbroad injunction is an

---

[5] The parties' request to refer this case to the Court's mediation program is thus denied. For the reasons set forth in Judge Berzon's dissenting opinion, Judge Berzon would grant the mediation request.

abuse of discretion." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009) (quotations and alteration omitted); *see also McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1297 (9th Cir. 1992).

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *accord Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *California ex rel. Becerra v. Azar*, 950 F.3d 1067, 1105 (9th Cir. 2020) (en banc); *City & County of San Francisco v. USCIS*, 944 F.3d 773, 789 (9th Cir. 2019)).

To obtain this relief, a plaintiff "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *USCIS*, 944 F.3d at 788–89 (quoting *Winter*, 555 U.S. at 20) (alterations in original). "Likelihood of success on the merits is the most important factor." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (quotations omitted). In this Circuit, we also "employ[] an alternative 'serious questions' standard, also known as the 'sliding scale' variant of the *Winter* standard." *Ramos*, 975 F.3d at 887 (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011)). Under that formulation, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff[s] can support issuance of a preliminary injunction, so long as the plaintiff[s] also show[] that there is a likelihood of

irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies*, 632 F.3d at 1135.

The district court found that plaintiffs had established a likelihood of success on three claims: (1) deliberate indifference to the medical needs of detainees, in violation of the Fifth Amendment; (2) punitive conditions of confinement, also in violation of the Fifth Amendment; and (3) a violation of section 504 of the Rehabilitation Act, 29 U.S.C. § 794.  445 F. Supp. 3d at 741–48.  We hold, however, that plaintiffs failed to demonstrate a likelihood of success or serious questions on the merits of any of these claims.  We address each in turn.

## III

We begin with plaintiffs' primary claim that ICE "failed to promulgate and implement medically necessary protocols and practices to protect medically vulnerable people" from COVID-19, and that this failure amounted to deliberate indifference in violation of the Fifth Amendment.  We conclude that plaintiffs have not shown a likelihood of success or serious questions on the merits of this claim, and that the district court's determination otherwise turned on a misapprehension of the governing legal standards.

## A

Demonstrating deliberate indifference requires a substantial showing.  Plaintiffs must establish the following:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant

> did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).

In substance, the government focuses on the third element, which requires plaintiffs to show that defendants' conduct was "objectively unreasonable." *Id.* To establish objective unreasonableness, a plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc)); *see also, e.g.*, *Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir. 2020) (per curiam).

The "reckless disregard" standard is a formidable one. *See, e.g.*, *Roman*, 977 F.3d at 947 (Miller, J., concurring in part and concurring in the judgment) (describing "reckless disregard" as a "high standard"). Neither "mere lack of due care," nor "an inadvertent failure to provide adequate medical care," nor even "[m]edical malpractice," without more, is sufficient to meet this standard. *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976); *Gordon*, 888 F.3d at 1125; *Castro*, 833 F.3d at 1071; *see also Roman*, 977 F.3d at 947 (Miller, J., concurring in part and concurring in the judgment) ("Although the word 'reasonable' might be taken to suggest something akin to the duty of reasonable care applied in negligence cases, the standard is more demanding than that . . . ."). Instead, a plaintiff must show that the

defendant "disregard[ed] an excessive risk" to the plaintiff's health and safety by failing to take "reasonable and available measures" that could have eliminated that risk.  *Castro*, 833 F.3d at 1070–71 (quoting *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1050 (9th Cir. 2002)).

The scope of the plaintiffs' allegations and the nature of their requested relief also necessarily inform our analysis. *See Gordon*, 888 F.3d at 1125 (explaining that whether the government's conduct was "objectively unreasonable" "will necessarily turn on the facts and circumstances of each particular case" (quotations omitted and alteration accepted)).   In many cases alleging unconstitutional deliberate indifference to medical needs, the plaintiff seeks relief as to himself, based on his own medical circumstances. *See, e.g.*, *Gamble*, 429 U.S. at 99–106; *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1243–46 (9th Cir. 2016); *Long v. County of Los Angeles*, 442 F.3d 1178, 1181–86 (9th Cir. 2006); *Toguchi v. Chung*, 391 F.3d 1051, 1055–56 (9th Cir. 2004).  In some cases, the plaintiffs seek relief on behalf of a larger group, but one nonetheless bounded by a more narrowly drawn common experience, such as conditions at a particular facility.   *See, e.g.*, *Roman*, 977 F.3d at 939 (conditions at the Adelanto ICE Processing Center); *Disability Rights Mont., Inc. v. Batista*, 930 F.3d 1090, 1093–96 (9th Cir. 2019) (conditions at the Montana State Prison).

More unusually here, in contrast, the basis for plaintiffs' request and the district court's injunction was not the individual circumstances of any detainee or the conditions at any ICE facility.  Given the inevitable differences in the medical vulnerabilities of individual detainees and the material differences across the approximately 250 detention facilities nationwide, plaintiffs' premising their requested

50                    FRAIHAT V. USICE

injunctive relief on these grounds would have created understandable problems in justifying a nationwide injunction and nationwide classes.

Instead, and in an effort to match the broad relief they sought, plaintiffs focused on the asserted unconstitutionality of ICE's nationwide directives, issued through the policy documents we chronicled above at length.  *See Brown v. Plata*, 563 U.S. 493, 499–506, 505 n.3 (2011) (exposure of prisoners to substantial risk of serious harm through statewide policies and practices); *Parsons v. Ryan*, 754 F.3d 657, 662–68, 676–78 (9th Cir. 2014) (same).  The district court's order granting a preliminary injunction thus focused on these same ICE policy documents, as well as "several additional global failures" that also were premised on the documents. 445 F. Supp. 3d at 743–45.  As the district court thus made clear in its October 2020 order enforcing the injunction, "the nature of the violation is a failure to adopt sufficiently comprehensive protocols to protect Subclass members."  2020 WL 6541994, at *8.  In this sense, plaintiffs' constitutional challenge is necessarily more abstract, yet more far-reaching, than a challenge to individual or facility-specific conditions of confinement.

Based on our careful review of ICE's March and April 2020 directives, we conclude that plaintiffs have not made "a clear showing" that in responding to the evolving and unprecedented COVID-19 pandemic, ICE acted with "deliberate indifference" to medical needs or in "reckless disregard" of health risks.  *California v. Azar*, 911 F.3d at 575; *Gordon*, 888 F.3d at 1125.  We chronicled the various ICE mandates and guidance documents at some length above because they show why plaintiffs cannot establish a likelihood of success on the merits.

Those documents demonstrate that far from recklessly disregarding the threat of COVID-19, ICE in the spring of 2020 (and earlier) took steps to address COVID-19. In particular, the March 6, 2020 IHSC Interim Reference Sheet, March 27, 2020 ICE Action Plan, April 4, 2020 Docket Review guidance, and April 10, 2020 ICE ERO Pandemic Response Requirements collectively provided a detailed set of directives on a host of topics relevant to mitigating the risks of COVID-19. These topics included: screening of detainees and staff for COVID-19 symptoms and exposure risk; monitoring, tracking, and reporting of detainees who had possible viral exposure; housing, cohorting, quarantining, and testing of detainees who may have developed COVID-19; hygiene practices, such as mask-wearing and sanitization; social distancing policies for sleeping, mealtimes, recreation periods, and otherwise; health education of detainees and staff; adherence to additional CDC Interim Guidance; release of detainees, with priority for those who had greater susceptibility to COVID-19 infection; limits on outside visits to detention facilities; development of facility-specific mitigation plans; and so on.

The April 10, 2020 ICE ERO Pandemic Response Requirements—which was ICE's most recent directive prior to the district court's injunction and which ICE issued after plaintiffs had already sought preliminary injunctive relief—bears particular mention. The Pandemic Response *Requirements* made compliance with the CDC Interim Guidance mandatory for all ICE detention facilities and instituted a system for reporting at-risk detainees or suspected or confirmed COVID-19 cases on an expedited timeframe. It also contained mandatory, detailed requirements for provision of hygiene supplies, PPE, and signage; procedures for cleaning various surfaces and common items; screening detainees and staff; and detainee

housing protocols, including social distancing, cohorting, and medical isolation methods. It further required each facility to establish a mitigation plan dedicated to protecting detainees.

The Supreme Court long ago reminded us that "[a]ny rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution." *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). Particularly in the face of scientific uncertainty about COVID-19—and with due consideration for the Executive Branch's preeminent role in managing immigration detention facilities and its greater institutional competence in this area, *see Bell v. Wolfish*, 441 U.S. 520, 548 (1979); *Roman*, 977 F.3d at 947 (Miller, J., concurring in part and concurring in the judgment)—we cannot conclude that ICE's directives are the stuff of deliberate indifference. Updated over time to account for improved understandings of an unprecedented global pandemic, ICE's documents reflect a mobilized effort to address what ICE acknowledged was the "seriousness and pervasiveness of COVID-19."

As a result, whether one would characterize ICE's spring 2020 policy response to COVID-19 as strong, fair, needing improvement, or something else, it simply cannot be described in the way that matters here: as a reckless disregard of the very health risks it forthrightly identified and directly sought to mitigate. The district court's determination that ICE's national directives reflected a "callous indifference to the safety and wellbeing of the

FRAIHAT V. USICE                53

Subclass members," 445 F. Supp. 3d at 745, is therefore not supported.[6]

B

Plaintiffs' contrary arguments, which the district court accepted, do not demonstrate otherwise. To the extent plaintiffs have come forward with evidence suggesting that ICE might have approached the pandemic more effectively in the spring of 2020, plaintiffs have not shown that ICE's national policies reflected deliberate indifference or reckless disregard of COVID-19.

*First*, plaintiffs argued, and the district court agreed, that ICE had unreasonably delayed in issuing nationwide directives to detention facilities. 445 F. Supp. 3d at 744–45. For example, the district court faulted the government for "promulgat[ing] only non-binding guidance for the first month of the pandemic" and for "unreasonably delay[ing] taking steps that would allow higher levels of social distancing in detention." *Id.* at 743–44. But this does not demonstrate deliberate indifference.

It may be that ICE could have moved more expeditiously in engaging the threat that COVID-19 posed. But ICE began addressing that issue in January 2020, and was addressing it in earnest by March 2020, when it issued the IHSC Interim Reference Sheet and ICE Action Plan. COVID-19 presented a public health crisis unlike any that we have encountered in our time. *See, e.g.*, *Hope v. Warden York Cnty. Prison*,

---

[6] Our fine dissenting colleague maintains we have applied a subjective intent standard. That is not correct. The standard, as we have indicated, is an objective one, and we have considered ICE's policies through that lens.

972 F.3d 310, 330 (3d Cir. 2020) ("COVID-19 presents highly unusual and unique circumstances that have radically transformed our everyday lives in ways previously inconceivable and have altered our world with lightning speed and unprecedented results." (quotations and citations omitted and alterations accepted)).  Plaintiffs have not demonstrated that ICE's response to the pandemic in the spring of 2020 materially trailed that of the many other areas of government that were confronting this challenging new problem at the same time.

Regardless, ICE's earlier delays in addressing COVID-19 did not demonstrate deliberate indifference on an ongoing basis.  "[T]o establish eligibility for an injunction, [plaintiffs] must demonstrate the continuance of [defendants'] disregard during the remainder of the litigation and into the future." *Farmer v. Brennan*, 511 U.S. 825, 846 (1994).  If ICE's prior delays had led to harm, that injury might be redressable in court.  But the relief sought here is injunctive in nature.  And plaintiffs have not explained how ICE's allegedly being slow out of the gate could justify preliminary injunctive relief if ICE's national policies at the time of the injunction did not reflect deliberate indifference. *See id.* at 846 n.9 (observing that defendants "could prevent issuance of an injunction by proving, during the litigation, that they were no longer unreasonably disregarding an objectively intolerable risk of harm and that they would not revert to their obduracy upon cessation of the litigation").

*Second*, the district court found special fault with ICE's March 6, 2020 IHSC Interim Reference Sheet.  445 F. Supp. 3d at 743, 745.  The district court explained that "Plaintiffs raise serious questions about the reasonableness of the IHSC guidance at the time it was promulgated and updated" because, among other things, "[t]he IHSC guidance omits

aspects of the CDC recommendations" and "did not more strongly recommend social distancing." *Id.* at 745. These observations, however, did not support a finding of deliberate indifference.

We discussed the IHSC Interim Reference Sheet in detail above. That document provided extensive recommended protocols for intake medical screening, monitoring of detainees with exposure risk (both those with symptoms and those who presently lacked them), quarantining, and cohorting of detainees. Once again, whatever limitations might be detected in this "interim" set of policies does not demonstrate a reckless disregard of COVID-19. The Interim Reference Sheet instead reflects an effort, ongoing in nature, to address viral exposure through recommended implementation of concrete procedures.

Several weeks later, moreover, ICE would issue the April 10, 2020 ICE ERO Pandemic Response Requirements, which directed that all ICE facilities "*must*" comply with the CDC's Interim Guidance on COVID-19 and which contained a section detailing "Additional Measures to Facilitate Social Distancing." While the district court questioned "whether the issuance of non-binding recommendations is an objectively 'reasonable' response to a pandemic," it acknowledged that the Pandemic Response Requirements "set forth 'mandatory requirements' for all facilities housing ICE detainees." *Id.* at 724, 744. That ICE was updating its policies during the preliminary injunction proceedings and mid-pandemic also underscores the difficulty plaintiffs face in showing that ICE's policies reflected deliberate indifference on a nationwide level. The reckless disregard standard did not permit the district court

to scrutinize ICE's national policies at the level that it did. *See Wolfish*, 441 U.S. at 539, 547–48.[7]

*Third*, the district court agreed with plaintiffs that ICE had "fail[ed] to take measures within ICE's power to increase the distance between detainees." *Id.* at 745. But plaintiffs did not thereby demonstrate ICE's deliberate indifference to the risks of COVID-19.

There are understandable constraints in imposing social distancing measures in a detention facility consistent with other necessary governmental objectives, such as security and the need to place certain persons in custody. *See, e.g.*, *Wolfish*, 441 U.S. at 540 ("The Government . . . has legitimate interests that stem from its need to manage the facility in which the individual is detained."). Even so, as detailed in the various ICE directives from March and April 2020, ICE recommended and ordered extensive social distancing measures, which included releasing some persons from detention altogether.

Most notably, the April 10, 2020 Pandemic Response Requirements mandated that ICE facilities "*must*" adopt the CDC Guidelines, which included the requirement to "**[i]mplement social distancing strategies to increase the physical space between incarcerated/detained persons**." Moreover, the Pandemic Response Requirements directed

---

[7] Like the district court, the dissent flyspecks ICE's policies to the point of criticizing its use of particular words or phrases, like "please," "ideally," and "efforts should be made," while chastising ICE for acknowledging the realistic difficulties associated with achieving complete social distancing in custodial settings. These critiques are inconsistent with the reckless disregard standard and the deference owed to the government in its operation of immigration detention centers mid-pandemic.

that "all facilities housing ICE detainees should implement . . . to the extent practicable" a detailed list of "Additional Measures to Facilitate Social Distancing." These measures, which reiterated many of the CDC's recommended social distancing strategies, consisted of the following required actions, which we quote in full:

- Efforts should be made to reduce the population to approximately 75% of capacity.

- Where detainee populations are such that such cells are available, to the extent possible, house detainees in individual rooms.

- Recommend that detainees sharing sleeping quarters sleep "head-to-foot."

- Extend recreation, law library, and meal hours and stagger detainee access to the same in order to limit the number of interactions between detainees from other housing units.

- Staff and detainees should be directed to avoid congregating in groups of 10 or more, employing social distancing strategies at all times.

- Whenever possible, all staff and detainees should maintain a distance of six feet from one another.

- If practicable, beds in housing units should be rearranged to allow for

> sufficient separation during sleeping hours.

Taken together, ICE's national policies in the spring of 2020, including adoption of CDC Guidelines, did not reflect reckless disregard of the very social distancing approaches they sought to implement.[8] While we do not suggest these policies are impervious to criticism, they did not demonstrate deliberate indifference to medical needs.

*Fourth*, the district court found plaintiffs had met their burden because "Defendants have not provided even nonbinding guidance to detention facilities specifically regarding medically vulnerable detainees, pending individualized determinations of release or denial of release." 445 F. Supp. 3d at 744. This finding appears to have been the root of that portion of the district court's injunction requiring ICE to undertake various actions as to those detainees with certain "Risk Factors" that the district court specified. *Id.* at 750–51.

We conclude, however, that plaintiffs did not meet their burden of demonstrating deliberate indifference on this front either because the district court's determination otherwise

---

[8] The dissent claims that in *Roman*, we held that the CDC Guidelines "do not provide a workable standard." 977 F.3d at 946. But the dissent leaves out the rest of the quoted sentence in that case, which states that the CDC Guidelines "do not provide a workable standard *for a preliminary injunction*." *Id.* (emphasis added). In *Roman*, we *vacated* a district court's COVID-19–related preliminary injunction that applied to just a single immigration detention facility. *Id.* at 945. And in the course of doing so, we advised the district court not to base any renewed injunction for that particular facility on the CDC Guidelines. *Id.* We certainly did not say in *Roman* that the CDC Guidelines were unworkable as national policy, which is how ICE is using them here.

was premised on legal error and a misapprehension of ICE's policies.  As an initial matter, and contrary to suggestions in the district court's decision, ICE's mandatory Pandemic Response Requirements did consider whether certain detainees were at higher risk of developing serious illness from COVID-19 based on certain identified factors, such as age and preexisting health conditions.  ICE made this the focus of its determinations whether to release certain detainees from custody, as well as various internal reporting requirements.  ICE also directed, for example, that if facilities lacked adequate capacity to house confirmed COVID-19 cases individually, "the facility must be especially mindful of cases that are at higher risk of severe illness from COVID-19" to "prevent transmission" to the "higher-risk individual."

To the extent the district court believed it was necessary for ICE to develop hygiene and other practices specific to persons with greater vulnerability to COVID-19, the government responds that the guidance ICE issued applied to *all* detainees, which included those at greater risk from COVID-19.  The government's chosen approach does not reflect deliberate indifference.

ICE developed its policies based on its knowledge of how immigration detention facilities functioned and in consultation with the CDC.  It may be that plaintiffs, their experts, and the district court have identified an alternative strategy that ICE could have pursued and that would have been more effective.  But "a mere difference of medical opinion is insufficient, as a matter of law, to establish deliberate indifference."  *Toguchi*, 391 F.3d at 1058 (quotations omitted and alterations accepted).  Nor can the constitutional line be drawn based on "a court's idea of how best to operate a detention facility."  *Wolfish*, 441 U.S. at

539. The deliberate indifference standard recognizes that the Executive must have some discretion in addressing a complex problem like the one before us; plaintiffs' and the district court's approach do not account for that. *Cf. Swain v. Junior*, 961 F.3d 1276, 1289 (11th Cir. 2020) ("We simply cannot conclude that, when faced with a perfect storm of a contagious virus and the space constraints inherent in a correctional facility, the defendants here acted unreasonably . . . .").[9]

*Finally*, and for similar reasons, the district court erred in determining that ICE's policies for releasing detainees were "objectively unreasonable," and in finding that ICE acted with deliberate indifference in not adhering to

---

[9] The dissent attempts to suggest that the district court's injunction was "limited" because it only applied to "medically vulnerable detainees." But the certified classes comprised persons with the Risk Factors that the district court identified, which consisted of anyone over age 55 or who had a wide range of different health issues, including conditions such as high blood pressure and asthma. The district court itself explained that "general knowledge and common sense indicate that the class is large." *Fraihat*, 445 F. Supp. 3d at 736 (quotations and brackets omitted). And by the district court's determination, the classes consist of persons "at immigration detention facilities across the country," so that any injunction would operate "across all facilities." *Id.* at 719, 738. These statements belie the dissent's effort to minimize the import of the district court's injunction, while confirming that in ordering ICE to follow certain directives for those detainees with "Risk Factors," the district court's disagreement with ICE's approach to the pandemic was not somehow a limited one.

The dissent similarly maintains that "[t]he district court's injunction did not create a nationwide policy," but "mandated only that *ICE* change its *own* nationwide policies." But that is a distinction without a difference. It is obvious that the preliminary injunction imposed on ICE extensive directives that the district court devised, subject to the district court's continuing oversight.

procedures that would result in the release of more detainees.
445 F. Supp. 3d at 745. The district court concluded that
ICE's Docket Review guidance improperly failed to contain
"a strong presumption of release." *Id.* In its later October 7,
2020 order, the district court elaborated that its initial
injunction was intended to "result in meaningful reviews *and
the release of significant numbers of Subclass members*," so
that "*only in rare cases* would Defendants fail to release a
Subclass member not subject to mandatory detention." 2020
WL 6541994, at *10 (emphasis added). The district court
further clarified that it had "expected that some individuals
subject to mandatory detention would be released." *Id.* at
*11.

Plaintiffs have not demonstrated a likelihood of success
in obtaining such extraordinary relief on a system-wide
basis. While "the district court's power to grant injunctive
relief included the authority to order a reduction in
population, if necessary to remedy a constitutional
violation," *Roman*, 977 F.3d at 942, compelled release of
detainees is surely a remedy of last resort, *see, e.g.*, *Hope*,
972 F.3d at 333 (characterizing release of immigration
detainees as "the most extreme" remedy); *see also Plata*,
563 U.S. at 500–01. The same is true of a judicial decree
ordering the government to adhere to procedures with the
expectation and understanding that they will result in greater
release of detainees. And, in all events, the availability of
any of this relief necessarily turns on "the antecedent
question whether the government has acted with 'reckless
disregard.'" *Roman*, 977 F.3d at 947 (Miller, J., concurring
in part and concurring in the judgment).

In this case, plaintiffs did not demonstrate that the mere
fact of their detention amounted to deliberate indifference.
It is undisputed that the government has the authority to

detain those in the plaintiff class.  *See* 8 U.S.C. §§ 1225(b), 1226(a), (c), 1231(a).   Nor did the conditions of confinement, as reflected in ICE's nationwide policy directives, provide a basis for the district court effectively to order the release of substantial numbers of immigration detainees.

The same was true of the district court's directives requiring ICE to adhere to more stringent custody review determinations that reflected a "strong presumption of release." *Fraihat*, 445 F. Supp. 3d at 745.  Cross-referencing the April 4, 2020 Docket Review guidance, the mandatory Pandemic Response Requirements stated that ICE ERO "will review" detainees at higher risk of illness "to determine whether continued detention is appropriate."   That the plaintiffs and district court may have desired more detainees be released, and on a potentially quicker basis, does not mean that the government's approach—which involved early release determinations—reflected reckless disregard on a national basis.

The Supreme Court has recognized that "judicial deference to the Executive Branch is especially appropriate in the immigration context."   *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999).   And "the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." *Wolfish*, 441 U.S. at 548; *see also Mirmehdi v. United States*, 689 F.3d 975, 984 (9th Cir. 2012) ("[T]he decision to detain an alien pending resolution of immigration proceedings is explicitly committed to the discretion of the Attorney General . . . ."), *as amended* (June 7, 2012).  When combined with the exigencies of a global pandemic, these core principles, grounded in the Constitution's separation of powers, must in this context necessarily inform the

deliberate indifference standard and the scope of appropriate injunctive relief.

For the reasons we have explained, plaintiffs have not demonstrated a likelihood of success or serious questions going to the antecedent constitutional violation that would justify any of the relief they were seeking, much less a judicial decree effectively directing the United States to release persons whom it was lawfully detaining. That is especially the case in view of ICE policies that already enabled the discretionary release of detainees with greater susceptibility to COVID-19—policies which, at the time of the injunction, had already led to the release of many detainees. On this record, there is no basis to conclude that to avoid acting with deliberate indifference, the Executive Branch was required to release large numbers of detainees held under proper authority.

The dissent for its part attempts to save the district court's nationwide injunction by downplaying its significance, calling the injunction "limited, modest, and deferential." Suffice it to say, that is not an apt description of the injunction before us, which imposed far-ranging court-ordered directives on the Executive Branch during a pandemic. That is why the district court itself (accurately) viewed plaintiffs as "claim[ing] entitlement to a comprehensive response to the pandemic," and why the district court viewed the issue in this case as whether ICE's "global response" to the pandemic was "adequate." *Fraihat*, 445 F. Supp. at 738–39; *see also id.* at 742 n.25 (district court "reject[ing] the implication that it lacks authority to enter class-wide relief to require a constitutionally adequate response to COVID-19 from ICE").

Nor can the import of the district court's injunction be minimized on the theory that the injunction operated on

ICE's policies and not the detention centers themselves. The policies govern the detention centers. There is no dispute that plaintiffs "claim Defendants have failed to ensure minimum lawful conditions of confinement at immigration detention facilities across the country," and that the district court's injunction therefore operates "across all facilities." *Fraihat*, 445 F. Supp. 3d at 719, 738. To say that the injunction bears upon the policies in the first instance is only to underscore the magnitude of both the relief plaintiffs sought and the district court's error in concluding that plaintiffs had shown that ICE acted with reckless disregard to COVID-19 on a national level.

C

Perhaps recognizing that the district court's injunction cannot be maintained based on ICE's policy directives, plaintiffs devote extensive effort to detailing the conditions at certain ICE facilities. In this regard, plaintiffs have pointed to potential shortcomings in the on-the-ground COVID-19 response at individual detention facilities in spring 2020.

Whether those shortcomings would rise to the level of a constitutional violation, however, is a different question. *See Gordon*, 888 F.3d at 1125. And whether those conditions persist today, over a year after plaintiffs first sought injunctive relief, is yet another question, underscoring the difficulties with issuing injunctive relief about detention conditions in the midst of a fast-moving pandemic, where improved scientific knowledge leads to updated approaches over time. *See Roman*, 977 F.3d at 945–46 (vacating provisions of a preliminary injunction ordering specific COVID-19 measures at Adelanto where "circumstances have changed dramatically" since the time of the injunction). In this case, moreover, most of the named

plaintiffs who sought the injunction are no longer in custody at all and were not detained at least as of July 2020.[10]

The more fundamental point, however, is that conditions at individual detention facilities cannot support the injunction that plaintiffs sought. While the district court discussed conditions at certain ICE facilities, as described by detainees and other visitors to detention facilities, 445 F. Supp. 3d at 728–34, the district court did not base its injunction on this evidence, some of which it characterized as "anecdotal," *id.* at 728. Instead, the district court was clear that it was the claimed deficiencies in ICE's nationwide directives that justified a nationwide injunction and nationwide classes.

"[T]he common question driving this case," the district court explained, is the adequacy of "Defendants' system-wide response" to the pandemic. *Id.* at 737. Accordingly, the district court's analysis focused on ICE's "decision to promulgate . . . guidance" and its purported "systemwide inaction." *Id.* at 743. In its later order enforcing the injunction, the district court reiterated that "[t]he Preliminary Injunction and subsequent orders address only Defendants' *systemwide* response to the pandemic." 2020 WL 6541994, at *13. The district court thus was clear that its preliminary injunction order "does not opine on the lawfulness of conditions faced by any individual detainee, nor does it

---

[10] Although we do not reach the question of irreparable harm, we note that the dissent's perception of that issue turns on its unsupported determination that ICE's national policies reflected reckless disregard, and that the district court's solution to the situation was more likely to ameliorate harm than ICE's own policies. The dissent also questions the accuracy of the central statistic on which it relies.

determine the lawfulness of conditions at any particular facility." *Id.*

The district court's disclaimer was understandable because the circumstances at individual detention facilities could not justify the broad, nationwide relief that plaintiffs pursued. By seeking an injunction based on ICE's allegedly unconstitutional "systemwide" response, plaintiffs necessarily attacked ICE's detention policies at every one of its more than 250 facilities across the country. Yet the five class representatives had been detained at only three facilities.

The government persuasively argues that given the material differences across ICE facilities—including their size, layout, health care capabilities, whether they also housed non-ICE detainees, and so on—the nature of the injunctive relief plaintiffs sought could not be justified based on evidence about conditions at individual facilities. On this record, that position is well-taken.

A federal court must "tailor[] a remedy commensurate with the . . . specific violations" at issue in a case, and it errs where it "impose[s] a systemwide remedy going beyond [the] scope" of those violations. *Lewis v. Casey*, 518 U.S. 343, 359 (1996) (quoting *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 417 (1977)); *accord California v. Azar*, 911 F.3d at 584 ("The scope of an injunction . . . must [be] tailor[ed] . . . 'to meet the exigencies of the particular case.'" (quoting *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (per curiam))). "[O]nly if there has been a systemwide impact may there be a systemwide remedy." *Flores v. Huppenthal*, 789 F.3d 994, 1005–06 (9th Cir. 2015) (alteration in original) (quoting *Casey*, 518 U.S. at 359–60).

Plaintiffs have not demonstrated that the conditions at their individual facilities support a showing that ICE has acted with deliberate indifference or reckless disregard as to the approximately 250 immigration detention facilities nationwide. In this case, moreover, the declarations upon which the district court relied to support the preliminary injunction all were dated in March 2020, which was prior to the April 10, 2020 Pandemic Response Requirements, ICE's most significant operative guidance at the time the district court entered its injunction. *See* 445 F. Supp. 3d at 728–34. And while plaintiffs attempted to submit additional declarations in a filing that the district court denied as moot, those facility-specific declarations—which were prepared only several days after the mandatory Pandemic Response Requirements were issued and included discussion of events prior to that time—do not show deliberate indifference on a system-wide basis either. Indeed, the CDC's own guidance acknowledged differences in "facility types . . . and sizes" and specified that "[a]dministrators and agencies should adapt these guiding principles to the specific needs of their facility."

For these reasons, plaintiffs' reliance on our decisions in *Roman v. Wolf*, 977 F.3d 935 (9th Cir. 2020) (per curiam), and *Zepeda Rivas v. Jennings*, 845 F. App'x 530 (9th Cir. 2021), is misplaced. In *Roman*, plaintiffs challenged only the conditions of confinement at one immigration detention facility, Adelanto, and they sought an injunction only with respect to that facility's handling of COVID-19. 977 F.3d at 939. The district court there had before it detailed information about the conditions at Adelanto, such as the population levels, screening procedures, cleaning routines, and physical layout of the facility, down to the precise distance between bunk beds in feet and inches. *Roman v. Wolf*, 2020 WL 1952656, at *1–9 (C.D. Cal. Apr. 23, 2020),

*aff'd in part and vacated in part by* 977 F.3d at 946–47. Even then, we "vacate[d] the provisions of the preliminary injunction that ordered specific measures to be implemented at Adelanto," including reductions of the detainee population. 977 F.3d at 939, 945. And we cautioned that "the district court should, to the extent possible, avoid imposing provisions that micromanage the Government's administration of conditions at Adelanto." *Id.* at 946.

Similarly, in *Zepeda Rivas*, plaintiffs challenged the conditions at two detention facilities. As in *Roman*, in entering a preliminary injunction the district court considered detailed evidence about those facilities' approach to COVID-19. *Zepeda Rivas v. Jennings*, 465 F. Supp. 3d 1028, 1034 (N.D. Cal. 2020), *aff'd in part*, 845 F. App'x at 534. There were also notable similarities between the two facilities: they were both located in California's Central Valley, were operated under the same ICE field office, and received detainees convicted of similar crimes transferred from the same county jail. *See Zepeda Rivas v. Jennings*, 445 F. Supp. 3d 36, 38–40, 39 n.4 (N.D. Cal. 2020).

*Roman* and *Zepeda Rivas* are of no assistance to plaintiffs here and put in perspective the immensity of the relief sought in this case. In contrast to the comparatively focused, facility-specific relief in those two prior cases, plaintiffs here challenged conditions of confinement at every ICE detention facility nationwide. The relief they seek is far greater than what was at issue in *Roman* and *Zepeda Rivas*. Plaintiffs' request demanded proof that would meet it. And given the nature of their challenge, that proof was not to be found in the form of particular conditions at individual detention facilities.

Plaintiffs also argue that the injunction could be justified by the district court's reference to "ICE's apparent failure to

enforce compliance with its policy documents." 445 F. Supp. 3d at 743. But the district court here was referring to the fact that "from March 11, 2020 to April 10, 2020," ICE's policies "seem[] to have been voluntary." *Id.* As the district court acknowledged, and as we have explained, the April 10, 2020 Pandemic Response Requirements were mandatory. *See id.* at 724 (district court quoting the Pandemic Response Requirements and stating that "[t]he Pandemic Response Requirements set forth 'mandatory requirements' for all facilities housing ICE detainees as well as best practices"). The district court still faulted those Requirements for lacking "enforcement mechanisms." *Id.* But the district court did not here elaborate on the "enforcement mechanisms" that were supposedly lacking. And plaintiffs have cited no authority requiring such additional mechanisms as a matter of constitutional law in the face of mandatory policies that were to be implemented through a chain of command.

To the extent plaintiffs instead argue that ICE has failed adequately to implement its policies at individual facilities, this encounters the same problem we have discussed above about the difficulties of invoking facility-specific conditions to justify a "clear showing" of nationwide deliberate indifference. Noncompliance at individual facilities could provide evidence of a lack of adequate oversight at those specific facilities. *See, e.g.*, *Roman*, 977 F.3d at 939–940. But on this record, that evidence is insufficient to support a finding as to ICE's allegedly deliberately indifferent "system-wide response." 445 F. Supp. 3d at 737. There is considerable distance between imperfect implementation of a policy, or even knowledge of the imperfect implementation of a policy, and deliberate indifference in the constitutional sense. *See, e.g.*, *Mortimer v. Baca*, 594 F.3d 714, 722–23 (9th Cir. 2010); *see also, e.g.*, *Gamble*, 429 U.S. at 105–06; *Gordon*, 888 F.3d at 1125; *Castro*, 833 F.3d at 1071.

We therefore hold that plaintiffs failed to make a "clear showing" of entitlement to relief commensurate with the scope of their request. *USCIS*, 944 F.3d at 789 (quoting *Winter*, 555 U.S. at 22). Plaintiffs have not established a likelihood of success or serious questions on the merits of their claim that ICE's nationwide approach to COVID-19 in spring 2020 reflected deliberate indifference or reckless disregard of health risks. The district court's injunction therefore cannot stand on this basis.

IV

Given our holding on plaintiffs' deliberate indifference claim, it all but follows that plaintiffs have not demonstrated a likelihood of success on their closely related theory that ICE's COVID-19 policies reflected unconstitutional "punishment" under the Fifth Amendment.

"[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Wolfish*, 441 U.S. at 535. We have thus held that "a civil detainee awaiting adjudication is entitled to conditions of confinement that are not punitive." *Jones v. Blanas*, 393 F.3d 918, 933 (9th Cir. 2004). "[A] restriction is 'punitive' where it is intended to punish, or where it is 'excessive in relation to its non-punitive purpose,' or is 'employed to achieve objectives that could be accomplished in so many alternative and less harsh methods.'" *Id.* at 933–34 (alteration accepted) (first quoting *Demery v. Arpaio*, 378 F.3d 1020, 1028 (9th Cir. 2004); and then quoting *Hallstrom v. City of Garden City*, 991 F.2d 1473, 1484 (9th Cir. 1993)). But "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Wolfish*, 441 U.S. at 539.

In this case, we easily conclude that there is a "legitimate governmental objective" in detaining plaintiffs. *Id.* ICE is holding them because they are suspected of having violated the immigration laws or are otherwise removable from the United States. *See* 8 U.S.C. §§ 1182(a), 1225(b), 1226(a), (c), 1227(a), 1231(a). The government has an understandable interest in detaining such persons to ensure attendance at immigration proceedings, improve public safety, and promote compliance with the immigration laws. *See, e.g.*, *Demore v. Kim*, 538 U.S. 510, 521 (2003); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018) (explaining that "Congress has authorized immigration officials to detain some classes of aliens during the course of certain immigration proceedings" to allow "immigration officials time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal activity before a final decision can be made").

The district court concluded that "[d]uring a pandemic such as this, it is likely punitive for a civil detention administrator to fail to mandate compliance with widely accepted hygiene, protective equipment, and distancing measures until the peak of the pandemic." 445 F. Supp. 3d at 746. But regardless of ICE's earlier actions, by April 10, 2020, the Pandemic Response Requirements imposed a host of mandatory obligations on all ICE detention facilities, including mandatory compliance with the CDC Guidelines. Just as ICE's national directives as of that time did not reflect deliberate indifference to COVID-19, they did not create excessive conditions of "punishment" either.

The district court concluded otherwise in part on the ground that ICE had "fail[ed] to take similar systemwide actions as jails and prisons." *Id.* at 746–47. But plaintiffs cannot demonstrate a likelihood of success on that theory

either.  Under case law that the district court referenced, "a presumption of punitive conditions arises where the individual is detained under conditions identical to, similar to, or more restrictive than those under which pretrial criminal detainees are held." *Jones*, 494 F.3d at 934.  If a plaintiff establishes that this presumption applies, "the burden shifts to the defendant to show (1) 'legitimate, non-punitive interests justifying the conditions of the detainee's confinement' and (2) 'that the restrictions imposed are not "excessive" in relation to these interests.'" *King v. County of Los Angeles*, 885 F.3d 548, 557 (9th Cir. 2018) (alterations accepted) (quoting *Jones*, 494 F.3d at 935).

*Jones* announced the foregoing comparative presumption in the context of a California state prisoner who was civilly detained and awaiting proceedings under California's Sexually Violent Predator Act.  *See* 393 F.3d at 922–23.  *King* involved a plaintiff in substantially the same situation.  *See* 885 F.3d at 552–53.  Plaintiffs have not identified authority from this Court extending *Jones*'s presumption to the context of federal immigration detainees.  But assuming without deciding that it would be appropriate to invoke that presumption in the immigration context—in which different government interests are at stake—the presumption provides no aid to plaintiffs here.

As an initial matter, to the extent plaintiffs seek application of this presumption to their confinement itself, as opposed to their "*conditions* of confinement," *Jones*, 494 F.3d at 934 (emphasis added), we have not previously invoked the presumption in that manner.  Nor do we see how we could do so in this context, when the Supreme Court "has recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process." *Demore*, 538 U.S. at 523.  Insofar as plaintiffs argue that

they should be released in greater numbers because more criminal detainees have been released due to concerns about COVID-19 at their prisons, we are aware of no authority requiring such parity as a matter of federal constitutional law.

To the extent plaintiffs' intended comparison is instead between the conditions at different facilities—ICE facilities versus those housing criminal detainees—plaintiffs have not demonstrated a likelihood of success on that theory. In *Jones*, where we invoked the presumption plaintiffs seek, we were considering a suit for damages by a single state detainee who was civilly committed pending a trial to determine whether he qualified as a sexual predator under California law. *Jones*, 494 F.3d at 922–23. We compared that detainee's conditions of confinement to those of the general jail population at the same facility in which the plaintiff was housed. *Id.* at 934–35.

Here, in sharp contrast, plaintiffs' argument in favor of a presumption of "punitive" conditions depends on a far more monumental comparison: all ICE detention facilities against (presumably) all prisons housing criminal detainees. Once again, the scope of plaintiffs' desired relief demands a commensurately high showing, which plaintiffs have not made here.

The record lacks evidence from which to draw any relevant comparisons between the overall conditions of confinement of ICE detainees as compared to those in criminal custody. The only basis for comparison that the district court identified related to a Department of Justice memorandum from the Attorney General to the Federal Bureau of Prisons (BOP) concerning the release of criminal detainees due to COVID-19 concerns. 445 F. Supp. 3d at 747.

That comparison is unavailing. There is, as we have already explained, no support in our cases for applying *Jones*'s presumption about comparative "conditions" of confinement to the government's continued *ability* to confine persons pursuant to lawful authority, as here. But even setting that threshold issue aside, plaintiffs have not demonstrated that any "presumption" about punitive conditions should arise from the BOP memorandum.

When we have applied the presumption announced in *Jones*, we have done so after comparing the relevant conditions of confinement as a whole. Thus in *Jones*, for example, we compared the plaintiff's overall conditions of confinement—including recreational activities, phone calls, time out of cell, and so on—with those of persons in the jail's general population. *See* 393 F.3d at 934–35; *see also King*, 885 F.3d at 557 (similar). Even assuming release determinations qualify as "conditions" of confinement (they do not), plaintiffs have not explained how we can evaluate this one "condition" in isolation, without comparing the various other "conditions" at ICE and criminal detention facilities that also bear on COVID-19 mitigation efforts. And on that point, and beyond custody release determinations, plaintiffs have not identified how the relevant "conditions" generally differ across the two types of facilities. Under these circumstances, we do not think the *Jones* presumption could apply, or that it could apply with any meaningful force, when plaintiffs' focus is limited to one "condition" of confinement among many.

Regardless, plaintiffs have not demonstrated there is any material difference between the BOP's approach to COVID-19-based custody release determinations and that which ICE set forth in its Docket Review guidance. The April 10, 2020 Pandemic Response Requirements provides that all

detention facilities housing ICE detainees "*must*" "[n]otify both the local ERO Field Office Director (or designee) and the Field Medical Coordinator as soon as practicable, but in no case more than 12 hours after identifying any detainee who meets the CDC's identified populations potentially being at higher-risk for serious illness from COVID-19." The Pandemic Response Requirements then instruct that "[u]pon being informed of" such a detainee, "ERO will review the case to determine whether continued detention is appropriate."

At this point, the Pandemic Response Requirements cross-reference the April 4, 2020 Docket Review guidance, which provides detailed instructions for higher-risk "cases that should be reviewed to re-assess custody." After setting forth an "[e]xpand[ed]" list of health conditions that would warrant this review, the Docket Review guidance instructs relevant personnel to "review the case to determine whether continued detention remains appropriate in light of the COVID-19 pandemic." The Guidance further makes clear that "[t]he fact that an alien is potentially higher-risk for serious illness from COVID-19 should be considered a factor weighing in favor of release."

Notwithstanding this, the district court concluded that the BOP memorandum reflected "a more decisive and urgent call to action," whereas ICE's Docket Review guidance "arguably fails to communicate the same sense of urgency or concern." 445 F. Supp. 3d at 747. When considering the Docket Review guidance in conjunction with the later Pandemic Response Requirements, we do not think they promote a materially discrepant message from that of the BOP memorandum. But even if there were a difference in emphasis, any such perceived tonal difference does not demonstrate a sufficiently material divide between ICE's

approach and that of the BOP. That perceived disparity thus could not be the basis for any "presumption" of punitiveness. Nor, as we have explained, have plaintiffs otherwise shown a likelihood of success on this Fifth Amendment "punishment" claim.

V

We turn lastly to plaintiffs' statutory claim under the Rehabilitation Act. That Act prohibits a program receiving federal financial assistance from discriminating based on disability. 29 U.S.C. § 794; *see generally Fleming v. Yuma Reg'l Med. Ctr.*, 587 F.3d 938, 940 (9th Cir. 2009). We hold that plaintiffs have not met their burden of establishing a likelihood of success on the merits of this claim.

Section 504 of the Rehabilitation Act states in relevant part that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). A plaintiff bringing a section 504 claim thus "must show that '(1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance.'" *Updike v. Multnomah County*, 870 F.3d 939, 949 (9th Cir. 2017) (quoting *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001)).

Plaintiffs have at the very least not established a likelihood of success on the third element. Plaintiffs have not identified any "benefit" that they have been denied. The district court held otherwise after concluding that the "programmatic 'benefit' in this context . . . is best

understood as participation in the removal process." 445 F. Supp. 3d at 748. But even assuming "participation in the removal process" could fit within the statutory term "benefit," plaintiffs have not shown they were deprived of the ability to participate in their immigration proceedings. Plaintiffs in their answering brief respond only that "a person cannot participate in challenging her removal from this country—by communicating with counsel, witnesses, or the immigration judge—if she is on a ventilator." But this bare allegation is insufficient.

In addition, plaintiffs did not establish a further requirement of section 504's third element, which is that the denial of benefits be "solely by reason" of plaintiffs' alleged disabilities. 29 U.S.C. § 794(a). Plaintiffs at most demonstrated that they were subjected to inadequate national policies that they claimed reflected deliberate indifference to COVID-19; they did not show they were treated differently from other detainees "solely by reason" of their disabilities. *See K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1099 (9th Cir. 2013).

We have no occasion to reach the Rehabilitation Act's other elements because we conclude that plaintiffs have not shown a likelihood of success that they were denied a benefit solely by reason of their claimed disabilities. Their statutory claim, like their constitutional claims, thus cannot support preliminary injunctive relief. And because plaintiffs have not demonstrated a likelihood of success on any claim, we need not address the other preliminary injunction factors that plaintiffs also would have needed to establish. *See California ex rel. Becerra*, 950 F.3d at 1083 ("If a movant fails to establish likelihood of success on the merits, we need not consider the other factors.").

\*   \*   \*

COVID-19 presents inherent challenges in institutional settings, and it has without question imposed greater risks on persons in custody.   But plaintiffs had to demonstrate considerably more than that to warrant the extraordinary, system-wide relief that they sought.   The demanding legal standards that govern plaintiffs' request reflect the separation of powers implications underlying any effort to place presumptively Executive responsibilities in judicial hands.   That COVID-19 is an unprecedented public health issue could not thereby sustain a preliminary injunction that, without sufficient basis, effectively placed a federal court at the center of the Executive's nationwide effort safely to manage immigration detention facilities in the middle of an evolving pandemic.

We therefore reverse the preliminary injunction and direct that all orders premised on it be vacated.

**REVERSED      AND      REMANDED      WITH INSTRUCTIONS.**

BERZON, Circuit Judge, dissenting:

I dissent from both the majority's opinion vacating the district court's preliminary injunction and its order denying the parties' joint request for mediation.

Today, the majority vacates the district court's April 2020 preliminary injunction. To arrive at its holding, the majority applies incorrect standards three times: The majority recites but does not engage with our sliding scale approach for reviewing a preliminary injunction. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011); Opinion at 46. It correctly identifies but then

flouts our mandate to review the grant of a preliminary injunction for abuse of discretion, not de novo. *See, e.g., id.* at 58–59 (reaching its own "conclu[sion]" as to whether the plaintiffs met their factual burden). And, functionally, it evaluates Plaintiffs' Fifth Amendment reckless disregard claim under a subjective, instead of the proper, objective, standard. *Id.* at 48–53. The majority also repeatedly characterizes as "sweeping," "far-reaching" and of great "magnitude," *id.* at 9, 11–12, an injunction that is actually limited, modest, and deferential to the government's primary role in crafting policy and administering the detention facilities that house immigration detainees. Beyond these analytical errors, the majority does precisely what it chastises the district court for: by declining the parties' joint request for mediation, the majority imposes its own will on the parties.

## I.

This appeal is more easily summarized than the majority's lengthy opinion suggests. The federal government is authorized, and sometimes required, by statute to hold people in civil detention pending federal immigration proceedings. *See generally Jennings v. Rodriguez*, 138 S. Ct. 830, 836–38 (2018). But "[t]he Fifth Amendment requires the government to provide conditions of reasonable health and safety to people in its custody." *Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir. 2020) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (9th Cir. 2017)).[1] People in custody can

---

[1] People in custody may also argue that conditions are unconstitutionally punitive under a related Fifth Amendment due process theory. *See Roman v. Wolf*, 977 F.3d 935, 943 n.4 (citing *Bell v. Wolfish*, 441 U.S. 520, 535–37 (1979)). I agree with the majority that the

demonstrate unconstitutional conditions by pointing to systemwide policies insufficient for protecting their health and safety. *See generally Brown v. Plata*, 563 U.S. 493, 505 n.3 (2011); *Parsons v. Ryan*, 754 F.3d 657, 676–79 (9th Cir. 2014).

In March 2020, a group of people in federal immigration detention sought, in an already pending case, emergency subclass certification for, and a preliminary injunction on behalf of, all detainees who for medical reasons were "at heightened risk of severe illness and death upon contracting the COVID-19 virus." *Fraihat v. U.S. Immigr. & Customs Enf't*, 445 F. Supp. 3d 709, 726, 736–41 (C.D. Cal. 2020) (*Preliminary Injunction*). The district court provisionally certified both subclasses, using a set of medical risk factors substantially similar to those put forth by U.S. Immigration and Customs Enforcement (ICE), based on guidance from the Centers for Disease Control and Prevention (CDC). *Id*.; *see also Fraihat v. U.S. Immigr. & Customs Enf't*, No. 19-1546, 2020 WL 1932393 (C.D. Cal. Apr. 20, 2020) (*Class Certification Order*). So—and this point is critical, although the majority opinion repeatedly loses track of it—this case concerns ICE COVID-19 policy *only* as it relates to medically vulnerable detainees.

The majority opinion, disregarding that this case focuses on the lack of specific provisions in ICE's policy statements regarding *vulnerable detainees*, recites at length the provisions in ICE documents governing the treatment of all detainees during the early days of the pandemic. That ICE produced a fair amount of paper addressing the COVID-19

---

Plaintiffs have not raised serious questions on the merits of their punitive conditions claim or their Rehabilitation Act claim.

problem in its facilities should not obscure the critical facts as found by the district court and here relevant:

During the period of time the district court considered when issuing the injunction under review, ICE had issued a national policy guidance, known as the "Detained Docket Review Guidance," advising its agents to reassess the continued custody of some medically vulnerable detainees. But, the district court found, the policy was discretionary, as it did not "mandate action" and lacked "any requirement" that ICE field agents conduct such custody reviews. *Preliminary Injunction*, 445 F. Supp. 3d at 743, 750. The district court recounted that the guidance only "*ask[ed]* Field Office Directors to '*please*' make individualized determinations of the necessity of ongoing detention, and only as to some detainees." *Preliminary Injunction*, 445 F. Supp. 3d at 743 (emphasis added) (quoting Detained Docket Review Guidance). Moreover, the district court found, ICE did not have a centralized tracking mechanism enabling affirmative and quick identification of such detainees, nor did ICE "enforce compliance." *Id.* at 726–28, 745, 747, 743. "To the extent COVID-19 risk was addressed by individual facilities from March 11, 2020 to April 10, 2020," the district court concluded, "it seems to have been voluntary." *Id.* at 743. And, the district court further found, ICE had no specific policy mandating minimum acceptable detention conditions for medically vulnerable subclass members in particular, directed at reducing their chance of contracting COVID-19 while they remained detained. *Id.* at 744.

ICE's April 10, 2020, COVID-19 policy, known as the "Pandemic Response Requirements," or "PRR," did not cure these defects. It sought implementation of the measures it laid out to prevent the spread of COVID-19 only "to the extent practicable," specified that "*[e]fforts* should be made

to reduce the population to approximately 75% of capacity," and recognized that "strict social distancing *may not be possible* in congregate settings such as detention facilities." Finally, the PRR included "no mention of enforcement mechanisms." *Preliminary Injunction*, 445 F. Supp. 3d at 743. For all its verbosity, the majority opinion does not identify as clear error—and therefore as an abuse of discretion—any of the district court's findings about ICE's inadequate focus on the particular needs of medically vulnerable detainees or ICE's failure to mandate and assure compliance with directives to protect such detainees.

Because ICE's initial policy guidance was discretionary and its updated guidances required only "[e]fforts" that the guidance itself recognized as perhaps futile, high-risk detainees faced dangerous, deteriorating conditions at the time the injunction under review issued. Plaintiff subclass members detained in ICE facilities reported "little change in protocols or procedures in place in light of COVID-19." One man, detained at the Etowah County Detention Center in Alabama, detailed his living conditions thus: he had received no formal education about COVID-19; he ate three meals a day in a crowded setting, side-by-side with approximately seventy other people; he spent four hours every day in a group area where "there [wa]s no room for social distancing" and the maximum distance between people was approximately two feet; he shared a cell with another person in which social distancing was not possible; he was given soap once every one-to-two weeks; he was given one facemask to reuse; and there was no hand sanitizer available. Another man, detained at the Stewart Detention Center in Georgia, declared, "[s]ince the COVID-19 crisis started, ICE has not made any changes to the cleaning schedule for our dorm. Nor have we been provided with additional cleaning

supplies to keep our dorm disinfected and sufficiently clean."

An employee at a faith-based organization that works with people in ICE detention facilities reported that people in detention "ha[d] not experienced any material changes that protect them from the virus. To the contrary, I have daily conversations with our detained community members and with each passing day the conditions get worse." The testimony of another man, detained at the Adelanto Detention Center in California, highlighted the ways in which conditions were deteriorating. Hand sanitizer in a dispenser in a common area had been empty for more than two weeks. More than that, the man worked as a janitor in the facility, earning one dollar per day, and although "[t]here [we]re bottles of disinfectant in the janitor's closet that [they] [we]re supposed to add to the bucket," the bottles were "empty." "We are," he told the district court, "just cleaning with water."

The district court's findings reflected this disturbing evidence and that of medical experts. After a hearing, the district court found that 15% of subclass members would die if they contracted COVID-19, which was considerably more likely while they remained detained. *Preliminary Injunction*, 445 F. Supp. 3d at 722, 744. Subclass members who contract COVID-19 and survive would be likely to experience "life-altering complications" such as "permanent loss of respiratory capacity, heart conditions, [and] kidney damage." *Id.* The district court also found that "a surge in preventable cases would further strain local hospital and healthcare resources." Based on the record before it and its findings, the district court issued a preliminary injunction in April 2020 to protect the medically vulnerable detainee subclass members from COVID-19.

According to the majority, the "sweeping injunction" "was extraordinary beyond measure" and "effectively place[d] this country's network of immigration detention facilities under the direction of a single federal district court." Opinion at 9, 11–12. That characterization, to put it mildly, is not accurate.

The Plaintiffs did not contend, as the majority suggests, that "all of the approximately 250 immigration detention facilities nationwide" were violating the Fifth Amendment. *Id.* at 9. Instead, Plaintiffs claimed *ICE's nationwide policies*, or lack thereof, for protecting high-risk detainees from COVID-19 exposed them to an unconstitutional risk of harm given their medical vulnerabilities. So it was not the preliminary injunction that put the hundreds of immigration facilities under the control of the district court. Instead each of those facilities is part of the federal government's immigration detention system and must comply with ICE's national policies. For that reason, systemic changes in the policies will affect individual facilities, but the injunction is directed at the promulgation of the policies, not at evaluating the conditions at individual facilities. And, as the district court noted, "[D]efendants do not dispute that they have the authority to mandate compliance [with national policies]." *Preliminary Injunction*, 445 F. Supp. 3d at 746.

Although one would not know this from reading the majority's hyperbolic language about the separation of powers and appropriate judicial reticence, the April 2020 injunction ultimately required ICE to devise appropriate policies; the injunction did not dictate those policies or usurp the agencies' role in running the detention facilities. It left the definition of specific policies to the defendants, and appropriately so. *Cf. Brown v. Plata*, 563 U.S. 493, 500 (2011) (upholding a district court's order that le[ft] the

choice of means to reduce overcrowding to the discretion of . . . officials"). Injunctions regarding conditions in detention facilities are suitable when they lay out "general areas . . . that [the agency] need[s] to address," and "direct the [agency] to develop specific policies and procedures for complying with" federal law. *Armstrong v. Davis*, 275 F.3d 849, 883 (9th Cir. 2001) (Berzon, J., concurring). That is precisely what the district court's original injunction did.

Specifically, the preliminary injunction mandated, at a high level of generality, the following:

- Defendants shall provide ICE Field Office Directors with the Risk Factors identified in the Subclass definition;

- Defendants shall identify and track all ICE detainees with Risk Factors. Most should be identified within ten days of this Order or within five days of their detention, whichever is later;

- Defendants shall make timely custody determinations for detainees with Risk Factors, per the latest Docket Review Guidance. In making their determinations, Defendants should consider the willingness of detainees with Risk Factors to be released, and offer information on post-release planning, which Plaintiffs may assist in providing;

- Defendants shall provide necessary training to any staff tasked with identifying detainees with Risk Factors,

or delegate that task to trained medical personnel;

- The above relief shall extend to detainees with Risk Factors regardless of whether they have submitted requests for bond or parole, have petitioned for habeas relief, have requested other relief, or have had such requests denied;

- Defendants shall promptly issue a performance standard or a supplement to their Pandemic Response Requirements ('Performance Standard') defining the minimum acceptable detention conditions for detainees with the Risk Factors, regardless of the statutory authority for their detention, to reduce their risk of COVID-19 infection pending individualized determinations or the end of the pandemic;

- Defendants shall monitor and enforce facility-wide compliance with the Pandemic Response Requirements and the Performance Standard.

*Preliminary Injunction*, 445 F. Supp. 3d at 750–51. The injunction, then, specified areas that needed to be addressed, leaving to ICE the development of specific policies and procedures. Pursuant to the injunction, ICE, not the court, was to decide how to identify and track detainees, the standards governing custody determinations, the "minimal acceptable detention conditions," and the way in which compliance would be monitored and enforced.

The government never moved to stay the injunction, modify it, or vacate it, despite the district court's invitation to do so, *see id.* at 750, and waited two months to file an appeal.

According to the district court, after the injunction issued, custody reviews of subclass members remained "a disorganized patchwork of non-responses or perfunctory denials." *Fraihat v. U.S. Immigr. & Customs Enf't*, No. EDCV191546JGBSHKX, 2020 WL 6541994, at *6, *10 (C.D. Cal. Oct. 7, 2020) (*Supervisory Order*). There was still no minimum detention standard "to address the substantial risk of death to subclass members during the pandemic." *Id.* at *6. And "monitoring efforts rel[ied] on a meager survey that allow[ed] facilities to self-report their level of compliance." *Id.* To address these gaps, the district court issued a further order in October 2020, from which defendants also appealed. *See generally id.*; Notice of Appeal, *Fraihat v. U.S. Immigr. & Customs Enf't*, No. 5:19-cv-01546-JGB-SHK (C.D. Cal. Dec. 7, 2020), ECF No. 250. Most recently, a special master appointed by the district court reported that immigration detention facilities "are in the midst of an unprecedented surge in cases." Report and Recommendation of Special Master, *Fraihat v. U.S. Immigr. & Customs Enf't*, No. 5:19-cv-01546-JGB-SHK (C.D. Cal. May 21, 2021), ECF No. 304; *see also* Opinion at 43–44 (referencing the special master). The majority opinion devotes considerable attention to the details of the October 2020 order, even though it is the subject of a separate appeal.

## II.

It is true that this case has an artificial quality, as the development of the coronavirus crisis has taken many twists and turns, both terrifying and at times heartening, and both inside and outside detention institutions, since April 2020.

As a result of both changes in the pandemic's course and concerns about ICE's implementation of the bare-bones provisions of the April injunction, the district court has acted within its power in considering new facts on the ground and revisiting the terms of the order it originally issued. *See* Fed. R. Civ. P. 62(d) ("While an appeal is pending from an interlocutory order . . . that grants . . . an injunction, the court may . . . modify . . . [the] injunction."). But the majority's approach to this fluid situation—relying on the district court's October order to demonstrate that the April order was too intrusive, while refusing to recount or consider any of the facts underlying it—cannot be justified. *See, e.g.*, Opinion at 61.

Either we consider—as did this court in *Roman v. Wolf*, 977 F.3d 935 (9th Cir. 2020), and *Zepeda Rivas v. Jennings*, Nos. 20-16276 & 20-16690 (9th Cir. 2021)—what actually *happened* after the April 2020 injunction issued, or we do not. Were we to consider it, we might note that what happened, according to the district court, was that ICE did little to carry out the broad, deferential directives issued in April, and the coronavirus spread exponentially among the medically vulnerable members of the Plaintiff subclasses. It might well have made more sense to consolidate this appeal with the appeal of the October order and the appeal of the district court's June 23, 2021, order that adopted the special master's report and recommendation regarding compliance with the April 2020 injunction—but we did not do that.

What we cannot do is what the majority does: treat the April injunction here under review as if it included all the

terms of the October order while refusing to consider the factual and legal circumstances that led to that second order.[2]

In the end, we have to deal with the appeal before us, from the April injunction, *not* with the appeals *not* before us, from the October 2020 and June 2021 orders. I therefore focus this dissent on the April record and the April injunction.

## III.

As to the question actually before us—the propriety of the April, 2020, preliminary injunction—the majority begins by applying a misleading standard when considering whether the issuance of the injunction was proper. The majority first lays out the familiar preliminary injunction test in *Winter v. Nat. Res. Def. Council*, Inc., 555 U.S. 7 (2008), under which "[a] plaintiff . . . must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id*. at 20. The majority then acknowledges in passing that in this court we apply *Winter* through a sliding scale approach, adjusting the level of likelihood of success on the merits to the degree and imminence of irreparable harm demonstrated. Opinion at 46; *All. for the Wild Rockies*, 632 F.3d at 1131–32. But its recitation of the standard from *Alliance for the Wild Rockies* is the beginning

---

[2] It is critical in this regard that we are reviewing a *preliminary* injunction. The case remains pending, so the majority's rejection of a preliminary injunction based on the April 2020 record with regard to the deliberate indifference issue does not preclude the Plaintiffs from moving for, nor the district court from considering, a renewed motion for a preliminary injunction or permanent relief.

and end of its consideration and appreciation of the sliding scale standard.

I would actually applying the sliding scale analysis under *Alliance for the Wild Rockies* with regard to Plaintiffs' reckless disregard due process claim, rather than reciting and then ignoring it. Doing so, I would affirm the district court's preliminary injunction.[3]

### A.

Contrary to the majority's suggestion, our standard of review is not whether "*[w]e* conclude" "that plaintiffs did not meet their burden of demonstrating deliberate indifference." Opinion at 58–59 (emphasis added); *see also id.* at 61. Rather, "[a]s long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001) (internal quotation marks omitted). "A preliminary injunction should be set aside only if the district court 'abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact.'" *Doe v. Kelly*, 878 F.3d 710, 719 (9th Cir. 2017) (internal quotation marks omitted). The majority opinion is bereft of any recognition of our

---

[3]Alternatively, I would leave the injunction in place and suspend consideration of this case while the parties mediate towards a solution, as they have requested. On June 1, 2021, the parties informed us that they were considering requesting a referral to the court's mediators, and on September 9, 2021, they jointly did so. The majority today refuses to grant the parties' joint request. I note that this court has an excellent in-house mediation service, and during my time on the court, a panel has denied a joint request for referral to that service rarely if ever.

limited role in reviewing a district court's issuance of a preliminary injunction.

## B.

Again, under *Alliance for the Wild Rockies*, the proper preliminary injunction inquiry takes into account whether the balance of hardship tips sharply in Plaintiffs' favor, and, if so, whether they have raised serious questions going to the merits of their Fifth Amendment reckless disregard claim. "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff[s] can support issuance of a preliminary injunction, so long as the plaintiff[s] also show[] that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id*. at 1135. Here, in my view, the equity balance does strongly favor the Plaintiffs. And there are, at a minimum, serious questions as to whether ICE's supervision of detention facilities recklessly disregarded the medical needs of the high risk detainees who make up the Plaintiff subclasses. The district court did not abuse its discretion in so concluding.

**(i)** First, the balance of equities does tip sharply in Plaintiffs' favor.

When the government is a party, the balance of equities factor merges with the public interest consideration. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). On the balance of equities/public interest point, *Roman* is instructive. *Roman* held that "[t]he district court rightly concluded that the equities and public interest tipped in [the] [p]laintiffs' favor," because the "[p]laintiffs were likely to suffer irreparable harm absent relief given COVID-19's high mortality rate," and the government's interests were unlikely to be harmed by the issuance of an injunction:

many of the plaintiffs did not have criminal records and there was little risk the plaintiffs would "abscond if they were released" especially given the availability of electronic monitoring tools." 977 F.3d at 944.

The same is true here. As the district court explained, defendants "do not dispute that 15% of [subclass members] who ultimately contract COVID-19 will die, or that those who survive are likely to suffer life-altering complications," such as "permanent loss of respiratory capacity, heart conditions, [and] kidney damage." *Preliminary Injunction*, 445 F. Supp. 3d. at 744, 722. Death and life-altering medical conditions are surely irreparable injuries. In fact, a comparison with *Roman* suggests that the balance of hardships tips *more* "sharply towards the plaintiff[s]," *All. for the Wild Rockies*, 632 F.3d at 1135, than in *Roman*, because, as to the irreparable harm to the class, *Fraihat* subclass members are particularly vulnerable to COVID-19, while the *Roman* class included all detainees.

Also as in *Roman*, the government's interests here were not likely to be injured. The latest statistics available suggest that 70% of detained subclass members were not mandatorily detained, *Supervisory Order*, 2020 WL 6541994, at *5, and thus not "inadmissible or deportable because of [their] criminal history," 8 U.S.C. § 1226(c). There is no reason to think that *Fraihat* subclass members are more likely to have criminal records than *Roman* class members. And there is no presumption that *Fraihat* subclass members with criminal records would be routinely released under the April order, which specified that ICE should apply

its own Detained Docket Review Guidance, not one provided by the court.[4]

The heightened risk of a COVID-19 outbreak in detention centers was apparent in April 2020.[5] A "remedy for unsafe conditions need not await a tragic event." *Helling v. McKinney*, 509 U.S. 25, 33–34 (1993). Also, the district court's preliminary injunction opinion explained that "[a]n immigration facility outbreak would also menace the non-detained: a surge in preventable cases would further strain local hospital and healthcare resources." *Preliminary Injunction*, 445 F. Supp. 3d. at 722.

"Faced with . . . preventable human suffering," as we are here, "we have little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor." *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017); *see Preliminary Injunction*, 445 F. Supp. 3d at 749 (quoting *Hernandez*).

---

[4] I note that in the October enforcement order, the district court retained the Detained Docket Review Guidance as providing the governing standards and specified only that, "Defendants shall not apply the Docket Review Guidance rule against release of Section 1226(c) detainees so inflexibly that *none* of these subclass members are released." *Supervisory Order*, 2020 WL 6541994, at *12 (emphasis added).

[5] It is no surprise that the pandemic's eventual course bore this prediction out. In a July 2020 filing, an expert relayed to the district court that "detention centers are closed environments that increase the risk of COVID-19 outbreaks and are institutional amplifiers of the virus, not unlike factories or nursing homes." *Supervisory Order*, 2020 WL 6541994, at *3. And in October 2020 the district court observed, "[d]etention centers with lax social distancing or other COVID-19 prevention measures continue to pose a grave threat of harm to individuals residing and working in them, *as well as to the community as a whole*." *Id.* (emphasis added).

Because the district court appropriately concluded that an injunction was needed to safeguard the health of both detainees *and* the communities surrounding detention centers, its issuance of a preliminary injunction was in the public interest. The district court so found and did not abuse its discretion in doing so.

**(ii)** Next, Plaintiffs have raised serious questions going to the merits of their reckless disregard claim. The district court "identified the correct legal rule" governing this claim. *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc). Under *Gordon v. County of Orange*, 888 F.3d 1118 (9th Cir. 2018), Plaintiffs must show

> "(i) the defendant[s] made an intentional decision with respect to the conditions under which . . . plaintiff[s] w[ere] confined; (ii) those conditions put the plaintiff[s] at substantial risk of suffering serious harm; (iii) the defendant[s] did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant[s'] conduct obvious; and (iv) by not taking such measures, the defendant[s] caused the plaintiff[s'] injuries."

*Id*. at 1125. The majority focuses only on the third element, as there is no dispute that the others are met.[6] *See* Opinion at 48–53.

Critically, "[w]ith respect to the third element, the defendant[s'] conduct must be *objectively* unreasonable." *Gordon*, 888 F.3d at 1125 (quoting *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc) (emphasis added)). "[T]he plaintiff[s] must 'prove more than negligence but less than subjective intent—something akin to reckless disregard.'" *Id*. (quoting *Castro*, 833 F.3d at 1071) (footnote omitted). The majority recognizes this point but then repeatedly elides it.

Even though the proper standard "is one of *objective* indifference, not *subjective* indifference," *id*. at 1120 (emphasis added), the majority substantiates its analysis with cases that additionally require subjective indifference. It does so primarily by relying on cases that predate *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). Opinion at 48–49, 59–

---

[6] Defendants do not dispute that they made a series of intentional decisions with respect to COVID-19—in fact, the premise of their defense, and the majority's reversal, is that ICE "forthrightly identified and directly sought to mitigate," Opinion at 52–53. the threat of COVID-19. There is also no dispute that Plaintiffs were at "substantial risk of suffering serious harm," *Gordon*, 888 F.3d at 1125, in the midst of a global pandemic. As the district court explained, "[i]t is undisputed that COVID-19 finds its way into almost every . . . communal setting." *Preliminary Injunction*, 445 F. Supp. 3d at 744. Further, defendants "do not dispute that 15% of [subclass members] who ultimately contract COVID-19 will die, or that those who survive are likely to suffer life-altering complications." *Id*. Similarly, there is no dispute that the causation element is met too, as, to prove causation, "a plaintiff need only prove a 'sufficiently imminent danger,' because a 'remedy for unsafe conditions need not await a tragic event.'" *Roman*, 977 F.3d at 943–44 (quoting *Helling*, 509 U.S. at 33–34 (cleaned up).

60. *Kingsley* held the proper standard for evaluating a detainee's excessive force claim is purely objective. 576 U.S. at 395–97. Applying *Kingsley*, *Gordon* "conclude[d] that the proper standard of review" for "right to adequate medical care" claims "is one of objective indifference, not subjective indifference." 888 F.3d at 1120.

The majority relies, for example, on *Toguchi v. Chung*, 391 F.3d 1051, 1058 (2004) for the proposition that "a mere difference of medical opinion is insufficient, as a matter of law, to establish deliberate indifference." But *Toguchi*, decided before *Gordon*, applied "both the objective and subjective" test. *Id.* at 1057 (quoting *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002). Similarly, the majority quotes *Swain v. Junior*, 961 F.3d 1276, 1289 (11th Cir. 2020), as support for its conclusion that the government did not act with deliberate indifference. Opinion at 59–60. But, as *Swain* explicitly noted, the Eleventh Circuit "require[s] detainees to prove *subjective* deliberate indifference." 961 F.3d at 1285 n.4 (emphasis added); *see Dang ex rel. Dang v. Sheriff, Seminole Cnty. Fla.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (holding *Kingsley* did not abrogate Eleventh Circuit precedent of using a subjective standard for claims of inadequate medical treatment). Thus, *Swain* held the government had not "acted with a deliberately indifferent mental state" because its mental state was not "equivalent to '*subjective* recklessness.'" 961 F.3d at 1289. Our court applies a different standard, so *Swain*'s reasoning offers little guidance.

The majority's importation of subjective elements into its analysis is not simply a matter of erroneously citing cases applying a subjective standard. The majority's analysis of whether ICE's policies regarding the protection of medically

vulnerable detainees from serious illness and possible death is replete with consideration of subjective factors.

To the majority, ICE's April 2020 policy response was reasonable because it "reflect[ed] a mobilized *effort*" which "*forthrightly* identified and directly *sought* to mitigate" the health risks posed by COVID-19. Opinion at 52–53 (emphasis added); *see also id.* at 4. Indeed—and thankfully—some federal immigration officials did recognize the threat of COVID-19 in detention facilities. For example, ICE's March 2020 "Action Plan" recognized "[t]he combination of a dense and highly transient detained population presents unique challenges for ICE efforts to mitigate the risk of infection and transmission."

But the *Kingsley/Gordon* reckless disregard standard is not satisfied by simply recognizing a risk to health and safety, expressing concern, and taking *some* measures to decrease the risk. Instead, the officials responsible for the conditions must take "reasonable available measures to abate that risk"; the degree of risk presented necessarily informs which "reasonable available measures" are needed "to abate" them. *Gordon*, 888 F.3d at 1125. Plaintiffs have presented evidence which, viewed through an objective standard, strongly suggesting the government did not prescribe such measures, whether it meant to do so or not.

Distracted, I submit, by its evaluation of whether ICE was acting in good faith, the majority holds that ICE's policy about detention conditions is not "objectively unreasonable," Opinion at 48–53; *Gordon*, 888 F.3d at 1125 (quoting *Castro*, 833 F.3d at 1071). I disagree. Given the degree of irreparable harm to which the Plaintiff subclasses of medically vulnerable detainees were exposed, *Roman* makes clear that the district court did not abuse its discretion in concluding that the Plaintiffs at least demonstrated a

serious legal question on the merits of their claim, sufficient to support the grant of a preliminary injunction.

The majority holds, for example, that "[P]laintiffs did not demonstrate that the mere fact of their detention amounted to deliberate indifference,"[7] Opinion at 61, such that the government's custody review policy at the time could be considered unconstitutional reckless disregard of potential medical injury. But the district court did not hold that continued detention itself demonstrated reckless disregard of the safety of medically vulnerable detainees during the pandemic. Instead, the district court's findings—and order—focused on the failure to articulate a mandatory individual review requirement for each member of the limited, medically vulnerable Plaintiff subclasses to determine *whether* temporary release was appropriate under ICE's own release standards.

With regard to the underlying finding regarding the level of risk—again, an essential aspect of determining whether any failure to cabin that risk was "reckless"—the district court found that 15% of subclass members would die if they contracted COVID-19, *Preliminary Injunction*, 445 F. Supp.

---

[7] The post-*Kingsley* case law continues to use the term "deliberate indifference," *see, e.g.*, *Gordon*, 888 F.3d 1118, 1124–25 (9th Cir. 2018); *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1069–70 (9th Cir. 2016), despite its origination in the Eighth Amendment subjective standard cases, *e.g.*, *Whitley v. Albers*, 475 U.S. 312, 320 (1986); *Hudson v. McMillian*, 503 U.S. 1, 6 (1992), and even though the term seems to incorporate the subjective component (that the "indifference" was "deliberate"). I use "reckless disregard" here and suggest that we stop using the misleading "deliberate indifference" rubric in cases involving pretrial or civil detention Fifth or Fourteenth Amendment challenges.

3d at 722, 744, which was significantly more likely while they remained detained.[8]

Notably, the government does not contend that the district court's factfinding as to the level of risk to which medically vulnerable detainees are exposed was clearly erroneous. Given that level of risk, the government was required to take "reasonable available measures to abate th[e] risk," *Gordon*, 888 F.3d at 1125, which stemmed directly from the congregate nature of detention. Issuing an advisory policy for field agents with regard to reviewing the continued detention of medically vulnerable people, *see* pp. 101–104, *infra*, does amount to reckless disregard for subclass members' health and safety—or at least the district court did not abuse its discretion in so concluding.

The majority's dismissal of *Roman* as not pertinent here notwithstanding, Opinion at 67–69, *Roman* strongly supports this conclusion. In *Roman*, we agreed with the district court, *see* 977 F.3d at 943, that detaining people in a too-crowded detention facility without proper sanitation exposed them to a "substantial risk of suffering serious harm" from COVID-19, *Gordon*, 888 F.3d at 1125. For support, *Roman* pointed to *Helling*, 509 U.S. at 35, which it described as "holding that the health risk posed by a prison inmate's involuntary exposure to second-hand smoke could form the basis of a claim that the government was violating his right to reasonable safety." *Roman*, 977 F.3d at 943–44.

---

[8] It is possible that *since* April 2020, developments such as a more sophisticated understanding of COVID-19 and the availability of a vaccine mean that this estimated fatality rate is no longer accurate. The shifting nature of the pandemic is precisely why I strongly disagree with the majority's insistence on deciding a case that the parties would now prefer to mediate. *See* note 4, *supra*.

And again the *Fraihat* subclass members—compared to the *Roman* plaintiffs—faced a heightened risk of harm because the *Fraihat* subclass included *only* those who were already medically vulnerable to COVID-19—not, as in *Roman*, all detainees.[9]

In addition to holding that the risk of harm to *all* detainees from COVID-19 exposure during immigration detention was serious, *Roman* held it was not an abuse of discretion for the district court in that case to conclude that ICE's conduct at the time the injunction issued was "objectively unreasonable," *Gordon*, 888 F.3d at 1125 (quoting *Castro*, 833 F.3d at 1071), such that ICE "violated detainees' due process right to reasonable safety," *Roman*, 977 F.3d at 943. The majority holds that because "the guidance ICE issued [concerning detention conditions] applied to *all* detainees, which included those at greater risk from COVID-19," "[t]he government's chosen approach does not reflect deliberate indifference." Opinion at 59. But the undisputed record shows subclass members are not similarly situated to all other persons detained. In fact, subclass members are uniquely vulnerable to COVID-19, and the government must take "reasonable available measures to abate *that* risk." *Gordon*, 888 F.3d at 1125 (emphasis added).

\*   \*   \*

In sum, the rubric that is the appropriate one here, is whether the "balance of hardships . . . tips sharply towards the plaintiff[s]." *All. for the Wild Rockies*, 632 F.3d at 1135. The district court did not abuse its discretion in concluding

---

[9] One of Plaintiffs' experts declared that a person aged 50–59 years without underlying medical conditions had a 1% "case fatality rate."

that it does. As in *Roman*, the district court appropriately concluded that the Plaintiffs "were likely to suffer irreparable harm absent relief given COVID-19's high mortality rate," 977 F.3d at 944. And, for the reasons I have explained, the issuance of an injunction accorded with the public interest, and there were at least "serious questions" going to the merits of the plaintiff's reckless disregard Fifth Amendment claim.

## IV.

So, the district court did not err in concluding it could properly issue *some* preliminary injunction. The question that remains is whether the district court abused its discretion by ordering the specific terms of the April 2020 injunction. I am convinced that it did not.

The majority maintains that the district court abused its discretion in issuing a preliminary injunction in April 2020 because, according to the majority, even if ICE was "slow out of the gate" in addressing COVID-19, "ICE's national policies at the time of the injunction did not reflect deliberate indifference." Opinion at 54. More specifically, the majority suggests that, by April 2020, ICE had already "take[n] reasonable available measures to abate th[e] risk" of COVID-19 to subclass members, *Gordon*, 888 F.3d at 1125, pointing out that, by then, "ICE policies . . . had already led to the release of many detainees." Opinion at 63.

What the district court actually found was that ICE had released 693 individuals since March 2020 based on medical vulnerabilities. *Preliminary Injunction*, 445 F. Supp. 3d at 727. At the time, ICE had more than thirty thousand people in custody. *Id*. at 725. That 693 individuals were released is no measure of whether ICE's release review policy had reached and was going to reach all endangered

members of the Plaintiff subclasses. The district court's order that ICE affirmatively require prompt detention reviews of the particularly vulnerable subset of detainees in the Plaintiff subclasses, and that it enforce the requirement, was designed to assure that the number of medically vulnerable individuals released reflected the application of ICE's own standards for release to the high risk presented, not local intransigence or foot-dragging.[10]

The majority considers that the district court's injunction might have been justified if the Pandemic Response Requirements had not been mandatory. Opinion at 69. But it rejects this justification because, in its view, "the April 10, 2020 Pandemic Response Requirements *were* mandatory." *Id.* (emphasis added). The majority inaccurately asserts that "the district court acknowledged" that the PRRs were mandatory. *Id.* But the majority points to the district court's statement, in quotation marks, that the April 10, 2020 Pandemic Response Requirements *purported* to "set forth 'mandatory requirements' for all facilities housing ICE detainees." 445 F. Supp. at 724 (quoting PRR). In fact, the PRR's concrete terms regarding custody reviews, and the specific language it uses to convey those terms to ICE facilities, belie the majority's suggestion that the terms were likely to be understood as mandatory.

The processes the PRR laid out regarding custody reviews afforded ICE broad discretion. The PRR does not

---

[10] As it turned out, six months later the district court found "a pattern of noncompliance or exceedingly slow compliance," *Supervisory Order*, 2020 WL 6541994, at *13, vindicating the district court's earlier apprehension about "Defendants' halting start to pandemic response" and its conclusion that "Defendants have not . . . shown that delays or non-enforcement of ICE facility-wide policies will cease." *Preliminary Injunction*, 445 F. Supp. 3d at 750.

impose a time limit by which custody reviews of medically vulnerable detainees must take place. It advises facilities to notify Enforcement and Removal Operations ("ERO") "in no case more than 12 hours after identifying any detainee" who is "potentially . . . at higher-risk for serious illness from COVID-19." But there is no requirement that the review itself take place expeditiously; it specifies no time period at all. Upon notification, the PRR specifies, "ERO will review the case to determine whether continued detention is appropriate." That description is followed by a citation to the April 4, 2020 Detained Docket Review Guidance. The custody review the PRR specifies is thus the same as the review laid out in the previous guidance, the Detained Docket Review Guidance.

That guidance is replete with advisory language no one contends is mandatory. And in fact, the language the Detained Docket Review Guidance uses to describe the custody review process is unlikely to be understood by readers as conveying an imperative; the language amounts, at most, to exhortations that ICE facilities take specified action. In the section regarding custody reviews, for example, the Detained Docket Review Guidance uses encouraging, advisory language such as "should," not directive terms such as "must" and "shall."

Elsewhere, with regard to other conditions both guidance documents refer to what "must," be done, what facilities are "directed" to do, and what branch offices are "required" to do—regarding. *See, e.g.*, Pandemic Response Requirements at 8, 12 (staff member obligations), 9 (signage requirements), 15 (notifying ICE of case rates), 16 (food safety hygiene requirements), 9 (hand hygiene requirements). The contrast is evident. Where guidance does not state "'must' or 'shall' . . . but merely that [an actor]

'should'" take some action, such language affords discretion. *United States v. Navarro-Vargas*, 408 F.3d 1184, 1205, (9th Cir. 2005) (en banc). Just so here.

Given the language used regarding custody review and the internal contrasting language, the district court did not abuse its discretion in concluding the Pandemic Response Requirements would not be understood as mandatory with regard to reviewing custody, and in issuing an injunction to compel ICE to issue actual directives requiring timely custody reviews of members of the Plaintiff subclass, and to enforce them.

The majority similarly explains that it vacates the preliminary injunction's requirement to articulate minimum detention standards for subclass members in part because "ICE was updating its policies during the [April 2020] preliminary injunction proceedings and mid-pandemic," including the April 10th "Pandemic Response Requirements." Opinion at 55.[11] But the result of this "updating," at the time the injunction issued, was a moving target of enunciated policies strewn about with precatory language. Those documents advised: detention facilities should implement measures to facilitate social distancing "to the extent practicable"; detention "facilities *should consider* cohorting daily intakes"; "*[e]fforts* should be made" to reduce capacity of people detained; people should be detained in individual rooms "to the extent possible"; "strict

---

[11] Despite the preliminary injunction, it was still the case six months later that "[u]nder each PRR iteration, a 70-year-old with multiple Risk Factors w[ould] be held in essentially the same conditions as a 20-year-old, 'ideally' with further accommodations once they bec[a]me infected or [had] been in close contact with COVID-19." *Supervisory Order*, 2020 WL 6541994, at *7.

social distancing *may not be possible* in congregate settings such as detention facilities"; and "*[i]deally*, ill detainees should not be cohorted with other infected individuals." The injunction did not override or disregard ICE's efforts or impose the district court's own pandemic detention protections. Instead, it afforded discretion and control to ICE, requiring that ICE "supplement" its existing guidance with a carefully considered set of standards that could be clearly communicated to each detention center and enforced by ICE. *Preliminary Injunction*, 445 F. Supp. 3d at 751.

Additionally, the majority makes much of the fact that the PRR mandated ICE facilities adopt the CDC guidelines for detention facilities, deeming that overlap "[m]ost notabl[e]." Opinion at 56. But *Roman* subsequently held the CDC guidelines "do not provide a workable standard" because of a "lack of specificity" and "key" "vague[]" "caveats, such as that its recommendations 'may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions.'" 977 F.3d at 946. Given these features, *Roman* remarked, "it is no surprise that the parties . . . disagree about what the CDC guidance means." *Id.* The majority strains to minimize *Roman*'s conclusion, reminding us that *Roman* concluded only that the CDC Guidelines were unworkable for a preliminary injunction, not "unworkable as national policy, which is how ICE is using them here." Opinion at 58 n.7. True. But this observation does not impede my own conclusion, which naturally follows. The reasons the CDC Guidelines were "a poor guidepost for mandatory injunctive relief" are precisely the same reasons the guidelines cannot save the PRR: the guidelines were vague and nonmandatory, admitting of "adapt[ation] based on individual facilities'" needs. *Roman*, 977 F.3d at 946. Finally, the majority harps on what it characterizes as the "sweeping" "nationwide

relief" the district court ordered that "effectively place[d] this country's network of immigration detention facilities under the direction of a single federal district court." Opinion at 11–12, 66, 9. COVID-19 was and is a nationwide problem. ICE's control of detention centers is nationwide. ICE's policies thus apply nationwide. Plaintiffs could not have challenged an ICE policy specific to the detention centers that housed them because ICE's policies are not detention-center specific. The district court's injunction did not create a nationwide policy; it mandated only that *ICE* change its *own* nationwide policies. The injunction did not specify any particular standards for any particular facilities—or, indeed, any standards at all, as it only required ICE to have and enforce its own standards.

One measure of the reasonableness of the injunction the district court issued in April is a comparison with the advice provided in *Roman* regarding ordering detainees released. The district court in *Roman* had "imposed a moratorium on [the] receipt of new detainees . . . [and] ordered the facility's detainee population to be reduced to a level that would enable social distancing," among other things. 977 F.3d at 939. *Roman* explained,

> If the district court determines, based on current facts, that particular measures are necessary to ensure that conditions . . . do not put detainees at unreasonable risk of serious illness and death, it may require such measures. The district court may, for example, require . . . a reduction in the population to a level that would allow for six-foot social distancing, if it concludes th[at] action[] [is] necessary to bring the conditions to a constitutionally adequate level.

FRAIHAT v. USICE                                    107

*Id*. at 945–46.

Here, the district court did *not* order the mass release of
the particularly vulnerable subclass members in April 2020.
Although the majority characterizes the district court as
"compell[ing] release of detainees," Opinion at 61, in fact
the April injunction required only that ICE assure the review
of subclass members' continued custody according to its
own standards for release; there was no compelled release
here. Instead, the district court ordered a prompt,
comprehensive, enforceable *review* of whether each subclass
member should remain in custody, based on ICE's own
standards for release (its Detained Docket Review
Guidance). *Preliminary Injunction*, 445 F. Supp. 3d. at 751.
So the majority is just wrong when it says that the relief
provided in this case was "far greater" than the relief
approved in *Roman*; in fact, it was considerably narrower.
Opinion at 68. The district court did not abuse its discretion
with regard to requiring individualized custody reviews.

At oral argument, the government pointed to the
requirement that it adopt detention and release standards
specifically for subclass members—that is, the medically
vulnerable detainees—as a particular burden. It is hard to
see why it is more burdensome to review a subgroup of
detainees for release than to review all of them, or more
burdensome to promulgate isolation and quarantine
provisions for a subgroup of detainees than for all detainees.
It may, for example, prove difficult to prescribe individual
rooms, not cohorting, for isolating or quarantining *all*
detainees, but practical to do so for medically vulnerable
individuals. Moreover, the specific release and detention
condition standards were left to Defendants. The district
court provided the government the very flexibility the
majority emphasizes is important, and limited even the

flexible requirements to the Plaintiff subclasses, not all detainees. *See* Opinion at 52, 61. It was up to the government to determine which preventative measures were most appropriate for medically vulnerable detainees.

## V.

The majority nonetheless "reverse[s] the preliminary injunction." Opinion at 78. It also "direct[s] that all orders premised on it be vacated." *Id.*

As to this latter edict, according to the majority, "[t]he district court's class certification ruling depended on, and was in service of, its preliminary injunction." *Id.* at 45. Thus, "the class certification order necessarily falls . . . regardless of whether class certification was otherwise proper."[12] *Id.*

I do not see why that is so. Although it is true that, under *Paige v. California*, 102 F.3d 1035 (9th Cir. 1996), "we could not *uphold* [the preliminary injunction] without also upholding the certification of the class," *id*. at 1039 (emphasis added), and thus, *if* the class certification order was infirm, *then* the preliminary injunction might be as well, the majority does not uphold the preliminary injunction. Further, *Roman* vacated provisions of a preliminary injunction related to COVID-19 in federal immigration detention, just as the majority does here, while *upholding* the

---

[12] I agree with the majority that "we have jurisdiction" to review the district court's provisional class certification order, Opinion at 45, even though the government did not seek permission to appeal that under Federal Rule of Civil Procedure 23(f), because the class certification order "is inextricably bound up with the grant of the interim injunction," *Paige v. California*, 102 F.3d 1035, 1039 (9th Cir. 1996).

district court's provisional class certification order. 977 F.3d at 944–45.

Whether the *Fraihat* subclass certification is proper depends on Federal Rule of Civil Procedure 23. *Roman* provides strong evidence that such certification was proper. *See id.* at 944. As the majority does not provide a contrary Rule 23 analysis, there is no reason the district court must repeat its own, and the majority opinion should not be read to suggest otherwise.

## VI.

I am convinced that the district court did not err in determining that circumstances were potentially life-threatening for subclass members; that issuing an injunction would be in the public interest; and that Plaintiffs raised serious questions on the merits of their reckless disregard claim in light of these facts. The majority is nonetheless alarmed by the modest, deferential, preliminary injunction. Contrary to the majority's suggestion, the district court's remedy does not place all federal detention facilities under its control nor purport to set policy. The injunction directs *ICE* to craft, implement, and enforce *its own policies*, adequate to meet the needs of the medically vulnerable members of the Plaintiff subclasses. As neither issuance of a preliminary injunction to address a developing dire situation nor the terms of the deferential injunction issued were an abuse of the district court's discretion, I respectfully, but vigorously, dissent.